COPY

IN THE UNITED STATES DISTRICT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ROBIN BABOVEC, As Special Administratrix
of the Estate of Casey Babovec, Deceased,

Plaintiff,

-vs-

DEPUTY AND OFFICERS MIKE RICHARDS,
TONYA PARKER, CALVIN REED, SAM
GRIFFIN, DION McGUIRE, RYAN McKINLEY,
DAVID FENTON, JAMES PAYNE, NANCY
SHELLNUT, BRUCE PENNINGTON, JOHN and
JANE DOES I-V, COUNTY OF SALINE,

Defendants.

No. 4:13CV0699KGB



VIDEOTAPED DEPOSITION OF BRUCE PENNINGTON

TAKEN ON BEHALF OF THE PLAINTIFF

ON OCTOBER 22, 2014, BEGINNING AT 12:49 P.M.

IN FAYETTEVILLE, ARKANSAS

APPEARANCES

on behalf of the PLAINTIFF

**Mr. James F. Swindoll**
LAW OFFICES OF JAMES F. SWINDOLL
212 Center Street, Ste. 300
Little Rock, Arkansas 72201
501-374-1290
jswindoll@swindolllaw.com

(Appearances continued on next page.)

REPORTED BY:  Shannon S. Harwood, CSR

**CORPORATE OFFICE:** 511 Couch Drive, Suite 100 • Oklahoma City, OK 73102

## PROFESSIONAL REPORTERS

**TULSA, OK**
918.583.8600   405.272.0559 FAX

**OKLAHOMA CITY, OK**
405.272.1006   405.272.0559 FAX

**FAYETTEVILLE, AR**
479.587.1006   877.272.0559 FAX

**LITTLE ROCK, AR**
501.414.0863   877.272.0559 FAX

**TOLL FREE 800.376.1006**

**www.PROREPORTERS.com**

Babovec vs. Deputy & Officers Of The County Of Saline          Bruce Pennington

1   **APPEARANCES (Continued)**

2   **on behalf of the DEFENDANTS**

3   **Mr. James F. Swindoll**
    **LAW OFFICES OF JAMES F. SWINDOLL**
4   **212 Center Street, Ste. 300**
    **Little Rock, Arkansas 72201**
5   **501-374-1290**
    **jswindoll@swindolllaw.com**

6

7

8                          **I N D E X**

9                                                    **Page**

10  **Direct Examination by Mr. Swindoll**              **4**

11

12                        **EXHIBITS**

13  **Exhibit          Description**

14  **1. Practices and procedurs index**               **5**

15  **2. Section 1**                                    **6**

16  **3. Section 3**                                    **7**

17  **4. Organizational structure**                     **7**

18  **5. Section 7**                                   **10**

19  **6. Custody philospy**                            **12**

20  **7. Inmate rights**                               **12**

21  **8. Conducted energy weapons**                    **14**

22  **9. Injured/sick persons**                        **18**

23

24

25

Babovec vs. Deputy & Officers Of The County Of Saline          Bruce Pennington

1              **STIPULATIONS**

2

3          It is hereby stipulated and agreed by and

4    between the parties hereto, through their respective

5    attorneys, that the deposition of BRUCE PENNINGTON may

6    be taken pursuant to agreement and notice and in

7    accordance with the Federal Rules of Civil Procedure on

8    October 22, 2014, at the offices of 300 North College,

9    Fayetteville, Arkansas, before Shannon S. Harwood, CSR.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Babovec vs. Deputy & Officers Of The County Of Saline         Bruce Pennington

1          THE VIDEOGRAPHER:  This is the videotaped

2    deposition of Bruce Pennington, in the matter of Babovec

3    versus Deputy and Officers of the County of Saline.

4    This deposition is being held at 300 North College

5    Avenue in Fayetteville, Arkansas, on October 22nd, 2014.

6    We are on the record at 12:49 p.m.

7         Will counsel please state your appearances for the

8    record?

9          MR. SWINDOLL:  I'm James Swindoll and I'm here

10   for the Babovec family.

11          MR. ELLIS:  Gorge Ellis for the Defendants.

12          THE VIDEOGRAPHER:  The court reporter will now

13   swear in the witness.

14   WHEREUPON,

15                    BRUCE PENNINGTON,

16   after having been first duly sworn, deposes and says in

17   reply to questions propounded as follows, to-wit;

18                    DIRECT EXAMINATION

19   BY MR. SWINDOLL:

20        Q.    Would you give us your full name, please?

21        A.    Bruce Dale Pennington.

22        Q.    Okay.  Sheriff Pennington, I'll call you

23   during your deposition, because we'll be talking about a

24   time when you were sheriff --

25        A.    Yes.

1      Q.    -- could you just tell us the time in which

2  you were sheriff, the beginning and end so we know

3  that's the period of time we're talking about?

4      A.    Okay.  I became a sheriff in 2009 and I

5  retired in 2013.

6      Q.    Okay.  All right.  So between 2009 and 2011,

7  you were the sheriff of Saline County?

8      A.    Yes, I was.

9      Q.    You were the chief executive law enforcement

10  officer in the county?

11      A.    Yes, sir.

12      Q.    You were in charge of the jail?

13      A.    Yes, sir.

14      Q.    You promulgated a number of policies and

15  practices during your term there; did you not?

16      A.    Yes, sir.

17      Q.    I'm going to show you a table of contents.

18          MR. SWINDOLL:  Here's one for you, Bucky.

19      Q.    (By Mr. Swindoll)  And see if that's the

20  practice and procedures index.

21      A.    Yes, sir, it is.

22      Q.    Okay.  And the reason I add that -- and I'm

23  going to make that Exhibit 1 to the deposition -- is

24  these were the areas in your procedures, practices and

25  policies that the deputies were to look at when they

1    were employed in Saline County; is that correct?

2         A.   That's correct, sir.

3         Q.   Okay.  And they were to follow the guidelines

4    set out in these directives?

5         A.   Yes, sir.

6         Q.   Okay.  And what I'm doing is I'm going to get

7    all the documents and go with those and then we'll come

8    back and start talking, so I just -- this will be

9    Exhibit Number 1.

10             MR. ELLIS:  No objection to any of them that I

11   know of.

12             MR. SWINDOLL:  No, no, you gave them to me.

13             MR. ELLIS:  They all from me?

14             MR. SWINDOLL:  Yeah.

15             MR. ELLIS:  Okay.

16        Q.   (By Mr. Swindoll)  Number 2 is section 1 in

17   there and I just want to look at that for a minute, and

18   that's why I knew that was Section 1 of the manual that

19   we're talking about, right?

20        A.   Yes, sir.

21        Q.   Okay.  Let's mark that as 2.  Now, let's mark

22   that so we don't lose -- let me do that too.  Looking at

23   Exhibit Number 2, it reminds me of a question that's

24   been on my mind.  Does every deputy get a copy of this

25   book when they come to work for you?

1        A.    Yes, sir.

2        Q.    Okay.  Okay.  Number 3 is Section Number 3 in

3    that manual and I want you to look at that and see if

4    it's so.  Okay.  That's Page 3.1.  I've marked it as

5    Exhibit 3.  Sheriff Pennington, is that a prologue,

6    Section 3, to the manual that you and I have been

7    describing and discussing?

8        A.    Yes, sir.

9        Q.    Okay.  Show you Number 4.  I think this is

10    Section 6 of that manual and it sets out the

11    organizational structure inside your department; is that

12    correct, sir?

13        A.    Yes, sir.

14            MR. ELLIS:  Excuse me, mine says Section 5.

15            MR. SWINDOLL:  Does it?  I might have --

16            MR. ELLIS:  My table of contents does.

17            MR. SWINDOLL:  Okay.

18            MR. ELLIS:  But it says Section 6 on the

19    document.

20            MR. SWINDOLL:  Yeah, yeah, I'm just looking at

21    the document.  Section 6.

22            MR. ELLIS:  Gotcha.

23        Q.    (By Mr. Swindoll)  So that I just want to

24    understand it for a minute, that it did set out that,

25    didn't it?  Where is the jail on this process?  Is

1    lieutenant in detention?

2          A.    This part.

3          Q.    Yes.

4          A.    Is the jail.

5          Q.    Okay.  The whole part is?

6          A.    Yes, sir.

7          Q.    Okay.

8          A.    With the exception of administrative

9    lieutenant or chief deputy finance and office personnel,

10   but underneath lieutenant and the jail?

11         Q.    Yeah.

12         A.    Is the jail itself.

13         Q.    Okay.  Great.  It shows chief deputy between

14   you and the lieutenant in detention.  Who would have

15   been your chief deputy?

16         A.    It would have been Bill Field, F-I-E-L-D.

17         Q.    And who would have been your lieutenant in

18   detention?

19         A.    I'm trying to -- what year are we looking at?

20         Q.    2011 is when this event occurred -- no --

21   yeah, '11, yeah, it's '14 today.

22         A.    I'm thinking it was Ray Pennington.

23         Q.    Okay.

24         A.    I know it was.

25         Q.    Is he -- is he related to you?

```
 1          A.    None at all.

 2          Q.    Interesting.

 3          A.    Yes, it is.

 4          Q.    And then the sergeant in detention would have

 5    been?

 6          A.    Mike Richards.

 7          Q.    Okay.  And then is there more than one

 8    corporal at the jail?

 9          A.    Yes.

10          Q.    That's what I was thinking.

11          A.    There -- matter of fact, there's four.

12          Q.    Four corporals.  Okay.  And can you call their

13    names, by any chance?

14          A.    I don't know who they are now.

15          Q.    Now.  No, but I mean at the time, do you

16    remember?  And I won't hold you to it if it's wrong.

17    I'm just trying to get the names so we can talk about

18    them.

19          A.    Shellnut, and I can't remember the other

20    three.  I don't know why I remembered her.

21          Q.    Okay.  And then detention officers are the

22    people who actually handle the detainees and the

23    inmates; is that right?

24          A.    That's correct.

25          Q.    Now, do I understand, and I'm just learning
```

1    about law enforcement, that these are non-certified

2    positions?

3          A.    In the -- in the detention facilities?

4          Q.    Yes.

5          A.    That's correct.

6          Q.    Okay.  So that is going to be Number 4.

7    Exhibit Number 5, could you tell us what those are, sir?

8          A.    They are general orders.

9          Q.    For a guy who is unfamiliar with law

10   enforcement, tell me the effect of a general order,

11   Sheriff Pennington.

12         A.    Well, what it does, it just sets out basically

13   protocol on how the individuals should act or react

14   and --

15         Q.    It's pretty detailed.  You go into --

16         A.    Well, go just like Order Number 2, you know,

17   it's includes the constitutional law.

18         Q.    Uh-huh.

19         A.    And then 3 is Training and Officer Judgment.

20   4 is Punishment Prohibited.  6 is Equal Protection.  7

21   is Public Service Report, Procedural Due Process.  8 is

22   Use of Force.  9 is Deadly Force.  10 is Reasonable

23   Cause to Believe.  11 is Pre-Arrest Contacts, Reasonable

24   Suspicion.  12 is Particularized Belief For Objective

25   Basis.  13 is Due Process, and 14 is Maximum Jail

1    Policy.

2          Q.    Yes.   The general rules seem to me -- and I

3    may not be right about this.   They seem to me to be

4    focused on the part of the jail.   Is that accurate?

5          A.    It would also include the jail, but this was

6    in each manual that was given to --

7          Q.    Okay.

8          A.    -- patrol deputies, CID and warrants and

9    everything.

10         Q.    You would have expected all of your deputies

11   to be aware of your general orders, wouldn't you?

12         A.    One thing that I had the command staff do,

13   like a new employee --

14         Q.    Uh-huh.

15         A.    -- or when they issued them their manual --

16         Q.    Uh-huh.

17         A.    -- policy and procedure manual, in a certain

18   amount of time period, they would have to bring it back

19   to their supervisor and they would initial the pages to

20   show them that they read them.

21         Q.    And then you can go back to it later from the

22   file, pull it, and say, did you initial this, sir?

23         A.    That's right, so why did you do that?

24         Q.    Yes.   Okay.   So they would have been shown to

25   everybody who was in the jail who was employed by you?

Babovec vs. Deputy & Officers Of The County Of Saline          Bruce Pennington

1    A.    Yes, sir.

2    Q.    And they would have expected -- you would have

3  expected all of the personnel in the jail to know and

4  obey these general orders?

5    A.    Yes, sir.

6    Q.    Number 6 is called a Custody Philosophy.  If

7  you would explain to me the purpose of Exhibit Number 6?

8    A.    Well, the whole philosophy I had is basically

9  that the faculty staff will maintain the constitutional,

10  secure and humane detention of arrested persons who are

11  in custody.

12    Q.    Uh-huh.

13    A.    In a nutshell.

14    Q.    Okay.  And this would have been a policy that

15  would have been in effect in 2011, and in fact, would

16  have been in effect during your entire term as sheriff;

17  is that right?

18    A.    Correct.

19    Q.    And you would have expected your -- not your

20  inmates.  You wish your inmates would, but you would

21  have expected your employees to understand this policy

22  and to implement it in their actions?

23    A.    Yes, sir.

24    Q.    I'm marking Number 7, which is called Inmate

25  Rights, I'm wondering if you could explain what that --

1     the purpose of the inmates rights is?

2         A.    Well, basically that, you know, they will have

3     reasonable cause for the courts, access to their

4     attorney, permitted to worship or meditate at a

5     reasonable time --

6         Q.    Uh-huh.

7         A.    -- right to humane treatment.  Inmates have a

8     right to be secure from self-incrimination.

9         Q.    Uh-huh.

10        A.    And at the time of intake, the inmate shall be

11    afforded an opportunity to make a reasonable number of

12    phone calls at the inmate's expense.

13        Q.    Those are the considerations that are part of

14    the inmates rights?

15        A.    Correct.

16        Q.    Now, one of these had "Inmates have a right to

17    be secure from self-incrimination and shall not be

18    subjected to unlawful attempts to obtain statements or

19    confession while they are incarcerated."  What does that

20    mean, sir, that's number 6, I think?

21        A.    "Inmates have a right to be secure from self-

22    incrimination," is that the one?

23        Q.    Uh-huh, yes.  It's the second part of that.

24        A.    "And shall not be subjected to unlawful

25    attempts to obtain statements," well, in other words,

1    you cannot unlawfully obtain information for the purpose

2    of a case.

3        Q.    Okay.

4        A.    You know --

5        Q.    So you can't --

6        A.    -- you can't coerce them.

7        Q.    You can't treat them inhumanely in order to --

8        A.    No.

9        Q.    Okay.  Thank you.  Conducted Energy Weapons,

10    Number 8.

11            MR. ELLIS:  It's what?

12            THE WITNESS:  Tazer.

13            MR. ELLIS:  Tazer.

14        Q.    (By Mr. Swindoll)  Tazers.  There you are.

15    Put that one on there.

16            MR. SWINDOLL:  And I'll give you one, Bucky.

17        A.    In my -- I am going to say this in regard to a

18    Tazer --

19        Q.    (By Mr. Swindoll)  Yes.  Yes.

20        A.    -- I know when I was a patrol sergeant at the

21    sheriff's office --

22        Q.    Yeah.

23        A.    -- and I was chosen to attend Tazer school so

24    I could become an instructor.

25        Q.    Yeah.

1      A.   Well, I'm retired from the state police and,

2   you know, was a sergeant with the state police and I

3   thought, that can't be that painful.  Well, let me tell

4   you, when they shot me with that -- well, they first

5   asked me, how long do you want to go?  I said, I want

6   the full ride, which is five seconds.

7      Q.   Yeah.

8      A.   During that five seconds, I could have gone to

9   the grocery store, to the hospital, I mean, that was the

10  longest five seconds.

11     Q.   It was the longest five seconds.

12     A.   But when it cycles and it goes off --

13     Q.   Nothing?

14     A.   -- nothing.

15     Q.   Okay.

16     A.   But of course, I went to pepper spray school,

17  too, and that's a whole lot worse, by far.

18     Q.   Has a lot longer residual?

19     A.   Oh, yes, it does.

20     Q.   I gotcha.  If Tazers are used properly, they

21  are a good law enforcement weapon.

22     A.   I guarantee you.  I couldn't tell you how many

23  times I stood on the side of the road as a state trooper

24  fighting, of course, you know, we had those pancake

25  slappers in those days.  That would do a pretty good

1    trip, but the Tazer has been -- as you said, if it's

2    used properly, best tool law enforcement has.

3            Q.    Yeah.   There are two kinds of applications for

4    the Tazer, right?   One I read is called dry?

5            A.    Dry.

6            Q.    Straight up against the -- and the other is

7    with the darts?

8            A.    Uh-huh.

9            Q.    And the Tazers that you have the capability to

10   do both?

11           A.    Both.

12           Q.    That's that S26 or S27?

13           A.    Uh-huh.

14           Q.    Let's talk for just a minute since it is

15   Number 8, in order to use a Tazer in your department,

16   people have to be trained and have to be approved to use

17   Tazers, don't they?

18           A.    That's correct.

19           Q.    Why is that?

20           A.    Well, first and foremost, like any training,

21   you know, the purpose behind it is to train and instruct

22   that individual to be able to use it properly.   And I

23   required anyone who used the Tazer, whether it be in

24   patrol or detention, that they would have to attend the

25   class that Arkansas law enforcement standards approved.

1       Q.     Uh-huh.

2       A.     And that they also had to be tazed.  And the

3    purpose of that is to let them know what it feels like

4    so you don't abuse what you're using.

5       Q.     Right.  Okay.  So if a Tazer is used, you

6    would expect that the user of the Tazer would have

7    attended the school and understand how to use it?

8       A.     That's correct.

9       Q.     Okay.  And you mentioned the five seconds,

10    I've read that.  Explain what that five-second

11    application is and why you don't want to go beyond five

12    seconds.

13       A.     Well, the makers of the Tazer has it cycled.

14    They're the ones that built it and it cycles in five --

15    five seconds.

16       Q.     Oh, I see.

17       A.     And after the five seconds, if they still

18    don't adhere to your commands, well, then, you can light

19    them up again.

20       Q.     Okay.

21       A.     You know.

22       Q.     All right.

23       A.     But it's the maker of the Tazer --

24       Q.     Who sets the five seconds?

25       A.     -- who sets the five seconds.

1      Q.    What about repeated tazing, dry tazing?  Is

2   that a procedure that you would use in your department,

3   and if so, when?

4      A.    If a person has to do it two or three times on

5   the dry, it's because that individual is not adhering to

6   the command, verbal command, and still presents a danger

7   to that officer or other people around him.

8      Q.    Okay.  All right.  Number 9 for us today.

9   Okay.  Could you just tell me what the injured/sick

10  policy is and is it in the manual and what you expect to

11  be done with this?

12     A.    Yes, but first and foremost, it is in the

13  manual, and it's a policy that adheres to taking care of

14  injured persons.

15     Q.    Uh-huh.

16     A.    You know, it sets the ground work just like

17  procedure policy A, if it's a misdemeanor and they're

18  needing to go to the emergency room --

19     Q.    Uh-huh.

20     A.    -- we release them, you know.

21     Q.    Okay.

22     A.    Because that way, the county wouldn't have to

23  bear the burden of expense.

24     Q.    Right.

25     A.    And then talks about deputy's discretion and

1    different circumstances.

2         Q.    Uh-huh.

3         A.    Motor vehicle accidents, explosion.

4         Q.    And this was the policy in effect -- I ask

5    about that because it doesn't seem to have anything in

6    this about the jail and it seems to suggest these are

7    the officers in the field who encounter these kinds of

8    people.  Can you tell me whether you think that as well?

9         A.    I don't know.

10        Q.    It always refers to deputy and I always think

11   they're called jailers or deputies.

12        A.    They are called both.

13        Q.    Okay.

14        A.    You know -- it's just --

15        Q.    Okay.  So you would expect that this policy

16   would also be adhered to in the jail?

17        A.    Yes, sir.

18        Q.    And that if people were injured and in the

19   discretion of the officer or if you could tell that the

20   person is seriously injured, they should go to the

21   emergency room or have emergency care.  Do you agree?

22        A.    That's -- I agree.

23        Q.    Okay.

24             MR. ELLIS:  Just, Mr. Swindoll, if I could

25   interrupt you and I don't want to mess your deposition

1    up, in the jail manual itself, there is a Section G

2    called Health Services.

3              MR. SWINDOLL:  Okay.

4              MR. ELLIS:  Which is specifically applicable

5    to the jail.  I don't think there is anything that is

6    necessarily in conflict with the general document that

7    you're discussing, and I've got a copy of that if you

8    need it.

9              MR. SWINDOLL:  I would like to look at it just

10   to see if I can put it together for us, just so I don't

11   have to worry that I didn't get all the questions I

12   asked.

13             MR. ELLIS:  You'll have to file a question

14   production.

15             MR. SWINDOLL:  Oh.  Well, thank you.  Thank

16   you for that.

17             MR. ELLIS:  Just a minute.  Let me get the --

18   see where it starts and stops.  It's that right there.

19   It's that right there.  They've got their own use -- the

20   jail has its own use of force.

21             MR. SWINDOLL:  Policy.  I see that.  Do you

22   have a separate copy of all these or this --

23             MR. ELLIS:  I just brought one.  It's the only

24   one I brought.  I mean, I've got another set at the

25   office.  You can have that.

1          MR. SWINDOLL:  Okay.

2          MR. ELLIS:  And that's the use -- that's the

3     jail's use of force policy.

4          MR. SWINDOLL:  Yes, I got that one coming up,

5     but I haven't gotten this one.  Just take me a second,

6     it will save us.

7          MR. ELLIS:  Again, I don't think there's a

8     conflict between the two documents, but you might want

9     to confirm that.

10         Q.   (By Mr. Swindoll)  All right.  Looking at a

11    set of documents, I'm going to -- these are jail --

12    whether than me telling everybody what they are, why

13    don't you, Sheriff Pennington, tell us what those are

14    and we'll attach those and make those an exhibit.

15         A.   Well, G1 is subject health services and

16    primary responsibility is for the medical staff, which

17    we did have.

18         Q.   Uh-huh.

19         A.   Nurses, sick call, medical, dental,

20    psychiatric available.

21         Q.   Uh-huh.

22         A.   Inmate medical records will be maintained

23    separate in inmate booking.  G3 is medical response,

24    specifies what they need to be looking for; severe

25    bleeding, unconsciousness, serious breathing

Babovec vs. Deputy & Officers Of The County Of Saline          Bruce Pennington

1   difficulties, head injuries, severe burns, severe pain,

2   sudden onset of behavior -- bizarre behavior or health

3   or life threatening situations.  And then it goes down

4   to -- then the procedure sets up what they will do.

5       Q.   Yeah.

6       A.   G4 is medical call, specifies that they will

7   have to complete a sick call form and return it to the

8   escort, roving deputy or officer, and then it just goes

9   up through the chain to the medical staff.

10      Medication, pharmaceutical medication, which is G5

11  and it just --

12              (Due to power outage, deposition concluded at

13  1:12 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2          I, Shannon S. Harwood, a Certified Shorthand

3     Reporter, do hereby certify that the foregoing is a

4     true and correct transcription of my shorthand notes

5     of proceedings had in Case Number 4:13CV0699KGB heard

6     on the 22nd day of October, 2014, and is only valid

7     with my stamped seal and my original signature.

8          I further certify that I am not related to nor

9     attorney for either of said parties nor otherwise

10    interested in said action.

11         IN WITNESS WHEREOF, I have hereunto set my hand and

12    seal this 29th day of October, 2014.

13

14

15

16

17

18

19

20

21

22

23

24                                  _____

25                                  Shannon S. Harwood, CSR

# SALINE COUNTY SHERIFF'S OFFICE

## Table of Contents

| Page | Content | | Page | Content |
|------|---------|---|------|---------|
| 001 | Welcome | | 053 | Investigation- Motor Vehicle Accidents |
| 002 | Disclaimer | | 054 | Juvenile Procedures |
| 003 | Memorandum | | 055 | Line of Duty Deaths |
| 004 | Mission Statement | | 056 | Media Relations |
| 005 | Organizational Structure | | 057 | Membership in Organizations |
| 006 | General Orders | | 058 | Mobile Audio-Video Equip/Comp |
| 007 | Address & Telephone Numbers | | 059 | Off-Duty Employment |
| 008 | Americans with Disabilities | | 060 | Off-Duty Police Activity/Neighborhood |
| 009 | Applicants – Employees with Disabilities | | 061 | Patrol Functions |
| 010 | Arrest Procedures | | 062 | Police Vehicle – Emergency Operations |
| 011 | Bail Bonds | | 063 | Police Vehicle - Maintenance |
| 012 | Bloodborne Pathogens | | 064 | Police Vehicle - Occupants |
| 013 | Body Armor | | 065 | Police Vehicle – Pursuit Driving |
| 014 | Bomb Threats / Disaster Planning | | 066 | Police Victim Assistance |
| 015 | Canine K-9 Operations | | 067 | Political Activity |
| 016 | Cards – Official – Personal | | 068 | Probation Period |
| 017 | Chain of Command | | 069 | Promotional Procedures |
| 018 | Chemical Irritant Projector | | 070 | Property – Belonging to SO |
| 019 | Communicable Diseases | | 071 | Property - Disposition |
| 020 | Community Relations | | 072 | Psychological and Physical Exam |
| 021 | Computer issues | | 073 | Racial Profiling |
| 022 | Conduct – Abuse of Position | | 074 | Radio Procedures |
| 023 | Conduct – Unbecoming an Employee | | 075 | Recommendation of Services |
| 024 | Conducted Energy Weapons | | 076 | Report – Offense - Incident |
| 025 | Court Procedures | | 077 | Report – Writing Procedures |
| 026 | Crime Prevention | | 078 | Response Outside Jurisdiction |
| 027 | Death – Serious Injury Notification | | 079 | Ride-a-Long Program |
| 028 | Debts | | 080 | Robbery – Bank/Holdup-Alarm Procedure |
| 029 | Domestic Abuse Incidents | | 081 | Search – Execution of Warrant |
| 030 | Emergency Call-Out Procedures | | 082 | Search – Motor Vehicles |
| 031 | Employee Drug Testing | | 083 | Search - Person |
| 032 | Enforcement – Mutual Aid | | 084 | Sheriff's Reserve |
| 033 | Enforcement – Traffic | | 085 | Smoking and Use of Tobacco |
| 034 | Equal Employment Opportunity | | 086 | Spiked Barrier System |
| 035 | Ethics | | 087 | Stolen-Recovered Vehicle |
| 036 | Evidence | | 088 | Telephonic Reports |
| 037 | Firearms Authorization | | 089 | Towing – Wrecker service |
| 038 | Firearms Training and Qualification | | 090 | Training |
| 039 | Folder, Felony Case | | 091 | Training Requirements |
| 040 | Gratuities, Rewards, Witness Fees, Donations | | 092 | Transporting Arrested Persons |
| 041 | Harassment – Workplace | | 093 | Twenty One Standards of Conduct |
| 042 | Hostage Barricaded Subject | | 094 | Uniforms - Grooming |
| 043 | Impartiality | | 095 | Use of Force |
| 044 | Information – Divulging | | 096 | Use of Unmarked Vehicles |
| 045 | Injured – Sick Persons | | 097 | Vehicle Checkpoints and Roadblocks |
| 046 | Insubordination | | 098 | Vehicle Safety Checkpoints |
| 047 | Intensive Criminal Patrol | | 099 | Vicious Animal Enforcement |
| 048 | Intoxicants and Non-Prescribed Drugs | | 100 | Property – Storage (Evidence Locker) |
| 049 | Inventory – Motor Vehicle | | 101 | Sp... |
| 050 | Investigation – Criminal | | | |
| 051 | Investigation – Internal Affairs | | | |

EXHIBIT # 1  1922
DATE
DEPONENT Pennington
PROFESSIONAL REPORTERS  800.376.1006

# SALINE COUNTY DETENTION

## Table of Contents

**PREFACE**            **Employee Rules of Conduct**

**SECTION A**            **ADMINISTRATION, ORGANIZATION AND MANAGEMENT**

J-001            Custody Philosophy
J-002            Table Organization Detention
J-003            Inmate Security / Confidentiality
J-004            Staff and Staff to Inmate Communication
J-005            Personnel Training
J-006            News Media / Public Information
J-007            Patrol Supervision
J-008            General Floor Rules

**SECTION B**            **INTAKE AND RELEASE**

J-009            Booking / Intake
J-010            Classification
J-011            Property
J-012            Inmate Release
J-013            Frisk Search
J-014            Strip Search

**SECTION C**            **INMATE RULES, DISCIPLINE AND RIGHTS**

J-015            Inmate Rights
J-016            Inmate Correspondence / Telephone
J-017            Visitation
J-018            Inmate Rules and Discipline
J-019            Inmate Grievances
J-020            Inmate Hygiene
J-021            Crimes against Facility Staff

**SECTION D**            **INMATE SERVICES AND PROGRAMS**

J-022            Work Detail / Trustees
J-023            Inmate Weddings
J-024            Inmate Services and Programs
J-025            Recreation

## SECTION E                SANITATION AND MAINTENANCE

J-026                Facility Housekeeping
J-027                Sanitation and Safety Inspections
J-028                Maintenance of Facility
J-029                Infection Control
J-030                Cell Inspections
J-031                Inmate Laundry

## SECTION F                FOOD SERVICE

J-032                Food Service Management
J-033                Food Service Health and Safety Compliance
J-034                Menu Planning
J-035                Special Diets
J-036                Control of Kitchen Cutlery Equipment
J-037                Inmate Meal Service

## SECTION G                MEDICAL AND HEALTH SERVICES

J-038                Health Services
J-039                Inmate Death
J-040                Medical Emergency Response
J-041                Medical Call
J-042                Medication / Pharmaceutical Distribution

## SECTION H                SECURITY AND CONTROL

J-043                Force and Restraints
J-044                Entry Port Entrance / Exit
J-045                Control of Contraband
J-046                Key Control and Inventory
J-047                Tool Control and Inventory
J-048                Inmate Transport
J-049                Work-Release Inmates
J-050                Inmate Counts

## SECTION I                SAFETY AND EMERGENCY PROCEDURES

J-051                Fire Safety and Emergency Evacuation
J-052                Bomb Threat / Bomb Explosion
J-053                Escape
J-054                Control of Weapons and Ammunition
J-055                Hostage Plan
J-056                Disturbance / Riot
J-057                Power Failure

**SECTION J**                **OPERATIONS**

| | |
|---|---|
| J-058 | Jail Administrator |
| J-059 | Administrative Sergeant |
| J-060 | Jail Corporal |
| J-061 | Master Control Officer |
| J-062 | Booking Officer |
| J-063 | Escort/Roving Officer |
| J-064 | Control Tower Officer |
| J-065 | Infirmary Officer |
| J-066 | Transport Sergeant |
| J-067 | Transport Corporal |
| J-068 | Transport Officer |
| J-069 | Medication Distribution |
| J-070 | Facility Schedule |
| J-071 | Outside Work Detail |
| J-072 | Inmate Haircuts |

**SECTION K**                **CROSS REFERENCE**

| | |
|---|---|
| J-073 | Cross Reference Policy with Jail Standards |

**SECTION L**                **SALINE COUNTY SHERIFF'S OFFICE POLICY AND PROCEDURE MANUALADDENDUM**

| | |
|---|---|
| J-074 | Objectives and Responsibilities |
| J-075 | General Directives |
| J-076 | Supervisor-Subordinate Relationships |
| J-077 | Arrests and Detention |
| J-078 | Communication, Correspondence, and Records |
| J-079 | Firearms |
| J-080 | Employment Information |
| J-081 | Fraternization |
| J-082 | Cell Extraction |

## SECTION 001

## <u>WELCOME</u>

I am pleased to welcome you as a member of the Saline County Sheriff's Office. This manual is specifically designed to assist you in understanding many of the issues that you may experience. Rules, regulations, policies and procedures are a means of assisting you in your job performance.

Since it is impossible to provide all answers here, and you will have other questions from time to time, your supervisor will be happy to answer your questions when they arise. I ask that you take special care in the performance of your duties and are as proud of yourself as we are proud of you.

May your association with the Sheriff's Office belong and satisfying for you as well as for the citizens of Saline County.

Sincerely,


Bruce Pennington, Sheriff



1.1

## SECTION 003

## <u>MEMORANDUM FROM THE SHERIFF</u>

TO:        ALL MEMBERS OF THE SALINE COUNTY SHERIFF'S OFFICE

FROM:      BRUCE PENNINGTON, SHERIFF

SUBJECT:   POLICY AND PROCEDURES MANUAL

1.    This Saline County Sheriff's Office Policy and Procedures Manual will be in full force and effect on September 20, 2006.

2.    The contents of this manual are applicable to all deputies, and where specified, to all non-certified employees of the Sheriff's Office.  (The term "employee" shall apply to all deputies and non-sworn employees of the Sheriff's Office).

3.    All published general orders, special orders, and administrative instructions not in conflict with this manual shall have the same effect for administrative purposes.  All other documents in conflict with this manual and the previous Policy and Procedures Manuals are hereby canceled.

4.    The contents of this manual, any general or special orders shall not be canceled, amended, or new orders issued without the approval of, and over the signature of the Sheriff.

5.    Failure of an employee to perform the duties of his or her position or assignment, or violation by an employee of any Sheriff's Office rule, regulation, policy, procedure, order or instruction having the effect of a regulation or order, may be considered sufficient cause for termination, demotion, suspension, or other penalty as determined by the Sheriff.



3.1

**Section 006**

## ORGANIZATIONAL STRUCTURE OF THE SHERIFF'S OFFICE





# SECTION 007

## SHERIFF'S GENERAL ORDER NO. 1

### Preservation of the Orderly Pursuit of Happiness by Free Persons

A. **Civil Peace:** No person within Saline County shall at any time be any wise disquieted or called in question by the County Sheriff or his deputies for any differences in opinion not actually disturbing the civil peace. All persons and every person may freely and fully have and enjoy their own judgments and consciences throughout the County so long as they behave themselves peaceably and quietly and do not use their liberty to prohibited licentiousness or prohibited profaneness, nor to the civil injury or outward disturbance of others. *Adapted from* the 1663 Royal Charter for Colony of Rhode Island, 1663.

D. **Order and Security:** The law enforcement powers of the Sheriff and his deputies shall be used for the purposes of maintaining order and preserving security and keeping the peace as reasonably believed (objectively reasonable in light of the facts and circumstances confronting the deputy) to be most meet and convenient for the general good of the County applying the law in a manner that is just (rationally related to a legitimate order or security objective) and equal (uniformly applied to all persons similarly situated). All persons are free to walk and drive the streets and highways and to be present in other public places without interference by the Sheriff or his deputies so long as they are not engaging in *conduct* that is actually disturbing the peace or creating an order or security problem in violation of the law. *Adapted from* the Mayflower Compact, Declaration of Independence, and U.S. Constitution, Amendments 4, 5 and 14.

D. **Life, Liberty and Property:** The law enforcement powers of the Sheriff and his deputies shall be used in a manner recognizing that all persons are created equal and equally endowed by their Creator with the unalienable rights of life, liberty, and property. **"Life"** is not only physical life, but "whatever God has given . . . for ... growth and enjoyment" of life. **"Liberty"** is "the right to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free [persons]." **"Property"** is a "substantial expectancy of receiving a benefit to which one has a claim of entitlement supported by a mutually explicit rule or understanding." *Adapted from* the Declaration of Independence and U.S. Constitution, Amendments 5 and 14; *Munn v. Illinois*, 94 U.S. 113 (1877); *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Perry v. Sniderman*, 408 U.S. 593 (1972) (paraphrased quotation).

E. ***Conduct*** **is the Issue for Law Enforcement Purposes:** The Sheriff and his deputies are prohibited from arbitrarily utilizing race, color [ethnicity], national origin or religion in selecting which individuals to subject to routine investigatory activities, or in deciding upon the scope and substance of law enforcement activity following the initial routine investigatory activity, except reliance on the criteria in combination with other identifying factors when the law enforcement officer is seeking to apprehend a specific suspect whose race, color [ethnicity], national origin or religion is part of the description of the suspect, and the description is thought to be reliable and locally relevant. A person's race, color [ethnicity], national origin or religion, orientation, belief or worldview is not a fact justifying an arrest or a pre-arrest contact unless the person's race, color [ethnicity], national origin or religion, orientation, belief or worldview is an element of "a reasonable cause to believe" [for arrest] that an offense has been or is being committed or is an element of a "reasonable suspicion" [for pre-arrest contact] that an offense has been or is being committed. Act 1207 of 2003; Ark. R. Crim. Pro. Rule 4.1 , *McGuire v. State*, 265 Ark. 621, 580 S.W.2d 198 (1979) and Ark. R. Crim. Pro. Rule 2.1.



## SHERIFF'S GENERAL ORDER NO. 2

### "Official Policy" includes Constitutions and Laws

A.  **Official Policy:** It is the official policy of this agency that all use of governmental authority/power by this agency shall conform to the limitations imposed upon this agency by the constitution and laws of the United States and the State of Arkansas.

B.  **U.S. Constitution:** The official policy of this agency includes the United States Constitution (e.g., the 14th Amendment, Due Process & Equal Protection, and the 4th Amendment, Searches and Seizures),

C.  **U.S. Laws:** The official policy of this agency includes the laws enacted by the United States Congress (e.g., the Civil Rights Act of 1964, the Americans with Disabilities Act, the Family and Medical Leave Act, and the Fair Labor Standards Act) which govern county conduct.

D.  **Arkansas Constitution:** The official policy of this agency includes the Arkansas Constitution (e.g., Article 2, Declaration of Rights).

E.  **Arkansas Laws:** The official policy of this agency includes he laws enacted by the Arkansas General Assembly (e.g., the Arkansas Civil Rights Act, the Arkansas Criminal Code, and the Arkansas Rules of Criminal Procedure).

F.  **Written Protocol:** The official policy of the Sheriff's Office also includes the other "written protocol" as set forth in General Order No. 3, including but not limited to the General Orders of the Sheriff which are intended to articulate appropriate methods of carrying out law enforcement and detention duties, as required by the fundamental requirements of the 4th, 8th and 14th Amendments to the U.S. Constitution, and the Saline County Sheriff's Office Policy and Procedures Manual.

## SHERIFF'S GENERAL ORDER NO. 3

### Written Protocol / Training / Officer Judgment

The written protocol of this agency shall include (in the following order of controlling authority):

A. **The Arkansas Rules of Criminal Procedure:** The rules of criminal procedure incorporate the limitations imposed upon the Sheriff and his deputies by the Constitution and therefore set forth the procedures to be followed by the Sheriff and his deputies.

B. **General Orders:** The General Orders set forth the overall philosophy of operation for the Sheriff's Office.

C. **Post Orders:** The Post Orders are specific written commands given for the performance of a particular function or task assigned to a particular post of operation.

D. **Policy & Procedure Manual:** The Policy and Procedure Manual sets forth the normal routine to be followed by the agency and is to be used as a tool for anticipating situations that might confront a deputy and to provide the deputy with the policy and procedure to normally be followed by the deputy.

E. **Training & Judgment:** Each deputy and each jailer is to act in accord with written protocol but in any event and in all events shall use his or her training and judgment as needed to act with objective reasonableness (with respect to any search or seizure, including any use of force) and without deliberate indifference (with respect to the discharge of any duty to protect a person in custody of the Sheriff's Office or with respect to any person with whom that Sheriff's Office has a special relationship that imposes on the Sheriff an affirmative duty to protect that person).

F. **Operating Guidelines for Law Enforcement Functions:** In the event a search or seizure matter arises (including any use of force) for which there is no written general order, post order, policy or procedure directly on point, then the CJI Model Law Enforcement Policy and Procedures Manual shall be the Operating Guideline for that law enforcement activity of the Sheriff's Office.

G. **Operating Guidelines for Detention Functions:** In the event a duty-to-protect matter arises for which there is no written general order, post order, policy or procedure directly on point, then the CJI Model Detention Facilities Policy and Procedures Manual (which incorporates the Arkansas Jail Standards) shall be used as the Operating Guideline for that detention activity of the Sheriff's Office.

# SHERIFF'S GENERAL ORDER NO. 4

## 14th Amendment / Punishment Prohibited

    **A.  Punishment Prohibited:**  A pre-trial detainee may not be subjected to <u>any</u> punishment.  *Hamilton v. Love,* 328 F.Supp. 1182 (E.D. Ark. 1971).

    **B.  Protection Required:**  The purpose of pre-trial detention is to assure the defendant's presence at trial.  Jail officials and staff shall take affirmative action to adequately to safeguard the physical safety of all jail detainees. No employee of the Sheriff's Office shall act in any manner that is deliberately indifferent to a necessary jail detainee protection need.  *Estelle v. Gamble,* 429 U.S. 97 (1976).

    **C.  Jail Order & Security Reason Required for Restrictions:**  Restrictions on pre-trial detainees and practices of pre-trial detainment must be rationally related to a legitimate non-punitive jail objectives of insuring security and order in the jail and may not be excessive in relation to that purpose.  *Bell v. Wolfish,* 441 U.S. 520, 561 & 662 (1979).

    **D.  General Order No. 1 Incorporated:**  The provisions of General Order No. 1 are incorporated into this General Order No. 4.  The Sheriff and his deputies are prohibited from *arbitrarily* utilizing race, color [ethnicity], national origin, gender, age, disability, orientation, belief, or worldview as a criteria for Sheriff's Office action.

## SHERIFF'S GENERAL ORDER NO. 5

## 14th Amendment / Substantive Due Process

A.  **Rational Relationship to Legitimate Sheriff's Office Objectives:** In accord with the Substantive Due Process Clause of the Fourteenth Amendment, which requires that all County action to be non-arbitrary, all action of the Sheriff and his deputies is to be rationally related to the effectuation of the legitimate governmental objectives of the Office of the Sheriff. 14th Amendment

B.  **Keeping the Peace, Maintaining Ordering, and Preserving Security:** Any law enforcement action by the Sheriff's Office action that subjects a person to the deprivation of any life interest, liberty interest, or property interest must be rationally related to the Sheriff's objectives of keeping the peace, maintaining order, or preserving security.

C.  **General Order Nos. 6, 7, and 8 Incorporated:**  The provisions of General Order Nos. 6, 7, and 8 are incorporated into this General Order.  The constitutionally required standards of "reasonable suspicion" (stop and detain), a "reasonable cause to believe" (arrest), and a "particularized belief and objective basis" (search) precludes stops, arrests, or searches based on criteria impermissibly applied.  In other words, these standards prohibit stops, arrests, or searches based, to any degree, on race, ethnicity, national origin, or religion in selecting which individuals to subject to routine investigatory activities, or in deciding upon the scope and substance of law enforcement activity following the initial routine investigatory activity, except that the criteria of race, ethnicity, national origin, or religion may be relied upon in combination with other identifying factors when the law enforcement officer is seeking to apprehend a specific suspect whose race, ethnicity, or national origin is part of the description of the suspect, and the description is thought to be reliable and locally relevant. Act 1207 of 2003

D.  **General Order No. 1 Incorporated:**  The provisions of General Order No. 1 are incorporated into this General Order.  The Sheriff and his deputies are prohibited from *arbitrarily* utilizing race, color [ethnicity], national origin, gender, age, disability, orientation, belief, or worldview as a criteria for Sheriff's Office action.

# SHERIFF'S GENERAL ORDER NO. 6

## 14th Amendment / Equal Protection / Differences in Treatment

A. **Uniform Treatment of Persons Similarly Situated:** In accord with the Equal Protection Clause of the Fourteenth Amendment, persons similarly situated will be treated in a same or substantially similar manner by the Sheriff and his deputies. In other words, there must be a rational basis for any difference of treatment of persons encountered by *the Sheriff or his deputies and that rational basis must be related to a legitimate order or security objective of the Sheriff's Office.* 14th Amendment

B. **General Order Nos. 6, 7, and 8 Incorporated / Arbitrary Bias Prohibited:** The provisions of General Order Nos. 6, 7, and 8 are 1 are incorporated into this General Order. The constitutionally required standards of "reasonable suspicion"(stop and detain), a "reasonable cause to believe" (arrest), and a "particularized belief and objective basis" (search) precludes stops, arrests, or searches based on criteria impermissibly applied. In other words, these standards prohibit stops, arrests, or searches based, to any degree, on race, ethnicity, national origin, or religion in selecting which individuals to subject to routine investigatory activities, or in deciding upon the scope and substance of law enforcement activity following the initial routine investigatory activity, except that the criteria of race, ethnicity, national origin, or religion may be relied upon in combination with other identifying factors when the law enforcement officer is seeking to apprehend a specific suspect whose race, ethnicity, or national origin is part of the description of the suspect, and the description is thought to be reliable and locally relevant. Act 1207 of 2003

C. **General Order No. 1 Incorporated:** The provisions of General Order No. 1 are incorporated into this General Order. The Sheriff and his deputies are prohibited from *arbitrarily* utilizing race, color [ethnicity], national origin, gender, age, disability, orientation, belief, or worldview for a difference in treatment with respect to Sheriff's Office decisions.

## SHERIFF'S GENERAL ORDER NO. 7

### 14th Am. / Procedural Due Process / Public Service Report / Pre-Deprivation Hearing Process

A.  **Hearing Both Sides of the Story:** In accord with the Procedural Due Process Clause of the Fourteenth Amendment, "notice and an opportunity for hearing" is required before a *final* governmental deprivation of life, liberty, or property" by the Sheriff or his deputies; although "the formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." "The opportunity to present reasons, either in person or in writing, why proposed [governmental] action [that would result in a deprivation of life, liberty, or property] should not be taken is a fundamental due process requirement" to provide an initial check against mistaken decisions -- essentially a determination of whether there are reasonable grounds to believe that the [reasons given by the government for the proposed deprivation] are true and support the proposed action." The "notice and hearing" procedures required for law enforcement activities of the Sheriff's Office (e.g., formal hearing, disinterested tribunal, judicial review, evidentiary rules, discovery rights, right to counsel, sworn trial record, and appeal rights) are set forth in the Arkansas Rules of Criminal Procedure.  For Sheriff's Office conduct not governed by the Ark. Rules of Crim. Procedure, a hearing process will be provided via a Public Service Report process. *Cleveland Board v. Loudermill*, 105 S.Ct. 1487 (1985); Act 1207 of 2003.

A.  **Policy is to Follow the Law:** Because it is the policy of the County to follow the law of both the United States and the State of Arkansas, any person having any reason to believe that the conduct of any employee of the Sheriff's Office is illegal or unconstitutional is encouraged to, and should, file a Public Service Report (and all Sheriff's Office employees are directed to encourage the use of Public Service Reports for the purpose of enabling the Sheriff to use Public Service Reports) as a means for hearing the citizen's side of the story regarding any such complaints.

B.  **Universal Access / Duty to Report:** Any person (including any employee or detainee) may submit a complaint or grievance regarding any activity of the Sheriff's Office.  A complaint or grievance should be presented in writing, but may be presented orally. The complaint or grievance (whether written or oral) should be presented to the recipient's supervisor and passed through the chain of command to the Sheriff, Chief Deputy, and Captain.

C.  **Public Service Report Log:** Each Public Service Report alleging suspected illegal or unconstitutional conduct shall be reduced to writing (using a Public Service Report Form, whether completed by the reporting citizen or by a Sheriff's Office supervisor), shall be entered into the Sheriff's Office Public Service Report Log, shall be timely resolved by written decision of the Sheriff, Chief Deputy, or Captain, and shall be reported to the Internal Complain Review Board if the Sheriff, Chief Deputy, or Captain concludes that there is reason to believe that there has been a violation of the law or the constitution.  The Sheriff has the final decision on all Public Service Reports.

D.  **Opportunity for Hearing:** Any citizen filing a formal Public Service Report form may be offered the opportunity to be heard, so that the citizen has a meaningful opportunity to present all of his or her side of the story. Citizens who file frivolous Public Service Reports will not be offered an opportunity for a hearing.

## SHERIFF'S GENERAL ORDER NO. 8

### 4th Amendment / Use of Force / *Objective* Reasonableness Required

**A.   Objective Reasonableness Required:**  All force used by this agency, regardless of the degree of force used, must be "objectively reasonable" in light of the facts and circumstances confronting the deputy without regard to the underlying intent or motivation of the deputy. A deputy is not to use more force than necessary to accomplish the lawful purpose intended. A deputy's use of "excessive" force is unconstitutional.   Force must be used to protect, not punish!  *Feemster v. Dehntjer*, 661 F.2d 87, 89 (8th Cir. 1981); *Monroe v. Pape*, 365 U.S. 167 (1961).

**B.   Objective Reasonableness Defined:**  All claims that law enforcement officials have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under the 14th Amendment's "rational basis" (substantive due process) standard. Thus, the test is *objective*, not subjective. The 4th Amendment "reasonableness" inquiry is whether the deputies' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. The "reasonableness" of a particular use of force must be judged from the perspective of a *reasonable* deputy on the scene, and its calculus embodies an allowance for the fact that law enforcement officers are often forced to make split-second decisions about the amount of force necessary in a particular situation.  In other words, the question of reasonableness will be viewed prospectively, "standing in the officer's shoes." If the deputy is in an emergency situation requiring a split-second decision, the test of reasonableness will be whether the decision to use the force actually applied was a reasonable decision in that emergency situation requiring a split-second decision. *Graham v. Connor*, 490 U.S. 386 (1989).

**C.   In Accord with Training and Protocol:**  The Supreme Court said in *Graham v. Connor* that the "reasonableness" of a particular use of force *"must be judged from the perspective of a reasonable officer on the scene,"* and its calculus embodies an allowance for the fact that deputies are often forced to make split-second decisions about the amount of force necessary in a particular situation.  A reasonable deputy acts in accord with applicable training and protocol. Each deputy is to make his/her own decisions in a manner that is objectively reasonable and not inconsistent with the deputy's training or with written protocol.

7.8

# SHERIFF'S GENERAL ORDER NO. 9

## 4th Amendment / *Deadly* Force / Violence Prevention

A. **"Deadly Force" Defined:** Deadly force is force that, under the circumstances in which it is used, is readily capable of causing serious physical injury or death.

B. **Use of Deadly Force; Limitations:** Use of deadly force by a member of the Sheriff's Office against a person is limited to the following:

    1.  To effect an arrest (or to prevent escape from custody after arrest) of a person whom the deputy reasonably believes:

        a)  has committed a felony;
        b)  *and* the felon either:

            i)  had used *deadly force* in the commission of the felony or
            ii)  would use *deadly force* against the deputy or others if not immediately apprehended,

        c)  *and* the felon cannot otherwise be apprehended.

    2.  To defend himself or a third person from what he reasonably believes to be the use of imminent use of *deadly force*.

C. **Deadly Force to Prevent Escape Limited to *Violent* Fleeing Felon.** Ark. Code Ann. 5-2-610(b)(1) has been declared to be unconstitutional (because it unconstitutionally permits the use of deadly physical force to prevent the escape of a non-violent fleeing felon) and is NOT the official policy or a part of the written protocol of this agency (even though it has not been repealed or modified by the Arkansas General Assembly). Deadly force to prevent the escape from custody after arrest is permitted only to prevent the escape of a *violent* fleeing felon under the circumstances set forth below.

C. **General Order No. 4** (4th Amendment / Use of Force / Excessive Force Prohibited) applies to the use of *deadly* force as well as the use of *non*-deadly force.

## SHERIFF'S GENERAL ORDER NO. 10

### Warrantless Arrests / "Reasonable Cause to Believe" Required

    **A.  Constitutional Limitation on Power to Arrest:**  All arrests shall be made in accord with the limitations imposed upon the Sheriff and his deputies by the Arkansas Rules of Criminal Procedure (which incorporate the limitations imposed by the U.S. Constitution and the Arkansas Constitution) and require a "reasonable cause to believe" for all warrantless arrests.  Ark. R. Crim. Pro., Rules 4.1 - 4.6; 7.1 - 7.3.; Act 1207 of 2003.

    **B.  Warrantless Felony Arrest:**  The Sheriff and his deputies are authorized to arrest a person for a felony (without an arrest warrant) only when the officer has "reasonable cause to believe" that the person has engaged in *conduct* that is a felony.  Ark. R. Crim. Pro., Rule 4.1.

    **C.  Warrantless Misdemeanor or Violation Arrest:**  The Sheriff and his deputies are authorized to arrest a person (without an arrest warrant) for a misdemeanor or "violation" only when the person engages in misdemeanor (or violation) *conduct* in the deputy's presence.  Ark. R. Crim. Pro., Rule 4.1.

    **D.  Warrantless Traffic Offense Arrest:**  The Sheriff and his deputies are authorized to arrest a person (without an arrest warrant) for a traffic offense only when the officer has reason to believe that the person has engaged in *conduct* that is a traffic offense involving i) death or physical injury to a person or ii) damage to property or iii) DWI.  Ark. R. Crim. Pro., Rules 4.1 - 4.6; 7.1 - 7.3.

    **E.  *"A Reasonable Cause to Believe" Defined:*** A reasonable cause to believe exists where facts and circumstances within the deputy's knowledge and of which he has reasonably trustworthy knowledge are sufficient in themselves to warrant a man of reasonable caution to conclude that an offense has been or is being committed.  *McGuire v. State*, 265 Ark. 621, 580 S.W.2d 198 (1979). *See* Annotations to Ark. R. Crim. Pro., Rule 4.1.

    **F.  General Order No. 1** is hereby incorporated by reference as a part of this General Order No. 6.

## SHERIFF'S GENERAL ORDER NO. 11

### Pre-Arrest Contacts / "Reasonable Suspicion" Required

A.  **Constitutional Limitation on Power to Stop and Detain Without Arrest:** Any pre-arrest contact interfering in any manner with a person's liberty and any detention without arrest shall be made in accord with the limitations imposed upon the Sheriff and his deputies by the Arkansas Rules of Criminal Procedure (which incorporate the limitations impose by the U.S. Constitution and the Arkansas Constitution) and require a "reasonable suspicion" that an offense has been or is being committed. Ark. R. Crim. Pro., Rules 2.1 - 3.5; Act 1207 of 2003.

B.  **Request for *Voluntary* Cooperation:** The Sheriff and his deputies are authorized to *request* any person to *voluntarily* furnish information, cooperate in an investigation, cooperate in the prevention of crime, respond to questions, appear at the Sheriff's Office, or comply with any other reasonable request - so long as: i) there is no indication that a person is legally obligated to furnish information or to otherwise cooperate (if no legal obligation exists) and ii) any request that a person come to or remain at the Sheriff's Office or prosecuting attorney's office or other similar place be accompanied by reasonable steps taken by the officer to make it clear that there is no legal obligation to comply with such a request. Ark. R. Crim. Pro., Rules 2.2 and 2.3.

C.  **Stop and Detain / 15-minute Maximum:** The Sheriff or his deputy (when lawfully present in any place) may (in the performance of his or her duties) stop and detain any person who the deputy *reasonably suspects* is committing, has committed, or is about to commit (1) a felony or (2) a misdemeanor involving danger of forcible injury in persons or of appropriation of or damage to property *if* such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. A deputy who has detained a person based on reasonable suspicion shall immediately advise that person of the deputy's official identity and the reason for the detention. A deputy acting under this rule may require the person to remain in or near such place in the deputy's presence for such time as is reasonable under the circumstances and in no event more not more than 15 minutes. At the end of such period, the person detained shall be released without further restraint, or arrested and charged with an offense (if the "reasonable cause to believe" requirement for an arrest has been met, as required by General Order No. 6). Ark. R. Crim. Pro., Rules 3.1 and 3.2.

E.  **"A Reasonable Suspicion" or "Reasonably Suspects" Defined:** A reasonable suspicion is a suspicion that is reasonable as opposed to an imaginary or purely conjectural. A suspicion is reasonable if it is <u>based on facts or circumstances</u> which of themselves do NOT give rise to the probable cause requisite to justify a lawful arrest (i.e. "a reasonable cause to believe ... an offense has been or is being committed"), but which give rise to more than a bare suspicion that an offense has been or is being committed. Ark. R. Crim. Pro., Rule 2.1.

F.  **General Order No. 1** is hereby incorporated by reference as a part of this General Order No. 7.

## SHERIFF'S GENERAL ORDER NO. 12

## Warrantless Searches / "Particularized Belief and Objective Basis" Required

A. **Constitutional Limitation on Power to Search:** Different types of searches have different rules that apply, as set forth in Ark. R. Crim. Pro., Rules 10.1 - 16.2, all of which are incorporated herein by reference. All searches by the Sheriff and his deputies shall be made in accord with the limitations imposed by the particular section of the Arkansas Rules of Criminal Procedure governing that type of search. Ark. R. Crim. Pro., Rules 10.1 - 16.2; Act 1207 of 2003.

B. **Search Pursuant to Arrest:** A deputy making a lawful arrest may (without a search warrant) conduct a search of the person or property of the accused for the following purposes only:
  (i)       to protect the deputy, the accused, or others;
  (ii)      to prevent the escape of the accused;
  (iii) to furnish appropriate custodial care if the accused is jailed; or
  (iv)      to obtain evidence of the commission of the offense for which the accused has been arrested or to seize contraband, the fruits of crime, or other things criminally possessed or used in conjunction with the offense.
Ark. R. Crim. Pro., Rule 12.1.

C. *Strip* **Search of Arrestee Requires Reasonable Suspicion:** An arrestee shall not be strip searched unless there is a reasonable suspicion that the arrestee is concealing a weapon or contraband on his or her person. (As used herein, the term "strip search" shall not include pat down searches at the time of the arrest; handcuffing of arrestees at the time of the arrest; inventory of personal effects; pat down, searches of pockets, purses, wallets, hats, shoes, jackets, and similar exterior items of clothing at the time of booking; changing detainees in the jail unit into jail uniforms; or other policies applied to prisoners in the jail once they have been processed into the general jail population.) Ark. R. Crim. Pro., Rule 12.1; *Donny Ringo, et al. v. City of Pine Bluff, et al.,* USDC No. PB-C-88-49, Judge Eisele.

D. **"Reasonable Suspicion" for Strip Search of Arrestee:** A reasonable suspicion that an arrestee is concealing weapons or contraband on his or her person means *a particularized and objective basis* for suspecting the particular arrestee of secreting weapons or contraband. Ark. R. Crim. Pro., Rule 12.1; *Donny Ringo, et al. v. City of Pine Bluff, et al.,* USDC No. PB-C-88-49, Judge Eisele.

E. *Presumed* **Reasonable Suspicion for Strip Search of Arrestee:** The following shall constitute, without limitation, reasonable suspicion that an arrestee is concealing weapons or contraband: a) the arrest is for a felony;b) the arrest is for a misdemeanor or violation which involves weapons or contraband; or c) the arrestee has a prior record of convictions or unresolved arrests for felony offenses or for misdemeanors or violations involving weapons or contraband. Ark. R. Crim. Pro., Rule 12.1; *Donny Ringo, et al. v. City of Pine Bluff, et al.,* USDC No. PB-C-88-49, Judge Eisele.

F. **Factors in Formulating Reasonable Suspicion for Strip Search:** The bases for *presumed* reasonable suspicion contained in the preceding paragraph shall not be considered to be all the bases for which reasonable suspicion may arise. Reasonable suspicion may be based upon *any facts concerning the arrestee, the nature of the crime for which the arrest was made, or the circumstances of the* arrest, provided that such facts could reasonably give rise to a suspicion that the arrestee is concealing weapons or contraband on his or her person. Ark. R. Crim. Pro., Rule 12.1; *Donny Ringo, et al. v. City of Pine Bluff, et al.,* USDC No. PB-C-88-49, Judge Eisele.

G. **General Order No. 1** is hereby incorporated by reference as a part of this General Order No. 8.

# SHERIFF'S GENERAL ORDER NO. 13

## 14th Am. / Procedural Due Process / Rules of Criminal Procedure

**A.  Warrantless Arrest / 48-Hour Rule / Judicial Determination of Probable-Cause-to-Detain:**

1.  A person arrested without a warrant is entitled to the same judicial probable-cause-to-detain review that a person arrested with a warrant receives before the issuance of a warrant. Where a person is arrested without a warrant, that person may not be jailed or subjected to other restraints *more than 48 hours* without a judicial determination of probable-cause-to-detain. The required judicial determination of probable-cause-to-detain is the same determination normally made in connection with the issuance of an arrest warrant. The standard is the same as that for the issuance of an arrest warrant. Is there "a reason to believe" that the person arrested without a warrant has committed a crime? The required judicial determination is to be made "promptly after" the arrest. Forty-eight (48) hours is the outside limit. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. *Gerstein v. Pugh*, 95 S.Ct. 854, 868 (1975) and *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). Rule 5.2 of the Arkansas Rules of Criminal Procedure.

2.  Each arresting deputy presenting a detainee arrested without a warrant shall be informed by the jail staff that it is the *arresting deputy's responsibility* to obtain a warrant *after* a warrantless arrest, to evidence probable cause to detain, and deliver it to the jail within 48 hours of the arrest.

3.  The jail staff shall provide a *daily* check of written evidence of a probable-cause-to-detain decision by a judicial officer, for each jail detainee held without an arrest warrant.

4.  Absent a judicial determination of probable-cause-to-detain being made within 48 hours of a warrantless arrest (e.g., an arrest warrant being issued), the arrestee shall be release from custody.

**B.  All Arrests / 72-Hour Rule / First Appearance Hearing:**

1.  Every person arrested, with or without a warrant, who is not released by citation or other lawful manner is entitled to physically appear before a judge "without unnecessary delay" so that the person arrested can: i) have the charges read, ii) be told of his right to remain silent, iii) be told of his right to an attorney, and iv) ask for release. Rule 8.1 of the Arkansas Rules of Criminal Procedure.

2.  Unless a Judge orders otherwise, "without necessary delay" shall mean not more than 72 hours and the jail staff shall attempt to have each person arrested before a judge within 72 hours of the arrest for a Rule 8.1 First Appearance Hearing.

3.  If a person is not taken before a judge within 72 hours after being detained, the Sheriff, Chief Deputy, Captain, or Jail Administrator is to be notified so that a Rule 5.2 "Sheriff's Citation" release decision can be made and/or a Court Order can be obtained to permit the jail to continue to hold the detainee past 72 hours without a Rule 8.1 Hearing.

**C.  Release Upon Judicial Order:**

When a judge orders a detainee to be immediately released, the detainee should be immediately released (NOT put back into a holding cell at the courthouse, NOT transported back to the jail in chains, NOT strip-searched, NOT processed back into the jail population, and NOT continued to be held until sometime later in the day when the out-processing paperwork can be conveniently completed).

# SHERIFF'S GENERAL ORDER NO. 14

## 14th Amendment / Maximum Jail Population / Sheriff's Authority to Release Jail Detainees

A. **Limiting Jail Population:** "Neither sheriffs nor ... administrators of jails shall refuse to accept any prisoner lawfully arrested or committed within the jurisdiction of the supporting agency of the jail *except as necessary to* limit prisoner population in compliance with [the laws and constitution of this state and within the requirements of the United States Constitution]." A.C.A. § 12-41-503(b)

B. **Duty to Obey Jail Population Maximum:** "Sheriffs and other keepers or administrators of jails within the State of Arkansas are responsible for managing the populations and operations of their respective facilities in compliance with the laws and constitution of this state and within the requirements of the United States Constitution." A.C.A. § 12-41-503(a).

C. **Constitutional Maximum Jail Population:** In the Arkansas case of *Campbell v. Sebastian County Sheriff Bill Cauthron*, 623 F.2d 508 (8th Cir. 1980), the Eighth Circuit Court of Appeals ruled that an Arkansas county jail shall provide 130-154 square feet of space for four detainees held more than 16 hours per day. The same space must be available when 3 are held for more than one week. That calculates to 43.3 square feet per jail detainee housing area for detainees held more than one week. The jail is full -- for constitutional purposes -- when the addition of another jail detainee would reduce the available living space in the jail, per detainee, to less than 43.3 square feet. A jail cell is full -- for constitutional purposes -- when the addition of another jail detainee would reduce the available living space in that cell, per detainee, to less than 43.3 square feet.

D. **Sheriff's Authority to Release Misdemeanor Detainee:** Rule 5.1(a). When a person is arrested for any misdemeanor, the ranking officer on duty at the place of detention to which the arrested person is taken may issue a citation in lieu of continued custody. Ark. R. Crim. Pro., 5.2(b).

E. **Sheriff's Authority to Release Felony Detainee:** Upon the recommendation of a prosecuting attorney, the ranking officer on duty at the place of detention to which the arrested person is taken may issue a citation in lieu of continued custody when the person has been arrested for a felony. Ark. R. Crim. Pro., Rule 5.2 (c).

F. **Factors to be Considered in Determining Whether to Release:** In determining whether to continue custody or issue a citation, the officer shall inquire into and consider facts about the accused, including but not limited to: (i) place and length of residence; (ii) family relationships; (iii) references; (iv) present and past employment; (v) criminal record; and (vi) other relevant facts such as:(A) whether an accused fails to identify himself satisfactorily; (B) whether an accused refuses to sign a promise to appear pursuant to citation; (C) whether detention is necessary to prevent imminent bodily harm to the accused or to another; (D) whether the accused has ties to the jurisdiction reasonably sufficient to assure his appearance and there is a substantial likelihood that he will respond to a citation; and (E) whether the accused previously has failed to appear in response to a citation. Rule 5.2(d).

G. **Citation to Appear at Certain Place, Date, and Time:** A citation is a "written order, issued by a law enforcement officer who is authorized to make an arrest, requiring a person accused of violating the law to appear in a designated court or governmental office [including a return to the jail] at a specified date and time." Rule 5.

H. **Seek Judicial Assistance:** If the jail population cannot be managed within the constitutional maximum (43.3 square feet of living space per detainee) without judicial assistance, then the Administrative Judge of the Circuit Court shall be contact for an order directing the Sheriff what to do for the Sheriff to be able to keep the jail population under the constitutional maximum.

**Subject:    CUSTODY PHILOSOPHY**
**Policy No.   A-1**

EXHIBIT #
DATE
DEPONENT
PROFESSIONAL
REPORTERS                800.376.1006

**I.    Policy**

The Saline County Sheriff's Office and Jail Facility will maintain the constitutional, secure and humane detention of arrested persons who are in custody.

**II.    General Information**

PHILOSOPHY

A.    This jail facility was designed and constructed to provide the citizens of Saline County with a safe and secure environment either complying with, or exceeding the standards stipulated by local, state, federal and professional agencies.

B.    All jail operations will ensure that inmates remanded are provided with a safe, secure and humane treatment consistent with applicable standards, laws and judicial decisions.

    1.    Inmates will be classified to the least restrictive mode of housing with due consideration to the safety of the public, inmates and staff.

    2.    Essentials of human life, i.e., medical and mental health care, nutritious meals, recreation, clean environment and religious counseling will be provided to all inmates.

C.    The continuity of family and community contact will be encouraged by appropriate policies governing visiting, telephone usage, volunteer involvement and mail.

D.    Community involvement will be encouraged through the use of citizens' committees and volunteer organizations.

E.    Staff will participate in the implementation of the facility's goals, objectives, policies and procedures.

**III.    Goals and Objectives**

The goal of the Saline County Sheriff's Office and Jail Facility shall be to house inmates in a safe and constitutionally adequate environment while ensuring protection of the surrounding community through the operation of a secure facility.

1.    The use of modern and progressive administrative practices to ensure a legal and fiscally sound operation through the formulation of policies and procedure.

2.    Ensuring that the jail facility is in compliance with the federal, state, and county statutes.

3.    Establishing and maintaining an appropriate classification system that will allow for safe and constitutional housing.

4.    Maintaining security within the institution so as to ensure the safety of the surrounding community and the safety of the inmates and staff.

5.    Ensuring that all inmates are afforded opportunities to exercise their rights to communicate with persons outside the jail facility.

6.    Providing adequate health care, food service and other inmate services as dictated by

county and state statutes.

7. Establishing and maintaining inmate programs.

8. Maintaining and practicing emergency procedures that will provide safety for the inmates and staff during an evacuation of the facility and/or its continued operations under emergency circumstances.

9. The Sheriff and Jail Administrator will review all objectives to ensure that appropriate policies and procedures are in effect.

**Subject:    INMATE RIGHTS**
**Policy No.   C-1**

**I.      Policy**

The jail administration recognizes inmates have certain rights relative to the conditions of their confinement.

**II.     General Information**

Published inmate rights shall include the following:

A.    All inmates of a criminal detention facility shall have reasonable access to the courts through counsel whether appointed or retained, and in the event counsel has not been retained or appointed, the inmate should have reasonable access to law library materials.

B.    All inmates have a right to have access to their attorney. Legal consultation(s) shall be permitted in private, unmonitored and at the place of detention on a reasonable basis.

C.    Inmates shall not be segregated solely because of race, creed or color.

D.    Inmates shall be permitted to worship or meditate at a reasonable time as prescribed by their faith; to have access to clergy of their faith, if available; to adhere to dietary laws of their faith where possible.

E.    All inmates have a right to humane treatment which provides for nourishing food, access to medical and dental care when indicated, clean living quarters and a healthy, safe and secure environment. In no way shall denial of regular meal service be used as a disciplinary measure.

F.    Inmates have a right to be secure from self-incrimination and shall not be subjected to unlawful attempts to obtain statements and/or confessions while they are incarcerated.

G.    At the time of intake, the inmate shall be afforded an opportunity to make a reasonable number of phone calls, at the inmate's expense, in which he may contact an attorney of choice, bondsmen, and a member of his/her family.





# SECTION 025

## CONDUCTED ENERGY WEAPONS

**I.    USE OF THE ADVANCED TASER**

The ADVANCED TASER is a defensive weapon listed in the force continuum the same as chemical agents located between empty hands and closed hands.   The decision to use the ADVANCED TASER is the same as the decision to use OC spray: it depends on the actions and the critical distance of the threat.   Therefore, a deputy does not have to get dangerously close to a threat to the ADVANCED TASER.

The ADVANCED TASER is deployed as an additional police tool and is not intended to replace firearms or self-defense techniques. The ADVANCED TAZER is authorized to be used to effect a lawful arrest, to prevent escape from lawful custody, or to restore institutional integrity in a detention facility. The ADVANCED TASER is authorized to be used when a danger of physical injury to the deputy or other person(s) is reasonably apparent and the deputy is unable to verbally control an offender; or to control a dangerous or violent subject when deadly physical force does not appear to be justified and/or necessary, or attempts to subdue the subject by other conventional tactics have been, or will likely be, ineffective in the situation at hand; the subject is threatening physical violence towards deputies, or there is reasonable expectation that it will be unsafe for deputies to approach within contact range of the subject. See SECTION 096 – USE OF FORCE.

**II.    Purpose**

This order sets forth Saline County Sheriff's Office policy regarding deployment of the ADVANCED TASER.

The following provisions are established:

A.    ADVANCED TASER shall be issued to and used only by deputies who have successfully completed the agency's ADVANCED TASER training program or a training program by Taser International.

B.    Only properly functioning and charged ADVANCED TASERs shall be used.

C.    The X26/M26 ADVANCED TASER will be the only taser(s) allowed for use by the Saline County Sheriff's Office at this time.

D.    Decision to deploy the ADVANCED TASER will be made by the certified ADVANCED TASER operator or instructor.

E.    Laser sight from the ADVANCED TASER shall never be aimed at the suspect's face or head area.

F.    Use or deployment of the ADVANCED TASER will be documented on a use of force report. This shall then be forwarded to the law enforcement commander via the chain of command.·

G.    The deployment of the ADVANCED TASER will be considered in the force continuum the same as chemical agents or aerosol projectors.

H.    A display of the "test arc" or "painting" the subject with the laser is permitted in order to gain compliance in an arrest situation where resistance is anticipated.

I.    Persons who have been subjected to the ADVANCED TASER, or the probes, shall be treated as follows:

1. Once in custody, the arresting deputy shall contact the shift supervisor and advise that the person has been subjected to the ADVANCED TASER and relate the approximate time and the action that occurred. If the probes penetrate the skin, the puncture sites shall be brought to the attention of the shift supervisor. The deputy shall then remove the cartridge from the ADVANCED TASER and then remove the ADVANCED TASER probes that are embedded in skin. Since the probes are a biohazard, the deputy shall wear protective gloves when removing the probes and use alcohol swabs on the wounds. The probes shall be placed in a biohazard bag and disposed of properly (if serious injury or death occurs, then the probes and cartridge shall be kept as evidence). Photographs should be taken of the subject if possible.

2. If the ADVANCED TASER probes penetrated a sensitive area of the body (such as the neck near an artery, the cheek, groin, etc.), the deputy shall arrange for medical personnel to remove the probes. Transportation to a medial facility will be by police transport unless an ambulance is more appropriate due to other related or non-related injuries.

3. Deputies must be aware that one easily overlooked aspect of injury in shooting a subject with an ADVANCED TASER is that of falling from a standing position. A thorough physical examination with particular emphasis on injuries secondary to the fall should be performed.

J.    The ADVANCED TASER will not be used in the following situations:

- Near flammable liquids or gases.
- Threaten use to gain information from a suspect.
- If attempted, will result in possible injury to the deputy or suspect.
- To awaken an intoxicated individual.

K.    No deputy shall playfully, maliciously, or intentionally misuse the unit in a display of power or against an individual except to gain control of a situation.



EXHIBIT #

DATE

DEPONENT

800.376.1006

## SECTION 046

## INJURED/SICK PERSONS

### I.  POLICY

Emergency comfort care provided by a deputy to any injured or sick person shall be done where the person is found.  Medical professionals warn against unnecessarily handling or moving the injured due to the risk of aggravating after-effects or extended hospitalization of the injured person.  Deputies will attempt to provide whatever comfort they can until professional medical care can be obtained.  There may be emergency situations requiring the immediate removal of seriously injured or critically ill persons from a position of imminent danger.  The decision must, in all instances, be based on the safety and protection of the victim.

### II.  PROCEDURES

A.  <u>Arrest of injured Persons</u>:  Persons who are taken into custody with visible injuries or convincing complaints of an injury shall be provided with professional medical care prior to incarceration.

1.  If hospitalization is required, a misdemeanor suspect will be released to the examining physician.  The arresting deputy shall issue a Uniform Violations Notice to the suspect setting a location, time and date for court appearance.

2.  If hospitalization is required for an arrested felony suspect the Sheriff or his/her designee shall be notified, and should a clear danger of escape be present, a deputy guard may be assigned to the suspect until released and processed according to the law.

3.  In any situation, other than an emergency, the arresting deputy will contact an immediate supervisor for instructions concerning the medical care.

B.  Should a deputy respond to a call involving a person who is seriously injured, however, no arrest is made, the following procedures shall apply:

1.  All situations will be somewhat different in circumstance and will therefore require the use of deputy discretion to some extent.

2.  The primary responsibility of the first responder is to care for the injured.  However, unless dangerous circumstances exist, which require a seriously injured person to be moved, deputies will not attempt to move any injured person.  Situations in which an injured person would have to be moved include, but are not limited to, the following:

a.  Motor vehicle accident for which the injured person(s) is in imminent danger of further injury due to a possible vehicle explosion.

b.  Any type of explosion for which the injured are in danger of further injury due to fire, chemical exposure, or other environmental factors.

c.  Any type of natural disaster such as tornado, flood, and earthquake, etc. for which environmental factors exists that create a substantial risk of further injury to the injured in question.

C.  Deputies who are not properly trained, certified, and have the proper equipment to render first aid, such as CPR, will not attempt any such procedures.

D.  Deputies who are properly trained, certified, and have the proper equipment to render first aid may do so, however, will limit the aid not to exceed their level of training/certification.

E.  In all cases a complete written report shall be prepared giving all information available and action taken by the deputy.

F.    <u>Sick Persons</u>:  A deputy responding to a call to assist a person who is ill, shall provide immediate assistance and comfort and shall make necessary arrangements for the transportation of the ill person to a health care professional of their choice.

    1.    Any person who is unconscious or unable to give any information or make a decision concerning their physician of choice shall be transported to the closest health care facility for treatment.

    2.    A complete written report will be prepared by the deputy providing this assistance, citing the circumstances and action taken by the deputy.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ROBIN BABOVEC, as Special
Administratrix of the Estate
of CASEY BABOVEC, Deceased                    PLAINTIFF


VS.               CASE NO: 4:13cv0699 KGB


DEPUTY & OFFICERS MIKE RICHARDS,
TONYA PARKS, CALVIN REED, DION
MCGUIRE, RYAN MCKINLEY, DAVID
FENTON, JAMES PAYNE, NANCY SHELNUTT,
SUPERVISOR LT. COURTNEY, BRUCE
PENNINGTON, JOHN & JANE DOES I-V,
COUNTY OF SALINE                              DEFENDANTS


ORAL DEPOSITION (VIA VIDEO)

OF

SHERIFF BRUCE PENNINGTON, VOLUME II OF II

(Taken November 5, 2014, at 2:12 p.m.)


LEE ANN DICKENS, CCR

7315 I STREET

LITTLE ROCK, ARKANSAS  72207

(501) 614-7367

2

**A P P E A R A N C E S**


ON BEHALF OF PLAINTIFF:

MR. JAMES F. SWINDOLL
LAW OFFICES OF JAMES F. SWINDOLL
312 CENTER STREET
SUITE 300
LITTLE ROCK, ARKANSAS    72201


ON BEHALF OF DEFENDANTS:

MR. GEORGE D. "BUCKY" ELLIS
ELLIS LAW FIRM
126 NORTH MAIN STREET
BENTON, ARKANSAS    72018


ALSO PRESENT:    MR. MIKE TSCHIEMER, The Videographer

3

## I N D E X

STYLE AND NUMBER. . . . . . . . . . . . . . . . .   1

APPEARANCES . . . . . . . . . . . . . . . . . .   2

CAPTION . . . . . . . . . . . . . . . . . . .   4

THE WITNESS:  **SHERIFF BRUCE PENNINGTON, VOL. II OF II**

  EXAMINATION BY MR. SWINDOLL . . . . . . . .   6

  EXAMINATION BY MR. ELLIS. . . . . . . . . .   39

  FURTHER EXAMINATION BY MR. SWINDOLL . . . . .   41

DEPOSITION CONCLUDED. . . . . . . . . . . . . .   42

COURT REPORTER'S CERTIFICATE. . . . . . . . . .   43

## E X H I B I T S

NO./DESCRIPTION:                          MARKED:

Exhibit No. 1 - Photograph. . . . . . . . . . .   25

Exhibit No. 2 - Photograph. . . . . . . . . . .   26

Exhibit No. 3 - Inmate Death/Policy G-2 . . . . .   31

4

```
 1                    C A P T I O N
 2        ANSWERS AND ORAL DEPOSITION OF SHERIFF BRUCE
 3    PENNIGTON (VIA VIDEO), VOLUME II OF II, a witness
 4    produced at the request of counsel for the PLAINTIFFS
 5    taken in the above-styled and numbered cause on the
 6    5th day of November, 2014, before LEE ANN DICKENS,
 7    Certified Court Reporter, at 2:12 p.m., at the law
 8    offices of Mr. George D. "Bucky" Ellis, Ellis Law
 9    Firm, 124 North Main Street, Benton, Arkansas,
10    pursuant to the agreement hereinafter set forth.
11
12                * * * * * * * *
13
14                 S T I P U L A T I O N S
15        IT IS STIPULATED AND AGREED by and between the
16    parties through their respective counsel that the
17    oral deposition of SHERIFF BRUCE PENNINGTON (VIA
18    VIDEO), VOLUME II OF II may be taken for any and all
19    purposes according to the Arkansas Rules of Civil
20    Procedure.
21
22                * * * * * * * *
23
24
25
```

**LEE ANN DICKENS, CCR**
**(501)614-7367**

5

**P R O C E E D I N G S**

1

2      THE VIDEOGRAPHER:  We're on the audio/
3   video record at approximately 2:12 p.m. on
4   November 5th, 2014.
5      This is Mike Tschiemer, Legal Video
6   Specialist for Arkansas Legal Video.
7      We're at Ellis Law Firm, 126 North Main
8   Street in Benton, Arkansas for the
9   continuation of the deposition of Bruce
10   PEnnington in the matter of *Robin Babovec vs.*
11   *Deputy & Officers Mike Richards, Tonya*
12   *Parker, Et Al*, United States District Court
13   case No. 4:13cv0699 KGB.
14      The court reporter is Ann Dickens -- or
15   Lee Ann Dickens.  Excuse me.
16      Will Counsel please state their
17   appearances for the record?
18      MR. SWINDOLL:  I'm James Swindoll.  I'm
19   here for Robin Babovec.
20      MR. ELLIS:  George Ellis for the
21   Defendants.
22      THE VIDEOGRAPHER:  Ms. Dickens, will you
23   please swear in the witness?
24      THE COURT REPORTER:  I'll ask you to
25   raise your right hand, please, sir.

6

1          THE WITNESS:  (Complies.)

2          THE COURT REPORTER:  Do you solemnly

3      swear or affirm that the testimony you're

4      about to give is the truth, the whole truth,

5      nothing but the truth?

6          THE WITNESS:  I do.

7          THE COURT REPORTER:  Thanks.

8          THE VIDEOGRAPHER:  Thanks.  Please

9      proceed.

10     THEREUPON,

11        **BRUCE PENNINGTON, VOLUME II OF II,**

12         THE WITNESS HEREINBEFORE NAMED,

13     having been first duly cautioned and

14     sworn by me to testify to the truth,

15     the whole truth, and nothing but the

16     truth, testified on his oath as

17     follows, to-wit:

18                    **EXAMINATION**

19 BY MR. SWINDOLL:

20 Q    Sheriff, what is the penalty for a violation in

21 the jail or the general order by one of your

22 deputies?

23 A .  Normally, what happened if someone was found

24 doing something inappropriate or whatever, it went

25 before a staff review.

7

1    Q    Uh-huh.

2    A    And it was up to them to determine what degree

3    of punishment if there was to be.  You know, it could

4    include up to time off without pay up to termination.

5    Q    Okay.

6         Can you just tell me a little bit about who

7    constituted the committee to make the decision?

8    A    The -- excuse me.  In the event that it was an

9    occurrence that required a review board --

10   Q    Uh-huh.

11   A    -- it was set up by the chief deputy.  And it

12   consisted of the chief deputy --

13   Q    Uh-huh.

14   A    -- the administrative lieutenant, patrol

15   lieutenant, the CID sergeant or lieutenant.

16   Q    Uh-huh.

17        Now, would that be for violations at the jail as

18   well?

19   A    Yes.

20   Q    For general orders?

21   A    Yes.

22   Q    Do you remember, as we sit here today, any time

23   when you have sanctioned a jailor under the general

24   orders for a violation?

25   A    Yes.

8

```
 1              THE VIDEOGRAPHER:  Mr. Swindoll, you've
 2         got your microphone covered up.
 3              MR. SWINDOLL:  Okay.
 4    Q    (By Mr. Swindoll)  If you would, just give me an
 5    example of that so I can --
 6    A    We had an individual one time who struck an
 7    inmate.
 8    Q    Uh-huh.
 9    A    We had a review board.  It was determined that
10    he had -- did -- in effect did strike an inmate.
11    Subsequently he was terminated.
12    Q    Okay.
13         So if -- well, it's -- each circumstance
14    controls, right?
15    A    Yes.
16    Q    That's what I'm thinking of.
17    A    Exactly.
18    Q    So there was at least one time in the past when
19    the committee determined that the use of force was
20    wrong enough to result in termination of one of your
21    jailers?
22    A    Yes.
23    Q    When was that; do you remember?
24    A    Oh -- matter of fact, it wasn't just one.  I
25    think we had two that had used excessive force --
```

**LEE ANN DICKENS, CCR**
**(501)614-7367**

9

```
 1    Q    Uh-huh.

 2    A    -- and both of those resulted in termination.

 3    Q    Is that in recent vintage, or --

 4    A    2012 --

 5    Q    Okay.

 6    A    -- I believe it was.

 7    Q    Okay.

 8    A    '11 or '12.

 9    Q    Do you remember the names of those jailors by

10  chance?

11    A    No, sir.  I don't.

12    Q    Let me go back here.

13         You know we're here about an event that occurred

14  on April the 13th of 2011?

15    A    Yes, sir.

16    Q    And you were the sheriff at that time?

17    A    That's correct.

18    Q    And you showed me -- I think the last time we

19  talked you showed me how the jail is set up and who

20  reports to who.

21    A    Yes, sir.

22    Q    And in April of 2011 when it happened, what was

23  your involvement?

24    A    I was the sheriff.

25    Q    Okay.
```

10

1       Did you take an active role in investigation to
2  determine what had happened?
3  A    No, sir.  Once this occurrence occurred, I had
4  Lieutenant Frost who was CID lieutenant at the
5  time --
6  Q    Uh-huh.
7  A    -- contact the Arkansas State Police --
8  Q    Uh-huh.
9  A    -- to have them come and investigate it so it
10  wouldn't show any signs of impropriety on out part.
11  Q    Was there an independent investigation in your
12  department before the deputy -- I mean before the
13  state trooper got there?
14  A    Not to my knowledge.
15  Q    I furnished the city the statement that
16  everybody gave before they talked to the trooper.
17  Are you familiar with those?
18  A    No.
19  Q    Okay.
20       Did you actually see the film?
21  A    I -- I can't recall whether I did or not because
22  --
23               MR. ELLIS:  Let me interject and ask if
24          Counsel is referring to the video -- the
25          surveillance video of the -- that you've

11

```
 1              supplied --
 2                   MR. SWINDOLL:  I should have been
 3              clearer.  I should have been clearer.
 4    Q    (By Mr. Swindoll)  There are video cameras in
 5    your jail?
 6    A    Yes.
 7    Q    And were you aware that this event was recorded
 8    on video?
 9    A    Yes.
10    Q    That's the video I'm asking you.  Did you have a
11    chance to (inaudible) the video before you turned it
12    over or since to review this film?
13    A    I observed it.  I didn't, you know, review it
14    like just -- just really sit here and look --
15    Q    Right.
16    A    -- and -- you know.
17    Q    Do you remember whether or not any jailor was
18    ever cautioned, reprimanded or sanctioned for any act
19    involved in the death of Casey Babovec?
20    A    There was not.
21    Q    What's the purpose of pre-trial detention?
22                   THE WITNESS:  Excuse me?
23    Q    (By Mr. Swindoll)  What's the purpose of
24    pre-trial detention?  General Order No. 4 says
25    they're there for security.  Let me explain that to
```

1    you.

2                    MR. ELLIS:  General Order No. --

3                    MR. SWINDOLL:  4, if I remember

4           correctly.

5                    MR. ELLIS:  Here?

6                    MR. SWINDOLL:  Yeah.  I've got it.  Okay.

7    Q    (By Mr. Swindoll)  In General Order No. 4 -- and

8    let me read it to you and see if you agree with it.

9    "The purpose of pre-trial detention is to assure the

10   Defendant's presence at trial."  That's what it

11   says?

12   A    Yes.

13   Q    And that's obvious what it means, right?

14   A    Yes.

15   Q    Okay.

16        "Jail officials and staff shall take affirmative

17   action to adequately safe-guard the physical safety

18   of all jail detainees."

19   A    Uh-huh.

20   Q    "No employee of the sheriff's office shall act

21   in any manner that is deliberately indifferent or

22   unnecessary to a jail detainee's protection."  What

23   kind of protection needs would detainees need?

24   A    Well, protection from other inmates, protect

25   them from doing harm to themselves --

13

1    Q    Uh-huh.

2    A    -- such as suicide attempts and protection to

3    make sure that those that are in the jail facility as

4    jailors --

5    Q    Uh-huh.

6    A    -- do not harm or hurt any inmates.

7    Q    Now, the supervisors in the jail, if they see a

8    jailor acting in a way that is prohibited under the

9    general rule, what are their obligations?

10   A    To report it --

11   Q    Okay.

12   A    -- to their supervisor.

13   Q    Uh-huh.

14   A    To do a report such as an incident report --

15   Q    Uh-huh.

16   A    -- and let it go up the chain.

17   Q    If they see that an inmate is suffering damage

18   from an act which the reviewer sees as unnecessary

19   force, what is he to do?

20   A    If it's unnecessary force and he uses force,

21   then there's a form -- a use of force form that is

22   required.

23   Q    Okay.

24        If he is a supervisor and sees one of his

25   deputies -- for example, he was hitting one of the

**LEE ANN DICKENS, CCR**
**(501)614-7367**

14

1    inmates unnecessarily or taking an act -- a physical

2    action against a detainee, what is he to do to

3    protect the detainee under Rule 4?

4    A    First and foremost separate the inmate from the

5    deputy and then do a use of force, you know, and

6    present that to his supervisor for further review.

7    Q    And you mentioned to me that in your review of

8    the circumstances as the head of -- sheriff in Saline

9    County you felt that the officers were not sanctioned

10   and did not deserve to be sanctioned.  Is that what I

11   read kind of in behind --

12   A    Correct.

13   Q    Okay.

14   A    I had talked with the fire department personnel

15   who responded with the paramedics --

16   Q    Uh-huh.

17   A    -- and they had nothing but praise in regards to

18   the actions that the staff took in trying to revive

19   Mr. Babovec.  You know, that they did everything

20   humanly possible to try to have him brought back.

21   Q    Okay.

22        Did you believe at the time you talked to them

23   that Casey Babovec had expired during the subduing or

24   thereafter?

25   A    It was my understanding thereafter.

15

1    Q    What were you told and what do you remember

2    about thereafter?

3    A    That when they placed Casey in the cell, he

4    found the biggest person in there to start an

5    altercation with.  And the staff went inside and

6    brought him down and he was fighting them and so they

7    dry-stunned him with a taser --

8    Q    Uh-huh.

9    A    -- to try to get him to comply.

10   Q    Yes.

11   A    You know, so that's my knowledge of what

12   occurred.

13   Q    Okay.

14        So when you were told -- you believe that they

15   actually entered the cell themselves to take Casey

16   out?

17   A    Yes.

18   Q    And you believe -- you know that you were told

19   they were using a dry taser.  You and I talked about

20   conductive energy weapons.

21   A    Yes, sir.

22   Q    Anybody who used a taser on Casey Babovec that

23   day, April 11th, should have been trained and

24   certified to use the taser; is that right?

25   A    That's right.

16

1    Q    Now, let's talk about emergent medical needs for

2    a few minutes.  Is there any doubt in your mind that

3    if a detainee has an emergent medical need that they

4    are entitled to medical care?

5    A    Exactly.

6    Q    How is that determination (inaudible)?

7    A    Back in 2011, that was back before we had

8    in-house medical --

9    Q    Uh-huh.

10   A    -- it was -- would be determined by the corporal

11   on duty --

12   Q    Uh-huh.

13   A    -- whether or not this person, one, was faking,

14   two, was really in need of medical services.

15   Q    If the corporal hears the detainee asked for

16   emergent -- medical care, what is he to do?

17              THE WITNESS:  To make that decision --

18              MR. SWINDOLL:  Yes.  Uh-huh.

19              THE WITNESS:  -- whether or not --

20   Q    (By Mr. Swindoll)  Whether or not it's necessary

21   to have medical treatment for that detainee in that

22   circumstance?

23   A    Right.

24   Q    Tell me how he -- how -- how you train them and

25   what they do to make that decision.

17

1   A    Well, unfortunately, I think one of the shifts

2   had an EMT that was on -- and I have also been an EMT

3   in my career.  And that's not enough training in

4   itself to make an adequate decision --

5   Q    Uh-huh.

6   A    -- of whether or not this person is actually in

7   need of assistance or is faking.

8   Q    Uh-huh.

9   A    That was one of the biggest problems I had with

10  the quorum court to finally get a medical on --

11  in-house --

12  Q    Uh-huh.

13  A    -- because of, you know, the amount of lawsuits

14  that could occur by not having it there.

15  Q    Right.

16       So there was a battle at the time that you

17  wanted a medical professional to make this evaluation

18  in your jail?

19  A    Exactly.

20  Q    And you're telling me that hadn't been granted

21  you?

22  A    Not at that time.

23  Q    But it was later?

24  A    Yes.

25  Q    How long had you been pushing for a medical

18

1    person in the jail?

2    A    When I first became sheriff, I had a real good

3    friend who was a surgeon at the VA hospital.  And he

4    came on board at no cost.  And he would come three

5    times a week for sick call.

6    Q    Uh-huh.

7    A    And -- but, finally, he got to the point -- his

8    wife was scared about him being sued --

9    Q    Uh-huh.

10    A    -- that he thought it was in his best interest.

11    So 2009 until we finally got it in 2012, I believe.

12    Q    Uh-huh.

13        How did the decision to -- I want to talk for a

14    few minutes about emergency medical care.  One is it

15    would a sick call and maybe they tell you they've got

16    a headache --

17    A    Uh-huh.

18    Q    -- and they need to go see a doctor.  Another

19    would be to assess and determine whether or not

20    emergency medical care was necessary?

21    A    That, again, was up to the corporal on duty.

22    Q    Uh-huh.

23    A    And I know several times that they would go

24    ahead and call 911 and the ambulance and fire

25    department would come down and sometimes they -- the

**LEE ANN DICKENS, CCR**
**(501)614-7367**

19

1    paramedics would make an assessment and say nah.  And

2    then there's been times where they've been taken to

3    the emergency room.

4    Q    Was it the practice in Saline County at the time

5    to offer emergency medical service to an inmate

6    suffering a heart attack?

7    A    Yes.

8    Q    What if an inmate told you he was suffering a

9    heart attack, what would be the decision process at

10   that time?

11   A    Again, it would be up to the corporal on duty to

12   try to determine whether this person was actually

13   having a heart attack or was faking.

14   Q    Yeah.

15        There is no time when a detainee should be

16   punished; is that right?

17   A    That's correct.

18   Q    Okay.

19        They are to be held for the trial court to

20   determine what they need to do?

21   A    Exactly.

22   Q    All right.

23        So would it be a violation of the general orders

24   and the practices in Saline County for a deputy to

25   ignore repeated requests for medical -- emergency

20

1  medical care if he knew that that inmate had ingested

2  drugs?

3  A    Well, then if they have knowledge that this

4  person has ingested drugs --

5  Q    Yeah.

6  A    -- they should or should have made provisions

7  for medical.

8  Q    Right.

9      Explain that to me.

10  A    Well, I mean --

11  Q    I know it's obvious, but we need it for the

12  record.

13  A    I understand.  It's kind of like if a person is

14  brought in by Saline County or any other law

15  enforcement agency to the jail facility, if they had

16  a blood alcohol reading of .20 or above --

17  Q    Uh-huh.

18  A    -- we wouldn't accept them because of the risk

19  involved.

20  Q    Uh-huh.

21  A    And the same thing.  If you have an individual

22  that comes in and the deputy has knowledge that this

23  individual has ingested drugs, then they should be

24  awarded medical assessment.

25  Q    Okay.

1    And because the assessment necessary to

2    determine whether or not they were truly at risk from

3    ingesting drugs requires medical people?

4    A    Yes.

5    Q    Would you say that's true?

6    A    Oh, yes.  A layperson wouldn't be able to

7    determine that.

8    Q    Right.

9    And what was the policy at Saline County jail in

10    2011 if an inmate was -- told you that they had

11    ingested drugs?  What would have been the policy to

12    get them emergency care?

13    A    Well, you know, the individual that they told

14    should have taken the appropriate actions to --

15    Q    Would they transport the inmate or call 911?

16    That's what I'm trying to get at, Sheriff.

17    A    It depends on when you look at them -- I mean,

18    if they're just falling over and, you know, labored

19    breathing, things of that nature, then they would

20    have called for an ambulance.

21    Q    Okay.

22    A    If not, then one of the jail staff could have

23    transported them.

24    Q    Okay.

25    But either way would have been acceptable

1    practice in the jail?

2    A    Yes.

3    Q    Now, if an inmate suffers an injury in the jail

4    at the hands of one of the jailors, are they entitled

5    to emergency medical care?

6    A    Depending on what -- the severity of the injury.

7    You know, if it's a black eye or something like that

8    --

9    Q    A bloody nose?

10   A    Yeah.

11   Q    Yeah.

12   A    But if it's to the degree that it's

13   disfigurement of a limb or something like that or if

14   the individual were, of course, need suture, then

15   definitely they would get the medical attention.

16   Q    What is excessive force, Sheriff?

17   A    Any officer, whether it be a road deputy or a

18   detention facility jailor, you should only use enough

19   force, one, make the arrest, or in the jail would be

20   to subdue an inmate.

21   Q    Okay.

22        And force in excess of that would be considered

23   excessive?

24   A    Yes.

25   Q    Is that fair?

23

```
1    A    That's fair.

2    Q    So if you have an inmate that is subdued or

3    partially sub- -- let's say you have an inmate in

4    handcuffs --

5    A    Uh-huh.

6    Q    -- would you be allowed to -- inmate on the

7    ground in handcuffs --

8    A    (Witness nods head up and down.)

9    Q    -- would you be allowed to sit on top of this

10   inmate?

11   A    Depends on if they're kicking --

12   Q    Uh-huh.

13   A    -- or whatever, you know, then yes.

14   Q    What's the danger of asphyxiation -- positional

15   asphyxiation in the use of force in a jail?

16   A    I don't follow you.

17   Q    Okay.

18        One of the things that happened to Casey was an

19   asphyxiation -- one of the sources of his death is he

20   couldn't breath.  And I'm wondering if that's a

21   recognized --

22              MR. ELLIS:  Object to the --

23   Q    (By Mr. Swindoll) -- complication -

24              MR. ELLIS:  I'm going to object to the

25         form of the question, but go ahead and
```

24

1      answer.

2             MR. SWINDOLL:  Yeah.  Bucky and I have

3          another deposition to take and we'll have

4          that clearly stated.

5    Q    (By Mr. Swindoll)  But is expiration by forcing

6    the breath out -- asphyxiation a worry of police

7    officers during the time when they're subduing

8    inmates?

9    A    You know, in my 40 years of doing this --

10   Q    Uh-huh.

11   A    -- and I have been on top of several --

12   Q    Yeah.

13   A    -- and I've never had one asphyxiate.  You know,

14   that --

15   Q    You've never had one worry that they're -- or

16   you worry that they're not breathing correctly --

17   A    No.

18   Q    -- when you're on top of them?

19   A    Huh-uh.  I've worried if I'm going to hit them

20   in the back of the head with something, but --

21   Q    Yeah.  Yeah.

22             MR. SWINDOLL:  Sorry.  That's okay.

23             MR. SWINDOLL:  Okay.  I'm going to --

24          this is going to be a new exhibit to the

25          deposition.

25

1                    (THEREUPON, Exhibit No. 1 was marked for

2                identification and is attached hereto.)

3    Q    (By Mr. Swindoll)  This is the number of

4    officers that were involved in the subduing of Casey

5    Babovec.  And I'm wondering did you have any

6    criticism in your review or going out to talk to any

7    of your officers about this take-down?  You said you

8    didn't sanction anybody.  Did you ever have any

9    discussions about --

10   A    No.

11   Q    -- anything that --

12   A    This is the first time I've seen this.

13   Q    Okay.

14               THE WITNESS:  What is there?  Three or

15          four?

16               MR. SWINDOLL:  There's eight.

17               MR. ELLIS:  I didn't see eight, Mr.

18          Swindoll, and I object to your

19          characterization of eight.

20               THE WITNESS:  We never had eight working

21          on a shift.

22               MR. SWINDOLL:  I mean, they came from

23          everywhere in the jail.  Okay.

24               MR. ELLIS:  I don't see eight.

25               MR. SWINDOLL:  Here they are.

26

1          THE COURT REPORTER:  Okay.  Bucky -

2          MR. ELLIS:  I don't see nine in that

3     photograph.

4          THE COURT REPORTER:  -- would you mark

5     this -- let's go ahead and mark those so we

6     don't get confused.

7          (THEREUPON, Exhibit No. 2 was marked for

8     identification and is attached hereto.)

9          MR. SWINDOLL:  Exhibit 1 and Exhibit 2 to

10    his deposition.

11         MR. ELLIS:  And those are -

12         MR. SWINDOLL:  Yeah.

13         THE COURT REPORTER:  Well, what was the

14    other one that you-all came in with?  Was

15    that already marked previously?

16         MR. ELLIS:  I think so.

17         THE COURT REPORTER:  All right.  Okay.

18  Q    (By Mr. Swindoll)  There are some questions that

19  you might not know the answers to, so I'm just going

20  asking directly.

21  A    Sure.

22  Q    Okay.

23      The tape reveals that this man released his

24  bodily fluids during this event.  Were you aware of

25  that?

27

```
1    A    No.
2    Q    The tape also reveals that following the
3    subduing and his release of the fluids he was dragged
4    into another room.  Were you aware of that?
5    A    No.
6    Q    Were you aware that there was 10 minutes before
7    anyone treated Casey Babovec before they dragged him
8    into that room?
9    A    No.
10   Q    But we can agree that if Casey needed emergency
11   medical care after the take-down after the tasing,
12   after the subduing that he was entitled to it?
13   A    Should have received it.
14   Q    Yes.
15        In your judgment in the review that you made,
16   the actions of your officers were not only
17   constitutional but in connection and in line with
18   jail policies that you had in place?
19   A    Correct.  This information was after the state
20   police investigated it --
21   Q    Uh-huh.
22   A    -- and found that there were no wrongdoings.
23   Q    I was talking to somebody about my preparation
24   for the deposition today and I made a statement and
25   he thought I was wrong.  I said that I thought that
```

28

1    jailors were not certified law enforcement officers;

2    is that correct?

3    A    That's correct.

4    Q    That have a different set of training?

5    A    Correct.

6    Q    Some of them graduate and go on to school?

7    A    What happens --

8    Q    Yeah.

9    A    -- you know, they'll start out in the jail.

10   Q    Uh-huh.

11   A    And then as openings come open in patrol, you

12   know, they'll apply.  If they are hired, then they're

13   sent to the Arkansas Law Enforcement Training

14   Academy.

15   Q    And then once they finish that they get

16   certified?

17   A    Yes.

18   Q    Yes.

19        Now, what kind of training are provided to

20   jailors?

21   A    Jail Standards, which is a course that's

22   approved by Arkansas Law Enforcement Training

23   Academy.  And that's one.

24   Q    Uh-huh.

25   A    CPR is another.  You know, taser is another.

1    You know, being able to operate a breathalyzer.  You

2    know, those type things.

3    Q    So each skill set is acquired on the job?  Is

4    that what I'm hearing --

5    A    Yes.

6    Q    -- or is that through classes?

7    A    Through classes.

8    Q    Okay.

9         How important is training to ensure that you

10   have safe and a well-running jail?

11   A    Well, training is, you know, very essential

12   whether it be jail, CID.  You know, you can never

13   learn enough.  So that's the reason why -- prior to

14   my retirement, you know, they had -- continually, you

15   know, being trained in classes and different things.

16   Q    We've talked about the -- well, we discussed the

17   fact that you were after the quorum court to get you

18   medical care in the jail?

19   A    Correct.

20   Q    Now I want to ask you were you also ever

21   discussing with them the need to get more personnel

22   in the jail?

23   A    Yes.

24   Q    Tell me about that.

25   A    Well, and, again, you know, I would go before

30

1    the quorum court because as our inmate counts rose --

2    for the safety of not only the officers but the

3    inmates, it was necessary.  And so while I was

4    sheriff we were able to build on to the jail which

5    raised our inmate capacity up to 250.  And,

6    therefore, I had to go before the quorum court --

7    Q    Uh-huh.

8    A    -- and ask for additional personnel to be able

9    to operate the jail where, you know, we could be in

10   compliance --

11   Q    Right.

12   A    -- with Jail Standards and also for the safety

13   of the safety of the inmates and officers in charge.

14   Q    And what -- how were you received at quorum

15   court about it?

16   A    Saline County being one of two counties in the

17   state of Arkansas without a county-wide sales tax --

18   Q    Yeah.

19   A    -- you know, at first they thought we could do

20   more with less --

21   Q    Yeah.

22   A    -- but then, you know, finally they did provide,

23   you know, additional staffing.

24   Q    When did that happen; do you remember?

25   A    Late 2011.  Early 2012.

**LEE ANN DICKENS, CCR**
**(501)614-7367**

31

```
1    Q    And so before that you felt that you needed more
2    help in the jail?
3    A    Certainly.
4    Q    And that was for the purposes you've told us?
5    A    Yes, sir.
6    Q    Okay.
7         Now, look at Inmate Death -- the policy -
8              MR. SWINDOLL:  And that's going to be No.
9         3 to the deposition.
10             (THEREUPON, Exhibit No. 3 was marked for
11        identification and is attached hereto.)
12   Q    (By Mr. Swindoll)  Can you just kind of explain
13   what that policy is and what ?
14   A    Yes, sir.  If there -- if a death does occur at
15   the jail facility, there will be a thorough
16   investigation handled by the Criminal Investigation
17   Division, whether it be the state police, CID or
18   county.
19   Q    Right.
20   A    Staff will secure and observe the scene.  Staff
21   member will detain, identify and separate all
22   suspects and witnesses.  The staff member will notify
23   the shift supervisor and the shift supervisor will
24   notify the commander on call.
25   Q    Okay.
```

1    And you preserve the scene of the accident -- or

2    assuming there's a death the crime scene is what I'm

3    thinking?

4    A    Well, certainly.

5    Q    You want to preserve it in the same manner --

6    A    Yes.

7    Q    -- and in the same way?

8    A    Yes.

9    Q    Okay.

10    You've mentioned to me that you were pursuing

11    helping the medical assistance in the jail so someone

12    could review.  Before you were able to get that, did

13    you offer any training to any of the people that were

14    doing the physician -- to help make an assessment

15    about whether or not an inmate's drug use was

16    dangerous to him or --

17    A    No.

18    Q    I went through all these documents and we could

19    spend an hour talking about them, but -- so let's

20    just get to the final questions and move on here.

21    Would a jailor ever be allowed to punish a detainee

22    with a taser?

23    A    Not to punish.  No.

24    Q    Would that be a violation of the general policy

25    of a jailor?

33

```
 1   A    Yes.
 2   Q    Would it be a violation of the general orders?
 3   A    Yes.
 4   Q    Would it be a violation of good police conduct?
 5   A    Exactly.  It would.
 6   Q    We talked a little bit about dry-tasing the last
 7   time.
 8   A    (Witness nods head up and down.)
 9   Q    And were you aware that there was more than one
10   taser being used on this individual Casey Babovec?
11   A    I did not know that.
12                  MR. SWINDOLL:  I spent 5 hours at my
13              computer and it takes 5 minutes to ask 5
14              pages.
15   Q    (By Mr. Swindoll)  Do you remember any of the
16   EMT people who discussed with you the actions of your
17   jailors that you said was commendable?  Do you
18   remember any of those, by any chance?
19   A    Not by name.
20   Q    Okay.
21   A    I do know it was -- that fire was on --
22   Q    Yeah.
23        What part does a request by an inmate play in
24   this?  If he asks, how much weight is that given?
25   Does it depend on the circumstance?
```

**LEE ANN DICKENS, CCR**
**(501)614-7367**

34

1  A    It depends on the corporal who they're asking.

2  Different circumstances and what medical need are

3  they needing.  Is it just a headache, or -- you know.

4  Q    Right.  I have to ask this question.

5      As the chief executive officer at the jail, can

6  you tell us it was decided, after review that the

7  force used against Detainee Babovec met the standards

8  of excessive force at Saline County?  As the chief

9  executive at the jail and after reviewing everything

10  that you did, do you believe that the forces used

11  against Casey Babovec met the standards that you had

12  in place at the jail in April of 2011?

13  A    I do.

14  Q    Okay.

15      Did you believe in reviewing this matter that

16  any less force could have been just as effective?

17  A    (Inaudible.)

18          THE COURT REPORTER:  I'm sorry.  Did you

19      say "no?"

20          THE WITNESS:  No.  I'm sorry.

21          THE COURT REPORTER:  I couldn't see you.

22      No.  You're fine.  Thank you.

23  Q    (By Mr. Swindoll)  Did your review ever

24  determine that the inmate or the detainee needed

25  emergency medical care?

**LEE ANN DICKENS, CCR**
**(501)614-7367**

1    A    Not until the occurrence occurred.

2    Q    After the occurred, did you think he needed --

3    A    After.

4    Q    -- emergency medical care?

5    A    Yes.  And that's the reason why 911 was called.

6    Q    While your deputies or your jailors wait on 911

7    in an emergency medical situation, what are their

8    obligations to the detainee?

9    A    I believe on Casey that they started CPR.

10   Q    Did you ever review the method and manner of the

11   CPR that was --

12   A    No.

13   Q    And you would know when the proper method was

14   used and when it might not be?

15   A    Yes.

16              MR. ELLIS:  What was the question?

17              MR. SWINDOLL:  I said did you ever review

18         the EMT provided by the deputies that he's

19         discussing in the film itself to determine

20         whether or not it was accurate.

21              MR. ELLIS:  And that wouldn't be by a

22         deputy.  It would be a jailor.

23              MR. SWINDOLL:  Jailor.

24              MR. ELLIS:  And his answer was?

25              MR. SWINDOLL:  He reviewed it and he was

36

1          about to tell me that the procedure -- the

2          mouth-to-mouth that was given him was proper

3          by the deputy because of what he said.

4          That's where I was going with that.

5     A    And my response would be yes.  Because any

6     action when it comes to a person not breathing -- any

7     action is better than no reaction.

8     Q    (By Mr. Swindoll)  Okay.

9          If the inmate has been subdued, do you believe

10    that it would be proper to swing at the inmate to

11    determine whether or not he was faking about being

12    asleep?

13    A    See, the -- you know, I've done similar things

14    in the past to see, you know, if they are faking,

15    or --

16    Q    Okay.

17         I looked through the federal files, Sheriff, and

18    they were in the 20's, maybe in the 30's cases filed

19    against Saline County during this time in which you

20    were the sheriff.  Can you just discuss those with me

21    for a minute?

22    A    Most of them had to do with medical --

23    Q    Uh-huh.

24    A    -- that was --

25    Q    I saw that as well.

37

```
 1    A      -- inadequate in the jail.
 2    Q      That was part of your evidence to go to the
 3    committee and try to get money?
 4    A      Exactly.  To get you know in staff medical.  And
 5    by doing so has -- the company -- they took the
 6    lawsuits on themselves.
 7    Q      They did?
 8    A      Yeah.  So that relieved the county of having
 9    that.
10    Q      Have you ever discussed the actual events that
11    any of the deputies ever saw?
12    A      No.
13               MR. ELLIS:  And you mean the jailors?
14               MR. SWINDOLL:  Jailors.  Because they're
15          not deputies.  They're -
16               MR. ELLIS:  We'll stipulate that when you
17          say "deputies" you mean jailors.
18               MR. SWINDOLL:  Yeah.  Unless I mean
19          jailor.
20               MR. ELLIS:  Thank you.
21    Q      (By Mr. Swindoll)  If a jailor who is not
22    certified or trained on the taser - use of a taser,
23    what's the penalty?
24    A      Again, it would go before a staff review board.
25    And whatever determination they made would be what I
```

38

1  would sign off on.

2  Q    Okay.

3       In your review before today, have you spent any

4  time looking at the actual actions of the deputies?

5  I mean, if I wanted to ask you about Deputy Dion, for

6  example, do you know what part he took in any of

7  this?

8  A    No.

9  Q    I mean, I could ask you for each of the

10  deputies --

11  A    Yes.

12  Q    -- and I'd probably get the same answer,

13  wouldn't I?

14  A    Yes.

15  Q    Do you support the -- what's the import of the

16  use of force?  Does it have some use in

17  administrating the jail?

18  A    What it does -- it will do one or two things.

19  Q    Uh-huh.

20  A    It will clear a jailor or it could come with the

21  findings of the inmate.

22  Q    Uh-huh.

23  A    You know, so the purpose of it is to determine

24  was the force necessary.  And if not, if appropriate

25  actions would be taken.

39

1    Q    Do you know, as we sit here today, whether or

2    not any use of force documents were filled out on

3    Casey Babovec?

4    A    I do not know.

5    Q    Should they have been?

6    A    If force was excessive.

7    Q    Well, I mean, if force was used.  A use of force

8    report doesn't require that it be excessive, does it?

9    A    No.

10   Q    It should be noted and --

11   A    Yes.

12   Q    -- explained and justified, if necessary?

13   A    Exactly.

14   Q    And so those reports, if they were not filled

15   out -- there's not a form, you don't get an

16   opportunity to figure out what happened?

17   A    Correct.

18              MR. SWINDOLL:  One more second.

19   Q    (By Mr. Swindoll)  Do you believe that an inmate

20   who is being attacked illegally by a jailor has a

21   right to defend himself?

22   A    Yes.

23              MR. SWINDOLL:  Thank you.  No more

24        questions.

25                      **EXAMINATION**

**LEE ANN DICKENS, CCR**
**(501)614-7367**

40

```
 1   BY MR. ELLIS:
 2   Q    Now, Sheriff, first -- just a couple of things.
 3   You were shown policy No. G-2, Inmate Death, a few
 4   minutes ago --
 5   A    Okay.
 6   Q    -- which is Exhibit 3 --
 7   A    Okay.
 8   Q    -- to this deposition; is that correct, sir?
 9   A    (Witness nods head up and down.)
10   Q    Is that correct, sir?
11   A    Uh-huh.
12   Q    And it lists several things that need to be done
13   in the case of an inmate's death; is that correct,
14   sir?
15   A    That's correct.
16   Q    Were all of those things done in this case?
17   A    To my knowledge, it was.
18   Q    Thank you.
19        Now, we talked about under Mr. Swindoll's
20   questioning what the jail staff needs to do with
21   respect to emergency medical care and that they
22   should be taken to the hospital or dial 911 in case
23   of drugs, pot, crack, whiskey, meth.  Now, you're not
24   suggesting, are you, Sheriff, that every -- that
25   every drunk, every meth head, every pot head and
```

41

1    every crack head that comes through the jail if they

2    have ingested drugs or alcohol should automatically

3    be taken to the hospital?

4    A    No.  No.  Because if you did half the people

5    that are brought in would end up in the hospital.

6    Q    Exactly.

7              MR. ELLIS:  I believe that's all.  Thank

8         you.

9                   **FURTHER EXAMINATION**

10   BY MR. SWINDOLL:

11   Q    That doesn't mean that that officer that we've

12   described to has to make the assessment should not

13   determine with his best judgment whether or not that

14   inmate needs emergency medical care?

15   A    That's correct.

16   Q    And is consistent with what you and I've talked

17   about?

18   A    Yes.

19             MR. SWINDOLL:  That's it.  And thank you

20        for coming down here.

21             THE WITNESS:  Oh, you're welcome, sir.

22             MR. SWINDOLL:  I hope I didn't wear you

23        out.

24             THE WITNESS: Oh, no.  Not at all.  This

25        ain't my first rodeo.

42

1          THE VIDEOGRAPHER:  Okay.  This will

2     complete the deposition.

3          We're off the record at 2:54 p.m.

4          THE COURT REPORTER:  All right.  Thanks

5     so much.

6          (WHEREUPON, the proceedings were

7     concluded in the matter at 2:54 p.m.)

8               (WITNESS EXCUSED)

9               * * * * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**LEE ANN DICKENS, CCR**
**(501)614-7367**

43

# C E R T I F I C A T E

STATE OF ARKANSAS      )
                       )ss
COUNTY OF PULASKI      )

    I, LEE ANN DICKENS, Certified Court Reporter #403, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of a Stenotype machine and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

    I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

    WITNESS MY HAND AND SEAL this 1st day of December, 2014.

                       _____
                       LEE ANN DICKENS, CCR
                       AR NOTARY EXPIRY 10/28/15

**LEE ANN DICKENS, CCR**
**(501)614-7367**





**Subject:    INMATE DEATH**
**Policy No.  G-2**

**I.        Policy**

Inmate deaths occurring in the jail facility will be thoroughly investigated and handled by the Criminal Investigation Division.

**II.       Procedure**

A.    The jail staff will secure or preserve the scene and all evidence as if it were a homicide. This includes instruments and/or materials used to effect death.

B.    The staff member will detain, identify and separate all suspects and witnesses.

C.    The staff member will notify the Shift Supervisor.  The Shift Supervisor will notify the commander on call.

