# In The Matter Of:

*Robin Babovec v.*
*Deputy & Officers Mike Richards, et. al.*

---

*Dion McGuire*
*November 21, 2014*

---

*Grigsby Reporting Services*
*711 Foxboro Drive*
*Jacksonville, AR  72076*
*fgrigsby07@comcast.net*
*(501) 580-5117*

Original File Dion McGuire-Babovec.prn

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


ROBIN BABOVEC, as Special
Administratrix of the Estate
of CASEY BABOVEC, Deceased                    PL
                                                        AINTIFF


VS.              CASE NO: 4:13cv0699 KGB


DEPUTY & OFFICERS MIKE RICHARDS,
TONYA PARKS, CALVIN REED, DION
MCGUIRE, RYAN MCKINLEY, DAVID
FENTON, JAMES PAYNE, NANCY SHELNUTT,
SUPERVISOR LT. COURTNEY, BRUCE
PENNINGTON, JOHN & JANE DOES I-V,
COUNTY OF SALINE                    DEFENDANTS


ORAL DEPOSITION

OF

DION MCGUIRE

(Taken November 21, 2014, at 1:50 p.m.)


LEE ANN DICKENS, CCR

7315 I STREET

LITTLE ROCK, ARKANSAS  72207

(501)614-7367

2

# A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

MR. JAMES F. SWINDOLL
LAW OFFICES OF JAMES F. SWINDOLL
312 CENTER STREET
SUITE 300
LITTLE ROCK, ARKANSAS   72201


ON BEHALF OF DEFENDANTS:

MR. GEORGE D. "BUCKY" ELLIS
ELLIS LAW FIRM
126 NORTH MAIN STREET
BENTON, ARKANSAS    72018

3

## I N D E X

STYLE AND NUMBER. . . . . . . . . . . . . . . . .    1

APPEARANCES . . . . . . . . . . . . . . . . . .    2

CAPTION . . . . . . . . . . . . . . . . . . . .    4

THE WITNESS:  DION MCGUIRE

     EXAMINATION BY MR. SWINDOLL . . . . . . . .    5

     EXAMINATION BY MR. ELLIS. . . . . . . . . .    52

     FURTHER EXAMINATION BY MR. SWINDOLL . . . . .    55

     FURTHER EXAMINATION BY MR. ELLIS. . . . . . .    57

DEPOSITION CONCLUDED. . . . . . . . . . . . . .    57

COURT REPORTER'S CERTIFICATE. . . . . . . . . .    58

## E X H I B I T S

NO./DESCRIPTION:                          MARKED:

Exhibit No. 1 - Photos. . . . . . . . . . . . .    27

Exhibit No. 2 - Statement (typed) . . . . . . .    29

Exhibit No. 3 - Statement (handwritten) . . . . .    29

4

1          C A P T I O N

2      ANSWERS AND ORAL DEPOSITION OF DION MCGUIRE, a

3   witness produced at the request of counsel for the

4   PLAINTIFFS taken in the above-styled and numbered

5   cause on the 21st day of November, 2014, before LEE

6   ANN DICKENS, Certified Court Reporter, at 1:50 p.m.,

7   at the law offices of Mr. George D. "Bucky" Ellis,

8   Ellis Law Firm, 124 North Main Street, Benton,

9   Arkansas, pursuant to the agreement hereinafter set

10  forth.

11

12              * * * * * * * *

13

14          S T I P U L A T I O N S

15      IT IS STIPULATED AND AGREED by and between the

16  parties through their respective counsel that the

17  oral deposition of DION MCGUIRE may be taken for any

18  and all purposes according to the Federal Rules of

19  Civil Procedure.

20

21              * * * * * * * *

22

23

24

25

5

1                      P R O C E E D I N G S

2              THEREUPON,

3                        DION MCGUIRE,

4                THE WITNESS HEREINBEFORE NAMED,

5              having been first duly cautioned and

6              sworn by me to testify to the truth,

7              the whole truth, and nothing but the

8              truth, testified on his oath as

9              follows, to-wit:

10                       EXAMINATION

11   BY MR. SWINDOLL:

12   Q    Can you just give us your name, Dion.

13   A    Dion McGuire.

14   Q    Dion, how long had you worked for Saline County?

15   A    I worked there a total about a year.  Maybe a

16   little over a year.

17   Q    Tell me a little about your experience coming to

18   Saline County.  What had you been doing before you

19   reached Saline County?

20   A    Well, my job right before that, I worked for

21   Little Rock Waste Water.

22   Q    Okay.

23   A    But I worked for the Department of Corrections.

24   Q    How long did you work for the Department of

25   Corrections?

6

1    A    About 10.

2    Q    Ten (10) years --

3    A    Twelve (12) --

4    Q    -- or so?

5    A    -- years.  Approximately.  Yes, sir.

6    Q    What kind of duties did you have at the

7    Department of Corrections?

8    A    I was a -- well, a little bit of everything.  My

9    primary job was a kitchen captain is what they called

10   it.  I was the food service director --

11   Q    Okay.

12   A    -- for the unit.  Supervised employees as well

13   as inmates.  And then at times I had to ride regional

14   maintenance.  Hoe squad rider.  Just different

15   things.

16   Q    Okay.

17        When you came to work for Saline County as a

18   jailor?

19   A    Uh-huh.

20   Q    Is that right?

21   A    Yes, sir.

22   Q    Tell me a little bit about your first role at

23   Saline County.  What were you doing for them when you

24   came to work?

25   A    Just jail duties.  Just inmate care.

1  Q    Tell me about your training for this job.  How

2  much training did you have?

3  A    Other than prior experience, nothing.  Just my

4  prior experience and I went through a few classes

5  while I was employed with Saline County.

6  Q    As you started, what was your role in the jail?

7  A    Just jailor.

8  Q    Okay.

9  A    Just jailor.  Just counting inmates, passing

10  food out.  Just tending to their needs.

11  Q    Did you stay at that same level of jailor for

12  the entire time that you worked for Saline County?

13  A    No, sir.

14  Q    Tell me about your progression up the ranks.

15  A    I got a promotion to corporal.  I was a

16  supervisor over one of the shifts.

17  Q    So would you have been a supervisor in April of

18  2001 when this event occurred?

19  A    No, sir.

20  Q    You would have been a corporal then?

21  A    No, sir.

22  Q    You weren't a corporal then?

23  A    Huh-uh.

24  Q    So what was your job in April of 2011?

25  A    Just a jailor.

1  Q    All right.

2        Now, when did you first learn that Casey Babovec

3  was in the facility?

4  A    I walked in to the booking area -- this is the

5  best I can recall, I walked in to the booking area

6  and I just noticed that they had brought someone in

7  who was -- for lack of the use of a better word --

8  bouncing off the walls.  He wouldn't, couldn't sit

9  down.

10 Q    Uh-huh.

11 A    And just talk, talk, talk, talk.  And that's

12 when I first --

13 Q    Tell me about that.

14 A    I just observed him.  They had -- I had went

15 through a class.  We observe inmates who come in to

16 make sure that they're not too intoxicated -- too

17 drunk.  We don't -- we wouldn't accept them.

18 Q    Right.  In fact, the sheriff told me that you

19 will not accept one that's too drunk.

20 A    Absolutely.

21 Q    And why is that?

22 A    Because you're putting other inmates at risk.

23 We won't even take an inmate to the back of the jail

24 if they're too intoxicated.  We keep them up front

25 and observe them.

9

1  Q    Have you had occasion to be exposed to I guess

2  jailees who have done drugs at one point or another?

3  A    Sure.

4  Q    And what are you trained about that?

5  A    Just -- the big thing is like with meth use, the

6  stimulant -- the way that the eyes -- the dilation of

7  the eyes.

8  Q    Uh-huh.

9  A    You tilt their head back, if their eyes flutter.

10  Just different things that you -- over the years that

11  I've been taught as indications.  Shakiness.

12  Q    Shakiness.

13      Is not being able to sit still another example?

14  A    Sure.  Absolutely.

15  Q    Bowel control is another?

16  A    I guess it could be.  I mean, I'm not saying --

17  it just depends on the situation.  It could be.

18  Q    So when you first came in, can you give me an

19  estimate of what time that would be and what you saw

20  in Casey -- what time you saw him?  We know he --

21  A    It was in the evening time I want to say.

22  Q    Okay.

23  A    I want to say between 3:00 and 5:00.  I'm not

24  for sure --

25  Q    Okay.

1   A     -- on what time.  But when I observed him, my

2   supervisor I noticed was with him and so I didn't

3   really pay attention to Casey.  But I did notice him

4   when I walked in there.  Because most inmates are

5   supposed to sit down until they're booked --

6   Q     Uh-huh.

7   A     -- and Casey just didn't do it.  We had to tell

8   him numerous times, Casey, sit down.  Mr. Babovec,

9   sit down.

10  Q     And that is after when he was being booked in?

11                   THE WITNESS:  Excuse me.  Sir?

12  Q     (By Mr. Swindoll)  Is that when he was being

13  booked?

14  A     Yes, sir.  Whenever he was first brought in.

15  Q     He just wouldn't -- he couldn't sit down?  What

16  was your judgment --

17  A     I don't know if he couldn't or --

18  Q     -- on that, Dion?

19  A     -- he wouldn't.  He wouldn't.  And I think it

20  was -- I'm no professional at it.

21  Q     Yeah.

22  A     I'm not an expert.  He may be -- I mean, it

23  was -- to my best recollection he was high on

24  something.

25  Q     Okay.

1   A    And couldn't.

2   Q    All right.

3        When you have an inmate like that --

4   A    Uh-huh.

5   Q    -- a detainee in this case -- he was a

6   detainee -- can you tell me what the practices of the

7   jail were about making sure that inmate didn't need

8   care?  Medical care?

9   A    Sure.  First you just -- observation is watching

10  the inmate --

11  Q    Uh-huh.

12  A    -- to see if he has any kind of stress or

13  distress or any kind of -- and Mr. Babovec -- that's

14  what drove me into him or zeroed me in on him.

15  Q    Yeah.

16  A    Noticing him was watching him.  And, honestly --

17  for lack of the use of a better word -- he came

18  across to me as just someone who is happy and high.

19  I mean, he wasn't in any kind of distress to where I

20  would look at him any further.  I mean, he was just

21  talking and just going on about his business.

22  Q    You said your supervisor was with him when you

23  came in.  Who was that?

24  A    Sam Griffin.

25  Q    Sam Griffin.  Okay.

1      Do you know what they had been doing or

2  discussing?  You just saw what you saw.  I know that.

3  But -

4  A    I -- I -- I --

5  Q    Did you talk to your supervisor?

6  A    I believe it was -- Sam was talking to him about

7  sitting down.

8  Q    I got it.

9  A    You've got to stay sitting down.  You can't be

10  up running around.  And I think he was more or

11  less -- he was the supervisor and it's practice for a

12  supervisor to come out and take a disruptive inmate

13  off to the side and say, you know, I'm running this

14  show.  This is how it's going to be.  You need to do

15  this.

16  Q    So were you there to monitor him before he was

17  put in the jail or did you just see him in the --

18  A    No, sir.  Sam came to me and asked me to go and

19  watch him as he was showering.

20  Q    Okay.

21  A    Because he had I think urinated on himself.

22  Q    Uh-huh.

23  A    And we let him get his shower.  We thought that

24  might calm him down.  You know, take you a cold

25  shower.  Change clothes.  Get to feeling better.  And

1  whenever he came out, that's whenever I put him into

2  the holding cell.

3  Q    All right.

4       Did you have any conversation with him as you

5  were walking him back to the cell?

6  A    No.  I don't want to -- I'm not lying.  I

7  just -- I don't remember.

8  Q    That's fair.

9  A    But --

10  Q    I meant to tell you, Dion, if you don't remember

11  something, don't worry about it.  If you can't

12  remember -- there's actually some statements that

13  we'll go over in a minute to kind of clear up some

14  stuff.  I'm just trying to get what you --

15  A    Right.  And I was -- if it is, it was something

16  of act right.

17  Q    Okay.

18  A    Calm down.  You know, something to that effect.

19  Q    Okay.

20  A    If there was, I would think that that's what it

21  would have been.

22  Q    Now, this would have been April of 2011.  How

23  long had you been a jailor at this point?

24  A    Oh.  When did I start there.  Since the

25  previous -- what was it -- October, November.  About,

14

1  what, 6, 7 months.

2  Q   In the 6 or 7 months that you had been there,

3  had you seen other inmates that you thought might be

4  high?

5  A   Sure.

6  Q   Did you ever see one that you thought needed

7  emergency care because of it?

8  A   Sure.

9  Q   What did you do when you saw that?

10  A   We did not accept them into the jail.  The

11  arresting officer, we made him take that detainee to

12  the hospital and get a doctor's clearance before we

13  would accept them.

14  Q   Why?

15  A   Because we didn't -- there's not a doctor on

16  staff there.

17  Q   Uh-huh.

18  A   And we can't do anything with an inmate -- we

19  can't take him to the back because now we're putting

20  other inmates at risk to put an intoxicated person

21  back there with them.  And there's just no place

22  to -- it's not a detox.  It's a jail.

23  Q   It's a jail?

24  A   I mean, you have people in there detoxing, but

25  if they're going to cause trouble or be trouble, I

15

1  mean --

2  Q    Or be at risk?

3  A    If they can't control themselves.  If they can't

4  hold themselves up, walk by themselves, do normal

5  functions by themselves, we won't accept them.

6  Q    If you -- during that period of time, did you

7  ever see an inmate that had already been accepted

8  that you thought was high that needed emergency

9  medical care?

10  A    Sure.

11  Q    What would happen when you saw that?

12  A    I have seen the (inaudible) inmate to the

13  hospital themselves.

14  Q    Do you know what the practice in the Saline

15  County jail was in April of 2011 about emergency

16  medical care?

17              THE WITNESS:  About emergency medical

18         care?

19              MR. SWINDOLL:  Yes.

20  A    Well, we call 911 if they -- and then we have

21  AED's on the wall.  If they stop breathing --

22  Q    (By Mr. Swindoll) Uh-huh.

23  A    -- we know where AED's are.  We're certified CPR

24  and such as that.

25  Q    Okay.

16

1  A    Yes, sir.

2  Q    Were you ever trained to look and try to

3  determine -- you mentioned you had been to courses is

4  the reason I ask you this --

5  A    Uh-huh.

6  Q    -- about what drugs people on or the hazards to

7  those people that might be involved with that drug

8  use?

9  A    No, sir.  Not to the point to where if I -- I

10  could look at somebody and go he's on cocaine or he's

11  on meth.

12  Q    Okay.

13  A    Not to that extent.  No, sir.

14  Q    Could you tell that they were -- had you been

15  trained to the point where you were as a supervisor

16  able to determine how badly high a man was?  Whether

17  he was --

18  A    Sure.

19  Q    -- in trouble?

20  A    Sure.  I would even call in a street deputy to

21  give them a sobriety test right there in the booking

22  area before I'd accept them.

23  Q    Okay.

24  A    I've done that before.

25  Q    Once they were in the jail, how is that handled?

1  Is the inmate -- is the inmate allowed to ask for

2  medical care in the jail?

3  A    Sure.  Yes, sir.  They're allowed.  Yes, sir.

4  Q    If an inmate says I'm dying of a heart attack.

5  I'm having a heart attack, what is the reaction in

6  the jail?

7  A    The first thing I'm going to do is call whatever

8  medical personnel -- they've got a nurse that passes

9  out medicine.  I'm calling that person first.

10 Q    Yeah.

11 A    We're going to get a blood pressure on that

12 person.

13 Q    Uh-huh.

14 A    Depending on that blood pressure, I'm -- if it's

15 over a certain number, we're going to call 911.

16 Q    In April of 2011, was there any medical care

17 available in this jail?

18 A    Yes, sir.

19 Q    What was that?

20 A    AED's.  It's the -- I don't -- I can't remember

21 what it stands for, but it's a device if you

22 attach --

23 Q    Uh-huh.

24 A    -- it gives electrical shocks for each --

25 Q    To restart the heart.  Right.

18

1  A    Yes, sir.

2  Q    Let me ask you this.  Was there a personnel

3  present that you could have taken the inmate to or

4  the detainee to and said please check this person

5  out.  I'm worried about his health?  Was there

6  anybody --

7  A    If David Coulson (phonetic) was there, he would

8  be one -- and I'm not for sure if he was there.  But

9  we had one person who was -- at that time, if I'm not

10  mistaken, we had one person who was in the -- there

11  was a lady that done it for years.  I can't even

12  think of her name.  But, now, David Coulson was the

13  last person I know.  And there's usually someone

14  there.

15  Q    I think the sheriff told me the other day that

16  he wasn't able until October or November of 2011 to

17  actually get a medical person in the jail.

18  A    Like I --

19  Q    Does that --

20  A    Yeah.  I mean, it very well could because I

21  don't think David Coulson - he might have -- I don't

22  think he was a licensed nurse --

23  Q    Yes, sir.

24  A    -- or anything like that.

25  Q    All right.

1  A    If that's what you're asking.

2  Q    All right.

3      If an inmate has a heart attack in the jail, how

4  is it handled?

5  A    Well, we're -- if I was on duty, I would have to

6  identify that that's what he was sure enough having,

7  call 911 and get the AED if his heart has stopped and

8  progress from there.  Just keep his airway open until

9  a first responder has arrived.

10  Q    You rose to a supervisor level at some point

11  during your tenure at the jail, right?

12  A    Yes, sir.

13  Q    As a supervisor, were you required to watch

14  other jailors to be sure that they complied with the

15  general orders in the jail?

16  A    Yes, sir.

17  Q    If you saw another deputy --

18  A    Uh-huh.

19  Q    -- in your position as a supervisor who was not

20  exercising and using the general policies of the

21  jail, what would you do?

22  A    Depending on the situation --

23  Q    Uh-huh.

24  A    -- if it was violating someone -- I mean, if he

25  was -- as long as somebody is right -- unless you say

20

1 if he'd come in late, I might talk to him.

2 Q    Yeah.

3 A    If he's back there beating an inmate, I'm going

4 to send him up -- he's going to be fired, as far as

5 I'm concerned.

6 Q    Okay.

7      You're going to step in --

8 A    He's going home.

9 Q    You're going to intervene --

10 A    Sure.

11 Q    -- to protect the detainee?

12 A    Yes.

13 Q    Do you have an opinion as to whether or not --

14 if a detainee is improperly attacked by an officer or

15 force is being used or is unnecessary, does a

16 detainee have a right to defend himself?

17 A    I would say that -- to some extent, I would say

18 yes.  I mean, it just depends.  If you have a

19 crazy -- and I know there's all kinds of cops out

20 there.  If you have a crazy cop out there doing --

21 you know, beating him, I would say to a certain

22 extent, yes.

23 Q    And was it the practice at the Saline County

24 jail for the supervisors to intervene if the officers

25 -- if there were, in fact, officers who were

21

1  exercising extraordinary force?

2  A    Absolutely.

3  Q    Now, let me talk for a minute about training

4  with you if I can.

5  A    Yes, sir.

6  Q    During the time that you were employed with the

7  Saline County jail, can you estimate for me the

8  amount of training that you received with respect to

9  excessive force?

10  A    In that year I believe I went through one actual

11  class and that was in Hot Spring County.

12  Q    Tell me about that class.

13  A    It was a class on how to deal with mentally --

14  mentally challenged inmates, excessive force, riot

15  control, riots in the jail.  I believe there were

16  cell extractions maybe --

17  Q    Uh-huh.

18  A    -- in that class.  I mean, just overall dealing

19  with inmates -- troubled inmates and problem inmates.

20  Q    Did you ever receive any training on the taser?

21  A    Me myself, no, sir.

22  Q    Was there training being given to officer on the

23  tasers at that time?

24  A    They were scheduling people, like this month

25  so-and-so is going to get.  Next month -- they may

22

1    come to you in a month and say, Hey, you've got taser

2    training.

3    Q    And this day -- on April the 11th, had you

4    received any taser training at all?

5    A    No.

6    Q    I noticed that you told one of the officers who

7    investigated that you grabbed a taser?

8    A    Yes.

9    Q    What were you going to do with that taser?

10    A    Well, the holding cell was full that day.  A lot

11    of people.

12    Q    Uh-huh.

13    A    I didn't know what this guy was going to do

14    coming out the bathroom.  My job -- one of my jobs is

15    to protect him.  Even if he started the fight, it's

16    to protect him.  I didn't know if I'm going to --

17    when I opened that door, if this guy is going to come

18    out after me or what.

19    Q    I gotcha'.

20    A    I'm going to protect him.  But it got -- I threw

21    it down or it got knocked out of my hand.

22    Q    I think it got knocked out of your hand

23    according to what you said.  We'll get there in a

24    second.

25    A    Okay.

23

1  Q    During the time that you were employed as a

2  Saline County jailor, did you ever see any officer

3  exercise unnecessary force against an inmate?

4  A    No.  I mean maybe some verbal stuff, you know,

5  just talking to them rough.  But as far as beating on

6  inmates and stuff like that, no, sir.  I have to tell

7  the truth on that.  I do know one.  And that was a

8  sergeant broke a lady's arm down there one time and

9  he got fired over it.  Sergeant Hart.

10  Q    Yeah.  I remember that one.

11       Calvin Reed.  I represented another young man

12  that was accused -- Calvin Reed -- and somehow you

13  were involved in that.

14  A    Yes, sir.

15  Q    Tell me about what you remember about that.

16  A    It was Anthony Westbrook and he was getting

17  ready to be released.  He was in the booking area.

18  And for some reason -- and I still don't know why --

19  the video showed -- I was in the back, but the video

20  showed him going across booking, grabbing some

21  paperwork out of the jailor's hand that was trying to

22  discharge him and ran to the bathroom with it and was

23  going to try to flush it down the toilet.  And by the

24  time I got back up front, they were taking him in and

25  putting him in a restraint chair.

24

1  Q    Uh-huh.

2  A    I guess I'm about six years older than this kid

3  is, but he knows me from whenever I went to school.

4  And he starts hollering my name -- I mean, just over

5  and over.  And I just remember that I just kept going

6  in there and telling him that as long as you're

7  screaming and hollering they're going to keep you in

8  this chair.  Hush.  Let me find out -- I didn't even

9  know what he'd done.  Let me see what you did.  And

10  it was just a case that Anthony was accusing Reed of,

11  well, excessive force.

12  Q    Uh-huh.

13       Did you see any such exercise of excessive

14  force?

15  A    No.

16  Q    Did you ever see Officer Reed put his hand on

17  Anthony while he was in the chair?

18               THE WITNESS:  Put his hands on him as far

19        as --

20  Q    (By Mr. Swindoll)  Around his shoulders and push

21  him back up against the chair?  Did you see it?

22  A    I didn't actually see it, but I seen it on

23  video.

24  Q    Okay.

25       Where were you at that time?

25

1   A    I was in the back.  I was in the back.  That

2   happened up front.  I believe Sam Griffin was in the

3   back passing out medicine.

4   Q    Okay.

5   A    And I believe I was passing out mats for the

6   inmates at that time.

7   Q    Okay.

8   A    I'm not for sure.

9   Q    Yeah.

10       In your judgment, was that excessive force?

11   A    Him --

12   Q    Pushing him up against the wall like that?

13   A    Well, I don't -- you know what.  I'm just like

14   you-al.  You see what's on video.

15   Q    Uh-huh.

16   A    I don't know what was said.  But even though

17   he's in a chair, if you're restrained in a chair,

18   nobody should put their hands on you.  I don't know

19   the circumstances.  I don't know what happened.  But

20   nobody should -- if you restrained, then you're

21   restrained.

22   Q    That's common sense, right?

23   A    Yes, sir.

24   Q    And it was against the practice to punish a

25   detainee by putting them in the chair?

1  A    Absolutely.

2  Q    You don't punish a detainee ever?

3  A    It's not meant for punishment.  It's meant to

4  protect that inmate really.

5  Q    Okay.

6       And when he's in there, it would be the policy

7  of the jail not to use force against an inmate that's

8  already restrained in that chair?

9  A    I'd better not ever see it.

10 Q    Now, I made some pictures for us off of the tape

11 because -- and there's a copy for you -- could I have

12 the one with the numbers on the front?  Let's use

13 this one.  I want to be sure I know who these people

14 are.

15          MR. ELLIS:  This one?

16          MR. SWINDOLL:  Yeah.  That's the same

17       copy, I think.  It's just -

18          MR. ELLIS:  Which one do you want me to

19       use?

20          MR. SWINDOLL:  Use that one because

21       they're --

22          THE COURT REPORTER:  All right.  Now,

23       give me a sign.

24          MR. SWINDOLL:  All right.

25          MR. ELLIS:  Now, let's back up.  Off the

1           record.

2                   (THEREUPON, after a brief discussion was

3           held off-the-record, the proceedings resumed

4           as follows, to-wit:)

5                   MR. SWINDOLL:  We'll mark these as 1.

6                   THE COURT REPORTER:  All right.  Thanks.

7                   (THEREUPON, Exhibit No. 1 was marked for

8           identification and is attached hereto.)

9    Q    (By Mr. Swindoll)  Okay.

10        Dion, I have one and I'm guessing that's you,

11   but I'm not sure.

12   A    Yeah.  I was thinking I -- I mean, I was the

13   first one -- I opened the door.

14   Q    Yeah.

15        And if you will look, Casey comes out on the

16   next one -- the next one over.

17   A    Let me see.

18   Q    And you were there.  And I think you're the one

19   --

20   A    No.  That is Parker.

21   Q    That's Parker?

22   A    I can see her hat and her hair on the back of

23   her neck.  That is me on the right.

24   Q    Okay.  All right.

25   A    From my torso down.

1    Q    Sure.

2         So when I have No. 2, that is Dion?

3    A    I believe so.  I would say yes.

4    Q    And that is Officer Parker?

5              MR. ELLIS:  No. 1.

6    Q    (By Mr. Swindoll)  No. 1 is Tonya Parker?

7    A    Yes, sir.

8    Q    Do you know who No. 3 is?

9    A    I do.  Oh.  What is her name.

10   Q    Shellnutt?

11   A    That is her.  Nancy Shellnutt.

12   Q    Yeah.

13   A    And the guy he first attacked is Sam Griffin

14   with a hat and those are corporal stripes on his arm

15   there.

16   Q    Okay.

17   A    And the other two I don't -- I can't tell.

18   Q    Okay.

19              MR. SWINDOLL:  I think before we go any

20         further, let's introduce the statements that

21         you gave in this case and there were three of

22         them.

23              THE WITNESS:  Okay.

24              MR. SWINDOLL:  Or at least two.  One

25         might have been typed up after you -- after

29

1       the handwritten one.

2            MR. ELLIS:  Let me interject.  I've gone

3       over -- my paralegal and I have gone over

4       those.  I think what you have before you, you

5       had a handwritten version and a typewritten

6       version --

7            MR. SWINDOLL:  That's what I --

8            MR. ELLIS:  -- and they are word-for-word

9       the same.

10           MR. SWINDOLL:  Okay.

11  Q    (By Mr. Swindoll)  Dion, I'd like for you to

12  look at this for a minute.

13  A    Yes.

14  Q    And if you haven't reviewed those lately, if you

15  want to take a second to look at them, you can.  If

16  you've reviewed them, I've just got a few questions.

17  I'd like to go over the statements.

18  A    Go ahead.

19  Q    I don't mean to wear you out with it.

20  A    That's all right.

21  Q    Okay.

22           THE COURT REPORTER:  All right.  May I

23       just interject for a second?

24           MR. SWINDOLL:  Yes.

25           THE COURT REPORTER:  Are we marking

1      something?

2          MR. SWINDOLL: Yeah. We're going to mark

3      -

4          THE COURT REPORTER: Can we talk about

5      this?

6          MR. SWINDOLL: Please, let's do. The

7      package of photos is 1. And then we'll mark

8      these 2 and 3.

9          THE COURT REPORTER: All right. Thanks.

10     I'm so sorry I interrupted.

11         (THEREUPON, Exhibit Nos. 2 and 3 were

12      marked for identification and are attached

13      hereto.)

14  Q   (By Mr. Swindoll) We're looking at Exhibit No.

15  3 which, I think, is a statement, Dion, that you

16  made -- and it looks like the time shows it was the

17  next day?

18         THE WITNESS: What? The statement?

19         MR. SWINDOLL: Yeah.

20         THE WITNESS: What does it say?

21  Q   (By Mr. Swindoll) The date and time?

22  A   4/18.

23  Q   Okay.

24     Well, that's the same day you interviewed the

25  police officer.

31

1  A    Yes, sir.

2  Q    Did you make any written statement before 4/18?

3  A    I don't remember.  I really don't.

4  Q    Do you know whether or not you filed a use of

5  force report in this case?

6  A    I don't -- I really don't recall.  I want to say

7  yes, but I'm not -- I can't say yes.  I don't recall.

8  Q    Okay.

9       A use of force -- you know what that document

10  is, don't you?

11  A    Yes, sir.

12  Q    What's the purpose of the use of force document?

13  A    A use of force is to just document anything

14  that -- any kind of force that may be used against an

15  inmate.

16  Q    Okay.

17  A    It can be used for later.

18  Q    Okay.  Yeah.  Okay.

19       Now, I've got a statement -- and I thought I

20  made three copies, but apparently I did not.  So I'm

21  just going to look here for a minute and ask you --

22  and that may be -

23       "While in the shower room, I noticed he was

24  acting very strange and was on some type of

25  stimulant."

1    A    Uh-huh.

2    Q    Now, back to what you and I were talking about

3    when you were asked to help him later in the day

4    after the booking, he was still on -- acting like he

5    was still on stimulants you thought; is that right?

6    A    I don't know if he was ever booked in.  But from

7    the time he came in --

8    Q    Uh-huh.

9    A    -- until the time that the incident happened --

10   Q    Uh-huh.

11   A    -- he appeared to be on something that had his

12   blood pressure up.

13   Q    Okay.  All right.

14   A    And I don't mean actual blood.  I mean, he

15   was jittery.  Like I said, couldn't sit down.

16   Q    Right.

17   A    Wouldn't quit talking.

18   Q    Now, showing signs of being under the same

19   influence we're talking about, right?  The one you

20   jut mentioned?

21   A    Yes, sir.  He was up and he was down and he was

22   talking.  Yes, sir.

23   Q    Now -- okay.  The second page, it says "When I

24   stood, I turned and noticed Mr. Babovec sitting --"

25   -- now, this is after the event?

1  A    Yes, sir.

2  Q    "Mr. Babovec was sitting on the floor.  I did

3  not see Mr. Babovec spit blood."

4  A    It says I did see.

5  Q    Oh, I did see.  Okay.  What does that mean?

6  A    He was -- right after the incident happened, he

7  and I were on the bottom.  I stood up.  By the time I

8  could turn around, they had him sitting up.

9  Q    Okay.

10  A    And his head was down like this (indicating) and

11  there was blood coming out of his mouth.

12  Q    Okay.

13  A    And I did.  I want to say I did.  I thought now

14  he's all right.  You know, they've done backed him

15  up.  He's breathing.  He's fine.  Well, I turned to

16  go to the bathroom because as you read in there he

17  had bitten me.

18  Q    Right.

19       But he was actually sitting up.  Was he

20  speaking?

21  A    Not that I heard.  Actually, to be honest, I

22  didn't even see his face.  He was sort of sitting

23  with his back to me.

24  Q    When they took him out of the cell where you

25  were interacting with Mr. Babovec and took him to the

34

1    other cell, did you ever see him again in the other

2    cell?

3    A    Yes, sir.

4    Q    Okay.

5         You --

6                   MR. ELLIS  "By the other cell," do you

7         mean Cell No. 5?

8                   MR. SWINDOLL:  Cell No. 5.

9    Q    (By Mr. Swindoll)  You took the equipment in

10   there, didn't you?

11   A    Yes, sir.

12   Q    Who was in there at the time?

13   A    If I recall, there was Mike Prewitt, Calvin

14   Reed, Sam Griffin, I believe Tonya Parker was

15   standing in there.

16   Q    Now, it says "While I was observing the deputies

17   working on Babovec, inmate Christie Nichols was

18   sitting on the bench in booking and was stating to me

19   that Babovec had told her while he was sitting there

20   that he had swallowed two grams of meth before he

21   came into the jail."

22   A    Yes.

23   Q    Who is Christie Nichols?

24   A    She was a female detainee that was there being

25   booked at the time also.

35

1  Q    And then it says "I knew I was looking at a dead

2  man before any fight broke out with the deputies."

3  What did you mean by that?

4  A    No, sir.  She.  Nichols stated.

5  Q    Oh, okay.

6  A    She said that, that she knew she was looking at

7  a dead man before he even got into it with the --

8  Q    Do you know what that meant?

9  A    She was just -- the way I --

10  Q    That's what I'm asking.

11  A    -- took it was he had told her that he had taken

12  this drug and she knew that meth kills you.  I

13   mean --

14  Q    Yeah.

15  A    I don't --

16  Q    That's what it looks like, but if there was

17  something else that you thought I wanted to hear

18  that.

19  A    No, sir.

20  Q    Now, were you there at any time when they were

21  interviewing the inmates -- the Arkansas State Police

22  came in and interviewed on the 18th?  They

23  interviewed Christie Nichols.  They interviewed

24  several others.  They may have interviewed you.

25  A    Yes.  I was interviewed by the state police

36

1   investigator, but was I --

2   Q    Were you in the jail when they were interviewing

3   Christie Nichols and others?

4   A    I don't know because I don't know when they

5   interviewed her so I don't know if I was in the jail

6   or not.

7   Q    Okay.  I mean, if you don't know, you don't

8   know.

9   A    Yes, sir.

10  Q    We can move that way.  Okay.

11       In Exhibit No. 2 -- you were looking at 3.  And

12  I'll read it to you and hand it over.

13  A    Okay.

14  Q    It says "I reached in and grabbed Mr. Babovec by

15  his shirt and pulled him from the cell."

16  A    Uh-huh.

17  Q    And what do you mean by that?

18  A    Whenever I opened the door, that guy he

19  slapped --

20  Q    Uh-huh.

21  A    -- was tearing him up.

22  Q    Okay.

23  A    And I reached in there and I grabbed him and I

24  pulled him out.  I see here where he's standing here,

25  but you can see me over here.  I've got a hold of him

1  and I pulled him from that cell and I was directing

2  him at that time to go to the ground because he'd

3  just assaulted another inmate.

4  Q    Okay.

5       Let me look at one -- it prefaces that.  It says

6  "When I got to the cell door, Mr. Babovec was

7  standing just inside the door."

8  A    Uh-huh.

9  Q    And you just told me that while he was standing

10  there another inmate was still attacking him?

11  A    Yes.  He -- whenever he come around -- and it

12  looked like he was running from the guy.  Because he

13  come around and when I opened the door, boom.  He's

14  right there.  And I reached in because I didn't know

15  if this guy was fixing to come out the door, too, on

16  him.  And then you can see the whole all this is

17  going on there's an officer standing at that door --

18  Q    Okay.

19  A    -- to keep people from coming out.

20  Q    And that's Parker?

21  A    Yes, sir.

22  Q    Tonya Parker?  Okay.

23       It says "I started giving him direct orders to

24  go to the ground."  We just discussed that.

25  A    Yes, sir.

38

1  Q    "He became very combative and would not submit

2  to my orders."

3  A    Absolutely.

4  Q    And then escorted him to the ground.  Tell me

5  about the take-down.

6  A    Okay.  I came up -- he was stout.  I mean, I

7  don't know if it was from whatever he was on or

8  whatever but he was pretty stout that day.  And we

9  got to scuffling around and I came from behind him.

10  They teach us a choke-hold.

11  Q    Take-down.  I got it.

12  A    Got a hold of him with his legs and we went down

13  and that's my arm ended up underneath him where he

14  was biting me.

15  Q    Okay.

16  A    So I'm laying half on him.  And after that,

17  everybody just --

18  Q    How many officers did you estimate were involved

19  when the incident happened?

20            THE WITNESS:  Including me?

21            MR. SWINDOLL:  Uh-huh.

22  A    Maybe six.

23  Q    (By Mr. Swindoll)  Okay.

24  A    Could be one or two more or less.

25  Q    I counted as many as eight, but it could be just

1  six.

2  A    And like I said, I couldn't see --

3  Q    What was their role?  I mean, if you had him

4  ground already --

5  A    We couldn't get him -- I couldn't -- whenever we

6  got him on the ground, we're still wrestling on the

7  ground.  He's got me and he -- he almost had me

8  instead of me having him.

9  Q    Uh-huh.

10  A    And he wouldn't put his hands behind his back.

11  He kept fighting.  And the reason it took me -- as

12  you see -- and I'm not taking anything away from

13  these girls, but these are young little nice petite

14  girls.  And it took most of them I mean just to act

15  as one man and I don't mean that in any rude way.

16  But there was a lot of women in there that -- that

17  was my first step with Parker and Shellnutt.  And

18  then whenever they seen all of us struggling, that's

19  when I --

20  Q    Did you feel or see or hear anybody tase Casey

21  while you had him on the ground?

22  A    Did I feel, see or hear it.  Yes.

23  Q    Tell me about that.

24  A    I just heard the taser.  I just heard the taser,

25  and it was --

40

1    Q    Was it a dry tase --

2    A    Yes, sir.

3    Q    -- up against the skin?

4    A    Yes, sir.

5    Q    And it makes a different sound, doesn't it?

6    A    Yes, sir.

7    Q    Tell me what you heard.

8    A    Just a tat, tat, tat, tat of the taser.

9    Q    Did the taser go all the way as he was doing

10   that?  Did it discharge completely?

11   A    Just about.  The battery was going down.

12   Q    Now, when are you taught to use the dry tase?

13   A    When you're trying to get an inmate to comply

14   with an order or to just get control of an inmate.

15   Q    Is there a difference in application for the

16   guards to use a dry tase?

17   A    I couldn't say.  I hadn't really been through

18   that training.

19   Q    Was it the practice in the jail --

20            THE WITNESS:  Do what?

21   Q    (By Mr. Swindoll)  Was it the practice in the

22   jail in April of 2011 for untrained people to use

23   tasers?

24   A    Should have been.  Yes, sir.

25   Q    I think you misunderstood my question.  Was it

41

1    the practice of the jail for people who had not been

2    trained in tasers to use tasers?

3    A    No.  No, sir.  No.  It wasn't practice.  If you

4    wasn't trained, you should not be tasing anybody.

5    Q    It would have been against the practice in the

6    jail?

7    A    Yes, sir.

8    Q    Why is that?

9    A    Because you should know what it feels like to be

10   tased.  What you're applying to somebody, you should

11   know what that feels like so you don't over-tase

12   someone or use excessive force.

13   Q    Now, in your judgment as a jailor in the

14   take-down and then the restraint, should an inmate --

15   a detainee ever asphyxiate during a take-down or

16   restraint?

17              MR. ELLIS:  Do you know what asphyxiate

18         means?

19              THE WITNESS:  Whenever you can't breathe.

20              MR. ELLIS:  Yes, sir.

21   A    And to me -- and I'm just being honest with you.

22   I'm not trying to be difficult.

23   Q    (By Mr. Swindoll)  Oh, I know.  I'm not --

24   A    To me, if would -- the circumstances would be

25   different.  It depends on if they're on -- and this

42

1  is just me.  I mean, if they're on something that's

2  going to cause their heart to explode or -- I mean it

3  could possibly happen.  It just depends on what that

4  inmate is on or not on.

5  Q    And that's just your assessment.  You don't

6  really have any training to know whether or not any

7  drug would cause an asphyxiation, do you?

8  A    The only thing that I would know first-hand is a

9  mixture of drugs -- you know, drinking along with

10  pain pills and stuff like that I've always heard that

11  would do it.  But that's my only -- I'm not a

12  professional on it.

13  Q    If the autopsy report shows that one of the

14  causes of deaths was asphyxiation --

15  A    Uh-huh.

16  Q    -- can you explain that to me?

17            MR. ELLIS:  And I'll object to the form

18        of the question because I don't think that is

19        what the autopsy report shows, but go ahead

20        and answer the question if you can.

21            THE WITNESS:  Would you say it again,

22        please?

23  Q    (By Mr. Swindoll)  I'm just asking that if one

24  of the causes was asphyxiation in the death of Casey

25  Babovec, can you -- you were in the middle of it --

43

1    A    Sure.

2    Q    Can you explain how he was asphyxiated?

3    A    No, sir.  Other than if he choked on -- you

4    know, people -- I don't know their bodily functions

5    whenever they pass away, they -- I don't know if he

6    choked on something.  I know that it wasn't -- nobody

7    physically choked him.

8    Q    Did you see the release of his fluids on the

9    floor there in the middle of the jail?

10   A    Honestly I didn't see it.  I smelt it.  He did

11   defecate himself.

12   Q    Did you hear Casey Babovec say I'm not

13   resisting.  I can't breathe?

14   A    No, sir.  I really did not.

15   Q    If you hear an inmate say that, what should a

16   jailor do?

17   A    I'm going to check and see what's keeping him

18   from breathing.  Because, I mean, there shouldn't --

19   there's not a method -- holding somebody's breath,

20   choking them unless you're in a fight for your life

21   with a detainee, it's not a normal practice just to

22   cut off their air.

23   Q    The --

24   A    So that would be the first thing I would look

25   for.

44

1  Q    Okay.

2       You're cuffing this guy with his hands behind.

3  A    Uh-huh.

4  Q    If people are sitting on him while that's

5  happening, can he asphyxiate?

6            MR. ELLIS:  Now, wait a minute.  Now --

7  A    Well, I'm not a doctor.  I don't know.

8            MR. SWINDOLL:  If he doesn't know, Bucky,

9        he can say he doesn't know.

10  A   But I'm just saying his hands weren't like this

11  (indicating).  His hands were underneath me.

12  Q    (By Mr. Swindoll)  Once they got --

13  A    Uh-huh.

14  Q    -- the handcuffs on him -- his hands were cuffed

15  behind him --

16  A    Yes, sir.

17  Q    -- was he able to keep you from sitting on him?

18  A    After he was handcuffed, I mean, I don't even

19  remember him having handcuffs put on him, to be

20  honest.  Now, he could.  He could have been hog-tied,

21  but I don't know.

22  Q    He's hog-tied.  Here's the picture of it.

23  A    Okay.

24  Q    It's obvious he's hog-tied.

25            MR. ELLIS:  It's not obvious to me, Mr.

1           Swindoll.

2                 MR. SWINDOLL:  Okay.  If it's not obvious

3           he's hog-tied --

4    Q    (By Mr. Swindoll)  What does hog-tied mean, just

5    so we know?

6    A    Just hobbled.  That's with your legs brought up

7    behind your back and your hands and that never

8    happened to him that day.

9    Q    His hands were behind him?

10   A    Because whenever he's --

11                MR. ELLIS:  Exactly.

12   A    Whenever -- well, yes.  Yes, sir.  Now, his

13   hands might have been behind him.  But hog-tied, no,

14   sir.

15   Q    (By Mr. Swindoll)  Okay.

16   A    And that was because at the time we were on the

17   bottom of the pile that's what we were trying to do.

18   Q    Have you reviewed the film?

19                THE WITNESS:  Have I reviewed the film?

20                MR. SWINDOLL:  Uh-huh.

21   Q    (By Me. Swindoll)  Have you ever seen it?

22   A    I don't think I have.  Let me -- I have seen it

23   on phones from people.  It was all over U-Tube or

24   something.  Somebody put it on.

25   Q    That day in the jail who would have been the

46

1 person most likely with the responsibility to ensure

2 that the inmate was not too high?

3 A    Sam Griffin.

4 Q    Okay.

5 A    That would be my -- he was the shift supervisor

6 at that time.

7 Q    And it was his job under the rules to evaluate

8 and determine what was necessary?

9 A    Yes, sir.  As far as inmate care, you know,

10 being too intoxicated to come into the jail.  Yes,

11 sir.

12 Q    What about while they're in the jail -- if

13 they're in the jail?

14          MR. ELLIS:  What was your question again?

15 Q    (By Mr. Swindoll)  Once they're into the jail,

16 whose job is it to ensure that they are not a danger

17 to themselves through the use of drugs?

18 A    That would be the deputies on duty.

19 Q    It would be any jailor that was supposed to

20 assess and look?

21 A    Sure.  That's everybody's job is the inmates'

22 care.

23 Q    Okay.

24      Were detainees treated any differently than the

25 rest of jail inmates?

1  A    Say that one more time.

2  Q    Were detainees --

3  A    Uh-huh.

4  Q    -- treated any differently -- housed separately

5  or protected in any way differently than the other

6  inmates?

7  A    No, sir.  Not that I know of.  I don't --

8  detainees, you're talking about someone who is just

9  booked in and inmates somebody who is --

10  Q    Like Casey.  He hadn't been to the jail yet and

11  they called him a detainee.

12  A    No, sir.  I mean, everybody is brought in and

13  booked and you're either put in a cell waiting to go

14  to trial or after you get through being convicted or

15  whatever your sentence is, you either go to a

16  misdemeanor pod or you go to the felony pod to wait

17  to go down to the farm.  And everybody is treated the

18  same unless there's something in their medical jacket

19  or their inmate record saying that there's something

20  wrong with them.  And then we do have a medical ward

21  there where we're isolate them and keep an eye on

22  them.

23           MR. SWINDOLL:  Let's take just a two-

24        minute break and I might be through.

25           (THEREUPON, after a short break, the

48

1        proceedings resumed as follows, to-wit:)

2   Q    (By Mr. Swindoll)  Did you have an opinion when

3   you stepped up and removed yourself from the area as

4   to whether or not Casey Babovec was alive or dead?

5   A    At the time I walked away, I thought the man was

6   alive.  I didn't know anything was wrong until I come

7   out of the bathroom.  I came out of the bathroom and

8   they're all gathered up over there and I walked over

9   and I heard -- I think it was Griffin or Parker one

10  said he's not breathing.  And as soon as that was

11  said -- and I'm not just -- I am bragging on these

12  guys -- everybody jumped.  And they done -- I would

13  say everything that -- all the capabilities we had at

14  that jail to save that man we were using it.

15  Q    Do you know how long he was in the cell by

16  himself handcuffed?

17              MR. ELLIS:  Now, wait a minute.  Which

18       cell?

19              MR. SWINDOLL:  Cell 5.

20  A    I don't know if he was.  If he was, it was right

21  after they took him in there.  Everybody came out.

22  And then I think that's when Ms. Parker and him went

23  in there and that's when they observed him not

24  breathing.  And then they went back into --

25  Q    (By Mr. Swindoll)  Was Austin Reed part of that?

49

1               THE WITNESS:  Sir?

2    Q    (By Mr. Swindoll)  Was Calvin Reed part of that?

3    A    He was in there.  Yes, sir.

4    Q    The first time you heard he wasn't breathing,

5    that's when everybody --

6    A    Yes, sir.

7    Q    Do you know how long he had not been breathing

8    when that happened?

9    A    I don't know just the time.  I mean, it was

10   (indicating).  By the time I got up, walked over and

11   rinsed my arm off and came back, it wasn't a minute.

12   I mean, I was there and then came back.  Because I

13   thought the guy was still alive doing well and I

14   wanted to get back in case they needed help again.  I

15   didn't know anything was wrong until I got back over

16   there and heard that.  And that wasn't -- I would say

17   a minute, a minute-and-a-half at the most.

18   Q    You can't think of any reason why he would have

19   been left in that cell for 7, 8, 9 minutes by

20   himself?

21   A    Absolutely not.

22   Q    Why would you not want to think that happened?

23   A    Because it didn't take that long for them to

24   realize that something was wrong with him.  And once

25   they did, they didn't just leave him laying there.

50

1    Q    Now, the taping system that they have in the

2    jail doesn't have any audio, does it?

3    A    Not that I'm aware.  No, sir.

4    Q    Tell me whether or not people sitting at the

5    desk can hear inside that cell?

6    A    Oh, let me think.  No.  I don't believe they can

7    hear inside the holding cell.

8    Q    The holding cell is what I'm asking.

9    A    It's just the cells in the back where they have

10   an intercom.  Nobody at the booking area can hear

11   what's being said in there that I'm aware of.

12   Q    How would an inmate speak to any jailor if they

13   can't -- don't know -- I mean, how could he get the

14   attention of a jailor?

15   A    They knock on the door.  They've got glass in

16   the door.  They can knock on the door, come up to the

17   door.  And there's a jailor comes around once every

18   15 minutes that looks in and checks on them.

19   Q    If a jailor is checking and one of the detainees

20   or inmates says that they are having a serious health

21   issue, what is that jailor to do?

22   A    First thing they do normally is call the

23   supervisor.  And if there's a -- someone who is on

24   the medical team that passes out the medicine,

25   they'll call them.  And they usually bring what they

51

1  call the crash cart over, removed the inmate from the

2  cell, take their blood pressure and make sure all

3  their vital signs is right.  And if anything is

4  inadequate with that, then, I mean, it's -- we

5  normally call 911 and ask them to come look at this

6  inmate.

7  Q    You talked about a crash cart.  Is that kind of

8  like a medical crash cart?

9  A    It's a cart where we take it to the back and

10  have to issue out inmates their own medication.

11  Q    Uh-huh.

12  A    And on that cart you have a blood pressure cuff,

13  a fever thermometer.  Things like that.

14  Q    You are not working for the jail anymore?

15  A    No.

16  Q    Could I have your cell number so we can contact

17  you for the trial?   It starts January 26.

18           MR. ELLIS:  You can get him through me.

19           MR. SWINDOLL:  Oh, yeah.  That's right.

20      Well, then, the next time I see you, I guess

21      we'll be at the trial.

22           THE WITNESS:  Okay.

23           MR. SWINDOLL:  Thank you for coming down

24      and visiting with us.

25           THE WITNESS:  Yes, sir.

52

1           MR. ELLIS:  I have just a couple of

2       little things.

3                     EXAMINATION

4  BY MR. ELLIS:

5  Q    Again, I'm looking at Exhibit No. 3 which is a

6  handwritten version of your statement.  "I yelled

7  for --" -- and I'm about two-thirds of the way down

8  on Page 2.

9  A    Okay.

10 Q    "I yelled for the deputies to grab Babovec's arm

11 from under me as I tried to push his arm back from

12 under me."

13 A    Uh-huh.

14 Q    "The deputies cuffing Mr. Babovec got his arm

15 and shortly after they got his arm from under me, I

16 heard 'he's cuffed' clear."

17 A    Yes, sir.

18 Q    Did I read that correctly, sir?

19 A    Absolutely.

20 Q    And at that point, is that when everybody got

21 off of him?

22 A    That's when everybody started coming off of him.

23 Q    They started coming off of him.

24      And after that, you saw him sitting up?

25 A    Sitting in an upright position.  Yes, sir.

53

1  Q    And then after -- immediately after that, I took

2  it from questioning by Mr. Swindoll is when you went

3  into the bathroom to rinse off your arm where he had

4  bitten you?

5  A    Yes, sir.

6  Q    And then you went into Cell 5?

7  A    Right.

8  Q    And that was about 90 -- at the most 90 seconds?

9  A    Yes, sir.

10  Q    Now, while you were in the bathroom, that must

11  have been when they took him to Cell 5?

12  A    Yes, sir.

13  Q    Okay.

14      Was there ever a time then in Cell 5 that you

15  know of when he was unaccompanied by a jailor?

16  A    No, sir.  Every time I seen him there was

17  someone in there.  And other than that, the only

18  other time I was absent from there was when I went to

19  grab the AED and the stethoscope and things like

20  that.

21  Q    But that was after they said he's not breathing?

22  A    Right.  That's when I walked out and I heard

23  them say that and Griffin said go get -- I mean, he

24  was on it.  He done -- he tried.

25  Q    All right.

1                  MR. SWINDOLL:  Well, why --

2                  MR. ELLIS:  I ain't through yet.

3                  MR. SWINDOLL:  Keep on.  You're

4          entertaining me.

5    Q   (By Mr. Ellis)  When you went to the door at Cell

6    1 after he had gotten in a fight --

7    A    Uh-huh.

8    Q    -- and just to use the vernacular, he had

9    apparently picked out the biggest dude in the room --

10   A    Yes, sir.

11   Q    -- to fight with?

12   A    Yes, sir.

13   Q    And I don't want to interject into this case in

14   any dramatic way, but did he just happen to also be

15   the only African American in that cell?

16   A    The only black man in the cell.

17   Q    Of about -- I don't know -- a dozen folks?

18   A    About a dozen.

19   Q    So he goes over and he picks this fight.  You

20   saw that -- did you see that part on the video?

21   A    I did -- yes, sir.  I mean, I caught it right --

22   he's sitting there for just a couple of seconds.

23   And, I mean, it wasn't 10 seconds and he's back up

24   and just -- he walked over to the guy and just --

25   Q    Okay.

55

1    A    I think he slapped him.

2    Q    And so you went to the door --

3    A    Uh-huh.

4    Q    -- and by then the scuffle looked like the other

5    follow was getting the best of Mr. Babovec?

6    A    When I opened the door, Casey was ducking a shot

7    and he was coming towards the door.

8    Q    So it was your effort then to look after Mr.

9    Babovec's welfare --

10   A    Absolutely.

11   Q    -- with regard to that fight?

12   A    Sure.  That was my main thing because he -- yes,

13   sir.  Get him out of there, get them separated --

14   Q    Uh-huh.

15   A    -- get him totally out of there and then find

16   out what's going on.

17   Q    All right.

18              MR. ELLIS:  I think that's all I have.

19                   FURTHER EXAMINATION

20   BY MR. SWINDOLL:

21   Q    I want to follow-up.  You said that you didn't

22   know of any time when there was not a deputy present

23   with Casey in Cell 5?

24   A    Yes, sir.

25   Q    What's the practice?  Why would there always be

56

1  a deputy present?

2  A    Well, there were just so many people there.

3  And, I mean, I don't know.  I don't know what was

4  going through their mind.  I wouldn't -- if I was a

5  supervisor and I had an inmate that was unconscious,

6  possibly dead, nobody is going to leave his side.

7  We're going to keep eyes on him until the proper

8  people get there so I can answer some questions.

9  Q    Why would you do that?

10 A    For court purposes.  If you think that inmate is

11 dead or if he's not breathing or dying, it's for

12 court purposes.  Don't have a reason to believe

13 anything else happened to him.  I had my eyes on him

14 ever since this happened.

15 Q    For court purposes.  What about the health of

16 the inmate?

17 A    Well, that's what I'm saying.  If I found out

18 he's already not breathing -- for one, if he's not

19 breathing, why wouldn't we be in there.  I mean, I'm

20 not asking you to -- I'm just saying, to my

21 knowledge, sir, he never -- he wasn't left alone.  If

22 he was, I did not see it.

23 Q    And you can't imagine any reason of why it would

24 happen?

25 A    No, sir.  I couldn't.  I really couldn't.

57

1  Q    Okay.

2                    FURTHER EXAMINATION

3  BY MR. ELLIS:

4  Q    Did it look to you like those people in that

5  room were trying to save his life?

6  A    Absolutely they were.

7           MR. ELLIS:  Thank you.  Nothing further.

8           THE COURT REPORTER:  All right.  Thanks

9        so much.

10          (WHEREUPON, the proceedings were

11       concluded in the matter at 2:45 p.m.)

12              (WITNESS EXCUSED)

13           *  *  *  *  *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

58

# C E R T I F I C A T E

STATE OF ARKANSAS     )

                         )ss

COUNTY OF PULASKI     )


    I, LEE ANN DICKENS, Certified Court Reporter #403, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of a Stenotype machine and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

    I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

           WITNESS MY HAND AND SEAL this 17th day of December, 2014.


                        _____

                        LEE ANN DICKENS, CCR
                        AR NOTARY EXPIRY 10/28/15


                                       LEE ANN DICKENS, CCR
                                        (501)614-7367

## A

**able (4)**
9:13;16:16;18:16;
44:17
**above-styled (1)**
4:4
**absent (1)**
53:18
**Absolutely (9)**
8:20;9:14;21:2;
26:1;38:3;49:21;
52:19;55:10;57:6
**accept (6)**
8:17,19;14:10,13;
15:5;16:22
**accepted (1)**
15:7
**according (2)**
4:18;22:23
**accused (1)**
23:12
**accusing (1)**
24:10
**across (2)**
11:18;23:20
**act (2)**
13:16;39:14
**acting (2)**
31:24;32:4
**actual (2)**
21:10;32:14
**actually (5)**
13:12;18:17;24:22;
33:19,21
**AED (2)**
19:7;53:19
**AED's (3)**
15:21,23;17:20
**African (1)**
54:15
**again (5)**
34:1;42:21;46:14;
49:14;52:5
**against (8)**
23:3;24:21;25:12,
24;26:7;31:14;40:3;
41:5
**AGREED (1)**
4:15
**agreement (1)**
4:9
**ahead (2)**
29:18;42:19
**ain't (1)**
54:2
**air (1)**
43:22
**airway (1)**
19:8
**alive (3)**
48:4,6;49:13

**allowed (2)**
17:1,3
**almost (1)**
39:7
**alone (1)**
56:21
**along (1)**
42:9
**always (2)**
42:10;55:25
**American (1)**
54:15
**amount (1)**
21:8
**ANN (1)**
4:6
**Anthony (3)**
23:16;24:10,17
**anymore (1)**
51:14
**apparently (2)**
31:20;54:9
**appeared (1)**
32:11
**application (1)**
40:15
**applying (1)**
41:10
**Approximately (1)**
6:5
**April (7)**
7:17,24;13:22;
15:15;17:16;22:3;
40:22
**area (6)**
8:4,5;16:22;23:17;
48:3;50:10
**Arkansas (2)**
4:9;35:21
**arm (9)**
23:8;28:14;38:13;
49:11;52:10,11,14,
15;53:3
**around (7)**
12:10;24:20;33:8;
37:11,13;38:9;50:17
**arresting (1)**
14:11
**arrived (1)**
19:9
**asphyxiate (3)**
41:15,17;44:5
**asphyxiated (1)**
43:2
**asphyxiation (3)**
42:7,14,24
**assaulted (1)**
37:3
**assess (1)**
46:20
**assessment (1)**
42:5
**attach (1)**

**17:22**
**attached (2)**
27:8;30:12
**attack (3)**
17:4,5;19:3
**attacked (2)**
20:14;28:13
**attacking (1)**
37:10
**attention (2)**
10:3;50:14
**audio (1)**
50:2
**Austin (1)**
48:25
**autopsy (2)**
42:13,19
**available (1)**
17:17
**aware (2)**
50:3,11
**away (3)**
39:12;43:5;48:5

## B

**Babovec (16)**
8:2;10:8;11:13;
32:24;33:2,3,25;
34:17,19;36:14;37:6;
42:25;43:12;48:4;
52:14;55:5
**Babovec's (2)**
52:10;55:9
**back (27)**
8:23;9:9;13:5;
14:19,21;20:3;23:19,
24;24:21;25:1,1,3;
26:25;27:22;32:2;
33:23;39:10;45:7;
48:24;49:11,12,14,
15;50:9;51:9;52:11;
54:23
**backed (1)**
33:14
**badly (1)**
16:16
**bathroom (7)**
22:14;23:22;33:16;
48:7,7;53:3,10
**battery (1)**
40:11
**beating (3)**
20:3,21;23:5
**became (1)**
38:1
**behind (7)**
38:9;39:10;44:2,
15;45:7,9,13
**bench (1)**
34:18
**Benton (1)**
4:8

**best (3)**
8:5;10:23;55:5
**better (4)**
8:7;11:17;12:25;
26:9
**big (1)**
9:5
**biggest (1)**
54:9
**bit (2)**
6:8,22
**biting (1)**
38:14
**bitten (2)**
33:17;53:4
**black (1)**
54:16
**blood (8)**
17:11,14;32:12,14;
33:3,11;51:2,12
**bodily (1)**
43:4
**booked (7)**
10:5,10,13;32:6;
34:25;47:9,13
**booking (8)**
8:4,5;16:21;23:17,
20;32:4;34:18;50:10
**boom (1)**
37:13
**bottom (2)**
33:7;45:17
**bouncing (1)**
8:8
**Bowel (1)**
9:15
**bragging (1)**
48:11
**break (2)**
47:24,25
**breath (1)**
43:19
**breathe (2)**
41:19;43:13
**breathing (11)**
15:21;33:15;43:18;
48:10,24;49:4,7;
53:21;56:11,18,19
**brief (1)**
27:2
**bring (1)**
50:25
**broke (2)**
23:8;35:2
**brought (4)**
8:6;10:14;45:6;
47:12
**Bucky (2)**
4:7;44:8
**business (1)**
11:21

## C

**call (9)**
15:20;16:20;17:7,
15;19:7;50:22,25;
51:1,5
**called (2)**
6:9;47:11
**calling (1)**
17:9
**calm (2)**
12:24;13:18
**Calvin (4)**
23:11,12;34:13;
49:2
**came (16)**
6:17,24;9:18;
11:17,23;12:18;13:1;
32:7;34:21;35:22;
38:6,9;48:7,21;49:11,
12
**Can (26)**
5:12;8:5;9:18;
11:6;21:4,7;27:22;
29:15;30:4;31:17;
36:10,25;37:16;
42:16,20,25;43:2;
44:5,9;50:5,6,10,16;
51:16,18;56:8
**capabilities (1)**
48:13
**captain (1)**
6:9
**care (6)**
6:25;11:8,8;14:7;
15:9,16,18;17:2,16;
46:9,22
**cart (5)**
51:1,7,8,9,12
**case (6)**
11:5;24:10;28:21;
31:5;49:14;54:13
**Casey (13)**
8:2;9:20;10:3,7,8;
27:15;39:20;42:24;
43:12;47:10;48:4;
55:6,23
**caught (1)**
54:21
**cause (4)**
4:5;14:25;42:2,7
**causes (2)**
42:14,24
**cautioned (1)**
5:5
**cell (30)**
13:2,5;21:16;
22:10;33:24;34:1,2,6,
7,8;36:15;37:1,6;
47:13;48:15,18,19;
49:19;50:5,7,8;51:2,
16;53:6,11,14;54:5;

Case 4:13-cv-00699-KGB    Document 22-4    Filed 12/22/14    Page 61 of 94

Robin Babovec v.                                                    Dion McGuire
Deputy & Officers Mike Richards, et. al.                   November 21, 2014

15,16;55:23
cells (1)
  50:9
certain (2)
  17:15;20:21
Certified (2)
  4:6;15:23
chair (8)
  23:25;24:8,17,21;
  25:17,17,25;26:8
challenged (1)
  21:14
Change (1)
  12:25
check (2)
  18:4;43:17
checking (1)
  50:19
checks (1)
  50:18
choked (3)
  43:3,6,7
choke-hold (1)
  38:10
choking (1)
  43:20
Christie (4)
  34:17,23;35:23;
  36:3
circumstances (2)
  25:19;41:24
Civil (1)
  4:19
class (5)
  8:15;21:11,12,13,
  18
classes (1)
  7:4
clear (2)
  13:13;52:16
clearance (1)
  14:12
clothes (1)
  12:25
cocaine (1)
  16:10
cold (1)
  12:24
combative (1)
  38:1
coming (8)
  5:17;22:14;33:11;
  37:19;51:23;52:22,
  23;55:7
common (1)
  25:22
completely (1)
  40:10
complied (1)
  19:14
comply (1)
  40:13
concerned (1)

20:5
concluded (1)
  57:11
contact (1)
  51:16
control (4)
  9:15;15:3;21:15;
  40:14
conversation (1)
  13:4
convicted (1)
  47:14
cop (1)
  20:20
copies (1)
  31:20
cops (1)
  20:19
copy (2)
  26:11,17
corporal (4)
  7:15,20,22;28:14
Corrections (3)
  5:23,25;6:7
correctly (1)
  52:18
Coulson (3)
  18:7,12,21
counsel (2)
  4:3,16
counted (1)
  38:25
counting (1)
  7:9
County (12)
  5:14,18,19;6:17,
  23;7:5,12;15:15;
  20:23;21:7,11;23:2
couple (2)
  52:1;54:22
courses (1)
  16:3
Court (11)
  4:6;26:22;27:6;
  29:22,25;30:4,9;
  56:10,12,15;57:8
CPR (1)
  15:23
crash (3)
  51:1,7,8
crazy (2)
  20:19,20
cuff (1)
  51:12
cuffed (1)
  44:14
cuffed' (1)
  52:16
cuffing (2)
  44:2;52:14
cut (1)
  43:22

**D**

danger (1)
  46:16
date (1)
  30:21
David (3)
  18:7,12,21
day (10)
  4:5;18:15;22:3,10;
  30:17,24;32:3;38:8;
  45:8,25
dead (5)
  35:1,7;48:4;56:6,
  11
deal (1)
  21:13
dealing (1)
  21:18
death (1)
  42:24
deaths (1)
  42:14
defecate (1)
  43:11
defend (1)
  20:16
Department (3)
  5:23,24;6:7
Depending (1)
  17:14;19:22
depends (4)
  9:17;20:18;41:25;
  42:3
DEPOSITION (2)
  4:2,17
deputies (5)
  34:16;35:2;46:18;
  52:10,14
deputy (4)
  16:20;19:17;55:22;
  56:1
desk (1)
  50:5
detainee (13)
  11:5,6;14:11;18:4;
  20:11,14,16;25:25;
  26:2;34:24;41:15;
  43:21;47:11
detainees (4)
  46:24;47:2,8;50:19
determine (3)
  16:3,16;46:8
detox (1)
  14:22
detoxing (1)
  14:24
device (1)
  17:21
DICKENS (1)
  4:6
difference (1)

40:15
different (4)
  6:14;9:10;40:5;
  41:25
differently (3)
  46:24;47:4,5
difficult (1)
  41:22
dilation (1)
  9:6
DION (12)
  4:2,17;5:3,12,13,
  14;10:18;13:10;
  27:10;28:2;29:11;
  30:15
direct (1)
  37:23
directing (1)
  37:1
director (1)
  6:10
discharge (2)
  23:22;40:10
discussed (1)
  37:24
discussing (1)
  12:2
discussion (1)
  27:2
disruptive (1)
  12:12
distress (2)
  11:13,19
doctor (2)
  14:15;44:7
doctor's (1)
  14:12
document (3)
  31:9,12,13
done (7)
  9:2;16:24;18:11;
  24:9;33:14;48:12;
  53:24
door (16)
  22:17;27:13;36:18;
  37:6,7,13,15,17;
  50:15,16,16,17;54:5;
  55:2,6,7
down (21)
  8:9;10:5,8,9,15;
  12:7,9,24;13:18;
  22:21;23:8,23;27:25;
  32:15,21;33:10;
  38:12;40:11;47:17;
  51:23;52:7
dozen (2)
  54:17,18
dramatic (1)
  54:14
drinking (1)
  42:9
drove (1)
  11:14

drug (3)
  16:7;35:12;42:7
drugs (4)
  9:2;16:6;42:9;
  46:17
drunk (2)
  8:17,19
dry (3)
  40:1,12,16
ducking (1)
  55:6
dude (1)
  54:9
duly (1)
  5:5
during (5)
  15:6;19:11;21:6;
  23:1;41:15
duties (2)
  6:6,25
duty (2)
  19:5;46:18
dying (1)
  17:4;56:11

**E**

effect (1)
  13:18
effort (1)
  55:8
eight (1)
  38:25
either (2)
  47:13,15
electrical (1)
  17:24
Ellis (25)
  4:7,8;26:15,18,25;
  28:5;29:2,8;34:6;
  41:17,20;42:17;44:6,
  25;45:11;46:14;
  48:17;51:18;52:1,4;
  54:2,5;55:18;57:3,7
else (2)
  35:17;56:13
emergency (4)
  14:7;15:8,15,17
employed (1)
  7:5;21:6;23:1
employees (1)
  6:12
ended (1)
  38:13
enough (1)
  19:6
ensure (2)
  46:1,16
entertaining (1)
  54:4
entire (1)
  7:12
equipment (1)

Case 4:13-cv-00699-KGB    Document 22-4    Filed 12/22/14    Page 62 of 94

Robin Babovec v.                                          Dion McGuire
Deputy & Officers Mike Richards, et. al.          November 21, 2014

34:9
escorted (1)
  38:4
estimate (3)
  9:19;21:7;38:18
evaluate (1)
  46:7
even (9)
  8:23;16:20;18:11;
  22:15;24:8;25:16;
  33:22;35:7;44:18
evening (1)
  9:21
event (2)
  7:18;32:25
everybody (8)
  38:17;47:12,17;
  48:12,21;49:5;52:20,
  22
everybody's (1)
  46:21
Exactly (1)
  45:11
EXAMINATION (4)
  5:10;52:3;55:19;
  57:2
example (1)
  9:13
excessive (6)
  21:9,14;24:11,13;
  25:10;41:12
Excuse (1)
  10:11
EXCUSED (1)
  57:12
exercise (2)
  23:3;24:13
exercising (2)
  19:20;21:1
Exhibit (5)
  27:7;30:11,14;
  36:11;52:5
experience (3)
  5:17;7:3,4
expert (1)
  10:22
explain (2)
  42:16;43:2
explode (1)
  42:2
exposed (1)
  9:1
extent (3)
  16:13;20:17,22
extractions (1)
  21:16
extraordinary (1)
  21:1
eye (1)
  47:21
eyes (5)
  9:6,7,9;56:7,13

**F**

face (1)
  33:22
facility (1)
  8:3
fact (2)
  8:18;20:25
fair (1)
  13:8
far (4)
  20:4;23:5;24:18;
  46:9
farm (1)
  47:17
Federal (1)
  4:18
feel (2)
  39:20,22
feeling (1)
  12:25
feels (2)
  41:9,11
felony (1)
  47:16
female (1)
  34:24
fever (1)
  51:13
few (2)
  7:4;29:16
fight (7)
  22:15;35:2;43:20;
  54:6,11,19;55:11
fighting (1)
  39:11
filed (1)
  31:4
film (2)
  45:18,19
find (2)
  24:8;55:15
fine (1)
  33:15
fired (2)
  20:4;23:9
Firm (1)
  4:8
first (16)
  5:5;6:22;8:2,12;
  9:18;10:14;11:9;
  17:7,9;19:9;27:13;
  28:13;39:17;43:24;
  49:4;50:22
first-hand (1)
  42:8
fixing (1)
  37:15
floor (2)
  33:2;43:9
fluids (1)
  43:8

flush (1)
  23:23
flutter (1)
  9:9
folks (1)
  54:17
follow (1)
  55:5
follows (3)
  5:9;27:4;48:1
follow-up (1)
  55:21
food (2)
  6:10;7:10
force (15)
  20:15;21:1,9,14;
  23:3;24:11,14;25:10;
  26:7;31:5,9,12,13,14;
  41:12
form (1)
  42:17
forth (1)
  4:10
found (1)
  56:17
front (4)
  8:24;23:24;25:2;
  26:12
full (1)
  22:10
functions (2)
  15:5;43:4
further (5)
  11:20;28:20;55:19;
  57:2,7

**G**

gathered (1)
  48:8
gave (1)
  28:21
general (2)
  19:15,20
George (1)
  4:7
girls (2)
  39:13,14
given (1)
  21:22
gives (1)
  17:24
giving (1)
  37:23
glass (1)
  50:15
goes (1)
  54:19
gotcha' (1)
  22:19
grab (2)
  52:10;53:19
grabbed (3)

22:7;36:14,23
grabbing (1)
  23:20
grams (1)
  34:20
Griffin (8)
  11:24;25;25:2;
  28:13;34:14;46:3;
  48:9;53:23
ground (7)
  37:2,24;38:4;39:4,
  6,7,21
guards (1)
  40:16
guess (4)
  9:1,16;24:2;51:20
guessing (1)
  27:10
guy (9)
  22:13,17;28:13;
  36:18;37:12,15;44:2;
  49:13;54:24
guys (1)
  48:12

**H**

hair (1)
  27:22
half (1)
  38:16
hand (5)
  22:21,22;23:21;
  24:16;36:12
handcuffed (2)
  44:18;48:16
handcuffs (2)
  44:14,19
handled (2)
  16:25;19:4
hands (10)
  24:18;25:18;39:10;
  44:2,10,11,14;45:7,9,
  13
handwritten (3)
  29:1,5;52:6
happen (4)
  15:11;42:3;54:14;
  56:24
happened (10)
  25:2,19;32:9;33:6;
  38:19;45:8;49:8,22;
  56:13,14
happening (1)
  44:5
happy (1)
  11:18
Hart (1)
  23:9
hat (2)
  27:22;28:14
hazards (1)
  16:6

head (2)
  9:9;33:10
health (3)
  18:5;50:20;56:15
hear (8)
  35:17;39:20,22;
  43:12,15;50:5,7,10
heard (10)
  33:21;39:24,24;
  40:7;42:10;48:9;
  49:4,16;52:16;53:22
heart (6)
  17:4,5,25;19:3,7;
  42:2
held (1)
  27:3
help (2)
  32:3;49:14
hereinafter (1)
  4:9
HEREINBEFORE (1)
  5:4
Here's (1)
  44:22
hereto (2)
  27:8;30:13
Hey (1)
  22:1
high (6)
  10:23;11:18;14:4;
  15:8;16:16;46:2
himself (5)
  12:21;20:16;43:11;
  48:16;49:20
hobbled (1)
  45:6
Hoe (1)
  6:14
hog-tied (6)
  44:20,22,24;45:3,4,
  13
hold (3)
  15:4;36:25;38:12
holding (5)
  13:2;22:10;43:19;
  50:7,8
hollering (2)
  24:4,7
home (1)
  20:8
honest (3)
  33:21;41:21;44:20
honestly (2)
  11:16;43:10
hospital (2)
  14:12;15:13
Hot (1)
  21:11
housed (1)
  47:4
Huh-uh (1)
  7:23
Hush (1)

Case 4:13-cv-00699-KGB    Document 22-4    Filed 12/22/14    Page 63 of 94

Robin Babovec v.                                                          Dion McGuire
Deputy & Officers Mike Richards, et. al.                          November 21, 2014

24:8

# I

**identification (2)**
27:8;30:12
**identify (1)**
19:6
**Ill (1)**
42:17
**imagine (1)**
56:23
**immediately (1)**
53:1
**improperly (1)**
20:14
**inadequate (1)**
51:4
**inaudible (1)**
15:12
**incident (3)**
32:9;33:6;38:19
**Including (1)**
38:20
**indicating (3)**
33:10;44:11;49:10
**indications (1)**
9:11
**influence (1)**
32:19
**inmate (36)**
6:25;8:23;11:3,7,
10;12:12;14:18;15:7,
12;17:1,1,4;18:3;
19:3;20:3;23:3;26:4,
7;31:15;34:17;37:3,
10;40:13,14;41:14;
42:4;43:15;46:2,9;
47:19;50:12;51:1,6;
56:5,10,16
**inmates (19)**
6:13;7:9;8:15,22;
10:4;14:3,20;21:14,
19,19,19;23:6;25:6;
35:21;46:25;47:6,9;
50:20;51:10
**inmates' (1)**
46:21
**inside (3)**
37:7;50:5,7
**instead (1)**
39:8
**interacting (1)**
33:25
**intercom (1)**
50:10
**interject (3)**
29:2,23;54:13
**interrupted (1)**
30:10
**intervene (2)**
20:9,24
**interviewed (7)**

30:24;35:22,23,23,
24,25;36:5
**interviewing (2)**
35:21;36:2
**into (11)**
11:14;13:1;14:10;
34:21;35:7;46:10,15;
48:24;53:3,6;54:13
**intoxicated (4)**
8:16,24;14:20;
46:10
**introduce (1)**
28:20
**investigated (1)**
22:7
**investigator (1)**
36:1
**involved (3)**
16:7;23:13;38:18
**isolate (1)**
47:21
**issue (2)**
50:21;51:10

# J

**jacket (1)**
47:18
**jail (40)**
6:25;7:6;8:23;
11:7;12:17;14:10,22,
23;15:15;16:25;17:2,
6,17;18:17;19:3,11,
15,21;20:24;21:7,15;
26:7;34:21;36:2,5;
40:19,22;41:1,6;
43:9;45:25;46:10,12,
13,15,25;47:10;
48:14;50:2;51:14
**jailees (1)**
9:2
**jailor (16)**
6:18;7:7,9,11,25;
13:23;23:2;41:13;
43:16;46:19;50:12,
14,17,19,21;53:15
**jailors (1)**
19:14
**jailor's (1)**
23:21
**January (1)**
51:17
**jittery (1)**
32:15
**job (8)**
5:20;6:9;7:1,24;
22:14;46:7,16,21
**jobs (1)**
22:14
**judgment (3)**
10:16;25:10;41:13
**jumped (1)**
48:12

**jut (1)**
32:20

# K

**keep (8)**
8:24;19:8;24:7;
37:19;44:17;47:21;
54:3;56:7
**keeping (1)**
43:17
**kept (2)**
24:5;39:11
**kid (1)**
24:2
**kills (1)**
35:12
**kind (7)**
6:6;11:12,13,19;
13:13;31:14;51:7
**kinds (1)**
20:19
**kitchen (1)**
6:9
**knew (3)**
35:1,6,12
**knock (2)**
50:15,16
**knocked (2)**
22:21,22
**knowledge (1)**
56:21
**knows (1)**
24:3

# L

**lack (2)**
8:7;11:17
**lady (1)**
18:11
**lady's (1)**
23:8
**last (1)**
18:13
**late (1)**
20:1
**lately (1)**
29:14
**later (2)**
31:17;32:3
**law (2)**
4:7,8
**laying (2)**
38:16;49:25
**learn (1)**
8:2
**least (1)**
28:24
**leave (2)**
49:25;56:6
**LEE (1)**
4:5

**left (2)**
49:19;56:21
**legs (2)**
38:12;45:6
**less (2)**
12:11;38:24
**level (2)**
7:11;19:10
**licensed (1)**
18:22
**life (2)**
43:20;57:5
**likely (1)**
46:1
**little (7)**
5:16,17,21;6:8,22;
39:13;52:2
**long (8)**
5:14,24;13:23;
19:25;24:6;48:15;
49:7,23
**look (13)**
11:20;16:2,10;
27:15;29:12,15;
31:21;37:5;43:24;
46:20;51:5;55:8;57:4
**looked (2)**
37:12;55:4
**looking (5)**
30:14;35:1,6;
36:11;52:5
**looks (3)**
30:16;35:16;50:18
**lot (2)**
22:10;39:16
**lying (1)**
13:6

# M

**Main (2)**
4:8;55:12
**maintenance (1)**
6:14
**makes (1)**
40:5
**making (1)**
11:7
**man (8)**
16:16;23:11;35:2,
7;39:15;48:5,14;
54:16
**many (3)**
38:18,25;56:2
**mark (3)**
27:5;30:2,7
**marked (2)**
27:7;30:12
**marking (1)**
29:25
**mats (1)**
25:5
**matter (1)**

57:11
**may (7)**
4:17;10:22;21:25;
29:22;31:14,22;
35:24
**Maybe (4)**
5:15;21:16;23:4;
38:22
**MCGUIRE (4)**
4:2,17;5:3,13
**mean (41)**
9:16;10:22;11:19,
20;14:24;15:1;18:20;
19:24;20:18;21:18;
23:4;24:4;27:12;
29:19;32:14,14;33:5;
34:7;35:3,13;36:7,
17;38:6;39:3,14,15;
42:1,2;43:18;44:18;
45:4;47:12;49:9,12;
50:13;51:4;53:23;
54:21,23;56:3,19
**means (2)**
41:18
**meant (4)**
13:10;26:3,3;35:8
**Medical (12)**
11:8;15:9,16,17;
17:2,8,16;18:17;
47:18,20;50:24;51:8
**medication (1)**
51:10
**medicine (3)**
17:9;25:3;50:24
**mentally (2)**
21:13,14
**mentioned (2)**
16:3;32:20
**meth (4)**
9:5;16:11;34:20;
35:12
**method (1)**
43:19
**middle (2)**
42:25;43:9
**might (8)**
12:24;14:3;16:7;
18:21;20:1;28:25;
45:13;47:24
**Mike (1)**
34:13
**mind (1)**
56:4
**minute (9)**
13:13;21:3;29:12;
31:21;44:6;47:24;
48:17;49:11,17
**minute-and-a-half (1)**
49:17
**minutes (2)**
49:19;50:18
**misdemeanor (1)**
47:16

Case 4:13-cv-00699-KGB    Document 22-4    Filed 12/22/14    Page 64 of 94

Robin Babovec v.                                                    Dion McGuire
Deputy & Officers Mike Richards, et. al.                    November 21, 2014

mistaken (1)
18:10
misunderstood (1)
40:25
mixture (1)
42:9
monitor (1)
12:16
month (3)
21:24,25;22:1
months (2)
14:1,2
more (3)
12:10;38:24;47:1
most (5)
10:4;39:14;46:1;
49:17;53:8
mouth (1)
33:11
move (1)
36:10
much (2)
7:2;57:9
must (1)
53:10
myself (1)
21:21

**N**

name (4)
5:12;18:12;24:4;
28:9
NAMED (1)
5:4
Nancy (1)
28:11
necessary (1)
46:8
neck (1)
27:23
need (2)
11:7;12:14
needed (3)
14:6;15:8;49:14
needs (1)
7:10
Next (5)
21:25;27:16,16;
30:17;51:20
nice (1)
39:13
Nichols (5)
34:17,23;35:4,23;
36:3
nobody (5)
25:18,20;43:6;
50:10;56:6
normal (2)
15:4;43:21
normally (2)
50:22;51:5
North (1)

4:8
Nos (1)
30:11
notice (1)
10:3
noticed (5)
8:6;10:2;22:6;
31:23;32:24
Noticing (1)
11:16
November (3)
4:5;13:25;18:16
number (2)
17:15;51:16
numbered (1)
4:4
numbers (1)
26:12
numerous (1)
10:8
nurse (2)
17:8;18:22

**O**

oath (1)
5:8
object (1)
42:17
observation (1)
11:9
observe (2)
8:15,25
observed (3)
8:14;10:1;48:23
observing (1)
34:16
obvious (3)
44:24,25;45:2
occasion (1)
9:1
occurred (1)
7:18
October (2)
13:25;18:16
off (10)
8:8;12:13;26:10,
25;43:22;49:11;
52:21,22,23;53:3
officer (8)
14:11;20:14;21:22;
23:2;24:16;28:4;
30:25;37:17
officers (4)
20:24,25;22:6;
38:18
offices (1)
4:7
off-the-record (1)
27:3
older (1)
24:2
Once (5)

16:25;44:12;46:15;
49:24;50:17
one (35)
7:16;8:19;9:2;
14:6;18:8,9,10;
21:10;22:6,14;23:7,8,
10;26:12,13,15,18,
20;27:10,13,16,16,
18;28:24;29:1;32:19;
37:5;38:24;39:15;
42:13,23;47:1;48:9;
50:19;56:18
only (5)
42:8,11;53:17;
54:15,16
open (1)
19:8
opened (5)
22:17;27:13;36:18;
37:13;55:6
opinion (2)
20:13;48:2
ORAL (2)
4:2,17
order (1)
40:14
orders (3)
19:15;37:23;38:2
others (2)
35:24;36:3
out (34)
7:10;12:12;13:1;
17:9;18:5;20:19,20;
22:14,18,21,22;
23:21;24:8;25:3,5;
27:15;29:19;33:11,
24;35:2;36:24;37:15,
19;48:7,7,21;50:24;
51:10;53:22;54:9;
55:13,15,16;56:17
over (22)
5:16;7:16;9:10;
13:13;17:15;23:9;
24:4,5;27:16;29:3,3,
17;36:12,25;45:23;
48:8,8;49:10,15;
51:1;54:19,24
overall (1)
21:18
over-tase (1)
41:11
own (1)
51:10

**P**

package (1)
30:7
page (2)
32:23;52:8
pain (1)
42:10
paperwork (1)

23:21
paralegal (1)
29:3
Parker (10)
27:20,21;28:4,6;
34:14;37:20,22;
39:17;48:9,22
part (3)
48:25;49:2;54:20
parties (1)
4:16
pass (1)
43:5
passes (2)
17:8;50:24
passing (3)
7:9;25:3,5
pay (1)
10:3
people (16)
14:24;16:6,7;
21:24;22:11;26:13;
37:19;40:22;41:1;
43:4;44:4;45:23;
50:4;56:2,8;57:4
period (1)
15:6
person (9)
14:20;17:9,12;
18:4,9,10,13,17;46:1
personnel (2)
17:8;18:2
petite (1)
39:13
phones (1)
45:23
phonetic (1)
18:7
photos (1)
30:7
physically (1)
43:7
picked (1)
54:9
picks (1)
54:19
picture (1)
44:22
pictures (1)
26:10
pile (1)
45:17
pills (1)
42:10
place (1)
14:21
PLAINTIFFS (1)
4:4
please (3)
18:4;30:6;42:22
pm (1)
4:6;57:11
pod (2)

47:16,16
point (6)
9:2;13:23;16:9,15;
19:10;52:20
police (3)
30:25;35:21,25
policies (1)
19:20
policy (1)
26:6
position (2)
19:19;52:25
possibly (1)
42:3;56:6
practice (3)
12:11;15:14;20:23;
25:24;40:19,21;41:1,
3,5;43:21;55:25
practices (1)
11:6
prefaces (1)
37:5
present (3)
18:3;55:22;56:1
pressure (3)
17:11,14;32:12;
51:2,12
pretty (1)
38:8
previous (1)
13:25
Prewitt (1)
34:13
primary (1)
6:9
prior (2)
7:3,4
problem (1)
21:19
Procedure (1)
4:19
proceedings (3)
27:3;48:1;57:10
produced (1)
4:3
professional (2)
10:20;42:12
progress (1)
19:8
progression (1)
7:14
promotion (1)
7:15
proper (1)
56:7
protect (5)
20:11;22:15,16,20;
26:4
protected (1)
47:5
pulled (3)
36:15,24;37:1
punish (2)

25:24;26:2
**punishment (1)**
  26:3
**purpose (1)**
  31:12
**purposes (4)**
  4:18;56:10,12,15
**pursuant (1)**
  4:9
**push (2)**
  24:20;52:11
**Pushing (1)**
  25:12
**put (10)**
  12:17;13:1;14:20;
  24:16,18;25:18;
  39:10;44:19;45:24;
  47:13
**putting (4)**
  8:22;14:19;23:25;
  25:25

**Q**

**quit (1)**
  32:17

**R**

**ran (1)**
  23:22
**ranks (1)**
  7:14
**reached (4)**
  5:19;36:14,23;
  37:14
**reaction (1)**
  17:5
**read (3)**
  33:16;36:12;52:18
**ready (1)**
  23:17
**realize (1)**
  49:24
**really (8)**
  10:3;26:4;31:3,6;
  40:17;42:6;43:14;
  56:25
**reason (6)**
  16:4;23:18;39:11;
  49:18;56:12,23
**recall (4)**
  8:5;31:6,7;34:13
**receive (1)**
  21:20
**received (2)**
  21:8;22:4
**recollection (1)**
  10:23
**record (2)**
  27:1;47:19
**Reed (7)**
  23:11,12;24:10,16;

34:14;48:25;49:2
**regard (1)**
  55:11
**regional (1)**
  6:13
**release (1)**
  43:8
**released (1)**
  23:17
**remember (9)**
  13:7,10,12;17:20;
  23:10,15;24:5;31:3;
  44:19
**removed (2)**
  48:3;51:1
**report (3)**
  31:5;42:13,19
**Reporter (8)**
  4:6;26:22;27:6;
  29:22,25;30:4,9;57:8
**represented (1)**
  23:11
**request (1)**
  4:3
**required (1)**
  19:13
**resisting (1)**
  43:13
**respect (1)**
  21:8
**respective (1)**
  4:16
**responder (1)**
  19:9
**responsibility (1)**
  46:1
**rest (1)**
  46:25
**restart (1)**
  17:25
**restrained (4)**
  25:17,20,21;26:8
**restraint (3)**
  23:25;41:14,16
**resumed (2)**
  27:3;48:1
**reviewed (4)**
  29:14,16;45:18,19
**ride (1)**
  6:13
**rider (1)**
  6:14
**right (41)**
  5:20;6:20;8:1,18;
  11:2;13:3,15,16;
  16:21;17:25;18:25;
  19:2,11,25;20:16;
  25:22;26:22,24;27:6,
  23,24;29:20,22;30:9;
  32:5,13,16,19;33:6,
  14,18;37:14;48:20;
  51:3,19;53:7,22,25;
  54:21;55:17;57:8

**rinse (1)**
  53:3
**rinsed (1)**
  49:11
**riot (1)**
  21:14
**riots (1)**
  21:15
**risk (3)**
  8:22;14:20;15:2
**Rock (1)**
  5:21
**role (3)**
  6:22;7:6;39:3
**room (3)**
  31:23;54:9;57:5
**rose (1)**
  19:10
**rough (1)**
  23:5
**rude (1)**
  39:15
**Rules (2)**
  4:18;46:7
**running (3)**
  12:10,13;37:12

**S**

**Saline (11)**
  5:14,18,19;6:17,
  23;7:5,12;15:14;
  20:23;21:7;23:2
**Sam (8)**
  11:24,25;12:6,18;
  25:2;28:13;34:14;
  46:3
**same (6)**
  7:11;26:16;29:9;
  30:24;32:18;47:18
**save (2)**
  48:14;57:5
**saw (9)**
  9:19,20;12:2,2;
  14:9;15:11;19:17;
  52:24;54:20
**saying (5)**
  9:16;44:10;47:19;
  56:17,20
**scheduling (1)**
  21:24
**school (1)**
  24:3
**screaming (1)**
  24:7
**scuffle (1)**
  55:4
**scuffling (1)**
  38:9
**second (4)**
  22:24;29:15,23;
  32:23
**seconds (3)**

53:8;54:22,23
**send (1)**
  20:4
**sense (1)**
  25:22
**sentence (1)**
  47:15
**separated (1)**
  55:13
**separately (1)**
  47:4
**sergeant (2)**
  23:8,9
**serious (1)**
  50:20
**service (1)**
  6:10
**set (1)**
  4:9
**several (1)**
  35:24
**Shakiness (2)**
  9:11,12
**Shellnutt (3)**
  28:10,11;39:17
**sheriff (2)**
  8:18;18:15
**shift (1)**
  46:5
**shifts (1)**
  7:16
**shirt (1)**
  36:15
**shocks (1)**
  17:24
**short (1)**
  47:25
**shortly (1)**
  52:15
**shot (1)**
  55:6
**shoulders (1)**
  24:20
**show (1)**
  12:14
**showed (2)**
  23:19,20
**shower (3)**
  12:23,25;31:23
**showering (1)**
  12:19
**showing (1)**
  32:18
**shows (3)**
  30:16;42:13,19
**side (2)**
  12:13;56:6
**sign (1)**
  26:23
**signs (2)**
  32:18;51:3
**sit (7)**
  8:8;9:13;10:5,8,9,

15;32:15
**sitting (15)**
  12:7,9;32:24;33:2,
  8,19,22;34:18,19;
  44:4,17;50:4;52:24,
  25;54:22
**situation (2)**
  9:17;19:22
**six (3)**
  24:2;38:22;39:1
**skin (1)**
  40:3
**slapped (2)**
  36:19;55:1
**smelt (1)**
  43:10
**so-and-so (1)**
  21:25
**sobriety (1)**
  16:21
**somebody (5)**
  16:10;19:25;41:10;
  45:24;47:9
**somebody's (1)**
  43:19
**somehow (1)**
  23:12
**someone (8)**
  8:6;11:18;18:13;
  19:24;41:12;47:8;
  50:23;53:17
**soon (1)**
  48:10
**sorry (1)**
  30:10
**sort (1)**
  33:22
**sound (1)**
  40:5
**speak (1)**
  50:12
**speaking (1)**
  33:20
**spit (1)**
  33:3
**Spring (1)**
  21:11
**squad (1)**
  6:14
**staff (1)**
  14:16
**standing (5)**
  34:15;36:24;37:7,
  9,17
**stands (1)**
  17:21
**start (1)**
  13:24
**started (5)**
  7:6;22:15;37:23;
  52:22,23
**starts (2)**
  24:4;51:17

**State (2)**
35:21,25
**stated (1)**
35:4
**statement (5)**
30:15,18;31:2,19;
52:6
**statements (3)**
13:12;28:20;29:17
**stating (1)**
34:18
**stay (2)**
7:11;12:9
**step (2)**
20:7;39:17
**stepped (1)**
48:3
**stethoscope (1)**
53:19
**still (7)**
9:13;23:18;32:4,5;
37:10;39:6;49:13
**stimulant (2)**
9:6;31:25
**stimulants (1)**
32:5
**STIPULATED (1)**
4:15
**stood (2)**
32:24;33:7
**stop (1)**
15:21
**stopped (1)**
19:7
**stout (2)**
38:6,8
**strange (1)**
31:24
**Street (2)**
4:8;16:20
**stress (1)**
11:12
**stripes (1)**
28:14
**struggling (1)**
39:18
**stuff (4)**
13:14;23:4,6;42:10
**submit (1)**
38:1
**Supervised (1)**
6:12
**supervisor (14)**
7:16,17;10:2;
11:22;12:5,11,12;
16:15;19:10,13,19;
46:5;50:23;56:5
**supervisors (1)**
20:24
**supposed (2)**
10:5;46:19
**sure (24)**
8:16;9:3,14,24;

11:7,9;14:5,8;15:10;
16:18,20;17:3;18:8;
19:6,14;20:10;25:8;
26:13;27:11;28:1;
43:1;46:21;51:2;
55:12
**swallowed (1)**
34:20
**SWINDOLL (49)**
5:11;10:12;15:19,
22;24:20;26:16,20,
24;27:5,9;28:6,19,24;
29:7,10,11,24;30:2,6,
14,19,21;34:8,9;
38:21,23;40:21;
41:23;42:23;44:8,12;
45:1,2,4,15,20,21;
46:15;47:23;48:2,19,
25;49:2;51:19,23;
53:2;54:1,3;55:20
**sworn (1)**
5:6
**system (1)**
50:1

**T**

**take-down (4)**
38:5,11;41:14,15
**talk (8)**
8:11,11,11,11;
12:5;20:1;21:3;30:4
**talked (1)**
51:7
**talking (8)**
11:21;12:6;23:5;
32:2,17,19,22;47:8
**tape (1)**
26:10
**taping (1)**
50:1
**tase (4)**
39:20;40:1,12,16
**tased (1)**
41:10
**taser (9)**
21:20;22:1,4,7,9;
39:24,24;40:8,9
**tasers (1)**
21:23;40:23;41:2,2
**tasing (1)**
41:4
**tat (5)**
40:8,8,8,8
**taught (2)**
9:11;40:12
**teach (1)**
38:10
**team (1)**
50:24
**tearing (1)**
36:21
**telling (1)**

24:6
**Ten (1)**
6:2
**tending (1)**
7:10
**tenure (1)**
19:11
**test (1)**
16:21
**testified (1)**
5:8
**testify (1)**
5:6
**Thanks (3)**
27:6;30:9;57:8
**THEREUPON (5)**
5:2;27:2,7;30:11;
47:25
**thermometer (1)**
51:13
**thinking (1)**
27:12
**though (1)**
25:16
**thought (10)**
12:23;14:3,6;15:8;
31:19;32:5;33:13;
35:17;48:5;49:13
**three (2)**
28:21;31:20
**threw (1)**
22:20
**tilt (1)**
9:9
**times (2)**
6:13;10:8
**toilet (1)**
23:23
**told (6)**
8:18;18:15;22:6;
34:19;35:11;37:9
**Tonya (3)**
28:6;34:14;37:22
**took (9)**
33:24,25;34:9;
35:11;39:11,14;
48:21;53:1,11
**torso (1)**
27:25
**total (1)**
5:15
**totally (1)**
55:15
**towards (1)**
55:7
**to-wit (3)**
5:9;27:4;48:1
**trained (1)**
9:4;16:2,15;41:2,4
**training (10)**
7:1,2;21:3,8,20,22;
22:2,4;40:18;42:6
**treated (3)**

46:24;47:4,17
**trial (3)**
47:14;51:17,21
**tried (2)**
52:11;53:24
**trouble (3)**
14:25,25;16:19
**troubled (1)**
21:19
**truth (4)**
5:6,7,8;23:7
**try (2)**
16:2;23:23
**trying (6)**
13:14;23:21;40:13;
41:22;45:17;57:5
**turn (1)**
33:8
**turned (2)**
32:24;33:15
**Twelve (1)**
6:3
**two (4)**
28:17,24;34:20;
38:24
**two- (1)**
47:23
**two-thirds (1)**
52:7
**type (1)**
31:24
**typed (1)**
28:25
**typewritten (1)**
29:5

**U**

**unaccompanied (1)**
53:15
**unconscious (1)**
56:5
**under (5)**
32:18;46:7;52:11,
12,15
**underneath (2)**
38:13;44:11
**unit (1)**
6:12
**unless (3)**
19:25;43:20;47:18
**unnecessary (2)**
20:15;23:3
**untrained (1)**
40:22
**up (29)**
7:14;8:24;12:10;
13:13;15:4;20:4;
23:24;24:21;25:2,12;
26:25;28:25;32:12,
21;33:7,8,15,19;
36:21;38:6,13;40:3;
45:6;48:3,8;49:10;

50:16;52:24;54:23
**upright (1)**
52:25
**urinated (1)**
12:21
**use (19)**
8:7;9:5;11:17;
16:8;26:7,12,19,20;
31:4,9,12,13;40:12,
16,22;41:2,12;46:17;
54:8
**used (3)**
20:15;31:14,17
**using (2)**
19:20;48:14
**usually (2)**
18:13;50:25
**U-Tube (1)**
45:23

**V**

**verbal (1)**
23:4
**vernacular (1)**
54:8
**version (1)**
29:5,6;52:6
**video (5)**
23:19,19;24:23;
25:14;54:20
**violating (1)**
19:24
**visiting (1)**
51:24
**vital (1)**
51:3

**W**

**wait (3)**
44:6;47:16;48:17
**waiting (1)**
47:13
**walk (1)**
15:4
**walked (8)**
8:4,5;10:4;48:5,8;
49:10;53:22;54:24
**walking (1)**
13:5
**wall (2)**
15:21;25:12
**walls (1)**
8:8
**ward (1)**
47:20
**Waste (1)**
5:21
**watch (2)**
12:19;19:13
**watching (1)**
11:9,16

**Water (1)**
  5:21
**way (8)**
  9:6;35:9;36:10;
  39:15;40:9;47:5;
  52:7;54:14
**wear (1)**
  29:19
**welfare (1)**
  55:9
**weren't (2)**
  7:22;44:10
**Westbrook (1)**
  23:16
**what's (6)**
  25:14;31:12;43:17;
  50:11;55:16,25
**Whenever (12)**
  10:14;13:1,1;24:3;
  36:18;37:11;39:5,18;
  41:19;43:5;45:10,12
**WHEREUPON (1)**
  57:10
**whole (2)**
  5:7;37:16
**whose (1)**
  46:16
**witness (17)**
  4:3;5:4;10:11;
  15:17;24:18;28:23;
  30:18,20;38:20;
  40:20;41:19;42:21;
  45:19;49:1;51:22,25;
  57:12
**women (1)**
  39:16
**word (2)**
  8:7;11:17
**word-for-word (1)**
  29:8
**work (3)**
  5:24;6:17,24
**worked (5)**
  5:14,15,20,23;7:12
**working (2)**
  34:17;51:14
**worried (1)**
  18:5
**worry (1)**
  13:11
**wrestling (1)**
  39:6
**written (1)**
  31:2
**wrong (4)**
  47:20;48:6;49:15,
  24

**Y**

**year (3)**
  5:15,16;21:10
**years (5)**

  6:2,5;9:10;18:11;
  24:2
**yelled (2)**
  52:6,10
**you-al (1)**
  25:14
**young (2)**
  23:11;39:13

**Z**

**zeroed (1)**
  11:14

**1**

**1 (6)**
  27:5,7;28:5,6;30:7;
  54:6
**1:50 (1)**
  4:6
**10 (3)**
  6:1,2;54:23
**11th (1)**
  22:3
**12 (1)**
  6:3
**124 (1)**
  4:8
**15 (1)**
  50:18
**18th (1)**
  35:22

**2**

**2 (5)**
  28:2;30:8,11;
  36:11;52:8
**2:45 (1)**
  57:11
**2001 (1)**
  7:18
**2011 (6)**
  7:24;13:22;15:15;
  17:16;18:16;40:22
**2014 (1)**
  4:5
**21st (1)**
  4:5
**26 (1)**
  51:17

**3**

**3 (6)**
  28:8;30:8,11,15;
  36:11;52:5
**3:00 (1)**
  9:23

**4**

**4/18 (2)**
  30:22;31:2

**5**

**5 (7)**
  34:7,8;48:19;53:6,
  11,14;55:23
**5:00 (1)**
  9:23

**6**

**6 (2)**
  14:1,2

**7**

**7 (3)**
  14:1,2;49:19

**8**

**8 (1)**
  49:19

**9**

**9 (1)**
  49:19
**90 (2)**
  53:8,8
**911 (4)**
  15:20;17:15;19:7;
  51:5



















4/13/2011 5:12:33 PM





1/13/2011 5:12:42 PM



1/13/2011 5:12:42 PM



TO: LT. PENNINGTON, SGT. RICHARDS, AND SGT. LESTER

CC: LT. COURTNEY

FROM: DEPUTY D. McGuire

SUBJECT: Casey Shane Babovec

DATE: April 13, 2011

        On 4-13-2011 at approx.1645 Cpl. Griffin told me to take Mr. Babovec to the shower area and allow him to change his pants. Mr. Babovec had been brought in earlier in the day by Deputy Edens. And for reasons unknown to me Mr. Babovec soiled his pants. After Mr. Babovec changed his pants I placed him back into holding cell #1 in the booking area. I went to the monitor where the camera shows the inside of cell #1 in the booking area to watch Mr. Babovec because he had been acting very strange, as if to be on some type of stimulant. As I was observing Mr. Babovec I saw Mr. Babovec get up from where he was sitting and walk over to another inmate in the cell and strike him in the head area. I alerted the other officers in the booking area that there was a fight occurring in cell #1. When I got to the cell door the door was opened and Mr. Babovec was standing just inside the door. I reached in and grabbed Mr. Babovec by his shirt and pulled him from the cell. I started giving Mr. Babovec direct orders to go to the ground. Mr. Babovec became very combative and would not submit to my orders. I then escorted Mr. Babovec to the ground. When we went to the ground my left arm became trapped under Mr. Babovec and I continued to give Mr. Babovec orders to stop resisting and place his hands behind his back. At this time I felt Mr. Babovec biting my arm at the wrist area. I was trying to free my arm from Mr. Babovec but couldn't so I continued to use my body weight to hold Mr. Babovec to the ground. The other officers were placing cuffs on Mr Babovec at this time and due to my placement I couldn't see what was taking place. When I heard an officer state Mr. Babovec was cuffed I felt my arm being freed from under Mr. Babovec. I then stood up and removed myself from the area. Mr. Babovec was then taken to holding cell #5 in the booking area. I was standing in the booking area when I heard Cpl. Parker asked if Mr. Babovec was breathing. There were a number of Deputies in holding cell #5 attending to Mr. Babovec and I didn't want to get in their way because they were doing CPR so I stay back and waited for further orders from my superiors. I observed Rescue come in and take control of Mr. Babovec at this time. Benton Rescue exited the jail with Mr. Babovec at approx. 17:29. XXX End of Statement XXX.



EXHIBIT
McGill

①

4/18/11
3:00p - 4:30p
Dion McGuire

On 4-13-11 I was told by my super
CPL Griffen to go to the shower room and let MR.
Babovec change his pants. MR Babovec had been brought
in to the jail earlier and for reasons unknown to me he
soiled his pants. After allowing Mr. Babovec to change his
pants I placed him (Babovec) back into cell #1 in the
booking area. While in the shower room I noticed Mr.
Babovec acting very strange, as to be on some type
of stimulant. So, when I placed Mr Babovec back into
the holding cell, I went around to the monitor
(Dim his tie) which shows the inside of the holding cell Mr. Babovec
was in, to watch his behavior. It was very obvious Mr.
Babovec was under the influence of some type of drug.
When Mr. Babovec entered the cell he sat down, still
showing signs of being under the influence. After sitting for
just a few seconds Mr. Babovec got up and walked up
to another inmate who was sitting down and struck him
in the head area. I alerted other deputies in the booking
area that there was a fight in cell #1. I ran to the
cell door and had a taser in my hand. When the cell
door opened opened Mr. Babovec was right in front of me,
maybe one foot separated us. I reached in with my
left hand and grabbed Mr Babovec and pulled him towards
the outside of the cell. Mr. Babovec's left arm came
up and his elbow struck me and I dropped the
taser. I then grabbed Mr. Babovec with both hands

②

and escorted him to the ground. When we landed my
left arm found its way under Mr. Rabovec, and
and he was laying on my arm with me half way on
and half way off of him. The way we were positioned
my hand and wrist were at in reach of Rabovec's
mouth. And Mr. Rabovec started biting me on my wrist
I was shouting for Mr. Rabovec to stop biting me and
was also trying to free my arm and hand from under Mr.
Rabovec. After only a few seconds Mr. Rabovec stopped biting
me. I heard Deputies yelling for Rabovec to put his
"other" hand behind his back and I informed the
Deputies Mr. Rabovecs arm and hand were under me and
he couldn't put his hand behind his back. I yelled for the
Deputies to grab Rabovecs arm from under me as I tried
to push his arm back from under me. The Deputies
cuffing Mr. Rabovec got his arm and shortly after they
got his arm from under me I heard "he's cuffed" "Clear"
I felt my left arm being freed from under Rabovec body and
when I could I stood up. When I stood I turned
And noticed Mr. Rabovec siting on the floor. I did see
Mr. Rabovec spit blood from his mouth. After making sure
everybody was ok I went to the bathroom. A washed my
arm where Rabovec had bitten me. When I came from
the bathroom I went over to holding cell #5 where they
had Mr. Rabovec, when I came upon the cell
I heard CPL Parker say "he's not breathing" I observed
CPL Parker, CPL Griffin, Deputy Reed, Deputy Pruitt, Sgt And 乂

Jon Maulden ⟋

③

find a pulse on MR. Babovec. when they couldn't find a pulse they (Griffin, Parker, Reed, Pruitt) went into CPR life saving mode. CPL Griffin gave me an order to go get his stethoscope and the AED which was on the wall in the hallway. when I returned with the AED Dept requested I gave it to the Deputies and they had began CPR, then when the AED was ready it was applied to MR. Babovec and the machine was shocked. while I was observing the Deputies working on Babovec Inmate Christy Nicholes was sitting on the bench in booking area was staring to me that Babovec had told her while he was sitting next to her that he had swallowed 2 grams of meth before he came into the jail to keep from getting caught with it. She (Nicholes) stated "I knew I was looking at a dead man before any fight. I then observed the broke out with the deputies. I then observed the Rents to Fire's Rescue come into the jail and take control of MC Babovec situation and AFTER working on him and putting him in a stretcher they exited the jail and put Babovec into the Ambulance and left.

XXX END OF STATEMENT XXX XDW

DWMcGuire #826

Dion McGuire

Sgt

TO:  LT. PENNINGTON, SGT. RICHARDS, AND SGT. LESTER

CC:  LT. COURTNEY

FROM: DEPUTY D. McGuire

SUBJECT: Casey Shane Babovec

DATE: April 13, 2011

                On 4-13-2011 at approx.1645 Cpl. Griffin told me to take Mr. Babovec to the shower area and allow him to change his pants. Mr. Babovec had been brought in earlier in the day by Deputy Edens. And for reasons unknown to me Mr. Babovec soiled his pants. After Mr. Babovec changed his pants I placed him back into holding cell #1 in the booking area. I went to the monitor where the camera shows the inside of cell #1 in the booking area to watch Mr. Babovec because he had been acting very strange, as if to be on some type of stimulant. As I was observing Mr. Babovec I saw Mr. Babovec get up from where he was sitting and walk over to another inmate in the cell and strike him in the head area. I alerted the other officers in the booking area that there was a fight occurring in cell #1. When I got to the cell door the door was opened and Mr. Babovec was standing just inside the door. I reached in and grabbed Mr. Babovec by his shirt and pulled him from the cell. I started giving Mr. Babovec direct orders to go to the ground. Mr. Babovec became very combative and would not submit to my orders. I then escorted Mr. Babovec to the ground. When we went to the ground my left arm became trapped under Mr. Babovec and I continued to give Mr. Babovec orders to stop resisting and place his hands behind his back. At this time I felt Mr. Babovec biting my arm at the wrist area. I was trying to free my arm from Mr. Babovec but couldn't so I continued to use my body weight to hold Mr. Babovec to the ground. The other officers were placing cuffs on Mr Babovec at this time and due to my placement I couldn't see what was taking place. When I heard an officer state Mr. Babovec was cuffed I felt my arm being freed from under Mr. Babovec. I then stood up and removed myself from the area. Mr. Babovec was then taken to holding cell #5 in the booking area. I was standing in the booking area when I heard Cpl. Parker asked if Mr. Babovec was breathing. There were a number of Deputies in holding cell #5 attending to Mr. Babovec and I didn't want to get in their way because they were doing CPR so I stay back and waited for further orders from my superiors. I observed Rescue come in and take control of Mr. Babovec at this time. Benton Rescue exited the jail with Mr. Babovec at approx. 17:29. XXX End of Statement XXX.



# ARKANSAS STATE POLICE

**ASP-6B**
**(Rev. 12/05)**

## Description Of Subject/Index Form

Name: _____ **DION MCGUIRE** _____ Race: __ **W** __ Sex: __ **M** __
    (First/MI/Last Name)
    DOB: ▰▰▰▰▰ Age: __ **42** __

Alias(es): _____

Address: _____ **735 S. NEELEY** _____ City: __ **BENTON** __ State: __ **AR** __ Zip: __ **72015** __

Height: __ **6'0** __ Weight: __ **260** __ Complexion: _____ Hair: __ **BLK** __ Eyes: __ **BR** __

SSN: _____ DL#: ▰▰▰▰▰ DLY: _____ State: __ **AR** __

SID#: _____ FBI#: _____ Place Of Birth: __ **AR** __

Telephone Number: __ **501-303-5609** __ Cell Phone Number: _____

E-mail Address: _____ Tracking Number: _____

Scars/Marks/Tattoos(Location of Each): _____

Relatives(Name/Address/Relationship): _____

Peculiarities: _____

Occupation & Employer: __ **DEPUTY/ SALINE COUNTY SHERIFF'S OFFICE** __

Education(Include Trade Schools): __ **SOME COLLEGE** __

Veh. Year: _____ Make: _____ Model: _____ Style: _____ Lic#: _____ Color: _____

Arrested: ☐ Yes ☐ No   Charge/Code#: _____

City/County Arrested: _____ County Occurred In: _____

Fingerprinted: ☐ Yes ☐ No   Date: _____ Agency: _____
                          (Month/Day/Year)

Photographed: ☐ Yes ☐ No   Date: _____ Agency: _____
                          (Month/Day/Year)

Sexual Victim/Minor: ☐ Yes ☐ No   Involvement: __ **W** __ Name Type: __ **I** __ Drug: _____

Ref#: _____ Date Of Crime: _____ Entered By: _____ Date: _____
                        (Month/Day/Year)                              (Month/Day/Year)

Special Agent: __ **TFC. Joe Pickett #527** __ File#: __ **CID-A-04326-11** __
            (Rank/First/MI/Last Name/Badge#)

Note: Involvement Codes-    W= Witness        Name Type Codes-   I= Individual              G= Identity Groups
                            S= Subject                           B= Business                M= Motorcycle Gang
                            U= Unknown Subject                   U= Unknown, Established     S= Street Gang
                            A= Association                       C= Crime Family            V= Vehicle
                            V= Victim                            F= Financial Institution    O= Other



# ARKANSAS STATE POLICE

ASP-3
(Rev. 09/00)

## Criminal Investigation Division
## Case Form

Date:           APRIL 18, 2011
Dictated by:    SA JOE PICKETT
Date Typed:     MAY 23, 2011 proofed MB
Copies to:      SA JOE PICKETT
                SA DAVID MOSS

## INTERVIEW OF WITNESS

DION MCGUIRE
W/M,
735 SOUTH NEELEY
BENTON, AR 72015
WORK PH: 501-303-5609
POE: SALINE COUNTY SHERIFF'S OFFICE

On April 18, 2011 I interviewed DION MCGUIRE at the Saline County Sheriff's Office in reference to this case. The interview began at approximately 3:00 pm and concluded at approximately 4:30 pm. The interview was audio recorded and a copy of the recording will be made a part of this file. MCGUIRE and I were the only people present at the time of the interview. An ASP 6B and handwritten statement were completed and will be made a part of this file. MCGUIRE'S statement is as follows.

"On 4-13-11 I was told by my supv. Cpl. GRIFFIN to go to the shower room and let Mr. BABOVEC change his pants. Mr. BABOVEC had been brought into the jail earlier and for reasons unknown to me he soiled his pants. After allowing Mr. BABOVEC to change his pants I placed him (BABOVEC) back into cell number one in the booking area. While in the shower room I noticed Mr. BABOVEC acting very strange, as to be on some type of stimulant. So, when I placed Mr. BABOVEC back into the holding cell, I went around to the monitor which shows the inside of the holding cell Mr. BABOVEC was in, to watch his behavior. It was very obvious to Mr. BABOVEC was under the influence of some type of drug. When Mr. BABOVEC entered the cell he sat down, still showing signs of being under the influence. After sitting for just a few seconds Mr. BABOVEC got up and walked up to another inmate who was sitting down and struck him in the head area. I alerted other Deputies in the booking area that there was a fight in cell number one. I ran to the cell door and had a taser in my hand. When the cell door opened Mr. BABOVEC was right in front of me, maybe one foot separated us. I reached in with my left hand and grabbed Mr. BABOVEC and pulled him towards the outside of the cell. Mr. BABOVEC's left arm came up and his elbow struck me and I dropped the taser. I then grabbed Mr. BABOVEC with both hands and escorted him to the ground. When we landed my left arm found its way under Mr. BABOVEC, and he was laying on my arm with me half way on and half way off of

CRIME: DEATH INVESTIGATION

FILE NUMBER: CID-A-04326-11

ASP-3
PAGE 2

him. The way we were positioned my hand and wrist were in reach of BABOVEC's mouth, and Mr. BABOVEC started biting me on my wrist. I was shouting for Mr. BABOVEC to stop biting me and was also trying to free my arm and hand from under Mr. BABOVEC. After only a few seconds Mr. BABOVEC stopped biting me. I heard deputies yelling for BABOVEC to put his other hand behind his back and I informed the deputies Mr. BABOVEC's arm and hand were under me and he couldn't put his hand behind his back. I yelled for the deputies to grab BABOVEC's arm from under me as I tried to push his arm back from under me. The deputies cuffing Mr. BABOVEC got his arm and shortly after they got his arm from under me I heard "he's cuffed, clear." I felt my left arm being freed from under BABOVEC's body and when I could I stood up. When I stood I turned and noticed Mr. BABOVEC sitting on the floor, I did see Mr. BABOVEC spit blood from his mouth. After making sure everybody was ok I went to the bathroom and washed my arm where BABOVEC had bitten me. When I came from the bathroom I went over to holding cell number five where they had taken Mr. BABOVEC, when I came upon the cell I heard Cpl. PARKER say "he's not breathing". I observed Cpl. PARKER, Cpl. GRIFFEN, Deputy REED, and Deputy PREWITT try and find a pulse. They (GRIFFEN, PARKER, REED, and PREWITT) went into CPR life saving mode. Cpl. GRIFFIN gave me an order to go get his stethoscope and the AED which was on the wall in the hall way. When I returned with the gear requested I gave it to the deputies and they had begun CPR. Then when the AED was ready it was applied to Mr. BABOVEC and the machine was started. While I was observing the deputies working on BABOVEC, inmate CHRISTY NICHOLES was sitting on the bench in booking area and was stating to me that BABOVEC had told her while he was sitting next to her that he had swallowed two grams of meth before he came into the jail to keep from getting caught with it. She (NICHOLES) stated "I knew I was looking at a dead man before any fight broke out with the deputies." I then observed the Benton Fire and Rescue come into the jail and take control of Mr. BABOVEC situation and after working on him and putting him on a stretcher the exited the jail and put BABOVEC into the ambulance and left."