IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


ROBIN BABOVEC, as Special
Administratrix of the Estate
of CASEY BABOVEC, Deceased                    PLAINTIFF


VS.                    CASE NO: 4:13cv0699 KGB


DEPUTY & OFFICERS MIKE RICHARDS,
TONYA PARKS, CALVIN REED, DION
MCGUIRE, RYAN MCKINLEY, DAVID
FENTON, JAMES PAYNE, NANCY SHELNUTT,
SUPERVISOR LT. COURTNEY, BRUCE
PENNINGTON, JOHN & JANE DOES I-V,
COUNTY OF SALINE                              DEFENDANTS


---

ORAL DEPOSITION (VIA VIDEO)

OF

SHERIFF BRUCE PENNINGTON, VOLUME II OF II

(Taken November 5, 2014, at 2:12 p.m.)

---


LEE ANN DICKENS, CCR

7315 I STREET

LITTLE ROCK, ARKANSAS   72207

(501) 614-7367

**EXHIBIT**
**babbler**
3

2

# A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

MR. JAMES F. SWINDOLL
LAW OFFICES OF JAMES F. SWINDOLL
312 CENTER STREET
SUITE 300
LITTLE ROCK, ARKANSAS    72201


ON BEHALF OF DEFENDANTS:

MR. GEORGE D. "BUCKY" ELLIS
ELLIS LAW FIRM
126 NORTH MAIN STREET
BENTON, ARKANSAS      72018


ALSO PRESENT:    MR. MIKE TSCHIEMER, The Videographer

3

# I N D E X

STYLE AND NUMBER. . . . . . . . . . . . . . . . .  1

APPEARANCES . . . . . . . . . . . . . . . . . .  2

CAPTION . . . . . . . . . . . . . . . . .  4

THE WITNESS:  **SHERIFF BRUCE PENNINGTON, VOL. II OF II**

    EXAMINATION BY MR. SWINDOLL . . . . . . . .  6

    EXAMINATION BY MR. ELLIS. . . . . . . . . . 39

    FURTHER EXAMINATION BY MR. SWINDOLL . . . . . 41

DEPOSITION CONCLUDED. . . . . . . . . . . . . . 42

COURT REPORTER'S CERTIFICATE. . . . . . . . . . 43

# E X H I B I T S

NO./DESCRIPTION:                              MARKED:

Exhibit No. 1 - Photograph. . . . . . . . . . . 25

Exhibit No. 2 - Photograph. . . . . . . . . . . 26

Exhibit No. 3 - Inmate Death/Policy G-2 . . . . . 31

4

1          C A P T I O N

2      **ANSWERS AND ORAL DEPOSITION OF SHERIFF BRUCE**

3  **PENNINGTON (VIA VIDEO), VOLUME II OF II,** a witness

4  produced at the request of counsel for the **PLAINTIFFS**

5  taken in the above-styled and numbered cause on the

6  5th day of November, 2014, before **LEE ANN DICKENS,**

7  Certified Court Reporter, at 2:12 p.m., at the law

8  offices of Mr. George D. "Bucky" Ellis, Ellis Law

9  Firm, 124 North Main Street, Benton, Arkansas,

10  pursuant to the agreement hereinafter set forth.

11

12              *  *  *  *  *  *  *  *  *

13

14          S T I P U L A T I O N S

15      **IT IS STIPULATED AND AGREED** by and between the

16  parties through their respective counsel that the

17  oral deposition of **SHERIFF BRUCE PENNINGTON (VIA**

18  **VIDEO), VOLUME II OF II** may be taken for any and all

19  purposes according to the Arkansas Rules of Civil

20  Procedure.

21

22              *  *  *  *  *  *  *  *  *

23

24

25

**LEE ANN DICKENS, CCR**
**(501)614-7367**

5

|   | **P R O C E E D I N G S** |
|---|---|
| 1 | |
| 2 | THE VIDEOGRAPHER:  We're on the audio/ |
| 3 | video record at approximately 2:12 p.m. on |
| 4 | November 5th, 2014. |
| 5 | This is Mike Tschiemer, Legal Video |
| 6 | Specialist for Arkansas Legal Video. |
| 7 | We're at Ellis Law Firm, 126 North Main |
| 8 | Street in Benton, Arkansas for the |
| 9 | continuation of the deposition of Bruce |
| 10 | PEnnington in the matter of *Robin Babovec vs.* |
| 11 | *Deputy & Officers Mike Richards, Tonya* |
| 12 | *Parker, Et Al*, United States District Court |
| 13 | case No. 4:13cv0699 KGB. |
| 14 | The court reporter is Ann Dickens -- or |
| 15 | Lee Ann Dickens.  Excuse me. |
| 16 | Will Counsel please state their |
| 17 | appearances for the record? |
| 18 | MR. SWINDOLL:  I'm James Swindoll.  I'm |
| 19 | here for Robin Babovec. |
| 20 | MR. ELLIS:  George Ellis for the |
| 21 | Defendants. |
| 22 | THE VIDEOGRAPHER:  Ms. Dickens, will you |
| 23 | please swear in the witness? |
| 24 | THE COURT REPORTER:  I'll ask you to |
| 25 | raise your right hand, please, sir. |

**LEE ANN DICKENS, CCR**
**(501)614-7367**

Case 4:13-cv-00699-KGB   Document 27-3   Filed 01/09/15   Page 6 of 44
Case 4:13-cv-00699-KGB   Document 22-2   Filed 12/22/14   Page 57 of 97

6

1      THE WITNESS:  (Complies.)

2      THE COURT REPORTER:  Do you solemnly

3  swear or affirm that the testimony you're

4  about to give is the truth, the whole truth,

5  nothing but the truth?

6      THE WITNESS:  I do.

7      THE COURT REPORTER:  Thanks.

8      THE VIDEOGRAPHER:  Thanks.  Please

9  proceed.

10  THEREUPON,

11    **BRUCE PENNINGTON, VOLUME II OF II,**

12      THE WITNESS HEREINBEFORE NAMED,

13  having been first duly cautioned and

14  sworn by me to testify to the truth,

15  the whole truth, and nothing but the

16  truth, testified on his oath as

17  follows, to-wit:

18                **EXAMINATION**

19  BY MR. SWINDOLL:

20  Q    Sheriff, what is the penalty for a violation in

21  the jail or the general order by one of your

22  deputies?

23  A    Normally, what happened if someone was found

24  doing something inappropriate or whatever, it went

25  before a staff review.

Case 4:13-cv-00699-KGB   Document 22-2   Filed 12/22/14   Page 53 of 97

7

1   Q    Uh-huh.

2   A    And it was up to them to determine what degree

3   of punishment if there was to be.  You know, it could

4   include up to time off without pay up to termination.

5   Q    Okay.

6        Can you just tell me a little bit about who

7   constituted the committee to make the decision?

8   A    The -- excuse me.  In the event that it was an

9   occurrence that required a review board --

10  Q    Uh-huh.

11  A    -- it was set up by the chief deputy.  And it

12  consisted of the chief deputy --

13  Q    Uh-huh.

14  A    -- the administrative lieutenant, patrol

15  lieutenant, the CID sergeant or lieutenant.

16  Q    Uh-huh.

17       Now, would that be for violations at the jail as

18  well?

19  A    Yes.

20  Q    For general orders?

21  A    Yes.

22  Q    Do you remember, as we sit here today, any time

23  when you have sanctioned a jailor under the general

24  orders for a violation?

25  A    Yes.

8

```
 1              THE VIDEOGRAPHER:  Mr. Swindoll, you've
 2         got your microphone covered up.
 3              MR. SWINDOLL:  Okay.
 4    Q    (By Mr. Swindoll)  If you would, just give me an
 5    example of that so I can --
 6    A    We had an individual one time who struck an
 7    inmate.
 8    Q    Uh-huh.
 9    A    We had a review board.  It was determined that
10    he had -- did -- in effect did strike an inmate.
11    Subsequently he was terminated.
12    Q    Okay.
13         So if -- well, it's -- each circumstance
14    controls, right?
15    A    Yes.
16    Q    That's what I'm thinking of.
17    A    Exactly.
18    Q    So there was at least one time in the past when
19    the committee determined that the use of force was
20    wrong enough to result in termination of one of your
21    jailors?
22    A    Yes.
23    Q    When was that; do you remember?
24    A    Oh -- matter of fact, it wasn't just one.  I
25    think we had two that had used excessive force --
```

**LEE ANN DICKENS, CCR**
**(501)614-7367**

Case 4:13-cv-00699-KGB   Document 27-3   Filed 01/09/15   Page 9 of 44
Case 4:13-cv-00699-KGB   Document 22-2   Filed 12/22/14   Page 60 of 97

9

1   Q    Uh-huh.

2   A    -- and both of those resulted in termination.

3   Q    Is that in recent vintage, or --

4   A    2012 --

5   Q    Okay.

6   A    -- I believe it was.

7   Q    Okay.

8   A    '11 or '12.

9   Q    Do you remember the names of those jailors by

10  chance?

11  A    No, sir.  I don't.

12  Q    Let me go back here.

13       You know we're here about an event that occurred

14  on April the 13th of 2011?

15  A    Yes, sir.

16  Q    And you were the sheriff at that time?

17  A    That's correct.

18  Q    And you showed me -- I think the last time we

19  talked you showed me how the jail is set up and who

20  reports to who.

21  A    Yes, sir.

22  Q    And in April of 2011 when it happened, what was

23  your involvement?

24  A    I was the sheriff.

25  Q    Okay.

**LEE ANN DICKENS, CCR**
**(501)614-7367**

Case 4:13-cv-00699-KGB    Document 27-3    Filed 01/09/15    Page 10 of 44
Case 4:13-cv-00699-KGB  Document 22-2  Filed 12/22/14  Page 61 of 97

10

1      Did you take an active role in investigation to
2  determine what had happened?
3  A    No, sir.  Once this occurrence occurred, I had
4  Lieutenant Frost who was CID lieutenant at the
5  time --
6  Q    Uh-huh.
7  A    -- contact the Arkansas State Police --
8  Q    Uh-huh.
9  A    -- to have them come and investigate it so it
10  wouldn't show any signs of impropriety on out part.
11  Q    Was there an independent investigation in your
12  department before the deputy -- I mean before the
13  state trooper got there?
14  A    Not to my knowledge.
15  Q    I furnished the city the statement that
16  everybody gave before they talked to the trooper.
17  Are you familiar with those?
18  A    No.
19  Q    Okay.
20       Did you actually see the film?
21  A    I -- I can't recall whether I did or not because
22  --
23            MR. ELLIS:  Let me interject and ask if
24       Counsel is referring to the video -- the
25       surveillance video of the -- that you've

**LEE ANN DICKENS, CCR**
**(501)614-7367**

Case 4:13-cv-00699-KGB    Document 22-2    Filed 12/22/14    Page 62 of 97

11

1       supplied --

2              MR. SWINDOLL:  I should have been

3              clearer.  I should have been clearer.

4    Q    (By Mr. Swindoll)  There are video cameras in

5    your jail?

6    A    Yes.

7    Q    And were you aware that this event was recorded

8    on video?

9    A    Yes.

10   Q    That's the video I'm asking you.  Did you have a

11   chance to (inaudible) the video before you turned it

12   over or since to review this film?

13   A    I observed it.  I didn't, you know, review it

14   like just -- just really sit here and look --

15   Q    Right.

16   A    -- and -- you know.

17   Q    Do you remember whether or not any jailor was

18   ever cautioned, reprimanded or sanctioned for any act

19   involved in the death of Casey Babovec?

20   A    There was not.

21   Q    What's the purpose of pre-trial detention?

22              THE WITNESS:  Excuse me?

23   Q    (By Mr. Swindoll)  What's the purpose of

24   pre-trial detention?  General Order No. 4 says

25   they're there for security.  Let me explain that to

**LEE ANN DICKENS, CCR**
**(501)614-7367**

1   you.

2              MR. ELLIS:  General Order No. --

3              MR. SWINDOLL:  4, if I remember

4        correctly.

5              MR. ELLIS:  Here?

6              MR. SWINDOLL:  Yeah.  I've got it.  Okay.

7   Q    (By Mr. Swindoll)  In General Order No. 4 -- and

8   let me read it to you and see if you agree with it.

9   "The purpose of pre-trial detention is to assure the

10  Defendant's presence at trial."   That's what it

11  says?

12  A    Yes.

13  Q    And that's obvious what it means, right?

14  A    Yes.

15  Q    Okay.

16       "Jail officials and staff shall take affirmative

17  action to adequately safe-guard the physical safety

18  of all jail detainees."

19  A    Uh-huh.

20  Q    "No employee of the sheriff's office shall act

21  in any manner that is deliberately indifferent or

22  unnecessary to a jail detainee's protection."  What

23  kind of protection needs would detainees need?

24  A    Well, protection from other inmates, protect

25  them from doing harm to themselves --

13

1    Q     Uh-huh.

2    A     -- such as suicide attempts and protection to

3    make sure that those that are in the jail facility as

4    jailors --

5    Q     Uh-huh.

6    A     -- do not harm or hurt any inmates.

7    Q     Now, the supervisors in the jail, if they see a

8    jailor acting in a way that is prohibited under the

9    general rule, what are their obligations?

10   A     To report it --

11   Q     Okay.

12   A     -- to their supervisor.

13   Q     Uh-huh.

14   A     To do a report such as an incident report --

15   Q     Uh-huh.

16   A     -- and let it go up the chain.

17   Q     If they see that an inmate is suffering damage

18   from an act which the reviewer sees as unnecessary

19   force, what is he to do?

20   A     If it's unnecessary force and he uses force,

21   then there's a form -- a use of force form that is

22   required.

23   Q     Okay.

24         If he is a supervisor and sees one of his

25   deputies -- for example, he was hitting one of the

**LEE ANN DICKENS, CCR**
**(501)614-7367**

1    inmates unnecessarily or taking an act -- a physical

2    action against a detainee, what is he to do to

3    protect the detainee under Rule 4?

4    A    First and foremost separate the inmate from the

5    deputy and then do a use of force, you know, and

6    present that to his supervisor for further review.

7    Q    And you mentioned to me that in your review of

8    the circumstances as the head of -- sheriff in Saline

9    County you felt that the officers were not sanctioned

10    and did not deserve to be sanctioned.  Is that what I

11    read kind of in behind --

12    A    Correct.

13    Q    Okay.

14    A    I had talked with the fire department personnel

15    who responded with the paramedics --

16    Q    Uh-huh.

17    A    -- and they had nothing but praise in regards to

18    the actions that the staff took in trying to revive

19    Mr. Babovec.  You know, that they did everything

20    humanly possible to try to have him brought back.

21    Q    Okay.

22    Did you believe at the time you talked to them

23    that Casey Babovec had expired during the subduing or

24    thereafter?

25    A    It was my understanding thereafter.

**LEE ANN DICKENS, CCR**
**(501)614-7367**

15

1   Q    What were you told and what do you remember

2   about thereafter?

3   A    That when they placed Casey in the cell, he

4   found the biggest person in there to start an

5   altercation with.  And the staff went inside and

6   brought him down and he was fighting them and so they

7   dry-stunned him with a taser --

8   Q    Uh-huh.

9   A    -- to try to get him to comply.

10  Q    Yes.

11  A    You know, so that's my knowledge of what

12  occurred.

13  Q    Okay.

14       So when you were told -- you believe that they

15  actually entered the cell themselves to take Casey

16  out?

17  A    Yes.

18  Q    And you believe -- you know that you were told

19  they were using a dry taser.  You and I talked about

20  conductive energy weapons.

21  A    Yes, sir.

22  Q    Anybody who used a taser on Casey Babovec that

23  day, April 11th, should have been trained and

24  certified to use the taser; is that right?

25  A    That's right.

16

```
 1   Q    Now, let's talk about emergent medical needs for
 2   a few minutes.  Is there any doubt in your mind that
 3   if a detainee has an emergent medical need that they
 4   are entitled to medical care?
 5   A    Exactly.
 6   Q    How is that determination (inaudible)?
 7   A    Back in 2011, that was back before we had
 8   in-house medical --
 9   Q    Uh-huh.
10   A    -- it was -- would be determined by the corporal
11   on duty --
12   Q    Uh-huh.
13   A    -- whether or not this person, one, was faking,
14   two, was really in need of medical services.
15   Q    If the corporal hears the detainee asked for
16   emergent -- medical care, what is he to do?
17              THE WITNESS:  To make that decision --
18              MR. SWINDOLL:  Yes.  Uh-huh.
19              THE WITNESS:  -- whether or not --
20   Q    (By Mr. Swindoll)  Whether or not it's necessary
21   to have medical treatment for that detainee in that
22   circumstance?
23   A    Right.
24   Q    Tell me how he -- how -- how you train them and
25   what they do to make that decision.
```

**LEE ANN DICKENS, CCR**
**(501)614-7367**

Case 4:13-cv-00699-KGB   Document 27-3   Filed 01/09/15   Page 17 of 44
Case 4:13-cv-00699-KGB   Document 22-2   Filed 12/22/14   Page 68 of 97

17

1   A    Well, unfortunately, I think one of the shifts

2   had an EMT that was on -- and I have also been an EMT

3   in my career.  And that's not enough training in

4   itself to make an adequate decision --

5   Q    Uh-huh.

6   A    -- of whether or not this person is actually in

7   need of assistance or is faking.

8   Q    Uh-huh.

9   A    That was one of the biggest problems I had with

10  the quorum court to finally get a medical on --

11  in-house --

12  Q    Uh-huh.

13  A    -- because of, you know, the amount of lawsuits

14  that could occur by not having it there.

15  Q    Right.

16       So there was a battle at the time that you

17  wanted a medical professional to make this evaluation

18  in your jail?

19  A    Exactly.

20  Q    And you're telling me that hadn't been granted

21  you?

22  A    Not at that time.

23  Q    But it was later?

24  A    Yes.

25  Q    How long had you been pushing for a medical

1  person in the jail?

2  A    When I first became sheriff, I had a real good

3  friend who was a surgeon at the VA hospital.  And he

4  came on board at no cost.  And he would come three

5  times a week for sick call.

6  Q    Uh-huh.

7  A    And -- but, finally, he got to the point -- his

8  wife was scared about him being sued --

9  Q    Uh-huh.

10  A    -- that he thought it was in his best interest.

11  So 2009 until we finally got it in 2012, I believe.

12  Q    Uh-huh.

13       How did the decision to -- I want to talk for a

14  few minutes about emergency medical care.  One is it

15  would a sick call and maybe they tell you they've got

16  a headache --

17  A    Uh-huh.

18  Q    -- and they need to go see a doctor.  Another

19  would be to assess and determine whether or not

20  emergency medical care was necessary?

21  A    That, again, was up to the corporal on duty.

22  Q    Uh-huh.

23  A    And I know several times that they would go

24  ahead and call 911 and the ambulance and fire

25  department would come down and sometimes they -- the

Case 4:13-cv-00699-KGB   Document 27-3   Filed 01/09/15   Page 19 of 44
Case 4:13-cv-00699-KGB  Document 22-2  Filed 12/22/14  Page 70 of 97

19

1    paramedics would make an assessment and say nah.  And

2    then there's been times where they've been taken to

3    the emergency room.

4    Q    Was it the practice in Saline County at the time

5    to offer emergency medical service to an inmate

6    suffering a heart attack?

7    A    Yes.

8    Q    What if an inmate told you he was suffering a

9    heart attack, what would be the decision process at

10   that time?

11   A    Again, it would be up to the corporal on duty to

12   try to determine whether this person was actually

13   having a heart attack or was faking.

14   Q    Yeah.

15        There is no time when a detainee should be

16   punished; is that right?

17   A    That's correct.

18   Q    Okay.

19        They are to be held for the trial court to

20   determine what they need to do?

21   A    Exactly.

22   Q    All right.

23        So would it be a violation of the general orders

24   and the practices in Saline County for a deputy to

25   ignore repeated requests for medical -- emergency

20

1   medical care if he knew that that inmate had ingested
2   drugs?
3   A    Well, then if they have knowledge that this
4   person has ingested drugs --
5   Q    Yeah.
6   A    -- they should or should have made provisions
7   for medical.
8   Q    Right.
9        Explain that to me.
10  A    Well, I mean --
11  Q    I know it's obvious, but we need it for the
12  record.
13  A    I understand.  It's kind of like if a person is
14  brought in by Saline County or any other law
15  enforcement agency to the jail facility, if they had
16  a blood alcohol reading of .20 or above --
17  Q    Uh-huh.
18  A    -- we wouldn't accept them because of the risk
19  involved.
20  Q    Uh-huh.
21  A    And the same thing.  If you have an individual
22  that comes in and the deputy has knowledge that this
23  individual has ingested drugs, then they should be
24  awarded medical assessment.
25  Q    Okay.

**LEE ANN DICKENS, CCR**
**(501)614-7367**

Case 4:13-cv-00699-KGB   Document 27-3   Filed 01/09/15   Page 21 of 44
Case 4:13-cv-00699-KGB   Document 22-2   Filed 12/22/14   Page 72 of 97

21

1       And because the assessment necessary to

2  determine whether or not they were truly at risk from

3  ingesting drugs requires medical people?

4  A     Yes.

5  Q     Would you say that's true?

6  A     Oh, yes.  A layperson wouldn't be able to

7  determine that.

8  Q     Right.

9       And what was the policy at Saline County jail in

10 2011 if an inmate was -- told you that they had

11 ingested drugs?  What would have been the policy to

12 get them emergency care?

13 A     Well, you know, the individual that they told

14 should have taken the appropriate actions to --

15 Q     Would they transport the inmate or call 911?

16 That's what I'm trying to get at, Sheriff.

17 A     It depends on when you look at them -- I mean,

18 if they're just falling over and, you know, labored

19 breathing, things of that nature, then they would

20 have called for an ambulance.

21 Q     Okay.

22 A     If not, then one of the jail staff could have

23 transported them.

24 Q     Okay.

25      But either way would have been acceptable

**LEE ANN DICKENS, CCR**
**(501)614-7367**

22

1    practice in the jail?

2    A    Yes.

3    Q    Now, if an inmate suffers an injury in the jail

4    at the hands of one of the jailors, are they entitled

5    to emergency medical care?

6    A    Depending on what -- the severity of the injury.

7    You know, if it's a black eye or something like that

8    --

9    Q    A bloody nose?

10   A    Yeah.

11   Q    Yeah.

12   A    But if it's to the degree that it's

13   disfigurement of a limb or something like that or if

14   the individual were, of course, need suture, then

15   definitely they would get the medical attention.

16   Q    What is excessive force, Sheriff?

17   A    Any officer, whether it be a road deputy or a

18   detention facility jailor, you should only use enough

19   force, one, make the arrest, or in the jail would be

20   to subdue an inmate.

21   Q    Okay.

22        And force in excess of that would be considered

23   excessive?

24   A    Yes.

25   Q    Is that fair?

**LEE ANN DICKENS, CCR**
**(501)614-7367**

23

1   A     That's fair.

2   Q     So if you have an inmate that is subdued or

3   partially sub- -- let's say you have an inmate in

4   handcuffs --

5   A     Uh-huh.

6   Q     -- would you be allowed to -- inmate on the

7   ground in handcuffs --

8   A     (Witness nods head up and down.)

9   Q     -- would you be allowed to sit on top of this

10  inmate?

11  A     Depends on if they're kicking --

12  Q     Uh-huh.

13  A     -- or whatever, you know, then yes.

14  Q     What's the danger of asphyxiation -- positional

15  asphyxiation in the use of force in a jail?

16  A     I don't follow you.

17  Q     Okay.

18        One of the things that happened to Casey was an

19  asphyxiation -- one of the sources of his death is he

20  couldn't breath.  And I'm wondering if that's a

21  recognized --

22              MR. ELLIS:  Object to the --

23  Q     (By Mr. Swindoll) -- complication -

24              MR. ELLIS:  I'm going to object to the

25        form of the question, but go ahead and

24

```
 1      answer.
 2              MR. SWINDOLL:  Yeah.  Bucky and I have
 3          another deposition to take and we'll have
 4          that clearly stated.
 5   Q   (By Mr. Swindoll)  But is expiration by forcing
 6   the breath out -- asphyxiation a worry of police
 7   officers during the time when they're subduing
 8   inmates?
 9   A   You know, in my 40 years of doing this --
10   Q   Uh-huh.
11   A   -- and I have been on top of several --
12   Q   Yeah.
13   A   -- and I've never had one asphyxiate.  You know,
14   that --
15   Q   You've never had one worry that they're -- or
16   you worry that they're not breathing correctly --
17   A   No.
18   Q   -- when you're on top of them?
19   A   Huh-uh.  I've worried if I'm going to hit them
20   in the back of the head with something, but --
21   Q   Yeah.  Yeah.
22              MR. SWINDOLL:  Sorry.  That's okay.
23              MR. SWINDOLL:  Okay.  I'm going to --
24          this is going to be a new exhibit to the
25          deposition.
```

**LEE ANN DICKENS, CCR**
**(501)614-7367**

25

1          (THEREUPON, Exhibit No. 1 was marked for

2          identification and is attached hereto.)

3   Q    (By Mr. Swindoll)  This is the number of

4   officers that were involved in the subduing of Casey

5   Babovec.  And I'm wondering did you have any

6   criticism in your review or going out to talk to any

7   of your officers about this take-down?  You said you

8   didn't sanction anybody.  Did you ever have any

9   discussions about --

10  A    No.

11  Q    -- anything that --

12  A    This is the first time I've seen this.

13  Q    Okay.

14          THE WITNESS:  What is there?  Three or

15          four?

16          MR. SWINDOLL:  There's eight.

17          MR. ELLIS:  I didn't see eight, Mr.

18          Swindoll, and I object to your

19          characterization of eight.

20          THE WITNESS:  We never had eight working

21          on a shift.

22          MR. SWINDOLL:  I mean, they came from

23          everywhere in the jail.  Okay.

24          MR. ELLIS:  I don't see eight.

25          MR. SWINDOLL:  Here they are.

**LEE ANN DICKENS, CCR**
**(501)614-7367**

```
 1            THE COURT REPORTER:  Okay.  Bucky –
 2            MR. ELLIS:  I don't see nine in that
 3       photograph.
 4            THE COURT REPORTER: -- would you mark
 5       this -- let's go ahead and mark those so we
 6       don't get confused.
 7            (THEREUPON, Exhibit No. 2 was marked for
 8       identification and is attached hereto.)
 9            MR. SWINDOLL:  Exhibit 1 and Exhibit 2 to
10       his deposition.
11            MR. ELLIS:  And those are –
12            MR. SWINDOLL:  Yeah.
13            THE COURT REPORTER:  Well, what was the
14       other one that you-all came in with?  Was
15       that already marked previously?
16            MR. ELLIS:  I think so.
17            THE COURT REPORTER:  All right.  Okay.
18  Q    (By Mr. Swindoll)  There are some questions that
19  you might not know the answers to, so I'm just going
20  asking directly.
21  A    Sure.
22  Q    Okay.
23       The tape reveals that this man released his
24  bodily fluids during this event.  Were you aware of
25  that?
```

**LEE ANN DICKENS, CCR**
**(501)614-7367**

27

1   A   No.

2   Q   The tape also reveals that following the

3   subduing and his release of the fluids he was dragged

4   into another room.  Were you aware of that?

5   A   No.

6   Q   Were you aware that there was 10 minutes before

7   anyone treated Casey Babovec before they dragged him

8   into that room?

9   A   No.

10   Q   But we can agree that if Casey needed emergency

11   medical care after the take-down after the tasing,

12   after the subduing that he was entitled to it?

13   A   Should have received it.

14   Q   Yes.

15       In your judgment in the review that you made,

16   the actions of your officers were not only

17   constitutional but in connection and in line with

18   jail policies that you had in place?

19   A   Correct.  This information was after the state

20   police investigated it --

21   Q   Uh-huh.

22   A   -- and found that there were no wrongdoings.

23   Q   I was talking to somebody about my preparation

24   for the deposition today and I made a statement and

25   he thought I was wrong.  I said that I thought that

28

```
 1   jailors were not certified law enforcement officers;
 2   is that correct?
 3   A    That's correct.
 4   Q    That have a different set of training?
 5   A    Correct.
 6   Q    Some of them graduate and go on to school?
 7   A    What happens --
 8   Q    Yeah.
 9   A    -- you know, they'll start out in the jail.
10   Q    Uh-huh.
11   A    And then as openings come open in patrol, you
12   know, they'll apply.  If they are hired, then they're
13   sent to the Arkansas Law Enforcement Training
14   Academy.
15   Q    And then once they finish that they get
16   certified?
17   A    Yes.
18   Q    Yes.
19        Now, what kind of training are provided to
20   jailors?
21   A    Jail Standards, which is a course that's
22   approved by Arkansas Law Enforcement Training
23   Academy.  And that's one.
24   Q    Uh-huh.
25   A    CPR is another.  You know, taser is another.
```

**LEE ANN DICKENS, CCR**
**(501)614-7367**

```
 1   You know, being able to operate a breathalyzer.  You
 2   know, those type things.
 3   Q    So each skill set is acquired on the job?  Is
 4   that what I'm hearing --
 5   A    Yes.
 6   Q    -- or is that through classes?
 7   A    Through classes.
 8   Q    Okay.
 9        How important is training to ensure that you
10   have safe and a well-running jail?
11   A    Well, training is, you know, very essential
12   whether it be jail, CID.  You know, you can never
13   learn enough.  So that's the reason why -- prior to
14   my retirement, you know, they had -- continually, you
15   know, being trained in classes and different things.
16   Q    We've talked about the -- well, we discussed the
17   fact that you were after the quorum court to get you
18   medical care in the jail?
19   A    Correct.
20   Q    Now I want to ask you were you also ever
21   discussing with them the need to get more personnel
22   in the jail?
23   A    Yes.
24   Q    Tell me about that.
25   A    Well, and, again, you know, I would go before
```

Case 4:13-cv-00699-KGB   Document 27-3   Filed 01/09/15   Page 30 of 44
Case 4:13-cv-00699-KGB   Document 22-2   Filed 12/22/14   Page 81 of 97

30

1    the quorum court because as our inmate counts rose --
2    for the safety of not only the officers but the
3    inmates, it was necessary.  And so while I was
4    sheriff we were able to build on to the jail which
5    raised our inmate capacity up to 250.  And,
6    therefore, I had to go before the quorum court --
7    Q    Uh-huh.
8    A    -- and ask for additional personnel to be able
9    to operate the jail where, you know, we could be in
10   compliance --
11   Q    Right.
12   A    -- with Jail Standards and also for the safety
13   of the safety of the inmates and officers in charge.
14   Q    And what -- how were you received at quorum
15   court about it?
16   A    Saline County being one of two counties in the
17   state of Arkansas without a county-wide sales tax --
18   Q    Yeah.
19   A    -- you know, at first they thought we could do
20   more with less --
21   Q    Yeah.
22   A    -- but then, you know, finally they did provide,
23   you know, additional staffing.
24   Q    When did that happen; do you remember?
25   A    Late 2011.  Early 2012.

**LEE ANN DICKENS, CCR**
**(501)614-7367**

1   Q    And so before that you felt that you needed more

2   help in the jail?

3   A    Certainly.

4   Q    And that was for the purposes you've told us?

5   A    Yes, sir.

6   Q    Okay.

7       Now, look at Inmate Death -- the policy –

8           MR. SWINDOLL:  And that's going to be No.

9       3 to the deposition.

10           (THEREUPON, Exhibit No. 3 was marked for

11        identification and is attached hereto.)

12   Q    (By Mr. Swindoll)  Can you just kind of explain

13   what that policy is and what ?

14   A    Yes, sir.  If there -- if a death does occur at

15   the jail facility, there will be a thorough

16   investigation handled by the Criminal Investigation

17   Division, whether it be the state police, CID or

18   county.

19   Q    Right.

20   A    Staff will secure and observe the scene.  Staff

21   member will detain, identify and separate all

22   suspects and witnesses.  The staff member will notify

23   the shift supervisor and the shift supervisor will

24   notify the commander on call.

25   Q    Okay.

32

1      And you preserve the scene of the accident -- or

2  assuming there's a death the crime scene is what I'm

3  thinking?

4  A    Well, certainly.

5  Q    You want to preserve it in the same manner --

6  A    Yes.

7  Q    -- and in the same way?

8  A    Yes.

9  Q    Okay.

10     You've mentioned to me that you were pursuing

11  helping the medical assistance in the jail so someone

12  could review.  Before you were able to get that, did

13  you offer any training to any of the people that were

14  doing the physician -- to help make an assessment

15  about whether or not an inmate's drug use was

16  dangerous to him or --

17  A    No.

18  Q    I went through all these documents and we could

19  spend an hour talking about them, but -- so let's

20  just get to the final questions and move on here.

21  Would a jailor ever be allowed to punish a detainee

22  with a taser?

23  A    Not to punish.  No.

24  Q    Would that be a violation of the general policy

25  of a jailor?

**LEE ANN DICKENS, CCR**
**(501)614-7367**

```
 1    A    Yes.
 2    Q    Would it be a violation of the general orders?
 3    A    Yes.
 4    Q    Would it be a violation of good police conduct?
 5    A    Exactly.  It would.
 6    Q    We talked a little bit about dry-tasing the last
 7    time.
 8    A    (Witness nods head up and down.)
 9    Q    And were you aware that there was more than one
10    taser being used on this individual Casey Babovec?
11    A    I did not know that.
12              MR. SWINDOLL:  I spent 5 hours at my
13              computer and it takes 5 minutes to ask 5
14              pages.
15    Q    (By Mr. Swindoll)  Do you remember any of the
16    EMT people who discussed with you the actions of your
17    jailors that you said was commendable?  Do you
18    remember any of those, by any chance?
19    A    Not by name.
20    Q    Okay.
21    A    I do know it was -- that fire was on --
22    Q    Yeah.
23         What part does a request by an inmate play in
24    this?  If he asks, how much weight is that given?
25    Does it depend on the circumstance?
```

**LEE ANN DICKENS, CCR**
**(501)614-7367**

34

1    A    It depends on the corporal who they're asking.

2    Different circumstances and what medical need are

3    they needing.  Is it just a headache, or -- you know.

4    Q    Right.  I have to ask this question.

5         As the chief executive officer at the jail, can

6    you tell us it was decided, after review that the

7    force used against Detainee Babovec met the standards

8    of excessive force at Saline County?  As the chief

9    executive at the jail and after reviewing everything

10   that you did, do you believe that the forces used

11   against Casey Babovec met the standards that you had

12   in place at the jail in April of 2011?

13   A    I do.

14   Q    Okay.

15        Did you believe in reviewing this matter that

16   any less force could have been just as effective?

17   A    (Inaudible.)

18             THE COURT REPORTER:  I'm sorry.  Did you

19        say "no?"

20             THE WITNESS:  No.  I'm sorry.

21             THE COURT REPORTER:  I couldn't see you.

22        No.  You're fine.  Thank you.

23   Q    (By Mr. Swindoll)  Did your review ever

24   determine that the inmate or the detainee needed

25   emergency medical care?

**LEE ANN DICKENS, CCR**
**(501)614-7367**

35

|   |   |   |
|---|---|---|
| 1 | A | Not until the occurrence occurred. |
| 2 | Q | After the occurred, did you think he needed -- |
| 3 | A | After. |
| 4 | Q | -- emergency medical care? |
| 5 | A | Yes.  And that's the reason why 911 was called. |
| 6 | Q | While your deputies or your jailors wait on 911 |

7   in an emergency medical situation, what are their

8   obligations to the detainee?

9   A   I believe on Casey that they started CPR.

10  Q   Did you ever review the method and manner of the

11  CPR that was --

12  A   No.

13  Q   And you would know when the proper method was

14  used and when it might not be?

15  A   Yes.

16              MR. ELLIS:  What was the question?

17              MR. SWINDOLL:  I said did you ever review

18          the EMT provided by the deputies that he's

19          discussing in the film itself to determine

20          whether or not it was accurate.

21              MR. ELLIS:  And that wouldn't be by a

22          deputy.  It would be a jailor.

23              MR. SWINDOLL:  Jailor.

24              MR. ELLIS:  And his answer was?

25              MR. SWINDOLL:  He reviewed it and he was

**LEE ANN DICKENS, CCR**
**(501)614-7367**

36

1          about to tell me that the procedure -- the

2          mouth-to-mouth that was given him was proper

3          by the deputy because of what he said.

4          That's where I was going with that.

5     A    And my response would be yes.  Because any

6     action when it comes to a person not breathing -- any

7     action is better than no reaction.

8     Q    (By Mr. Swindoll)  Okay.

9          If the inmate has been subdued, do you believe

10    that it would be proper to swing at the inmate to

11    determine whether or not he was faking about being

12    asleep?

13    A    See, the -- you know, I've done similar things

14    in the past to see, you know, if they are faking,

15    or --

16    Q    Okay.

17         I looked through the federal files, Sheriff, and

18    they were in the 20's, maybe in the 30's cases filed

19    against Saline County during this time in which you

20    were the sheriff.  Can you just discuss those with me

21    for a minute?

22    A    Most of them had to do with medical --

23    Q    Uh-huh.

24    A    -- that was --

25    Q    I saw that as well.

**LEE ANN DICKENS, CCR**
**(501)614-7367**

37

1    A    -- inadequate in the jail.

2    Q    That was part of your evidence to go to the

3    committee and try to get money?

4    A    Exactly.  To get you know in staff medical.  And

5    by doing so has -- the company -- they took the

6    lawsuits on themselves.

7    Q    They did?

8    A    Yeah.  So that relieved the county of having

9    that.

10   Q    Have you ever discussed the actual events that

11   any of the deputies ever saw?

12   A    No.

13            MR. ELLIS:  And you mean the jailors?

14            MR. SWINDOLL:  Jailors.  Because they're

15        not deputies.  They're -

16            MR. ELLIS:  We'll stipulate that when you

17        say "deputies" you mean jailors.

18            MR. SWINDOLL:  Yeah.  Unless I mean

19        jailor.

20            MR. ELLIS:  Thank you.

21   Q    (By Mr. Swindoll)  If a jailor who is not

22   certified or trained on the taser - use of a taser,

23   what's the penalty?

24   A    Again, it would go before a staff review board.

25   And whatever determination they made would be what I

**LEE ANN DICKENS, CCR**
**(501)614-7367**

Case 4:13-cv-00699-KGB   Document 27-3   Filed 01/09/15   Page 39 of 44
Case 4:13-cv-00699-KGB   Document 22-2   Filed 12/22/14   Page 89 of 97

38

1   would sign off on.

2   Q   Okay.

3      In your review before today, have you spent any

4   time looking at the actual actions of the deputies?

5   I mean, if I wanted to ask you about Deputy Dion, for

6   example, do you know what part he took in any of

7   this?

8   A   No.

9   Q   I mean, I could ask you for each of the

10   deputies --

11   A   Yes.

12   Q   -- and I'd probably get the same answer,

13   wouldn't I?

14   A   Yes.

15   Q   Do you support the -- what's the import of the

16   use of force?  Does it have some use in

17   administrating the jail?

18   A   What it does -- it will do one or two things.

19   Q   Uh-huh.

20   A   It will clear a jailor or it could come with the

21   findings of the inmate.

22   Q   Uh-huh.

23   A   You know, so the purpose of it is to determine

24   was the force necessary.  And if not, if appropriate

25   actions would be taken.

Case 4:13-cv-00699-KGB   Document 27-3   Filed 01/09/15   Page 39 of 44
Case 4:13-cv-00699-KGB   Document 22-2   Filed 12/22/14   Page 90 of 97

39

1    Q    Do you know, as we sit here today, whether or

2    not any use of force documents were filled out on

3    Casey Babovec?

4    A    I do not know.

5    Q    Should they have been?

6    A    If force was excessive.

7    Q    Well, I mean, if force was used.  A use of force

8    report doesn't require that it be excessive, does it?

9    A    No.

10   Q    It should be noted and --

11   A    Yes.

12   Q    -- explained and justified, if necessary?

13   A    Exactly.

14   Q    And so those reports, if they were not filled

15   out -- there's not a form, you don't get an

16   opportunity to figure out what happened?

17   A    Correct.

18              MR. SWINDOLL:  One more second.

19   Q    (By Mr. Swindoll)  Do you believe that an inmate

20   who is being attacked illegally by a jailor has a

21   right to defend himself?

22   A    Yes.

23              MR. SWINDOLL:  Thank you.  No more

24       questions.

25                        **EXAMINATION**

**LEE ANN DICKENS, CCR**
**(501)614-7367**

40

BY MR. ELLIS:

Q    Now, Sheriff, first -- just a couple of things.
You were shown policy No. G-2, Inmate Death, a few
minutes ago --

A    Okay.

Q    -- which is Exhibit 3 --

A    Okay.

Q    -- to this deposition; is that correct, sir?

A    (Witness nods head up and down.)

Q    Is that correct, sir?

A    Uh-huh.

Q    And it lists several things that need to be done
in the case of an inmate's death; is that correct,
sir?

A    That's correct.

Q    Were all of those things done in this case?

A    To my knowledge, it was.

Q    Thank you.

      Now, we talked about under Mr. Swindoll's
questioning what the jail staff needs to do with
respect to emergency medical care and that they
should be taken to the hospital or dial 911 in case
of drugs, pot, crack, whiskey, meth.  Now, you're not
suggesting, are you, Sheriff, that every -- that
every drunk, every meth head, every pot head and

**LEE ANN DICKENS, CCR**
**(501)614-7367**

41

```
1   every crack head that comes through the jail if they
2   have ingested drugs or alcohol should automatically
3   be taken to the hospital?
4   A    No.  No.  Because if you did half the people
5   that are brought in would end up in the hospital.
6   Q    Exactly.
7             MR. ELLIS:  I believe that's all.  Thank
8        you.
9                   FURTHER EXAMINATION
10  BY MR. SWINDOLL:
11  Q    That doesn't mean that that officer that we've
12  described to has to make the assessment should not
13  determine with his best judgment whether or not that
14  inmate needs emergency medical care?
15  A    That's correct.
16  Q    And is consistent with what you and I've talked
17  about?
18  A    Yes.
19             MR. SWINDOLL:  That's it.  And thank you
20        for coming down here.
21             THE WITNESS:  Oh, you're welcome, sir.
22             MR. SWINDOLL:  I hope I didn't wear you
23        out.
24             THE WITNESS:  Oh, no.  Not at all.  This
25        ain't my first rodeo.
```

**LEE ANN DICKENS, CCR**
**(501)614-7367**

42

```
 1            THE VIDEOGRAPHER:  Okay.  This will
 2     complete the deposition.
 3            We're off the record at 2:54 p.m.
 4            THE COURT REPORTER:  All right.  Thanks
 5     so much.
 6            (WHEREUPON, the proceedings were
 7     concluded in the matter at 2:54 p.m.)
 8                (WITNESS EXCUSED)
 9             *  *  *  *  *  *  *  *  *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

43

# C E R T I F I C A T E

STATE OF ARKANSAS        )
                         )ss
COUNTY OF PULASKI        )

    I, LEE ANN DICKENS, Certified Court Reporter #403, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of a Stenotype machine and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

    I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

    WITNESS MY HAND AND SEAL this 1st day of December, 2014.

_____
LEE ANN DICKENS, CCR
AR NOTARY EXPIRY 10/28/15

**LEE ANN DICKENS, CCR**
**(501)614-7367**

