IN THE MATTER OF CASEY BABOVEC

EXAMINATION UNDER OATH (VIA VIDEO)

OF

CHRISTY J. NICHOLS

(Taken March 26, 2013, at 10:28 a.m.)

LEE ANN DICKENS, CCR
7315 I STREET
LITTLE ROCK, ARKANSAS   72207
(501) 614-7367

ORIGINAL

EXHIBIT
4

## A P P E A R A N C E S

MR. JAMES F. SWINDOLL
THE LAW OFFICES OF JAMES F. SWINDOLL
212 CENTER STREET
SUITE 300
LITTLE ROCK, ARKANSAS   72201


ALSO PRESENT:   MR. MIKE TSCHIEMER, The Videographer


LEE ANN DICKENS, CCR
(501) 614-7367

3

# I N D E X

STYLE AND NUMBER. . . . . . . . . . . . . . . . . . .   1

APPEARANCES . . . . . . . . . . . . . . . . . . . . .   2

PROCEEDINGS . . . . . . . . . . . . . . . . . . . . .   4

WITNESS:  **CHRISTY J. NICHOLS**

    Examination by Mr. Swindoll. . . . . . . . . .   5

PROCEEDINGS CONCLUDED . . . . . . . . . . . . . . . .  17

COURT REPORTER'S CERTIFICATE. . . . . . . . . . . . .  18

LEE ANN DICKENS, CCR
(501) 614-7367

```
 1                    P R O C E E D I N G S
 2         THE EXAMINATION UNDER OATH OF CHRISTY J. NICHOLS
 3   (VIA VIDEO), taken in the above-referenced cause on
 4   the 26th day of March, 2013, before Lee Ann Dickens,
 5   Arkansas Supreme Court Certified Court Reporter #403,
 6   a Notary Public in and for Pulaski County, Arkansas,
 7   at 10:28 a.m., at the law offices of Mr. James F.
 8   Swindoll, The Law Offices of James F. Swindoll, 212
 9   Center Street, Suite 300, Little Rock, Arkansas.
10
11                    * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

LEE ANN DICKENS, CCR
(501) 614-7367

```
 1                    P R O C E E D I N G S
 2          THEREUPON,
 3                    CHRISTY J. NICHOLS,
 4          THE WITNESS HEREINBEFORE NAMED,
 5          having been first duly cautioned and
 6          sworn by me to testify to the truth,
 7          the whole truth, and nothing but the
 8          truth, testified on her oath as
 9          follows, to-wit:
10                        EXAMINATION
11     BY MR. SWINDOLL:
12     Q    Would you give us your full name, please.
13     A    Christy Janelle Nichols.
14     Q    Christy, how old are you?
15     A    I'm 40.
16     Q    And you live here in Pulaski County now?
17     A    No.  I still live in Saline County.
18     Q    Okay.
19          You're here today voluntarily?  You've come --
20     A    Yes.
21     Q    -- without a subpoena?
22     A    Right.
23     Q    You've come to tell the truth about something
24     that you saw?
25     A    Yes.
```

CHRISTY J. NICHOLS                                            6

1  Q   Is that right?
2  A   Yes.
3  Q   Were you in the jail in the detention facility
4  on April the 13th of 2011?
5  A   Yes.
6  Q   Let me take you there around 5:00 or 5:30 in the
7  afternoon. Did you see a young man named Casey
8  Babovec?
9  A   Yes. I did.
10 Q   All right.
11     In your own words, tell us what you saw that day
12 and then I'll ask some questions to follow-up.
13 A   Okay. I went up to the front. I was always in
14 isolation, and I went up -- excuse me -- and I went
15 up to the front for my hour out and mainly to get
16 some cold water out of the fountain. And when I was
17 up there, they had me sitting on a bench by the pay
18 phones which is where I usually sat. And there was a
19 lot of noise going on in cell No. 1 which was like
20 pretty close to the bench. It was a guy beating on
21 the door saying that he was having a heart attack.
22 Please help him. And they was yelling at him to stop
23 beating on the door.
24     Well, all the other inmates started beating on
25 the door saying that he had had a bowel movement on

LEE ANN DICKENS, CCR
(501) 614-7367

CHRISTY J. NICHOLS                                7

1  himself and that he smelled really bad. If they
2  would please get him out of there. And so they was
3  making fun of him. And then they pulled him out of
4  there. And Officer McGuire was standing -- he was --
5  they sat him down beside me -- Casey. And, you know,
6  I didn't really want to engage in too much
7  conversation due to his situation. You know, I was
8  just looking at him kind of funny like something's
9  wrong -- bad wrong. And I knew that the guy had been
10 tweaking on dope -- "tweaking" meaning fidgety. You
11 know, you could just tell, and -- because I'd done it
12 in the past and I know all the movements. And, you
13 know, that -- that -- that was, you know, normal
14 behavior for that -- for that circumstance.
15      But the feces part, that wasn't normal, so I
16 was -- I was trying to understand what was going on.
17 And Officer McGuire was standing right here. I was
18 sitting right here and Casey was standing right
19 here -- or sitting beside me. And he said I bet you
20 can't be still for 30 seconds. He didn't last 2
21 seconds. He couldn't be still. And they was
22 laughing at him, you know, kind of like playing a
23 game with him.
24      Then they took him in the shower part and
25 showered him and put some orange jumpsuit pants on

1  him. And he came out and they had his pants rolled
2  up in a plastic garbage bag. And when he came out,
3  they had sat him beside me because they had something
4  to do before they could put him back in the cell.
5  And, basically, they was making fun of him because he
6  was on meth and, you know, he was having a hard time
7  controlling his body movements.
8  Q    Was he still having trouble with his heart
9  attack? Was he still complaining about that at the
10 time?
11 A    At the time, no.
12 Q    Okay.
13 A    No. At that point, when -- once had came out
14 and then had the shower and everything, I guess
15 during that time he felt that he -- maybe he thought
16 he was going to get some help. I'm not really sure.
17 Q    Okay.
18 A    He didn't really know what was going on any more
19 than I did. But they was just showering him --
20 changing his clothes and stuff. And as we were
21 sitting there talking and while he was waiting to go
22 back in the cell he informed me that he was scared.
23 He said that he had -- when that officer pulled him
24 over that he had swallowed two grams of meth. And I
25 looked at him and I said, Well, it must have been

CHRISTY J. NICHOLS                      9

1  pretty good because of, you know, the way you're
2  moving around and stuff. And he said, Yeah. It was.
3  And he was looking at me and he was scared. You
4  know, I was asking him where he was from and stuff
5  like that, and, you know, we was just talking like
6  normal people.
7      But when he had told me that he had swallowed
8  two grams of meth and that he was scared, I felt like
9  he was telling me that because he wanted me to tell
10 them so that they would help him because they had
11 already been refusing him help.
12     So when he went back into the cell I informed
13 Officer Parker that he had swallowed -- he told me
14 that he had swallowed two grams of meth. And I
15 didn't tell her that for any reasons other than for
16 his protection -- for his health because, you know,
17 he'd said something about heart attack. Even though
18 when he was out in the lobby he was okay, maybe he
19 thought he was getting ready to get some help. But
20 when they put him back in the cell I think that
21 scared him. And when they did, they told him that if
22 he beat on that door one more time that they was
23 going to tase him.
24 Q   In punishment?
25 A   Yeah. Yeah. In punishment. They was going to

LEE ANN DICKENS, CCR
(501) 614-7367

CHRISTY J. NICHOLS                                                    10

1   tase him and, you know, teach him a lesson, you know,
2   how to stay off the door because he was on the floor.
3   I remember because I was on the outside and I heard
4   him on the floor speaking under the door saying --
5   and he was holding his chest -- please help; that he
6   was having a heart attack. And there was a lot of
7   people in the cell with him and they heard him, too.
8   I mean, it was clear that the guy was scared and that
9   was what was going on.
10      They yelled back to him that's what you get for
11  doing meth. You shouldn't have been doing meth. And
12  they was taunting him. And then when they put him
13  back in the cell I guess he went in there and hit
14  somebody or something. I don't know. I was on the
15  outside. I didn't see in there. But if he did go in
16  there and hit somebody, I would think that that would
17  be the only way he knew that he could get some help
18  without being tased because he asked for it
19  appropriately and they wouldn't give it to him. And
20  the guy had to do something. I felt like he was
21  pushed in a corner.
22      So when that happened, I was -- I was looking at
23  the cameras with the guards. And -- well, when
24  they -- the guard ran over there and he said he just
25  hit somebody, I ran over there and looked at the

camera. And then -- because it's like he was a big show. He was like entertainment. And they -- they all ran over there and they jerked the door open. And I was sitting there watching everything and they jerked the door open. And, oh, my gosh. They all just started tasing him. They jerked him down and they had him on the floor. And the horrible thing is they was yelling at this guy. I guess he had -- at some point, you know, like when they had him on the ground was beating him. He had lost his bowels again. And it was after that point that I noticed he became unresponsive. And they was saying terrible things to him.

The sergeant was standing -- Sergeant Richards was standing over him saying, Oh, looks like the little boy peed on himself. And it was going all out from under him on the floor. And the guards were hitting him even harder and yelling. Because -- okay. And he'd bit one guard on the hand. And so he was punching him off because he bit his hand -- his wrist and he was hitting him with this one (indicating). Well, apparently, he'd loosened his grip -- I mean he had stopped biting and the officers that were down close to his rear-end, they were hitting him and yelling that he had done, you know,

CHRISTY J. NICHOLS                               12

1  No. 2 on himself.  I don't know.
2  Q    Uh-huh.
3  A    And they was hitting him.  And then the sergeant
4  was standing over him watching everything, making fun
5  of the guy while at they were doing this.  They drug
6  him off to that room after he had -- I mean, the guy
7  wasn't -- when they -- before they even got off of
8  him he wasn't -- he was just laying there.  And I was
9  under the impression he was dead right then.
10 Q    Christy, did you hear Casey say I'm not
11 resisting?
12 A    Yeah.  He said he wasn't resisting.  He said
13 that all the way from the beginning up until he
14 couldn't even talk no more because they was beating
15 him and, you know, they had tased him and stuff.
16 Q    Did you hear Casey say I can't breath?
17 A    Yeah.  Yeah.  I heard him say he couldn't
18 breathe, he wasn't resisting and that he was having a
19 heart attack and he asked for help.
20 Q    Okay.
21      And you heard all of that while the police
22 officers were on him?
23 A    Yeah.
24 Q    And it was loud enough for the police officers
25 to hear as well?

LEE ANN DICKENS, CCR
(501) 614-7367

CHRISTY J. NICHOLS                     13

1  A   Well, yeah.  Their ears were right by him.  You
2  know, I could hear everything because I'm like right
3  there.
4  Q   Okay.
5      Now --
6  A   And they were just -- when he was saying these
7  things, it was -- if you look at the film, you could
8  tell obviously they did not care.  That wasn't the
9  whole -- that wasn't the point.
10 Q   Okay.
11     Now, when they dragged him into the next room,
12 did any of the officers come back and say anything
13 into the room that you could hear?
14 A   Yes.
15 Q   What did they say?
16 A   Well, after they had drug him into the room,
17 they had come out and said he's snoring.  The MF is
18 snoring.
19 Q   Right.
20 A   And then when they said that, that's what people
21 call a death gurgle.  And when they said that, I knew
22 he was gone because, I mean, I've heard it too many
23 times.
24 Q   Christy, we will know and people will show you
25 later a statement that you gave after this.

LEE ANN DICKENS, CCR
(501) 614-7367

CHRISTY J. NICHOLS                                14

1  A    Yeah.
2  Q    Can you explain the circumstances where you gave
3  a statement? And if anything was different then from
4  what you've said today, why was it different then.
5  A    Well, the way I said it then. I said it as close
6  to the way it was without incriminating myself under
7  the circumstances I was in. Because I had been in
8  that jail -- I had spent 10 months there. And during
9  that time I had spent in that jail, I had seen some
10 terrible things and I wasn't going to be a part of
11 those terrible things. So I told the state police
12 officer -- no -- the sheriff's department. I don't
13 even know what I told them, but I know whatever it
14 was I told them was to their benefit. And the reason
15 for that is only obvious.
16           THE WITNESS:  After what I saw, do
17      you really think I'm going to tell it like
18      it is so these people -- so they can,
19      what, get me next, you know.
20 Q    (By Mr. Swindoll) When the state police officer
21 comes, describe the circumstances involving the
22 statement to the state police officer and whether or
23 not any of the deputies were present or circling that
24 room?
25 A    Okay. Yeah. There were deputies outside in the

LEE ANN DICKENS, CCR
(501) 614-7367

1  hallway. The door was shut, but they were all out
2  there. They were all nervous including the deputies
3  that took part in beating the guy. And even after I
4  got through, they asked me what all I said. And,
5  yeah. During that time, they were.
6     They -- whether they were or not, I informed the
7  state police officer -- I looked him directly in his
8  eyes and told him there's no way I'm going to tell
9  you the exact real story on this until I get out of
10 here. And he asked me if he could make a taped
11 statement and I said no. I said I'll write you a
12 written statement. And I did.
13 Q   Okay.
14 A   What happened with that written statement is
15 beyond me, but I wrote one.
16 Q   And the statement that you wrote then that's
17 different from today was because you were protecting
18 yourself?
19 A   Yeah. But, see, the statement that I wrote the
20 state police officer, I felt like because he was a
21 state police officer and wasn't associated -- he
22 wasn't -- he didn't work for the county, I was more
23 direct with that statement.
24 Q   Okay.
25 A   Because I trusted him to keep that within the

1   state police.
2   Q   But --
3   A   I was more direct with it, but I also told him
4   that if he wanted 100 percent everything that he'd
5   have to wait until I got out because there were parts
6   of that that I did not trust.
7   Q   And, in fact, you would not give me a statement
8   until after March 18th?
9   A   That's right. I would not.
10  Q   Tell us why.
11  A   For fear of my safety.
12  Q   Okay.
13      Because you were still in the -- under the
14  control of or had -- they had the ability to harm
15  you?
16  A   Right. Yeah. I was involved in Saline County
17  Adult Drug Corp Program, and there's no way --
18  they're already -- like you're constantly 24/7 under
19  surveillance for 18 months. You have to go in
20  several times a week. You're under the power of
21  their jurisdiction in Saline County. And there was
22  no way I was going to put myself at risk by doing any
23  kind of statements or anything. I mean, I came up
24  here and I spoke. But as far as recorded anything,
25  it wasn't going to happen until I got out from under

CHRISTY J. NICHOLS                                17

1  that.
2  Q    The information you've given us today is the
3  truth and the whole truth and nothing but the truth?
4  A    So help me God.
5              MR. SWINDOLL:  Thank you so much,
6       Christy.
7              THE WITNESS:  Uh-huh.
8              THE COURT REPORTER:  Okay.  Thanks.
9              (WHEREUPON, the proceedings were
10      concluded in the matter at 10:40 a.m.)
11             (WITNESS EXCUSED)
12                 * * * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

                    LEE ANN DICKENS, CCR
                      (501) 614-7367

CHRISTY J. NICHOLS                                                18

C E R T I F I C A T E

STATE OF ARKANSAS  )
                   )ss
COUNTY OF PULASKI  )

    I, LEE ANN DICKENS, Certified Court Reporter #403 and Notary Public, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of a Stenotype machine and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

    I FURTHER CERTIFY that I am neither counsel for, related to, nor employed by any of the parties to the action in which these proceedings were taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action.

    WITNESS MY HAND AND SEAL this 27th day of March, 2013.

                                        Lee Ann Dickens, CCR
                                        AR Notary Expiry 10/28/15

LEE ANN DICKENS, CCR
(501) 614-7367