# In The Matter Of:

*Robin Babovec v.*
*Deputy & Officers Mike Richards, et. al.*

---

*Lieutenant Michael Richards*
*December 11, 2014*

---

*Lee Ann Dickens*

EXHIBIT

6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ROBIN BABOVEC, as Special
Administratrix of the Estate
of CASEY BABOVEC, Deceased                    PL
                                                      AINTIFF

VS.              CASE NO: 4:13cv0699 KGB

DEPUTY & OFFICERS MIKE RICHARDS,
TONYA PARKS, CALVIN REED, DION
MCGUIRE, RYAN MCKINLEY, DAVID
FENTON, JAMES PAYNE, NANCY SHELNUTT,
SUPERVISOR LT. COURTNEY, BRUCE
PENNINGTON, JOHN & JANE DOES I-V,
COUNTY OF SALINE                    DEFENDANTS

ORAL DEPOSITION

OF

LIEUTENANT MICHAEL L. RICHARDS

(Taken December 11, 2014, at 2:10 p.m.)

LEE ANN DICKENS, CCR

7315 I STREET

LITTLE ROCK, ARKANSAS  72207

(501) 614-7367

2

# A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

MR. JAMES F. SWINDOLL
LAW OFFICES OF JAMES F. SWINDOLL
312 CENTER STREET
SUITE 300
LITTLE ROCK, ARKANSAS    72201


ON BEHALF OF DEFENDANTS:

MR. GEORGE D. "BUCKY" ELLIS
ELLIS LAW FIRM
126 NORTH MAIN STREET
BENTON, ARKANSAS     72018

3

# I N D E X

STYLE AND NUMBER. . . . . . . . . . . . . . . .    1

APPEARANCES . . . . . . . . . . . . . . . . .    2

CAPTION . . . . . . . . . . . . . . . . . . .    4

THE WITNESS:  LIEUTENANT MICHAEL L. RICHARDS

    EXAMINATION BY MR. SWINDOLL . . . . . . . .    5

    EXAMINATION BY MR. ELLIS. . . . . . . . . .   40

DEPOSITION CONCLUDED. . . . . . . . . . . . . .   43

COURT REPORTER'S CERTIFICATE. . . . . . . . . .   44

# E X H I B I T S

NO./DESCRIPTION:                          MARKED:

Exhibit No. 1 - Photograph. . . . . . . . . . .   10

LEE ANN DICKENS, CCR
(501) 614-7367

4

1                    C A P T I O N

2        ANSWERS AND ORAL DEPOSITION OF LIEUTENANT

3   MICHAEL L. RICHARDS, a witness produced at the

4   request of counsel for the PLAINTIFFS taken in the

5   above-styled and numbered cause on the 11th day of

6   December, 2014, before LEE ANN DICKENS, Certified

7   Court Reporter, at 2:10 p.m., at the law offices of

8   Mr. George D. "Bucky" Ellis, Ellis Law Firm, 124

9   North Main Street, Benton, Arkansas, pursuant to the

10  agreement hereinafter set forth.

11

12                 * * * * * * * *

13

14               S T I P U L A T I O N S

15       IT IS STIPULATED AND AGREED by and between the

16  parties through their respective counsel that the

17  oral deposition of LIEUTENANT MICHAEL L. RICHARDS may

18  be taken for any and all purposes according to the

19  Federal Rules of Civil Procedure.

20

21                 * * * * * * * *

22

23

24

25

5

```
 1                P R O C E E D I N G S
 2           THEREUPON,
 3              LIEUTENANT MICHAEL L. RICHARDS,
 4               THE WITNESS HEREINBEFORE NAMED,
 5           having been first duly cautioned and
 6           sworn by me to testify to the truth,
 7           the whole truth, and nothing but the
 8           truth, testified on his oath as
 9           follows, to-wit:
10                     EXAMINATION
11  BY MR. SWINDOLL:
12  Q    Lieutenant Richards, would you give us your full
13  name.
14  A    Michael L. Richards.
15  Q    Lieutenant, I know that are an employee of the
16  Pulaski County Sheriff's Department.  How long have
17  you been so employed?
18  A    Saline County Sheriff's Department.
19  Q    Saline.  Yeah.  Yes.  I'm sorry.
20  A    Saline County Sheriff's Department.  Yes, sir.
21  6 years -- well, it will be 6 years the 27th of this
22  month.
23  Q    Okay.
24       Can you give me a little background before you
25  came to the sheriff's office?
```

6

1   A    I worked multiple years in the Texas Department

2   of Criminal Justice for their prison system.  Took a

3   break from that and sold insurance for a while.  Made

4   a lot more money.  Different type of headache.  A

5   friend talked me into coming back to work for the

6   sheriff's office.

7   Q    And when you came back, what role did you have

8   at the sheriff's office?

9   A    Started as a jailor.

10  Q    As a jailor?

11  A    Yes.

12  Q    Now, in April of 2011 -- that's when this event

13  occurred, what was your position?

14  A    Detention sergeant.

15  Q    Tell us what a detention sergeant does.

16  A    In charge of the daily activities within the

17  jail underneath the jail administrator or

18  lieutenant -- jail lieutenant.

19  Q    Would you -- what kind of hours would you be

20  working as a --

21  A    Usually 7:00 to 5:00 Monday through Friday.

22  Q    Were you on duty this day?

23  A    Yes, sir.

24  Q    Were you still there at the offices when this

25  happened?

7

1   A    Yes, sir.

2   Q    In your own words, tell me what you think

3   happened and what you saw.  And I'll ask you what

4   people told you later, but what did you see,

5   Lieutenant?

6   A    I received a call from my on duty corporal.

7   Q    Uh-huh.

8   A    She was in the master control center at that

9   time.  And she said there's something going on in

10  booking.  You'd better look.  And that's common.  If

11  there's some type of incident and whoever is

12  available from administration --

13  Q    Uh-huh.

14  A    -- you know, we try to get there.

15  Q    Uh-huh.

16  A    I got up and left my office.  And there's two

17  people in my office.  That's -- that was Sergeant

18  McKinney and myself.

19  Q    Uh-huh.

20  A    Our desks are right beside each other.  We

21  exited -- he said where you going.  I said I'm going

22  to booking to see what's going on.  We exited the

23  administrative offices.

24  Q    Uh-huh.

25  A    It's almost a straight shot across the main

8

1   hallway into the hallway to the booking area.  It's a

2   short, you know, 20-foot hallway.

3   Q    Uh-huh.

4   A    When we stepped out of our office and into the

5   doorway of the booking area, there was a fight going

6   on in the floor -- a struggle going on in the floor

7   and there were several officers involved --

8   Q    Uh-huh.

9   A    -- and a subject involved.  And at that time I

10  didn't know who it was.  It was just -- just

11  somebody.

12  Q    Okay.

13  A    Oddly, one of the first things I noticed and I

14  commented to McKinney was he had on jail pants but he

15  had on a free-world shirt.  And that's uncommon.

16  Usually we put -- if we put one or the other, you

17  know, we give them all --

18  Q    Yeah.  Sure.

19  A    -- our clothes.  It was just an odd thing.  The

20  first thing I observed was his arm was

21  (indicating) -- he was on his stomach.  There was

22  officers on his legs holding down his legs -- trying

23  to hold down his legs.  There was an officer on one

24  arm.  There was an officer trying to hold down his

25  torso, but this one arm was loose (indicating).  And

1  they were trying to get control of that arm -- it

2  appeared they were trying to get control of that arm

3  and get him under control.  And it was a pretty good

4  struggle.  There was a lot of struggling going on.

5       The time it took us to walk there -- they got

6  the arm and they got it behind his back and were just

7  clicking the handcuffs when we stopped.

8  Q    Okay.

9  A    We got close enough to tell what was going on

10 and we stopped.

11 Q    Were the officers still on top of him?

12 A    They were kind of -- they were -- they're down

13 here.  They're on their knees -- they're on their

14 hands and knees.

15 Q    Uh-huh.

16 A    They're literally flat on the floor.

17 Q    Yeah.

18 A    And as we walked up they were just relaxing and

19 kind of getting their -- getting up off of him I

20 guess is the right way to put it.

21 Q    Right.

22           MR. SWINDOLL:  I thought I might have a

23           picture for us just to make sure we're

24           talking about the same thing.  Okay.  Let's

25           use this one because I think by this time

10

1          everybody is up and you may be in it.

2               Let's mark this as Exhibit 1.

3               THE COURT REPORTER:  All right.  Thanks.

4               (THEREUPON, Exhibit No. 1 was marked for

5          identification and is attached hereto.)

6    Q    (By Mr. Swindoll)  And see if you can tell me

7    the sequence.

8    A    Yeah.  I'm here.  McKinney is here and the

9    officers are up.

10   Q    Yeah.  They're standing up.  And that's what I

11   take it -- this is just as after they had gotten him

12   cuffed and they're --

13   A    Yes.

14   Q    -- standing off of him; is that right?

15   A    That's probably a little further off of --

16   probably a little further on past them just getting

17   off of him.

18   Q    Okay.  All right.  Let me look at that and I'll

19   ask you a few questions.  Okay.

20        Now, what I heard you say is you could picture

21   yourself and Sergeant McKenna --

22   A    McKinney.  Yes.

23   Q    McKinney.

24        If you could just put your name on there.

25   A    (Witness complies.)

1  Q    Okay.

2               MR. SWINDOLL:  And that's Exhibit 1.

3               THE COURT REPORTER:  Yes, sir.

4  Q   (By Mr. Swindoll)  We've established that

5  they've -- what was the conversation between you and

6  the officers?

7  A   I asked what -- I just asked what happened --

8  Q    Okay.

9  A   -- because I wasn't aware of what had all

10  started or --

11  Q    Uh-huh.

12  A   -- all that.  And I don't remember who -- it

13  seemed like it was Mr. McGuire at the time said there

14  was a fight in Holding Cell 1.  And the door was

15  closed to Holding Cell 1 at that time.  I said is

16  everybody all right.  And he said when we needed to

17  get this guy off he wouldn't get off.  So we had to

18  pull him out of the cell.  That's how they wound up

19  outside of the cell in the floor.

20      I'm pretty sure it was McGuire at that point

21  because he was showing me his arm where he'd gotten

22  bit.  He had a big old bite mark on his arm.  And he

23  said, Yeah.  He said he fought us pretty good.

24      Well, anyway, he was laying there on his stomach

25  handcuffed.  He was still struggling on the floor and

12

1  he was mumbling.  I don't know.  He -- I can't tell

2  you what he was saying.  It wasn't something that I

3  could understand, but he was mumbling.  Not exactly

4  thrashing on the floor, but moving on the floor.  The

5  floor was wet.  There were huge round wet puddles.

6  Q    Urine?

7  A    Urine.  That's what it turned out to be.  I just

8  assumed at that time that's what it was.

9  Q    Yeah.

10  A    I said we've got to get out of this.  Well, I

11  look and nobody's go gloves on because when they

12  rushed in it was an emergency situation.  When they

13  look at the cameras and see the fight they go in and

14  they don't take time to put the stuff on.  They went

15  in to break up the fight and nobody had gloves on.

16  So I told them to put gloves on because it was a

17  mess.  They all go get gloves on except Shellnutt.

18  Shellnutt at first she couldn't get up off the floor.

19  Her knee was bunged up pretty bad and she couldn't

20  get up off the floor at first.

21       Everybody went and got gloves on except her.

22  Somebody brought her gloves, I think, and then --

23  yeah.  Seems like somebody brought her, her gloves.

24       McKinney and I had just been to a training

25  course on dealing with restrained people.

13

1   Q   Okay.

2   A   And McKinney got down on the floor with Reed and

3   said I'm going to show you -- we're going to show you

4   how to properly set somebody up that's -- get them

5   back on their feet if they're restrained with

6   handcuffs.  So he demonstrated the technique where

7   you roll them up on their side and you kind of roll

8   up where they're in a sitting position.  They did

9   that.  Reed was behind the man on the floor.  I

10  didn't know his name at the time.  He was behind the

11  guy.  McKinney was beside him.  Whenever they rolled

12  him over, he started spitting.  He was spitting blood

13  and saliva and he was spitting all over the floor

14  trying to clear his mouth.  He was -- and he was

15  awake, but he was spitting all over the floor.

16      And I said We've got to get him out of this.

17  Reed got him -- I said do we have an open holding

18  cell.  And he said 5 is open.  So Reed got him by

19  the -- like the yoke, I'd guess you'd call it, of the

20  shoulder -- across the back shoulders and pulled him

21  into the Holding Cell 5.  I turned around and said

22  find some trustees and get this mess cleaned up

23  because it was.  It was a big large area.  I said get

24  this mess cleaned up.

25      I walked from there to the holding cell.  He was

14

1  on his stomach in the holding cell at that time.  And

2  Parker came in.  Reed was there.  I can't remember

3  exactly.  And I'm -- it's been 3 years ago.  But

4  seemed like we were the first ones -- they were the

5  first ones in the cell.  I think Reed never came out.

6  He went in with him and never came out.  But the cell

7  door was open.  I walked over -- and I can't remember

8  exactly.  Parker was there and Reed was there.  And

9  there could have been somebody else in the cell, but

10  I can't remember for sure.

11        I said -- he started throwing up.  He was

12  throwing up.  They rolled him on his side.  Parker

13  was clearing his airway.  When he started throwing up

14  and they tried to roll him on his side, he was still

15  throwing up.  That's when Reed -- it looks like on

16  film that he jerks away from him because Reed -- as

17  they're trying to roll him and he starts throwing up,

18  Reed jumps back.  And he then gets a-hold of him

19  again and him and Parker finish rolling him.  And

20  they wind up -- after they get his airway cleared

21  they roll him on to his back.  But the reason he

22  jumped back was because he was throwing up.  I know

23  there's been a lot of things said about that, but

24  that's what happened.  I was in the cell -- was

25  standing there when it happened.

15

1     At that point, he was still -- I won't say
2  struggling but he was still moving.  And I said I'm
3  going to get leg restraints -- I said do we have any
4  leg restraints in booking and they said no.  I said
5  I'll get some because I had the key to the restraint
6  box in the sergeant's office.
7  Q    Uh-huh.
8  A    I went and got a -- I went to -- it's probably
9  there and back 100 feet.  I went and got the leg
10 restraints and I came back.  When I came back, they
11 had rolled him on to his back and he was still
12 mumbling -- wheezing and mumbling.  Parker was down
13 in the floor and she said I don't -- she said I don't
14 know if I feel a pulse or not.  And I said What.  And
15 she said -- I said I can hear him and she said but I
16 don't know if I feel a pulse.  I said call 911.
17 McKinney said I'm on it.  He was just outside the
18 door.  He gets on the phone right there at the
19 booking desk.  I said you need to start -- I said if
20 you can't find a pulse start CPR.  So Parker started
21 CPR.  Reed cleared his airway and Cooper was headed
22 back and Parker started compressions.
23     McKinney makes the 911 call.  And he's still --
24 I'm looking at corner and I could see what's going on
25 where he's at.  And I said somebody get the AED.

16

1  Well, Shellnutt by then is up.  She starts for the

2  AED and McKinney throws the phone down and he goes

3  and gets the AED and beats her back.  She's still

4  hobbling.  She -- her knee is this big (indicating).

5       McKinney comes back with the AED.  They

6  continued CPR.  We had to open it.  It gives you

7  instructions where to put this pad and where to put

8  this pad.  They did that.  They pulled his shirt off.

9  They get the pads on, put the button and it says stop

10 compressions, monitoring -- it gives a bunch of

11 instructions.  They do what it says.  And then it

12 says begin compressions.  They do.  And at some

13 point -- I can't remember -- right in there somewhere

14 Parker switches off from doing compressions and

15 Michael Prewitt starts doing compressions.  Reed is

16 still at his head.  Sergeant -- I mean Corporal

17 Griffin is in there at the same time and he was doing

18 the count so they'd know when to -- that was before

19 they changed CPR from no breaths.  At that time you

20 did so many compressions and so many breaths.  He was

21 doing the count for them.

22       They brought -- they had brought a -- at the

23 very early -- when they first started CPR, they got a

24 mask that you could -- a breathing mask.  There in

25 booking they've got a breathing mask.  Reed was doing

1    the breaths.  Parker was doing the compressions.  And

2    then later on Prewitt was doing the compressions and

3    he started throwing up again.  Some -- seemed like --

4    I think it was after Prewitt started he started

5    throwing up again.  You know, it seemed like we stood

6    there a long time doing this before the fire

7    department got there.  They got there first.  It

8    wasn't the paramedics.  It was the fire department.

9    They didn't do anything.  They just held the door and

10   waited on -- I mean, they looked at him, but they

11   didn't really do anything.

12        When the paramedics got there, they took over

13   and they told us stop compressions.  We stopped

14   compressions and got back and they worked on him.  It

15   wasn't but just a couple of minutes when they put him

16   on a stretcher or a Gurney and out they went.

17        I followed them out to the ambulance.  They got

18   in the ambulance and they were there for a little bit

19   before they did anything.  And finally he turned and

20   he said do you have any personal information so I got

21   the ADR which turned out to be the wrong one.  But we

22   got an ADR for him and took it to the ambulance and

23   they said close the doors.  We closed the doors and

24   they stayed there -

25             MR. ELLIS:  Let me interrupt just a

1          second.  An "ADR."  You mean an Arrest

2     Disposition -

3               THE WITNESS:  Arrest Disposition Report.

4               MR. ELLIS: -- Report?

5               THE WITNESS:  It had all his personal

6     information on it.

7               MR. ELLIS:  Hope that's okay.

8               THE WITNESS:  I'm sorry.

9  A     Stood there a little bit and the ambulance

10 finally drove off.  And then I went and kind of

11 supervised the clean-up and then we started on our

12 reports.  Started talking -- getting everybody to sit

13 down, get reports from everybody, find out what went

14 on, find out who he is -- you know, most of this time

15 I didn't even know who he was.  It was just -- there

16 was a lot going on more important than find out who

17 he was.

18      You know, my people -- the CPR was right.  We

19 have the AED report and it showed how deep the

20 compressions were, the number of compressions -- I

21 mean, my -- our people did the right things.

22 Q     (By Mr. Swindoll)  Okay.

23      And when did you find out that Casey had died?

24 A     Probably an hour, hour-and-a-half later.  I sent

25 one of our principal officers to follow -- that was

19

1   Ford -- Brandon Ford.  And Ford called me.  I was in

2   the office doing -- recording the video and getting

3   reports and stuff.  I don't know the exact time.  But

4   probably an hour, hour-and-a-half later from the time

5   the ambulance actually left.

6   Q    What do you mean when you say you were getting

7   the video?

8   A    When you -- everything is recorded.

9   Q    Yes.

10  A    It was all on video.  There are cameras in the

11  holding cell.  I went back and downloaded the

12  video -- not just from this situation, but from the

13  minute he was brought into the jail when the deputy

14  first brought him in.  That was earlier in the

15  afternoon.  He had been there about 3 hours when all

16  this took place.

17  Q    Yeah.

18  A    And I started the video from the minute he was

19  brought in.  I recorded the entire time he was in the

20  holding cell all the way -- I recorded until the

21  ambulance drove off the property and kept it -- you

22  know, downloaded and kept it.

23  Q    As a result, we have the video?

24  A    (Witness nods head up and down.)

25          MR. SWINDOLL:  Thank you for that.

20

1  Q    (By Mr. Swindoll)  What I'd like to do now is

2  just talk about how the sheriff's department --

3  especially the jail is --

4  A    Yes, sir.

5  Q    I understand you're a supervisor and you report

6  to a jail administrator?

7  A    Correct.

8  Q    Is that right?

9  A    At that time.  Yes.

10 Q    And the jail administrator reports to the

11 sheriff?

12 A    Correct.

13 Q    And the jail administrator was who at the time?

14 A    Ray Pennington.

15 Q    Ray Pennington.  No relation to --

16 A    No.  Not that I know of.  I've asked that and

17 they said --

18 Q    I asked the sheriff and he said the same thing.

19           MR. ELLIS:  Yeah.  There is no relation.

20           MR. SWINDOLL:  Okay.

21 Q    (By Mr. Swindoll)  Who is it that's responsible

22 in the jail for the training of the officers?

23           THE WITNESS:  Directly performing the

24       training or overseeing the training or -

25           MR. SWINDOLL:  Well, a little of both.

21

1   Q    (By Mr. Swindoll)  I mean somebody has got to

2   recognize training's importance.  Someone has to

3   order --

4   A    Starts with the --

5   Q    -- the training?

6   A    It goes down from the jail administrator to the

7   detention sergeant to the training sergeant.

8   Q    So there's a training sergeant at the --

9   A    Sergeant McKinney.

10  Q    McKinney.  Okay.

11       Tell me about emergency medical care in the jail

12  in April of 2011.  What provisions --

13  A    That's a broad question.

14  Q    What provisions were --

15  A    We'd all had first responder training and CPR

16  training and had certifications that -- we do that

17  annually.

18  Q    You mean every jailor has?

19  A    Every jailor gets an annual.

20  Q    So every jailor involved in this had had CPR

21  training?

22  A    Unless they had started right before or right

23  after the training and just hadn't gone through it.

24  And I -- without looking at the personnel records, I

25  can't answer that.

LEE ANN DICKENS, CCR
(501) 614-7367

Case 4:13-cv-00699-KGB    Document 22-5    Filed 12/22/14    Page 23 of 54

22

1   Q    I've been talking to some about when an inmate

2   is too inebriated to be put in the jail.  Tell me

3   about that.

4               THE WITNESS:  The policy then or the

5          policy now?

6               MR. SWINDOLL:  Policy then.

7   A    The policy then was it was officer -- it was

8   corporal -- whoever the shift supervisor's discretion

9   --

10  Q    (By Mr. Swindoll)  And --

11  A    -- in conjunction with the arresting officer.

12  Q    And if those two believe he was too intoxicated

13  then they would not take him, but instead take him to

14  --

15  A    Medical.

16  Q    Medical?

17  A    He would have to be medically cleared.

18  Q    Okay.

19       What about drug ingestion or drug use?  I know

20  you guys pick up people who are using drugs or  who

21  are affected by drugs?

22  A    If we know that they did it, we require medical

23  attention.

24  Q    So if --

25  A    If it's known.

23

1    Q    If your staff had known in April of 2011 that

2    Casey Babovec had ingested methamphetamine, he would

3    have been required to go to the med or not?

4    A    Probably.  Probably.

5    Q    And how would you-all make that decision,

6    Lieutenant Richards?

7    A    It's just one that's made every day on the spot.

8    You know, it's how much, do you know how much, do you

9    know what it was.  Often you know they've taken

10   something, but you don't know what.

11   Q    Uh-huh.

12   A    There's no sure answer.  It's -- it's done on a

13   case-to-case basis.  Whatever information we can

14   gather as to the type of substance, the amount of

15   substance, how long it's been, are they going up, are

16   they going down.

17   Q    Uh-huh.

18   A    You have to know a few parameters before you can

19   make a decision.

20   Q    Is there training available for that?

21   Recognition of somebody -- how high they are?

22   A    Yes.  It's part of our jail standards training.

23   Q    Talk to me about how that -- how can you take

24   people with no medical background and teach them to

25   recognize the drugs and the kinds of drugs people are

24

1  on and the amount that may be harmful?

2  A    We don't teach them that.  We teach them to

3  recognize signs.

4  Q    Okay.

5  A    Can they stand, can they talk, are they

6  coherent, are they combative, are they overly

7  complacent.  What's their demeanor.

8  Q    Or they're hyped up?  Is that something you --

9  A    Yeah.

10  Q    If you see somebody like that, what's the

11  situation?  What do you do?

12  A    You decide on the spot.

13  Q    If you see someone that is getting worse, what

14  do you do?

15  A    Monitor.

16  Q    You might not know when you take them in and you

17  see all of the sudden that there's a problem?  You

18  see that they're not the same and that they're

19  getting agitated which is what we think happened in

20  this case?  I'm just trying to get the test.  How

21  would you determine, Okay.  That's too much.  He

22  needs to go to the hospital?

23  A    There's no answer to that question.  It's just

24  we monitor them.  If we see something that draws our

25  attention, we monitor them more.  They're on camera

25

1 all time, but there has to be somebody sitting there

2 looking at the camera.

3 Q    Right.

4 A    If they're -- if we know there's a situation,

5 they're on suicide watch, if they're -- if they're

6 blown to a certain amount on the BAC -

7 Q    Uh-huh.

8 A    -- then we have 15-minute cell checks where

9 they're checked -- physically checked on.

10 Q    Uh-huh.

11 A    But if you don't know that, it's -- something

12 has to draw your attention to it.

13 Q    As the supervisor that day, did you know that

14 Casey Babovec had ingested methamphetamine?

15 A    None of us did.  The officer that arrested him

16 didn't.

17 Q    When did you learn that methamphetamine was

18 involved?

19 A    From an inmate that came in with him after he

20 was already gone to the hospital.

21 Q    And not before?

22 A    No.

23 Q    If your people had learned that he had ingested

24 methamphetamine just before the arrest in April of

25 2011, what would have been the policy at Saline

26

1  County jail?

2  A    Monitor.

3  Q    And to look for the things you just talked to me

4  about?

5  A    Yes.

6  Q    And when would it be to the point where you were

7  worried that he was a danger to himself or to others?

8  A    When he started a fight in his cell.

9  Q    And not before?

10  A    Actually, he had defecated on himself just right

11  before that if I remember right.

12  Q    At least urinated.  We know that?

13  A    No.  I think the reason they changed his pants

14  out is because he defecated himself just before the

15  fight.

16  Q    All right.

17       And then when you came out there, you could see

18  the water on the floor.  Could you smell the

19  defecation at that time, too?

20  A    It didn't really smell like urine until you got

21  down close.  It smelled more like sweat.

22  Q    Uh-huh.  Okay.

23  A    And he was sweating profusely.

24  Q    Did you hear him say anything that day?

25  A    Just mumble.  Now, when he first come out of the

```
 1  cell, you could hear yelling going on that wasn't
 2  coming from the officers.  But by the time we got
 3  there and they got him handcuffed and everybody kind
 4  of took a breath, he was just -- he was mumbling.
 5  And it was unintelligible, but he was mumbling.
 6  Q    What would you expect your officers to do if
 7  they heard an inmate who was restrained say I can't
 8  breathe?
 9  A    Until they get him under control, they're going
10  to continue with the force as-needed.  That's -- you
11  have to it.
12  Q    Do you believe as the supervisor in the jail
13  that day that your officers acted within the confines
14  of the rules of the jail?
15  A    Absolutely.
16  Q    Okay.
17  A    100 percent.
18  Q    Do you believe that they exercised excessive
19  force at any time?
20  A    Not once.
21  Q    Do you believe --
22  A    Not that I observed.  Anything that I observed.
23  Q    Did you see them use tasers on this man?
24  A    No.
25  Q    Do you --
```

28

1   A    There was a taser in the floor when I got to the

2   booking area, but it was about 5 or 6 feet away from

3   the pile.

4   Q    Are your jailors to use tasers on inmates if

5   they have not been trained for the taser?

6   A    No.

7   Q    Why not?

8   A    Part of our policy is that you must receive

9   taser training.

10  Q    And if they did not have taser training and used

11  a taser on this day it would have been against the

12  jail policy?

13  A    Yes -- no.  Not jail policy.  Sheriff's office

14  policy.

15  Q    Okay.

16  A    And that's -- that sounds like the same thing,

17  but it's not.

18  Q    If your jailors had recognized that this man had

19  methamphetamine in him and they thought that it was

20  severe enough, they would have been required by the

21  rules to seek emergency medical care and have him

22  taken to the hospital?

23  A    Yes.

24  Q    Now, were you aware of any difficulty between

25  the quorum court and the jail with respect to

1  funding?

2  A    No.

3  Q    Were you aware whether or not --

4  A    But it wasn't my function either.

5  Q    Yeah.  Sheriff Pennington was asking them to

6  have medical personnel in the jail.  Were you aware

7  of that?

8  A    They had -- we had been turned down in September

9  of 2010, I think.

10 Q    Uh-huh.

11 A    We had asked -- and I learned this later, but

12 Lieutenant Pennington and the sheriff had presented

13 that to the quorum court and been denied.

14 Q    Do you know when the jail began to have medical

15 care next for inmates inside the jail?

16 A    We signed our first contract -- we put the

17 medical -- we signed a contract with a medical

18 provider which was Advanced Correctional Healthcare.

19 They became -- visiting in the jail -- I think they

20 went to work I believe May the 5th of 2012.

21 Q    Okay.

22 A    I think that's right.  I would have to look at

23 the contract to see, but I think May the 5th of 2012.

24 Q    Was there any person under your supervision

25 including yourself who had been trained in medical

1  care of inmates at any time?

2  A    Well, first responder and CPR.

3  Q    Okay.

4  A    Yes.

5  Q    Is there a difference between a detainee and a

6  jail inmate?

7  A    No.

8  Q    Do you have any more obligations to a detainee

9  than you do an inmate?

10  A    No.

11  Q    Do you have an obligation to safeguard the

12  physical safety of detainees?

13  A    Absolutely.

14  Q    If one of your officers sees another officer

15  violating the general rules of the jail or putting an

16  inmate in danger, what should they do?

17  A    Report it immediately.

18  Q    Should he intervene?

19  A    That's not addressed in our policy.

20  Q    As a --

21  A    They're not going to do it without it being

22  policy without being told to.

23  Q    Okay.

24        So what I -- I mean there are different levels

25  of experience in any jail system with the officers.

1   A   Yes.

2   Q   So if more experienced officers may see an

3 inexperienced officer do something, would they be

4 required under the rules of the jail to stop that to

5 keep harm from occurring?

6   A   If there was actually physical harm being done.

7 Yes.

8   Q   Okay. I guess I was leading into -- but you

9 said that if it's not a rule of the jail -- and it

10 wasn't -- how would a supervisor feel the right to

11 intervene or another officer to stop -- let's say

12 Reed, for example. Let's just say Reed is doing

13 something wrong. Does every other jailor have the

14 obligation to stop Reed from doing something that

15 would harm a detainee?

16   A   Yes. If there was visible threat. Yes.

17   Q   Okay.

18      Did you see Officer Reed sitting on Casey

19 Babovec --

20   A   No.

21   Q   -- during the time you were there?

22   A   No. I didn't.

23   Q   Would you expect an inmate to be sat on who has

24 already been handcuffed behind his back?

25   A   According to whether they were still struggling

1  or not, whether they were still a threat.

2  Q    If they weren't struggling, would you expect one

3  of your inmates to -- one of your officers to --

4  A    No.  If there was no threat, no.  I would not.

5  Q    Why would you not want that?

6  A    There was no reason for it.

7  Q    Do you think it might present a danger to the

8  inmate?

9  A    Possibly.

10  Q    Positional asphyxiation, is that a term you know

11  about?

12  A    Absolutely.

13  Q    Do you teach your officers about that?

14  A    Yes.

15  Q    When is that ?

16  A    Jail standards.

17  Q    And just for my -- so when I ask questions,

18  positional asphyxiation can occur when an officer is

19  restraining an inmate and somehow blocks air flow

20  into that inmate; is that right?

21  A    That can occur.  Yes.

22  Q    Well, I mean, is that --

23  A    That's not how the term is generally used.

24  Q    Yeah.

25       Well, tell me how it's generally used because I

1  don't want to misuse the term.

2  A    Someone being restrained and not put in a

3  position where their airway is open.

4  Q    Okay.

5  A    You can't lay someone flat on their stomach

6  that's restrained with their hands behind their back

7  because it places too much pressure on their chest.

8  But what's commonly used in a jail setting to put the

9  in a position while they're restrained to not

10 asphyxiate.

11 Q    Meaning you turn them over on their stomach?

12 A    On their side.

13 Q    On their side?

14 A    Uh-huh.

15 Q    And that keeps them from asphyxiating?

16 A    Correct.

17 Q    You noticed that there were a number of

18 officers -- I counted as many as eight during this

19 time when you walked in?

20 A    Okay.

21 Q    Is that something normal for your jail?

22 A    As many as we can get.

23 Q    Okay.

24 A    That's our safety in numbers.  And that -- and

25 the proper way to restrain somebody is not to get in

34

1  a fight with them. But it's one gets a leg, one gets

2  a leg, one gets an arm, one gets an arm, one gets the

3  torso, one gets the handcuffs. That's the proper way

4  to do it.

5  Q    Okay.

6       In 2011, do you have any memory of ever sending

7  anybody to the -- a hospital because of emergency

8  medical care in the Saline County jail?

9  A    I don't know the answer to that question.

10  Probably. I --

11  Q    You don't remember any --

12  A    I don't remember specific --

13  Q    And that's all I'm asking.

14  A    -- things. I mean, it could be for a variety of

15  reasons. I don't --

16  Q    You have lots of duties. I'm not asking you to

17  remember every one of them.

18  A    Yeah.

19  Q    But if you did, I want to talk about it.

20  A    All right.

21  Q    But it was the practice to do that?

22  A    Yes.

23  Q    And since you can't remember generally, you

24  can't remember ever doing that for anyone on drugs or

25  can you?

34

1  a fight with them.  But it's one gets a leg, one gets

2  a leg, one gets an arm, one gets an arm, one gets the

3  torso, one gets the handcuffs.  That's the proper way

4  to do it.

5  Q    Okay.

6       In 2011, do you have any memory of ever sending

7  anybody to the -- a hospital because of emergency

8  medical care in the Saline County jail?

9  A    I don't know the answer to that question.

10 Probably.  I --

11 Q    You don't remember any --

12 A    I don't remember specific --

13 Q    And that's all I'm asking.

14 A    -- things.  I mean, it could be for a variety of

15 reasons.  I don't --

16 Q    You have lots of duties.  I'm not asking you to

17 remember every one of them.

18 A    Yeah.

19 Q    But if you did, I want to talk about it.

20 A    All right.

21 Q    But it was the practice to do that?

22 A    Yes.

23 Q    And since you can't remember generally, you

24 can't remember ever doing that for anyone on drugs or

25 can you?

1    A    Not a specific incident.

2    Q    Right.  That's what I was thinking.

3         It would have been the policy, though.  It would

4    have been a policy to protect both the inmates in the

5    jail, the detainee and the officers involved?

6    A    Correct.

7    Q    Do you have an opinion or are going to try to

8    offer an opinion during the trial about what caused

9    this death?

10                 THE WITNESS:  What caused this death?

11                 MR. SWINDOLL:  Uh-huh.

12   A    Methamphetamine ingestion.

13   Q    (By Mr. Swindoll)  Why do you --

14   A    There's no doubt about it.  That's what the

15   autopsy said and I believe that.

16   Q    Have you talked to the people who did the

17   autopsy?

18   A    No.  I have a written report.

19   Q    That's your belief in the --

20   A    I have a written report.

21   Q    Did you see other causes of death at the same

22   time?

23   A    No.  It doesn't say causes of death.  It says

24   aided by or however you want to word it.

25                 MR. ELLIS:  Exacerbated.

36

1          THE WITNESS:  Exacerbated.  He got in a

2          fight in the cell and at some point those

3          bags in his stomach ruptured.  Now, that's

4          what happened.  The other inmate that came in

5          with him wrote a statement saying that he

6          ingested two bags of methamphetamine to keep

7          the cops from finding it.  And he told us

8          what he did with his methamphetamine.

9  Q    (By Mr. Swindoll)  If you had known he had that

10  methamphetamine in him -- if he'd ingested it, would

11  you have taken him to the hospital?

12  A    Yeah.  I think I would have.

13  Q    Why?

14  A    Precaution because you don't ever know.

15  Sometimes they pass through and it comes out the

16  other end and sometimes it doesn't.

17  Q    So as the supervisor, you can say that the

18  actions your jailors took that night represent jail

19  policy and were consistent with jail policy?

20  A    I think they were.  Yes.

21  Q    And as the supervisor, you found nothing

22  objectionable about anything your officers did that

23  night?

24  A    I can't think of a thing.

25  Q    Did you notice civilians sitting there -- two

1  civilians at the time you walked in there?

2  A    I don't recall any civilians.  There could have

3  been.  I was more focused on the incident at hand.

4  Q    Were there use of force reports filled out in

5  this case?

6  A    There were officers' reports from everybody.

7  Q    Yeah.

8       I'm just wondering if use of force a different

9  kind of report than a report --

10 A    It is now.

11 Q    I've seen all those reports.

12 A    Yeah.  It is now.

13 Q    In August of -- I mean in April of 2011 --

14 A    There was a form that was -- sometimes it was

15 used and sometimes it was not.

16 Q    Okay.

17      And if there are not any in the file, then --

18 A    That's been changed.

19 Q    Now they use it all the time?

20 A    Yes.  Actually we started a file on the -- we

21 have a computerized file not that tracks everything.

22 Q    The tasers that you were using at the time have

23 records that have been furnished to me, and I think

24 there are two phases of this taser.  One is the dry

25 tase?

38

1  A    Dry stun.  Yes.

2  Q    And another is the darts?

3  A    Correct.

4  Q    Is that right?

5       And the phasers that were used -- tasers that

6  were used -- that's Star Wars -- tasers that were

7  used that night were used in the dry stun mode?

8  A    "Drive stun."

9  Q    "Drive?"

10 A    Correct.

11 Q    Should your jailors ever threaten the inmates?

12 A    No.

13 Q    They should never threaten them I'll tase you if

14 you don't do this?

15 A    Yes.  You give a taser warning.  If you do not

16 comply, you will be tased.  That's part of taser

17 training.

18 Q    Now, if an inmate is requesting medical care,

19 what is the situation in April of 2011?

20 A    According to what they're requesting medical

21 care for.  If it's something obvious -

22 Q    If an inmate is saying I'm having a heart

23 attack, what are you going to do as a jailor?

24 A    Get medical -- the first thing we're going to do

25 is sit them down, take their blood pressure, their

39

1  pulse, all their vital signs.

2  Q    You're not going to ignore it?

3  A    No.

4  Q    You're going to do that as a precaution to see

5  if -- whether there's any signs to back up what this

6  guy is saying?

7  A    Absolutely.

8  Q    And there will be some physical signs, won't

9  there?

10  A    Yes.

11  Q    So there's no reason not to take that in that

12  circumstance?

13  A    That's correct.

14  Q    What would be different with medical care on the

15  jury if someone suspected one of your inmates had

16  ingested methamphetamine -- if you have a doctor and

17  you're going to send them out, are they more likely

18  to send them over there where they'll have the same

19  evaluation or -- unless your officers think that --

20  just kind of talk with me about that.

21  A    That's a long question.  You're going to have to

22  clarify.

23  Q    Okay.  I'm really just trying to get the

24  understanding of the -- now we have doctors in the

25  jail, or you've got medical people?

1   A    We have medical staff.  Yes.

2   Q    What would they have done in this situation?

3   A    The same thing.  First thing to do is vital

4   signs.  Or if it's something obvious, you treat

5   what's obvious.  If it's something that's not

6   obvious, it's just a statement, then you have to try

7   to look at that.

8   Q    If they make a statement and it's obvious,

9   something should be -- some action should be added to

10  the --

11  A    Yes.  The medical staff.  Yes.

12  Q    Okay.

13          MR. SWINDOLL:  I think I'm through.  Let

14          me look at one record.  I am through.  Thank

15          you, Mr. Richards.

16                          EXAMINATION

17  BY MR. ELLIS:

18  Q    Now, Mr. Richards, you're not saying, are you,

19  that every pot head, every meth head, every crack

20  head and every alcoholic who comes through the jail

21  should be given some kind of medical care regardless

22  of their condition, are you?

23  A    No.

24  Q    Of course not.

25  A    As the condition warrants.  I mean, no.

1   Q    For example, if they're unsteady on their feet

2   or if their speech is profoundly slurred or --

3   A    No.

4   Q    -- some other outward manifestation that --

5   A    No.  That's a daily a occurrence.  It's when it

6   goes beyond that when they can't stand, when they

7   can't talk, when they can't -- it goes way beyond

8   that.

9   Q    I wouldn't say it's a daily occurrence that --

10  A    Well --

11  Q    Have you ever stopped and counted the number of

12  inebriated people who come through that jail as

13  inmates regardless of whatever the substance is?

14  A    No.  No.  Not really.

15  Q    Would you lose count?

16  A    Yes.  You couldn't count it in one day.

17  Q    Yeah.

18       Now, you said that you think everybody did

19  everything right; is that correct?

20  A    I believe they did.

21  Q    Did you have a conversation with -- what's his

22  name -- Mr. Pickett -- Mr. Prickett?

23  A    The state policeman.

24  Q    The state policeman who conducted the

25  investigation.

42

```
1   A    Yes.

2   Q    Do you remember him?

3   A    I do.

4   Q    What's his name?

5   A    "Prickett."

6   Q    Is it "Prickett?"

7   A    Joe Prickett.

8   Q    Joe Prickett.  That's it.  He's a --

9   A    He was the investigator.

10  Q    Investigator who investigated this entire

11  incident.  And do you know why he did instead of an

12  internal?

13  A    I think it was requested.

14  Q    It was.

15       And did you have a conversation with him at any

16  time --

17  A    Yes.

18  Q    -- about this incident?

19  A    Everybody involved did.

20  Q    And what did he tell you?

21  A    I was one of the last people involved -- and may

22  have been the last person involved just because

23  people work -- you know, I could be required to stay.

24  He went through everything, asked all the questions.

25  I wrote a written statement.  He asked a lot of
```

1  questions.  When he was all done, he said I'll tell

2  you.  I do a lot of these.  I've done a lot of jail

3  incident investigations.  He said this is one of the

4  best-handled, most professionally-handled-by-the-book

5  situations I've ever investigated.  He gave

6  compliments to the sheriff and to us on our handling

7  of the situation.

8                MR. ELLIS:  Pass the witness.

9                MR. SWINDOLL:  Thank you.

10                THE COURT REPORTER:  All right.  Thanks

11          so much.

12                (WHEREUPON, the proceedings were

13          concluded in the matter at 2:48 p.m.)

14                    (WITNESS EXCUSED)

15                * * * * * * * * *

16

17

18

19

20

21

22

23

24

25

44

CERTIFICATE

STATE OF ARKANSAS      )
                       )ss
COUNTY OF PULASKI      )


I, LEE ANN DICKENS, Certified Court Reporter #403, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of a Stenotype machine and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

WITNESS MY HAND AND SEAL this 15th day of December, 2014.


LEE ANN DICKENS, CCR
AR NOTARY EXPIRY 10/28/15


LEE ANN DICKENS, CCR
(501) 614-7367

## A

**above-styled (1)**
4:5
**Absolutely (4)**
27:15;30:13;32:12;
39:7
**according (3)**
4:18;31:25;38:20
**across (2)**
7:25;13:20
**acted (1)**
27:13
**action (1)**
40:9
**actions (1)**
36:18
**activities (1)**
6:16
**actually (4)**
19:5;26:10;31:6;
37:20
**added (1)**
40:9
**addressed (1)**
30:19
**administration (1)**
7:12
**administrative (1)**
7:23
**administrator (5)**
6:17;20:6,10,13;
21:6
**ADR (3)**
17:21,22;18:1
**Advanced (1)**
29:18
**AED (5)**
15:25;16:2,3,5;
18:19
**affected (1)**
22:21
**afternoon (1)**
19:15
**again (3)**
14:19;17:3,5
**against (1)**
28:11
**agitated (1)**
24:19
**ago (1)**
14:3
**AGREED (1)**
4:15
**agreement (1)**
4:10
**a-hold (1)**
14:18
**aided (1)**
35:24
**air (1)**
32:19

**airway (4)**
14:13,20;15:21;
33:3
**alcoholic (1)**
40:20
**almost (1)**
7:25
**ambulance (6)**
17:17,18,22;18:9;
19:5,21
**amount (3)**
23:14;24:1;25:6
**ANN (1)**
4:6
**annual (1)**
21:19
**annually (1)**
21:17
**appeared (1)**
9:2
**April (6)**
6:12;21:12;23:1;
25:24;37:13;38:19
**area (4)**
8:1,5;13:23;28:2
**Arkansas (1)**
4:9
**arm (10)**
8:20,24,25;9:1,2,6;
11:21,22;34:2,2
**around (1)**
13:21
**Arrest (3)**
18:1,3;25:24
**arrested (1)**
25:15
**arresting (1)**
22:11
**as-needed (1)**
27:10
**asphyxiate (1)**
33:10
**asphyxiating (1)**
33:15
**asphyxiation (2)**
32:10,18
**assumed (1)**
12:8
**attached (1)**
10:5
**attack (1)**
38:23
**attention (3)**
22:23;24:25;25:12
**August (1)**
37:13
**autopsy (2)**
35:15,17
**available (2)**
7:12;23:20
**awake (1)**
13:15
**aware (4)**

11:9;28:24;29:3,6
**away (2)**
14:16;28:2

## B

**Babovec (3)**
23:2;25:14;31:19
**BAC (1)**
25:6
**back (20)**
6:5,7;9:6;13:5,20;
14:18,21,22;15:9,10,
10,11,22;16:3,5;
17:14;19:11;31:24;
33:6;39:5
**background (2)**
5:24;23:24
**bad (1)**
12:19
**bags (2)**
36:3,6
**basis (1)**
23:13
**beats (1)**
16:3
**became (1)**
29:19
**began (1)**
29:14
**begin (1)**
16:12
**behind (5)**
9:6;13:9,10;31:24;
33:6
**belief (1)**
35:19
**Benton (1)**
4:9
**beside (2)**
7:20;13:11
**best-handled (1)**
43:4
**better (1)**
7:10
**beyond (2)**
41:6,7
**big (3)**
11:22;13:23;16:4
**bit (3)**
11:22;17:18;18:9
**bite (1)**
11:22
**blocks (1)**
32:19
**blood (2)**
13:12;38:25
**blown (1)**
25:6
**booking (8)**
7:10,22;8:1,5;15:4,
19;16:25;28:2
**both (2)**

20:25;35:4
**box (1)**
15:6
**Brandon (1)**
19:1
**break (2)**
6:3;12:15
**breath (1)**
27:4
**breathe (1)**
27:8
**breathing (2)**
24:6,24,25
**breaths (3)**
16:19,20;17:1
**broad (1)**
21:13
**brought (7)**
12:22,23;16:22,22;
19:13,14,19
**Bucky (1)**
4:8
**bunch (1)**
16:10
**bunged (1)**
12:19
**button (1)**
16:9

## C

**call (4)**
7:6;13:19;15:16,23
**called (1)**
19:1
**came (10)**
5:25;6:7;14:2,5,6;
15:10,10;25:19;
26:17;36:4
**camera (1)**
24:25;25:2
**cameras (2)**
12:13;19:10
**Can (13)**
5:24;10:6;15:15;
23:13,18,23;24:5,5;
32:18,21;33:22;
34:25;36:17
**care (9)**
21:11;28:21;29:15;
30:1;34:8;38:18,21;
39:14;40:21
**case (2)**
24:20;37:5
**case-to-case (1)**
23:13
**Casey (4)**
18:23;23:2;25:14;
31:18
**cause (1)**
4:5
**caused (2)**
35:8,10

**causes (2)**
35:21,23
**cautioned (1)**
5:5
**Cell (18)**
11:14,15,18,19;
13:18,21,25;14:1,5,6,
9,24;19:11,20;25:8;
26:8;27:1;36:2
**center (1)**
7:8
**certain (1)**
25:6
**certifications (1)**
21:16
**Certified (1)**
4:6
**changed (3)**
16:19;26:13;37:18
**charge (1)**
6:16
**checked (2)**
25:9,9
**checks (1)**
25:8
**chest (1)**
33:7
**circumstance (1)**
39:12
**Civil (1)**
4:19
**civilians (3)**
36:25;37:1,2
**clarify (1)**
39:22
**cleaned (2)**
13:22,24
**clean-up (1)**
18:11
**clear (1)**
13:14
**cleared (3)**
14:20;15:21;22:17
**clearing (1)**
14:13
**clicking (1)**
9:7
**close (3)**
9:9;17:23;26:21
**closed (2)**
11:15;17:23
**clothes (1)**
8:19
**coherent (1)**
24:6
**combative (1)**
24:6
**coming (2)**
6:5;27:2
**commented (1)**
8:14
**common (1)**
7:10

**commonly (1)**
33:8
**complacent (1)**
24:7
**complies (1)**
10:25
**compliments (1)**
43:6
**comply (1)**
38:16
**compressions (12)**
15:22;16:10,12,14,
15,20;17:1,2,13,14;
18:20,20
**computerized (1)**
37:21
**concluded (1)**
43:13
**condition (2)**
40:22,25
**conducted (1)**
41:24
**confines (1)**
27:13
**conjunction (1)**
22:11
**consistent (1)**
36:19
**continue (1)**
27:10
**continued (1)**
16:6
**contract (3)**
29:16,17,23
**control (5)**
7:8;9:1,2,3;27:9
**conversation (3)**
11:5;41:21;42:15
**Cooper (1)**
15:21
**cops (1)**
36:7
**corner (1)**
15:24
**corporal (3)**
7:6;16:16;22:8
**Correctional (1)**
29:18
**counsel (2)**
4:4,16
**count (4)**
16:18,21;41:15,16
**counted (2)**
33:18;41:11
**County (3)**
5:16,18,20;26:1;
34:8
**couple (1)**
17:15
**course (2)**
12:25;40:24
**Court (6)**
4:7;10:3;11:3;

28:25;29:13;43:10
**CPR (9)**
15:20,21;16:6,19,
23;18:18;21:15,20;
30:2
**crack (1)**
40:19
**Criminal (1)**
6:2
**cuffed (1)**
10:12

## D

**daily (3)**
6:16;41:5,9
**danger (3)**
26:7;30:16;32:7
**darts (1)**
38:2
**day (8)**
4:5;6:22;23:7;
25:13;26:24;27:13;
28:11;41:16
**dealing (1)**
12:25
**death (4)**
35:9,10,21,23
**December (1)**
4:6
**decide (1)**
24:12
**decision (2)**
23:5,19
**deep (1)**
18:19
**defecated (2)**
26:10,14
**defecation (1)**
26:19
**demeanor (1)**
24:7
**demonstrated (1)**
13:6
**denied (1)**
29:13
**Department (7)**
5:16,18,20;6:1;
17:7,8;20:2
**DEPOSITION (2)**
4:2,17
**deputy (1)**
19:13
**desk (1)**
15:19
**desks (1)**
7:20
**detainee (4)**
30:5,8;31:15;35:5
**detainees (1)**
30:12
**Detention (3)**
6:14,15;21:7

**determine (1)**
24:21
**DICKENS (1)**
4:6
**died (1)**
18:23
**difference (1)**
30:5
**Different (4)**
6:4;30:24;37:8;
39:14
**difficulty (1)**
28:24
**Directly (1)**
20:23
**discretion (1)**
22:8
**Disposition (2)**
18:2,3
**doctor (1)**
39:16
**doctors (1)**
39:24
**done (5)**
23:12;31:6;40:2;
43:1,2
**door (4)**
11:14;14:7;15:18;
17:9
**doors (2)**
17:23,23
**doorway (1)**
8:5
**doubt (1)**
35:14
**down (14)**
8:22,23,24;9:12;
13:2;15:12;16:2;
18:13;19:24;21:6;
23:16;26:21;29:8;
38:25
**downloaded (2)**
19:11,22
**draw (1)**
25:12
**draws (1)**
24:24
**Drive (2)**
38:8,9
**drove (2)**
18:10;19:21
**drug (2)**
22:19,19
**drugs (5)**
22:20,21;23:25,25;
34:24
**dry (3)**
37:24;38:1,7
**duly (1)**
5:5
**during (3)**
31:21;33:18;35:8
**duties (1)**

34:16
**duty (2)**
6:22;7:6

## E

**earlier (1)**
19:14
**early (1)**
16:23
**eight (1)**
33:18
**either (1)**
29:4
**Ellis (9)**
4:8,8;17:25;18:4,7;
20:19;35:25;40:17;
43:8
**else (1)**
14:9
**emergency (4)**
12:12;21:11;28:21;
34:7
**employed (1)**
5:17
**employee (1)**
5:15
**end (1)**
36:16
**enough (2)**
9:9;28:20
**entire (2)**
19:19;42:10
**especially (1)**
20:3
**established (1)**
11:4
**evaluation (1)**
39:19
**even (1)**
18:15
**event (1)**
6:12
**everybody (9)**
10:1;11:16;12:21;
18:12,13;27:3;37:6;
41:18;42:19
**Exacerbated (2)**
35:25;36:1
**exact (1)**
19:3
**exactly (2)**
12:3;14:3,8
**EXAMINATION (2)**
5:10;40:16
**example (2)**
31:12;41:1
**except (2)**
12:17,21
**excessive (1)**
27:18
**EXCUSED (1)**
43:14

**exercised (1)**
27:18
**Exhibit (3)**
10:2,4;11:2
**exited (2)**
7:21,22
**expect (3)**
27:6;31:23;32:2
**experience (1)**
30:25
**experienced (1)**
31:2

## F

**Federal (1)**
4:19
**feel (3)**
15:14,16;31:10
**feet (4)**
13:5;15:9;28:2;
41:1
**few (2)**
10:19;23:18
**fight (8)**
8:5;11:14;12:13,
15;26:8,15;34:1;36:2
**file (3)**
37:17,20,21
**filled (1)**
37:4
**film (1)**
14:16
**finally (2)**
17:19;18:10
**find (6)**
13:22;15:20;18:13,
14,16,23
**finding (1)**
36:7
**finish (1)**
14:19
**fire (2)**
17:6,8
**Firm (1)**
4:8
**first (16)**
5:5;8:13,20;12:18,
20;14:4,5;16:23;
17:7;19:14;21:15;
26:25;29:16;30:2;
38:24;40:3
**flat (2)**
9:16;33:5
**floor (17)**
8:6,6;9:16;11:19,
25;12:4,4,5,18,20;
13:2,9,13,15;15:13;
26:18;28:1
**flow (1)**
32:19
**focused (1)**
37:3

Robin Babovec v.
Deputy & Officers Mike Richards, et. al.

| | | | | |
|---|---|---|---|---|
| follow (1)<br>18:25 | guess (3)<br>9:20;13:19;31:8 | 13:17,21,25;14:1;<br>19:11,20 | 6:3<br>internal (1)<br>42:12 | 19:21,22<br>key (1)<br>15:5 |
| followed (1)<br>17:17 | Gurney (1)<br>17:16 | Hope (1)<br>18:7 | interrupt (1)<br>17:25 | kind (9)<br>6:19;9:12,19;13:7; |
| follows (1)<br>5:9 | guy (3)<br>11:17;13:11;39:6 | hospital (5)<br>24:22;25:20;28:22; | intervene (2)<br>30:18;31:11 | 18:10;27:3;37:9;<br>39:20;40:21 |
| force (4)<br>27:10,19;37:4,8 | guys (1)<br>22:20 | 34:7;36:11 | into (7)<br>6:5;8:1,4;13:21; | kinds (1)<br>23:25 |
| Ford (3)<br>19:1,1,1 | | hour (2)<br>18:24;19:4 | 19:13;31:8;32:20 | knee (2)<br>12:19;16:4 |
| form (1)<br>37:14 | **H** | hour-and-a-half (2)<br>18:24;19:4 | intoxicated (1)<br>22:12 | knees (2)<br>9:13,14 |
| forth (1)<br>4:10 | hallway (3)<br>8:1,1,2 | hours (2)<br>6:19;19:15 | investigated (2)<br>42:10;43:5 | known (3)<br>22:25;23:1;36:9 |
| fought (1)<br>11:23 | hand (1)<br>37:3 | huge (1)<br>12:5 | investigation (1)<br>41:25 | |
| found (1)<br>36:21 | handcuffed (3)<br>11:25;27:3;31:24 | hyped (1)<br>24:8 | investigations (1)<br>43:3 | **L** |
| free-world (1)<br>8:15 | handcuffs (1)<br>9:7;13:6;34:3 | | investigator (2)<br>42:9,10 | large (1)<br>13:23 |
| Friday (1)<br>6:21 | handling (1)<br>43:6 | **I** | involved (8)<br>8:7,9;21:20;25:18; | last (2)<br>42:21,22 |
| friend (1)<br>6:5 | hands (2)<br>9:14;33:6 | identification (1)<br>10:5 | 35:5;42:19,21,22 | later (1)<br>7:4;17:2;18:24; |
| full (1)<br>5:12 | happened (7)<br>6:25;7:3;11:7; | ignore (1)<br>39:2 | **J** | 19:4;29:11 |
| function (1)<br>29:4 | 14:24,25;24:19;36:4 | immediately (1)<br>30:17 | jail (40) | law (2)<br>4:7,8 |
| funding (1)<br>29:1 | harm (3)<br>31:5,6,15 | importance (1)<br>21:2 | 6:17,17,18;8:14;<br>19:13;20:3,6,10,13, | lay (1)<br>33:5 |
| furnished (1)<br>37:23 | harmful (1)<br>24:1 | important (1)<br>18:16 | 22;21:6,11;22:2;<br>23:22;26:1;27:12,14; | laying (1)<br>11:24 |
| further (2)<br>10:15,16 | head (5)<br>16:16;19:24;40:19, | incident (6)<br>7:11;35:1;37:3; | 28:12,13,25;29:6,14,<br>15,19;30:6,15,25; | leading (1)<br>31:8 |
| | 19,20 | 42:11,18;43:3 | 31:4,9;32:16;33:8,<br>21;34:8;35:5;36:18, | learn (1)<br>25:17 |
| **G** | headache (1)<br>6:4 | including (1)<br>29:25 | 19;39:25;40:20;<br>41:12;43:2 | learned (2)<br>25:23;29:11 |
| gather (1)<br>23:14 | headed (1)<br>15:21 | indicating (3)<br>8:21;25;16:4 | jailor (7)<br>6:9,10;21:18,19, | least (1)<br>26:12 |
| gave (1)<br>43:5 | Healthcare (1)<br>29:18 | inebriated (2)<br>22:2;41:12 | 20;31:13;38:23 | LEE (1)<br>4:6 |
| general (1)<br>30:15 | hear (3)<br>15:15;26:24;27:1 | inexperienced (1)<br>31:3 | jailors (4)<br>28:4,18;36:18; | left (2)<br>7:16;19:5 |
| generally (3)<br>32:23,25;34:23 | heard (2)<br>10:20;27:7 | information (3)<br>17:20;18:6;23:13 | 38:11 | leg (5)<br>15:3,4,9;34:1,2 |
| George (1)<br>4:8 | heart (1)<br>38:22 | ingested (6)<br>23:2;25:14,23; | jerks (1)<br>14:16 | legs (3)<br>8:22,22,23 |
| gets (10)<br>14:18;15:18;16:3; | held (1)<br>17:9 | 36:6,10;39:16 | Joe (2)<br>42:7,8 | levels (1)<br>30:24 |
| 21:19;34:1,1,2,2,2,3 | hereinafter (1)<br>4:10 | ingestion (2)<br>22:19;35:12 | jumped (1)<br>14:22 | LIEUTENANT (10)<br>4:2,17;5:3,12,15; |
| given (1)<br>40:21 | HEREINBEFORE (1)<br>5:4 | inmate (13)<br>22:1;25:19;27:7; | jumps (1)<br>14:18 | 6:18,18;7:5;23:6;<br>29:12 |
| gives (2)<br>16:6,10 | hereto (1)<br>10:5 | 30:6,9,16;31:23;32:8,<br>19,20;36:4;38:18,22 | jury (1)<br>39:15 | likely (1)<br>39:17 |
| gloves (7)<br>12:11,15,16,17,21, | high (1)<br>23:21 | inmates (8)<br>28:4;29:15;30:1; | Justice (1)<br>6:2 | literally (1)<br>9:16 |
| 22,23 | himself (3)<br>26:7,10,14 | 32:3;35:4;38:11;<br>39:15;41:13 | | little (6)<br>5:24;10:15,16; |
| goes (4)<br>16:2;21:6;41:6,7 | hobbling (1)<br>16:4 | inside (1)<br>29:15 | **K** | 17:18;18:9;20:25 |
| good (2)<br>9:3;11:23 | hold (2)<br>8:23,24 | instead (2)<br>22:13;42:11 | keep (2)<br>31:5;36:6 | long (4)<br>5:16;17:6;23:15; |
| Griffin (1)<br>16:17 | holding (9)<br>8:22;11:14,15; | instructions (2)<br>16:7,11 | keeps (1)<br>33:15 | 39:21 |
| | | insurance (1) | kept (1) | |

Case 4:13-cv-00889-KGB Document 27-6 Filed 01/09/15 Page 51 of 54

Robin Babovec v.                                                    Deputy and Michael Richards
Deputy & Officers Mike Richards, et. al.                                      December 11, 2014

look (8)
  7:10;10:18;12:11,
  13;26:3;29:22;40:7,
  14
looked (1)
  17:10
looking (3)
  15:24;21:24;25:2
looks (1)
  14:15
loose (1)
  8:25
lose (1)
  41:15
lot (7)
  6:4;9:4;14:23;
  18:16;42:25;43:2,2
lots (1)
  34:16

**M**

Main (2)
  4:9;7:25
makes (1)
  15:23
man (3)
  13:9;27:23;28:18
manifestation (1)
  41:4
many (4)
  16:20,20;33:18,22
mark (2)
  10:2;11:22
marked (1)
  10:4
mask (3)
  16:24,24,25
master (1)
  7:8
matter (1)
  43:13
may (7)
  4:17;10:1;24:1;
  29:20,23;31:2;42:21
McGuire (2)
  11:13,20
McKenna (1)
  10:21
McKinney (14)
  7:18;8:14;10:8,22,
  23;12:24;13:2,11;
  15:17,23;16:2,5;21:9,
  10
mean (12)
  16:16;17:10;18:1,
  21;19:6;21:1,18;
  30:24;32:22;34:14;
  37:13;40:25
Meaning (1)
  33:11
med (1)
  23:3

medical (20)
  21:11;22:15,16,22;
  23:24;28:21;29:6,14,
  17,17,25;34:8;38:18,
  20,24;39:14,25;40:1,
  11,21
medically (1)
  22:17
memory (1)
  34:6
mess (3)
  12:17;13:22,24
meth (1)
  40:19
methamphetamine (10)
  23:2;25:14,17,24;
  28:19;35:12;36:6,8,
  10;39:16
MICHAEL (5)
  4:3,17;5:3,14;
  16:15
might (3)
  9:22;24:16;32:7
minute (1)
  19:13,18
minutes (1)
  17:15
misuse (1)
  33:1
mode (1)
  38:7
Monday (1)
  6:21
money (1)
  6:4
Monitor (4)
  24:15,24,25;26:2
monitoring (1)
  16:10
month (1)
  5:22
more (8)
  6:4;18:16;24:25;
  26:21;30:8;31:2;
  37:3;39:17
most (2)
  18:14;43:4
mouth (1)
  13:14
moving (2)
  12:4;15:2
much (5)
  23:8,8;24:21;33:7;
  43:11
multiple (1)
  6:1
mumble (1)
  26:25
mumbling (6)
  12:1,3;15:12,12;
  27:4,5
must (1)
  28:8

myself (1)
  7:18

**N**

name (5)
  5:13;10:24;13:10;
  41:22;42:4
NAMED (1)
  5:4
need (1)
  15:19
needed (1)
  11:16
needs (1)
  24:22
next (1)
  29:15
night (3)
  36:18,23;38:7
nobody (1)
  12:15
nobody's (1)
  12:11
nods (1)
  19:24
None (1)
  25:15
normal (1)
  33:21
North (1)
  4:9
notice (1)
  36:25
noticed (2)
  8:13;33:17
number (3)
  18:20;33:17;41:11
numbered (1)
  4:5
numbers (1)
  33:24

**O**

oath (1)
  5:8
objectionable (1)
  36:22
obligation (2)
  30:11;31:14
obligations (1)
  30:8
observed (2)
  8:20;27:22,22
obvious (5)
  38:21;40:4,5,6,8
occur (2)
  32:18,21
occurred (1)
  6:13
occurrence (2)
  41:5,9

occurring (1)
  31:5
odd (1)
  8:19
Oddly (1)
  8:13
off (12)
  9:19;10:14,15,17;
  11:17,17;12:18,20;
  16:8,14;18:10;19:21
offer (1)
  35:8
office (9)
  5:25;6:6,8;7:16,17;
  8:4;15:16;19:2;28:13
officer (10)
  8:23,24;22:7,11;
  25:15;30:14;31:3,11,
  18;32:18
officers (19)
  8:7,22;9:11;10:9;
  11:6;18:25;20:22;
  27:2,6,13;30:14,25;
  31:2;32:3,13;33:18;
  35:5;36:22;39:19
officers' (1)
  37:6
offices (3)
  4:7;6:24;7:23
Often (1)
  23:9
old (1)
  11:22
once (1)
  27:20
one (24)
  8:13,16,23,25;
  9:25;17:21;18:25;
  23:7;30:14;32:2,3;
  34:1,1,2,2,2,3,17;
  37:24;39:15;40:14;
  41:16;42:21;43:3
ones (2)
  14:4,5
open (5)
  13:17,18;14:7;
  16:6;33:3
opinion (2)
  35:7,8
ORAL (2)
  4:2,17
order (1)
  21:3
others (1)
  26:7
out (20)
  8:4;11:18;12:7,10;
  13:16;14:5,6;17:16,
  17,21;18:13,14,16,
  23;26:14,17,25;
  36:15;37:4;39:17
outside (2)
  11:19;15:17

outward (1)
  41:4
over (7)
  13:12,13,15;14:7;
  17:12;33:11;39:18
overly (1)
  24:6
overseeing (1)
  20:24
own (1)
  7:2

**P**

pad (2)
  16:7,8
pads (1)
  16:9
pants (2)
  8:14;26:13
paramedics (2)
  17:8,12
parameters (1)
  23:18
Parker (9)
  14:2,8,12,19;15:12,
  20,22;16:14;17:1
part (3)
  23:22;28:8;38:16
parties (1)
  4:16
pass (2)
  36:15;43:8
past (1)
  10:16
Pennington (4)
  20:14,15;29:5,12
people (14)
  7:4,17;12:25;
  18:18,21;22:20;
  23:24,25;25:23;
  35:16;39:25;41:12;
  42:21,23
percent (1)
  27:17
performing (1)
  20:23
person (2)
  29:24;42:22
personal (2)
  17:20;18:5
personnel (2)
  21:24;29:6
phasers (1)
  38:5
phases (1)
  37:24
phone (2)
  15:18;16:2
physical (3)
  30:12;31:6;39:8
physically (1)
  25:9

pick (1)
22:20
Pickett (1)
41:22
picture (2)
9:23;10:20
pile (1)
28:3
place (1)
19:16
places (1)
33:7
PLAINTIFFS (1)
4:4
pm (2)
4:7;43:13
point (5)
11:20;15:1;16:13;
26:6;36:2
policeman (2)
41:23,24
policy (15)
22:4,5,6,7;25:25;
28:8,12,13,14;30:19,
22;35:3,4;36:19,19
position (4)
6:13;13:8;33:3,9
Positional (2)
32:10,18
Possibly (1)
32:9
pot (1)
40:19
practice (1)
34:21
Precaution (2)
36:14;39:4
present (1)
32:7
presented (1)
29:12
pressure (2)
33:7;38:25
pretty (4)
9:3;11:20,23;12:19
Prewitt (3)
16:15;17:2,4
Prickett (5)
41:22;42:5,6,7,8
principal (1)
18:25
prison (1)
6:2
probably (8)
10:15,16;15:8;
18:24;19:4;23:4,4;
34:10
problem (1)
24:17
Procedure (1)
4:19
proceedings (1)
43:12

produced (1)
4:3
professionally-handled-by-the-book (1)
43:4
profoundly (1)
41:2
profusely (1)
26:23
proper (2)
33:25;34:3
properly (1)
13:4
property (1)
19:21
protect (1)
35:4
provider (1)
29:18
provisions (2)
21:12,14
puddles (1)
12:5
Pulaski (1)
5:16
pull (1)
11:18
pulled (2)
13:20;16:8
pulse (4)
15:14,16,20;39:1
purposes (1)
4:18
pursuant (1)
4:9
put (14)
8:16,16;9:20;
10:24;12:14,16;16:7,
7,9;17:15;22:2;
29:16;33:2,8
putting (1)
30:15

Q

quorum (2)
28:25;29:13

R

Ray (2)
20:14,15
really (4)
17:11;26:20;39:23;
41:14
reason (4)
14:21;26:13;32:6;
39:11
reasons (1)
34:15
recall (1)
37:2
receive (1)
28:8

received (1)
7:6
Recognition (1)
23:21
recognize (3)
21:2;23:25;24:3
recognized (1)
28:18
record (1)
40:14
recorded (1)
19:8,19,20
recording (1)
19:2
records (2)
21:24;37:23
Reed (17)
13:2,9,17,18;14:2,
5,8,15,16,18;15:21;
16:15,25;31:12,12,
14,18
regardless (2)
40:21;41:13
relation (2)
20:15,19
relaxing (1)
9:18
remember (12)
11:12;14:2,7,10;
16:13;26:11;34:11,
12,17,23,24;42:2
Report (9)
18:3,4,19;20:5;
30:17;35:18,20;37:9,
9
Reporter (4)
4:7;10:3;11:3;
43:10
reports (7)
18:12,13;19:3;
20:10;37:4,6,11
represent (1)
36:18
request (1)
4:4
requested (1)
42:13
requesting (2)
38:18,20
require (1)
22:22
required (4)
23:3;28:20;31:4;
42:23
respect (1)
28:25
respective (1)
4:16
responder (2)
21:15;30:2
responsible (1)
20:21
restrain (1)

33:25
restrained (6)
12:25;13:5;27:7;
33:2,6,9
restraining (1)
32:19
restraint (1)
15:5
restraints (3)
15:3,4,10
result (1)
19:23
RICHARDS (8)
4:3,17;5:3,12,14;
23:6;40:15,18
right (26)
7:20;9:20,21;10:3,
14,18;11:16;15:18;
16:13;18:18,21;20:8;
21:22,22;25:3;26:10,
11,16;29:22;31:10;
32:20;34:20;35:2;
38:4;41:19;43:10
role (1)
6:7
roll (5)
13:7,7;14:14,17,21
rolled (3)
13:11;14:12;15:11
rolling (1)
14:19
round (2)
12:5
rule (1)
31:9
Rules (5)
4:19;27:14;28:21;
30:15;31:4
ruptured (1)
36:3
rushed (1)
12:12

S

safeguard (1)
30:11
safety (2)
30:12;33:24
Saline (5)
5:18,19,20;25:25;
34:8
saliva (1)
13:13
same (8)
9:24;16:17;20:18;
24:18;28:16;35:21;
39:18;40:3
sat (1)
31:23
saw (1)
7:3
saying (5)

12:2;36:5;38:22;
39:6;40:18
second (1)
18:1
seek (1)
28:21
seemed (4)
11:13;14:4;17:3,5
Seems (1)
12:23
sees (1)
30:14
send (2)
39:17,18
sending (1)
34:6
sent (1)
18:24
September (1)
29:8
sequence (1)
10:7
sergeant (9)
6:14,15;7:17;
10:21;16:16;21:7,7,8,
9
sergeant's (1)
15:6
set (2)
4:10;13:4
setting (1)
33:8
several (1)
8:7
severe (1)
28:20
Shellnutt (3)
12:17,18;16:1
sheriff (5)
20:11,18;29:5,12;
43:6
Sheriff's (8)
5:16,18,20,25;6:6,
8;20:2;28:13
shift (1)
22:8
shirt (2)
8:15;16:8
short (1)
8:2
shot (1)
7:25
shoulder (1)
13:20
shoulders (1)
13:20
show (2)
13:3,3
showed (1)
18:19
showing (1)
11:21
side (5)

13:7;14:12,14;
33:12,13
**signed (2)**
29:16,17
**signs (5)**
24:3;39:1,5,8;40:4
**sit (2)**
18:12;38:25
**sitting (4)**
13:8;25:1;31:18;
36:25
**situation (7)**
12:12;19:12;24:11;
25:4;38:19;40:2;43:7
**situations (1)**
43:5
**slurred (1)**
41:2
**smell (2)**
26:18,20
**smelled (1)**
26:21
**sold (1)**
6:3
**somebody (11)**
8:11;12:22,23;
13:4;14:9;15:25;
21:1;23:21;24:10;
25:1;33:25
**somehow (1)**
32:19
**Someone (5)**
21:2;24:13;33:2,5;
39:15
**Sometimes (4)**
36:15,16;37:14,15
**somewhere (1)**
16:13
**sorry (2)**
5:19;18:8
**sounds (1)**
28:16
**specific (2)**
34:12;35:1
**speech (1)**
41:2
**spitting (4)**
13:12,12,13,15
**spot (2)**
23:7;24:12
**staff (3)**
23:1;40:1,11
**stand (2)**
24:5;41:6
**standards (2)**
23:22;32:16
**standing (3)**
10:10,14;14:25
**Star (1)**
38:6
**start (2)**
15:19,20
**Started (17)**

6:9;11:10;13:12;
14:11,13;15:20,22;
16:23;17:3,4,4;18:11,
12;19:18;21:22;26:8;
37:20
**starts (4)**
14:17;16:1,15;21:4
**state (2)**
41:23,24
**statement (4)**
36:5;40:6,8;42:25
**stay (1)**
42:23
**stayed (1)**
17:24
**stepped (1)**
8:4
**still (12)**
6:24;9:11;11:25;
14:14;15:1,2,11,23;
16:3,16;31:25;32:1
**STIPULATED (1)**
4:15
**stomach (6)**
8:21;11:24;14:1;
33:5,11;36:3
**stood (2)**
17:5;18:9
**stop (5)**
16:9;17:13;31:4,
11,14
**stopped (4)**
9:7,10;17:13;41:11
**straight (1)**
7:25
**Street (1)**
4:9
**stretcher (1)**
17:16
**struggle (2)**
8:6;9:4
**struggling (5)**
9:4;11:25;15:2;
31:25;32:2
**stuff (2)**
12:14;19:3
**stun (3)**
38:1,7,8
**subject (1)**
8:9
**substance (3)**
23:14,15;41:13
**sudden (1)**
24:17
**suicide (1)**
25:5
**supervised (1)**
18:11
**supervision (1)**
29:24
**supervisor (6)**
20:5;25:13;27:12;
31:10;36:17,21

**supervisor's (1)**
22:8
**Sure (5)**
8:18;9:23;11:20;
14:10;23:12
**suspected (1)**
39:15
**sweat (1)**
26:21
**sweating (1)**
26:23
**SWINDOLL (19)**
5:11;9:22;10:6;
11:2,4;18:22;19:25;
20:1,20,21,25;21:1;
22:6,10;35:11,13;
36:9;40:13;43:9
**switches (1)**
16:14
**sworn (1)**
5:6
**system (2)**
6:2;30:25

---

**T**

**talk (6)**
20:2;23:23;24:5;
34:19;39:20;41:7
**talked (3)**
6:5;26:3;35:16
**talking (3)**
9:24;18:12;22:1
**tase (2)**
37:25;38:13
**tased (1)**
38:16
**taser (8)**
28:1,5,9,10,11;
37:24;38:15,16
**tasers (5)**
27:23;28:4;37:22;
38:5,6
**teach (4)**
23:24;24:2,2;32:13
**technique (1)**
13:6
**term (3)**
32:10,23;33:1
**test (1)**
24:20
**testified (1)**
5:8
**testify (1)**
5:6
**Texas (1)**
6:1
**Thanks (2)**
10:3;43:10
**THEREUPON (2)**
5:2;10:4
**thinking (1)**
35:2

**though (1)**
35:3
**thought (2)**
9:22;28:19
**thrashing (1)**
12:4
**threat (3)**
31:16;32:1,4
**threaten (2)**
38:11,13
**throwing (8)**
14:11,12,13,15,17,
22;17:3,5
**throws (1)**
16:2
**told (5)**
7:4;12:16;17:13;
30:22;36:7
**Took (7)**
6:2;9:5;17:12,22;
19:16;27:4;36:18
**top (1)**
9:11
**torso (2)**
8:25;34:3
**to-wit (1)**
5:9
**tracks (1)**
37:21
**trained (2)**
28:5;29:25
**training (16)**
12:24;20:22,24,24;
21:5,7,8,15,16,21,23;
23:20,22;28:9,10;
38:17
**training's (1)**
21:2
**treat (1)**
40:4
**trial (1)**
35:8
**tried (1)**
14:14
**trustees (1)**
13:22
**truth (3)**
5:6,7,8
**try (3)**
7:14;35:7;40:6
**trying (8)**
8:22,24;9:1,2;
13:14;14:17;24:20;
39:23
**turn (1)**
33:11
**turned (5)**
12:7;13:21;17:19,
21;29:8
**two (5)**
7:16;22:12;36:6,
25;37:24
**type (3)**

6:4;7:11;23:14

---

**U**

**uncommon (1)**
8:15
**under (4)**
9:3;27:9;29:24;
31:4
**underneath (1)**
6:17
**unintelligible (1)**
27:5
**Unless (2)**
21:22;39:19
**unsteady (1)**
41:1
**up (31)**
7:16;9:18,19;10:1,
9,10;11:18;12:15,18,
19,20;13:4,7,8,22,24;
14:11,12,13,15,17,20,
22;16:1;17:3,5;
19:24;22:20;23:15;
24:8;39:5
**urinated (1)**
26:12
**Urine (3)**
12:6,7;26:20
**use (7)**
9:25;22:19;27:23;
28:4;37:4,8,19
**used (9)**
28:10;32:23,25;
33:8;37:15;38:5,6,7,7
**using (2)**
22:20;37:22
**Usually (2)**
6:21;8:16

---

**V**

**variety (1)**
34:14
**video (6)**
19:2,7,10,12,18,23
**violating (1)**
30:15
**visible (1)**
31:16
**visiting (1)**
29:19
**vital (2)**
39:1;40:3

---

**W**

**waited (1)**
17:10
**walk (1)**
9:5
**walked (5)**
9:18;13:25;14:7;

33:19;37:1
**warning (1)**
  38:15
**warrants (1)**
  40:25
**Wars (1)**
  38:6
**watch (1)**
  25:5
**water (1)**
  26:18
**way (5)**
  9:20;19:20;33:25;
  34:3;41:7
**weren't (1)**
  32:2
**wet (2)**
  12:5,5
**what's (8)**
  7:22;15:24;24:7,
  10;33:8;40:5;41:21;
  42:4
**wheezing (1)**
  15:12
**Whenever (1)**
  13:11
**WHEREUPON (1)**
  43:12
**whole (1)**
  5:7
**wind (1)**
  14:20
**within (2)**
  6:16;27:13
**without (3)**
  21:24;30:21,22
**witness (13)**
  4:3;5:4;10:25;18:3,
  5,8;19:24;20:23;
  22:4;35:10;36:1;
  43:8,14
**wondering (1)**
  37:8
**word (1)**
  35:24
**words (1)**
  7:2
**work (3)**
  6:5;29:20;42:23
**worked (2)**
  6:1;17:14
**working (1)**
  6:20
**worried (1)**
  26:7
**worse (1)**
  24:13
**wound (1)**
  11:18
**written (3)**
  35:18,20;42:25
**wrong (2)**
  17:21;31:13

**wrote (2)**
  36:5;42:25

### Y

**years (4)**
  5:21,21;6:1;14:3
**yelling (1)**
  27:1
**yoke (1)**
  13:19
**you-all (1)**
  23:5

### 1

**1 (5)**
  10:2,4;11:2,14,15
**100 (2)**
  15:9;27:17
**11th (1)**
  4:5
**124 (1)**
  4:8
**15-minute (1)**
  25:8

### 2

**2:10 (1)**
  4:7
**2:48 (1)**
  43:13
**2010 (1)**
  29:9
**2011 (7)**
  6:12;21:12;23:1;
  25:25;34:6;37:13;
  38:19
**2012 (1)**
  29:20,23
**2014 (1)**
  4:6
**20-foot (1)**
  8:2
**27th (1)**
  5:21

### 3

**3 (2)**
  14:3;19:15

### 5

**5 (3)**
  13:18,21;28:2
**5:00 (1)**
  6:21
**5th (2)**
  29:20,23

### 6

**6 (3)**
  5:21,21;28:2

### 7

**7:00 (1)**
  6:21

### 9

**911 (2)**
  15:16,23