```
 1            IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
 2                 WESTERN DIVISION

 3   ROBIN BABOVEC, As Special
     Administratrix Of The Estate
 4   Of CASEY BABOVEC, Deceased,
                      Plaintiff,
 5        v.
     DEPUTY AND OFFICERS MIKE
 6   RICHARDS, TONYA PARKER,          No. 4:13CV00699 KGB
     CALVIN REED, SAM GRIFFIN,
 7   DION MCGUIRE, RYAN MCKINNEY,     Monday, January 26, 2015
     DAVID FENTON, JAMES PAYNE,       Little Rock, Arkansas
 8   NANCY SHELNUTT, BRUCE            8:58 a.m.
     PENNINGTON, JOHN and JANE
 9   DOES I-V, and COUNTY OF
     SALINE,
10                    Defendants.

11                TRANSCRIPT OF TRIAL - VOLUME 1
12            BEFORE THE HONORABLE KRISTINE G. BAKER,
               UNITED STATES DISTRICT JUDGE, and a jury
13

14   APPEARANCES:

15   On Behalf of the Plaintiff:

16       MR. JAMES F. SWINDOLL, Attorney at Law
         MS. EMILY KOSTELNIK, Attorney at Law
17          Law Offices of James F. Swindoll
            212 Center Street, Suite 300
18          Little Rock, Arkansas  72202

19
     On Behalf of the Defendants:
20
         MR. GEORGE D. ELLIS, Attorney at Law
21          Ellis Law Firm P.A.
            126 North Main Street
22          Benton, Arkansas  72015

23

24       Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
25   transcription.
```

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

1          **INDEX - VOLUME 1** (January 26, 2015)

2   Pretrial................................................  3

3       [Jury Selection not transcribed.]

4   Preliminary Jury Instructions........................... 29

5   Opening Statement/Plaintiff............................. 38

6   Opening Statement/Defendants........................... 49

7

8   **WITNESSES**
    (For the Plaintiff)     Direct   Cross   Redirect   Recross

9   **CAROLYN VOILES**          58      64       72        74

10  **CHARLES KOKES**           77      86

11  **CHRISTY NICHOLS**         91      98      112

12  **BRUCE PENNINGTON** [Video]  114

13

14

15

16  **EXHIBITS**                                   RECEIVED

17  Defendants' Exhibit 2.................................. 90

18

19

20

21

22

23

24

25

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

1       (Proceeding at 8:58 a.m., as follows:)

2           THE COURT:  Good morning.  We are on the record in

3    Case No. 4:13CV699, Babovec v. Deputy and Officers Mike

4    Richards, et al.

5       The plaintiff is represented today -- will counsel for the

6    plaintiff, if you would, state your name and introduce the folks

7    you have with you at the table.

8       You don't have anybody.  All right.

9           MR. SWINDOLL:  Your Honor, I do have a young lawyer

10   who just disappeared.  She should be right back.

11          THE COURT:  All right.

12          MR. SWINDOLL:  I'm James Swindoll.  I represent the

13   plaintiffs today.  Emily Kostelnik is a young lawyer with me

14   today, and she'll be assisting me.

15          THE COURT:  All right.  Thank you.

16          MR. ELLIS:  George Ellis for the defendants.

17          THE COURT:  Thank you, Mr. Ellis.

18      We are here to take up pretrial matters.  I have a list to

19   go through with you all, and I'm sure you have things that you

20   may wish to bring up as well.  First let's make sure, did

21   everyone receive a copy of the civil trial memo that

22   Ms. Washington sent by e-mail?  Have you all had the opportunity

23   to review that?

24          MR. ELLIS:  Yes.

25          MR. SWINDOLL:  Yes.

1          THE COURT:  All right.  We're going to seat 12 jurors

2    today, and by virtue of that memo, you all have consented that

3    we'll try it down to the six.  A civil case can be tried down to

4    six.  I'm not going to seat alternates.  We'll seat 12, though,

5    in the box, and then if we lose anybody during this cold and flu

6    season, for any reason, we'll continue with the trial and

7    continue to deliberate.  Is that acceptable?

8          MR. ELLIS:  Did I understand the Court to say that

9    we're going to try this to a six-person jury?

10         THE COURT:  No, we're going to seat 12 jurors.

11         MR. ELLIS:  Ultimately.  Okay.

12         THE COURT:  I'm not seating alternates.  So, for

13   example, if Juror No. 12 gets the flu and is out, we'll have a

14   discussion on the record, but if we can't bring that person back

15   in for the trial, you all have consented that we're going to try

16   it down to six.

17         MR. ELLIS:  I'm fine with that.

18         MR. SWINDOLL:  I am, too.

19         THE COURT:  All right.  Thank you.  I know my law

20   clerk, Cody McBride, who is working on this case, circulated the

21   Court's proposed statement of the case.  Is the Court's proposed

22   statement of the case acceptable to the plaintiff?

23         MR. SWINDOLL:  It is, your Honor.

24         THE COURT:  And to the defense?

25         MR. ELLIS:  With two minor exceptions, your Honor, it

1    is acceptable.  Could I approach the lectern?

2              THE COURT:  You may.

3              MR. ELLIS:  The statement of the case says that -- it

4    lists the defendants, and then it says in their individual and

5    official capacities.  There is only one remaining defendant in

6    his official capacity, I believe.  That would be former Sheriff

7    Pennington.  All of the rest are defendants in their individual

8    capacities.

9         The other is this, and I don't know that it matters, but

10   it's -- to be accurate, in the last paragraph beginning with the

11   fourth line:  "Mr. Babovec, while in a holding cell, got into a

12   fight and was forcibly removed from the holding cell by Saline

13   County Detention Center staff, including some defendants."

14        In fact, those who did remove him, all of those who removed

15   him were defendants.

16        With those two minor issues, the first one I think is not

17   minor, but the second one is minor --

18             THE COURT:  Okay.

19             MR. ELLIS:  -- this is fine.  This is fine with me.

20             THE COURT:  And I will hear from Mr. Swindoll.

21             MR. SWINDOLL:  Thank you, your Honor.  I have no

22   problem with either one of those.  I think that's a correct

23   statement.

24             THE COURT:  Okay.

25             MR. SWINDOLL:  I have named everybody that I could

1    find on that film.

2            THE COURT:  Okay.  So, gentlemen, the proposal then

3    would be that the opening paragraph would be "against the

4    Defendants Mike Richards, Tonya Parker, Calvin Reed, Sam

5    Griffin, Dion McGuire, Ryan McKinney, David Fenton, James Payne,

6    and Nancy Shelnutt in their individual capacity, and Bruce

7    Pennington in his individual and official capacity"?

8        I'm not following what you're proposing.

9            MR. ELLIS:  Just exactly what you said, except that

10    Sheriff Pennington is sued in his official capacity only.  You

11    dismissed in his individual capacity.

12            THE COURT:  I think I dismissed the excessive force,

13    but not the medical.

14            MR. ELLIS:  Is that my -- I'd have to look back.  I'll

15    take the Court's word for it, though, that that's what you did.

16            THE COURT:  So he's still here in his individual

17    capacity as a defendant on that.

18            MR. ELLIS:  All right.

19            THE COURT:  And I'm happy to specify that if you wish

20    at this point.

21            MR. ELLIS:  No, that's fine.  I just want the others

22    out as in their official capacities, and I think the Court's

23    covered that fine.

24            THE COURT:  All right.  Mr. Swindoll, do you have any

25    input into that?  Do you agree with that?

1              MR. SWINDOLL:  I agree with that, your Honor.

2              THE COURT:  And for the edit to the end, where it says

3    including some defendants, my proposal at this point for the

4    statement of the case would be just to strike "including some

5    defendants."

6              MR. SWINDOLL:  Yes, your Honor.

7              THE COURT:  And just say:  He was forcibly removed

8    from the holding cell by Saline County Detention Center staff.

9              MR. SWINDOLL:  That's fine.

10             THE COURT:  And just leave it at that.  The facts will

11   bear out before we get to the point on instructing the jury on

12   what they're to consider.

13         Mr. McBride, do you understand the edits to be made?  If

14   you can do that and circulate another copy.

15         All right.  I know we have an objection that was filed to

16   the video, and then I know from reviewing the pretrial

17   disclosures that there are some other specific issues that were

18   highlighted for the Court in the pretrial disclosures.  Why

19   don't we take up our video first.  That's Docket No. 33 is the

20   objection to the video filed by the defendants.  I'm happy to

21   permit counsel for the defendants to address that, and then I'll

22   hear from counsel for the plaintiffs.

23             MR. SWINDOLL:  Your Honor, I have withdrawn the

24   objectionable video.  It is not the video that we are putting

25   in.  The video that we are putting in is the one from the Saline

1    County Detention Center collected by my clients.

2            THE COURT:  All right.

3            MR. SWINDOLL:  I have reduced them to mp4 so that we

4    can play them here in the courtroom, but the original video has

5    been placed into evidence.

6            THE COURT:  All right.  And so the Court knows and

7    prepares for the timing of that, is that the duration of the

8    video?  Is there any objection to that?  Is it the four-hour

9    video?

10           MR. SWINDOLL:  It is the four-hour video, but what I

11   did was separate it into before the holding cell, before they're

12   objecting, during the objection, and afterwards, so that

13   everybody would not have to watch and we could go right to the

14   area that we need to be talking about.

15           THE COURT:  All right.

16           MR. ELLIS:  I'm fine with that, your Honor.

17           THE COURT:  Are you fine with that?  And have you seen

18   a copy of the video?

19           MR. ELLIS:  I have not, but I know exactly what he's

20   talking about.

21           THE COURT:  I will take it Docket 33, the objection to

22   the video, is moot because that exhibit has been withdrawn.

23           MR. SWINDOLL:  Correct.

24           THE COURT:  All right.  From reviewing your pretrial

25   disclosure sheets, I note that there is an issue regarding the

1    Arkansas State Police investigative file that was raised in the

2    pretrial disclosure sheet.  We can take up these issues now or

3    we can take them up during the course of the trial, but I want

4    to highlight them so that if there are objections to these

5    things, we're not dealing with it in opening statement.

6              MR. SWINDOLL:  Thank you, your Honor.

7              THE COURT:  I'm happy to hear about the objection.  I

8    think the plaintiff raised the objection.  And then I'll permit

9    the defense to respond.

10             MR. SWINDOLL:  Your Honor, the state police file is a

11   conglomerate of statements, conclusions, investigative actions

12   that he took and a resolution for it in his mind, which are not

13   relevant to this proceeding.

14        Secondly, it is hearsay within hearsay.  I have proposed

15   that we can use certain of the exhibits in the file.  Mr. Ellis

16   has agreed.  I object to the entire file for all of the reasons

17   that are obvious:  It is hearsay, it is out-of-court statements,

18   it's conclusions.  It's not based -- even the author of the

19   report is not going to be in this trial.

20             THE COURT:  All right.  I'm happy to hear a response.

21             MR. ELLIS:  Your Honor, the file is marked as Exhibit

22   3 for identification purposes, and I don't think -- I'm not

23   going to introduce the -- anything from the file that I can

24   recall offhand unless and until the expert witness -- Dr. Lyman

25   is his name -- Dr. Lyman testifies, and depending on what he has

1    to say, the file may or may not be admissible at that point.

2            THE COURT:  All right.  What I would suggest with that

3    is, in regard to the file, I note some of the problems -- that's

4    in part why I wanted to ask for your exhibits before the

5    pretrial.  I wanted to flip through and see what was in there

6    and share some concerns in regard to that file on portions of

7    it.  And some of it would depend on how, obviously, it's used,

8    what witness it's used with, and what manner it's used.

9        So my direction on that file will be, let's stay away from

10   it in opening, let's stay away from talking about contents,

11   flashing contents on an overhead and using it in that way in

12   opening.  When you get to the point where you anticipate

13   introducing a portion of it, why don't we approach the bench and

14   we'll have a discussion about it at that point.  If there's an

15   objection in regard to it, I'll rule on the objection at that

16   time.

17       If you wish to avoid that, talk about it with opposing

18   counsel before you get into it, and if opposing counsel's fine

19   with how you propose to do it with a particular witness, that's

20   fine.

21       In regard to prior statements, clearly prior statements for

22   any of the witnesses who are going to take the stand here,

23   obviously if they've given a prior written statement, there are

24   specific Federal Rules of Evidence that talk about that.  But I

25   haven't compared that list with the investigative file to note

1    whether all of these people are going to be here and be present.

2         So my direction is, let's stay away from that topic in

3    opening statement to the extent we can.  When you get to the

4    point where you wish to introduce portions of that file or the

5    entire file, let's approach the bench before we do.  Understood?

6              MR. ELLIS:  I'm fine with that.

7              MR. SWINDOLL:  Thank you.

8              THE COURT:  All right.  I note that there was a

9    proposal in the plaintiff's pretrial of playing Mr. Pennington's

10   deposition.  I don't know if -- and I know Mr. Pennington is

11   here in the courtroom today.  I know -- I anticipate --

12   Mr. Sutter, I see you in the back and I don't know if you're

13   here in an official capacity or as an observer, and you don't

14   have to say at this point, but what I want to do really is sort

15   of flesh out that issue, Sheriff Pennington's testimony by

16   deposition, so that we're not dealing with the logistics of that

17   with the jury in the box.

18             MR. SWINDOLL:  Thank you.  Plaintiff proposes to play

19   that deposition because it's the deposition of a party opponent

20   and can be used for any purpose.  He's here in the courtroom,

21   that's true, but I think I have the right when I take the

22   deposition of a deponent in discovery to use it in any way I

23   choose, and his testimony I intend to show to the jury to show

24   all the things that are in his written form that the Court saw.

25             THE COURT:  All right.  Mr. Ellis?

1            MR. ELLIS:  I believe only half of the deposition is

2    videoed, isn't it?

3            MR. SWINDOLL:  Both halves.

4            MR. ELLIS:  Was the second half videoed also?

5            MR. SWINDOLL:  Yes.

6            MR. ELLIS:  I'm not going to suggest to Mr. Swindoll

7    that he needs to try his case one way or the other.  He's an

8    experienced trial lawyer.  But I would just observe that

9    Mr. Pennington is seated right over here and he's going to be on

10   the witness stand, and the Court has discretion on that point

11   and I'd ask that the Court use its discretion one way or the

12   other.

13           THE COURT:  My concern about it is, if that's the

14   intent of the plaintiff, then the defense has the right to

15   object, lodge objections to the testimony if they were lodged at

16   the time.  You can request that the Court rule on it.  I haven't

17   reviewed the deposition in detail to know if that's an issue.

18   Typically what I have required of parties is to raise those

19   issues in advance so the Court can rule on objections in advance

20   as opposed to playing a deposition in bits and starts with the

21   Court ruling on it at the time it's shown to the jury when the

22   jurors are in the box.  So I'm not sure where Mr. Pennington

23   falls in the lineup of witnesses in the plaintiff's case.  But I

24   have concerns about the logistics of that.

25           I would encourage, Mr. Ellis, for you to review that

1   deposition, and if there are objections to the deposition that

2   you wish for the Court to rule on in advance if they were

3   preserved at the time, or even if they weren't preserved at the

4   time, you can raise it and I'll listen to the plaintiff's

5   arguments as to whether I should or shouldn't rule.  But my

6   request would be that you all talk about that and the logistics

7   of that so we're not doing it with the jury in the box.

8           MR. SWINDOLL:  Yes, your Honor.

9           MR. ELLIS:  He's fourth on the -- we could get to that

10  today, couldn't we?

11          MR. SWINDOLL:  Yes.  It will be today, if I can.

12          THE COURT:  I'll ask that after we convene -- we'll

13  take -- my plan is, we'll go through this pretrial, we'll seat

14  ou jurors, we'll pick our jury, probably get to opening

15  statement, one or two witnesses before lunch.  When we take our

16  break for lunch -- I'm a pretty regimented person in trial so

17  our jurors know what to expect.  We'll probably take about an

18  hour and a half break for lunch to let them be able to go

19  through security, come back through security, and eat.  What I'd

20  ask, after the lunch break today, y'all be prepared to talk to

21  me about that deposition and how you propose to handle that if

22  you've reached any agreements or if I need to rule on anything

23  before we start with that deposition.

24      All right.  The other note and question that I had, we can

25  raise it now or we can raise it at the time it comes up in

1    trial, but it seems to me there's some benefit for all of us

2    talking about it outside the presence of the jury first, are

3    these federal pleadings from other cases.  And I've looked at

4    that as the plaintiff's exhibit --

5          MR. SWINDOLL:  I've withdrawn that, your Honor.  It's

6    Exhibit 10, and I've withdrawn it.  Otherwise, we have

7    stipulated exhibits on behalf of the plaintiff.

8          THE COURT:  All right.  From the defense side, I note

9    that the defense listed a placeholder, any witnesses to be

10   called that were named in discovery and pretrial disclosures and

11   all the other various methods that witnesses or potential

12   witnesses can be listed.  What I need to confirm, Mr. Ellis, is

13   that the witness list that you handed to me today includes all

14   of those names.

15         MR. ELLIS:  It does.

16         THE COURT:  All right.  The reason I ask that, that's

17   the list I'm going to read to this potential jury panel, the

18   panel of potential jurors, and I want them to have the names of

19   anybody who may be called so that when we seat them, if there's

20   any problems that arise, we know it on the front end.

21      Gentlemen, those were the things that I highlighted from

22   your pretrial disclosures and from the filings in the case.  Are

23   there issues that you wish to raise?

24         MR. SWINDOLL:  There are, your Honor, a couple.

25   Number one, I have a subpoena out for a young lady named Christy

1   Nichols.  She went dark on me yesterday.  I am having someone go

2   to her house this morning --

3            MR. ELLIS:  I didn't hear.

4            MR. SWINDOLL:  She went dark yesterday.  She wouldn't

5   answer her phone.  She talked to me Saturday, but yesterday she

6   wouldn't all day.  She may be, may not be.  I'm sending someone

7   to her house, and I wanted to apprise the Court of this issue.

8            THE COURT:  All right.  You can keep me informed to

9   the extent you have information you want to share.

10        All right.  Mr. Ellis?

11           MR. ELLIS:  The only other thing I have, your Honor, I

12  filed a motion for our statements about which there's no

13  material dispute to be deemed admitted, and I would suggest to

14  the Court that we -- it may become moot as we take all of the

15  evidence.  I would suggest that we defer a ruling on that until

16  the close of, well, I guess the defense case, and at the

17  conclusion of the evidence, we can decide what we want to do

18  about that.

19           THE COURT:  And what I suggest, if it's acceptable,

20  Mr. Ellis, let's treat that sort of as proposed stipulations at

21  this point.  I'll keep a list up here of what I believe is

22  coming in and what's not coming in as contested.  Then I would

23  encourage both of you to discuss it as well and that we take it

24  up at the end of the case.  I'll take up that motion at the end

25  of the case.  You can tell me things that you all believe have

1    been stipulated to or not contested, and then I'll handle it as

2    a stipulation in the jury instructions, if that's acceptable.

3    Is that acceptable, Mr. Ellis?

4              MR. ELLIS:  It is to me.

5              THE COURT:  Mr. Swindoll?

6              MR. SWINDOLL:  Fine.

7              THE COURT:  That way you all can tell me what you

8    don't contest at that point.  If there are issues about what has

9    come in that's contested, I'll take them up at that time and

10   we'll treat them in front of the jury as a stipulation.

11       Anything else?  Mr. Swindoll?

12             MR. SWINDOLL:  Voir dire, just for a second.  Does the

13   Court have limits on voir dire?  I try not to overdo it, but I

14   do like to ask and find out some of their attitudes on some

15   things, and some judges don't like that kind of examination.

16   They prefer only the for-cause kind of questions.  But I have

17   been many times in front of courts where they say, "What are you

18   doing?"  Why are you asking that question about whether they

19   consider rules, safety rules, and that stuff.  And so I tell you

20   now, I want to do that.  I will do that if the Court doesn't

21   tell me that I should not.

22             THE COURT:  Mr. Ellis, do you have any input into

23   that?

24             MR. ELLIS:  Your Honor, Mr. Swindoll is an experienced

25   trial lawyer.  I'm sure he'll be appropriate in his voir dire.

1          THE COURT:  My view of the world is that, which is,

2     you all are experienced trial lawyers.  You know a jury in the

3     box.  You know when you've worn out your welcome with the

4     potential jurors or even with the jury.

5          I generally don't impose time limits.  If we get to

6     Wednesday afternoon and the plaintiff is still going on and

7     carrying on the case and the defense tells me they have an equal

8     number of witnesses and aren't going to be able to take the

9     stand during the week we've allotted, then I might take matters

10    into where I will impose time limits.  You know there are issues

11    that I don't where you can explore with the jury panel.  I will

12    ask general voir dire, and then I will permit the lawyers to

13    question the panel.  I will take objections if objections need

14    to be made, and you can ask to approach the bench and we'll have

15    a sidebar if there's any area that is inquired of that you

16    believe is inappropriate.

17         But I'll permit the lawyers to ask questions.  From the

18    description of the questions you asked, Mr. Swindoll, I don't

19    have any problem with that nature generally.  I haven't

20    previewed your questions, so I'm not giving you a ruling in

21    advance on any particular question.

22              MR. ELLIS:  A couple of things, your Honor.  First of

23    all, I'm just going to serve notice, I didn't file a motion in

24    limine on this, but Mr. Swindoll wouldn't do this because he

25    knows what he's doing in the courtroom, but some of his

1    witnesses may blurt out the word "murder," that --

2              MR. SWINDOLL:  None of my witnesses will, your Honor.

3              MR. ELLIS:  Certainly.

4              MR. SWINDOLL:  None of my witnesses will say the word

5    "murder," unless you press them and ask --

6              MR. ELLIS:  I won't.  I won't.

7         The other thing, your Honor, and this is a little

8    housekeeping matter and I hate to bring this up, I'm diabetic

9    and I carry this pump with me.  From time to time I might be

10   seen sticking a piece of peppermint in my mouth.  Is that

11   acceptable if I do that?

12             THE COURT:  That's fine.

13             MR. ELLIS:  I'll try to do it without the jury seeing

14   me.

15             THE COURT:  And if you need to take a break at any

16   point -- for anyone, if you need to take a break if there's a

17   situation that arises, just stand up and I'll take a break.

18   We'll get the jury out of the box.  If you need to leave before

19   the jury gets out of the box, you're not going to offend me.

20   We'll take a break, excuse the jury, and come back.

21             MR. ELLIS:  The only reason I might need to take a

22   break is the diuretic that I take as well.

23             THE COURT:  That's fine.  Get my attention and we'll

24   take a break.

25             MR. SWINDOLL:  Good news.  My dark witness has shown

1    and is in the witness room.  She's here.

2              MR. ELLIS:  Okay.

3              THE COURT:  Ms. Kostelnik, please spell your name for

4    the court reporter and me.

5              MS. KOSTELNIK:  It's Kostelnik, and it's

6    K-o-s-t-e-l-n-i-k.

7              THE COURT:  All right.  Thank you.

8              MR. ELLIS:  Your Honor, I have eight or ten clients.

9    The logistics of this, I guess, do you want them seated over

10   here on this side?

11             THE COURT:  You know, they may be seated on that side

12   in that first row, or you may seat them at the table and pull

13   up -- I don't know that we have any extra chairs to that extent

14   to pull up.  We may borrow some from the other side.  When we're

15   questioning our panel, I'll ask those folks to stand up and be

16   introduced so the jurors can look at them.  So it would be

17   helpful if they were in one spot, either in that first row or

18   around the table.

19             MR. ELLIS:  Okay.

20             THE COURT:  It may be that we can borrow some of the

21   chairs.  I don't know how many witnesses the plaintiff's table

22   anticipates they'll have sitting -- or party representatives

23   they'll have sitting there.  Obviously, Ms. Babovec.  I'm not

24   sure if there are others that will be present.

25        Mr. McBride, have you circulated the revised statement of

1   the case?

2                THE LAW CLERK:  I will now.

3                THE COURT:  All right.  While he's doing that, are

4   there any questions in voir dire that you wish the Court to ask

5   specifically, any of a sensitive nature that you wish to inquire

6   about but you don't wish to ask?

7                MR. SWINDOLL:  Yes, your Honor, there is.  We have

8   Saline County as a defendant in this case.  We have nine or ten

9   people from Benton on the panel.

10               THE COURT:  Okay.

11               MR. SWINDOLL:  Inquiring into that would be, I

12   think -- well, it would be better for the plaintiff if the Court

13   did that.

14               THE COURT:  Right.

15               MR. SWINDOLL:  Because you're bringing the case to

16   court and they have to pay their taxes in the county, are they

17   going to be able to go home and tell other people that they

18   found a problem with the county.

19               THE COURT:  Okay.  Anything else from the plaintiff on

20   that?

21               MR. SWINDOLL:  No, your Honor.  The rest of them I

22   think I can ask.

23               THE COURT:  Anything else, Mr. Ellis, for the defense.

24               MR. ELLIS:  I guess we need to know, and I don't want

25   to ask it, Mr. Swindoll doesn't either, if any of them have ever

1    been in jail.

2         MR. SWINDOLL:  And I don't want to ask that question.

3    You're absolutely right.

4         MR. ELLIS:  I'd rather take my chances, but it sure

5    would be nice to know that.  Would the Court entertain the idea

6    of --

7         THE COURT:  I will.

8         MR. ELLIS:  -- approaching that?  I want to ask if any

9    of them have ever been roughed up by a police officer, but I

10   don't want to ask about their jail history.  I guess that's the

11   only thing I can think of.

12        THE COURT:  Okay.  And Mr. McBride handed out a

13   revised statement of the case.  Why don't you both take a moment

14   to review that, make sure that our edits track what you all have

15   proposed and that it's acceptable to you.

16        MR. SWINDOLL:  Good for the plaintiff, your Honor.

17        THE COURT:  Mr. Ellis, is that acceptable?

18        MR. ELLIS:  It's fine.  It's fine.

19        THE COURT:  All right.  With that, it is now about

20   9:25.  We will stand in recess -- I'm not sure if our potential

21   jurors have finished the orientation.  Okay.  Why don't we stand

22   in recess for ten minutes.  We will come back in on the record

23   at 9:35, and when we come back in at that point, we'll be

24   prepared to start with jury selection.

25        We'll stand in recess.

1          (Recess from 9:23 a.m. until 9:39 a.m.)

2          THE COURT:  All right.  We are waiting for our panel

3    to come up for the jury, and then we'll start with jury

4    selection.

5          MR. SWINDOLL:  Your Honor, I have one matter before

6    they get here.

7          THE COURT:  Sure.

8          MR. SWINDOLL:  The punitive damage claim against Bruce

9    Pennington individually I want to dismiss.

10         THE COURT:  Okay.

11         MR. SWINDOLL:  I don't think there's any objection.

12         MR. ELLIS:  Of course not.

13         THE COURT:  All right.  The Court will note that that

14   claim is dismissed.

15         Also, while we're waiting on these folks to come up, I will

16   say it now because I may forget at the end of this proceeding,

17   there is a local rule that governs contact of jurors post trial.

18   You have to write the Court, request permission, and then

19   there's a process to go through to do that.

20         So at the end of this, if you are inclined or your clients

21   are inclined to make contact with jurors post trial to ask any

22   questions, you must first approach the Court.  And there's a

23   local rule, as I said, that governs that process that you should

24   consult before you check with the Court.

25         Are we ready?

1          COURT SECURITY OFFICER:  We're almost there.  We're

2    bringing them up in one elevator at a time.

3          THE COURT:  All right.

4      (Prospective jurors entered the courtroom.)

5      [Whereupon, voir dire was conducted by the Court and

6    counsel.  A jury of 12 was seated and sworn in.  Continuing in

7    open court at 12:07 p.m., jury present:]

8          THE COURT:  Is this jury satisfactory to the

9    plaintiff?

10          MR. SWINDOLL:  It is, your Honor.

11          THE COURT:  Satisfactory to the defense?

12          MR. ELLIS:  Yes, ma'am.

13          THE COURT:  With that, ladies and gentlemen who are in

14    the back of the courtroom, your service on this jury is

15    completed.  You all may be excused.  We've seated our 12 jurors

16    in the box who will serve as our jurors in this case.  Please go

17    and have a good rest of the day.  Understand and appreciate how

18    thankful we are that you all were here.  This process does not

19    work unless ladies and gentlemen like you are willing to serve,

20    and we all very much appreciate that.  So thank you.  You are

21    excused.

22      All right.  Ladies and gentlemen, it is now ten after 12.

23    We will take as our first order of business, we'll take a recess

24    and have lunch.  If you all would, please come back -- why don't

25    we come back today at 1:45.  I will tell you we'll take a break

1    mid afternoon today, around the three, three-thirty mark, and I

2    will keep you today until five o'clock unless that presents a

3    hardship for anyone.

4        If you have situations and issues, what I will propose is

5    the schedule that we keep is this:  We start in the morning at

6    nine, we'll take a mid-morning break of about 15 minutes.  I'll

7    usually do that about 10:15 or 10:30.  We'll break at noon each

8    day for lunch.  I'll give you an hour and a half for your lunch

9    break, 12 to 1:30.  We'll come back, take a mid-afternoon break,

10   and then we'll go until five.

11       If that presents a hardship -- I know we have a ribbon-

12   cutting ceremony.  If you'll let the Court Security Officer know

13   when that is set.  If you have doctors' appointments, other

14   things like that that would be difficult to reset at this point,

15   if you'll let the Court Security Officer know that, he can

16   communicate that to me and we'll adjust or shift.  So we have a

17   lot of information we need to move through, so if we'll stick to

18   that schedule, what I hope to do is present you with some

19   consistency so you can deal with personal matters on the lunch

20   hour.  But if starting at nine o'clock or until five presents a

21   hardship aside from the general hardship of jury service to

22   begin with, please let the Court Security Officer know and he

23   can let me know.

24       During this recess and every other recess, please do not

25   discuss this case among yourselves or with anyone else,

1    including your families and friends.  Do not allow anyone to

2    discuss this case with you or within your hearing.

3         Do not discuss also means do not e-mail, send text

4    messages, blog, or engage in any other form of written, oral, or

5    electronic communication, as I instructed you before.  Do not

6    read any newspaper or other written account, watch any televised

7    account or listen to any radio program on the subject of this

8    trial.

9         Do not conduct any internet research or consult with any

10   other sources about this case, the people involved in this case,

11   or its general subject matter.  You must keep your mind open and

12   free of outside information.  Only in this way will you be able

13   to decide the case fairly, based solely on the evidence and my

14   instructions on the law.  If you decide this case on anything

15   else, you will have done an injustice.  It is very important

16   that you follow these instructions.

17        With that, we will stand in recess until 1:45.  We'll come

18   back at 1:45, and we will begin.

19        Please rise.

20        (Jury exited the courtroom.)

21        THE COURT:  Counsel and the parties, if y'all would

22   have a seat, I'm going to explain another procedure that I

23   engage in so that you all know about it.

24        What I will do after the jury is excused, we'll go on the

25   record both before we bring the jury back in the box and after

1    they leave the box, and at that point I will ask if there's

2    anything that anybody wishes to put on the record or that we

3    need to take up.  That's my habit before and after a recess.

4        It doesn't mean you have to speak.  I just want you all to

5    have plenty of opportunity to raise with the Court, with one

6    another, any issues that you foresee coming up so that while we

7    have the jury in the box, we can move through things quickly to

8    the extent we can.

9        With that, counsel for the plaintiff, is there anything we

10   need to take up at this point on the record while the jury is

11   not in the box?

12           MR. SWINDOLL:  No, your Honor.

13           THE COURT:  Counsel for the defense?

14           MR. ELLIS:  No, your Honor.

15           THE COURT:  With that, we'll stand in recess.  I

16   mentioned that I wanted to hear about Mr. Pennington's

17   deposition and the anticipated use of that, if there were any

18   objections that the Court needed to rule on.

19       Why don't we come back in here at about 1:40, we can take

20   up that issue for about five minutes.  I'm not sure that we will

21   get to that point today in regard to the testimony of

22   Mr. Pennington, but let me know that you all have conferred and

23   sort of where that issue stands.

24       So we'll be back here by 1:40.  With that, we'll stand in

25   recess.

1          (Recess at 12:13 p.m., until 1:43 p.m., jury not present.)

2          THE COURT:  We are back on the record with counsel and

3    the parties outside the presence of the jury.

4          We took a break for our lunch, and when we left, I said

5    that I would come back on the record a little early to talk

6    about the deposition being played of Mr. Pennington and if there

7    are designations, if there are any objections to rule on prior

8    to being played.  I don't know if you all have had the

9    opportunity to visit about that, and, if so, what, if anything,

10   does the Court need to do?  Mr. Swindoll?

11         MR. SWINDOLL:  Your Honor, we have visited about it,

12   and Mr. Ellis has agreed that I can play the deposition in toto.

13         THE COURT:  All right.

14         MR. ELLIS:  May I amplify on that a little bit, your

15   Honor?  In our earlier life, Mr. Swindoll and I were old car

16   wreck lawyers.  We were taught that you could use the

17   depositions for any purpose.

18         THE COURT:  The state court rule is that way and a lot

19   of judges in federal court permit that, too.

20         MR. ELLIS:  That's fine if that's what he wants to do.

21         THE COURT:  If you have no objection to it, I'll let

22   you do it, Mr. Swindoll, and if there are any issues that come

23   up with it, I don't know if we will get there today, but that we

24   can revisit this issue before we start, if you wish, Mr. Ellis.

25         All right.  With that, I don't know that all of our jurors

1    are back.  I suspect our Court Security Officer is probably

2    rounding them up and will come in and tell me when they are

3    ready.  Do we have any other matters that we need to take up

4    now?

5              MR. SWINDOLL:  Not on behalf of the plaintiff, your

6    Honor.

7              THE COURT:  On behalf of the defendant?

8              MR. ELLIS:  We want to invoke the rule.

9              THE COURT:  All right.  Thank you for reminding me

10   about that.

11       I did have another question, too.  I will say it's not my

12   normal practice to allow jurors to ask questions, but if you all

13   wish, I will entertain that if both parties are in agreement to

14   do it.  Counsel for the plaintiff?

15             MR. SWINDOLL:  Yes.

16             THE COURT:  Counsel for the defense?

17             MR. ELLIS:  No.

18             THE COURT:  My inclination is, if both parties are not

19   agreeable, I'm not going to do it, so I'm not really sure how I

20   would do it.  I've never been asked to do it, nobody has ever

21   agreed to do it.  So my ruling is, we're not going to let jurors

22   ask questions during the process.

23       I will give the standard set of instructions to the jurors

24   when we come back and put them in the box and then we'll proceed

25   to opening statement and witnesses.

1           Are all of our jurors ready?

2                COURT SECURITY OFFICER:  I'm waiting for one to come

3    up now.

4                THE COURT:  Thank you.

5           (Jury entered the courtroom.)

6                THE COURT:  It's my understanding that counsel wish to

7    invoke the rule.  If there are any individuals present who

8    are -- anticipate being witnesses in the case but who are not a

9    party representative, if you all would please rise and excuse

10   yourself from the courtroom.

11          And you all may -- you know these folks better than we do,

12   so if there is anyone that you want to alert us, you can alert

13   the Court Security Officer.

14          All right.  We will swear witnesses one at a time as they

15   come up to the stand.  If you all would help us remember if

16   there's anyone who needs to be sworn at that time who is not,

17   but that will be our practice in this case.

18          Members of the jury, you have now been sworn, and I will

19   give you some preliminary instructions to guide you in your

20   participation in the trial.

21          First, ladies and gentlemen, I will give you these

22   instructions now, and then at the end of the trial, I will give

23   you more instructions.  I may also give you some instructions

24   during the trial.  All of the instructions, those I give you now

25   and those I give you later, whether they are in writing or given

1    to you only orally, are equally important and you must follow

2    all of them.

3        This is a civil case brought by the plaintiff against the

4    defendants.  It will be your duty to decide from the evidence

5    which party is entitled to your verdict.  Your duty is to decide

6    what the facts are from the evidence.  You are allowed to

7    consider the evidence in the light of your own observations and

8    experiences.  After you have decided what the facts are, you

9    will have to apply those facts to the law which I give you in

10   these and in my other instructions.  That is how you will reach

11   your verdict.

12       Only you will decide what the facts are; however, you must

13   follow my instructions whether you agree with them or not.

14       You have taken an oath to follow the law that I give you in

15   my instructions.

16       In deciding what the facts are, you may have to decide what

17   testimony you believe and what testimony you do not believe.

18   You may believe all of what a witness says or only part of it or

19   none of it.

20       In deciding what testimony to believe, consider the

21   witness's intelligence, their opportunity to have seen or heard

22   the things they testify about, their memories, any reasons they

23   might have to testify a certain way, how they act while

24   testifying, whether they said something different at another

25   time, whether their testimony is generally reasonable, and how

1  consistent their testimony is with other evidence that you

2  believe.

3      Do not let sympathy or your own likes or dislikes influence

4  you.  The law requires you to come to a just verdict, based only

5  on the evidence, your common sense, and the law that I give you

6  in my instructions, and nothing else.

7      Nothing I say or do during this trial is meant to suggest

8  what I think of the evidence or what I think your verdict should

9  be.

10     When I use the word "evidence," I mean the testimony of

11  witnesses, documents, and other things I receive as exhibits,

12  facts that I tell you the parties have agreed are true, and any

13  other facts that I tell you to accept as true.

14     Some things are not evidence.  I will tell you now what is

15  not evidence.

16     Lawyers' statements, arguments, questions, and comments are

17  not evidence.

18     Documents or other things that might be in court or talked

19  about but that I do not receive as exhibits are not evidence.

20     Objections are not evidence.  Lawyers have a right and

21  sometimes a duty to object when they believe something should

22  not be a part of the trial.  Do not be influenced one way or the

23  other by objections.  If I sustain a lawyer's objection to a

24  question or an exhibit, that means the law does not allow you to

25  consider that information.  When that happens, you have to

1   ignore the question or the exhibit, and you must not try to

2   guess what the information might have been.

3        Testimony and exhibits that I strike from the record or

4   tell you to disregard are not evidence and you must not consider

5   them.

6        Anything you see or hear about this case outside the

7   courtroom is not evidence and you must not consider it.

8        Also, I might tell you that you can consider a piece of

9   evidence for one purpose only and not for any other purpose.  If

10  that happens, I will tell you what purpose you can consider the

11  evidence for and what you are not allowed to consider it for.

12       Some of you may have heard the terms "direct evidence" and

13  "circumstantial evidence."  You should not be concerned with

14  those terms since the law makes no distinction between the

15  weight to be given to direct and circumstantial evidence.

16       During the trial I will sometimes need to talk privately

17  with the lawyers.  I may talk with them here at the bench while

18  you are in the courtroom, or I may call a recess and let you

19  leave the courtroom while I talk with the lawyers.  Either way,

20  please understand that while you are waiting, we are working.

21  We have these conferences to make sure that the trial is

22  proceeding according to the law or to avoid confusion or

23  mistakes.  We will do what we can to limit the number of these

24  conferences and to keep them as short as possible.

25       At the end of the trial, you will have to make your

1   decision based on what you recall of the evidence.  You will not

2   have a written copy of the testimony to refer to.  Because of

3   this, you have to pay close attention to the testimony and other

4   evidence as it is presented here in the courtroom.

5        If you wish, you may take notes to help you remember what

6   witnesses say.  You all have been provided with individual

7   notebooks for this purpose.  If you do take notes, do not show

8   them to anyone until you and your fellow jurors go to the jury

9   room to decide the case after you have heard and seen all of the

10  evidence and the case has been presented to you for

11  deliberation.  And do not let note-taking distract you from

12  paying close attention to the evidence as it is presented.

13       As I've said, you have each been provided with a pad of

14  paper and a pen or a pencil.  If you would, take that first page

15  and flip it over so the first page always remains blank.  At the

16  end of the day, if you would then flip back to that blank page,

17  leave your notebook on the chair, our Court Security Officer

18  will collect the notebooks at the end of each day and he will

19  hold them in confidence.  The Court won't see them, the lawyers

20  won't see them, nobody will see them.  They're your notebooks

21  and they're only for your purposes and for you.  If you will do

22  that, that helps keep your notes and thoughts confidential by

23  flipping over that first page.

24       The same is true for the seats you're in.  Look around at

25  the folks who are sitting next to you.  Everybody is in the same

1   seat as when we started and that will be your seat for the

2   duration of the trial.  You need to stay in that chair, in part

3   for the notebooks, but in part also for how you were numbered.

4       Jurors, to make this trial fair to all parties, you must

5   follow these rules:  First, do not talk or communicate among

6   yourselves about this case or about anyone involved with it

7   until the end of the case when you go to the jury room to

8   consider your verdict.

9       Second, do not talk with anyone else about this case or

10  about anyone involved with it until the trial has ended and you

11  have been discharged as jurors.

12      Third, when you are outside the courtroom, do not let

13  anyone tell you anything about the case or about anyone involved

14  with it until the trial has ended and your verdict has been

15  accepted by me.

16      If someone tries to talk to you about the case during the

17  trial, please report it to the Court Security Officer.

18      Fourth, during the trial, do not talk with or speak to any

19  of the parties, lawyers, or witnesses in this case, not even to

20  pass the time of day.  It is important not only that you do

21  justice in this case, but also that you act accordingly.  If a

22  person from one side of the lawsuit sees you talking with a

23  person from the other side of the lawsuit, even if it is just

24  about the weather, that may raise suspicions about your

25  fairness.  So when the lawyers, parties, and witnesses do not

1   speak to you in the halls or the elevator or the like, you must

2   understand that they are not being rude.  They know what they

3   are supposed to do.  They are not supposed to talk to you while

4   the trial is going on, and they are just following the rules.

5        Fifth, you may need to tell your family and close friends

6   and other people that you are part of this trial.  You can tell

7   them when you have to be in court and you can warn them not to

8   ask you about this case, tell you anything that they know or

9   think they know about the case, or talk about this case in front

10  of you.  But you must not communicate with anyone or post

11  information about the parties, witnesses, participants, claims,

12  evidence, or anything else related to this case.

13       You must not tell anyone anything about the jury's

14  deliberations in this case until after I accept your verdict or

15  until I give you specific permission to do so.

16       If you talk about the case with someone besides the other

17  jurors during the deliberations in the jury room, it looks as if

18  you might have already decided the case or that you might be

19  influenced in your verdict by their opinions.  That would not be

20  fair to the parties and it might result in the verdict being

21  thrown out and the case having to be tried over again.

22       During the trial, while you are in the courthouse and after

23  you leave for the day, do not give any information to anyone by

24  any means about this case.  For example, do not talk face to

25  face or use any electronic device, such as a telephone, cell

1  phone, smartphone, Blackberry, PDA, computer, or computer-like

2  device.  Likewise, do not use the internet or any internet

3  service.  Do not text or send instant messages.  Do not go on

4  any internet chat room, blog, or other websites such as

5  Facebook, MySpace, You Tube, or Twitter.

6      In other words, do not communicate with anyone about this

7  case except for the other jurors during deliberations in the

8  jury room after the case has been presented to you for

9  deliberation.  You may speak about it after I accept your

10  verdict.

11      Sixth, do not do any research on the internet, in

12  libraries, newspapers, or otherwise, and do not investigate this

13  case on your own.  Do not visit or view any place discussed in

14  this case and do not use the internet or other means to search

15  for or view any place discussed in the testimony.

16      Also, do not look up any information about the case, the

17  law, or the people involved, including the parties, the

18  witnesses, the lawyers, or even me, the judge.

19      Seventh, do not read any news stories or internet articles

20  or blogs that are about the case or about anyone involved with

21  it.  Do not listen to any radio or television reports about the

22  case or about anyone involved with it.

23      In fact, until the trial is over, you might avoid reading

24  newspapers or news journals at all and avoid listening to

25  television or radio newscasts at all.  I do not know whether

1  there will be any news reports about the case, but if there are,

2  you might find yourself listening to or reading something about

3  the case.

4      I can assure you when you have heard the evidence presented

5  in this case in this courtroom, you will know what you need to

6  know to return a just verdict.

7      The parties have the right to have you decide the case

8  based on evidence presented only here in this court.  If you

9  research, investigate, or experiment on your own or get

10 information from other sources, your verdict might be influenced

11 by inaccurate, incomplete, or misleading information.  Witnesses

12 here take an oath to tell the truth and the accuracy of their

13 testimony is tested through cross-examination.

14     All of the parties are entitled to a fair trial and an

15 impartial jury, and you have to conduct yourselves in a way that

16 ensures the integrity of the trial process.

17     If you decide a case based on information not admitted in

18 court, it denies the parties a fair trial.  You will deny them

19 justice.  Remember, you have taken an oath to follow the rules

20 and you must do so.

21     Eighth, do not make up your mind during the trial about

22 what your verdict should be.  Keep an open mind until after you

23 and your fellow jurors have discussed all the evidence in the

24 case during deliberation in the jury room after the case has

25 been presented to you by me for your deliberation.

1    The trial will proceed in the following manner:  First, the

2  plaintiff's lawyer will make an opening statement.  Next, the

3  defendants' lawyer may make an opening statement.

4    An opening statement is not evidence.  It is a summary of

5  evidence the lawyers expect you will see and hear during the

6  trial.

7    After opening statements, the plaintiff will then present

8  evidence.  The defendants' lawyer has the opportunity to cross-

9  examine the plaintiff's witnesses.

10    After the plaintiff has finished presenting her case, then

11  the defense may present evidence and the plaintiff's lawyer will

12  have the chance to cross-examine defense witnesses.

13    After you have seen and heard all of the evidence from all

14  sides, the lawyers will make closing arguments that summarize

15  and interpret the evidence.  Just as with opening statements,

16  closing arguments are not evidence.  After the closing

17  arguments, I will instruct you further on the law, and then you

18  will go to the jury room to deliberate and decide on your

19  verdict.

20    All right.  At this point, it is time for opening

21  statements.

22    On behalf of the plaintiff.

23    MR. SWINDOLL:  Thank you, your Honor.

24  Good afternoon.  When a county or a police force put people

25  in jail, the county and the jailers have an obligation to

1    furnish emergency medical care responsibly.  And if they don't

2    and harm results, they're responsible for the harm.

3        A police agency, a jailer who puts someone into custody

4    must use force against that person responsibly, and if they use

5    excessive force and they use it for the wrong reasons, they are

6    responsible for the harm that has occurred.

7        Here's what happened:  Let's go back to 2008, Saline

8    County.  The Quorum Court in Saline County does not fund medical

9    care at the jail.  In 2009, the sheriff comes to them and says

10   you have to furnish care.  People are not qualified to furnish

11   medical care.  They are trained EMT, but they are not capable of

12   furnishing medical care.

13       In 2009, the Quorum Court refuses to fund medical care.  In

14   2010, the same thing happens.  Sheriff Pennington goes and he

15   tells them, I've had a friend come in, a doctor friend of mine,

16   who stops in and tries to help us, but ladies and gentlemen, we

17   are not competent to care for the inmates in emergency medical

18   situations.

19       In April of 2011, a young citizen, 30 years old, is stopped

20   for a traffic fine.  The cops see he is inebriated, they see

21   that he is intoxicated, they see that he is under the effects of

22   a drug.  They take him to the sheriff's office, they take him to

23   a confinement center, and they process him there.

24       The people who are there at 12:30 and at one o'clock that

25   day see that he is intoxicated.  He tells them he is

1    intoxicated.  He is sweating profusely.  He has lost control of
2    his bowels in the police car and urinated on himself.
3         The processors talked to him and they put him in the cell.
4         At 2:06, they put him into the cell, and for two hours and
5    a half, he bounces around the cell like a rubber ball.  He
6    pleads for help.  He goes to the door and he leans against it
7    and says, "Please, I'm having a heart attack.  Please help."
8         And the sheriff says -- or the deputies and the jailers
9    say:  "If you continue to claim that you need medical help, we
10   are going to tase you."
11        At 4:45, he goes back to the door and he pleads, and at
12   five o'clock, they take him out after he has defecated on
13   himself.  They take him, they change his pants, they put him on
14   a bench just outside the cell, and the deputy who is treating
15   him, the deputy who is monitoring him, knows he's high.  In
16   fact, he taunts him.  He tells him in a joking way, "I bet you
17   can't sit still at all," and he can't.
18        And instead of giving him the medical care that is
19   necessary, they put him back into the cell.
20        Five minutes later, an altercation occurs.  At 5:06, Casey
21   Babovec, 30 years old, is by the door begging to be taken out of
22   the cell, and one of the jailers picks him up, pulls him out of
23   the cell, throws their arm around him, throws him down on the
24   floor and gets on top of him.  Then five more jailers come and
25   pile on top of him.

1    Finally another one comes from all the way across the room

2    and dives on top of him and starts tasing him.  And finally, the

3    patient, citizen, loses consciousness and the police officers

4    get up.  Except one.  One who sits on him and sits on him for

5    several minutes talking to all the deputies around.

6        How do we know this?  It's all on videotape.  You're going

7    to be able to see all of it, every bit of it.  They're talking.

8        Finally, he gets up off him.  He's still not conscious.

9    And they drag him into another cell, like a bag of potatoes, and

10   drop him face down on the floor and do nothing.

11       Five minutes later, one of them looks and wonders if he's

12   breathing.

13       When they drag him in, I want you to watch what happens.

14   They drop him in face first, and one of the jailers hits him

15   while he's unconscious.

16       Finally, they recognize he's not breathing.  Finally,

17   someone calls the EMTs.  Finally they come and there's no pulse,

18   there's no signal.  And they take him out.  He's dead.

19       That's what happened.  Who are we suing and why?  We're

20   suing Saline County for failing to provide medical care in their

21   jail, for emergency medical care.  There's not one person in

22   this room who will tell you that an inmate, a citizen, is not

23   entitled to emergency medical care, but every one of them will

24   tell you that day they didn't provide it.

25       They violated the constitutional rights, the county did, by

1   not providing medical care and relying on jailers who are not
2   competent to determine, evaluate, and protect the inmates under
3   their custody.
4        That has been a continuing practice.  The sheriff has been
5   to them on numerous occasions and asked them to provide the
6   medical care necessary.  He's told them that he can't do it,
7   that his men are doing their best they can, but they're not
8   competent and they do not provide it.  As of April 13, 2011,
9   there's no medical care in the jail.  That's why we're suing
10   Saline County.  They knew there was no medical.
11        They had civil suits filed against them, constitutional
12   suits just like this one, alleging they were not providing
13   medical care.  The Saline County Quorum Court knew it and they
14   did nothing.  That's why we're suing them.
15        We're suing the jail and the deputies and their supervisors
16   because they took this young man into custody, and they will
17   tell you they had an obligation to evaluate and not take him
18   into custody, send him to the hospital.  Just like someone who
19   has drank too much.  They tell you they have to do that.
20        Now, there are some photos that we'll show you right now to
21   demonstrate some of what I tell you.
22        Let's pull up 9.4.
23        This is the inside of the holding cell.  The man at the
24   door, facing the door, is Casey Babovec.  You can see that this
25   is at 4:29 and 44 seconds, at the very bottom in the middle

1    there.

2        All of these photos are timed to the second so that you can

3    watch them in sequence and you can see from the film what

4    happens.

5        4:31:06, No. 5, he's still at the door, still trying to get

6    help.

7        4:31, he's still trying to get help.  This is 9.6.

8        9.7, 4:31:52.  Casey is so affected that he pulls his shirt

9    off and wets it down, trying to keep the body temperature down.

10       Five o'clock and six seconds, No. 9.8.  There's one of the

11   jailers listening.

12       Finally, finally, 5 and 35, 9.9.  There's Casey at the door

13   again.

14       Finally they take him out, 5:03, they let him out and let

15   him change his pants.  This is the deputy that knows he's high,

16   knows he's in trouble, knows he's lost his balance, and knows

17   he's asked for help.  And they put him back on this bench.

18       You can see to the right of this picture, to the bottom

19   right, there's a little bench there.  I point that out to you

20   because one of our witnesses is sitting there, a witness who is

21   in jail, a witness who sat there and saw what happened.  We had

22   two civilians who were in the jail that day.  They're both going

23   to be here this afternoon to tell you what they heard.

24       I told you, they came to the door to pull Casey out.

25       9.08.

1      Now, in picture 9.11, do you see Casey in the picture on

2   his knees?  That's what's going to be shown to you.

3      9.12, 5:08, this is the beginning of the end.  Three of

4   them are there.

5      5:09.

6      5:09:26.  This is the beginning.  Do you see this picture

7   where you have five officers on top of this man?  This officer

8   coming in is Officer Reed.  Officer Reed is the one who comes

9   from all the way across the jail, and he jumps on Casey and he

10  starts trying to get him to do something when Casey can't move

11  his left arm.  This jailer starts tasing him over and over

12  again.

13     Finally, he loses consciousness.

14     Let's go to 9.16.

15     There's the scrum.  All of these jailers, all of them are

16  on top of this young man, all of them compressing his

17  cardiopulmonary system to the point where it overloads and he

18  dies.

19     The methamphetamine is a factor, but this medical examiner,

20  Charles Kokes, who is the chief examiner who evaluates him at

21  the autopsy, says methamphetamine did not kill this kid.  It was

22  a combination of police force, the trauma, this tasing, and most

23  of all the people laying on top of him which caused his system

24  to not be able to breathe.  Because his hands are behind him and

25  he's face down on the floor while they're on top of him.  A

Opening Statement/Plaintiff                    45

1    thousand pounds.

2        Now, go to nine.

3        There's Officer Reed still sitting on him.  He's

4    unconscious.  He's handcuffed.  There's nothing this young man

5    can do, and his last words before he went unconscious, you'll

6    hear today, were, "I'm not resisting.  I can't breathe."  He

7    yelled it and yelled it until he lost consciousness.

8        Officer Reed is sitting on him at 5:11:02.  That's the

9    time.

10       Officer Reed sitting at 5:11:34.  Still sitting on top of

11   him.

12       Officer Reed at 5:12:06, still sitting on top of him.

13       These are supervisors in the purple shirts.  They're

14   standing by.  They're not intervening.  They're not controlling

15   the jailers.  They are allowing this to occur right in their

16   presence.

17       5:12.  They decide Casey needs to be dragged to another

18   cell.

19       And 5 -- 9.22.  That's it.

20       There's Casey, the next one here, 9.23.  There's Casey

21   laying face down.  5:12:36.

22       5:12:42.  Look at his right hand.  Look at it closed.  Look

23   at Casey face down on the ground.  You make the decision.

24       It is until 5:14 -- go to 9.28.  Still on the ground, still

25   face down, still no care.  Still no help.

1      9.29.  Three officers standing there watching.  Nobody

2    doing anything.  This is not emergency medical care.  They have

3    rendered this man unconscious, and the proof will be, ladies and

4    gentlemen, that they knew it and that their rules require that

5    if they render a patient unconscious or one goes unconscious,

6    immediate emergency medical needs to be summoned, and they

7    don't.

8          Finally, at 5:24, outside help finally arrives at the jail.

9    This happens in 26 minutes.  Man goes to pleading on the floor

10   at the jail cell to dead in that period of time.  That's why

11   we're here today, ladies and gentlemen.

12         We are suing them because they failed to provide emergency

13   medical care before this event when they saw him in the cell,

14   when they knew his condition.  They did nothing to help or

15   protect this inmate, who couldn't call the doctor, who couldn't

16   help himself.  They will tell you he is under their control and

17   they have the obligation and they didn't.

18         So we're suing the jailers for not providing the medical.

19   We are suing the jailers because Casey's words were, "I'm not

20   resisting.  I can't breathe.  I can't get my breath."

21         That is not reasonable force.  And it is certainly not

22   reasonable force that once you render a patient unconscious

23   laying on the floor with his hands behind him to sit on his body

24   and continue to compress his pulmonary system until he dies.

25         And then we're suing them because they failed to provide

1    emergency care afterward.  Whatever had happened before,

2    whatever they want to tell you about this restraint, they

3    rendered him unconscious and they left him unconscious until he

4    died.

5          No human on earth can do that.  Police do not have the

6    right to do that.

7          As a result of all that weight on his body, Charles Kokes,

8    the medical examiner who will come this afternoon to tell us,

9    will tell you that pressing on it -- his cardiopulmonary system

10   is already excited by the drug.  They will tell you that when

11   they pound on him, when they land on him, when he struggled with

12   them, his system heats up, and he will tell you that when all of

13   that weight is on him and he can't breathe and he's trying to,

14   that he heats up to the point where his heart stops.

15         So it's clear to me that the failure to provide medical

16   care when the man is placed into the jail is a cause of this

17   accident or this death.  It is clear to me, and I hope clear to

18   you at the end of the case, that the use of force in this

19   circumstance was way over the top, especially after they had him

20   restrained, and they are responsible for the force.  It is clear

21   to me that no human is not entitled to emergency medical care

22   when he's rendered unconscious by six police officers.

23         Now, before we came here today, we had to prove to

24   ourselves and to Ms. Cruz that I had a case that we could

25   sustain, that we could show that her son did not die of

1    methamphetamine.  And we got the medical examiner to help us.

2    He will tell you -- I asked him this question specifically:

3    "Was methamphetamine the cause of his death?"

4         He said, "No."  And he'll tell you that.  No.

5         "Did the struggle and the weight up on top of him cause his

6    death?"

7         And he will tell you yes.

8         They want to talk about the meth.  Meth is a terrible

9    thing.  This young man made a terrible mistake.  He panicked and

10   he did something he should not have done.  But it does not mean

11   he should have died.

12        What can this jury do about it?  This jury can hear the

13   facts and hold these people accountable for their acts.  You can

14   hold Saline County responsible for the practice and pattern of

15   not providing emergency medical care at the jail.  You can hold

16   the officers responsible for not providing medical care to an

17   inmate that they had complete control of and they knew was in

18   trouble and did nothing but taunt and laugh at this guy.

19        And you can hold them responsible for excessive force when

20   you look at the video and see the amount of force used and how

21   unreasonable it was under the circumstances.

22        And you can hold them responsible and have them be

23   accountable for not providing the medical care at the end of

24   this man's life that might have saved him.

25        All of it has to be proved by a preponderance of the

1    evidence.  There's no case where the facts are just straight.

2    That's not the way it works.  The end of the case, you'll have

3    to decide by a preponderance of the evidence, is it more likely

4    true than not true that the methamphetamine would have killed

5    him?

6         Is it more likely true than not that medical care should

7    have been provided?

8         Is it more likely true than not that they should not have

9    used that force?

10        Is it more likely true than not that they should have

11   gotten him the medical care he needed when they rendered him

12   unconscious?

13        We ask you, ladies and gentlemen, to listen to this case

14   and to hold the county, the officers, and the sheriff

15   accountable for an unnecessary death.

16             THE COURT:  Mr. Ellis, you may proceed when you're

17   ready.

18             MR. ELLIS:  May it please the Court.

19        I want you to remember that word throughout this trial:

20   Accountable, accountable.  Now, after all of that, all of that

21   bluster, and all of that carrying on, here's what happened:

22   Mr. Babovec was picked up on April 13, 2011, at a traffic stop.

23   He had an outstanding warrant.  They wanted to give him a

24   chemical test.  He refused that, so they wrote him a ticket for

25   that.

1        But, now, Mr. Babovec, the proof is going to be, ladies and

2    gentlemen, was a seasoned veteran with respect to

3    methamphetamines, and I've got to tell you, it cuts my guts out

4    to have to tell you that in front of his mother.  She's lost her

5    boy.  I don't care -- she's lost her boy.  I don't care what --

6    he'd been to prison, but she still lost her boy.  Sympathy.

7    Judge Baker has already told you in your instructions, you took

8    a vow, an oath.  Sympathy will not influence your verdict.

9        But I've got to tell you, it's hard.  It will be hard in

10   that deliberation room because sympathy does enter into my

11   thinking in this case.  But you're just going to have to steel

12   your heart.  You're going to have to make a decision consistent

13   on facts and the evidence and on what her Honor tells you the

14   law is.

15       Now, with that said, here's what happened:  He's picked up

16   and he is taken to jail.  I told you there was an outstanding

17   warrant.  At some point, Mr. Swindoll didn't tell you this, he

18   apparently must not have wanted to get caught holding

19   methamphetamine because he ingested it, swallowed it, two

20   plastic containers of meth.

21       We know that because, again, I hate to bring this up in

22   front of his mother, the autopsy showed it.  We've got the

23   pictures.  I hope it's not necessary to bring them out, but the

24   autopsy showed that he had two -- that the doctor when he did

25   the autopsy, the pathologist had these plastic containers that

1   had ruptured.  At some point they had ruptured.  When, we don't

2   know, but at some point in the afternoon, that had happened.

3        Now, at some point also, he was put in Cell No. 1.

4        And at some point, he -- there's no nice way to say this.

5   He went to the bathroom in his pants.  Okay?  Urinated or

6   defecated or both.  And there was apparently some concern by the

7   others, eight or ten in the room, all men, that he be taken to

8   change his pants.

9        Now, this gentleman seated right over here -- raise your

10  hand, Dion.  Dion McGuire came and got him and took him to

11  shower.  His testimony will be -- we know what he's going to

12  say.  They've taken his deposition.  He used the word "happy."

13  He was okay.  He was obviously high, but he was not in acute

14  distress.

15       Now, this word "high," let's talk about that.  The other

16  jailers and jail administrators will also tell you that --

17  Mr. Richards, where are you?  Raise your hand.  He was a jail

18  sergeant at the time.

19       His testimony will be that about half or more of the people

20  who come through that jail on any one day have been drinking or

21  using drugs.  That doesn't mean they are in an acute state.

22  That's important.  And no doctor will be in here to tell you

23  anything different.

24       And so Dion takes him down.  Mr. McKinney -- raise your

25  hand -- went with him.  They showered him, gave him some clean

1    pants to wear, and took him back to Cell No. 1.  And then a

2    curious thing happened.  We don't know whether it was a racial

3    thing or why, probably the gentleman might have said something

4    about how stinky he was.  But as soon as he was put in Cell No.

5    1, it's on the tape, Babovec walks up to a large

6    African-American male and cold-cocks him.

7         Again, probably he had said something.

8         Now, at that point Dion had just put him in the cell, and

9    he backs up, and you'll see in the photographs that the booking

10   counter is about as far maybe from that cell door as that table

11   over there, and he goes back and someone at the counter is

12   looking at the monitor in front of her and says, "Come here and

13   look at this."  And it was that fight.

14        So Dion then and Ms. Shelnutt -- raise your hand -- and

15   Ms. Shelnutt and maybe a third person, I'm not sure, they rush

16   to the door and get him.

17        At this point, the proof will be, and all of them will tell

18   you this, there was a fight that had broken out.  Now, you know

19   this:  Fistfights break out in jail every day.  Pulaski County

20   Jail has, I don't know, a thousand folks down there.  It's two-

21   thirty, they've probably had three or four by now.  Something

22   about jails.  They have fights.

23        They have a duty, had a duty to Mr. Babovec to get him out

24   of there before this gentleman beat him up.  And they had a duty

25   to this gentleman to keep Mr. Babovec off of him.  And so they

1   got him out.

2        Well, that's not the end of the story.  Before we go any

3   further, let's look at the timeline.  Because in the aftermath

4   of all of this, Mr. McKinney prepared for Sergeant Richards a

5   timeline, and I think it's probably the same timeline that

6   Mr. Swindoll was talking about.

7        The fight broke out at 5:08 and 45 seconds.  Officer

8   McGuire, along with Shelnutt, we know -- by the way, she's

9   married and her name is Hunt, but we're going to call her

10  Ms. Shelnutt because of the record.  We'll not know who Ms. Hunt

11  is.  All right.  At 5:09:02, that's 17 seconds later, Officer

12  McGuire got him out of there, started bringing him out.

13       At 5:12, three minutes later, Babovec was placed into Cell

14  No. 5.  That's three minutes later.

15       Now, between that time, what happened?  Here's what the

16  proof is going to be:  They got him out and they had to cuff

17  him.  This guy was a danger to himself, to other inmates, and to

18  the jail staff.  This guy had to be cuffed.

19       Well, that wasn't going to happen as far as he was

20  concerned, and he fought back.  He was incredibly strong.

21       So they got him to the floor quickly.  And I don't

22  remember -- I don't remember who had which arm.  Someone had one

23  leg and somebody else had the other.  Ms. Shelnutt had one of

24  the legs, holding him down.  It was kind of a four-point.  Two

25  others had the arms, and someone was on top of him, and he was

1    not -- the proof will be that he was not asphyxiated.  They made

2    that up, just made it up.

3         Now, he was so strong that Ms. Shelnutt will tell you, as

4    he was lying on his front, he could lift them up with his leg

5    behind him.  That's how strong he was, and that's the difficulty

6    they had with getting him cuffed.

7         Now, what -- I want you to think about this as you hear the

8    proof.  What was their alternative?  That's going to be an

9    important part of the proof.  Just stand back and let him run

10   wild?  Let him jump the counter, beat up a couple of women

11   working back there?  Of course not.  He had to be restrained.

12        So in the matter of about three minutes, they get him into

13   Cell No. 5 by himself, and he is still breathing.  He's still

14   snoring, is one of the terms that somebody used.  He's still

15   breathing.  So he hasn't suffocated.  There's been no

16   asphyxiation at that point.  Again, they made that up out of

17   whole cloth, and they know they did.

18        Now, let's continue with this timeline.  He's in Holding

19   Cell 5 at 5:12 and 30 seconds.  At 5:16 is when Corporal

20   Parker -- raise your -- thank you.  Corporal Parker noticed that

21   Babovec wasn't breathing.  She didn't find a pulse.  She looked

22   for a pulse.

23        By then, Richards was on the scene, he had gone up to his

24   office for a minute and he had come back, just a minute or two,

25   and then he immediately said, "Call 911," and they started CPR.

1       Now, I think the proof is going to be that Officer Reed --

2    raise your hand, Officer Reed -- Officer Reed never hit anybody.

3    He was trying to turn Babovec over to put him up on his side.

4    That's what they do.  They want them on their side in case -- in

5    case they vomit, which he did.  And he pulled him, and his hand

6    slipped off of the shoulder of Mr. Babovec, and that's why his

7    hand is up like that.

8       You'll be able to see what I'm talking about if you see the

9    tape, and I think you will.

10      Now, if they want to make something of these folks, if they

11   just didn't care, if you come with me to Cell 5 and watch the

12   proof as it unfolds, you watch Ms. Parker on her hands and knees

13   giving CPR.  And as you see that tape, you watch, you watch

14   Mr. Reed giving CPR in a face full of vomit.  Those are those

15   uncaring officers that Mr. Swindoll wants you to figure out

16   there.  A face full of vomit.

17      So they came, 911 came, first responders, bring the

18   paramedics, and they roll him out.

19      So what did the medical examiner say?  The cause was

20   methamphetamine intoxication and the contributing factors were

21   struggle and exertion.  That's what the medical examiner said.

22   They can't change that.  It's in black and white, in the report.

23   It's going to be Defendants' Exhibit No. 2.

24      Methamphetamine, contributing factor, struggle and

25   exertion.  Whose struggle?  Whose struggle?  Mr. Babovec.  He

1    was the one struggling.  He's the one who didn't want to be

2    cuffed.  He's the one who was trying to get these people off of

3    him.

4         Now, it's not unusual, by the way -- I've got a note here,

5    I asked Sergeant Richards, Lieutenant Richards now, Sergeant

6    Richards:  "How often do people come into that jail and urinate

7    or defecate on themselves?"

8         You know what he said, you know what he'll say from the

9    witness stand?

10        "One every shift."

11        That was no notice to anybody with regard to an acute

12   situation that needed emergency medical care.  That's what the

13   proof's going to be in this case.

14        Now, finally, I want you to think about this word,

15   Mr. Swindoll's word, not mine.  He and I have known each other

16   for 30 years, we're friends.  I want you to think about his

17   word:  Accountability.  Accountable.  What killed Mr. Babovec?

18   What killed Mister -- it didn't have anything to do with

19   something that went on over at the Quorum Court in 2008.  Had

20   nothing to do with it.  If they'd had proof -- the proof will be

21   if they'd had a Mayo Clinic wing in the back of that jail, that

22   five minutes or so that I just described would have turned out

23   just to be the same.

24        He was killed by his own decision to evade arrest by

25   ingesting methamphetamine and it went south on him.  He

1    obviously was going to try to pass the thing, and I guess they

2    do that.  It went south on him.  It ruptured.

3          He struggled, and that exacerbated the problem.

4          And, by the way, Ms. Shelnutt will tell you, she was on

5    duty, and when they opened that door -- and I think Dion will

6    tell you the same thing -- to get him out of there thinking they

7    were helping him, he never uttered one single solitary word from

8    there all the way to Cell No. 5, to his death.

9          He never said, "I can't breathe."  And he sure never said,

10   "I'm not resisting."  In fact, I'll bet you we can find if we

11   look close enough on Mr. McGuire the scar that he left when he

12   bit him when they were trying to get him cuffed.  And he

13   wouldn't cooperate.  He would not submit to arrest.  That's what

14   killed him.  Remember the word "accountable" as you hear this

15   proof.

16         It will steel your heart.  I know it's hard as she sits

17   there and looks at you.  I can't even look her in the eye.  I

18   feel so sorry for her.  We all do.  But that's not what

19   courtrooms are about.  That's not what trials are about.  That's

20   not what evidence is about.  That's not what testimony is about.

21   And that's not what accountability is about.

22         At the conclusion of this case, I'll ask that you return a

23   verdict for the defendants.

24         Thank you.

25              THE COURT:  The first witness for the plaintiff.

1           MR. SWINDOLL:  Carolyn Voiles.

2       **CAROLYN VOILES, PLAINTIFF'S WITNESS, DULY SWORN**

3                     DIRECT EXAMINATION

4    BY MR. SWINDOLL:

5    Q.   Carolyn, give us your full name, please.

6    A.   Carolyn Anne Voiles.

7    Q.   Carolyn Voiles, were you in jail on April 13, 2011?

8    A.   Yes, sir.

9    Q.   I know you'll be asked about it later.  Tell the jury why

10   you were in jail.

11   A.   I stole something from Wal-Mart and was caught.

12   Q.   Were you already in jail or were you just being put into

13   the jail?

14   A.   I was being processed into the jail.

15   Q.   So that would have been about what time in the afternoon?

16   A.   Five something, I believe.

17   Q.   And were you standing there when Casey Babovec was taken

18   from Cell No. 1?  Did you see this?

19   A.   Yes, sir.

20         (Video playing.)

21           MR. SWINDOLL:  Now stop it right there.

22   BY MR. SWINDOLL:

23   Q.   Now, to me, that is you over in the very far left corner in

24   this picture; is that correct?

25   A.   Yes, sir.

1    Q.    So you're in a position to see this happen.

2    A.    Yes, sir.

3    Q.    Can you hear what is happening, Carolyn?

4    A.    Yes, sir.

5    Q.    Tell us in your own words what you saw happen.

6    A.    When they went to the door, he looked like when they pulled

7    him up, he was on his knees, and he was hollering, "I can't

8    breathe, I can't breathe," and he kept clutching at his arm.

9    Q.    Clutching which arm?

10   A.    I don't remember which arm.  I --

11   Q.    You mean clutching at his arm, like this [indicating]?

12   A.    Yeah, like he was trying to get his arm.

13   Q.    What happened next?

14   A.    He kept hollering, "I can't breathe, I can't breathe," and

15   they pulled him to the ground, wrestled with him for a while.

16         After they was wrestling with him, one of them was kneeling

17   on him.  They tased him.  I don't remember if they tased him

18   before or after he was on the ground.  I don't remember that.  I

19   think it was before.

20         Then after they got him under control, handcuffed him, and

21   then they drug him into the other room and they placed me in

22   another room.

23   Q.    Now, let's just looking at the film.  You have one there,

24   so tell us --

25         (Video playing.)

1              MR. SWINDOLL:  Stop.

2    BY MR. SWINDOLL:

3    Q.   Who is that that came running?

4    A.   I don't remember his name, but it was one of the gentlemen,

5    police officers there, and he was kneeling on his -- on him.

6              MR. SWINDOLL:  Go ahead.

7         (Video playing.)

8              MR. SWINDOLL:  Stop.

9    BY MR. SWINDOLL:

10   Q.   Now, you're sitting there and you see -- is one officer

11   still on top of Mr. Babovec?

12   A.   Yes, sir.

13   Q.   And that's what you meant when you said kneeling on him?

14   A.   Yes, sir.

15   Q.   How long did he kneel on him?

16   A.   A minute or two.  I don't remember exactly how long.

17        (Video playing.)

18             MR. SWINDOLL:  Stop.

19        Go ahead.

20        Stop.

21   BY MR. SWINDOLL:

22   Q.   We just saw the officer.  Was he talking to people when he

23   was kneeling on him?

24   A.   Yes.

25   Q.   What was he saying?

Voiles - Direct                                61

1    A.    Talking about how the man had went to the bathroom on

2    himself and then calling him names.

3    Q.    What kind of names were they calling him?

4    A.    I don't remember exactly.  One of them just had asked him

5    how come he couldn't take care of himself, how come he had shit

6    himself.  I'm sorry.  Excuse my language, but that's the words

7    he used.

8    Q.    Were these legitimate questions or were they taunts?  What

9    were they?

10   A.    It sounded more like they were joking around, laughing.  It

11   wasn't a serious statement like he just used the restroom on

12   himself and we need to get him cleaned up or anything like that.

13         (Video playing.)

14             MR. SWINDOLL:   Okay.  Now you can stop it.

15   BY MR. SWINDOLL:

16   Q.    At this point he's got his hands behind him.  They've got

17   him locked in handcuffs, face down.

18   A.    Yes, sir.  Yes, sir.

19   Q.    Now, has he quit talking yet?

20   A.    Yes.

21         (Video playing.)

22   BY MR. SWINDOLL:

23   Q.    What was the last thing you heard Casey Babovec say?

24   A.    "I'm not resisting.  I can't breathe."

25   Q.    He said that?

1    A.    Yes, sir.

2    Q.    That was out loud?

3    A.    Yes, sir.

4    Q.    Loud enough for you to hear over here in the corner over

5    here?

6    A.    Yes, sir.

7    Q.    And you heard him say that?  You could hear it way over

8    there?

9    A.    Yes, sir.  Yes, sir.

10   Q.    What is Officer Reed doing then?  Could you see?

11   A.    I could see him kneeling on him.  I didn't see what he was

12   doing with his hands or anything like that.  I just know they

13   was messing with him.

14         (Video playing.)

15   BY MR. SWINDOLL:

16   Q.    Did they roll him on his side?  Is this showing you?  Do

17   you remember that?

18   A.    I don't remember that.  I do remember them just dragging

19   him by his feet into the cell.

20              MR. SWINDOLL:  Stop.

21   BY MR. SWINDOLL:

22   Q.    At that point, you couldn't see him anymore; right?

23   A.    No, sir.

24   Q.    You said he hadn't been able to speak; right?

25   A.    Right.

Voiles - Direct                                                63

```
 1   Q.   And that his last words -- you told us what those were.
 2   A.   Yes, sir.
 3   Q.   Is that true?
 4   A.   Yes, sir.
 5   Q.   Now, you gave a statement before you talked to me after
 6   this, didn't you?
 7   A.   Yes, sir.
 8   Q.   And did you tell them everything that you just told us in
 9   the statement?
10   A.   No, sir.
11   Q.   Tell the jury why not.
12   A.   I was scared it was going to happen to me, and I have five
13   children and nine grandchildren, and it was my first time being
14   in jail.
15   Q.   You were actually scared that if you told the people who
16   were investigating what happened what you saw --
17   A.   Yes, sir.
18   Q.   -- that you would get in trouble?
19   A.   Yes, sir.
20   Q.   Are you telling the truth today?
21   A.   Yes, sir.
22   Q.   Now, you were shoplifting; right?
23   A.   Yes, sir.
24   Q.   Is that your first time as well?
25   A.   Yes, sir.
```

Voiles - Cross                                    64

1    Q.   Everything that you've told us, you saw that day?

2    A.   Yes, sir.

3    Q.   Everything that you heard, you let the jury know?

4    A.   Yes, sir.

5         MR. SWINDOLL:  Thank you.  No more questions.

6         THE COURT:  Cross-examination?

7                    CROSS-EXAMINATION

8    BY MR. ELLIS:

9    Q.   Ms. Voiles, I'm George Ellis.  I represent these

10   defendants.

11        It's not my purpose to embarrass you.  Okay?

12   A.   Yes, sir.

13   Q.   But I've got to ask you some questions.

14   A.   Yes, sir.

15   Q.   Now, what were you there for?

16   A.   For stealing from Wal-Mart.  For stealing from Wal-Mart.

17   Q.   Stealing from Wal-Mart.

18   A.   Yes, sir.

19   Q.   What did you steal?

20   A.   Some DVDs.

21   Q.   Some what?

22   A.   DVDs.

23   Q.   DVDs.  Okay.  But that's not the first time you were in

24   trouble, is it?

25   A.   Yes, sir.

1   Q.   That's the first time you'd ever been in trouble in your

2   life?  You think about that.

3   A.   No.  I was in trouble in St. Louis years and years ago, but

4   there was no charges filed.

5   Q.   Now, the statement that you gave earlier, it's your

6   testimony that you were afraid that they'd do something to you?

7   A.   Yes, sir.

8   Q.   That the sheriff's department would do something to you?

9   A.   While I was in jail, yes, sir.

10   Q.   How long were you in jail?

11   A.   I had just gotten there, but I have children that was in --

12   who are in jail and have been harassed by prison guards, so I

13   had heard stories from them of what could happen.

14   Q.   There are ten of them over here.  Can you point to one of

15   them that harassed you?

16   A.   None.

17   Q.   You can't?

18   A.   No.

19   Q.   Well, that was kind of a traumatic experience in your life,

20   wasn't it?  That's something I think I'd remember.

21   A.   It had not happened when I got to the jail.  I had not been

22   there before that.

23   Q.   I understand.  There was Ms. Shelnutt right there in the

24   front.  She was the booking officer.  Was she harassing you?

25   A.   No, sir.

1    Q.    Anybody else?

2    A.    No, sir.

3    Q.    Now, you were concerned that --

4          MR. ELLIS:  You knew I was going to have to ask for

5    help, didn't you, on this.  How do you turn it on?

6          THE COURT:  It will take a second to reset.

7          MR. ELLIS:  Don't laugh at me.

8          THE COURT:  Ms. Voiles, can you see it on your screen?

9          THE WITNESS:  Yes, ma'am.

10         MR. ELLIS:  Is it on y'all's screen?  On everybody

11   else's screen?

12         THE COURT:  It is now.

13         MR. ELLIS:  Okay.  Good.  Now we'll go on.

14   I should have come up here before and -- I want to make

15   this bigger.  Here we go.  Look at this.  Look at me.

16   BY MR. ELLIS:

17   Q.    Now, this is the statement that you gave that you were

18   concerned and afraid about; right?

19   A.    Yes, sir.

20   Q.    But this isn't to the sheriff's department, is it?

21   A.    No, sir.

22   Q.    Who is it to, Ms. Voiles?

23   A.    I think it was internal affairs, something like that.  Some

24   other police department.

25   Q.    No, it's not.  It was to a special agent of the Arkansas

1   State Police.

2   A.    I don't know what they were called, but yes, sir.

3   Q.    You weren't afraid of the state police, were you?

4   A.    It was still in the same jail, so yes, sir.

5   Q.    Did they interview you in the jail?

6   A.    Yes, sir.  They took me to a different room, away from all

7   the other inmates, but yes, sir.

8   Q.    They interviewed you at the sheriff's office.  Okay.

9         Well, let's see what you said here.  Maybe I can make it

10  work.  I can just barely run a word processor.

11        Okay.  It says that the officers had him go change clothes.

12  Is that your statement?

13  A.    Yes, sir.

14  Q.    "Voiles stated that after Babovec changed clothes, he was

15  put back in the holding cell."

16        Is that a true statement?

17  A.    Yes, sir.

18  Q.    "Voiles stated that shortly after Babovec was put back into

19  the holding cell, an officer watching the monitors stated that a

20  fight was occurring in the booking cell."

21        Is that a true statement?

22  A.    Yes, sir.

23  Q.    "Voiles stated that when the officers went to open the

24  door, Babovec charged the officers."

25        Is that a true statement?

1    A.    No, sir.

2    Q.    Ma'am?

3    A.    No, sir.

4    Q.    That's not a true statement?

5    A.    No, sir.

6    Q.    That's what I saw on the video.  Did you not see it?

7    A.    No, sir.

8    Q.    Okay.  "Voiles stated that when the officers went to

9    open --" okay.  I read that.

10        "Voiles stated that the officers grabbed Babovec and tried

11   to control him."

12        Is that a true statement?

13   A.    After they pulled him up off the ground and he kept

14   hollering about his arm, yes, sir.

15   Q.    Speak up a little bit.

16   A.    When they pulled him up out of the cell, yes, sir.  They

17   pulled him up out of the cell and he was hollering about his

18   arm.  Yes, sir.

19   Q.    Hollering about his --

20   A.    Arm, and he couldn't breathe.

21   Q.    Okay.  Is that anywhere in here?

22   A.    No, sir.

23   Q.    Okay.  "Voiles stated that Babovec started fighting the

24   officers.  Voiles stated that the officers took Babovec to the

25   ground."

1        Is that a true statement?

2   A.   No, sir.

3   Q.   That's not true?

4   A.   It depends on how you look at it.  It wasn't like he was

5   trying to resist them.  He was trying to tell them that he

6   couldn't breathe.  That's why he kept trying to grab at his arm.

7   Q.   Ms. Voiles, you know good and well he bit one of the

8   officers, didn't he?

9   A.   I don't know about that.

10  Q.   Did you not know about that?

11  A.   No, sir.

12  Q.   Oh, okay.

13       "Voiles stated that Babovec was still fighting.  Other

14  officers had to assist."

15       Is that a true statement?

16  A.   There was other officers that assisted.  He wasn't

17  resisting.  He was already on the ground.

18  Q.   "Voiles stated that once Babovec was under control,

19  officers placed him in another cell."

20       That's a true statement, isn't it?

21  A.   Yes.  They drug him.

22            MR. ELLIS:  I'm trying, your Honor.

23  BY MR. ELLIS:

24  Q.   "Voiles stated that after Babovec was put in the other

25  cell, officers started running out asking for knives and

1    scissors."

2        What's that about?

3    A.   I don't know.  I don't know.  I don't recall saying that,

4    sir.

5    Q.   Do you know why they were wanting knives and scissors?

6    A.   If they was wanting anything, I would assume it was because

7    he was having problems breathing or he was needing help.

8    Q.   Knives and scissors.  Okay.

9        "Voiles stated that she was moved to another location after

10   the officers requested medical attention."

11       Is that a true statement?

12   A.   Yes, sir.

13   Q.   Okay.  Now, this last paragraph I find really interesting,

14   Ms. Voiles.

15       "Voiles stated that she was familiar with the effects and

16   symptoms of drug users."

17       How are you familiar with that?

18   A.   I have children who have used drugs.

19   Q.   You've used drugs, haven't you?

20   A.   No, sir.  My children have used drugs.

21   Q.   Oh, but did they tell you what the effects were?  Is that

22   how you learned?

23   A.   No, I seen them when they went into the hospital and when

24   they've been put in jail.

25   Q.   All right.  "Voiles stated that by the way Babovec was

1    behaving, he was high on some type of drug."

2         Is that a true statement?

3    A.   I don't recall saying that, sir.

4    Q.   You don't recall saying it?

5    A.   No, sir.

6    Q.   Is it a true statement?

7    A.   That I know what the symptoms are?

8    Q.   I'll read it again.

9         "Voiles stated that by the way Babovec was behaving, he was

10   high on some type of drug."

11   A.   No, sir.  I don't believe that that's how he was acting.

12   He was saying he couldn't breathe.

13   Q.   "Voiles stated that Babovec was looking to fight someone."

14        Is that a true statement?

15   A.   No, sir.

16   Q.   But you said it.

17   A.   Yes, sir.  I might have.  I don't recall saying it.

18   Q.   "Voiles stated that Babovec was aggressive and out of

19   control."

20        Did you tell this special agent of the Arkansas State

21   Police that?

22   A.   I don't recall saying that, no, sir.

23   Q.   You don't remember saying that?

24   A.   No, sir, I don't.

25   Q.   Would you have any idea why he might put that down on

1  paper?

2  A.    I might have said that at that time because I was scared.

3  Q.    Oh, you don't remember saying it, but if you did say it,

4  you were scared?

5  A.    Yes, sir.

6  Q.    Of the Arkansas State Police Special Agent Dexter Holmes,

7  Badge 261?

8  A.    Yes, sir.

9  Q.    Tell us again why you were scared.

10  A.    My first time in jail, and by the things I'd heard from my

11  children about what goes on in jail, how the prisoners are

12  treated, and what I had just witnessed.

13  Q.    Is there anything in this statement right here, Ms. Voiles,

14  that you think might have gotten you in trouble with the

15  Arkansas State Police?

16  A.    In that statement?

17  Q.    Yeah.

18  A.    No.

19  Q.    In this one that we just read.

20  A.    No, sir.

21  Q.    I don't think so either.

22          MR. ELLIS:   Thank you.  Pass the witness.

23                       REDIRECT EXAMINATION

24  BY MR. SWINDOLL:

25  Q.    Ms. Voiles, who was standing outside the room while that

Voiles - Redirect

1   statement was being taken?

2   A.   Two of the officers from the --

3   Q.   One of these officers over here?

4   A.   Yes, sir.

5   Q.   Were two of them standing outside the room?

6   A.   Yes, sir.

7   Q.   You didn't sign that statement, did you?

8   A.   Not that I recall.  No, sir.

9   Q.   I didn't see a signature on it.  You never saw that

10  statement, did you?

11  A.   No, sir.  No, sir.

12  Q.   Let me understand what you're trying to tell us.  You're

13  trying to tell us that you were interviewed after you saw

14  someone die in the jail?

15  A.   Yes, sir.

16  Q.   You had a history of knowing that these jailers might do

17  something because your sons had had bad experiences?

18  A.   Yes, sir.

19  Q.   Two of the officers were standing outside the room while

20  the officer is interrogating you?

21  A.   Yes, sir.

22  Q.   Does the officer ask about Casey or does he ask about the

23  other officers?

24  A.   He asked -- he kept asking about what the other officers

25  had done, did I feel that they had done anything wrong and stuff

 1   like that.  He didn't --

 2   Q.   Did he ever ask you if Casey was yelling he couldn't

 3   breathe?

 4   A.   No, sir.

 5   Q.   And it was because you were scared you didn't feel

 6   comfortable describing to that officer what you'd seen?

 7   A.   Yes, sir.

 8          MR. SWINDOLL:  Thank you.

 9                    RECROSS-EXAMINATION

10   BY MR. ELLIS:

11   Q.   And this statement was taken approximately two days after

12   the event, wasn't it?

13   A.   Yes, sir.

14   Q.   You'd been in there two days.

15   A.   I guess so, yes, sir.  I think it was the next day.

16   Actually, I don't remember exactly when it was.

17   Q.   And nowhere in this statement does it reflect that Casey

18   Babovec said anything to anybody.

19   A.   No, sir.

20          MR. ELLIS:  Thank you.

21          MR. SWINDOLL:  Thank you, your Honor.  No more

22   questions of this witness.

23          THE COURT:  May this witness be excused?

24          MR. SWINDOLL:  Yes, your Honor.

25          MR. ELLIS:  Yes.

1          THE COURT:  You may step down and be excused.  Thank

2     you.

3          MR. SWINDOLL:  Let me see if Dr. Kokes is here.

4          MR. ELLIS:  Your Honor, can we take about a five-

5     minute break?  Would that be okay?

6          THE COURT:  Certainly.  Ladies and gentlemen, we're

7     going to take a five-minute break.

8          During this recess and every other recess, do not discuss

9     this case among yourselves or with anyone else, including your

10    family and friends.  Do not allow anyone to discuss the case

11    with you or within your hearing.

12         Do not discuss also means do not e-mail, send text

13    messages, blog, or engage in any other form of written, oral, or

14    electronic communication, as I instructed you before.

15         Do not read any newspaper or other written account, watch

16    any televised account, or listen to any radio program on the

17    subject of this trial.

18         Do not conduct any internet research or consult with any

19    other sources about the case, people involved in the case, or

20    its general subject matter.

21         You must keep your mind open and free of outside

22    information.  Only in this way will you be able to decide the

23    case fairly based solely on the evidence and my instructions on

24    the law.  If you decide this case on anything else, you will

25    have done an injustice.  It's important that you follow these

1    instructions.

2        It's now about 3:07.  We'll call it 3:10.  We'll go ahead

3    and take our afternoon break at this point and we'll stand in

4    recess for 15 minutes.  Let's come back on the record at 3:25,

5    if we'll be ready to come back in the box at 3:25.

6        Please rise.

7        (Jury exited the courtroom.)

8            THE COURT:  We'll stand in recess and we'll come back

9    a little early to see if we have anything to take up.  You all

10   may stand in recess until about 3:20.

11       (Recess at 3:09 p.m.)

12                   REPORTER'S CERTIFICATE

13       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

14

15                              Date:  November 5, 2015
     /s/ Christa R. Jacimore, RDR, CRR, CCR
16       United States Court Reporter

17

18

19

20

21

22

23

24

25

1          (Proceedings continuing at 3:23 p.m.; jury not present.)

2               THE COURT:  Is there anything we need to take up

3     before we put the jury back in the box, Mr. Swindoll?

4               MR. SWINDOLL:  Not for the plaintiff.

5               THE COURT:  Mr. Ellis?

6               MR. ELLIS:  No.

7               THE COURT:  Let's put our jury in the box.

8          (Jury present.)

9               THE COURT:  You may call your next witness.

10              MR. SWINDOLL:  Your Honor, we would call Dr. Charles

11    Kokes.

12         **CHARLES KOKES, PLAINTIFF'S WITNESS, DULY SWORN**

13                        DIRECT EXAMINATION

14    BY MR. SWINDOLL:

15    Q.   Could you give us your full name, please.

16    A.   Charles Paul Kokes, K-o-k-e-s.

17    Q.   Dr. Kokes, how are you employed?

18    A.   I am the state medical examiner for the State of Arkansas.

19    My place of employment is the state crime laboratory here in

20    Little Rock.

21    Q.   And how long have you been a medical examiner in the State

22    of Arkansas?

23    A.   I've been here working in Arkansas as a medical examiner

24    since 1993.

25    Q.   How long have you been in this field?

1   A.    As of this spring, it will be 30 years.

2   Q.    Tell us about how one becomes a forensic pathologist and

3   works for the state crime lab.

4   A.    Forensic pathology is a subspecialty area in the general

5   field of pathology.  To become a pathologist, one must first be

6   a medical doctor.  And I received my medical degree from the

7   University of Washington, 1980.  You then have to go on to do

8   specialty training in the field of pathology, which I did from

9   1981 to 1985 in California.  When one has finished their general

10  pathology training, then you can do subspecialty training in the

11  field of forensic pathology, which I did in California from 1985

12  to 1986.  And since completion of my formal training in forensic

13  pathology, I work full time as a forensic pathologist.

14  Q.    Tell us what a forensic pathologist does at the state crime

15  lab.

16  A.    At the state crime laboratory, myself and my associates

17  perform postmortem examinations, usually autopsies, on the

18  bodies of individuals who have died under unusual or suspicious

19  circumstances.  Some of these cases ultimately turn out to be

20  homicides.  Most do not.

21        An autopsy is a three-part process, where the first part

22  consists of an external examination of the body, where you look

23  for anything on the surface that may be relevant to the death.

24  That's followed by the part that everyone associates with the

25  word "autopsy," which is the internal examination, where

1    incisions are made on the trunk and head in order to expose and

2    remove the internal organs so that they can be examined, the

3    point being you look at these for evidence of injury or disease.

4    And the third part is any additional scientific testing or

5    investigation that needs to be considered before an ultimate

6    determination is made regarding the cause of death.

7        When we do examinations, we're not just trying to determine

8    the cause of death, although that is our main goal.  What we're

9    also trying to do, in a broader sense, is make findings that may

10   have relevance to an overall death investigation.  There may be,

11   for example, an injury on a body that really had nothing to do

12   with the death per se, but it may have larger relevance as far

13   as what happened at the time of death.

14       And when we finish all of our examination process and

15   consideration of additional findings, we compile those together

16   in the form of a report, which is given to the prosecutor and

17   coroner in the county where the case came from.

18   Q.   Thank you.  Now, in April of 2011, April 13, or shortly

19   thereafter, did you and your associates receive the body of

20   Casey Babovec?

21   A.   We did.

22   Q.   And this procedure that you discussed, an external

23   examination, an internal examination, and the scientific

24   examination were conducted on this young man?

25   A.   Yes, it was.

1    Q.    Now, at the time Casey was 30 years old.  Is that right?

2    A.    Yes, sir.

3    Q.    Now, let's start with the external examination if we can.

4    I'm looking at a page of your autopsy here.  Let's see if we can

5    pull it up.  Okay.  Right there.  Now, do you see the first page

6    of this, you have the external examination.  I have the second

7    page saying "head and neck."  But there's a part up here which

8    talks about hemorrhages, petechial hemorrhage, at the very top.

9    A.    Yes, sir.  I see that.

10   Q.    What is a petechial hemorrhage that you found on this young

11   man?

12   A.    Well, it's pronounced "petechial" hemorrhage.  And it's a

13   punctate or very small area of bleeding into the tissues,

14   usually on the surface of the eyes, inner surfaces of the

15   eyelids, sometimes on the inner surfaces of the lips.  It looks

16   just like if you took a very fine-tip Sharpie pen and made dots

17   with it.  That's kind of what it looks like.

18   Q.    And what is it caused from?

19   A.    There are a number of potential causes for petechial

20   hemorrhages.  The general overlying cause, the thing that causes

21   it in general, is increased pressure in the venous system or the

22   vein system.  And beyond that, you can see it in the context of,

23   for example, someone with severe congestive heart failure or

24   certain types of asphyxial death.

25   Q.    Asphyxial death, I want you to focus with me for a moment

1   on asphyxial death.  Now, not only did you do the examination,

2   you also had a chance to review the video the jury has just

3   seen.

4   A.   Yes, sir.  And just to clarify, before we get any further,

5   I did not personally conduct the examination.  It was conducted

6   by one of my associates.  But I did see the videotape of the

7   circumstances surrounding Mr. Babovec's death.

8   Q.   And you approved the autopsy.  It came to you for approval?

9   A.   Yes.  As part of my official duties as chief medical

10  examiner, I reviewed the report and signed it as well.

11  Q.   Based upon you looking at the video and the information

12  that you gathered, can you give us some knowledge that would

13  help us understand how Casey Babovec died that day?

14  A.   I believe I can, yes.

15  Q.   Doctor, you first examined the eyes.  And I really want to

16  ask a question that kind of may take us out -- and I'll come

17  back to it in a minute.  Did you find evidence on this young

18  man, based on the film you saw and the other evidence that you

19  examined, that there was compression asphyxia?

20  A.   Yes.  There was evidence of that.

21  Q.   Tell us what compression asphyxia is and what you mean by

22  the physical evidence that showed that.

23  A.   Compression asphyxia is a form of asphyxia, asphyxia in

24  general being the body's inability to get adequate amounts of

25  oxygen into the system.  And there's a lot of different forms.

1   But compression asphyxia is what we're talking about here.  And

2   it involves compression of the trunk such that the muscles in

3   the chest that normally allow us to breathe in and out can't

4   move, so you simply can't move air because of that compressive

5   force on the chest.

6   Q.    Did you find evidence of that on Casey Babovec?

7   A.    Yes.  There was evidence that some compression asphyxia

8   took place.

9   Q.    I'm going to show you --

10         MR. SWINDOLL:  May I approach the witness for a

11   second, Your Honor?

12         THE COURT:  You may.

13  BY MR. SWINDOLL:

14  Q.    I want to show you a picture that we have marked as 6.2 and

15  6.3.  Is that the evidence that you have discussed and talked to

16  us about?

17  A.    Yes, sir.

18  Q.    I'm putting up on the monitor evidence, Plaintiff's

19  Exhibit 6.2, which is the eyes of Casey Babovec.  It looks to be

20  the left eye.  Can you explain to us what this picture shows us

21  with respect to your testimony?

22  A.    This is actually the right eye.  And the metal forceps are

23  retracting the upper eyelid.  You can see the eyebrow just above

24  it.  What we're looking at is the surface of the eye and the

25  inner surface of the eyelid.  On the upper surface of the

1    eyeball, just close to where you can no longer see it, there's

2    slightly darker areas of discoloration, those fine pinpoint red

3    dots that I talked about.  They are also present on the inner

4    surface of the upper eyelid.  These are petechial hemorrhages.

5    Q.   I'm going to show you 6.3 and ask you if that helps us see

6    them even better.

7    A.   On this eye, I don't believe that they are visible.  This

8    is the left eye.

9    Q.   Okay.  Thank you.  Now, tell us what you found on the

10   physical examination, Doctor.  Just kind of summarize it for us.

11   A.   The abnormal findings; that is, the findings that you

12   wouldn't expect to find in an otherwise healthy 30 year old,

13   included the petechial hemorrhages that we just looked at.

14   There were also petechial hemorrhages on the inner surfaces of

15   the lips.  There was a bruise on the mid-front of the forehead.

16   There were two small lacerations or tears on the inner surface

17   of the lower lip on the right side.  Both lips were contused or

18   bruised.  There were also superficial injuries on the back of

19   the right elbow.  That was a small bruise.  There was a bruise

20   with a scrape on the inner surface of the right wrist.  There

21   were two small scrapes on the inner surface of the left wrist.

22   There was an abrasion or scrape on the left side of the back,

23   and there was a bruise on the inner surface of the left thigh.

24   Q.   Was this evidence of blunt force trauma?

25   A.   These are findings indicative of blunt force trauma.

1    That's how these types of injuries are sustained.  Bruises,

2    lacerations and scrapes are how significant blunt force trauma

3    manifests itself on the body's surface.

4    Q.    Everybody here knows that Casey Babovec had ingested

5    methamphetamine in two little bags.  You found those bags,

6    didn't you?

7    A.    The bags were found, yes.

8    Q.    And would methamphetamine by itself have killed Casey, when

9    you examined him, based on the science that you had?

10   A.    That's not possible to say, because this is more

11   complicated than a simple overdose case.  There were other

12   factors involved.  So the simple answer there is I don't know.

13   It may have.  It may not have.

14   Q.    Okay.  Explain to us what did cause his death.

15   A.    Well, his immediate cause of death was methamphetamine

16   intoxication.  But there were contributory causes of struggle,

17   restraint and exertion.  And that's what I was referring to a

18   moment ago when I said that this was a complicated situation.

19   An individual who is under the influence of methamphetamine is

20   at risk for sudden cardiac death.  When you add elements that

21   further worsen that individual's cardiac function, such as would

22   occur in a situation where they are physically exerting

23   themselves, involved in a struggle and restrained, then that

24   further exacerbates or worsens the cardiac function.  And a

25   cardiac arrest can then occur.

1    Q.    And what part did compression asphyxia play?

2    A.    Well, that's part -- that's part of the restraint that's in

3    the cause of death.  Imagine an individual whose cardiovascular

4    function is ramped up because of drugs.  And they are exerting

5    themselves, and that's also adding to that cardiac

6    overstimulation.  And then they become involved in a struggle,

7    and it's ramped up even more.  And then, as part of the

8    restraint, there's compression placed on the body so that they

9    can't breathe properly, get enough oxygen to satisfy the needs

10   of their system, particularly the heart.  And that can

11   essentially be a final straw as far as a fatal cardiac event if

12   the heart can't get enough oxygen.

13   Q.    The video that you viewed, did you see evidence on the

14   video of how the compression asphyxia occurred?

15   A.    Yes, I did.

16   Q.    Tell us what you saw.

17   A.    Well, what I saw -- and I'm dealing from recollection from

18   over -- well over two years ago.  Just the sheer number of

19   individuals who were involved in trying to restrain and control

20   Mr. Babovec likely put enough pressure on his trunk so that he

21   would have -- it would have been more difficult for him to

22   breathe or respire properly.

23   Q.    You said he was otherwise healthy.  The examination showed

24   this was an otherwise healthy young man?

25   A.    Yes.  The physical examination, the autopsy otherwise, did

1   not show evidence of other trauma or any sort of

2   life-threatening disease.

3   Q.   I'm showing you on the monitor one of the pictures in

4   evidence, which is 9.17.  And it shows the officers on top of

5   Casey.  Is that what you were referring to when you were talking

6   about what you saw two years ago?

7   A.   Yes, sir.

8   Q.   Can you say that it is more likely than not that it was the

9   combination of these factors, the ones you've described, that

10  caused the death of Casey Babovec?

11  A.   Yes.  In fact, I would go beyond that.  I would say that's

12  within reasonable medical certainty.

13  Q.   Okay.  And you or no one, as far as you know, can say that

14  methamphetamine by itself would have killed him.

15  A.   No.  I don't believe that anyone can say that within

16  reasonable medical certainty.

17  Q.   And if someone has said that there was no evidence of

18  asphyxiation, that's not accurate, is it?

19  A.   No.  The physical findings, as we've discussed, show

20  evidence of compression asphyxia.

21  Q.   Thank you, Doctor.

22                       CROSS-EXAMINATION

23  BY MR. ELLIS:

24  Q.   Doctor, I'm George Ellis.  I just have a couple of

25  questions for you.  You are a neutral witness, lawyers like to

1   say, aren't you?

2   A.   Yes, sir.  I would like to think that I'm neutral.

3   Q.   You don't have an ax to grind in this case one way or the

4   other, do you?

5   A.   No, sir.  I'm just here, as far as I'm concerned, to

6   explain how this individual died.

7   Q.   I appreciate that.  You did a report, or your office did a

8   report, that is in my hand.  Have you got it there?

9   A.   Yes, sir.

10  Q.   All right, sir.  Back on page -- I understand for you to

11  say -- and this clears all that up.  This asphyxiation issue is

12  part of this restraint that is a contributing factor.  Did I

13  understand you correctly?

14  A.   Yes, sir.

15  Q.   Okay.  Good.  That clears that up.  Now, the first page of

16  your report, conclusions -- I always thought it was interesting

17  a medical examiners's report starts with "conclusions," but I

18  think it's very apropos.  Cause of death:  Methamphetamine

19  intoxication.  And you have, or your office has contributory

20  factors:  Struggle, restraint and exertion.  Is that correct,

21  sir?

22  A.   Yes, it is.

23  Q.   Now, what do you understand that struggle to have been?

24  A.   Well, there was a struggle inside the holding cell area, as

25  I recall, somewhat.  And then there was some struggle as he was

1    withdrawn from the holding cell and then some struggle as he was

2    being restrained.

3    Q.    He was struggling not to get handcuffed, wasn't he?

4    A.    I would take your word on that.  Again, it's been so long

5    since I saw the video, I don't recall all the details.

6    Q.    And this business inside, you are aware of a fistfight that

7    occurred immediately prior to all of this.  And that's why they

8    were getting him out of the Cell 1, wasn't it?

9    A.    Yes, sir.

10   Q.    Okay.  Could that account for the superficial blunt force

11   trauma?

12   A.    It could, yes.

13   Q.    From the guy he was in the fistfight with?

14   A.    Yes.

15   Q.    Okay.  And let me -- I don't want to belabor this, Doctor.

16   Let me see if I can run this again.  I failed technology a while

17   ago.  Let me see if I can do it this time.  You read this

18   report.  Who actually prepared the report itself?

19   A.    The report was prepared by the pathologist who conducted

20   the examination, Dr. Daniel Dye.

21   Q.    The pathologist of record?

22   A.    Yes, sir.

23   Q.    And he's now in Birmingham, isn't he?

24   A.    He is.

25   Q.    And you've read it cover to cover and corner to corner.

1    And your signature is the reviewer.  Is that correct, sir?

2    A.    Yes, sir.

3    Q.    And you approved all of it word for word?

4    A.    Yes, I did.

5    Q.    All right, sir.  So we have this -- let me see here.  Here

6    it comes.  I'm going to make that a little bigger so that you

7    can see it.  Can you see it?

8    A.    I can.

9    Q.    I'm looking at I think the last page of this document.

10   Does that look like the last page to you?

11   A.    It is.

12   Q.    All right, sir.  And I'll read along here.  "The chain of

13   events set into action in this case all stemmed from Babovec's

14   ingestion of methamphetamine.  The toxic effects of

15   methamphetamine, in addition to pain from fighting with others,

16   pain from the use of a Taser, and restraint by law enforcement

17   officers likely to caused" -- you've got to help me with that

18   word.

19   A.    Catecholamine.

20   Q.    Thank you -- "release and a fatal cardiac dysrhythmia."

21   What is this word that you've just had to help me with?  What

22   does that mean?

23   A.    Catecholamine, that's a natural occurring substance in the

24   body that you all may have known about as adrenaline.  It's the

25   same thing as adrenaline.

1    Q.   All right, sir.  Good.  That clears that up.

2    "Unfortunately, the system for classification of manner of death

3    cannot accurately describe the chain of events that were set

4    into motion following Mr. Babovec's ingestion of

5    methamphetamine.  Therefore, it is our opinion that the method

6    of death is best classified as undetermined."

7         Did I read that correctly, sir?

8    A.   Yes, sir.

9    Q.   "The chain of events set into action in this case all

10   stemmed from Mr. Babovec's ingestion of methamphetamine."  Is

11   that what that says?

12   A.   Yes, sir.

13        MR. ELLIS:  Your Honor, this is Defendants' Exhibit 2.

14   We move its admission.

15        MR. SWINDOLL:  There's no objection, Your Honor.  I

16   think that we should admit all of the exhibits that we

17   stipulated to in the beginning.  I didn't ever hear the Court

18   admit those.  I've been using them.  I do not have any objection

19   to this one as well.

20        THE COURT:  All right.  This exhibit will be admitted.

21        (Defendants' Exhibit 2 received in evidence.)

22        MR. ELLIS:  May I publish to the jury?

23        THE COURT:  You may.  I would ask first that you

24   publish it to me before you hand it to all the jurors, and let

25   me review what's in that packet.

 1            MR. ELLIS:  I apologize.  I thought you had seen it,
 2   Your Honor.
 3       Pass the witness.
 4            THE COURT:  Is there any redirect?
 5            MR. SWINDOLL:  No, Your Honor, there's not.
 6            THE COURT:  Mr. Swindoll, have you reviewed this exact
 7   exhibit?
 8            MR. SWINDOLL:  Yes, I have, Your Honor.  It's the
 9   autopsy report.  Eight pages?  Nine pages?
10            THE COURT:  It's eight pages, just the report.
11            MR. SWINDOLL:  Yes.
12            THE COURT:  You may publish.
13       May this witness step down and be excused?
14            MR. SWINDOLL:  Yes, Your Honor, please.
15            THE COURT:  Mr. Ellis, may this witness be excused?
16            MR. ELLIS:  Ma'am?
17            THE COURT:  May this witness be excused?
18            MR. ELLIS:  Yes, absolutely.
19            THE COURT:  You may step down and be excused.
20            THE WITNESS:  Thank you, Your Honor.
21            THE COURT:  If you would, please approach the witness
22   stand.
23        **CHRISTY NICHOLS, PLAINTIFF'S WITNESS, DULY SWORN**
24                      DIRECT EXAMINATION
25   BY MR. SWINDOLL:

1  Q.    Christy, you have kind of a quiet voice.  Give us your full

2  name, please.

3  A.    My name is Christy Janelle Nichols.

4  Q.    Christy Nichols, were you an inmate at the detention center

5  in Saline County on April 13th, 2011, at around five o'clock?

6  A.    Yes, I was.

7  Q.    How long had you been there?

8  A.    April?  I had been there since November the 2nd.

9  Q.    Were you out into the general area about that time?

10  A.    Yes.

11  Q.    Tell us how you came to be out there.

12  A.    I was in isolation.  And I was out for my hour out, you

13  know, where you get an hour out.  And you take a shower and use

14  the phone and do things like that, you know.

15  Q.    I'm going to show you a picture that's marked as

16  Plaintiff's Exhibit 4.2, which is the area that we will be

17  talking about.  Is that the area where you were sitting that

18  day?

19  A.    Yes.

20  Q.    And can you tell us where you were sitting that day?

21  A.    I was sitting on the bench where the phones are.

22  Q.    Okay.  So you were sitting -- there's somebody in an orange

23  suit.  But that's not you, is it?

24  A.    No.  That's not me.

25  Q.    Okay.  But you were sitting near that phone right there

1    that we can see.  Right?

2    A.    Yes, yes.

3    Q.    Right there?

4    A.    Yeah.  That's the very edge of my sleeve.

5    Q.    Now, you see this?  I want you to watch it, and I'll stop

6    it as we talk.  You are sitting there.  You see this.

7          Stop it right now, Emily.

8          Now, you are sitting there.  Can you hear Casey Babovec

9    before he gets out of the cell?

10   A.    Yes, I can.

11   Q.    Tell the jury exactly what you heard.

12   A.    He was beating on the door.  And he was asking for help,

13   saying that his chest was hurting and that he needed medical

14   attention, that he thought he was going to die, and he was

15   scared.  And he just kept beating on the door and saying that he

16   needed help, that his chest hurt.

17   Q.    Now, you were sitting.  You saw them.  Take it out and run

18   it through.  You see them put Casey onto the floor.  What can

19   you hear Casey saying at this time, Ms. Nichols?

20   A.    Well, while he was on the floor?

21   Q.    While he was on the floor.

22   A.    I hardly remember.  But I remember before -- they told him

23   if he beat on the door one more time that they was going to tase

24   him.  And --

25   Q.    Did you hear Casey saying, "I'm not resisting"?

1  A.    Yeah, yeah.  He said that he wasn't resisting.  He said

2  that before they even opened the door.

3         MR. ELLIS:  Your Honor, I'm going to have to object.

4  He is leading this witness.  I would ask that that be stricken.

5  He knows better than that.  That's an experienced trial lawyer

6  standing there.  He knows better.

7         THE COURT:  Mr. Swindoll?

8         THE WITNESS:  It's also in my statement.

9         MR. SWINDOLL:  I'll withdraw the question, and we'll

10 do it again.

11        THE COURT:  All right.

12        MR. ELLIS:  I would ask that the jury be admonished.

13        THE COURT:  I overrule it.  You may proceed.

14        MR. SWINDOLL:  Thank you, Your Honor.

15 BY MR. SWINDOLL:

16 Q.    Christy, just tell us what you heard and what you remember.

17 I won't prompt you at all.

18 A.    Okay.  Well, he was inside the cell, and he kept beating on

19 the door -- and I'm going to say what I remember -- all the way

20 up to the point I'm looking at on the screen.  He was asking for

21 help, saying that his chest hurt.  And behind the counter, where

22 the officers are, Officer Shelnutt was saying, "You shouldn't

23 have been doing meth."  And then he had used the bathroom on

24 hisself.

25 Q.    Let me stop you right there.  Officer Shelnutt said what?

1    A.    "You shouldn't have been doing meth."

2    Q.    You heard that?

3    A.    I heard that.

4    Q.    When did you hear that?

5    A.    Before they pulled him out the first time.

6    Q.    Now, run the film.  You are watching.  Can you tell us when

7    you see Casey -- does he stay conscious all the time?

8    A.    He was conscious as far as I -- he was conscious all the

9    way up until he died.

10   Q.    What happened to Casey when those people were on top of

11   him?

12   A.    Excuse me?  I didn't hear.  Somebody was over there

13   talking.

14   Q.    I'm sorry?

15   A.    I didn't hear you.  Somebody was over there talking.

16   Q.    Okay.  What happened to Casey?  You saw him.  Can you tell

17   us in your own words what you were seeing?  How many officers

18   were there?

19   A.    There were several officers.  When they pulled him, when

20   they pulled him out of the cell, they were all on top of him.

21   And he was biting one of them.  And I heard the one that he was

22   biting, which was officer -- he was biting McGuire.  And Officer

23   McGuire was yelling that he was biting him.

24   Q.    Slow down, and pull the mike up, Christy.  Speak into the

25   mike so people can hear you.

1   A.    He was biting Officer McGuire.  And Officer McGuire was

2   yelling while he was down there, which I couldn't see there was

3   so many.  He was yelling that he was biting him.  And I guess

4   they were trying to get him loose.  I'm not really sure.  I was

5   just sitting there, just amazed at the whole thing, because, you

6   know, I felt like the paramedics should have been with the guy,

7   you know, considering that he was saying that he had chest

8   pains.

9   Q.    Were you sitting there when he left this room, when they

10  took him out of this room?

11  A.    Yeah.  When they drug him to that other room?

12  Q.    Yes.

13  A.    I was sitting there.

14  Q.    Did you see them take him into the other room?

15  A.    Yes, I did.

16  Q.    How did they take him in there?

17  A.    They drug him.  They drug him by his arm.

18  Q.    Did you see them come back out of the room?

19  A.    Yeah.

20  Q.    What were they saying when they came back out?

21  A.    They said he was snoring.

22  Q.    Were they making fun of him?

23  A.    They were just in disbelief, because like he had went to

24  sleep or something.  They said he was snoring.

25  Q.    Could you see anything on the floor when they moved him?

Nichols - Direct                           97

1    A.    Oh, yeah, yeah.  He had lost most of his bowels.

2    Q.    What do you mean by that?

3    A.    What I mean by that is, when they were on top of him, he

4    had urinated, and there were feces, you know.  And Sergeant

5    Richards was standing over him saying, "Oh, it looks like the

6    little boy peed on himself."  And if you had someone like a

7    lip-reading specialist, then you could see what the words were

8    as to what was being said from the ones who I quoted.

9    Q.    Sergeant Richards, the supervisor --

10   A.    He is.

11   Q.    -- said what?

12   A.    He said -- he had his arms crossed at that point.  And he

13   was standing over him saying, "Oh, it looks like the boy, little

14   boy, peed on himself."  He was making fun of him.  And I knew at

15   that point that the man had died.

16   Q.    Now, you gave a statement to the state police after?

17   A.    Yes, I did.  I gave a statement to the state police.  And I

18   stated to the state police that the statement I gave them would

19   not be the same as the one I gave them when I got out,

20   considering the fact that I was in there and the things that,

21   you know, had went on at that point.

22   Q.    Tell us the circumstances in which you were asked to give a

23   statement.  Kind of describe the room and the people involved.

24   A.    When I was asked to give a statement by the state police?

25   Q.    Uh-huh.

1   A.    It was just me and the state police officer.

2   Q.    Were there people outside the room?

3   A.    Yes.  Lieutenant Courtney, I remember him in particular.

4   Q.    Who are they?

5   A.    I guess they are CID detectives.

6   Q.    Officers in the Saline County Sheriff's Department --

7   A.    Yeah.

8   Q.    -- were standing just outside your door while you were

9   talking to the state police?

10  A.    Yes.  I knew -- was aware of that.  As a matter of fact, at

11  one point they even knocked on the door.  And it was -- I felt

12  like they was letting me know that they was out there.  And that

13  was CID, wasn't any of the jailers.  It was a whole different

14  section of the jail, you know, kind of actual detectives.

15  Q.    You have been in the hospital until the day before

16  yesterday.  Right?

17  A.    Yes.

18  Q.    What were you in the hospital for?

19  A.    I was in the hospital because my stomach stopped digesting

20  food.

21  Q.    You've come here voluntarily to help us today?

22  A.    Yes, yes.

23  Q.    Thank you.

24        THE COURT:  Mr. Ellis, cross-examination?

25                    CROSS-EXAMINATION

Nichols - Cross                                                            99

1    BY MR. ELLIS:

2    Q.    Ms. Nichols, do you know Ms. Voiles?

3    A.    Excuse me?

4    Q.    Ms. Voiles, do you know her?

5    A.    Ms. who?

6    Q.    Voiles, who just testified here earlier.  Have y'all ever

7    met?

8    A.    No.  I mean, I've seen her.  Are you talking about her

9    first name is Carolyn?

10   Q.    Uh-huh.

11   A.    Yeah.  I seen her a few times in passing.  But I don't know

12   her, no.  I didn't know her last name until you said it.

13   Q.    Now, I'm not going to try to embarrass you at all.  But

14   I've got to ask you some kind of personal questions, okay?

15   A.    Okay.  Go ahead.

16   Q.    Now, you are a meth user, aren't you?

17   A.    Yes.

18   Q.    Are you on any meth today?

19   A.    No.  I would be willing to take a drug test.

20   Q.    Okay.  Good.  At this particular time, you were on your

21   hour out in the booking area.  Is that correct?

22   A.    Yes.

23   Q.    And you had been in for a long, long time, several months.

24   Is that true?

25   A.    Yes.

Nichols - Cross

1    Q.    How many months had you been in?

2    A.    Well, I went in November 2nd, and the date was April

3    something.

4    Q.    Okay.  This was in April?

5    A.    Uh-huh.

6    Q.    Now --

7    A.    Five months.

8    Q.    What's your history?  Have you been to the penitentiary?

9    A.    Yes.  The last time I was in the penitentiary, I was

10   discharged on April the 13th of 2003.  And I haven't returned

11   since.

12   Q.    What did you go to the penitentiary for?

13   A.    Selling marijuana.

14   Q.    Okay.  It takes a lot of marijuana, big marijuana, to go to

15   the penitentiary, doesn't it?

16   A.    Well, they followed me around for three months.  Yeah, I

17   was selling quite a bit.

18   Q.    Is that the only thing you've ever done that caused you to

19   go to the penitentiary?

20   A.    That's what I was there for, yeah.

21   Q.    Anything else?

22   A.    Well, I had been on probation prior to that for selling

23   stolen weapons.

24   Q.    For what?

25   A.    Stolen weapons.

1    Q.    Selling weapons?

2    A.    Selling hot firearms.

3    Q.    Okay.  Anything else?

4    A.    No.  Well, forgery.  But that's not -- I didn't really get

5    in trouble for that.

6    Q.    You didn't get in trouble for the forgery?

7    A.    No.

8    Q.    Forgery is a dishonest act, isn't it?

9    A.    Yes.  I've done a lot of dishonest things in my life.

10   Q.    I'm not permitted and wouldn't if I were to ask you about a

11   juvenile record.  But do you have a juvenile record?

12   A.    I do.

13   Q.    Okay.  Can you tell us the first -- how old you were the

14   first time you got in trouble?

15   A.    With the law?  I guess I would say 14, 14 years old.

16   Q.    Fourteen?

17   A.    Yeah.

18   Q.    And how about at school?

19             MR. SWINDOLL:  Your Honor, I object.  We've gone

20   beyond what I think is fair cross-examination.

21             THE COURT:  Mr. Ellis, what's your response?

22             MR. ELLIS:  It goes to her credibility.

23             THE COURT:  Why don't you approach.

24        (Proceedings at sidebar as follows:)

25             MR. SWINDOLL:  I was good with the forgery.  I thought

Nichols - Cross                                        102

1   that's proper cross.  After that, the juvenile record, whether

2   she has trouble in school, seems to go way beyond the pale of

3   cross-examination.  It's designed solely --

4            THE COURT:  I will sustain the objection.  I don't

5   know where the school things were going.  But I can't envision

6   under the evidentiary rules where we're headed with that on

7   credibility.  If you want to make a record, I'll be happy to

8   permit you to make a record, and I'll reconsider it.

9            MR. ELLIS:  I'll just move on.  How about that?  That

10  will make it easy.

11           THE COURT:  That will be fine.  I'll admonish the

12  lawyers, if there are any further speaking objections -- all

13  objections will be made at a sidebar.

14           MR. SWINDOLL:  Yes, Your Honor.

15           THE COURT:  You may proceed.

16       (Proceedings continuing in open court as follows:)

17  BY MR. ELLIS:

18  Q.   Ms. Nichols, if I covered this, I apologize.  What were you

19  in for at this particular time?

20  A.   I had -- one of the things I was in there for was I had

21  pulled an officer over and asked him where the dope house was.

22  I was pretty messed up on drugs.  And I had a lot of drugs on

23  me, and I was messed up and needed someone to drive for me.  And

24  as far as credibility goes, I deserve none.  I'm not here for

25  credibility.  Anything bad you can say about someone, that's me.

1    Anything wrong that can be done, I did it.  That does not give

2    anyone the right to deny someone medical treatment when they are

3    dying.

4    Q.    Now, my question was -- listen to my question if you can.

5    What were you in for at this particular time?

6    A.    Possession of a controlled substance and burglary.

7    Q.    And what?

8    A.    Burglary.

9    Q.    Okay.  And what was the controlled substance?

10   Methamphetamine?

11   A.    Yes.

12   Q.    All right.  Why were you in isolation?

13   A.    Because I was out of control.  I didn't get along with

14   anyone.  I was better off being in a cell by myself because I

15   just -- I couldn't stand to be around all the other people.

16   Q.    Okay.  In your statement that you gave to the state police,

17   do you remember talking with Special Agent Dexter Holmes?

18   A.    Yes, I do.

19   Q.    And it was April -- it says here April 14.  Does that sound

20   about right?

21   A.    It was the same day the incident occurred.

22   Q.    Then down here, it says April 15.  So it was either

23   April 14th or April 15th.  Is that correct?

24   A.    It was a matter of hours after the incident occurred.

25   Maybe it was after midnight.

1    Q.    Okay.  It says here that you told him that he had had a

2    bowel movement on himself, and Nichols stated that the other

3    guys inside the cell were complaining of the smell.  Did you

4    tell him that?

5    A.    Yes.

6    Q.    Was it true?

7    A.    Yes.

8    Q.    "Nichols stated that Officer Shelnutt pointed" -- and this

9    is important -- "pointed a Taser at Babovec and told him if he

10   did not stop kicking and banging on the door she was going to

11   tase him."  Did you tell -- did you tell Special Agent Holmes

12   that?

13   A.    That is exactly what happened, yes.

14   Q.    Is that true?

15   A.    Yeah.

16   Q.    Okay.  You stated that Officer McGuire took Babovec to the

17   bathroom to change his pants.  We know that's true, don't we?

18   A.    Yeah, yeah.

19   Q.    "And Nichols stated that after Babovec changed pants he

20   came and sat next to her," to you.

21   A.    Yeah.

22   Q.    Is that correct?

23   A.    Yes.

24   Q.    Let me see if I can do this.  I forgot this was over here.

25   We'll read on here.  "Nichols stated that she uses

1    methamphetamine and Babovec's behavior resembled that of a

2    person high on methamphetamine."  And you know that because it

3    was like you are when you are high on methamphetamine.  Is that

4    true?

5    A.    He also told me he was, yeah.

6    Q.    And he told you that he was high on methamphetamine.

7    A.    Yeah.

8    Q.    "Nichols stated that she asked Babovec how much

9    methamphetamine he had used.  Nichols stated that Babovec told

10   her he swallowed 2 grams of methamphetamine before he was

11   arrested."  Did he tell you that they were in plastic

12   containers?

13   A.    No.  I didn't know that at the time.

14   Q.    He just said 2 grams.

15   A.    Yeah.

16   Q.    Is that a lot?  I don't know whether that's a lot of

17   methamphetamine or not.  Is that a lot of methamphetamine?

18   A.    It's a lot to do at one time, yeah.

19   Q.    Okay.  "Nichols stated that she informed the officers, but

20   no one did anything."  Now, what officer did you inform?

21   A.    Well, I told Parker.

22   Q.    Parker.  She's seated right over here.

23         Raise your hand up high so we can see.

24         Now, exactly when did you inform Parker?

25   A.    I'm really not sure.  I was -- really, there was a lot

1    going on in my head at that time.  I told her -- I told her --

2    it was at some point during all of the ruckus I told her.

3    Q.    Because it might have been after all of this had happened

4    and they had rolled Mr. Babovec out on the gurney, and then

5    that's when you told Parker that.  Could that have been?

6    A.    Regardless of when it was, they knew that he had done meth.

7    They knew he was on meth.

8    Q.    Could that have been when you told Tonya Parker that?

9    A.    It could have been.  I'm not really sure.

10   Q.    Okay.  Let's continue.  "Nichols stated that Babovec was

11   telling the officers he was having a heart attack, but the

12   officers did not do anything to help him."  Now, are you sure

13   about that?

14   A.    Well, I wasn't on the other side of the door.  I couldn't

15   see through the walls.  But, I mean, there was no 911 people

16   there.  There was no paramedics there.

17   Q.    I know.  But you can't really hear.  If you are outside

18   that cell, you can't hear what was being said inside the cell,

19   can you?

20   A.    Well, I heard him yelling out from under the door.  And

21   they were telling him to get off the door.  And I can't say what

22   happened inside the cell.  I did not see.

23   Q.    You just don't know.

24   A.    No.  I don't know.  There's no way I could know.

25   Q.    Well, you stated that Babovec was put back into Cellblock

Nichols - Cross

1   1.   "Nichols stated that shortly after Babovec was put back into

2   Cell 1 he got into a fight with another inmate."  That's true,

3   isn't it?

4   A.   That, like I said, I couldn't see through the walls.  But

5   that's what I heard.

6   Q.   You just heard that.  You don't know that.

7   A.   Well, I heard -- yeah.  They were watching on camera.  They

8   said that he had went in and walked up to another inmate and

9   slapped him or something like that.

10  Q.   I think in another statement you said you saw it on a

11  camera somewhere.  Is that correct?

12  A.   I wasn't exactly standing behind the desk watching the

13  camera with the officers.  As you see on the video, I was

14  sitting on the bench.

15  Q.   You saw something on the camera about a fight.  Is that

16  what I'm hearing you say?

17  A.   No.  I didn't see anything on the camera.  I was sitting on

18  the bench.

19  Q.   All right.  "Nichols stated that when the officers opened

20  the door they grabbed Babovec and put him on the ground."  Is

21  that a true statement?

22  A.   Well, I think they tased him and then put him on the

23  ground.

24  Q.   You think they tased him and then put him on the ground

25  right when they got him out of the cell?

Nichols - Cross    108

1    A.    I just remember them opening the door.  I wasn't exactly

2    watching all the Tasers to see where they went.  I just seen

3    them grab him and pull him out.  And he was on the ground, and

4    they were putting him in a hold.

5    Q.    So it's your memory that the door opens, they get him out,

6    and they tase him.

7    A.    Well, they had tased him.

8    Q.    They had already tased him.

9    A.    I'm not really sure.  At some point they had tased him.

10   And I remember the door -- when -- okay.  When you are watching

11   someone put their hands on someone else and do something, you

12   are not watching the Tasers.  You are watching what they are

13   doing with their hands.  So I can't -- I mean, he got tased, but

14   he was on the ground.  Apparently he had been tased several

15   times.

16   Q.    It's your testimony that Shelnutt had already threatened to

17   tase him.  So would it have been Officer Shelnutt who did the

18   tasing at this particular occasion?

19   A.    I cannot say at the point which one or any of them.  We're

20   talking about four years ago.

21   Q.    I understand.  So it's not -- it's that you don't remember

22   which one tased him.

23   A.    No.  I don't really remember.  I just remember that they

24   pulled him out.  And they was all on top of him, and it was bad.

25   Q.    Was he tased before or after he was on the floor?

1    A.    I believe both.

2    Q.    Both.  Okay.  So I'm just trying to get this in our minds.

3    The door opens.  He's pulled out of the door by Dion McGuire and

4    Ms. Shelnutt, and he's tased.  He goes to the ground.  He's

5    tased again.  Is that what you are telling the jury?  Is that

6    what you are telling the jury?

7    A.    Yes.

8    Q.    Okay.  Thank you.  "Nichols stated that once Babovec was on

9    the ground he started biting McGuire."  How do you know that?

10   Did you see it?

11   A.    Yeah.  I was sitting there looking.  McGuire had him in a

12   hold, and he had his teeth down over his arms.  I just saw it

13   briefly because there were so many of them.

14   Q.    All right.  "Nichols stated that one officer had to tase

15   Babovec."  That's that second tase you are talking about, isn't

16   it?

17   A.    Yeah, I believe so.

18   Q.    "Nichols stated that Babovec stopped fighting officers, put

19   him in another" -- "and they put him in another cell."  And you

20   stated that Babovec started making a loud snoring noise.  Now,

21   was he already in Cell 5 when he was making this loud snoring

22   noise?

23   A.    I'm not really sure.

24   Q.    Well, you said it here.  That's the reason I'm asking you

25   about it.

1    A.    I believe I was just repeating what the officers stated,

2    because I don't recall hearing that sound, or I would still hear

3    it in my head.

4    Q.    I mean, did you hear him snoring or not?

5    A.    No, I didn't.

6    Q.    You didn't hear him.  This is just -- you just said that,

7    but that just wasn't true when you said that?

8    A.    I was repeating what the officers said.

9    Q.    You were repeating what what officer said?

10   A.    McKinney and I believe it was Richards.  I'm not sure.  But

11   I know McKinney for sure.  I believe he's the one that said it.

12   And I was just repeating what he had said.  As far as hearing

13   it, the officer must have misunderstood or something.  But I

14   couldn't -- I didn't hear.  He was in a completely different

15   room.

16   Q.    Okay.  Then they requested an ambulance.  Is that true?

17   A.    Yeah, they did.  But they had pulled some kind of medical

18   thing off the wall and tried to resuscitate.

19   Q.    It says you stated that shortly after Babovec started

20   making the snoring noise, officers requested an ambulance.

21   A.    Shortly after it was said that he was making that sound,

22   they requested an ambulance.  But they had also tried to

23   resuscitate with some kind of equipment they had.

24   Q.    And then, within a few minutes, medical personnel had

25   arrived, and Babovec was taken to the hospital.

1    A.    Well, they said he was pronounced dead.

2    Q.    Is that correct?  Does it say that?

3    A.    That's what -- that's what I heard them say.

4    Q.    So your statement is not what you saw.  It's what you heard

5    somebody else saw.

6    A.    I mean, I wasn't there to check to see if he was alive or

7    not, check his vital signs or anything.  I mean, I wasn't

8    allowed to touch the inmates or be that close to them.  But

9    based on what I heard them say, he died before he left the jail.

10   That's hearsay, whatever you want to call it.  That's what I

11   know about it.

12   Q.    And you stated that the statement she gave me, this

13   officer, this special agent, will not be the same as the

14   statement you gave to the Saline County investigator.  You

15   stated that you were afraid, so you told the investigator what

16   you thought he wanted you to say.

17   A.    I told him everything that happened the best that I could

18   without incriminating anyone, because I did not want to get

19   involved in any situation where my safety was at stake.

20   Q.    You didn't want who involved?

21   A.    I didn't want to involve anyone in a situation where it was

22   incriminating towards them, because it was my safety.  I had to

23   look out for my safety as well.  I'm not saying that I was

24   threatened in any way.  But the whole situation just freaked me

25   out.

Nichols - Redirect                                                              112

1    Q.    So some of this statement that you gave to Special Agent

2    Holmes is true.

3    A.    You know, most of it is.  I don't see where --

4    Q.    And some of it is not true.

5    A.    The part that would be not true would be the hearsay part.

6    That would be because it's hearsay.  I can't say if it's true or

7    not if it's hearsay.

8    Q.    And some of it, you were telling him what he just wanted to

9    hear.

10   A.    All of it boils down to the guy was asking for medical help

11   and didn't get it.

12   Q.    Say that again.

13   A.    All of it boils down to the guy was asking for medical

14   attention, and he didn't get it.

15   Q.    Part of this, you just said what they wanted you to say,

16   what they wanted to hear.

17   A.    I wasn't coerced into saying anything on either end, either

18   way it went.  What I'm saying today is what happened from my

19   point of view from what I seen.

20   Q.    But you admitted in this statement, did you not, that you

21   gave inconsistent statements to the police, didn't you?

22   A.    I did.

23   Q.    Thank you.

24                       REDIRECT EXAMINATION

25   BY MR. SWINDOLL:

```
1    Q.    Christy, you did not see anything after they dragged
2    Casey's body out.  Is that right?
3    A.    No, I didn't.  I seen --
4    Q.    So what you can talk to us about is what we see on the
5    film.
6    A.    Right.
7    Q.    And what you said is what you heard --
8    A.    Right.
9    Q.    -- while this film is going on.
10   A.    Right.  That's -- what I couldn't see is what I heard.
11   That's the things I was saying was hearsay.
12   Q.    Is there any question in your mind that you heard Casey
13   Babovec ask for medical help?
14             MR. ELLIS:  Objection, Your Honor.
15             THE WITNESS:  I did.
16             MR. ELLIS:  Objection.  That's leading.
17             THE COURT:  I'll overrule it.  You may proceed.
18             THE WITNESS:  Answer the question?
19   BY MR. SWINDOLL:
20   Q.    Yes.  Go ahead.
21   A.    Yes.  He did ask for medical attention several times.
22             MR. SWINDOLL:  Thank you.
23             THE COURT:  Anything further of this witness, Mr.
24   Ellis?
25             MR. ELLIS:  No.
```

1          MR. SWINDOLL:  May she be excused, Your Honor?

2          THE COURT:  She may.

3      May she be excused, Mr. Ellis?

4          MR. ELLIS:  Yes, ma'am.

5          THE COURT:  You may be excused.

6          MR. SWINDOLL:  We're going to run the deposition of

7  Bruce Pennington.

8          THE COURT:  All right.

9          MR. SWINDOLL:  Would you explain what a deposition is,

10  Your Honor?

11          THE COURT:  I will.

12          MR. SWINDOLL:  It's about an hour.

13          THE COURT:  We're going to go until five o'clock.

14  It's fine for us to start it, I believe.

15          MR. SWINDOLL:  We can start it.

16          THE COURT:  Ladies and gentlemen of the jury,

17  testimony will now be presented to you in the form of a

18  deposition.  A deposition is the recorded answers a witness made

19  under oath to questions asked by lawyers before trial.  The

20  deposition testimony to be offered was recorded by video, and it

21  will be played for you now.  You should consider the deposition

22  testimony and judge its credibility as you would that of any

23  witness who testifies here in person.

24      You may proceed when you are ready.

25      (Videotaped deposition of Bruce Pennington played.)

1          THE COURT:  It's five o'clock.  Ladies and gentlemen

2    of the jury, we will recess overnight.  And we will meet back

3    here at nine o'clock in the box to begin testimony again.

4          During this recess and every other recess, please do not

5    discuss this case among yourselves or with anyone else,

6    including your family and friends.  Do not allow anyone to

7    discuss the case with you or within your hearing.  Do not

8    discuss also means do not email, send text messages, blog or

9    engage in any other form of written, oral or electronic

10   communication, as I instructed you before.

11         Do not read any newspaper or other written account, watch

12   any televised account or listen to any radio program on the

13   subject of this trial.  Do not conduct any Internet research or

14   consult with any other sources about this case, the people

15   involved in the case or its general subject matter.

16         You must keep your mind open and free of outside

17   information.  Only in this way will you be able to decide the

18   case fairly based solely on the evidence and my instructions on

19   the law.  If you decide this case on anything else, you will

20   have done an injustice.

21         It is very important that you follow these instructions.  I

22   may not repeat them before every recess.  But please keep them

23   in mind throughout the trial.

24         With that, we will stand in recess until tomorrow morning

25   at nine.  Have a good evening.  You may leave your notebooks on

1    the chair.  If you will turn that first page over, our court

2    security officer will collect them.

3        (Jury exits courtroom.)

4        THE COURT:  I have a few things to go over.  We are on

5    the record with counsel and the parties outside the presence of

6    the jury.  I will make this as quick as possible.  But there are

7    some housekeeping matters that we need to take up.

8        First are stipulated exhibits and then what will happen

9    with the exhibits.  There's been some reference to stipulated

10   exhibits.  The autopsy report has been moved and admitted.  For

11   the record, a juror handed that autopsy report back to counsel

12   as they were walking out.  And we will confirm that all pages

13   are there.

14       In regard to the exhibits, though, by tomorrow morning, if

15   you would please inform Ms. Washington as to a stipulated

16   exhibit list, I would appreciate that so I can keep track of

17   what you've stipulated.  If there are not stipulated exhibits,

18   then I need for you to admit them contemporaneously when you are

19   using the exhibit and before you show the exhibit to the jury.

20       With that, at the end of this trial, any exhibits that are

21   admitted, I will ask counsel to go on the record, review the

22   exhibits that are admitted.  And if both sides will make a

23   statement on the record that they have reviewed them and they

24   agree as to the content, the exhibits will then go back to the

25   jury in the jury room for deliberation.  Transcripts of

1    depositions that are played need to be tendered as an exhibit,

2    but they will not go back to the jury room.  Our court reporter

3    does not transcribe any transcript that's either read or played

4    as a video.  You need to tender that as the exhibit.

5         In regard to witnesses, Mr. Pennington obviously is a

6    defendant in this case.  I know that the plaintiff has a series

7    of defendants on the plaintiff's witness list in this case.  I'm

8    not certain what the plan is among counsel in terms of how you

9    intend to handle cross and then the defense's case in chief.  I

10   will say that I've seen it done various ways.  And the most

11   efficient way in my view is you don't get two bites at the

12   apple.  Plaintiff can call them in their case, and you can cross

13   them, but then take them on your direct and let's get it all

14   done at one time, or you can forego cross in the plaintiff's

15   case, and you can call them in your case, in the defense case.

16   And I defer to you as a strategy call.  If you call them in the

17   defense case and do a direct examination, the plaintiff will

18   obviously have an opportunity to cross at that time or recross,

19   however you want to view it.  But if we've got the witness on

20   the stand and you cross-examine them and you want to go into

21   your direct at that time, I'm fine with that.  But you don't get

22   two bites in regard to that.  We'll streamline it.  You can do

23   your direct examination in your case in chief.  You may let me

24   know how you wish to proceed in regard to that tomorrow morning.

25        I don't know.  I don't recall if Mr. Pennington's

1    deposition, if we were in receipt of the entire thing, if

2    there's any sort of questioning by defense counsel in that

3    deposition.  So if there is, my recollection of it is that it

4    was pretty limited, if any.  So you all may decide how to handle

5    that.  If you agree to how you want to handle it, that's fine.

6    But we need to have that discussion before we get in the middle

7    of an examination of a witness in front of the jury.

8          MR. ELLIS:  I would like to tell the Court now my

9    intention will be to finish with the witness during the

10   plaintiff's case in chief so that we don't have to call the

11   witness again in the defense's case in chief.

12         THE COURT:  All right.  And that's fine.  That's fine.

13   Are there any matters that you have that you wish to take up, or

14   do you have any questions about what I've said?

15         MR. SWINDOLL:  No, Your Honor.  I do not.  We do have

16   an agreed list.  The plaintiff, all but Exhibit No. 10 was

17   agreed to and stipulated to be put into evidence.  That's why it

18   was used in opening statement.  And I have not done the

19   formality of offering the video when I'm talking to the people.

20         THE COURT:  All right.  And I wasn't sure where we

21   left at the end of that during the exchange on the exhibits.

22   All but Plaintiff's 10?

23         MR. SWINDOLL:  That's the pleadings, the federal

24   pleadings that I withdrew.

25         THE COURT:  And do you intend to offer the plaintiff's

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1    version of the autopsy report, because that differs from the

2    defense's version?

3          MR. SWINDOLL:  Yes.  It's in my exhibits.  State crime

4    lab is Exhibit 2.

5          THE COURT:  Mr. Ellis, do you agree with what Mr.

6    Swindoll has said in regard to the plaintiff's exhibits?

7          MR. ELLIS:  I do.

8          THE COURT:  All right.  Then I will receive all but

9    Plaintiff's 10 as stipulated exhibits.  Are there any from the

10    defense side that have been stipulated to?

11          MR. ELLIS:  I just have three, Your Honor.

12    Defendants' Exhibit 3 is the state official investigation.  And

13    it's just marked for identification at this point, and it may

14    not be admitted.  2 is the autopsy report.  No. 1 is the video.

15    And that may be moot by the time the plaintiff rests.  We don't

16    know yet.

17          THE COURT:  All right.  No. 2 has been admitted.  So

18    what I hear you saying essentially is we'll take the defense

19    exhibits as they come.  I'll look to you to move to admit them.

20          MR. ELLIS:  No.  We stipulate.  This that he handed

21    me, with the exception of No. 10, which he withdrew, I stipulate

22    to.

23          THE COURT:  And I understand on the plaintiff's side,

24    on the list I have of the plaintiff's, I understand that.  I

25    have received -- all but 10 from the plaintiff's list is

1    stipulated.  In regard to defense exhibits, there are three.

2    We've admitted No. 2, which is the autopsy report.  There's No.

3    1, which is the -- No. 1 is the video, and No. 3 is the CID

4    investigation file.

5         And what I hear you saying, Mr. Ellis, is in regard to No.

6    1 and No. 3, you may or may not move to admit those.

7              MR. ELLIS:  That's correct.

8              THE COURT:  They are not being received as stipulated

9    exhibits.  Then we're on the same page.  And I will look to you.

10   If you wish to admit them, move to admit them at some point, and

11   we'll take it up again.  But I'll look to you to trigger me on

12   those exhibits.

13             MR. ELLIS:  I'll do so.

14             THE COURT:  All right.  Are there any other matters or

15   any other questions, Mr. Swindoll?

16             MR. SWINDOLL:  No, Your Honor.

17             THE COURT:  Mr. Ellis?

18             MR. ELLIS:  Just a housekeeping matter.  Will the

19   courtroom be secured overnight?

20             THE COURT:  It will be secured overnight.  And you are

21   welcome to leave the things here, and we'll open it up right

22   around eight o'clock tomorrow morning.  We will be back here.

23   We will put our jurors back in the box at nine.  Why don't we

24   all gather about 8:45 so that if we have any matters that we

25   need to take up before we get to the business of the day we're

1    all here and around to do that.

2            MS. KOSTELNIK:  Can I ask a housekeeping real quick?

3            THE COURT:  You may.

4            MS. KOSTELNIK:  On the depositions of -- on the

5    depositions of Mr. Pennington, how many copies are you going to

6    need?  I know that you need one for your court reporter.  Do you

7    need any additional copies for the Court for tomorrow?

8            THE COURT:  We do not.  If there are objections to be

9    ruled on that will be lodged or raised, it would be helpful if

10   you could tender a full copy of the transcript.  As I said,

11   that's not an exhibit that we'll end up sending back to the

12   jury.  I'll only send one copy of agreed-upon exhibits back to

13   the jury, so one set is fine.

14           MS. KOSTELNIK:  Thank you.

15           THE COURT:  Anything else?  If there are no other

16   business matters to take up, we'll stand in recess.  I'll see

17   you at 8:45 tomorrow morning.  Have a good evening.

18        (Overnight recess at 5:10 p.m.)

19                    REPORTER'S CERTIFICATE

20      I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

21

22   /s/Elaine Hinson, RMR, CRR, CCR        Date:  November 13, 2015.
     United States Court Reporter

23

24

25