```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
 2                       WESTERN DIVISION

 3   ROBIN BABOVEC, As Special
     Administratrix Of The Estate
 4   Of CASEY BABOVEC, Deceased,
                         Plaintiff,
 5        v.
     DEPUTY AND OFFICERS MIKE
 6   RICHARDS, TONYA PARKER,            No. 4:13CV00699 KGB
     CALVIN REED, SAM GRIFFIN,          Tuesday, January 27, 2015
 7   DION MCGUIRE, RYAN MCKINNEY,       Little Rock, Arkansas
     DAVID FENTON, JAMES PAYNE,         9:05 a.m.
 8   NANCY SHELNUTT, BRUCE
     PENNINGTON, JOHN and JANE
 9   DOES I-V, and COUNTY OF
     SALINE,
10                       Defendants.

11
                    TRANSCRIPT OF TRIAL - VOLUME 2
12            BEFORE THE HONORABLE KRISTINE G. BAKER,
                UNITED STATES DISTRICT JUDGE, and a jury
13

14   APPEARANCES:

15   On Behalf of the Plaintiff:

16      MR. JAMES F. SWINDOLL, Attorney at Law
        MS. EMILY KOSTELNIK, Attorney at Law
17         Law Offices of James F. Swindoll
           212 Center Street, Suite 300
18         Little Rock, Arkansas  72202

19
     On Behalf of the Defendants:
20
        MR. GEORGE D. ELLIS, Attorney at Law
21         Ellis Law Firm P.A.
           126 North Main Street
22         Benton, Arkansas  72015

23

24      Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
25   transcription.
```

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1                    **INDEX - VOLUME 2** (January 27, 2015)

2

3    **WITNESSES**
     (For the Plaintiff)      Direct      Cross      Redirect

4    **BRUCE PENNINGTON**
        [Video] Continuing      137

5

     **TONYA PARKER**            137        171        189

6

     **MICHAEL LYMAN**           194        206        232

7

     **CALVIN REED**             233        254        262

8

     **KELLI COFFEY**            264

9

     **DION MCGUIRE**            271

10

11   Re:  **Juror Comment**

12   **GEORGE CRAIG**            130

13   **BRUCE SPURLING**          131

14

15

16

17

18

19

20

21

22

23

24

25

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1          (Proceedings continuing at 9:05 a.m.; jury not present.)

2          THE COURT:  Good morning.  We are back on the record

3   with counsel and the parties outside the presence of the jury in

4   Case No. 4:13CV699.

5          We have been informed this morning that one of our jurors,

6   Juror No. 9, ███████████, overslept.  She's just now

7   waking up, and she is coming from Danville.  So if we wait for

8   ███████, it will likely be two hours or so was her estimate.

9   We can have our court security officer -- our options are to

10  wait or to proceed and try it to 11.  I'm happy to hear

11  arguments from counsel.  If you have any input on this issue, I

12  will certainly consider it.  At the end of the day, I will make

13  the decision on how we're going to proceed.

14         MR. SWINDOLL:  For the plaintiff, we would prefer to

15  wait.  We believe that the jury is a unit.  And this will

16  demonstrate to them that everybody in this courtroom has a

17  purpose.  And we think it would be beneficial to all parties for

18  the jury to know we respect them and want them here.

19         THE COURT:  All right.  Mr. Ellis?

20         MR. ELLIS:  Well, let me say that I fully recognize

21  this Court has absolute discretion on this point.  The Eighth

22  Circuit isn't going to reverse you one way or the other.  That

23  said, I fully concur with Mr. Swindoll and would prefer to wait.

24  It's an important case.

25         THE COURT:  All right.  I will say that I have some

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1    concerns that if we proceed without her we may start losing

2    others.  That's my concern.  One of the issues, though, that

3    plays into the consideration is gauging sort of where we're at

4    in this trial and how much we have to cover if we lose half a

5    day.  I don't know that either side is really prepared to think

6    about that, nor will I hold you to it.  But we said for these

7    folks that it may be up to five days.  My concern is, if you

8    think at any point that we may be pushing into a second week, we

9    need to know that to let them know that.  I don't know that

10   that's an option or an issue right now.  But if we get to that

11   point, I've got some concerns about that if we lose half a day.

12           MR. SWINDOLL:  Your Honor, I can say that I'm going to

13   be able to rest tomorrow at the end of the day.

14           THE COURT:  All right.  Mr. Ellis?

15           MR. ELLIS:  Well, we talked about this yesterday.  My

16   cross of the officers will be, in effect, the direct also, so we

17   could save a lot of time that way.  I'm not going to recall them

18   unless they weren't called by the plaintiff.  And I may not call

19   them then.  So we can move pretty quickly.  Mr. Swindoll and I,

20   we have a good working relationship.

21           THE COURT:  And I won't force you, Mr. Ellis, to

22   condense a defense.  You will get as much.  I said that at the

23   beginning.  I'm not going to pressure you to get a defense.  My

24   concern is for planning purposes for these folks, if we've set

25   five days, I need to give them as much notice if we're going to

1    push into the next week.

2        The other thing that you should know about my practice is,

3    when the case gets to the jury, I inform them that we're on

4    their timetable for deliberation.  They set the time they want

5    to arrive.  They set the time they want to leave.  They elect

6    their foreperson, and then they make their schedule.  They will

7    have waited on us and gone with our schedule for several days by

8    that point.  So I give it to them with the understanding that

9    they are the collective body that's going to make that decision.

10   So if they want to deliberate on Saturday, I'll be up here with

11   them on Saturday if that's what they wish to do.  But I leave it

12   up to them in order to make that decision.

13            MR. ELLIS:  Your Honor, I'm not going to speak the

14   unspeakable.  I'm sure we can finish this week.  But I have a

15   jury trial that starts in Judge Miller's court next Tuesday.

16            THE COURT:  Okay.  Understood.

17            MR. ELLIS:  We'll just make it up as we go along.

18   That's all we can do.

19            THE COURT:  With that, I'll make the decision at this

20   point that we will wait on her.  I will call the jury in to the

21   box, and I will let them know that we are going to attend to

22   some matters and that they will be on recess.

23        She said two hours.  Is two hours sufficient?

24            COURTROOM SECURITY OFFICER:  I would think so, yes,

25   ma'am.

1          THE COURT:  From Danville?

2          COURTROOM SECURITY OFFICER:  Danville is an hour and a

3    half away.  She had to have time to get ready.

4          THE COURT:  Right.  I will listen to counsel.  You

5    know, two hours from our start time at nine is about eleven.  We

6    can then get through about an hour.  But it may just make more

7    sense to bring these folks back in at 12:30 or one, because if I

8    have them for an hour, and if she's late, we're going to let

9    them go again and come back in at lunch.  So I'm happy to hear

10   from you all.  I don't know what your witness schedules are.  I

11   don't know if that puts anyone in a bind with anything that they

12   thought they would get through today.

13         MR. SWINDOLL:  Your Honor, the only constraint that

14   the plaintiff has is plaintiff's expert, Dr. Michael Lyman.  He

15   will be here this afternoon.  So it poses no problem at all to

16   start when the Court says.  He gets here at 10:30 this morning.

17   He will be available to testify anytime today.  And as long as I

18   can get him on, the rest of the people are here.

19         THE COURT:  All right.  Mr. Ellis, do you have any

20   input in that regard to bringing them back and then taking a

21   lunch or going straight, giving them a lunch and going straight

22   through this afternoon?

23         MR. ELLIS:  Is that a question to me?

24         THE COURT:  It was a question to you.  Do you have any

25   input on that?  Do you want to be heard on that one?

1          MR. ELLIS:  No, no.

2          MR. SWINDOLL:  One thing I might add, Your Honor, this

3    deposition is about 30 more minutes.  So we might, if she gets

4    here, we could play the deposition and start live testimony.

5          THE COURT:  Okay.

6          MR. SWINDOLL:  That's just a suggestion to the Court.

7    That's one way in which we could then speed up the testimony

8    with live people.

9          THE COURT:  What I will do is I'll bring everybody

10   back by eleven.  And then, when she's here, we'll get started at

11   that point.  I told these folks they would have their hour and a

12   half every day at lunch.  If they planned business, I don't want

13   to inconvenience any of them any further.  So I want them to be

14   able to plan on that.

15       Let's bring our jury back in the box.

16       (Jury present minus Juror No. 9.)

17          THE COURT:  Ladies and gentlemen of the jury, there is

18   some business the Court needs to attend to this morning that was

19   unexpected.  I'm going to let you all stay in recess until

20   eleven.  We'll be back in the box at eleven, and we will resume

21   our testimony then.  So if you all will be back here to be put

22   back in the box at eleven, we'll stand in recess until then.

23       (Jury exits courtroom.)

24          THE COURT:  We're on the record with counsel and the

25   parties outside the presence of the jury.

1    Is there anything that we need to take up at this time, Mr.
2  Swindoll?
3         MR. SWINDOLL:  Yes, ma'am.  Your Honor, Dr. Michael
4  Lyman will be here about the time the jury reconvenes.  He's an
5  expert.  And I ask that he be allowed to sit in the courtroom to
6  hear the testimony before his testimony.
7         THE COURT:  All right.
8         MR. SWINDOLL:  It will help formulate his opinion and
9  help cement it or reduce his opinion.
10        THE COURT:  Mr. Ellis?
11        MR. ELLIS:  I think that's permissible.
12        THE COURT:  I concur.  So we'll permit it.  When Mr.
13  Lyman enters -- if there's anyone else who enters, the rule is
14  still invoked.  You all know these folks better than we do.  You
15  can police it by letting the Court know or letting the Court
16  security officer know.  But the Court will permit Dr. Lyman or
17  Mr. Lyman --
18        MR. SWINDOLL:  Dr. Lyman.
19        THE COURT:  -- Dr. Lyman to sit in the courtroom
20  during the testimony prior to his own.  All right.  Anything
21  else on behalf of the plaintiff?
22        MR. SWINDOLL:  No, Your Honor.
23        THE COURT:  Anything for the defense?
24        MR. ELLIS:  No, Your Honor.
25        THE COURT:  All right.  We will stand in recess until

1    eleven o'clock.

2         (Recess from 9:14 a.m. until 10:52 a.m.; jury not present.)

3         THE COURT:  We are on the record with counsel and the

4    parties outside the presence of the jury.  The good news is all

5    of our jurors are here.  We have an unforeseen situation that's

6    developed that we need to take up, though, on the record at this

7    point.  I will ask one of our court security officers to come

8    up.  I'm going to put him under oath, and I'm going to let him

9    describe for you the comments he heard as the jurors were

10   walking out this morning.  And then we'll talk about what we're

11   going to do.

12        Come on up.

13        If you would, Ms. Washington, please swear him.

14              **GEORGE CRAIG, COURT'S WITNESS, DULY SWORN**

15                           EXAMINATION

16   BY THE COURT:

17   Q.   First, sir, if you would, please state your name for the

18   record.

19   A.   George Craig.

20   Q.   And Mr. Craig, would you please describe for counsel the

21   comments that you heard from jurors who were making their way

22   from my court when they were walking out?

23   A.   Yes, ma'am.  We were sitting at the screening point.  And

24   as the jury walked out this morning in a group, just a few

25   minutes before, as their break started, I turned around and

said, "Are y'all through?"  And one of the jury members turned

around and said, "Guilty."  And I looked back real quick,

because I knew the court was not over.  And one of the other

ladies said, "No.  We're on recess until eleven o'clock."

Q.    Was it a gentleman or a lady who said "guilty"?

A.    It was a gentleman.

Q.    Could you describe his physical appearance?

A.    He's the tall gentleman that to my knowledge is the

attorney that's on the jury.

Q.    You said the jurors were walking out in a group.  About how

many jurors were within earshot of the comment?

A.    Probably five or six, maybe seven, Your Honor.  I didn't

count.  There was those of us at the screening point and with

the jury.

Q.    Okay.  Were there any other comments that you overheard

other than what you've described now about the "guilty" comment?

A.    No, ma'am.  Just that.  That's all I heard.

         THE COURT:  Okay.  All right.  Thank you.  You may

step down.  I appreciate it.  I think there was another court

security officer who was in the room as well who heard the

comment.

         **BRUCE SPURLING, COURT'S WITNESS, DULY SWORN**

                        EXAMINATION

BY THE COURT:

Q.    If you would, would you also please state your name for the

1    record.

2    A.    Bruce Spurling.

3    Q.    Thank you.  If you would, describe what you heard this

4    morning as the jurors from my court were walking out of the

5    building.

6    A.    At the time they were walking out, I was behind the actual

7    x-ray machine monitoring a package coming through.  And I heard

8    Officer Craig ask if they were done.  The gentleman that was

9    described by Officer Craig stated "guilty."  A lady probably two

10    or three behind him within a few seconds said, "No.  We're on

11    break until eleven."

12    Q.    All right.  How many folks do you estimate from my jury

13    were within earshot?

14    A.    I would estimate about the same, five or six.

15    Q.    Okay.

16    A.    Because the lady that actually overheard it was behind him,

17    so I would assume everybody that was also behind him heard it

18    too.

19    Q.    All right.  Thank you.  You may step down.

20    A.    Yes, ma'am.

21          THE COURT:  All right.  I wanted to make counsel aware

22    of that because it was brought to my attention when the break

23    started.  I am happy to hear argument from counsel on those

24    issues if you wish to make it.  I will tell you that I have

25    given some thought to this over the break in terms of options.

1    But I haven't settled on an option, so I'm happy to hear what

2    you all would like to present, if anything.  And if you would

3    like to take a recess to confer with your clients, I'll permit

4    you to do that.

5            MR. SWINDOLL:  Your Honor, I think that is the lawyer

6    involved, in the middle back here, the tall man, the one for

7    AT&T's counsel.  In context, I think it might have been just a

8    joke.  He, obviously, knows the case is not over.  He,

9    obviously, knows he is not making judgments now, and he's not

10   trying to influence the jury.  This is a lawyer practicing, and

11   I don't think he would do that.  I really don't.  So I think

12   that it's a flippant joke remark made during -- everybody knows

13   they are not through and they are not to do that.  They have

14   heard continuous discussions in court you do not make

15   resolutions.  Knowing ▉▉▉ just ten years ago, he was a joker.

16   And I just don't think that he meant anything by it.  And I

17   really don't think anything but probably popoff.

18           THE COURT:  Mr. Ellis?

19           MR. ELLIS:  Your Honor, I would only inquire, has

20   anyone mentioned this matter to the juror?

21           THE COURT:  The Court has not.

22           MR. ELLIS:  How about our --

23           COURTROOM SECURITY OFFICER BAKER:  No.  I have not.

24           COURTROOM SECURITY OFFICER CRAIG:  No, sir.

25           COURTROOM SECURITY OFFICER SPURLOCK:  No.

1        THE COURT:  So all of the court security officers, the

2   two who overheard it and then the court security officer

3   assigned to our jury, have all responded "no," just so our

4   record is clear.

5        MR. ELLIS:  I just have to agree with Mr. Swindoll.

6   He was talking smack, and he was just popping off.  It was

7   totally innocuous, I think.  I don't have any problem with him

8   at all.  He may be the foreperson, and he may rule against us,

9   but that's not a basis for dismissing.

10       MR. SWINDOLL:  I know this guy well enough, you could

11  bring him in and ask.

12       MR. ELLIS:  I don't know him at all.

13       MR. SWINDOLL:  I haven't talked to him in ten years.

14  But I know him -- at the time, he was just a fresh young lawyer.

15  He had a sense of humor, and everybody at his firm enjoys a

16  sense of humor.  So I do not think that he would do anything to

17  wrongly -- he would not do anything to harm this proceeding.

18  I'm relatively sure of that.  Even if he rules against me, I

19  just trust his judgment.  I do not believe he intended to harm

20  anyone or influence the jury in any way.  But I would like to

21  hear from him if the Court has any reservations about taking him

22  off.

23       THE COURT:  Mr. Ellis, I'll give you an opportunity.

24       MR. ELLIS:  I just think this is a waste of time.  I'm

25  going to be real frank about that.  I don't think he meant

1    anything by that.  And if lawyers can't pop off a little bit

2    every once in a while, or jurors for that matter, we just need

3    to move on.

4         THE COURT:  The question I have -- and I appreciate

5    your comments.  My notion of this is it's information I have.

6    If I were sitting in your shoes and I had this information and

7    things turned out one way or the other for either side and you

8    all found out two weeks from now that I had this information, as

9    a practicing lawyer, I would want to know.  So with that, with

10   all due respect --

11        MR. ELLIS:  I appreciate that.

12        THE COURT:  -- we can either bring this juror in, and

13   I can ask him.  My concern is, not only him, but the five or six

14   other people who heard him.  I don't know.  And I'm happy to

15   hear argument about that.  Does it overemphasize it?  Is it best

16   just to let it go?  This is your case.  I'm here to preside and

17   keep the playing field level.  I'm happy to hear argument from

18   you all.  That's the question in my mind whether -- and I

19   believe it was ██████████, whether he comes in.

20        MR. SWINDOLL:  My gut tells me just go on.  On behalf

21   of the plaintiff, I ask let's just get it started.

22        THE COURT:  Mr. Ellis?

23        MR. ELLIS:  I didn't hear what he said.

24        MR. SWINDOLL:  I said on behalf of the plaintiff, I

25   don't think bringing him in helps anything.  If we bring five

1    jurors in, we make a big deal about this, we're going to end up

2    having everybody sitting on pins and needles the whole trial.

3    And I just don't think that benefits any of us.

4             MR. ELLIS:  I don't either.

5             THE COURT:  If y'all are in agreement, that makes it

6    easy on me.  But it's what I said before, which is this is

7    information that was brought to my attention.  And as a former

8    trial lawyer, if the judge had that kind of information, I would

9    want to have that kind of information before you heard it

10   walking out of the courtroom from somebody else who heard it in

11   the lobby.

12       So with that, we can go ahead and proceed.  Our jury is

13   ready if y'all are ready.  Do we need to take any breaks before

14   we get started?

15       Mr. Swindoll, do we need to take any breaks before we get

16   started?

17             MR. SWINDOLL:  No, Your Honor.  I'm having her set up

18   so she can run the video as soon as they arrive.

19             THE COURT:  Mr. Ellis, are you ready to proceed?

20             MR. ELLIS:  We are.

21       (Jury present.)

22             THE COURT:  Mr. Swindoll, you may proceed when you are

23   ready.

24             MR. SWINDOLL:  Thank you, Your Honor.  We will

25   continue the deposition of Sheriff Pennington.

1          (Videotaped deposition of Bruce Pennington continuing.)

2               MR. SWINDOLL:  Your Honor, that concludes the

3     deposition of Sheriff Pennington.

4               THE COURT:  You may proceed.

5               MR. SWINDOLL:  Thank you, Your Honor.  We call Tonya

6     Parker.

7          **TONYA PARKER, PLAINTIFF'S WITNESS, DULY SWORN**

8                         DIRECT EXAMINATION

9     BY MR. SWINDOLL:

10    Q.   Can you give us your full name, please.

11    A.   Tonya Mae Parker.

12    Q.   Ms. Parker, you worked at the jail in April of 2011?

13    A.   Yes, sir.

14    Q.   How long had you been at the jail at that time?

15    A.   I believe I was going in my second year.

16    Q.   In your second year?

17    A.   Yes, sir.

18    Q.   Are you still employed at the jail?

19    A.   Yes, sir.

20    Q.   In April of 2011, what was your rank?

21    A.   Corporal.

22    Q.   Were you a supervisor on duty April 13th of 2011 during

23    these events?

24    A.   Yes, sir.

25    Q.   What was your job as a supervisor?

Parker - Direct

1    A.    To run the shift.

2    Q.    Now, as a jailer, your job is only in the jail.  Right?

3    A.    Yes, sir.

4    Q.    Do you get training at the jail?

5    A.    Yes, sir.

6    Q.    Is it OJT?

7    A.    Yes, sir.

8    Q.    Do you have actual classes at the jail?

9    A.    We have -- we go to jail standards.

10   Q.    Jail standards, are those standards that you use to

11   determine and to protect both the inmates and the jailers at the

12   jail?  Right?

13   A.    Yes, sir.

14   Q.    Tell us about the chain of command.  You are a corporal.

15   How many people are under you?

16   A.    At that time, I believe there was four, I believe.

17   Q.    Okay.

18   A.    Between four or five.  It's been four years.  I'm sorry.

19   Q.    That's fine.  That's fine.  We'll see it on the film in a

20   minute when we get to it.

21   A.    Okay.

22   Q.    Did you have any part of the intake and evaluation of Casey

23   Babovec on April the 11th, 2011?

24   A.    Yes, sir.  I was there when he came in.

25   Q.    Okay.  When he came in, he was showing the effects of

Parker - Direct

1  methamphetamine, was he not?

2  A.   At that time, I didn't know what he was on.  He was just,

3  you know, he was kind of fidgety, you know, didn't hold still,

4  kind of jittery.

5  Q.   And you had been doing this long enough to know what that

6  probably meant, didn't you?

7  A.   You know, you can see it also in people that drink alcohol.

8  Q.   But in any event, the plaintiff was not normal?

9  A.   No, sir.

10  Q.   Now, were you responsible for monitoring Casey Babovec in

11  Cell No. 1?

12  A.   As a corporal, you are kind of -- you are responsible for

13  what's going on in the back, also in booking and mass control,

14  where the cameras are.  We have cameras in booking, and there's

15  officers that are sitting right there next to the cameras.

16  Q.   Okay.  Do you have cameras in the cells?

17  A.   Yes, sir.

18  Q.   Cell No. 1?

19  A.   Yes, sir.

20  Q.   Cell No. 5?

21  A.   Yes, sir.

22  Q.   Did you have audio in the cells?

23  A.   No, sir.

24  Q.   Could you hear what was going on in there?

25  A.   No, sir.

1   Q.   So it was really important, if you couldn't hear, that

2   someone be watching carefully what's going on in the cell.  Do

3   you agree?

4   A.   Yes, sir.

5   Q.   Now, Casey Babovec was having trouble during the hours

6   before 1645, wasn't he?

7   A.   What do you mean trouble?

8   Q.   If you were watching the cell, did you see him moving

9   around in the cell?  Did you see him bouncing off the door?  Did

10  you see him come to the door?  Did you see any of those?

11  A.   Yes, sir.  I wouldn't say he was bouncing off the wall.  We

12  also had five other inmates in there.

13  Q.   Had what?

14  A.   We also had five other inmates in there.  I believe it was

15  five.  And he was walking around.

16  Q.   You were watching that cell, were you not?

17  A.   No, sir.  Not all the time.

18  Q.   Did you see -- pull up -- 9.1, is that the cell that we're

19  talking about?

20  A.   Holding Cell 1?

21  Q.   Yes.

22  A.   Yes, sir.

23  Q.   Okay.  Now, in Exhibit 9.1, this shows 4:29.  It shows

24  Casey Babovec at the door.  Were you aware he was at the door?

25  A.   At some point he was, yes, sir.

Parker - Direct

1  Q.    Now, when an inmate comes to the door and tries to talk
2  through it, how do you respond to him?
3  A.    We go to the door.
4  Q.    Can you hear him?
5  A.    When you go to the door.
6  Q.    So someone sitting just outside the door, Ms. Parker, could
7  easily hear?
8  A.    Not necessarily easily, because you are back further away
9  when you are at the desk part, because the doors are sealed, you
10 know.
11 Q.    There is a bench right there by the door, though.  Right?
12 A.    Yes, sir.
13 Q.    And if you are standing at the door, you are telling me
14 that you can hear the inmate?
15 A.    Depending on where you are standing at.
16 Q.    Now, if an inmate comes to the door on the film and is
17 asking for something, do you go to figure out what it is that
18 the inmate is asking about?
19 A.    Yes, sir.
20 Q.    If an inmate is asking for emergent medical care, what do
21 you do as a corporal, as a Saline County officer?
22 A.    We would bring him out and assess him.
23 Q.    And what?
24 A.    And assess him.
25 Q.    Okay.  Do you know the signs of methamphetamine

1  intoxication?

2  A.    I mean, we just know, you know, when someone is on --

3  Q.    I know.  And that's because you haven't been in any medical

4  training to understand what it looks like.  Is that right?

5  A.    No, sir.

6  Q.    But you do know, based on your experience at the jail,

7  there are certain things that are tells, as it were.

8  A.    Yes, sir.

9  Q.    Tell us what you know, as a corporal in the sheriff's

10  department, about methamphetamine.  Is it dangerous to the

11  people who are using it?

12  A.    They are dangerous to themselves.  They can be.  It can be

13  also dangerous to anyone that they come in contact with.

14  Q.    Now, can you tell us at 4:29:03 that day whether or not you

15  were the one, if anybody, who came to the door to talk to Casey

16  Babovec when he is at the door in this picture?

17  A.    I don't remember now.

18  Q.    Casey Babovec -- let's go to 9.2, 4:29:07.  He's still at

19  the door.  Do you remember how many times you went to the door

20  that day?

21  A.    I believe I went once.

22  Q.    Just once?

23  A.    Yes, sir.  Because I had booking officers that are also

24  taking care of the booking area.

25  Q.    Turn to 9.5.  Did I understand you to say that there might

Parker - Direct                                           143

1    also be other people at the door listening for Casey Babovec,

2    not just you, but booking officers and others?

3    A.   Well, if he's bouncing or, I'm sorry, hitting on the door,

4    you know, which it's an all-day process, you know, because they

5    get tired of sitting in that room, a lot of times they may look

6    at the camera and see if there's any kind of distress going on.

7    Q.   Look at 4:31:52 and 9.7.  Were you aware at 4:30 that Mr.

8    Babovec had reached the point where he was taking his shirt off?

9    A.   No, sir.

10   Q.   And wetting it?

11   A.   No, sir.

12   Q.   If he is at the door asking for help and taking his shirt

13   off, what does a corporal in the Saline County Sheriff's

14   Department do?

15   A.   If someone was doing that, then he would be brought out.

16   Q.   Why would he be brought out?

17   A.   Because there was a reason -- you know, if he's taking his

18   shirt off and he's being agitated or any things like that, then

19   he would be brought out to pull him away from the other inmates

20   that's inside that cell both for his safety and for the other

21   safeties of the other detainees.

22   Q.   And if that wasn't done, it would have been a violation of

23   the jail policy?

24   A.   Not necessarily.

25   Q.   You said that that's what would be done.

1    A.    That's what we're trained to do.

2    Q.    But it's not a violation of general policy just to leave

3    them in there if you feel like they need to come out?

4    A.    I'm sorry.  I misunderstood.  Yes, sir.

5    Q.    Turn to 9.8, Emily.

6          I believe that's you, Ms. Parker.  Is that right?

7    A.    It could be, sir.

8    Q.    So that would have been -- and the time on that stamp is

9    five o'clock and six seconds?

10   A.    Okay.

11   Q.    So what I understand you to say is that in the one time

12   that you went there, this would have been the picture.

13   A.    Probably so.

14   Q.    So whatever was happening between 2:06, when he was placed

15   in there, and when he came up, the only time you interacted with

16   Casey Babovec was at five o'clock.

17   A.    I believe so.  I don't recall.  I thought maybe it might

18   have been one other time where me and Ms. Shelnutt may have went

19   up to the door together.  But, like I said, it's been four

20   years.  And it's --

21   Q.    Now, did you take Casey Babovec out and have him change his

22   pants?

23   A.    I believe I called the deputies.  And he had said he had

24   soiled his pants, and they brought him out to shower him out.

25   Q.    Which deputy was that?

1    A.    Deputy McGuire, and then Sergeant McKinney came out and

2    also assisted him.

3    Q.    And is Sergeant McKinney also a supervisor?

4    A.    Yes, sir.

5    Q.    Now, do you know whether or not Casey Babovec had lost his

6    bowels more than once that day?

7    A.    No, sir, I don't.  I don't recall.

8    Q.    Do you know that he had urinated on himself when he came

9    into the facility?

10   A.    I don't remember.

11   Q.    If he had and if he complained that he was having trouble,

12   would it have been the policy of the jail to provide emergency

13   medical service to him?

14   A.    For just urinating on himself?

15   Q.    And telling you that he had trouble, that he needed

16   emergency medical care.  Would that have been enough?

17   A.    If he would have stated that he needed emergency care, yes,

18   sir.  We would have to find out what he was needing the care

19   for.  Then we would have assessed it from then on.

20   Q.    Now, when you took Casey out, he was not resisting at all,

21   was he?

22   A.    No, sir.  He was just agitated.

23   Q.    In fact, turn to 9.10.

24         That's Casey at the door.  And is that you there taking him

25   out?  Are you in that picture?

1    A.    I can't tell.  I'm sorry.

2    Q.    Now, where were you when people decided to go to the door

3    after the fight, which we know is 5:08?  Were you present at

4    that time outside that cell?

5    A.    I don't remember.

6    Q.    We're going to look at the evidence, and I think it will

7    show us.

8    A.    Okay.

9    Q.    If you will run that tape.

10   A.    That's me right there with the ball cap.

11   Q.    Stop for a second.  That's you?

12   A.    Standing behind the yellow line.

13   Q.    Go ahead.  Now, who is that that came up?

14   A.    Which one?

15   Q.    The one, the guy who is standing right here, which is the

16   one who came up and went to the other side of the pile.

17   A.    I believe that's McGuire.

18   Q.    Who?

19   A.    McGuire, I think.  I'm not positive.

20   Q.    I think Dion McGuire is on the ground with his legs

21   sticking out towards us.  So do you know who that was?

22   A.    McGuire is in front.  That would have probably been Griffin

23   and Shelnutt.

24   Q.    Ms. Shelnutt is the one by the door, is she not?

25   A.    No.  That's me.  I believe that's myself.

Parker - Direct

1    Q.    You?

2    A.    Yes, sir.

3    Q.    You move.  Oh, I see.  You moved now.  Okay.  You are going

4    to close the door.

5    A.    Yes, sir.  I wanted to make sure the other inmates were

6    secure.

7    Q.    Can you hear what is going on right there?

8    A.    With Mr. Babovec, yes, sir.

9    Q.    If you hear in that circumstance an inmate saying, "I can't

10   breathe," what is your obligation as a supervisor?

11   A.    I would immediately go over there after I got through and

12   see what the situation was going on.

13   Q.    What is your role here?

14   A.    I'm getting the other inmates secured in that cell.

15   Q.    Who is that coming up right there?  Is that Officer Calvin

16   Reed?

17   A.    Talking about by the yellow line?

18   Q.    The one who just came running up.

19   A.    I believe that's Payne.

20   Q.    Stop.

21   A.    Oh.

22   Q.    Do you know who that is?

23   A.    I can't see them.

24   Q.    How many people can you count on there right now, ma'am?

25   A.    Counting myself?

Parker - Direct

1    Q.    Yes.

2    A.    Looks like four.  All I see is kind of a blob.

3    Q.    I think there are as many as six.  Do you know any of those

4    officers?  Can you describe any of the officers who are in that

5    pile?

6    A.    I can't from here.  The video is really grainy.  That's

7    Payne coming up there, I believe.

8    Q.    Yes.  Are you in the pile at this time?

9    A.    I'm down here on the leg on the -- looking at the picture,

10   I would be on the left.

11   Q.    What are you doing at that time?

12   A.    I'm doing a leg restraint.

13   Q.    At some point do people call clear?  Do you remember?

14   A.    No, sir.  I don't.

15   Q.    Who are these men coming up right now?

16   A.    That's Sergeant McKinney and Sergeant Richards.

17   Q.    Which one is which?

18   A.    Richards is on the right looking at the picture, and

19   Sergeant McKinney is on the left.

20   Q.    Both of those are supervisors, are they not?

21   A.    Yes, sir.

22   Q.    They are your supervisors?

23   A.    Yes, sir.

24   Q.    How many officers can you count that are there besides the

25   supervisors?

Parker - Direct

1    A.    Total in the whole picture?

2    Q.    Uh-huh.

3    A.    I'm counting eight.

4    Q.    Okay.  What is that officer doing on top of that individual

5    now, Corporal?

6    A.    He was handcuffing him.  I mean, he had just got done

7    handcuffing him.

8    Q.    And he's still on top of him, isn't he?

9    A.    Uh-huh.

10   Q.    Now, once you have a person like Casey Babovec restrained

11   and you have him facedown with handcuffs on him, what's the law

12   enforcement purpose for sitting on this man at that time?

13   A.    You have to make sure that he is secure.

14   Q.    Now, you know that Casey had gone quiet at this point,

15   don't you?

16   A.    What do you mean quiet?  I mean, he was cussing.

17   Q.    Huh?

18   A.    He was cussing.

19   Q.    He's laying on the ground.  He's already released his

20   fluids, hasn't he?

21   A.    Yes, sir.

22   Q.    In fact, I'm going to show you a statement.

23              MR. SWINDOLL:  May I approach, Your Honor?

24              THE COURT:  You may.

25   BY MR. SWINDOLL:

1    Q.    I'm going to show you a statement and ask if you can

2    identify this before we talk about it.

3    A.    Yes, sir.  That's a statement that I wrote.

4    Q.    And that's handwritten, isn't it?

5    A.    Yes, sir.

6    Q.    Right after the event?

7    A.    Yes, sir.

8    Q.    Okay.  Thank you.

9    A.    Uh-huh.

10   Q.    I'm going to -- now, it says you saw Officer Reed, and

11   Officer Fenton was getting his top area of the individual

12   subdued.  Is that what you said?

13   A.    Yes, sir.

14   Q.    And that's consistent with what you and I have been talking

15   about.  Right?

16   A.    Yes, sir.

17   Q.    Officer Reed was on top as well as Officer Fenton?

18   A.    Yes, sir.

19   Q.    And Officer Shelnutt?

20   A.    Yes, sir.

21   Q.    He seemed to have a lot of strength.  How big was Casey

22   Babovec?

23   A.    I don't know.  I mean, I don't know how much he weighed.

24   Q.    Okay.

25   A.    He's pretty good-sized.  He wasn't a tiny man.

1  Q.    And you said he seemed to have a lot of strength.

2  A.    Uh-huh.  Yes, sir.

3  Q.    Do you think that that strength is different than most

4  people, that it was more strength than normal?

5  A.    You could tell he was on something.

6  Q.    Do you think that the strength that he was exhibiting might

7  have been because he thought he was dying?

8  A.    I can't answer that question.

9  Q.    Now, and it says Officer Reed finally got them on him.  Are

10 you talking about the handcuffs?  Right?  Officer Reed finally

11 got the handcuffs, got them on him?  And I'm thinking you mean

12 handcuffs when you say that.

13 A.    Yes, sir.

14 Q.    At this time he started urinating all over himself, and it

15 was running out both sides of his legs.

16 A.    Yes, sir.  It's running down his pant legs.

17 Q.    He seemed to calm down.  And then he quit fighting, and

18 they rolled him onto his side and left him laying there.  Is

19 that what you say?

20 A.    Yes, sir.

21 Q.    Let's see if that's what happened in the tape.

22        (Video playing.)

23 Q.    Do you know what Officer Reed is saying right there?

24 A.    No, sir.  I don't recall.

25 Q.    Do you know what other officers are saying?

1    A.    No, sir.  I sure don't.

2    Q.    Is that Captain Richards right there on the right?

3    A.    Yes, sir.  Right next to the chair.

4    Q.    You said he was up and talking?

5    A.    Who?  Mr. Babovec?

6    Q.    Uh-huh.

7    A.    Right before the restraints, he was cussing.

8    Q.    When an inmate goes unconscious while he's in custody, what

9    are the obligations of the Saline County sheriff, according to

10   his own policies?

11   A.    That goes unconscious?

12   Q.    Yes.

13   A.    To call for medical --

14   Q.    Emergency medical.  Right?  He is entitled to that at that

15   time.

16   A.    Uh-huh, yes, sir.

17   Q.    And he is entitled to emergency medical if he asks for it.

18   A.    Yes, sir.

19   Q.    And you reasonably believe he needs it.

20   A.    Yes, sir.

21   Q.    Do you know what they are doing there?

22   A.    Taking -- they are taking him to Holding Cell 5.

23   Q.    Now, you say then Officer Reed pulled him to Cell 5.

24   A.    Yes, sir.

25   Q.    Now, what happened after that?

1   A.   We get to Cell 5, and he was on his abdomen.

2   Q.   Uh-huh.  Facedown?

3   A.   Uh-huh.  Yes, sir.  And the first thing I think is I always

4   watch people to make sure, you know, especially when they have

5   been handcuffed or anything like that, to make sure that they

6   are breathing and everything.

7   Q.   Had you called EMTs yet?

8   A.   No, sir.

9   Q.   This man is unconscious, isn't he?

10   A.   He was snoring, yes, sir.

11   Q.   Do you know what snoring is significant for in compression

12   asphyxia?  Do you know what that is?  Have you ever heard that

13   snoring is the last breath in the death?

14   A.   Yes, sir.  I have heard that.  And that's why I was

15   standing there looking at him at the time.  And that's when I

16   had noticed that there was no movement.

17   Q.   So time would have been of the essence, wouldn't it?

18   A.   Yes, sir.

19   Q.   From the time he got unconscious until you noticed him not

20   breathing, how much time elapsed?

21   A.   It seemed like forever, but it was within minutes.

22   Q.   It might have been forever.  Let's see.

23        THE COURT:  It is twelve o'clock.  We're going to take

24   our lunch break now.

25        During this recess and every other recess, please do not

1    discuss this case among yourselves or with anyone else,

2    including your family and friends.  Do not allow anyone to

3    discuss the case with you or within your hearing.  Do not

4    discuss also means do not email, send text messages, blog or

5    engage in any other form of written, oral or electronic

6    communication, as I instructed you before.

7        Do not read any newspaper or other written account, watch

8    any televised account or listen to any radio program on the

9    subject of this trial.  Do not conduct any Internet research or

10   consult with any other sources about this case, the people

11   involved in the case or its general subject matter.

12       You must keep your mind open and free of outside

13   information.  Only in this way will you be able to decide the

14   case fairly based solely on the evidence and my instructions on

15   the law.  If you decide the case on anything else, you will have

16   done an injustice.  It's very important that you follow these

17   instructions.

18       It's now noon.  We'll stand in recess until 1:30, take our

19   lunch break.  And we'll come back on the record at 1:30.

20       (Jury exits courtroom.)

21       THE COURT:  Do we need to take anything up at this

22   point with counsel and the parties on the record outside the

23   presence of the jury, counsel for the plaintiff?

24       MR. SWINDOLL:  Yes, Your Honor.  We need to tender the

25   transcript of the deposition of Sheriff Pennington, although I

1    understand it won't actually be taken.  It will be Exhibit 11

2    tendered by the plaintiff and held, I guess is what they told us

3    yesterday.

4              THE COURT:  All right.  Have you reviewed it, Mr.

5    Ellis?

6              MR. ELLIS:  Yes.

7              THE COURT:  If so, do you have any objection to it?

8              MR. ELLIS:  None.

9              THE COURT:  That will be received.  And as we

10   discussed yesterday, we will hold it.  It will become part of

11   the official record, but it won't go back to the jury room

12   during deliberation.

13       Anything else we need to take up for the plaintiff?

14             MR. SWINDOLL:  No, Your Honor.

15             THE COURT:  How about for defendants?

16             MR. ELLIS:  No.

17             THE COURT:  With that, we'll stand in recess.  Why

18   don't we come back again about ten minutes or so early.  If

19   there's anything we need to take up at that time, we'll let you

20   know.  Come back about 1:20, if counsel can be here about 1:20.

21   Enjoy your lunch.

22       (Recess from 12:02 p.m. until 1:27 p.m.; jury not present.)

23             THE COURT:  Are we ready to put our jury back in the

24   box, Mr. Swindoll?

25             MR. SWINDOLL:  No.

Parker - Direct

```
 1              THE COURT:  We're not ready to put the jury back in
 2    the box?  You are?
 3              MR. SWINDOLL:  Thank you.
 4              THE COURT:  Mr. Ellis, are we ready to put our jury
 5    back in the box?
 6              MR. ELLIS:  Yes.
 7         (Jury present.)
 8              THE COURT:  You may proceed when you are ready.
 9              MR. SWINDOLL:  Thank you, Your Honor.
10    BY MR. SWINDOLL:
11    Q.    Ms. Parker, you brought some notes up this time with you?
12    A.    Yes, sir.
13    Q.    I saw them.  What notes did you bring today?
14    A.    Just a time line.
15    Q.    The time line.  Okay.  Thank you.  Is that the time line
16    that we've all been working from?
17    A.    Yes, sir.
18    Q.    Okay.  We were talking about the amount of time between the
19    time that Mr. Babovec was rendered unconscious and then the next
20    action taken in the next room.  And that's when we took a break.
21    Do you remember?
22    A.    Yes, sir.
23    Q.    We were going to show that room and talk about what
24    happened inside it.  Okay?
25    A.    Yes, sir.
```

1        (Video playing.)

2   Q.   Now, do you agree that Casey is facedown?

3   A.   Yes, sir.

4   Q.   Do you believe in your training that's an appropriate way

5   to leave an unconscious inmate?

6   A.   He wasn't left there.  He was brought into the cell.  And

7   as you can see, he was turned over to be checked.

8   Q.   And you say you noticed that he wasn't breathing.  So you

9   come in in just a second to see that.  Right?

10  A.   Yes, sir.

11  Q.   Do you believe these officers, in carrying out their duties

12  of the Saline County sheriff, should have been checking to see

13  if there was any pulse and any breathing?

14  A.   We're all trained to do that.

15  Q.   And if they are not doing that, they are violating the

16  rules of Saline County.  Do you agree?

17  A.   Right.

18  Q.   Ms. Parker, what do you do when you see that an inmate is

19  not breathing?  What do you do right away?

20  A.   I check for a pulse.

21  Q.   And in this case did you check for a pulse?

22  A.   I did.

23  Q.   And did you find any pulse?

24  A.   No, sir.

25  Q.   And you didn't find any breathing, and you didn't find any

1    pulse?

2    A.    No, sir.

3    Q.    This was before all the emergency action that you mentioned

4    took place.

5    A.    Once I realized that he was not, we had no pulse, after

6    three tries on the three to four parts of the body, then we

7    started CPR.

8    Q.    If you had noticed that he's not breathing in the other

9    room, would you have begun CPR in the other room?

10   A.    Yes, sir.

11   Q.    So what happens?  Just keep going.  Are you in the room

12   yet?

13   A.    No.  I believe I'm at the door.

14   Q.    Let's keep going.  Is that you?

15   A.    Yes, sir.

16   Q.    That's you checking and finding no pulse?

17   A.    That's what I was checking.

18   Q.    Do you remember what you really were saying when you had

19   your hand out like this?

20   A.    I was probably either -- I don't remember.  I could have

21   been asking for gloves or blood pressure.  I don't remember,

22   sir.  It happened so fast.

23   Q.    You did ask for gloves, because they brought them to you,

24   didn't they?

25   A.    Yes, sir.

Parker - Direct

1  Q.   Now, during all of this time, while you are checking, you

2  never find any viable pulse on this young man.  Is that fair?

3  A.   No, sir -- yes, sir.  That is true.

4  Q.   Okay.  Now, could you smell that he had also defecated on

5  himself during the pileup?

6  A.   Not defecated.

7  Q.   If Deputy McGuire says he did, do you have any reason to

8  dispute that?

9  A.   No, sir.

10  Q.   What's happening now?

11  A.   I'm probably still checking -- I check three places for a

12  pulse.  I check the neck, the wrist and the inside of your

13  thigh.

14  Q.   And at that point you know there's no pulse.

15  A.   We had already called for 911 to be called.

16  Q.   Is there any reason that 911 could not have been called

17  when he went unconscious in the other room?

18  A.   I don't remember him going completely unconscious in the

19  other room.

20  Q.   If he went unconscious, 911 should have been called.

21  A.   Not necessarily.  If he goes unconscious -- on anybody that

22  goes unconscious, it could be from alcohol, from just, you know,

23  passing out from numerous things.

24  Q.   I'm going to show you part of the policies of the Saline

25  County sheriff for a minute and ask you if we can identify that.

Parker - Direct                                          160

1    Do you know the emergency medical response G-3 policy?  Are you

2    aware of that?  I'm trying to show it to you so you can look at

3    it.

4    A.    Yes, sir.

5    Q.    So you've just said that if someone is drunk and

6    unconscious you don't have to treat them.  Is that what you

7    said?

8    A.    No.  That's not what I said.

9    Q.    What did you say?

10   A.    I said we don't call 911 when they are unconscious right

11   away until they have been assessed.  Once they are assessed and

12   they are breathing and they are just unconscious from alcohol or

13   whatever they were coming in or from whatever the reason may be,

14   but if we find that he is or her in a distressed-type situation,

15   then, yes, we would have called 911.

16   Q.    So this policy that says emergency medical services are

17   available 24 hours a day to inmates, ensuring prompt emergency

18   medical attention, it's your understanding that the policy of

19   Saline County Sheriff's Department and the jail is that this

20   doesn't mean that they get called for EMT if they are

21   unconscious, if they have severe bleeding, if there's serious

22   breathing difficulties.  If there's a head injury or any health

23   or life-threatening situation, you don't call 911.

24   A.    In some of those, yes, you would.  But just

25   unconsciousness, no, because we are trained to watch for the

1    signs that would implement that we would need to call 911.

2    Q.    Do you remember --

3    A.    There's many steps you would take.

4    Q.    So this doesn't mean that he gets emergency care if he goes

5    unconscious.

6    A.    We are caring for him.  We are caring for him at the time

7    to assess.  And if it's something that needs to be assessed

8    more, then we would go the steps that needs to be taking place.

9    Q.    Do you think you are competent and trained to do so?

10   A.    I believe I'm competent to know, you know, how to check for

11   a pulse and if they are breathing and stuff, yes.

12   Q.    And if they are unconscious and you don't -- and they have

13   a pulse, you are not going to call.

14   A.    It depends on the situation.

15   Q.    What happens if one of your inmates has a stroke and falls

16   unconscious?  What do you do then?

17   A.    Then we would call 911.

18   Q.    How do you determine he has a stroke?

19   A.    There's variations that you would watch for and see.  The

20   history, you look at their histories.  You look at numerous

21   things.

22   Q.    You did not have medical care in the jail at this time, did

23   you?

24   A.    Are you talking about like a nurse or a doctor?  No, we did

25   not.

Parker - Direct

1   Q.   I'm talking about anybody to provide emergency medical care

2   at the time Casey died.  There was no one in this jail to do

3   that, no medically trained professionals.

4   A.   Not as a nurse or a doctor, no.  We're trained as far as,

5   you know, first responders and CPR.

6   Q.   Did you hear Sheriff Pennington testify just a few minutes

7   ago?

8   A.   Yes, sir.

9   Q.   That the training he did not feel was adequate for you to

10  make that determination?  Are you disputing him?

11  A.   No, sir.

12  Q.   Do you believe you were not adequate to make a medical

13  determination in this case about the level of intoxication?

14  A.   I didn't make a level.  I didn't determine.  I did what I

15  was trained to do, and that's what I did.

16  Q.   How can an inmate be sure, if he's unconscious, that he is

17  going to get emergency medical treatment?

18  A.   If they are unconscious, they are under a watch.  We are

19  right there with them the whole time.  They are never left

20  alone.

21  Q.   And so no matter what's happening, as long as you are

22  there, you think you are fulfilling the emergency care plan.

23  A.   No.  That's not what I said.  We're assessing him.  We are

24  determining -- I mean, if it's unconscious -- if he comes in and

25  he's been drinking and everything and he's -- you know how

1   people can pass out.  We can't take everybody that just passes

2   out to the hospital.

3   Q.    Why not?

4   A.    I can't answer that.

5   Q.    If a person loses consciousness in your jail, according to

6   the guidelines, an emergency medical call will be made.  Right?

7   Isn't that what it says?

8   A.    Yes, sir.

9   Q.    And it says that the detention officer confronted with a

10  medical emergency will, A, request assistance from 911.

11  A.    Right.

12  Q.    And that wasn't done immediately, was it?

13  A.    I was doing CPR.  And the sergeant had already started the

14  process of calling 911 whenever the situation started on Mr.

15  Babovec.

16  Q.    Now, between the time he was dragged and you determined

17  that he wasn't breathing, was any emergency medical procedure

18  provided to Casey Babovec?

19  A.    Other than the CPR and the AED was put on him, the

20  defibrillator --

21  Q.    I think that was after you determined that there was no

22  pulse.  Isn't that right?

23  A.    Yes.

24  Q.    So I'm asking you, before you determined that, when you

25  made the assessment that this inmate, this citizen, was not

1    breathing and had not been breathing for minutes, you did not

2    call 911.

3    A.    I immediately started CPR.  And the call had already been

4    made for 911 by Sergeant McKinney.

5    Q.    And in the time before, those precious minutes --

6    A.    It wasn't minutes.  It wasn't -- you are making it sound

7    like it was minutes and minutes.  It wasn't minutes by the time

8    that he was taken into the holding cell and then started the

9    CPR.

10   Q.    How long do you think a person can hold their breath for?

11   A.    I can't answer that.

12   Q.    The general orders of the jail are the rules of the jail,

13   are they not?

14   A.    Yes, sir.

15   Q.    And a violation of those rules is a violation of jail

16   policy.  Do you agree?

17   A.    Correct.

18   Q.    Do you further agree that all jailers must adhere to those

19   rules?

20   A.    Yes, sir.

21   Q.    Do you agree that all jailers must know those rules?

22   A.    Yes, sir.

23   Q.    And if they know those rules and they don't take action,

24   they are in violation of the jail policy?

25   A.    Correct.

Parker - Direct

1  Q.   And if they don't take action for emergency medical care,

2  the inmate doesn't get emergency medical care.  Is that true?

3  He can't call anybody for his own help.  You have to do that.

4  Right?

5  A.   Correct.

6  Q.   You have taken the ability from him while you have him in

7  custody to preserve his own life.  You must do so.  Do you

8  agree?

9  A.   I do.

10 Q.   And there is not just Casey Babovec.  You have 250 people

11 in your jail there at times, don't you?

12 A.   Yes, sir.

13 Q.   And they are there for all kinds of reasons.

14 A.   Yes, sir.

15 Q.   And every one of them is entitled to emergency medical care

16 if they need it.

17 A.   Yes, sir.

18 Q.   Can you think of any reason why a jailer would not follow

19 these guidelines if he knew them?

20 A.   No, sir.

21 Q.   Does any jailer ever have the right to ignore the need for

22 emergency medical care for one of the people they have in their

23 custody?

24 A.   No, sir.

25 Q.   Why not?

Parker - Direct                                166

1    A.    Are you talking if they ask for medical care?

2    Q.    Yeah.  You don't have the right to ever ignore.  Why do you

3    not have that right to ignore emergency medical situations?

4    A.    First, you need to figure out why they are needing the

5    emergency medical assistance anyway.  If they are asking to go

6    to the hospital, you know, there's many reasons people want to

7    go to the hospital when they come in.  They don't want to go to

8    jail.

9    Q.    Well, my question was, you never have a right to ignore.

10   A.    No, you don't.

11   Q.    There would never be that circumstance.

12   A.    No, sir.

13   Q.    So the emergency medical situation is what we are talking

14   about.  Everyone agrees every jailer has that obligation.

15   A.    Yes.

16   Q.    And to not do that would be in violation of all the things

17   we've talked about.  Right?

18   A.    Yes, sir.

19   Q.    And you made the assessment that day that Casey Babovec did

20   not need emergency medical care.  Is that right?

21   A.    No.  I didn't say he didn't need it.

22   Q.    Which supervisor made that determination at the detention

23   facility on April the 11th, if you know?

24   A.    I don't.  I don't recall.

25   Q.    Can you -- we talked a little bit about your training

Parker - Direct                                                      167

1    previously.  But can you just tell us a little bit about the

2    training that you have received to determine when a level of

3    intoxication, whether it be alcohol or drugs, you know that it's

4    time to do something to protect that inmate?  What training have

5    you had on that?

6    A.   At the jail or in the past?

7    Q.   In the jail.

8    A.   Just studies.

9    Q.   Huh?

10   A.   Just a lot of book reading and studies and seeing it every

11   day.

12   Q.   You don't ever remember any courses?

13   A.   Just jail standards.

14   Q.   A doctor never came and talked to you about that?

15   A.   No, sir.

16   Q.   You don't have any prescribed lists of symptoms to look

17   for?

18   A.   We do.

19   Q.   Is unconsciousness one of them?

20   A.   Yes.

21   Q.   What about profuse sweating?

22   A.   That is.

23   Q.   What about complaints of not being able to breathe?

24   A.   It depends on the exertion.

25   Q.   What about if they are fidgety and can't sit still?

1    A.    I mean, that's just all part of drugs, period.

2    Q.    At what point do the signs go just, it's okay, they are

3    drugs, they are going to be fine, to they are in danger and

4    might die?  Where is that dividing line?

5    A.    I can't answer that.

6    Q.    Is that because you are not trained to do so?

7    A.    Correct.

8    Q.    Do you believe that the care that Casey Babovec received in

9    the jail with respect to his medical care was the same medical

10   care that you deliver to all the inmates at the Saline County

11   Center?

12   A.    I believe so.  We take everybody.

13   Q.    So do you believe that every inmate received the exact same

14   kind of emergency medical attention that you gave to Casey

15   Babovec?

16   A.    Each case is different on how you are going to react to it.

17   It depends on what the emergency is at that time.

18   Q.    Well, we do have an emergency here, don't we?

19   A.    Yes.

20   Q.    We have a man who is intoxicated on methamphetamine and is

21   begging for help.

22   A.    Not once did I ever hear him beg for help.  Not once was he

23   asked or told us about a heart attack, not once.

24   Q.    If he had, what would have been required under the rules of

25   the Saline County Detention Center, the philosophy and the

Parker - Direct

1  actual major rules that we've been discussing for this?  What

2  would you have to do?

3  A.   If he said that he was actually having a heart attack, he

4  would have been brought out of the cell.  And he would have

5  right away had his blood pressure taken and all vitals checked

6  and went from there.

7  Q.   And it would be improper to ignore such a complaint by an

8  inmate.  Do you agree?

9  A.   I agree.

10  Q.   Do you believe that an inmate who says, "I'm not

11  resisting," should be listened to?

12  A.   Yes, sir.

13  Q.   If an inmate says to you during a restraint that, "I can't

14  breathe," what is your obligation as a corporal in the Saline

15  County Detention Center?

16  A.   Like I did when I was walking around and making sure that

17  everything was going like it was supposed to be going, but not

18  once did he even say he couldn't breathe.

19  Q.   Have you been trained to avoid suffocating people you are

20  restraining?

21  A.   To what, sir?

22  Q.   Have you been trained in techniques to avoid suffocating or

23  injuring the person you are restraining?

24  A.   Yes.

25  Q.   How do you avoid suffocating an inmate during a restraint?

1    A.    When you are restraining, you put them -- if you are taking

2    them to the ground, you put them in a four-point restraint.  And

3    that's two, one on each leg and the arm.  And Mr. -- for

4    example, Mr. Babovec, he was biting, so he was put in a head

5    restraint, someone at the top.

6    Q.    Now, maybe you can talk to us about that.  Maybe it will be

7    McGuire.  You know that McGuire had his arm around Casey, laying

8    on top of Casey.  His left arm was under Casey.  Do you know

9    that during the restraint?

10   A.    Underneath his arm?

11   Q.    Underneath Casey.

12   A.    Okay, okay.

13   Q.    Do you also know that Casey had his left arm underneath the

14   body and couldn't move it?

15   A.    He put his arm underneath his body because he didn't want

16   to be handcuffed.  He was trying to keep from being handcuffed.

17   Q.    How do you know that?

18   A.    I was there.  When --

19   Q.    Did you hear Deputy McGuire yelling, "his arm is under him,

20   he can't get there, he can't move it"?  Did you hear him yelling

21   that?

22   A.    No, sir.

23   Q.    If you had heard him yelling that, what would you have

24   done?

25   A.    I couldn't tell you, because I didn't hear it.

1    Q.    Do you think it's reasonable to leave a person laying

2    facedown after they have gone unconscious?

3    A.    It's really hard to answer.  I don't believe you should

4    leave them laying there for a long, long period of time.  But

5    you've got to let them settle down, especially since he just got

6    into a fight with a gentleman and then, you know, with the

7    officers.

8          MR. SWINDOLL:  Thank you.  No more questions, Your

9    Honor.

10                   CROSS-EXAMINATION

11   BY MR. ELLIS:

12   Q.    Now, Ms. Parker, Corporal Parker, let me begin with this

13   document that you were just looking at with Mr. Swindoll.  And

14   he went down a list of 1 through 8, unconsciousness, head

15   injury, severe pain, etc.  But he didn't read the last sentence

16   that I'm pointing to right here, did he?

17   A.    No, sir.

18   Q.    What is that?  Read that for the jury.

19   A.    "Common sense in any given situation must prevail."

20   Q.    Read it again.

21   A.    "Common sense in any given situation must prevail."

22   Q.    Thank you.  Now, I want to kind of begin at the beginning.

23   Were you present when Mr. Babovec came into the jail?

24   A.    Yes, sir.

25   Q.    Okay.  What did you observe?

1   A.    He was agitated.  He was hyper, jittery, just wouldn't hold

2   still.

3   Q.    Was his breathing labored?

4   A.    No, sir.

5   Q.    Was his speech slurred and incoherent?

6   A.    No, sir.

7   Q.    Okay.  Was he unsteady on his feet?

8   A.    He was just all over the place, you know.  But as far as if

9   he stood, he could stand up.

10  Q.    Okay.  As a matter of fact, we see the tape -- we can see

11  him on the tape walking over a little bit later and assaulting

12  the guy in Cell 1, don't we?

13  A.    Yes, sir.

14  Q.    And he's walking pretty forthrightly, isn't he?

15  A.    Yes, sir.

16  Q.    All right.  Now, what did you observe while he was in Cell

17  1?  And he was there for sometime as you all were processing him

18  and getting ready to book him in.  That takes a while.  And you

19  had others in there.

20  A.    Correct.  I wasn't out there the whole -- I didn't observe

21  him the whole time that he was in there.  It was just off and

22  on, and he's just -- he's just all over the cell.  He was back

23  and forth.  He was banging on the door.

24  Q.    Is that unusual?

25  A.    No, sir.

1    Q.    Is it unusual for them to take their clothes off?

2    A.    No, sir.

3    Q.    How often does that happen?

4    A.    Well, on shift, it's usually a couple of times, three times

5    a night.

6    Q.    A night?

7    A.    I work nights.  I'm sorry.  Yes, sir.

8    Q.    This is indelicate, but we have to cover it.  Is it unusual

9    for people coming in using alcohol, meth, pot, crack, cocaine,

10   all of that, to sometimes defecate or urinate on themselves?

11   A.    Yes, sir.

12   Q.    In their pants?

13   A.    Yes, sir.

14   Q.    How often does that happen?

15   A.    Two or three times maybe a week.

16   Q.    Two or three times a week?

17   A.    Uh-huh.

18   Q.    So would you say it's usual or unusual for that to happen?

19   A.    It happens a lot.

20   Q.    Okay.

21   A.    Yes, sir.

22   Q.    All right.  Now, when that happens, is that necessarily a

23   sign to you, as an experienced jailer, that that person is in

24   some kind of acute distress?

25   A.    No, sir.

1  Q.   Every time a person goes to the bathroom on themselves in a

2  jail because they are drunk or intoxicated on drugs, does that

3  mean to you as a jailer that they need emergency medical care?

4  A.   No, sir.

5  Q.   Every time that they are -- and I'm going to use the word

6  "unconscious," because that's the word that Mr. Swindoll was

7  using.  Every time a drunk in that jail is sleeping it off, does

8  that mean that you have to call 911?

9  A.   No, sir.

10 Q.   Load them up in an ambulance and take them to the hospital?

11 A.   No, sir.

12 Q.   Because that would be common sense that you don't have to

13 do that.

14 A.   Correct.

15 Q.   Now, where were you when Mr. McGuire over here -- and I

16 think Sergeant McKinney went with him -- came to get him out of

17 Cell 1 to go to the shower?

18 A.   I believe I'm the one that called and told McGuire -- I'm

19 sorry -- McGuire that Mr. Babovec needs his pants changed.

20 Q.   Okay.  You were the one?

21 A.   Yes, sir.

22 Q.   You were the corporal, and that was your call?

23 A.   Yes, sir.

24 Q.   And so he did.  Did you see him leave and go with Mr.

25 McGuire?

Parker - Cross

1    A.    Yes, sir.  He went with Mr. McGuire and Sergeant McKinney.

2    Q.    You were behind the booking counter.  Is that correct?

3    A.    Yes, sir.

4    Q.    Okay.  We've seen a photograph of that and the yellow line

5    and back in --

6    A.    Uh-huh.

7    Q.    Now, they came back.  And did you see them or Mr. McGuire

8    put Mr. Babovec back into Cell 1?

9    A.    Yes, sir.

10   Q.    Where were you when he put him back into Cell 1?

11   A.    I believe I was still behind the booking.

12   Q.    Okay.  And that's when the fight broke out?

13   A.    I don't believe it happened right away.

14   Q.    Did you see it on the screen?

15   A.    The fight?

16   Q.    The monitor?

17   A.    No.

18   Q.    You didn't see it?

19   A.    I didn't see it, no.

20   Q.    So --

21   A.    Are you talking about on the screen at work or here?

22   Q.    No, no, no, at work.

23   A.    Oh.

24   Q.    On this incident.

25   A.    No, sir.  I sure didn't.  I don't remember that.

Parker - Cross

1  Q.   They went and got him out of Cell 1.  Are you the one who

2  ordered them to do that?

3  A.   Yes, sir.

4  Q.   Okay.  So what did you observe then when that happened?

5  First of all, who went with Mr. McGuire?

6  A.   Shelnutt and Fenton.

7  Q.   Raise your hand.

8       And what did you see?

9  A.   Well, I told him he needed to come out.  When they opened

10  the door, Mr. Babovec was very hyper.  You know, he had just got

11  into it with another gentleman inside the cell.  So they brought

12  him out, and he was fighting them.

13  Q.   He was fighting?

14  A.   Uh-huh.

15  Q.   Now, when you say he was fighting them, what do you mean by

16  fighting?

17  A.   He was resisting.  He didn't want to come out.  He was

18  extremely upset.  He was fighting against the guards.

19  Q.   Did you ever hear him say, "I can't breathe"?

20  A.   No, sir.

21  Q.   Did you ever hear him say, "I'm having a heart attack"?

22  A.   No, sir.

23  Q.   During his entire stay in that jail, prior to his death on

24  that particular day, did you ever hear him say, "I'm having a

25  heart attack"?

Parker - Cross

1    A.    No, sir.

2    Q.    What would you have done if he had said that?

3    A.    We would have brought him out.  And like I was telling Mr.

4    Swindoll, that we would take -- I would take vitals right away,

5    blood pressure and vitals, because as soon as we would call for

6    an ambulance, that's the first thing they ask you for is what

7    are the vitals, so --

8    Q.    That happens, doesn't it?

9    A.    Yes, sir.

10   Q.    And that's what you've always done, isn't it?

11   A.    Yes, sir.

12   Q.    Okay.  And so he got out.  They got him out of Cell 1.

13   There was a fight going on.  And the three of them -- did the

14   three of them get him down, or did it take a fourth person or a

15   fifth person to come in and help to take -- we saw the tape.

16   I'm wanting to know about your memory.

17   A.    I'm just playing it in my head.  I know they struggled

18   getting him down.

19   Q.    Because you got involved in it pretty quickly.

20   A.    Yes, sir.  Yeah.  I think there was -- I think I even got

21   in there and assisted them.

22   Q.    Go ahead.

23   A.    I believe I assisted -- I don't remember.  I'm so sorry.

24   Q.    That's okay.  So he's finally down.  And there's something

25   about -- there's something about, you said earlier, a four-point

1    what?

2    A.    Restraint.

3    Q.    Okay.  Now, explain to the jury in some detail what that

4    is.

5    A.    A four-point restraint is where you try to get them down on

6    the ground.  And to keep them from hurting themselves or hurting

7    an officer, you put a four point.  You hold onto their legs.

8    Q.    One person is on his leg.

9    A.    One person on each leg.

10   Q.    On each leg.  Okay.

11   A.    And the other one is on an arm and part of the shoulder to

12   keep them down.

13   Q.    All right.  And that was the case here.

14   A.    Yes, sir.

15   Q.    Who had his, if you remember, his left leg?

16   A.    I believe it was myself.

17   Q.    And who had his right leg?

18   A.    I believe Shelnutt.

19   Q.    And who had his left arm, if you remember?

20   A.    I'm thinking Fenton.  I may be wrong on that.

21   Q.    Who had his right arm?

22   A.    I think McGuire.  I can't remember.

23   Q.    McGuire had his head, didn't he?

24   A.    I don't remember.

25   Q.    And who was on top of him?

Parker - Cross

1    A.    Well, Reed was on top to try to get him handcuffed.  But he

2    was not on his back.  He was on his pelvic area.

3    Q.    Okay.  Now, when you and the others were on his

4    extremities, his legs and his arms, did you have your bodies up

5    on him in any way or just on his extremities?

6    A.    Just -- not on him.  None of our body weight was on him.

7    Q.    On his torso.

8    A.    Right.

9    Q.    Was he strong?

10   A.    Yes.  He kicked Ms. Shelnutt off the ground with his leg.

11   Q.    With his leg going backwards?

12   A.    Yes, sir.

13   Q.    So Reed was on his back, straddling him?

14   A.    Yes, sir.

15   Q.    Where, if you remember observing, where was Reed's weight

16   centered?

17   A.    On his torso, like his butt.

18   Q.    But he was on his knees straddling him?

19   A.    Yeah.  He was on his knees straddling.  His full weight

20   wasn't on top of him.  He was straddling him on the lower

21   buttocks area.

22   Q.    Let's go over that again.  Reed's full weight was not on

23   Mr. Babovec.

24   A.    He was in a scissor-type hold, where you can straddle the

25   body and not put your full weight on them.

Parker - Cross

1   Q.    Uh-huh.

2   A.    And you do it on the lower part to where you are not up in

3   the middle, around your extremity part up in here.

4   Q.    Then, finally, up around his head, that was Mr. McGuire?

5   A.    Yes, sir.

6   Q.    And we know it was Mr. McGuire why?

7   A.    Because he was the one getting bit.

8   Q.    He got bit by Mr. Babovec?

9   A.    Yes, sir.

10  Q.    Who was saying, "I'm not resisting." I guess he was,

11  wasn't he?

12  A.    Not one time was he not resisting.

13  Q.    Okay. All right. And so why did you want to get him

14  cuffed, Corporal?

15  A.    For the safety of himself, for the safety of the officers.

16  And he just got into a confrontation with and went up and just

17  literally hit a man in Holding Cell 1.

18  Q.    For the safety of the other inmates --

19  A.    Yes, sir.

20  Q.    -- he had to be cuffed, didn't he?

21  A.    Yes, sir.

22  Q.    Okay. And so you get him cuffed. Reed gets him cuffed, I

23  guess, doesn't he?

24  A.    Yes, sir, after two or three tries, I believe.

25  Q.    Let's remind -- Reed -- thank you -- got him cuffed. Then

1   what happened?

2   A.   He laid there for a second.  And then they turned him over.

3   Then we took him to -- he was taken to Holding Cell 5.

4   Q.   Holding Cell 5?

5   A.   Uh-huh, yes, sir.

6   Q.   Now, did you ever hear him say any words during that entire

7   process, from the time they got him out of Cell 1 until the time

8   they got him into Cell 5, anything at all?

9   A.   He was cussing from the time that we pulled him out of Cell

10  1.

11  Q.   He was cursing?

12  A.   Yes, sir.

13  Q.   Other than that, did he ever say anything about his

14  condition?  Did he ever say anything, "I can't breathe," "I'm

15  having a heart attack," anything like that?

16  A.   No, sir.

17  Q.   Just giving you a good cussing?

18  A.   Yes, sir.

19  Q.   Okay.  And did the cussing continue as you got him into

20  Cell 5?

21  A.   No, sir.  He just -- he just -- he quit finally.  After he

22  got handcuffed, he started to calm down a little bit.

23  Q.   Okay.  So he's taken to Cell 5.  Reed gets him into Cell 5?

24  A.   Yes, sir.

25  Q.   And I noticed in the tape that he is eventually put up on

1    his side.

2    A.    Yes, sir.

3    Q.    Why is that?

4    A.    You don't want to leave them on their torso for very long.

5    You want to put them on their side.

6    Q.    That's part of your training, isn't it?

7    A.    Yes, sir.

8    Q.    And when then -- and we've got a time line here.  I think

9    this is already in evidence.  At 5:09:02 McGuire escorted

10   Babovec out of Holding Cell 1.  Is that what yours says?

11   A.    Yes, sir.

12   Q.    And then at 5:12:30, three and a half minutes later, he's

13   placed in Holding Cell 5.

14   A.    Correct.

15   Q.    So all of that happened in less than four minutes, didn't

16   it?

17   A.    Yes, sir.

18   Q.    And then 5:12:30 and then 5:16:02, you noticed that Babovec

19   was possibly in distress.

20   A.    Correct.

21   Q.    Elaborate for us, please.  We need to cover it again.  It's

22   important.

23   A.    Well, anytime -- anytime we put anybody in a restraint or

24   whatever they are at, we always go and assess them, always make

25   sure they are breathing okay, there's nothing out of the normal,

Parker - Cross

1  there's nothing that's causing an alarm.  That's just part --

2  that's what we're supposed to do.

3  Q.    And you did that?

4  A.    Yes, sir.

5  Q.    Okay.  I notice here that 46 seconds later Sergeant

6  McKinney called 911.  What transpired between those -- in that

7  46-second period?

8  A.    I started -- we started CPR as soon as I noticed that he

9  was not breathing.

10  Q.    Okay.

11  A.    We also called for the defibrillator right away.

12  Q.    But you had done something first.  You had assessed him,

13  and you had checked him.

14  A.    Yes, sir.

15  Q.    What did you do?

16  A.    I checked for his pulse in three different areas.

17  Q.    I'm going to come -- can I approach?  I'm going to come up

18  here and stand here.  You come over here.  And you point to me

19  on my body.  Come around here.

20          MR. ELLIS:  Can she do that, Your Honor?

21          THE COURT:  You may step down.

22  BY MR. ELLIS:

23  Q.    Now, assume I'm lying down.  Where would you do that on me?

24  A.    Well, I would -- first I would check it here, because you

25  have a main artery here.

1    Q.   Uh-huh, a carotid artery.

2    A.   Uh-huh.  And then you would check here.

3    Q.   Uh-huh.

4    A.   Then you check on --

5    Q.   I know.  That's fine.  The femoral artery?

6    A.   Yes.

7    Q.   On my thigh?

8    A.   Yes, sir.

9    Q.   Midway down?

10   A.   Yes, sir.

11   Q.   Those are the three points that you would check.

12   A.   Yes, sir.

13   Q.   Okay.  Did you do that?

14   A.   Yes, sir.

15   Q.   Did you check that?

16   A.   I did.

17   Q.   And you didn't get a pulse?

18   A.   No, sir.

19   Q.   Who did you say -- you said something to somebody, "I don't

20   think I'm getting a pulse."

21   A.   I believe I said that to Sergeant Richards.  I believe I

22   told that to Sergeant Richards.

23   Q.   Sergeant Richards -- raise your hand -- who, by then, had

24   come into the room.

25   A.   Yes, sir.

1   Q.   We saw that on the video, didn't we?

2   A.   Yes, sir.

3   Q.   And Sergeant Richards was in charge of that jail at that

4   point, wasn't he?  He's the person to whom you reported.

5   A.   Yes, sir.

6   Q.   And Sergeant McKinney too, I guess.

7   A.   Yes, sir.

8   Q.   And so then what -- then you all went into action.  Is that

9   correct?

10  A.   Correct.

11  Q.   Now, describe the CPR process that you went through.

12  A.   Well, you always want to make sure the airway is clear.

13  Q.   First of all, before you do that, until you noticed that he

14  wasn't breathing, did you consider this to be a medical

15  emergency?

16  A.   When I noticed he wasn't breathing?

17  Q.   Uh-huh.

18  A.   Yes.

19  Q.   That's when it became a medical emergency.

20  A.   Yes, sir.

21  Q.   Up until then, it wasn't, was it?

22  A.   No, sir.  I didn't feel that.

23  Q.   So go ahead with the CPR.

24  A.   Well, what you want to do, the first thing you want to do

25  is make sure your airway is clear.  Well, he had vomited.  So

1   Deputy Reed at the time was going to start mouth to mouth.  But

2   we had to clear -- he was doing mouth to mouth on a man that

3   just vomited.  So he was clearing that out and then --

4   Q.   He was giving him mouth to mouth even though he had

5   vomited?

6   A.   Oh, yeah, yeah.  He went straight into it.  And then I

7   started the chest compressions.

8   Q.   You started that business.

9   A.   Yes, sir.

10  Q.   Okay.  And we saw that on the video.

11  A.   Yes, sir.

12  Q.   Did you continue that until the first responders arrived?

13  A.   I did that.  And then we called for the defibrillator, and

14  Ms. Shelnutt got started hooking it up.  We got it put on him.

15  It never registered, so we went back to doing CPR until the

16  first responders came.

17  Q.   Okay.  Now, the defibrillator, you say it never responded.

18  How does that work?

19  A.   It has to read.  It's either -- it has to read a pulse or

20  -- it's hard to explain.  I'm not going --

21  Q.   It has to be able to pick up something.

22  A.   Pick up something, some rhythm, in order for it to say,

23  okay, go ahead and proceed.  And it never picked up.

24  Q.   And it tells you.

25  A.   Yes, sir.  It's all step by step right there.

1   Q.   And so they responded and then paramedics after that.

2   A.   Yes, sir.

3   Q.   And they rolled him out?

4   A.   Yes, sir.

5   Q.   Did you have at sometime a conversation with Christy -- we

6   call her Nichols.  We've called her Nicholas in the record.  I

7   don't know which one it is.  Did you talk to her?

8   A.   Yes, sir.

9   Q.   When did you talk to her?

10  A.   After it was all done, she told me that he -- she told me

11  that he had swallowed two bags.  I don't remember her saying

12  grams.

13  Q.   But it was after this entire event had occurred.

14  A.   After the whole thing had ended.  I told her, I said, you

15  know, she should have let us known that earlier.

16  Q.   And you heard her testimony here today?

17  A.   Yes, sir.

18  Q.   Or yesterday?

19  A.   Yes, sir.

20  Q.   And as I recall, she wasn't -- she finally said she wasn't

21  sure when she told you that.

22           MR. SWINDOLL:  Objection, Your Honor.  May I approach?

23           THE COURT:  You may.

24           MR. ELLIS:  I'll withdraw the question if that makes

25  it easier.

1   BY MR. ELLIS:

2   Q.    Corporal, can you think of anything you could have done for

3   Mr. Babovec, or anything, and based on your training and

4   experience, or anything you did that you, in retrospect,

5   wouldn't have done for Mr. Babovec --

6   A.    I believe --

7   Q.    -- in this case?

8   A.    -- I did everything correct.  I wouldn't change anything

9   that I did.  I'm sorry it ended the way that it did, but I don't

10  have anything I would have changed different.

11  Q.    How long have you been a jailer?

12  A.    I've been there five years now.

13  Q.    Say it again.

14  A.    I've been there five years now.

15  Q.    And you didn't feel that it was an emergency, using your

16  common sense --

17  A.    Yes, sir.

18  Q.    -- an emergency until there was a problem with breathing

19  and pulse.

20  A.    Correct.

21          MR. ELLIS:  Pass the witness.

22          MR. SWINDOLL:  Redirect?

23          THE COURT:  Yes.

24          MR. SWINDOLL:  Thank you, Your Honor.

25                      REDIRECT EXAMINATION

1   BY MR. SWINDOLL:

2   Q.   The idea that common sense prevails, Corporal Parker, does

3   that mean that you use your common sense to disregard the

4   standing orders in the jail?

5   A.   No, sir.

6   Q.   If the standing orders in the jail say that a patient or a

7   person who goes unconscious is entitled to emergency medical

8   care, are you telling this jury you can use your common sense

9   and your training to determine that he's not entitled to

10  emergency medical care?

11  A.   It depends on the situation.

12  Q.   That's what you are saying.  So you would do everything

13  exactly the same.

14  A.   Yes, I would.

15  Q.   Nothing has changed in Saline County since this day because

16  nothing was wrong.  Is that right?

17  A.   No.  We have medical at Saline County now.  We have a nurse

18  on all the time.  We have a doctor that comes in.  If we have a

19  situation, we call.

20  Q.   And they come down and check immediately, don't they?

21  A.   Not necessarily.

22  Q.   And if you worry about an assessment, you send them to

23  medical personnel now to be sure they are assessed if you are

24  worried that they are in danger.

25  A.    If the nurse is there.  If not, then it's up to the

Parker - Redirect

1   corporals to assess the situation.

2   Q.   Using your common sense.

3   A.   Yes, sir.

4   Q.   But this medical emergency response is just a suggestion.

5   Is that what you are telling us, that you can use and substitute

6   your judgment for the standing rules that protect people like

7   Casey Babovec?

8   A.   As it says, it's common sense in any given situation.

9   Q.   Now, you said you couldn't hear Casey.  But you also said

10  you couldn't hear McGuire.  So you didn't hear anything.  How

11  could you hear Casey if you didn't hear McGuire?

12  A.   Because I was right there when they were bringing Casey

13  out.  On the video, if you see, I'm walking around to the back

14  side.

15  Q.   Okay.  You said that this went on for just a couple of

16  seconds.  I would like to go back for a minute and look at the

17  time involved if we can.

18       (Video playing.)

19  Q.   Okay.  Stop it there for a second.  Now, this is Officer

20  Reed that you were discussing; is that right, in the middle over

21  Casey Babovec?

22  A.   Yes, sir.

23  Q.   Now, Casey Babovec has already been handcuffed.  Is that

24  right?

25  A.   I believe so.

Parker - Redirect

1    Q.    All those officers have stepped away because somebody has

2    called clear.  The handcuffs have been made.  Right?  So what's

3    the law enforcement purpose at this time, if you know, of this

4    man straddling this patient?  What is it?

5    A.    Probably just to make sure that he's secure.

6    Q.    Should he be sure that the man is breathing?

7    A.    He was breathing.

8    Q.    You tested him?  You looked at it at that time?

9    A.    Yes, sir.  As you can see, I'm walking around the whole --

10   Q.    Where are you?

11   A.    I should be down there on the bottom.  I believe that's

12   where I'm at.

13   Q.    What's his hand doing?  What's he talking about?  Do you

14   remember?

15   A.    Who?

16   Q.    Why is he leaning on Casey Babovec?  Do you know?

17   A.    He could be assessing.

18   Q.    Now he has his knee on him.  Do you know what he's doing

19   there?

20   A.    His knee where?  He's got one leg bent up, and his leg is

21   not on him.

22   Q.    Is that the way you drag prisoners from one place to

23   another, by their shirt?

24   A.    He wasn't drug by his shirt.

25   Q.    That's the practice at Saline County?

1    A.    He wasn't dragged by his shirt.  He had him by his arm,

2    underneath his armpit.

3    Q.    Now, you say it was just a couple of seconds before you

4    recognized that he wasn't breathing in the next room.  Isn't

5    that what you told us on cross-examination?

6    A.    It wasn't very long.

7    Q.    Let's see how long it was.

8    A.    It just seemed like it went --

9    Q.    Is he breathing there?

10   A.    I'm not in there yet.  That's when he was snoring.

11   Q.    That's you right there.  Right?

12   A.    Yes, sir.

13   Q.    So that time frame that we've just looked at, that's the

14   few seconds you were trying to tell us about?

15   A.    Yes, sir.  Actually, it was three minutes.

16   Q.    Okay.  Just one last question.

17   A.    Yes, sir.

18   Q.    I just want to be sure that I understand what this

19   guideline means, and I'll sit down.  Does this guideline mean

20   that an inmate is promised emergency medical care?

21   A.    Yes, sir.

22   Q.    Does it mean that the emergency medical will be implemented

23   in the event of medical emergencies and these emergencies shall

24   include unconsciousness?  That's what it means, doesn't it,

25   emergency medical care?

1    A.    Yes, sir.

2    Q.    Serious breathing difficulties, emergency medical care;

3    sudden onset of bizarre behavior, emergency medical care; health

4    or life-threatening situations, emergency care.  Those are all

5    outlined specifically.  And it says including but not limited

6    to.  Do you agree?

7    A.    Yes, sir.

8    Q.    And do you think that your assessment and your judgment

9    should overcome the written regulations that you are required to

10   adhere to, and you do that in the name of common sense?

11   A.    It says in training.

12   Q.    You were trained that you don't have to pay attention to

13   this.  You can use your common sense instead.  And if someone

14   dies in the process, that's their problem, isn't it?

15   A.    That's not what I said.

16   Q.    Thank you.

17           MR. SWINDOLL:  No more questions.

18           THE COURT:  Mr. Ellis, do you have anything further

19   from this witness?

20           MR. ELLIS:  Nothing further.

21           THE COURT:  You may step down.

22      You may call your next witness.

23           MR. SWINDOLL:  We call Dr. Michael Lyman.

24           **MICHAEL LYMAN, PLAINTIFF'S WITNESS, DULY SWORN**

25                      DIRECT EXAMINATION

Lyman - Direct                                                          194

1    BY MR. SWINDOLL:

2    Q.    Good afternoon, Dr. Lyman.  Introduce yourself to the jury,

3    please.

4    A.    My name is Michael Lyman.

5    Q.    And tell us who you are.

6    A.    I'm a professor of criminal justice -- and I work at a

7    private college, Columbia College of Missouri -- have been for

8    about 27 years.

9    Q.    And do you teach criminal justice?

10   A.    I teach criminal justice in both the undergraduate and the

11   graduate level.

12   Q.    And tell us a little bit about your endeavors.  You teach

13   at the graduate level.  Before we get to what you teach, let's

14   talk about your police background if you will.  Just tell the

15   jury about your experience as a police officer on the street and

16   in the jails and everywhere else that you've been.

17   A.    Sure.  I worked for two state police organizations:  First,

18   the State of Kansas as an investigator for the Kansas Bureau of

19   Investigation.  I was a sworn officer.  I then worked for the

20   State of Oklahoma, the state police there, the Oklahoma Bureau

21   of Narcotics and Dangerous Drugs.  And I was a senior agent

22   there, eventually promoted to a senior agent in that capacity.

23   I worked on shooting boards.  I worked in drug recognition,

24   where we go around and train officers around the state in

25   different types of drugs in that same capacity.  Of course, I

1    conducted investigations, made arrests, conducted the search

2    warrants and all the related investigative duties.

3    Q.    And you acted as a supervisor in some of these jobs?

4    A.    I supervised investigations, yes.

5    Q.    Okay.  Dr. Lyman, you are also a published author of a

6    number of books involving this topic, are you not?

7    A.    Yes.  I've authored eight books.

8    Q.    Give us an idea of some of the kinds of books that you've

9    been an author for.

10   A.    For print, I have four titles: *Criminal Investigation; The*

11   *Police:  An Introduction; Organized Crime*.  I also have titles

12   with other publishers, national publishers:  *Practical Drug*

13   *Enforcement Procedures and Administration*.  I've got *Drugs in*

14   *Society:  Causes, Concepts and Control;* another book on gangs.

15   Q.    And not only are you an instructor and an author, but you

16   do have a bureau that helps people like us and police agencies

17   as well.  You act as an expert witness.

18   A.    I do have an expert witness practice, yes.

19   Q.    And you do both sides, do you not, Doctor?

20   A.    I do.

21   Q.    So you do work for the police.  In fact, you are involved

22   in police cases right now.

23   A.    Yes.  I'm working with the Chicago Police Department and

24   the Johnson County, Kansas, Sheriff's Department in behalf of --

25   in a similar capacity for a civil litigation.

1    Q.    And you've asked -- and we've asked you to assist us in

2    this case.  Is that right?

3    A.    Yes.  That's true.

4    Q.    And so there's no question about it, you are paid for your

5    services?

6    A.    Oh, yes.

7    Q.    And what were you asked to do in this case, Dr. Lyman?

8    A.    I was asked to review this case with regard to the extent

9    that proper and timely medical attention was provided to Mr.

10   Babovec and with regard to the levels of force used against Mr.

11   Babovec by the employees of the sheriff's department and

12   subsequent to the use of force if there was proper and timely

13   medical attention provided to him.

14   Q.    How did you go about deciding what was going to be your

15   opinion in this case?  What did you do to work towards an

16   opinion to come up with your opinions?

17   A.    Well, I was provided a case file, a fairly voluminous case

18   file, in fact, read, you know, investigative reports and

19   narrative reports, depositions, transcripts, saw videos,

20   statements from individuals.

21   Q.    Have you reached an opinion within a reasonable

22   professional certainty on each of the three items that I've

23   asked you to review in this case?

24   A.    Yes, I have.

25   Q.    For the purpose of beginning, do you have an opinion as to

Lyman - Direct

1    whether or not Saline County provided emergency medical services
2    in a timely and reasonable basis for Casey Babovec when he was
3    inducted and placed into the holding cell?
4    A.    I do have an opinion in that regard.  And that is that they
5    in fact did not based on what I read and based on the available
6    standards regarding police use of force and provision of medical
7    services.
8    Q.    Thank you.  Do you have an opinion as to whether or not,
9    during the extraction and restraint of Casey Babovec in this
10   case, excessive force was used?
11   A.    I do have an opinion in that regard, and I do believe that
12   excessive force was in fact used.
13   Q.    And do you have an opinion as to whether or not following
14   the restraint that proper and reasonable medical care was
15   provided him?
16   A.    I also have an opinion in that regard.  And that is that
17   there was not probable -- proper or timely medical attention
18   provided to Mr. Babovec.
19   Q.    Now, let's go back to the first opinion, that medical care
20   was not provided in a timely and reasonable basis when he was
21   put into jail.  Give us the basis for that.  And just tell the
22   jury how it is that a person like you evaluates the evidence and
23   what evidence you evaluated to come to that conclusion, Doctor.
24   A.    Well, I evaluated the documents that I stated as well as
25   the videos which have been shown here in this proceeding.  I

1   also utilized my knowledge and expertise and research in jail

2   administration.  I teach jail administration on the graduate

3   level.  I teach corrections administration, in fact, on the

4   graduate level and corrections and penology on the graduate

5   level, so I have considerable familiarity with the handling of

6   prisoners by law enforcement personnel.

7        And generally the intake process is the process by which an

8   individual is properly assessed, at least initially, to

9   determine their suitability to be locked up, honestly.  And if

10  there are signs and indicators and evidence in its totality,

11  sometimes there's more than one red flag that indicate that the

12  person should not be locked up.  In fact, they should be the

13  recipient of medical attention.  That should be identified at

14  the intake process, if possible, if that evidence is available.

15  Q.   And did you make an assessment here as to whether or not at

16  the initial assessment it was proper and according to the

17  understanding you have of the rules?

18  A.   Are you asking with regard to the rules?

19  Q.   Yes.

20  A.   With regard to the rules, it was a violation of the policy,

21  a clear violation.  And that policy was identified just a few

22  minutes ago on the overhead.

23  Q.   Let's start with you state that during the initial

24  assessment a determination must be made about the inmate's

25  condition to be locked up, as you said.

Lyman - Direct                                           199

1    A.   Yes.  A reasonable determination.

2    Q.   What is it that you saw in this case that raises your

3    suspicions, red flags, as you said?

4    A.   Well, it's not just what I saw.  It's what I read in the

5    record as well.  And that's the fact that Mr. Babovec had

6    urinated on himself, possibly defecated on himself at the time

7    that he was brought to the jail.  He was fidgety, he was jumpy,

8    very nervous acting.

9         Those two indicators would lead a reasonable person to

10   believe that there could be some physiological problems going on

11   with this person.  I think it was pretty clear that he was under

12   the influence of some kind of drug.  I disagree that it could

13   have been alcohol under those conditions based on my experience

14   with drugs.  But fidgety, it could have been some stimulant,

15   probably was a stimulant.  And I think it was even stated by at

16   least one of the jailers in this case that they believed it

17   probably was a stimulant as well.  But coupled with the fact

18   that he had urinated or defecated on himself, that raises the

19   bar.  And, in fact, that very well could be the game changer

20   that would necessitate him to be looked at by medical

21   professionals.

22   Q.   And in your judgment it was not done in this case?

23   A.   It was not done.

24   Q.   So can you say with professional certainty that the Saline

25   County, the jail and the jailers, did not make a proper

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1   assessment of this individual before they placed him into their

2   facility?

3   A.   That's my opinion, yes.  That's part of my opinion.

4   Q.   Okay.  Now, is it more likely true than not that is so?

5   A.   Oh, yes.

6   Q.   Can you say beyond that -- can you say with reasonable

7   professional certainty that the jailers did not make a proper

8   assessment when they jailed --

9           MR. ELLIS:  Objection.  Would you ask counsel not to

10  lead, please?

11          THE COURT:  Do you wish to rephrase the question, Mr.

12  Swindoll?

13          MR. SWINDOLL:  Yes, Your Honor, I will.

14  BY MR. SWINDOLL:

15  Q.   Do you have an opinion -- you have said that it was more

16  likely than not.  I asked you beyond that, do you have an

17  opinion that is within reasonable professional certainty in your

18  field that this assessment was not proper?

19  A.   I do.

20  Q.   And that is that it was not proper?

21  A.   That's correct.

22  Q.   I've asked you to review the force involved in this case,

23  Dr. Lyman.  Explain to me whether or not in your opinion

24  excessive force was used and, if so, why.

25  A.   It absolutely was used in this case.  The video supports my

1    opinion in that regard.  When Mr. Babovec was extracted from the

2    cell -- and I believe it was Officer McGuire who was the one

3    that actually went hands on with him to pull him out.  If you

4    examine that video, as has been done here -- but I've looked at

5    it many, many times -- initially there appears to be four

6    officers on Mr. Babovec.  Of course, he was directed to the

7    floor right away, facedown on the floor.  Other officers joined.

8    Within a matter of seconds, there were six officers.  And I

9    agree with Ms. Parker, that there was ultimately eight officers

10   on him, in fact.

11        Of course, after he was handcuffed is also a concern,

12   because one officer, Reed, the jailer, Reed, remained on the

13   back of Babovec.  That's clearly shown in the video.  And for an

14   inordinately long time, unnecessarily, because Mr. Babovec was

15   handcuffed.  When you are handcuffed and facedown on the floor,

16   not only is it dangerous, because you may have a problem

17   breathing, you are at a distinct tactical disadvantage to pose a

18   threat to anybody.

19   Q.   Thank you.  I would like to review that video with you just

20   for a second.  You can comment as you would like about what you

21   see, Doctor.

22        (Video playing.)

23   A.   Well, you see Mr. Babovec being taken out.  What you don't

24   see is Mr. Babovec swinging at anybody.  He does appear to be

25   resistant, but not a threat.  He's stomach down right now,

1   clearly at a tactical disadvantage.  The officers are securing

2   him.  I believe there's at least four present, if I'm

3   counting -- there's five.  Officer Reed came in.  You see Ms.

4   Parker over against the wall to the right.  Another officer

5   comes in.  There's six.  Ms. Parker joins in.  There's seven.

6   And there might be even more than that there.  There are so many

7   people huddled over Mr. Babovec, it's really difficult to tell.

8        Even the period of time that Mr. Babovec was placed on his

9   stomach to even this point in the video, that's probably

10  30 seconds, give or take.  That's important, because given the

11  weight that is being placed on him, that's 30 seconds where it

12  could be difficult, if not impossible, to breathe.  And the

13  clock is ticking.  He's still on his stomach.

14       The supervisor is standing there.  Richard McKinney is

15  standing there observing.  Officers pull off except for Officer

16  Reed.  Still pressure on the back, clearly with his hands,

17  possibly a knee, possibly the left knee.  You see the right knee

18  appears to be on the ground.  We're looking at about a minute

19  now.  That's an estimate.  But I think that's a reasonable

20  estimation.  Still stomach down, still pressure on the back,

21  unnecessary, absolutely unequivocally unnecessary.  The man is

22  handcuffed.  In fact, he's not even moving.  Look at the leg,

23  the orange jumpsuit, not even moving, unresponsive.  He was

24  moving earlier, was he not?  Of course he was.  Not now, and not

25  for the last 15 seconds.  Still weight on him, still weight on

1    him.  The weight appears to be off right now.

2         Nowhere in the record does it show that any 911 call was

3    made at this point.  It should have been, because unresponsive

4    is the medical need.  Unresponsive -- the medical need doesn't

5    just show up when somebody decides to check the pulse.

6    Unresponsive speaks for itself, because those aren't medical

7    doctors standing around.  Those are jailers.  You can't make a

8    medical determination without medical training.

9    Q.   Now they are mopping up the fluids there.  Is this a crime

10   scene, Doctor?

11   A.   Yes, in my opinion.  Fluids are clear evidence, yet again,

12   more fluids being expelled from Mr. Babovec, more evidence that

13   something physiologically is wrong.

14   Q.   Thank you.  And your third opinion was that they failed to

15   provide medical care following the restraint.  And you started

16   talking about that just now when you said that the inability to

17   respond, the unconsciousness that you see, is the medical

18   emergency that we're talking about.

19   A.   That's exactly what I'm saying.

20   Q.   And that is something that is well known throughout police

21   agencies and jails all over the nation.

22        MR. ELLIS:  Your Honor, I would like to object.

23   Leading the witness.

24        THE COURT:  I overrule the objection.  You may

25   proceed.

1       THE WITNESS:  Yes.  That is widely known.

2  BY MR. SWINDOLL:

3  Q.   It is widely known.  Now, what happens if they don't do

4  that?  You've seen the video where it goes in, and they just

5  wait, and then finally somebody tests his pulse.

6  A.   Yes.

7  Q.   Is that a proper response for a jailer under these

8  circumstances?

9  A.   It would be a proper response for a jailer if it would have

10  happened immediately upon his becoming unresponsive, at which

11  time the second proper response would be to notify 911, grab

12  that defibrillator, try CPR until the EMTs arrive.  But I'm

13  referring to the booking area, not Cell No. 5.

14  Q.   Can you just speak to us about how it is that people like

15  Saline County, what kind of standards do you think apply in

16  Saline County?  Are there national standards involved?  You

17  teach and you write and you lecture in this area.  What kind of

18  standards should we be looking at?  Can we rely on the standards

19  in the jail in this case?

20  A.   The standards in the jail I do not take issue with, other

21  than the ambiguity of the common sense phrase.  Yes, of course,

22  officers should exercise common sense.  But that common sense

23  has to be tempered with reasonableness under the circumstances.

24  It's not common sense to allow somebody to be unresponsive and

25  just basically ignore them for a period of two or, as Corporal

1   Parker said, three minutes.

2   Q.   Now, you've heard that medical care is now available in the

3   jail.

4   A.   Yes.

5   Q.   In your experience throughout the nation, is medical care

6   something that jails normally have when they have a population

7   of 250 and above?

8   A.   Yes, it is.

9   Q.   Why is that throughout the nation the standard?

10   A.   Medical care onsite 24/7 is the national standard, because

11   there are medical emergencies for which jail personnel are not

12   trained.  Again, jail personnel are not medical professionals.

13   Most are not EMTs.  They do not have the expertise.  They might

14   have drug recognition training.  They might not, for that

15   matter.  But they might.  But even that doesn't tell the whole

16   story.  They don't know what's going on physiologically.

17   Feeling the pulse, that doesn't really tell you anything other

18   than they may have passed, too little too late.

19   Q.   And, finally, someone talked about snoring and compression

20   asphyxia.  I know that you have some experience with compression

21   asphyxia in restraint cases.  Can you speak to that idea about

22   snoring, Dr. Lyman?

23   A.   I can as it relates to the professional literature.  I'm

24   not a medical professional, but I have been trained in that very

25   thing.  In the law enforcement arena, it's known as positional

1    asphyxia.  And generally it's the death snore.  To put it in

2    kind of a casual term, it's the death snore.  And it's generally

3    the last breath, you know, that an individual takes before they

4    pass.

5    Q.    Thank you, Doctor.  No more questions.

6              THE COURT:  Cross-examination, Mr. Ellis?

7              MR. ELLIS:  Thank you.

8                        CROSS-EXAMINATION

9    BY MR. ELLIS:

10   Q.    Dr. Lyman, we met a few minutes ago, didn't we?

11   A.    Yes, we did.

12   Q.    And you finished with my first question I was going to ask.

13   You are not a medical doctor.

14   A.    No, I'm not.

15   Q.    Okay.  And you wouldn't claim in this courtroom to give

16   opinions touching on medical issues, would you?

17   A.    Not medical conclusions.  Medical issues is why we're here.

18   Q.    Medical conclusions.  Thank you.  That's a better word.

19   You wouldn't claim to be able to do that, would you?

20   A.    No.  And I haven't done that.

21   Q.    All right.  Now, you were hired by Mr. Swindoll some time

22   ago to look into this case and give him an opinion.  Is that

23   correct?

24   A.    Yes.

25   Q.    About how long ago was that?

Lyman - Cross                                                    207

```
1   A.    I believe it was last summer.

2   Q.    Okay.  And you told him that you were going to charge him

3   some money.

4   A.    I did.

5   Q.    And you have?

6   A.    I did.

7   Q.    My notes here from your materials that he provided me was a

8   $4,000 initial fee?

9   A.    I didn't hear the last part.  $4,000 what?

10  Q.    Initial fee?

11  A.    Initial fee, yes.

12  Q.    And $2,350 per day.  That's what your notes here say.

13  A.    For out of town, yes.

14  Q.    So $6,350 to this moment?

15  A.    No.  It's actually pushing around 10,000.

16  Q.    Around 10,000?

17  A.    Considering the time it took me to review the file.

18  Q.    Oh, okay, of course.  Now, this is your first trip to

19  Little Rock?

20  A.    It is.

21  Q.    Your dealings with Mr. Swindoll have been by telephone and

22  email?

23  A.    Yes.

24  Q.    That sort of thing?

25  A.    Yes.
```

1    Q.   Okay.  And letter correspondence.  And so some time ago you

2    got in the mail from him, or by email, or however, the

3    investigative file from the Arkansas State Police.  Is that

4    correct?

5    A.   Yes.

6    Q.   And you told us earlier that you reviewed it, as it's quite

7    voluminous.  Does that look like it?

8    A.   I didn't print it out.  It's electronic, so that very well

9    could be it.

10   Q.   Let me show you another copy of it.

11           MR. SWINDOLL:  Your Honor, may we approach?

12           THE COURT:  You may.

13           MR. ELLIS:  I'm not going to introduce it at this

14   point.

15           THE COURT:  Why don't we go ahead and approach,

16   please.

17       (Proceedings at sidebar as follows:)

18           THE COURT:  You can go ahead and state the basis of

19   your objection.  Was it that you thought he was going to admit

20   it?

21           MR. SWINDOLL:  I feel like he is going to start trying

22   to get into state police opinions.  I feel like we've already

23   visited this area, and the statements are what he's looked at if

24   he's going to question him about the statements.  But if he's

25   going to the conclusions of an officer that is not present and

1    will not be present, that was the basis of my objection.  And I

2    just wanted to bring this up, because we talked about this in

3    the beginning of trial.  And I just want to be sure we're all on

4    the same page here.

5             THE COURT:  We did.  My specific instruction was

6    before you got into the document that you needed to approach the

7    bench.  We were here at lunch, and we didn't approach.

8        So Mr. Ellis, what do you intend to do with the document?

9             MR. ELLIS:  I don't think Dr. Lyman's opinions of

10   officers are in this document.  And I'm going to ask him whether

11   he knows of any opinions of officers in this document.

12            MR. SWINDOLL:  Those are criminal opinions.

13            MR. ELLIS:  I'm not going to introduce the document,

14   though.  This is what he reviewed.  This is it.  This is the 703

15   material.  This is -- if you look at his opinion, it's listed.

16   We have a listing of everything he reviewed from his opinion.

17   You saw it, and it's this document.

18            THE COURT:  And hearsay within hearsay.

19            MR. ELLIS:  I'm not going to introduce it.

20            THE COURT:  If you are going for the conclusion or you

21   are going for an opinion, I don't see much difference between

22   that with that document too much.  Help me get around that.

23   What are you going for in that document?

24       Just for the record, we're standing here looking at a

25   document that's probably at least 50 to a hundred pages long

1   that contains a lot of various parts, which is why we raised

2   this in our pretrial and why I asked you to approach the bench

3   before.

4           MR. ELLIS:  I'll give you an example of what I'm going

5   to do.  There is -- part of his opinion is that Mr. Babovec was

6   crying for help that he was having a heart attack.  There are

7   ten statements in this document that he reviewed that don't have

8   that in there.  I'm going to ask him.

9           MR. SWINDOLL:  There are some that do.

10          MR. ELLIS:  There are two that do.

11          MR. SWINDOLL:  Besides Christy.  Some of the inmates.

12          MR. ELLIS:  I want to be able to ask him did you

13   review Mr. Crockett's statement.

14          THE COURT:  Is Mr. Crockett in court?

15          MR. ELLIS:  No.

16          THE COURT:  It's hearsay within hearsay.  He relied on

17   it.  I get it.  I understand that.  But if that goes on the

18   screen, it's hearsay within hearsay.  Mr. Crockett is not here

19   in court.  Those are the issues I'm talking about.  That's why I

20   wanted to have this whole discussion on the front end so

21   everybody was on the same page about that document.  I'll let

22   you tread lightly.  You can make the objections you make.  If I

23   sustain it, move on.  Don't put anything on that overhead that's

24   hearsay within hearsay.  Let's go forward with this witness.

25          MR. ELLIS:  I won't.

1          (Proceedings continuing in open court as follows:)

2          THE COURT:  Mr. Ellis, before you get started, we are

3  going to take our afternoon break.  We will go ahead and do that

4  now.

5          During this recess and every other recess, do not discuss

6  this case among yourselves or with anyone else, including your

7  family and friends.  Do not allow anyone to discuss the case

8  with you or within your hearing.  Do not discuss also means do

9  not email, send text messages, blog or engage in any other form

10  of written, oral or electronic communication, as I instructed

11  you before.

12          Do not read any newspaper or other written account, watch

13  any televised account or listen to any radio program on the

14  subject of this trial.  Do not conduct any Internet research or

15  consult with any other sources about this case, the people

16  involved in the case or its general subject matter.

17          You must keep your mind open and free of outside

18  information.  Only in this way will you be able to decide the

19  case fairly based solely on the evidence and my instructions on

20  the law.  If you decide this case on anything else, you will

21  have done an injustice.  It is very important that you follow

22  these instructions.

23          It is now -- we'll call it about five till.  Why don't

24  y'all come back in by ten after three.  We'll stand in recess

25  until ten after three.

1          (Jury exits courtroom.)

2          THE COURT:  We're on the record with counsel and the

3    parties outside the presence of the jury.  Is there anything we

4    need to take up for the plaintiff?

5          MR. SWINDOLL:  No, Your Honor.

6          THE COURT:  For the defense?

7          MR. ELLIS:  No.

8          THE COURT:  We'll stand in recess until ten after

9    three.

10         `(Recess at 2:54 p.m.)

11                    REPORTER'S CERTIFICATE

12      I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

13

14   /s/Elaine Hinson, RMR, CRR, CCR      Date:  November 13, 2015
     United States Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1           (Continuing at 3:13 p.m.; jury not present.)

2               THE COURT:  Is there anything we need to take up

3      before we put our jury back in the box?

4           Mr. Ellis?

5               MR. ELLIS:  No.

6               THE COURT:  Mr. Swindoll?

7               MR. SWINDOLL:  No, your Honor.

8               THE COURT:  All right.  Please rise.

9           (Jury entered the courtroom.)

10              THE COURT:  Please be seated.

11          Mr. Ellis, you may proceed when you are ready.

12              MR. ELLIS:  Thank you.

13                          CROSS-EXAMINATION

14     BY MR. ELLIS:

15     Q.   Dr. Lyman, let me go back.  You're currently a professor?

16     A.   Yes.

17     Q.   And previously, from the materials you provided

18     Mr. Swindoll, who provided them to me, you've been a teacher at

19     a law enforcement academy?

20     A.   I was a certified instructor, yes.

21     Q.   You worked for the Oklahoma Drug Enforcement

22     Administration?

23     A.   Oklahoma Bureau of Narcotics, state police, yes.

24     Q.   Kansas Bureau of Investigation?

25     A.   Correct.

1   Q.   Johnson County, Kansas, investigation?

2   A.   Investigative squad, yes.

3   Q.   A visiting professor at the University of Oklahoma?

4   A.   Yes.

5   Q.   Five jobs?  You've had five jobs?

6   A.   Some of those overlapped.  Yes.

7   Q.   You've never been a jailer?

8   A.   No, I have not.

9   Q.   You've never worked in a jail?

10  A.   No.

11  Q.   Have you ever been a jail administrator?

12  A.   No.  Teach administration.

13  Q.   You've never been a jail administrator?

14  A.   No.

15  Q.   Now, in preparation for your testimony in this case, you

16  provided us with a materials review, you called it.  Is that

17  correct, sir?

18  A.   Yes.

19  Q.   Do you have your materials with you there?

20  A.   I have my report with me, yes.

21  Q.   Good.  On page 20 and 21, you have listed everything from,

22  number one, the complaint -- I'm not going to go through all of

23  them, there are so many -- and down through 84, various

24  handwritten notes, photocopies of citations, et cetera, and it

25  looks to me like, Doctor, except for No. 12, 13, and 14, three

1   videos, and No. 82 and 84, all of those documents came from the

2   official state police report; is that correct, sir?  Take a look

3   at it.  Run your finger down it, if --

4   A.   I'm not sure what you're asking because you identified the

5   videos of the incident.

6   Q.   Except for that.  Except for the videos.  Video of Nichols,

7   video of Voiles, the complaint, No. 1.

8   A.   Right.

9   Q.   And then over on the next page, 82 and 84.  All the rest of

10  them come from the investigative file, don't they?

11  A.   Well, I wouldn't say that all of them do.  That could be.

12  I just don't recall right here and right now.  They may be

13  attachments to that file.  Because that is a big file.

14  Q.   You go down there, just run -- run down that list and tell

15  me if you see anything other than what we've mentioned that

16  doesn't come from the investigative file that was sent to you by

17  Mr. Swindoll.

18  A.   I don't have an independent recollection of exactly all of

19  the items that were in that investigative file, so I just can't

20  do that right now.  I don't have the capability.

21  Q.   I would suggest to you, sir, that I've done that and it

22  appears to me that that is the case.

23  A.   If that's the case, then I'm not going to argue with that.

24  Q.   All right, sir.  Now, you got this file from Mr. Swindoll

25  and you have given us an opinion, three opinions, as a matter of

Lyman - Cross                                          216

1    fact, based on that material plus the videos; correct?

2    A.   Well, based on all the materials I've listed here,

3    including materials that are not anywhere in the materials that

4    were provided to me by Mr. Swindoll.

5    Q.   Well, those books that you were talking about.

6    A.   They're not books.  They're professional articles generated

7    by the National Law Enforcement Policy Center.

8    Q.   All right.  Have you made any attempt, sir, to interview

9    any of the officers seated there or the other witnesses in this

10   case independently?

11   A.   No.

12   Q.   You haven't done that, have you?

13   A.   No.

14   Q.   Have you made any attempt to come to Little Rock,

15   Arkansas -- to Benton, Arkansas, and tour the facility that is

16   the subject of this litigation?

17   A.   I have not, no.

18   Q.   So all you know about the facts of this case are here.

19   A.   Well, again, I wouldn't agree to that.  They are listed,

20   some almost a hundred different items listed at the back of my

21   report, including those policies I referred to.

22   Q.   Well, let's find it.  Well, we'll leave that.  That will

23   take too much time.

24       Do you have an opinion about what should have been done

25   with Casey Babovec when he assaulted another inmate?

Lyman - Cross                                   217

1    A.    Oh, I think he should have been removed from the cell.  I

2    agree with that.

3    Q.    And should he have been handcuffed?

4    A.    If you isolate just that use of force against the inmate,

5    yes.  But we have to factor in the fact that he's got clear

6    medical issues as well.

7    Q.    Should he have been handcuffed?

8    A.    If you isolate just that, yes.

9    Q.    Okay.  Now, do you remember that there was no audio on the

10   tape that you reviewed of the incident?

11   A.    Yes.

12   Q.    So do you know whether he was saying anything to the

13   officers who were attempting to cuff him?

14   A.    With certainty, no.  But he was standing by the door and

15   appeared to be saying something, but, no, not with certainty.

16   Q.    And when he was -- after he was taken down -- were you in

17   the courtroom when Corporal Parker testified?

18   A.    Yes.

19   Q.    And did you hear her say that he gave her a good cussing?

20   A.    I did.

21   Q.    So he must have been still not unconscious.

22   A.    Based on what she says.  It depends on at what point in the

23   encounter.  But based on what she says, that's right.  But, of

24   course, there's other witnesses that say different things.

25   Q.    Which witnesses, sir?

Lyman - Cross

1  A.   I think Carolyn Voiles and Christy Nichols, I don't

2  remember them saying anything about him cussing.  That's not

3  consistent with what Ms. Parker said.

4  Q.   And that's it?  Those two?  That's it?  Anybody else?

5  Surely there's somebody else.

6  A.   Inconsistent with what Ms. Parker said?

7  Q.   Yes.

8  A.   Is that your question?

9  Q.   Sure.

10 A.   I think that's all that comes to mind right now.

11 Q.   All right, sir.  Now, do you believe that, based on what

12 you saw on the video, that there was a problem with positional

13 asphyxiation in this case?

14 A.   Yes.

15 Q.   What is the basis for your belief?

16 A.   My understanding of the nationally recognized policy is

17 they caution against prone restraint and the possibility of

18 suffocation.  That's widely known.

19 Q.   The possibility of suffocation.

20 A.   Yes.

21 Q.   Doctor, how many times have you testified?

22 A.   173.

23 Q.   You know we don't deal in possibilities in the courtroom.

24 You know that.  We deal with probabilities, don't we?

25 A.   We deal with evidence in a courtroom.

1    Q.    Probabilities.  And because he possibly would suffocate?

2    Is that what you just said?

3    A.    Yes.

4    Q.    Okay.  And if you had wanted to interview Officer Reed, you

5    might have learned just how he was positioned on Mr. Babovec,

6    wouldn't you?

7    A.    According to Mr. Reed, I probably would.

8    Q.    But you didn't do that.

9    A.    I had the video.

10   Q.    And on the video, you can clearly see, can you not, that he

11   is straddling Mr. Babovec on his knees, isn't he?

12   A.    No, that's not clear to me in the video.

13   Q.    That's not clear to you?

14   A.    No.

15   Q.    Well, it's clear to me.  Maybe -- we'll just let the jury

16   decide that.

17         Did you review the opinion -- I mean, did you review the

18   deposition, either video or transcript, of Sheriff Pennington?

19   A.    I did.

20   Q.    And did you hear him say in his video, and it's in evidence

21   now, that he was told by these investigators --

22              MR. SWINDOLL:  Objection, your Honor.

23              MR. ELLIS:  It's in evidence, your Honor.

24              MR. SWINDOLL:  May I approach?

25              THE COURT:  You may.

 1        [Bench conference reported as follows:]

 2             MR. SWINDOLL:  Your Honor, I believe that the next

 3    question or the intent of this question and the next series of

 4    questions is to get into evidence that the state police criminal

 5    investigation returned no findings, and I believe that's clearly

 6    outside the scope of this trial.  And I think we've already had

 7    those discussions and he's about to ask whether the sheriff said

 8    that or not.  I don't think he can do that.  I don't think you

 9    can get in the side door when you can't get in the front door.

10             MR. ELLIS:  No side door about it, your Honor.  The

11    direct testimony under questioning by Mr. Swindoll was that the

12    special agent -- not criminal investigator, the special agent

13    who investigated this case -- stated that there was no

14    wrongdoing, and that's in the evidence.  That is substantive

15    evidence in this case under questioning by Mr. Swindoll, without

16    objection from me.

17             MR. SWINDOLL:  This is a constitutional right

18    violation.  Those are criminal issues and not constitutional

19    issues, and I object.

20             THE COURT:  Do you have a copy of the transcript from

21    Sheriff Pennington's deposition?  Do you have that transcript?

22             MR. ELLIS:  He's got it.

23        While he's looking at that, your Honor, I want to be able

24    to ask him -- and I think I can because he's already testified

25    that he reviewed the documents, reviewed the investigative file.

Lyman - Cross                                              221

1    I think I should be allowed to ask him as a 703 question:  Did

2    you find anything in those documents critical of the conduct of

3    the sheriff's department in this incident?  Because he can't

4    give an opinion and then hide behind the materials that he

5    viewed.

6              MR. SWINDOLL:  The question confuses the jury because

7    the scope of the investigation of the officer was criminal in

8    nature.

9              MR. ELLIS:  No, it was not.

10             MR. SWINDOLL:  And not constitutional in nature.

11             MR. ELLIS:  It was not.

12             MR. SWINDOLL:  It certainly was.

13             THE COURT:  Is that Sheriff Pennington's deposition?

14             MR. SWINDOLL:  This is it.

15             THE COURT:  The transcript.

16             MR. ELLIS:  I found no wrongdoing is what it said.

17             MR. SWINDOLL:  It is also hearsay.

18             MR. ELLIS:  You elicited it.  You brought it out.

19             MR. SWINDOLL:  It came out during my exam.  I didn't

20   elicit it.  It was a gratuitous statement.

21             MR. ELLIS:  You did it.  Substantive evidence in this

22   case at this point.  And, Jim, we can't have this guy overnight

23   here.  We'll break the bank.  We've got to finish with him.

24             THE COURT:  This is one.  I think it's in volume two.

25             MR. ELLIS:  It's in volume two.

1           MR. SWINDOLL:  I was trying to find it in two.

2           THE COURT:  It was in volume two.  I think it was this

3    morning in the testimony.

4           MR. ELLIS:  It was toward the end.

5           MS. KOSTELNIK:  Do you remember how far back?

6           THE COURT:  My recollection of the testimony is

7    consistent with Mr. Ellis.  I'm happy to double-check the

8    transcript and make certain, but my recollection of the

9    testimony is that Mr. Ellis is correct.

10          MR. SWINDOLL:  I can't dispute that he said that the

11   state police found no wrongdoing.

12          MR. ELLIS:  Wrongdoing is his exact words.

13          MR. SWINDOLL:  But my objection goes to the nature of

14   their investigation.  They are not investigating a criminal --

15   they are investigating criminal.  They are not investigating

16   constitutional law violations, and it confuses the jury to

17   impose on the jury information about this criminal

18   investigation.

19          MR. ELLIS:  Then offer a limiting instruction.

20          THE COURT:  At this point, my recollection is -- and

21   unless you can tell me that it's not in that transcript, I'd

22   like to see the page to which you referred to see what the

23   precise question was and what the testimony was.

24          MR. ELLIS:  Because, Judge, I listened up when he

25   asked the question.  I remember it well.

1          MR. SWINDOLL:  Here's the question and answer that he

2    gave.

3          MR. ELLIS:  May I see it?

4          THE COURT:  You may.  It's on page 27 of volume two of

5    Sheriff Pennington's deposition.

6          MR. ELLIS:  I don't see it.

7          THE COURT:  Correct.  The question asked by

8    Mr. Swindoll is:  "In your judgment, in the review that you

9    made, the actions of your officers were not only constitutional

10   but in connection and in line with jail policies that you had in

11   place?"

12       Sheriff Pennington's answer was:  "Correct.  This

13   information was after the state police investigated it."

14       Mr. Swindoll said:  "Uh-huh."

15       And the answer is:  "And found that there were no

16   wrongdoings."

17          MR. ELLIS:  And he said the word "constitutional."

18          THE COURT:  I think Sheriff Pennington injected it

19   with his answer, if I read it correctly.  He injected it with

20   his answer in regard to the state police investigating it.  I

21   don't know that it was solicited or elicited by Mr. Swindoll.

22       I'm sensitive to the fact that this expert witness reviewed

23   the report, and I don't know that the report itself, which are

24   the first two pages, three pages of the document, not the

25   hundred pages of statements and things that come behind it, I

1    think that part of it likely is public record or a business

2    record by the state police, but I've got no one here to say that

3    and I've got no affidavit that says that, and I also don't -- I

4    don't know what to do with that at this point.

5        My reading of that document is that in the context of that,

6    the ultimate conclusion is, the prosecutor decided not to press

7    charges.  That was the outcome of that investigation.  Do you

8    disagree with that, Mr. Ellis?

9            MR. ELLIS:  Oh, absolutely I agree with it, yeah.  It

10   never occurred to them to press charges.

11           THE COURT:  But that was the upshot of the state

12   police investigation.

13           MR. ELLIS:  They sent it to a prosecutor.  Absolutely.

14           THE COURT:  The civil side of this, the constitutional

15   questions weren't looked at in that investigation.

16           MR. ELLIS:  Well, they're cops.  They wouldn't have.

17           THE COURT:  So, you know, understanding the premise of

18   that, I'll permit you to ask questions about that, the document

19   that this expert reviewed.  With that in mind.  I don't think

20   Mr. Swindoll opened the door.  I think Sheriff Pennington

21   injected the issue in his answer, not necessarily in a question

22   that was received, but I understand this expert reviewed those

23   documents.  I'll permit you to ask him about what he reviewed in

24   regard to that and I'll permit you both to explore sort of what

25   that difference is.

1      I don't think there's a 403 -- what I hear is more of a 403

2  objection in confusing this jury.

3             MR. SWINDOLL:  Yes, your Honor.

4             THE COURT:  As to that line of questioning, and I

5  overrule that objection.  So I don't know that that provides a

6  lot of guidance, but I think we're going to have to wade through

7  this and I'll rule on objections as they're made.

8             MR. ELLIS:  Well, here's the question:  Doctor, is

9  there anything in this investigative file that you reviewed that

10  is critical in any way of the conduct of the sheriff's

11  department in this incident?

12             THE COURT:  And I'm not going to raise an objection.

13  I don't know if Mr. Swindoll has an objection to that question

14  if that's the question that's asked.

15             MR. SWINDOLL:  That question, if that's the question,

16  why don't we drop this and you ask that question.  My worry is

17  the follow-up.

18             MR. ELLIS:  No, that's it.  That's the question.

19             MR. SWINDOLL:  That's it?

20             MR. ELLIS:  That's it.

21             MR. SWINDOLL:  If he says no or yes, you're done.

22             MR. ELLIS:  I get about 20 minutes of closing argument

23  from it.

24             MR. SWINDOLL:  Yes or no and you're done.  Then I

25  withdraw my objection and let's get going.

1          MR. ELLIS:  If he says yes, we'll see what happens.

2      [Continuing in open court:]

3  BY MR. ELLIS:

4  Q.   Sorry, Doctor.  You've got a plane to catch, don't you?

5  A.   I've got all the time in the world.

6  Q.   So we're talking about this state police investigation,

7  Doctor.

8  A.   Yes.

9  Q.   Have you had an opportunity during our sidebar to look at

10  the page on your opinion that talks about all of the documents

11  that you reviewed?

12  A.   I had an opportunity, but I didn't do that.  I wasn't asked

13  to.

14  Q.   Is there anything in this state police investigation that

15  you recall that is critical in any way, in any way, of the

16  conduct of the Saline County Sheriff's Office personnel, jail

17  personnel, in this incident?

18  A.   Not that I can recall.  It sets out the facts.  It's a law

19  enforcement investigation on a law enforcement organization.

20  Q.   Thank you.  Now, do you have a quarrel in any way with

21  Officer Reed, and I think you must, Officer Reed remaining

22  straddled on Mr. Babovec prior to his being taken to Cell 5?

23  A.   I do.

24  Q.   And what is the basis for your objection to that?

25  A.   It was unnecessary.

Lyman - Cross

1  Q.    What if Mr. Babovec was moving, still moving and bucking?

2  A.    He wasn't.

3  Q.    What if he had?

4  A.    Hypothetically?

5  Q.    Wasn't it necessary to maintain control of this prisoner?

6  He had just assaulted a fellow inmate.

7  A.    Not the way the jailer Reed was doing it.  He was

8  handcuffed.

9  Q.    But you've never been a jailer.

10  A.    That's it.

11  Q.    You've never been a jailer, so how do you know?

12  A.    But I've handcuffed close to 600 arrestees.

13  Q.    But you've never worked in a jail, have you?

14  A.    That doesn't matter.  It's the same thing.  Same principle.

15  Q.    What do you mean it doesn't matter?  You're in here talking

16  about jailers and you've got an opinion about them.

17  A.    I disagree.  Same principle.

18  Q.    You don't think it would be of benefit to have worked in a

19  jail, to know what it's like to be with these people?

20  A.    I think it's of greater benefit to have the experience

21  arresting people, people who are contrary in some cases and who

22  are resisting in some cases, and to have the necessary training

23  to know when they're under control.  Babovec was under control.

24  Q.    Do you know how often detainees in this jail take off their

25  clothes in the holding cells?

1   A.    Just based on what Parker said earlier.

2   Q.    Would you quarrel with that?

3   A.    I have no reason to take issue with that.

4   Q.    Because you're not a jailer.  You'd defer to her because

5   she's a jailer.

6   A.    Even if I was a jailer, I don't know what she observes in

7   her particular jail, at least what she says she observes.

8   Q.    And you don't have any reason to quarrel with her statement

9   that they periodically and often defecate and urinate on

10  themselves?

11  A.    I don't think she said often.  I think she acknowledged

12  that they do from time to time.

13  Q.    I think she said three times a week, didn't she?  Was her

14  memory.

15  A.    Something like that.

16  Q.    And we've got another one back here who is going to say

17  every shift, just about.  Would you quarrel with that?

18  A.    I don't have any control over what witnesses say.

19  Q.    Because you've never been a jailer.

20  A.    In terms of the defecation variable, I don't have any

21  quarrel to what she's saying.  But I still think it's evidence,

22  coupled with the totality of what the officers knew about

23  Babovec.

24  Q.    Well, her testimony was -- and she was the one that made

25  the call.  Her testimony was, he was taken to Cell 5; isn't that

1    true?

2    A.    Yes.

3    Q.    And within about three and a half minutes, if I remember

4    the timeline, about three and a half minutes, she determined

5    that he wasn't breathing and couldn't find a pulse.

6    A.    Three and a half minutes in Cell 5.  That doesn't include

7    the booking area.

8    Q.    But there's no indication that he was in distress in the

9    booking area, Doctor.

10   A.    Oh, there is, sir.  I disagree with that.

11   Q.    No, sir.  No, sir.

12   A.    I disagree with that.

13   Q.    Can you point to one single, solitary time in that booking

14   area that he was struck?

15   A.    You're talking about striking now as opposed to your

16   previous question?

17   Q.    Punched.

18   A.    It's hard to tell, actually, with that many officers on

19   him.  But I did point out the fact that his leg was unresponsive

20   where just moments earlier it was kicking.  That's evidence.

21   That's clear and unequivocal evidence.

22   Q.    And he was so strong that he lifted Officer Shelnutt from

23   behind.

24   A.    He wasn't lifting anybody when that leg was laying there

25   lifeless.

```
 1              MR. ELLIS:  Stand up, Officer Shelnutt.
 2              MR. SWINDOLL:  Objection, your Honor.  We're not using
 3    the defendants as evidence in this case.  Please.
 4              THE COURT:  Mr. Ellis, please move on.
 5              MR. ELLIS:  I was going to ask -- well, I will.
 6    BY MR. ELLIS:
 7    Q.   So, Doctor, how many times have you testified in court?
 8    A.   I believe 48 times since 2001.
 9    Q.   That's what I counted, and you say you work for both sides.
10    A.   I do.
11    Q.   Well, in your material that you provided us, I counted that
12    you have -- of those 48 times, you have testified 45 times for a
13    plaintiff and three times for a defendant.  Did you get that
14    wrong?
15    A.   In the last four years.  That's probably accurate.  It is
16    heavier on the plaintiff.
17    Q.   Do you think you would have been able to come to a better
18    opinion had you bothered to talk with these officers?
19    A.   No.
20    Q.   You don't think so?
21    A.   No.
22    Q.   Talk about their concerns and what their reactions were to
23    Mr. Babovec?
24    A.   I do not.
25    Q.   You don't think so?
```

1    A.    No, because they have a vested interest in the outcome of

2    the trial.

3    Q.    Of course they do.  They're being sued.  Of course they do.

4    A.    Well, you're making my point for me.

5    Q.    And you're being paid.  So you've got a vested interest in

6    the outcome of this case, too, don't you?

7    A.    No.  I've already been paid.

8    Q.    You've been paid.

9    A.    I've already been paid.  I can say what I want up here, and

10   I'm saying what I believe.

11   Q.    And your testimony is paid for.

12   A.    No.  My expertise is paid for.

13            MR. ELLIS:  Okay.  Can I have a moment, your Honor?

14            THE COURT:  You may.

15   BY MR. ELLIS:

16   Q.    Would it have helped if you'd at least found another jailer

17   to talk to?

18   A.    I'm familiar with jail administration.  I teach jail

19   administration to jailers.

20   Q.    So the answer to that question is no?

21   A.    No.  That's right.

22            MR. ELLIS:  Pass the witness.

23            MR. SWINDOLL:  Redirect, your Honor?

24            THE COURT:  You may.

25                      REDIRECT EXAMINATION

Lyman - Redirect                                    232

1    BY MR. SWINDOLL:

2    Q.    Dr. Lyman, talk to us just for a few minutes about what you

3    teach in penology and jails and how it is that you believe from

4    the questions that you have the expertise to help us understand

5    this situation.

6    A.    Well, corrections -- if I understand your question

7    correctly, corrections and penology is an undergraduate course,

8    so it's kind of an introductory course to jails and jail

9    administration, how jails are even built, for that matter, that

10   sort of thing.

11        In the graduate studies program, in our master of science

12   in criminal justice, we have a law enforcement track and a

13   corrections track, both administration tracks designed to train

14   the police administrator or the corrections administrator.

15   Students can choose which direction of the two they want to go.

16   And I happen to teach in both of those tracks, both of the law

17   enforcement and both of the corrections tracks.

18        Those deal more with jail operations, one of our courses,

19   and those deal with just general administration of personnel and

20   the management of inmates.

21   Q.    And excessive force, could you talk for a minute about your

22   teachings about excessive force and your experience with

23   excessive force?

24   A.    Yes.  I was a certified use of force trainer for three

25   years, full time, with a police academy in Missouri.  That's

1    where I went when I left the state of Oklahoma.  And we taught

2    close to 3,000 officers in the patrol capacity, some in

3    corrections capacity as well, and, of course, I've been

4    published for about 25 years in the area of use of force.  I

5    have testified to grand juries in places like Atlanta, asked to

6    go down there by the district attorney himself, testify about

7    the use of force continuum, intermediate force, deadly force,

8    all the different aspects of it.

9              MR. SWINDOLL:  Thank you.

10             THE WITNESS:  You're welcome.

11             THE COURT:  Anything further of this witness?

12             MR. ELLIS:  No, ma'am.

13             THE COURT:  May this witness step down and be excused?

14             MR. SWINDOLL:  He may.

15             THE COURT:  Dr. Lyman, you may step down.

16             THE WITNESS:  Thank you, your Honor.

17             THE COURT:  You may call your next witness.

18             MR. SWINDOLL:  We call Calvin Reed.

19             **CALVIN REED, PLAINTIFF'S WITNESS, DULY SWORN**

20                        DIRECT EXAMINATION

21   BY MR. SWINDOLL:

22   Q.   Could you give us your full name, please.

23   A.   Calvin Taylor Reed.

24   Q.   And were you employed at the jail as a jailer in April of

25   2011?

1    A.    Yes, sir.

2    Q.    You have been in the courtroom and seen the discussion.

3    A.    Yes, sir.

4    Q.    And you were involved with Casey Babovec shortly before his

5    death?

6    A.    Yes, sir.

7    Q.    Okay.  Were you a certified police officer at the time?

8    A.    At the time, no, sir.

9    Q.    Let's talk for a minute about your first exposure.  When

10   did you first learn anything at all about Casey Babovec?

11   A.    Just as this incident started.

12   Q.    So you did not know the history that Casey had had in the

13   cell, in the holding cell.

14   A.    No, sir.

15   Q.    You did not know what had gone on.  How did you find out?

16   A.    As I was giving passdown to the oncoming shift, one of the

17   jailers had turned and looked out of the window out of the

18   master control room, and she had said, "What is going on out

19   there?"

20        At that time, I turned around, and that's when I saw the

21   jailers struggling with Casey Babovec.

22            MR. SWINDOLL:  Okay.  Let's run the tape.

23   BY MR. SWINDOLL:

24   Q.    I'll kind of talk about what you did as we go along so

25   we'll know exactly what happened.

1    A.    Okay.

2          (Video playing.)

3    Q.    Now, Casey is on the floor.  Did you see that?  Which

4    officer is that, Officer Reed?  Do you know who that is that

5    just came up?

6    A.    I believe that was Corporal Griffin.

7    Q.    Is he a supervisor?

8    A.    Yes, sir, he is.

9    Q.    And you're not in the picture yet; right?

10   A.    No, sir.

11   Q.    Is that you?

12   A.    Yes, sir, it is.

13   Q.    You pick up a Taser and use it on this man, don't you?

14   A.    Yes, sir.

15   Q.    You are saying he's resisting arrest because he won't give

16   you his left arm; is that right?

17   A.    Yes, sir.

18   Q.    Do you know where his left arm is?

19   A.    No, sir, I couldn't see where it was at.

20   Q.    Do you know it's under your officer?

21   A.    No, sir.

22   Q.    Do you know at that time that Officer McGuire is yelling,

23   "I've got his arm"?

24   A.    He might have said it, but I don't remember hearing him

25   because at the same time, we were all yelling at him, at

1   Babovec, telling him to stop resisting and to give us your arm.

2   Q.   And you know that McGuire is saying he can't.  You've read

3   the file, haven't you?

4   A.   Yes, I've read the file.

5   Q.   And you know that Casey's arm, his left arm, the one you

6   were arguing with him and stunning him for, is under his body

7   and he can't give it to you.

8   A.   At the time I did not know.  After reading the report, I do

9   know now.

10  Q.   Tell me when you think the cuffs are on this man, sir.

11  A.   I believe at this time we are just now getting both cuffs

12  on him.

13  Q.   Now, is that Officer McGuire getting up?

14  A.   Yes, sir.

15  Q.   Now, you are on this man.

16  A.   Yes, sir.

17  Q.   He's cuffed.

18  A.   Yes, sir.

19  Q.   Look at his leg.

20  A.   Yes, sir.

21  Q.   Not moving, is it?

22  A.   No, sir.

23  Q.   What are you doing with your right hand, Mr. Reed?

24  A.   At this time I was still straddling on Babovec, but it was

25  as a preventative measure in case he tried to move or get up.

1    Q.    His leg is still not moving, is it?

2    A.    No, sir, it's not moving.

3    Q.    He's not moving, is he?

4    A.    No, sir.

5    Q.    Do you know whether he's breathing now?

6    A.    At this point, you can't really tell.

7    Q.    Now you've got your right knee on his back, right there,

8    don't you?

9          What's the law enforcement purpose for that, sir?

10   A.    Well, it's not completely on his back, but as a technique

11   to make sure you still have control of that person, they do

12   teach you that you can with a slight lean with your knees onto

13   them.  That way, again, if they try to move, you can then apply

14   some pressure just to keep them on the ground to keep control of

15   them.

16   Q.    And if the inmate is not moving, what's the purpose?

17   A.    Just as a preventative measure.

18   Q.    So if this inmate is unconscious, you still believe that

19   force requires you -- the excessive force you're using is

20   necessary, even though he's not moving and may be unconscious,

21   to stay on him?

22   A.    I did not know he was unconscious.

23   Q.    You're still on him; right?

24   A.    Yes, sir.

25   Q.    He's still not moving; right?

1    A.    No, sir.  Not until this time where we were moving him.

2    Q.    Had he defecated on himself during this, sir?

3    A.    He had urinated on himself.

4    Q.    If officer -- that's you dragging him.  Is that the way

5    that you treat the prisoners?  Is that the way you drag the

6    prisoners?

7    A.    Well, sir, at the time, seeing his size and then comparing

8    him to our size, trying to pick him up off of the floor, we

9    could have possibly caused an injury to ourself.

10   Q.    And he's unconscious at this point.  Do you agree?

11   A.    It's hard to say.

12   Q.    Would you drag a conscious man like that?

13   A.    Given whatever circumstances it's in, trying to pick him up

14   off of the floor versus, as you say, dragging him on a smooth

15   floor, it's probably a better suggestion than trying to pick

16   somebody up who weighs maybe another hundred pounds more than

17   you.  Then, yes, sir, it is.

18   Q.    Officer Reed, can you tell us whether or not any emergency

19   medical procedure is applied anytime in this room during your

20   presence?

21   A.    No, sir, I don't believe so.

22   Q.    Do you agree that if a citizen goes unconscious during a

23   restraint that he's entitled to emergency medical care?

24   A.    Yes, sir.

25   Q.    In fact, that's the obligation of the jailers, to provide

```
1    emergency medical care in emergent circumstances; right?
2    A.   Yes, sir, but when you --
3    Q.   You don't know whether or not he'd asked for a doctor
4    before, do you?
5    A.   No, sir, I did not know.
6    Q.   But you do know that he's unconscious once you drag him
7    into the other room.  Do you agree?
8    A.   No, sir.
9             MR. SWINDOLL:  Okay.  Let's line the other one up.
10        (Video playing.)
11   BY MR. SWINDOLL:
12   Q.   Officer Reed, is that the way that you believe a restrained
13   citizen should be treated by the Saline County Detention Center
14   and all the jailers there?
15   A.   No, sir.
16   Q.   You don't believe that, do you?
17   A.   No, sir.
18   Q.   Looking at that film bothers you, doesn't it?
19   A.   To a degree, yes, sir.
20   Q.   This man died, didn't he?
21   A.   Yes, sir.
22   Q.   Did anything stop you from asking for or trying to feel for
23   a pulse in the other room?
24   A.   No, sir.
25   Q.   Did anything stop you from trying to feel for a pulse in
```

1    this room?

2    A.    No, sir.

3    Q.    So when you say he was -- you don't know whether he was

4    unconscious, doesn't this convince you that he was, in fact,

5    unconscious?

6    A.    At this time he was still making noises that we assumed was

7    him snoring.  So, no, sir, it did not alarm me that he might

8    have needed any kind of medical attention.

9    Q.    You heard Dr. Lyman talk about positional asphyxiation,

10   didn't you?

11   A.    Yes, sir.

12   Q.    Do you know what that is?

13   A.    After hearing the others, yes, sir.

14   Q.    Were you familiar with this concept when you were subduing

15   this man?

16   A.    No, sir.

17   Q.    Does it appear to you to be a danger to a citizen if you're

18   subduing him and, in fact, you compress his lungs?

19   A.    Yes, sir.

20   Q.    What will happen?

21   A.    Well, it will make it hard for him to breathe in.

22   Q.    Do you agree that if a person is struggling for his last

23   breaths, that he has a right to do anything he can to try and

24   preserve his right in this circumstance?

25   A.    Yes, sir.

1   Q.   Does that include biting somebody who is choking him?

2   A.   On that one, I'd have to say no, sir.

3        MR. SWINDOLL:  Let's start again.

4        (Video playing.)

5   BY MR. SWINDOLL:

6   Q.   What are you doing there, Officer Reed?

7   A.   Well, right there we were getting ready to roll him over

8   into what's called the recovery position.

9   Q.   What's your right hand doing there?

10  A.   I was trying to grip his shirt to roll him over.  The

11  material that his shirt is made out of and at the time I was

12  wearing gloves, I lost my grip on his shirt and my hand slipped

13  off.

14  Q.   He was unconscious at this time.

15  A.   At this time he was not responsive, yes, sir.

16  Q.   Do you agree that unresponsive requires emergency medical

17  care?

18  A.   Again, it depends.  We have several inmates that will come

19  in there and pretend to be unresponsive.  But what they're

20  really looking for is a way to get out of jail, a way to get to

21  the hospital and possibly have friends or family waiting for

22  them at the hospital and make an escape.

23  Q.   And that generalization you applied this day to Casey

24  Babovec while he lay unconscious?

25  A.   No, sir, it was --

Reed - Direct

1   Q.   You attached that motive to him?

2   A.   Excuse me?

3   Q.   You attached the motive to him that you thought he was

4   faking.

5   A.   No, sir.

6   Q.   Then you just mentioned other circumstances and tried to

7   justify this circumstance with that, did you not?

8   A.   No, sir.  I was just simply stating that we have had in the

9   past inmates who have tried to play or pretend to be sick and

10  need medical attention that required them to go to the hospital.

11       MR. SWINDOLL:  We'll swap.

12  BY MR. SWINDOLL:

13  Q.   We've talked about this document, and I'm not going to go

14  over it with you completely, but do you agree that these

15  emergencies shall include, but are not limited to, all of those

16  eight?

17  A.   Yes, sir.

18  Q.   And if one of those is present, you as a jailer must

19  provide emergency medical care?

20  A.   Yes, sir.

21  Q.   And in this case, we know that he was unconscious.

22  A.   Yes, sir.

23  Q.   And we know that no emergency care was provided until he

24  was dragged into five and a few minutes elapsed.  Do you agree

25  with that?

Reed - Direct

```
 1   A.   Yes, sir.
 2   Q.   And do you think that it was a health or life-threatening
 3   situation?
 4   A.   It was possible, yes.
 5   Q.   And yet you didn't call emergency medical care.
 6   A.   No, sir, I didn't call.
 7   Q.   As a jailer, if you see that, do you have to tell somebody
 8   else to do that or is it your obligation?
 9   A.   It just depends.  Whoever is the first person that can get
10   to a phone and make that call.
11   Q.   And that's because it's necessary to try and help and
12   protect the person who is unconscious?
13   A.   Yes, sir.
14   Q.   Okay.  We stopped with you said your hand came off.
15   A.   Yes, sir.
16        MR. SWINDOLL:  Okay.  Let's roll from there.
17   (Video playing.)
18   BY MR. SWINDOLL:
19   Q.   Is he breathing there?
20   A.   At that point, I believe I had heard him make another
21   snoring sound.
22   Q.   Did you check to see if he was breathing?
23   A.   No, sir, I did not.
24   Q.   Did you check to see if there was a pulse?
25   A.   No, sir, I did not.
```

1  Q.    Did you rely on other people to do that?

2  A.    I wouldn't say I relied on them to.

3  Q.    Did you intend to call emergency and just didn't do it?

4  A.    No, sir.

5  Q.    So this was an intentional decision by you not to call

6  emergency medical?

7  A.    No, sir, that was not the intentions.

8  Q.    That's what happened.  Isn't it?

9  A.    I don't know who made the call.  I was in Holding Cell 5,

10  as you can see.  I never left the holding cell.

11  Q.    And you were in the best position to see if Casey Babovec

12  had any need for emergency medical if you never left.  You were

13  the only one that didn't leave; right?

14  A.    That's a possibility, yes, sir.

15  Q.    What are you saying to them there?  What is this?

16  [Indicating].

17  A.    I really can't remember what I was saying, seeing how this

18  was taking place after we just had to have a struggle with him.

19  Then I really can't recall what I was saying.

20  Q.    Were you making fun of him?

21  A.    No, sir.

22  Q.    Did you hear others making fun of him?

23  A.    No, sir.

24  Q.    Do you agree that seconds matter in an emergency?

25  A.    Yes, sir.

Reed - Direct

1    Q.    What are you saying there?

2    A.    I really don't remember.

3    Q.    In your job in the jail, was it ever your job to evaluate

4    the people when they booked them?

5    A.    Not necessarily.

6    Q.    Did you ever participate in evaluating any inmate that was

7    coming to the jail?

8    A.    No, sir.

9    Q.    Did you listen to Sheriff Pennington talk about the

10   qualifications that are not present in the jail staff about

11   medical care?

12   A.    Yes, sir.

13   Q.    Did you believe him?

14   A.    Yes, sir.

15   Q.    Did you want medical care in the jail?

16   A.    Yes, sir, we did.

17   Q.    And you didn't get it?

18   A.    No, sir, we didn't.

19   Q.    It was put upon you, wasn't it?

20   A.    Yes, sir.

21   Q.    And you had to deal with it the best way you could.

22   A.    Yes, sir.

23   Q.    If there had been medical personnel present in the jail,

24   what would you have done?

25   A.    That person probably would have been notified immediately

1  and any kind of medical decisions would have been made by that

2  person in whatever order she would have -- she or he would have

3  gave to the jailers as far as dealing with Mr. Babovec.  They

4  would have been carried out.

5  Q.    Okay.  Now, I asked earlier, but I want to be sure I

6  understand, you can see a video of everything going on in Cell

7  No. 1, right?  Is there a video feed that everybody can see?

8  A.    Yes, sir, there is.

9  Q.    Throughout the jail or is it just at the booking desk?

10  A.    Just in the booking area.

11  Q.    So the people in the booking desk are the ones who are

12  responsible for and required to review those inmates and make

13  sure that they are safe.

14  A.    Yes, sir.

15  Q.    And that's an obligation of their job?

16  A.    Yes, sir.

17  Q.    It's a rule for the jail that people should be reviewed

18  every 15 minutes or more; is that right?

19  A.    Yes, sir.

20  Q.    And there's no sound, is there?

21  A.    No, sir, I don't think there is.

22  Q.    You can't hear the inmates inside the booking area, can

23  you?

24  A.    Not on the video, you can't hear them.

25  Q.    Okay.  Can you hear them otherwise?

1  A.   If you're in the booking area, then, yes, you can hear

2  them.

3  Q.   Is there a sound in there?  Can you hear sound in there,

4  Mr. Reed?

5  A.   Sound as in --

6  Q.   As in the inmates yelling or talking or complaining about

7  stuff or asking for help?  Can they be heard in the booking

8  area?

9  A.   Yes, sir.

10 Q.   They can?

11 A.   If they are yelling it loud enough, yes, sir.

12 Q.   Can you hear them if you stand outside the door of Cell No.

13 1?

14 A.   Yes, sir.

15 Q.   Have you done that yourself, listened to them through the

16 door?

17 A.   Yes, sir.

18 Q.   If you're sitting on that bench next to the door, can you

19 hear inside?

20 A.   Like I said, if they're yelling it loud enough.

21 Q.   There's a series of questions.  You agree that you never

22 have the right to ignore an emergency medical circumstance in a

23 citizen in your jail.  Do you agree?

24 A.   Yes, sir.

25 Q.   Never?

1    A.    Yes, sir.

2    Q.    To do so would create danger for that citizen?

3    A.    Yes, sir.

4    Q.    Have you ever been there when someone had a heart attack?

5    A.    I don't believe I have.

6    Q.    Have people -- have EMTs been summoned there for people who

7    have been injured in the jail before?

8    A.    Yes, sir.

9    Q.    Have people had other medical emergencies where they've

10   been -- medical care has been brought to the jail by the EMTs

11   and taken to the hospital before during your service?

12   A.    Yes, sir.

13   Q.    So that's available?

14   A.    Yes, sir.

15   Q.    And could have been done that night if, in your judgment it

16   was necessary.  You could have initiated that?

17   A.    Yes, sir.

18   Q.    Sheriff Pennington said that you don't take people into the

19   jail who are too drunk.  Do you remember that?

20   A.    Yes, sir.

21   Q.    Is that true?

22   A.    Yes, sir.

23   Q.    Why don't you do that?

24   A.    Because depending on their level of intoxication, while

25   waiting in one of the holding cells to be processed, there's a

1   number of things that could happen while they're in there

2   waiting.

3   Q.   2.0 is what I think he said.  Do you remember that?

4   A.   I can't recall on that one.

5   Q.   Intoxication level above 2.0.

6   A.   Above 2.0.  Yes, sir.

7   Q.   And I was trying to figure out how that's dangerous, why

8   the jail would not allow them in if they were that drunk, but if

9   they were a little less drunk, it would be okay.  Can you

10  explain that to me, Officer?

11  A.   Well, the legal limit for a DWI is .08.  Anything that

12  starts to go above that, then you are starting to get into that

13  area where they have now put themselves in a dangerous

14  situation.

15  Q.   And their intoxication can be a danger to them themselves.

16  A.   Yes, sir, it can.

17  Q.   Have you had diabetics in your jail before?

18  A.   Yes, sir, we have.

19  Q.   Have you had to seek emergency medical care for diabetics

20  while they're in your jail?

21  A.   There were some.

22  Q.   I think we cleared up that you did not know anything about

23  the induction or how long he'd been there or what had happened

24  before you came to the scene, as we've talked here.  Is that

25  right?

1    A.    Yes, sir.

2    Q.    You can't use force on a person because you don't like him,

3    can you?

4    A.    No, sir.

5    Q.    You don't respect him, you can't use force, can you?

6    A.    No, sir.

7    Q.    It has to be a legal enforcement purpose, a law enforcement

8    purpose for you to use force.  Do you agree?

9    A.    Yes, sir.

10   Q.    And any force above a law enforcement purpose is excessive?

11   A.    Yes, sir.

12   Q.    Have you ever had a person tell you they're not resisting?

13   A.    No, sir, I have not.

14   Q.    Did you have one that night?

15   A.    No, sir.

16   Q.    You didn't hear a deputy say, "I've got his left arm under

17   me," so you don't know what was said, do you?

18   A.    No, sir.

19   Q.    Does your training involve chokeholds?

20   A.    To a certain extent.

21   Q.    Are you trained not to use a chokehold?

22   A.    No, sir, we're not.

23   Q.    Are you trained to use them?

24   A.    To some degree, yes, sir.

25   Q.    Okay.  How is a chokehold used?  How is it utilized?  How

1   do you use a chokehold?

2   A.   If it is used correctly, you can, I guess you'd say, render

3   the person to the point where they will fall asleep.

4   Q.   Meaning that you squeeze them until you have that vein all

5   shut off that shuts down the vein and then they go to sleep?  Is

6   that what you mean?  Do you know the mechanism for the chokehold

7   to render people unconscious?

8   A.   Yes, sir.

9   Q.   What is it?

10  A.   Well, while one arm -- if you have it correctly, one of his

11  own arms should be going up the side of his neck when your arm

12  comes around on the other side.  You then apply pressure where

13  you're basically pushing his head against his own arm to cut off

14  that circulation there.

15  Q.   And when the circulation cuts off, it takes a few seconds,

16  but then they go unconscious, don't they?

17  A.   Not unconscious.  They're asleep.

18  Q.   Is there a difference to you?

19  A.   Yes, sir.

20  Q.   Tell me the difference.

21  A.   Well, if applied correctly, when they're asleep, whenever

22  you put them up into the recovery mode, as I have recently

23  learned at the Black River Technical College Law Enforcement

24  Training Academy, whenever you put them up into the recovery

25  position where they've been sitting on their bottom, with a pat

Reed - Direct

1    on their back, you can wake them up.

2    Q.    While they're asleep, they're unresponsive?

3    A.    To any verbal commands, yes, sir, they are unresponsive to

4    those.

5    Q.    Can't control themselves?

6    A.    As far as --

7    Q.    They're asleep; right?  They don't have any conscious

8    control of their body if they're asleep.  Do you agree?

9    A.    Yes, sir.

10   Q.    So when they're unconscious, they don't have any control of

11   their body?

12   A.    Yes, sir.

13   Q.    So the difference to you is that they can wake up easier?

14   A.    Yes, sir.

15   Q.    But unconscious means unconscious.  Do you agree?

16   A.    To me unconscious means any other attempts to get this

17   person's attention and they're not responding to anything that

18   you're doing, at that point I would say they are unconscious.

19   Q.    When they're not responsive.

20   A.    Yes, sir.

21   Q.    Casey Babovec was not responsive; right?

22   A.    Yes, sir.

23   Q.    Did you use a Taser on Casey Babovec?

24   A.    Yes, sir, I did.

25   Q.    Did you use a Taser because he wouldn't give you his left

1    arm?

2    A.   That and because he was still struggling or fighting with

3    all the jailers.

4    Q.   The left arm he couldn't give you that we talked about in

5    the beginning of the testimony; right?

6    A.   Yes, sir.

7    Q.   So you tased him for something he couldn't help.

8    A.   In a way, sir.

9    Q.   So I guess looking at your actions, you can't see anything

10   different?  You don't need to do anything different?  Is that

11   right?

12   A.   No, sir.

13   Q.   Things the same in Saline County?

14   A.   Do I think it's the same?

15   Q.   Yeah.

16   A.   Well, since the administration has changed, there are

17   probably different rules.  After this incident sometime, I had

18   resigned from the Saline County Jail.

19   Q.   But you're employed back as a patrol officer now; right?

20   A.   Yes, sir, I am.

21        MR. SWINDOLL:  Thank you.

22        THE COURT:  Mr. Ellis?

23        MR. ELLIS:  I'll try to finish with this witness, your

24   Honor, so we won't have to recall him.

25                    CROSS-EXAMINATION

1   BY MR. ELLIS:

2   Q.    Calvin, how old are you?

3   A.    30 years old.

4   Q.    Tell us a little bit about your background.  Who are your

5   folks?

6   A.    John and Evelyn Reed.

7   Q.    Okay.  Evelyn Reed is a civic leader in Saline County,

8   isn't she?

9   A.    She's a what?

10  Q.    Civic leader.

11  A.    Yes, sir.

12  Q.    Okay.  And how long have you been in law enforcement?

13  A.    If you count the three years working in the jail, I also

14  did two years as an Alexander patrol officer, and this month

15  will make one year as a Saline County patrol deputy.

16  Q.    Okay.  And what did you do before that?

17  A.    I spent four years in the U. S. Navy.

18  Q.    United States Navy.  What did you do in the Navy?

19  A.    I started out as an undesignated seaman where out at sea I

20  was in charge of driving the ship that I was assigned to.

21  Q.    Okay.  What kind of ship was it?

22  A.    It was a missile guided destroyer.

23  Q.    Did you go to high school in Benton?

24  A.    Yes, sir.

25  Q.    Did you have any further education after high school?

1    A.    There was at least one semester of college at the Ouachita

2    Technical College.

3    Q.    Are you going to go back to school eventually?

4    A.    Hopefully I will get a chance to.

5    Q.    All right.  So you went -- how long had you been on the

6    force, the jail staff, when this incident occurred?  Do you

7    remember?

8    A.    It was a little over three years.

9    Q.    Three years?

10   A.    Yes, sir.

11   Q.    Okay.  And then you left, you went to Alexander --

12   A.    Yes.

13   Q.    -- and then you came back and you're a certified law

14   enforcement officer now.

15   A.    Yes, sir, I am.

16   Q.    Did you go to the law enforcement academy in Camden?

17   A.    No, sir.  I went to the Black River Technical College Law

18   Enforcement Training Academy.  It's not a college campus, but

19   they are also a law enforcement training academy.

20   Q.    And did you graduate from that school?

21   A.    Yes, sir, I did.

22   Q.    Okay.  Now, a lot's been made of your involvement in this

23   matter.  I'll not ask him to replay the tape, the video, but in

24   that regard, you walked up on the scene after -- was he already

25   on the floor?

```
 1   A.    Yes, sir.

 2   Q.    Okay.  And who all had him on the floor at that point?

 3   A.    At that point, Officer McGuire had his head.

 4   Q.    Had his head.  Okay.

 5   A.    I believe I was the one who was assisting Officer Shelnutt

 6   with the right leg.

 7   Q.    Okay.

 8   A.    Officer Griffin had the left arm, and I believe Officer

 9   Fenton was also on the -- that would be his left leg.  And I'm

10   not sure who was up there at the front on the right arm.

11   Q.    And someone before, Ms. Parker, referred to it as a four-

12   point restraint?

13   A.    Yes, sir.

14   Q.    Have you heard that term before?

15   A.    Yes, sir.

16   Q.    Is that what was going on here?

17   A.    Yes, sir.

18   Q.    But, actually, it was a five-point, because of McGuire,

19   wasn't it?

20   A.    Yes, sir.

21   Q.    Now, what was happening to McGuire during all of that?

22   A.    Well, I did hear him say, "He's biting me."

23   Q.    Okay.  Mr. Babovec was biting McGuire?

24   A.    Yes, sir.

25   Q.    And did you determine that that was, in fact, the case?
```

1   A.    Yes, sir.

2   Q.    Now, who finally got him cuffed?

3   A.    I believe it was myself and Corporal Griffin.

4   Q.    Why was it necessary -- this is kind of an obvious

5   question, but we need to ask.  Why was it necessary to cuff this

6   man?

7   A.    Given the nature of what was going on, we had to restrain

8   him.  Handcuffs is your first option of restraint.

9   Q.    Did you consider him dangerous at this point?

10  A.    Yes, sir.  He was a danger to himself, a danger to the

11  jailers, as well as other inmates or any other officers from

12  other agencies that could have been coming in there with their

13  detainees.

14  Q.    Did you know then or did you later learn that he had

15  attacked someone in Cell No. 1?

16  A.    It was after.

17  Q.    Sir?

18  A.    It was after the incident that I learned that he had

19  attacked somebody else.

20  Q.    That you learned that.  Okay.  So you're sitting on him.

21  Why do you continue to sit on him even though he's cuffed?

22  A.    At that time he's cuffed, but that doesn't necessarily mean

23  that you have them under control.  At any time they can still

24  move, he could have still kicked, his head was free, he could

25  have bit one of us on the leg.  There's a number of things that

1   could have happened if we would have all just scattered away.

2   Q.   And do you feel that that's the case in this case based on

3   your training and experience?

4   A.   Yes, sir.

5   Q.   Has that happened before that you had someone you thought

6   was in control and it turned out he's kicking and --

7   A.   Yes, sir.

8   Q.   -- screaming and whatever?

9   A.   Yes, sir.

10  Q.   Okay.  Now, when you were on top of him, what part of your

11  body was on his torso as you were sitting there straddling him?

12  A.   I believe I was --

13  Q.   Let me rephrase that.  What part of his body were you

14  sitting on?

15  A.   I was straddling on his -- his buttocks.

16  Q.   Okay.  And you weren't on his back?

17  A.   No, sir.

18  Q.   His back up here?

19  A.   No, sir.

20  Q.   And was it your full weight on him?

21  A.   No, sir.

22  Q.   Where was your weight?

23  A.   Most of the weight was still sitting on his buttocks.

24  Q.   And how about your knees?  Were you resting on your knees

25  also?

Reed - Cross

1    A.    Yes, sir.

2    Q.    Okay.  So you weren't on -- you were not pressing on his

3    back?

4    A.    No, sir.

5    Q.    In any way.

6    A.    No, sir.

7    Q.    All right.  Now, when you took him then into Cell 5, how

8    did you grab -- how did you grip him and bring him into Cell 5?

9    A.    I had grabbed him under both arms.

10   Q.    Okay.

11   A.    We were going to attempt to carry him over to Holding Cell

12   5.

13   Q.    But he was just too heavy?

14   A.    Yes, sir.

15   Q.    All right.  So you took him into Cell 5.  Now, this word

16   "emergency" has been thrown around quite a bit.  When was the

17   first time in Cell 5 that you knew that there might be a problem

18   with his breathing?

19   A.    When Corporal Parker stated that she did not notice his

20   chest or stomach moving, and at that point when she thought that

21   he was not breathing, that's when we realized that there might

22   be a medical emergency at that time.

23   Q.    And until then, did you even consider that it was a medical

24   emergency?

25   A.    At that time, yes, sir.

1   Q.   Beginning then?

2   A.   Yes, sir.

3   Q.   Now, what did you witness her doing after that?

4   A.   She checked his pulse, and we were all then at that time

5   watching his chest and stomach area, and we also noticed that

6   there was no movement.

7   Q.   Oh, by the way, it does appear and it's maybe not -- that

8   you struck him.  You didn't strike him, did you?

9   A.   No, I did not.

10  Q.   I'm going to come back --

11            MR. ELLIS:  May I come up here, your Honor?

12            THE COURT:  You may.

13  BY MR. ELLIS:

14  Q.   Come here.  Come over here.

15       Show the jury what you did and why it looks like on the --

16  show on me.  Show it on me.

17  A.   Okay.  I was trying to grip his shoulder to roll him over

18  to his side.

19  Q.   Uh-huh.

20  A.   And as I stated earlier, I was wearing gloves.  So when I

21  grabbed his shirt and went to pull, I lost the grip of his shirt

22  and my hand slipped off.

23  Q.   It went up.

24  A.   Yes, sir, it did.

25  Q.   Okay.  Did you see Corporal Parker demonstrate on me the

1  areas that she touched on Mr. Babovec to determine his pulse?

2  A.    Yes, sir.  Yes, sir.

3  Q.    Is that what you saw in Cell 5?

4  A.    Yes, sir.

5  Q.    Okay.  And so what did you all immediately do after she

6  said that she didn't have a pulse?

7  A.    I believe somebody, I'm not sure who it was, we had said

8  that we needed to start doing CPR.  They also requested for the

9  AED, I believe is what it's called, which was down the hall.

10  Q.    The defibrillator?

11  A.    Yes, sir.  And told somebody to go down the hall to get one

12  of our CPR masks.

13  Q.    Okay.  And then what happened?

14  A.    At that time Corporal Parker began doing chest

15  compressions.  Myself and Corporal Griffin held the mask on his

16  face while I was blowing the breaths into him.

17  Q.    He was vomiting, wasn't he, had been vomiting?

18  A.    Yes, sir.

19  Q.    But you did it anyway, didn't you?

20  A.    Yes, sir.

21  Q.    Tried to save his life, didn't you?

22  A.    Yes, sir.

23  Q.    Now, after a while, just a few minutes, actually, I believe

24  the first responders arrived?

25  A.    Yes, sir.

1  Q.   With regard to your efforts to save this guy's life and

2  your efforts to corral him and protect himself from himself and

3  other inmates and staff, is there anything you would have done

4  differently?

5  A.   No, sir.

6  Q.   Anything that you didn't do that you think you might should

7  have done or that you did do that you shouldn't have done?

8  A.   No, sir.  At the time I believe I done everything humanly

9  possible.

10         MR. ELLIS:  May I have a moment?

11         THE COURT:  You may.

12  BY MR. ELLIS:

13  Q.   How much do you weigh, Officer?

14  A.   At the time or now?

15  Q.   Then.

16  A.   Then, maybe 170 to 175.

17         MR. ELLIS:  Pass the witness.

18         MR. SWINDOLL:  Redirect, your Honor?

19         THE COURT:  Redirect.

20                    REDIRECT EXAMINATION

21  BY MR. SWINDOLL:

22  Q.   I want to look at the tape for just a minute.

23  A.   Okay.

24  Q.   With you.

25         (Video playing.)

1   Q.   He is laying face down; right?

2   A.   Yes, sir.

3   Q.   You rolled him over, and then you put him back on the

4   ground.

5   A.   Yes, sir.

6   Q.   Face down again.

7   A.   Yes, sir.

8   Q.   Did you check his pulse when you rolled him over?

9   A.   No, sir, I didn't.

10  Q.   Wasn't he already dead?

11  A.   That I don't know because at that time when I rolled him,

12  he had made that snoring sound.

13  Q.   You heard what Dr. Lyman says about the snoring sound.

14  It's his last breath.

15  A.   Yes, sir, I heard that.

16  Q.   Now, you've just told Mr. Ellis that you wouldn't do

17  anything different.  Did you treat every inmate in Saline County

18  the same way that you treated Casey Babovec?

19  A.   No, sir, I did not.

20  Q.   You used the same degree of care and concern for every

21  other inmate that you used for Casey Babovec?

22  A.   Any other inmate that was in there, if they acted the same

23  way that Mr. Babovec did, then I would have acted the same way I

24  did there.

25  Q.   And if Mr. Babovec couldn't breathe out in the area where

1   y'all had him restrained, you didn't call emergency care because
2   you didn't think you needed to.
3   A.   I was not aware if he needed it, sir.
4   Q.   You weren't aware because you hadn't been trained to look,
5   had you?
6   A.   What little training that I had received, as you've stated,
7   we are not medical certified, so, no, sir.
8              MR. SWINDOLL:  Thank you.
9              THE COURT:  Anything further, Mr. Ellis?
10             MR. ELLIS:  No, ma'am.
11             THE COURT:  You may step down.
12             THE WITNESS:  Thank you.
13             THE COURT:  You may call your next witness.
14             MR. SWINDOLL:  We call Kelli Coffey.
15             **KELLI COFFEY, PLAINTIFF'S WITNESS, DULY SWORN**
16                       DIRECT EXAMINATION
17  BY MR. SWINDOLL:
18  Q.   Kelli, give me your full name, please.
19  A.   Kelli Babovec Coffey.
20  Q.   How are you related to Casey Babovec?
21  A.   He is my brother.
22  Q.   Okay.  Tell us about Casey Babovec growing up.
23  A.   Growing up, he was my first friend.  He was the one that
24  took up for me.  Funny.  Oh, he was hilarious.  A joker,
25  prankster.  Caring, would do anything for anybody.  Helpful.

1    Just all around --

2    Q.    Where did you all grow up at?

3    A.    Kaufman, Texas, in the country, so we had lots of animals.

4    Goats.  I remember playing with the goats, racing the goats,

5    competition between the two of us.

6    Q.    Was it a good family relationship?

7    A.    Yes.  He was -- we were 20 months apart, so we were really

8    good friends.  He was my confidante.  He was, you know, the

9    secret keeper, the whatever happened, whatever was wrong, hold

10   my hand, get you through it.  Going to school, we were only a

11   grade apart, so we were always in the same school.  So when I

12   got in middle school, of course, the boys weren't -- they were

13   intimidated.

14   Q.    Was he close to his mother and father?

15   A.    Yes.  My mother especially.

16   Q.    Close to you?

17   A.    Yes.

18   Q.    Was there a lot of love between all of y'all?

19   A.    Yes.  He -- like I said, he was -- I mean, growing up,

20   like, we lived in the country, so we were each other's friend.

21   We were playmates.  We were everything together.  That's it.  We

22   played together.  Basketball.  I don't like to hunt, but he did,

23   so I would watch.  He liked to fish, so he would bait my hook

24   because I don't like worms.  So he would do all that stuff for

25   me.

1    Q.    Now, Casey was living in Arkansas at the time?

2    A.    That is correct.

3    Q.    What was your relationship as you grew older?  Did you

4    still maintain that relationship or --

5    A.    We always had a phone, so I talked to him.  He wrote me

6    several letters.  I wrote him back.  We talked.  I mean, it was

7    more -- it got distant because I grew up.  I was in high school.

8    So we separated a little bit.  I was going through a different

9    stage in my life, and then I went off to college.  So it just

10   changed at that point.  But it doesn't change the bond that we

11   had.  I mean, you still -- he's the only other person in the

12   world that knew my story.

13   Q.    Yeah.

14   A.    You know, like --

15   Q.    Now, you went on to college and you teach now, don't you?

16   A.    That is correct.  I teach.

17   Q.    Where do you teach at?

18   A.    I'm sorry?

19   Q.    Tell us where you teach at.

20   A.    I teach at Sunnyville Elementary School.  I work with

21   kindergarten through fourth grade struggling students.

22   Q.    Did Casey and Cheyenne -- tell us who Cheyenne is -- have a

23   relationship?

24   A.    Cheyenne is my niece and she was his daughter and she was

25   seven when he passed.  So she was at that fun age, you know,

1    about five where they get to be really -- have interests in

2    playing, and so they had a really fun relationship because Casey

3    liked to play.  Throwing balls around the backyard.  So, yeah,

4    this was hard for her because she was his little buddy.

5    Q.    When did you first hear that Casey had died in the jail in

6    Saline County?

7    A.    It was about 11 o'clock.  I don't remember the exact time

8    because I don't see well, so I was squinting to see the clock,

9    why was the phone ringing at that time of night.  It was my mom

10   on the other end.  She was crying hysterically, and that's how I

11   found out that he had passed.

12        Did you say how did I find out?  I'm sorry.

13   Q.    That's exactly what I asked.  Thank you.

14        How did his death affect you and affect Cheyenne and affect

15   your mother and affect your whole family?

16   A.    It broke my heart.  It crushed me.  It was devastating.  He

17   had been gone for many years, so I knew he was coming home.  We

18   had plans.  He was going to be an uncle to my kids.  My kids

19   loved him, just like Cheyenne did.  He was funny.  He was fun to

20   play with.  If he was around, you were laughing because he made

21   jokes all the time.  So he was just a happy-go-lucky, make you

22   laugh.  Through the whole process, it's -- watching -- it's just

23   a pain that I can't explain.  I can't imagine anybody else going

24   through it.  I don't want anybody to.  It put our -- it's

25   devastating.  Never dreamt.  I went to bed one night and I woke

1   up and my world was flipped upside down.

2        I have three children.  At the time I had two small

3   children.  My son was beginning the toddler stages of his life,

4   so if it weren't for pictures, I would not have any memories of

5   his toddlerhood because I was so numb for so long trying to wrap

6   my mind around how something like this can happen.

7        For myself, it's been really hard.  Like I said, for my

8   kids, like, I'm -- it's hard because I don't have the memories

9   of my -- of them.  I won't ever get him back, so it robbed me of

10  some time that I won't ever get back.

11       Watching my mom, the strength of our family, the

12  foundation, never seeing her crumble, you don't get over that.

13  You just don't.  My grandparents, I'm 32, and never once seen my

14  grandparents cry, not one time, but to see them weep, to have

15  the memories of everybody being crushed and then afterwards, not

16  being able to move on because of the way it happened, because

17  we're still here three and a half years later trying to figure

18  out why, why he wasn't important enough, why he wasn't valued

19  enough, why anybody gets to make that call.

20       I'm sorry.

21  Q.   So we're now almost four years?

22  A.   Yes.

23  Q.   How is it today?

24  A.   Well, I'm not as numb as I was.  At some point, time does

25  help you move on.  You don't heal.  I don't care what anybody

1    says, you don't heal.  Instead of having a full-time job, I work

2    part time so that I can try to force myself to remember my kids

3    and to spend time with them because it's a forced action every

4    day to get up and to do life because you get up, there's not a

5    night that I don't go to sleep thinking about that video, not

6    one single night.

7         I shouldn't have watched it, but I did because I knew that

8    if I wanted to get help, that I was going to have to see what

9    happened, so I watched it.

10        I want to put into words to explain what that feels like,

11   but I just don't know that it's even possible.  He -- to watch

12   your brother die in front of you, I know I wasn't there, but to

13   have it on video and to watch it and to see, to think about the

14   struggle that he went through, I can't get that out of my head.

15   I want to get that out of my head, but I can't.

16        I know that he was scared.  When we were little, he

17   would -- at night my parents would be in bed and, I don't know,

18   when we would talk, like, he would grab my hand -- my mom

19   doesn't even know this, but he would hold my hand, and I can't

20   remember -- I was thinking the other day, why do I

21   automatically -- why when I watch that video, why do I want to

22   hold his hand so bad?  And I think because that's what he always

23   did for me.  He just -- I want to hold his hand and I want him

24   to come out of that.  I want it to be not real.  I want it to be

25   a dream.  I want to wake up and it be over.

1    I have dreams all the time that he's alive, and that's

2  hard.  It's really hard to wake up the next day after you had a

3  dream about him playing football and tell yourself again that

4  he's not here and then get to go over again why it happened and

5  how it happened.

6    So how does it affect me today?  While I'm functioning, I

7  work, I get up, I take care of my kids, I love my family, I

8  function, but I will never forget it.  It's not fair that I have

9  to do this every day.  It's not fair to my husband, that he has

10  to deal with this, that he has to be so strong for me all the

11  time, because you can't move past it.

12         MR. SWINDOLL:  Thank you.  No more questions, your

13  Honor.

14         THE COURT:  Cross?

15         MR. ELLIS:  No questions.

16         THE COURT:  All right.  May this witness step down?

17         MR. SWINDOLL:  Thank you, your Honor.

18         THE COURT:  You may step down, Ms. Coffey.

19         MR. SWINDOLL:  May she remain in the courtroom?  She

20  no longer is testifying as a witness.

21         THE COURT:  Any objection to that, Mr. Ellis?

22         MR. ELLIS:  No, ma'am.

23         THE COURT:  All right.

24         MR. SWINDOLL:  Thank you.

25         THE COURT:  You may remain in the courtroom,

1    Ms. Coffey.

2         Please call your next witness.

3              MR. SWINDOLL:  We call Officer McGuire.

4              **DION MCGUIRE, PLAINTIFF'S WITNESS, DULY SWORN**

5                        DIRECT EXAMINATION

6    BY MR. SWINDOLL:

7    Q.   Can you give us your full name, please.

8    A.   Yes.  Dion Lee McGuire.

9    Q.   Dion, were you working at the jail in April of 2011?

10   A.   Yes, sir.

11   Q.   Now, we've been watching the film, and I'm going to show

12   the film, the first part of it, not the second part, because I

13   do understand that you really weren't involved when they dragged

14   him into Cell 5.  You weren't in there, you weren't

15   participating in any part.  You were standing by waiting for

16   orders.

17   A.   Yes, sir.

18   Q.   Is that right?

19   A.   Yes, sir.

20   Q.   That's what you've said in the past.  So we'll just talk

21   about inside the area.  Okay?

22   A.   Yes, sir.

23   Q.   Let's look at that film for a minute.

24        (Video playing.)

25   BY MR. SWINDOLL:

1    Q.    Stop.  Right there.  Stop.

2          That's you, is it not, Officer?

3    A.    Yes, sir.

4    Q.    And Casey Babovec is on the floor, isn't he?

5    A.    No, sir.

6    Q.    Sitting on his knees?

7    A.    No, sir.  I don't believe he was never -- I seen him -- he

8    was trying to get away from the man he was in the altercation

9    with, and I reached in and grabbed him.

10   Q.    There isn't a --

11         MR. SWINDOLL:  Can you pull up 5:08.  9.11 is the

12   exhibit.

13   BY MR. SWINDOLL:

14   Q.    There's a film inside that; right?

15   A.    Yes, sir.

16   Q.    Okay.  So we see the man that Casey had the problem with

17   over against the wall in the white stripes, don't we?

18   A.    Yes, sir.

19   Q.    He's over against the wall, isn't he?

20   A.    Yes, sir, over here to the left, yes, sir.

21   Q.    And Casey Babovec is on his knees; isn't he?

22   A.    Yes, sir.

23   Q.    And that's you in the door offering your hand out; right?

24   A.    Yes, sir.

25   Q.    And that's Casey reaching up to get it, isn't it?

1  A.    Yes, sir, it appears to be.  Yes, sir.

2  Q.    So when I say Casey was on his knees, you didn't remember

3  that.

4  A.    No, sir.  I did not, and I apologize to you.  It's been

5  four years, but that's what I had remembered.  I'm sorry.

6  Q.    Now, before he was pulled out, you helped him change his

7  pants.

8  A.    Yes, sir.

9  Q.    Now, you have said in the past that he -- for reasons

10  unknown to you, he soiled his pants.

11  A.    Yes, sir.

12  Q.    So you were never told about bringing Casey in, were you?

13  A.    No, sir.

14  Q.    You were never told that he was fidgety and he showed signs

15  of intoxication or being on drugs at the time he was introduced?

16  You were not told?

17  A.    You're asking if I was told that?

18  Q.    Yes, that day.

19  A.    No, sir.

20  Q.    You were not informed of anything.  You didn't know

21  anything until it was time to bring his pants out.  That was the

22  first time you had any contact with Casey Babovec that day.

23  Isn't that fair?

24  A.    Myself, yes, sir.

25  Q.    And at that time, when you brought him back, you placed him

1  on a bench.

2  A.    Uh-huh.

3  Q.    After he changed his pants.

4  A.    Yes, sir.

5  Q.    And that was with Christy Nichols sitting there, wasn't it?

6  A.    Yes, sir.

7  Q.    Now, you knew he was fidgety then.  You knew he was in

8  trouble.  You knew he was on drugs at that point in time.

9  A.    No, sir.  I didn't know he was in trouble because he didn't

10  act like he was in trouble.

11  Q.    So let's go forward.

12       He comes out.  Now stop.

13       At that point, you're going to take Mr. Babovec to the

14  ground.

15  A.    Yes, sir.

16  Q.    That's right.  And what you do to do that is, you take your

17  hand and sweep his feet onto him?  Is that how you did that?

18  A.    I was trying, yes, sir.

19  Q.    And by doing that, your hand ends up -- your left arm ends

20  up under Casey.

21  A.    Yes, sir.

22  Q.    And his left arm is under that as well.

23  A.    It was one of the two, yes, sir.  One of his arms was

24  under.

25  Q.    So you knew that Casey couldn't move his arm back up to

1    give them to the commanding officer, didn't you?  In fact, you

2    told them that?

3    A.    After they started giving him commands to bring his arm

4    back and he didn't, yes, sir.

5    Q.    What did you say?  "He can't"?  "He can't bring his arm

6    back, it's under me"?

7    A.    I said, "His arm is underneath me."  Yes, sir, I did.

8    Q.    An inmate who can't comply is not resisting, is he?

9    A.    An inmate who can't comply is not resisting?

10   Q.    He can't move his left arm up and give it to the officer.

11   It's under you and under him.  Right?

12   A.    Right.  But it's one arm.  He's got a whole other body.  He

13   was resisting with the rest of his body, yes, sir.

14   Q.    I understand, but I'm asking you about the arm.

15   A.    Yes, sir.

16   Q.    And the arm is not capable of being given to the officer

17   demanding it.

18   A.    Yes, sir.

19   Q.    And you say so?

20   A.    Yes, sir.

21   Q.    And nobody pays any attention to that, do they?

22   A.    Sir, I can't say if they did or not, but --

23         MR. SWINDOLL:  Okay.  Now, let's go down for a second.

24   (Video playing.)

25   Stop.

1   BY MR. SWINDOLL:

2   Q.   Now, I think that that's you with your feet sticking out

3   next to Casey; is that right?

4   A.   Yes, sir, it is.

5   Q.   And the way you're sitting is, you've got your arm around

6   Casey and he's got his arm under you and you're on top of him,

7   the top part of his body?

8   A.   Well, yes, sir, half on and half off.

9   Q.   Yes.  I'm not saying all on.

10  A.   Yes, sir.

11  Q.   I'm saying you're leaning over the top of his body because

12  your arm is on him and he's here.

13  A.   Yes, sir.

14  Q.   Okay.  Now, that's the arm.  It's near his mouth, and

15  that's the arm that you got bit on, isn't it?

16  A.   Yes, sir.

17           MR. SWINDOLL:  Okay.  Go ahead.

18       (Video playing.)

19  BY MR. SWINDOLL:

20  Q.   Is that Officer Reed?

21  A.   Yes, sir.

22  Q.   How many men at this time are on Casey Babovec?

23  A.   I see five.

24  Q.   Now stop for a second.

25       You're still on the floor near the Taser.  That's still

McGuire - Direct

1    you, isn't it?

2    A.    Yes, sir.

3    Q.    Your objective is to get the handcuffs on Casey, isn't it?

4    A.    Yes, sir, just to gain control of Mr. Babovec, yes, sir.

5    Q.    Now, your arm is still around Casey; is that right?

6    A.    Yes, sir.

7    Q.    Why is everybody standing up?  Is he cuffed at that point?

8    A.    I believe that he just got him cuffed at that point, yes,

9    sir.

10   Q.    Now are his legs moving?

11   A.    No, sir, I don't see them moving there, no, sir.

12   Q.    In fact, they never move again, do they, Officer?

13   A.    No, sir, not that I'm aware of.  No, sir.

14   Q.    He's unconscious, isn't he?

15   A.    Yes, sir, he's -- he's not moving, but I've seen the man

16   spit blood and he was making what they're calling snoring

17   sounds.  He wasn't spitting blood in this picture.  When they

18   moved him to the recovery position, he did.

19   Q.    He's not moving.  Can you tell us whether you agree that

20   there's a law enforcement purpose for a person who is already

21   handcuffed, laying face down who is not moving, is there any

22   other need to restrain this individual?

23   A.    Being the situation and what he had just done and the way

24   he was acting before, I myself as an ex law enforcement officer,

25   I understand why he done that.  He could wake up at any minute,

1    start kicking.  Needs to protect him also.  If he starts
2    flailing around, hitting his head on something.
3    Q.    He could wake up at any minute.  Meaning at this point you
4    know he was unconscious?
5    A.    That's what I said.  He wasn't moving.  Yes, sir.
6    Q.    Now, when an inmate is unconscious, what is the rule
7    regarding emergency medical care at the Saline County facility
8    in April of 2011?
9    A.    It depends on the situation, the reason that he is
10   unconscious.
11   Q.    If you had rendered him unconscious during the struggle to
12   gain control of this man, do you agree that he was entitled to
13   emergency medical care?
14   A.    At the time?  Are you talking about after the fact or at
15   this time right here?
16   Q.    When he's gone unconscious.  That's what I'm asking about
17   now.
18   A.    We needed to assess him and see what the problem was, sir.
19   Q.    Do you see anybody assessing Casey in this room at all?
20   A.    In Cell 5?
21   Q.    Do you remember anybody assessing him in the area before
22   they took him to Cell 5?
23   A.    In the booking area.  No, sir, we were trying to recover
24   him and get him away from the other inmates and get him secured.
25   Q.    Do you agree that if a man needs emergency medical care

1    because he's unconscious, it shouldn't be minutes later?

2    A.    Sure.

3    Q.    Why?  What's the danger in waiting minutes?

4    A.    Well, the oxygen cutoff to the brain is not good if he's

5    not breathing.

6    Q.    That's a serious condition.  If you had determined that he

7    wasn't breathing in the area, the general area, before he was

8    moved to Cell 5, what would you have done?

9    A.    Me myself, if I was the one there?

10   Q.    Yes, as a deputy there, what would you have done?

11   A.    If he was not breathing?

12   Q.    Yeah.

13   A.    Well, we would have started CPR, would have got AEDs, would

14   have called 911.  Sir, that's what we did as soon as we found

15   out.

16   Q.    When you did that, it was minutes later in the other room;

17   right?

18   A.    Yes, sir.

19   Q.    Now, there was no medical personnel in the jail in April of

20   2011 to assist the officers in any circumstance like this, was

21   there?

22   A.    Not trained professionals, no, sir.

23   Q.    Do you know how long that situation had gone on?

24   A.    No, sir, I hadn't.

25   Q.    How long had you been there?

1    A.    At that time, about six months.

2    Q.    And in the six months you'd been there, there had never

3    been a medical doctor present at the jail?

4    A.    Medical doctor?

5    Q.    Yes.

6    A.    No, sir.  There was a medical doctor that would come in on

7    certain days and see inmates for sick call, yes, sir.

8    Q.    Is that the one the sheriff mentioned?  He said that he had

9    an old friend who came in periodically?

10   A.    Honestly, sir, I don't know who the doctor was, but I do

11   know we had a doctor who would come by and do sick call and tend

12   to the inmates' needs.

13   Q.    Have you ever had to summon emergency medical care?

14   A.    Yes, sir.

15   Q.    On an inmate at the jail?

16   A.    Well, not at the jail.  I did at the penitentiary.

17   Q.    Okay.  What are the signs of meth intoxication?

18   A.    What are the signs of meth intoxication?

19   Q.    Uh-huh.

20   A.    I don't know the signs of meth intoxication, but I know the

21   signs of meth use.

22   Q.    Well, tell me about the signs of meth use then.

23   A.    Just, you know, your heartbeat is up.  You can't sit still.

24   You're fidgety.

25   Q.    Sweat profusely?

McGuire - Direct                                                281

1    A.    Some could.  Some don't.  I've seen them just as clammy as

2    they can be.

3    Q.    Incoherent speech?

4    A.    Some.

5    Q.    Loss of bowel control?

6    A.    It depends on the person, yes, sir.

7    Q.    Unconsciousness?

8    A.    Could.

9    Q.    Now, did you have any training at all to determine the

10   level of drugs in a person to see whether or not he was already

11   dangerous already to himself, was he in trouble?

12   A.    I'd been to a class years ago at the Department of

13   Corrections on identifying inmates on drugs.

14   Q.    At Saline County had you received any training?

15   A.    Other than jail standards.

16   Q.    The jail standards we've been mentioning here?

17   A.    Yes.

18   Q.    The rules?  But no specific training about recognition.

19   You heard Dr. Lyman talk about drug recognition that's --

20   A.    No, not at Saline County I haven't been to any class like

21   that.

22   Q.    Now, there was something I needed to ask you.  During the

23   time that you're restraining him and when he goes nonmoving,

24   immobile --

25   A.    Yes, sir.

1  Q.    -- does he defecate on himself?

2  A.    I believe that he did.

3  Q.    Okay.  So we have a man who you know is fidgety, at least,

4  when you put him back into the cell.  You knew, you went around

5  to watch, you pulled him out.

6  A.    Yes, sir.

7  Q.    He's not responsive.  He's gone to the bathroom all over

8  himself and he's leaked all his fluids onto the floor.  And you

9  don't think that's an emergency situation?

10  A.    No, sir, not at that time I didn't.  Can I elaborate on

11  that?

12  Q.    Yeah.

13  A.    The reason is, I had taken him to get a shower earlier, and

14  while I was in the restroom with Mr. Babovec, he was talking

15  just like we are right now.  Laughing.  He was joyful.  He was

16  complying with my orders.  He wasn't a problem in any way.

17  Q.    But you knew, you ran around saying there was going to be a

18  problem.  You told everybody there.

19  A.    No, sir.  I hadn't told anybody there was going to be a

20  problem.

21  Q.    You didn't?

22  A.    I asked them to watch the monitor because of his actions.

23  Q.    You went around the holding cell to watch his behavior?

24  A.    I went around and watched the camera, yes, sir.

25  Q.    It was very obvious Mr. Babovec was under the influence of

1   drugs?

2   A.   Yes, sir.

3   Q.   If you had heard Mr. Babovec ask for medical care, what

4   would have been your response?

5   A.   I would have found out what reason.

6   Q.   Why would you have done that?

7   A.   Because a lot of these guys would say they need emergency

8   medical care and they come out and there's nothing wrong.  They

9   want out of the cell.

10  Q.   How do you determine when one needs emergency medical care?

11  Just when they ask?

12  A.   Bring them out and assess them and ask them.

13  Q.   How do you assess them?

14  A.   Depending on what the problem is, what they're complaining

15  of.

16  Q.   You said you heard a snore while the pileup was on, while

17  you were on top of him?

18  A.   Yes, sir.  I know I did as soon as we were getting up.

19  While we were down there, I was doing a lot of hollering myself,

20  so --

21        MR. SWINDOLL:  Okay.  Thank you.

22        THE COURT:  Why don't we go ahead and take a break,

23  and, Mr. Ellis, you can question this witness then when we start

24  tomorrow.  We're really close to five o'clock.

25        During this recess and every other recess, do not discuss

1    this case among yourselves or with anyone else, including your

2    family and friends.  Do not allow anyone to discuss the case

3    with you or within your hearing.

4         Do not discuss also means do not e-mail, send text

5    messages, blog, or engage in any other form of written, oral, or

6    electronic communication, as I instructed you before.

7         Do not read any newspaper or other written account, watch

8    any televised account, or listen to any radio program on the

9    subject of this trial.

10        Do not conduct any internet research or consult with any

11   other sources about the case, the people involved in the case,

12   or its general subject matter.

13        You must keep your mind open and free of outside

14   information.  Only in this way will you be able to decide the

15   case fairly based solely on the evidence and my instructions on

16   the law.  If you decide this case on anything else, you will

17   have done an injustice.  It is very important that you follow

18   these instructions.

19        With that, we are at the five o'clock hour.  We'll start

20   again tomorrow morning at nine o'clock with our jury back in the

21   box.

22        Please rise.

23        (Jury exited the courtroom.)

24             THE COURT:  Please be seated.

25        You may step down.  Thank you.

1              THE WITNESS:  Thank you.

2              THE COURT:  We're on the record with counsel and the

3    parties outside the presence of the jury.  Are there matters

4    that we need to take up from counsel?

5              MR. SWINDOLL:  Your Honor, I don't know if it's a

6    matter that needs to be on the record, but I've been trying to

7    figure out how the verdict forms goes in this case, and I have

8    prepared some just what I think might be a way for us to start

9    looking at it.

10             THE COURT:  Okay.

11             MR. SWINDOLL:  I'd just like to hand them out to

12   everybody.

13             THE COURT:  All right.

14             MR. SWINDOLL:  And we can talk about it tomorrow or

15   something like that.

16             THE COURT:  All right.

17             MR. SWINDOLL:  I feel like it has to be

18   interrogatories, but I don't do civil rights work, so -- this is

19   my first case, so I don't have a clue.  If it were a tort

20   verdict, I would know exactly how it would go.

21             THE COURT:  All right.

22             MR. SWINDOLL:  And I'd like to give everyone a copy

23   around and we can all take a look so I can try to do this so I

24   know how to argue it, your Honor.

25             THE COURT:  All right.

1          MR. SWINDOLL:  Thank you, your Honor.

2          THE COURT:  We have also been looking at jury

3   instruction issues here on the Court's part on some of these

4   elements instructions and other things.  So we will take a look

5   at this this evening and we can visit about it.

6       I don't know how close we are to the end of the plaintiff's

7   case.

8          MR. SWINDOLL:  Your Honor, I still have most of the

9   day tomorrow.  I think I'll finish tomorrow afternoon, mid

10  afternoon.

11         THE COURT:  All right.

12         MR. SWINDOLL:  Well, it depends, I guess, if he's

13  going to do the direct on all of them, it might be towards the

14  end of the day, or maybe even the next, depending on how it

15  goes.  It gets faster and faster, as you know.

16         THE COURT:  Is there anything else on behalf of the

17  plaintiff?

18         MR. SWINDOLL:  No, your Honor.

19         THE COURT:  Mr. Ellis, anything on behalf of the

20  defense?

21         MR. ELLIS:  Not a thing.

22         THE COURT:  All right.  I will point to the parties a

23  case that I think all sides need to read, and we can talk about

24  it when we talk about these issues.

25      The case is an Eighth Circuit case.  It is *Andrews v. Neer*,

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

1    N-e-e-r, 253 F.3d 1052.

2              MR. ELLIS:  May I come up, your Honor?

3              THE COURT:  You may.  I'll give the cite again.

4    *Andrews v. Neer*, N-e-e-r, 253 F.3d 1052.

5              MR. ELLIS:  Page again?

6              THE COURT:  The case is -- tell me again.

7              MR. ELLIS:  The page.

8              THE COURT:  1052.

9              MR. ELLIS:  Thank you, ma'am.

10             THE COURT:  The case relates to the interplay of

11   wrongful death and 1983.

12        All right.  With that, if there's nothing else that we need

13   to take up outside the presence of the jury, we'll stand in

14   recess until probably about ten till nine tomorrow.  Come back

15   to make sure nothing else happens overnight.  Then we can visit

16   briefly before we put our jurors back in the box.

17        Have a good evening.

18             MR. SWINDOLL:  Thank you, your Honor.

19        (Overnight recess at 5:03 p.m.)

20                       REPORTER'S CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

22

23                                 Date:  November 9, 2015
     /s/ Christa R. Jacimore, RDR, CRR, CCR
24        United States Court Reporter

25