```
 1            IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
 2                  WESTERN DIVISION

 3   ROBIN BABOVEC, As Special
     Administratrix Of The Estate
 4   Of CASEY BABOVEC, Deceased,
                        Plaintiff,
 5           v.
     DEPUTY AND OFFICERS MIKE
 6   RICHARDS, TONYA PARKER,              No. 4:13CV00699 KGB
     CALVIN REED, SAM GRIFFIN,
 7   DION MCGUIRE, RYAN MCKINNEY,         Thursday, January 29, 2015
     DAVID FENTON, JAMES PAYNE,           Little Rock, Arkansas
 8   NANCY SHELNUTT, BRUCE                9:10 a.m.
     PENNINGTON, JOHN and JANE
 9   DOES I-V, and COUNTY OF
     SALINE,
10                    Defendants.

11                TRANSCRIPT OF TRIAL - VOLUME 4
12           BEFORE THE HONORABLE KRISTINE G. BAKER,
              UNITED STATES DISTRICT JUDGE, and a jury
13

14   APPEARANCES:

15   On Behalf of the Plaintiff:

16      MR. JAMES F. SWINDOLL, Attorney at Law
        MS. EMILY KOSTELNIK, Attorney at Law
17         Law Offices of James F. Swindoll
           212 Center Street, Suite 300
18         Little Rock, Arkansas  72202

19
     On Behalf of the Defendants:
20
        MR. GEORGE D. ELLIS, Attorney at Law
21         Ellis Law Firm P.A.
           126 North Main Street
22         Benton, Arkansas  72015

23

24      Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
25   transcription.
```

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

1          **INDEX - VOLUME 4** (January 29, 2015)

2

3    Jury Instructions Conference............................... 482

4
     Jury Instructions......................................... 560
5

6    Closing Argument/Plaintiff................................ 575

7
     Closing Argument/Defendants............................... 593
8

9    Closing Argument/Plaintiff................................ 604

10
     Jury Deliberations Begin.................................. 608
11

12   Jury Note................................................. 611

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceeding at 9:10 a.m., jury not present.)

2          THE COURT:  Good morning.  We are on the record with

3   counsel, outside the presence of the jury, to talk about jury

4   instructions.

5      I will first make you all aware of the condition of the

6   building.  We don't have heating and air today.  When this

7   building was built, there have been a series of challenges, as I

8   understand, on various aspects, one of which is the heating and

9   air.

10     There was a pipe that burst overnight.  We don't have

11  heating and air today.  We're going to go as long as we can go

12  today.  We'll see if it gets uncomfortable in this room or in

13  the jury room.  If it does, you make me aware, make sure the

14  Court Security Officer knows about it, and we'll sort of plan

15  accordingly.

16     But right now it's not uncomfortable to me in here.  I

17  predict by about one-thirty this afternoon, it may be a little

18  stuffier, but we'll see how it goes today.  I wanted to make you

19  all aware of that.

20     We may -- our room back there -- that jury room is pretty

21  closed in, so it may heat up quicker than some of the other

22  spaces in this building.  So we'll make our jurors aware of that

23  and see what they wish to do today.  But I wanted to put you all

24  on notice of that.  They're working to correct the problem, but

25  I don't believe it's a problem that will likely be corrected

1   quickly, is my understanding.

2      Okay.  Jury instructions.  Mr. McBride and I have visited

3   extensively after we e-mailed these last night and then again

4   this morning.  So as we go through this packet, I'm going to

5   raise some issues that may change how the packet reads and

6   change how some of the instructions are, and I want you both to

7   know, this run-through, make any objections you have.  I'd like

8   to engage in a dialogue about some of these things because I

9   think they're -- on these claims and on these theories, I think

10  there's probably more than one way that this could be done.  So

11  I'm very open to suggestions.

12     Let's start with the easy ones first.  I am going to go

13  through the instruction packet first, and the instruction packet

14  was e-mailed at five o'clock last night.  It starts with the

15  explanatory additional instructions, based upon Model 3.2.

16     Are there any edits, suggestions, or comments to this on

17  behalf of the plaintiff?

18          MR. SWINDOLL:  No, your Honor.

19          THE COURT:  On behalf of the defendants?

20          MR. ELLIS:  No, your Honor.  May we remain seated,

21  your Honor?

22          THE COURT:  You may.  Please remain seated.  Just be

23  sure to try to talk into your microphone.  Our court reporter is

24  the most important person who needs to hear you.  I can hear you

25  fine, but she has a little more trouble picking it up.

1      Judge's opinion, which is Instruction 2, based upon Model

2   3.3.  Anything from the plaintiff?

3              MR. SWINDOLL:  No, your Honor.

4              THE COURT:  Anything from the defendant?

5              MR. ELLIS:  No, your Honor.

6              THE COURT:  How about credibility of witnesses, based

7   upon Model 3.4.  Anything from the plaintiff?

8              MR. SWINDOLL:  No, your Honor.

9              THE COURT:  Anything from the defense?

10             MR. ELLIS:  No, your Honor.  I believe that's word for

11  word from the Eighth Circuit instructions.

12             THE COURT:  It is.  Where we didn't need to vary, we

13  haven't varied from the model on these.

14      Burden of proof, which is based on 3.4.  The one thing here

15  is, I think it leaves open the language that's bracketed, by the

16  greater weight of the evidence.  Anything from the plaintiff on

17  3.4?

18             MR. SWINDOLL:  No, your Honor.

19             MR. ELLIS:  No, your Honor, and I like that phrase,

20  greater weight of evidence.  I think that's clear.

21             THE COURT:  All right.  We'll take out those brackets,

22  obviously.  We'll also take out the title and the citation to

23  the authority in the draft and all those comments before we get

24  to the final version of this.

25      One thing, the next one raises the question, the next

1   instruction is color of state law based upon Model 4.2.  We've

2   included language that indicates that this is stipulated to.  We

3   talked about it at the pretrial, that there might be some facts

4   that you all wished to stipulate to to have me read to the jury

5   at the end.  I have not been presented with any.  I don't know

6   if there are any.  And I don't know if it's correct to say that

7   under color of state law is stipulated to, although I don't know

8   that there was any argument that it was not.

9          MR. SWINDOLL:  Well, your Honor, on behalf of the

10  plaintiff, I'm just not familiar enough with the proceedings to

11  know if Bucky would agree to any fact.  I felt like that we were

12  arguing about facts.  That's what we were arguing about in this

13  case, maybe not the law.  And so I'd like to hear from Bucky

14  about it, and I'm happy to admit any fact that will help us all.

15  I just don't know of any that's going to work like that.

16         THE COURT:  Right.  Mr. Ellis, is that acceptable?

17         MR. ELLIS:  Yes.  We were under color of law.

18  Everything that happened in this incident was under color of

19  law.

20         THE COURT:  All right.

21         MR. ELLIS:  In uniform and tasers on our hips.

22         THE COURT:  In regard to any other stipulations, why

23  don't we continue to move through the instructions, and I will

24  look to you all to confer.  After we're done with the

25  instructions conference, if there are any factual stipulations

1    aside from this -- we talked about it at the pretrial,

2    Mr. Ellis, I think you raised it, specifically in regard to some

3    facts that were perhaps included in some of the summary judgment

4    briefings.

5              MR. ELLIS:  I'm going to withdraw that motion, your

6    Honor.

7              THE COURT:  At this point in this proceeding, I'm not

8    sure what I would look to to say could be stipulated either.  So

9    that's fine.

10        We will take the stipulation as to the actions were taken

11   under color of state law, and 4.2, I hear no edits, comments, or

12   suggestions from either party.

13             MR. SWINDOLL:  On behalf of the plaintiff, that's

14   right.

15             THE COURT:  Instruction 6, the definition of serious

16   medical need for a convicted prisoner, Mr. Babovec obviously was

17   a pretrial detainee, but based upon the case law, this is the

18   same definition that applies to a pretrial detainee.  This is

19   based on Model 4.22.

20             MR. SWINDOLL:  Your Honor, I was concerned, but is the

21   Court saying that instead of showing convicted prisoner, it will

22   show pretrial detainee, medical need?

23             THE COURT:  The title will be completely removed.

24             MR. SWINDOLL:  Oh, good.

25             THE COURT:  There will be no title.  It will be

1    numbered only.  It will say Instruction No. 1, 2, 3, 4, 5, 6.

2    It will read what the instruction is.  There will be no title.

3    There will be no heading.  There will be no citation to

4    authority.

5         MR. SWINDOLL:  Great.  Thank you, your Honor.  Then I

6    have no objection to this instruction.

7         THE COURT:  Mr. Ellis?

8         MR. ELLIS:  None.  It's good.

9         THE COURT:  Instruction 7, deliberate indifference.

10        MR. SWINDOLL:  That's the model, your Honor, and

11   that's the one I've been working under, so I have no objection

12   to that.

13        MR. ELLIS:  No objection.

14        THE COURT:  All right.  Instruction 8, excessive use

15   of force.

16        MR. SWINDOLL:  Your Honor, I found nothing wrong with

17   that last night.  I looked at it.  I think that's what we've

18   been using as my model to examine the officers, so I don't have

19   any objection to this.

20        MR. ELLIS:  Your Honor, the top of the second page,

21   page 9, there's a bracket there:  Without regard to the

22   officer's own state of mind, intention, or motivation.

23      Do you mean for that to stay in?

24        THE COURT:  My question for that, Mr. Ellis -- and

25   there are other things bracketed.  I have probably three

1    comments about this.  This is the first one we'll start with.

2    The instructions on a note on use say to add that phrase if

3    there's evidence of the defendant officer's ill will toward the

4    plaintiff, and it's a cite to *Graham v. Connor*.  In the proposed

5    instructions, I think the defense included that as a proposed

6    suggestion in language.  I'm not certain if the defense wishes

7    for that to remain in, if the plaintiff wishes for that to

8    remain in, and also if it's supported.  As I said, the note on

9    use is, add this phrase if there is evidence of the defendant

10   officer's ill will toward the plaintiff.

11          MR. ELLIS:  And I don't think there is any evidence to

12   that effect.

13          MR. SWINDOLL:  Yeah.

14          THE COURT:  I don't really -- I don't see this as the

15   type of ill will that is generally associated with 1983.  I

16   think it's a stretch to say that that's here, if at all, so --

17          MR. ELLIS:  So that comes out?

18          THE COURT:  That would come out.

19          MR. SWINDOLL:  May I address it, at least, your Honor?

20          THE COURT:  You may.

21          MR. SWINDOLL:  Christy Nichols said that they were

22   standing around while this man was, obviously under the proof,

23   dying, making fun of him instead of treating him.  And I believe

24   that's the ill will that they're talking about.  It's evidence

25   of the malice of the officers to not do what they're supposed to

1   do and instead make fun of a man who is either unconscious or

2   dead on the floor, and I think that we have evidence of that.

3   And I think for the record for purposes of the instruction,

4   that's sufficient.

5              THE COURT:  Mr. Ellis?

6              MR. ELLIS:  I think we're talking here in this context

7   about, for example, racial animus, that kind of ill will, and

8   there's none of that, none of that.  Or transgender ill will,

9   that kind of thing.  There's nothing in this case to indicate

10  that.

11     The only reason that they were concerned with this man was

12  the undisputed proof, which was that he was dangerous, that he

13  was violent, and that's -- this isn't an ill will case.

14             MR. SWINDOLL:  Your Honor, I believe that's other

15  evidence besides dangerous and violent.  I believe that there's

16  evidence on the record that Casey said, "I'm not resisting, I

17  can't breathe."  That was the purpose of the struggle.  I think

18  the jury could conclude in this case that he was not being

19  violent or dangerous if they decide to choose that witness or

20  that evidence over the others.  In addition, the officers' own

21  state of mind, they have already testified in this case that

22  they did nothing wrong and they would not change anything they

23  did.

24             MR. ELLIS:  That's absolutely true.

25             MR. SWINDOLL:  And that's part of our case and it's

1    part of their case.  I think that that intention demonstrates

2    that they still believe and they don't do anything wrong.  So

3    this case is about whether or not they violated the

4    constitutional rights and whether they understood they were

5    doing it when they did it.  Because I have serious doubts these

6    officers understand constitutional rights.

7               THE COURT:  All right.  With that, given the comments

8    that have come into evidence in regard to the teasing and the

9    taunting, if the jury were inclined to find that, I'm going to

10   go back and look at *Graham v. Connor*, but I'm inclined to leave

11   the phrase in based upon Mr. Swindoll's arguments in regard to

12   the comments that were made or allegedly made at various points

13   in the encounter with Mr. Babovec by the different officers.

14      So let me look again at *Graham v. Connor* and I'll make a

15   ruling on that.  I'll take that under advisement at this point.

16               MR. SWINDOLL:  Thank you.

17               MR. ELLIS:  And note that we will object to it.

18               THE COURT:  Understood.  And for this, in regard to

19   objections and proffers, make your record here.  I'll permit you

20   to do whatever you want to do in regard to proffers.  I'm not

21   opposed to handwritten proffers, however you wish to do that

22   with our court reporter.  You can take care of that today before

23   we do the instructions.  You can leave them with her or you can

24   do it later today as long as you've made your record, in my

25   view, and get that submitted.

Jury Instructions Conference                                    491

1        Two other points about this instruction.  The word

2   "asphyxiated," it is in the description of the force that was a

3   proposed word by the plaintiff.

4             MR. SWINDOLL:  Your Honor, for the plaintiff, I

5   thought it was an accurate representation of what I believe the

6   proof was in this case.

7             THE COURT:  All right.  Mr. Ellis?

8             MR. ELLIS:  The medical examiner himself said that --

9   he cleared it up for us.  Asphyxia was part of the exertion that

10  Mr. Babovec engaged in, the contributing factors.  It's not a

11  separate and independent cause of death.  He made that clear.  I

12  think he even pointed to the word.

13            THE COURT:  I'm just not sure -- in the context of

14  this instruction, what struck me about the word is, it's just

15  not -- I mean, the literal language from the proposed

16  instruction is to describe the force, which is sort of struck,

17  choked, tased, kicked, applied physical force.

18            MR. SWINDOLL:  Your Honor, then I withdraw it.  You're

19  right.  I think that under the context of the instruction and

20  based upon what everybody knows that I don't, I'll withdraw

21  that.

22            THE COURT:  You know, I understand and appreciate --

23  and let me just make sure when I say that, I understand and

24  appreciate the dispute on the medical examiner.

25            MR. SWINDOLL:  Yes.

1          THE COURT:  And the findings.  It says:  Here describe

2     an act such as struck, hit, kicked, or shot.

3          MR. SWINDOLL:  Fair enough.  In that context,

4     asphyxiated doesn't apply.

5          THE COURT:  We'll make it struck, choked, tased,

6     kicked, or applied physical force.

7          MR. SWINDOLL:  Yes, your Honor.  Thank you.

8          THE COURT:  If that's acceptable, Mr. Ellis?

9          MR. ELLIS:  The evidence is absolutely barren of this

10    man having been struck or choked.  He was tased.  He was never

11    kicked.  Applied physical force, yes.  Yeah, the evidence is

12    clear that he was never struck, choked, or kicked.

13         MR. SWINDOLL:  Your Honor, I agree that there's no

14    evidence that he was kicked.  I disagree that there was no

15    evidence that he was choked or struck.  I think the evidence on

16    the video and the discussion with Officer Reed and myself

17    leave -- the jury could conclude from that evidence and from

18    what they see on the video that he, in fact, was struck.

19         THE COURT:  I agree with that, and I will also say I

20    think there's evidence in regard to the choking, in particular

21    the testimony from Officer McGuire.  I don't think he conceded

22    it, but I think the questioning was was your arm under his neck

23    and his mouth, pulling him back to the ground.  So I think

24    there's questions of fact.  That's why we've impaneled 12

25    people.  But I think there's enough there to let that word stay

1    in this instruction in terms of the description of the conduct.

2         So I hear the consensus that from this proposal, we're

3    taking out kicked, and I've already taken out asphyxiated.

4              MR. SWINDOLL:  Yes, your Honor.

5              THE COURT:  So it will read struck, choke, tased, or

6    applied physical force.

7              MR. SWINDOLL:  To Casey Babovec?

8              THE COURT:  Yes.

9              MR. SWINDOLL:  Okay.

10             MR. ELLIS:  We would object, your Honor, to struck,

11   choked, or -- and you've already taken out kicked.

12             THE COURT:  I have a question in regard to this

13   instruction.  You will see in this case the facts are such that,

14   as we get to talking about causation and damages, it's

15   difficult, this, to the extent any that I've seen in 1983 law

16   does, has to borrow tort concepts, right, of causation and

17   allocation.  We're going to move to that discussion.  But this

18   instruction in particular in the way these defendants are

19   situated, I want to raise the possibility of splitting out what

20   we've merged in this instruction.  And the Court has done the

21   merging on its own.

22        On the first paragraph of this proposed instruction, the

23   first element, we have that the individual defendant struck,

24   choked, tased, or applied physical force to Casey Babovec or the

25   individual defendant's subordinates struck, choked, tased, or

1  applied physical force to Casey Babovec.  So it's sort of

2  merging the application of force and the supervision of the

3  force.

4       I'm not certain on these facts that that's necessarily

5  appropriate for all of these defendants.  I think deliberate

6  indifference, when we get to that one, it's probably easier to

7  merge those concepts based upon the conduct, but here I think

8  there's an argument that, at least as to our defendants McKinney

9  and Richards, I don't know that they ever applied force.

10            MR. SWINDOLL:  And they did not.

11            THE COURT:  And so, you know, if there's no dispute

12  with that, it seems to me that we split out this instruction on

13  the first part into two separate instructions and edit the

14  interrogatories accordingly as to Mr. McKinney and Mr. Richards,

15  asking the jury to consider only that second paragraph.

16            MR. SWINDOLL:  I agree, your Honor.

17            MR. ELLIS:  I'm fine with it, your Honor.

18            THE COURT:  Does that make sense?

19            MR. ELLIS:  It does.  It wouldn't be my first choice,

20  but it's okay.  I'm fine with it.

21            THE COURT:  If you don't care if it's left this way,

22  they're your defendants, you know, I'm happy to entertain both

23  sides of that, but that's an issue that Mr. McBride and I in

24  talking through it to make the instructions track the facts and

25  what they're being asked to do.

1          MR. SWINDOLL:  On behalf of the plaintiff, it can be

2    joined, but I have no objection if Bucky wants it changed or if

3    the Court feels it's necessary to separate the two.

4          THE COURT:  All right.

5          MR. ELLIS:  You might want to say -- I'm just thinking

6    out loud.  The individual defendants or some of them or one or

7    more individual defendants or something like that.

8          THE COURT:  When you get to the -- when you get to the

9    interrogatories, you're asking for each individual whether they

10   violated --

11         MR. ELLIS:  That's right.

12         THE COURT:  -- Instruction 8.  It takes care of it on

13   that back end.

14         MR. ELLIS:  Absolutely.

15         MR. SWINDOLL:  So for that reason, I think it makes

16   even more sense to keep them together.

17         THE COURT:  I'm happy to do it either way.  I raise it

18   as an issue, Mr. Ellis, that really impacts both McKinney and

19   Richards.  If you don't have any objection to it, the elements

20   instruction being joined like this and if you want to table that

21   thought and revisit it after we talk about the allocation and

22   the interrogatories and damages and all that, that's fine, too.

23         MR. ELLIS:  I'm tentatively okay with that, your

24   Honor.

25         THE COURT:  With leaving it together or separating it?

 1          MR. ELLIS:  Leaving it like you have it.

 2          THE COURT:  All right.

 3          MR. ELLIS:  Just don't make fun of me later and say,

 4   ha, ha, ha.  Tricked him.

 5          THE COURT:  The denial of medical care, Instruction

 6   No. 9.

 7          MR. SWINDOLL:  I have no objection to this

 8   instruction, your Honor.

 9          MR. ELLIS:  Well, I object to this instruction

10   altogether.  I think that it gives two bites at the apple.  The

11   plaintiff is going to get a deliberate indifference instruction,

12   and that should cover this issue.  It shouldn't be allowed now

13   to also get denial of medical care.  I think he has to pick one

14   or the other, in other words.

15          THE COURT:  So --

16          MR. SWINDOLL:  Could I ask for clarification because

17   I'm not sure I understand what he just said.

18          THE COURT:  And so I want to make certain -- yes, you

19   can ask for clarification.

20          MR. ELLIS:  Of what I said?

21          MR. SWINDOLL:  Yeah.  What were you trying to tell us,

22   Bucky?  Because I'm just not tuned into it.  You're saying that

23   because --

24          MR. ELLIS:  I'm just going to think out loud, and that

25   usually gets me in trouble.  You can have a denial of medical

1    care without deliberate indifference.  You can't have deliberate
2    indifference to a serious medical need without denial of medical
3    care.  Does that make sense?
4              THE COURT:  This instruction takes care of both,
5    right?  This instruction is denial of medical care with
6    deliberate indifference.
7              MR. SWINDOLL:  Yes.
8              THE COURT:  It requires both.
9              MR. SWINDOLL:  And that's why I thought it was proper.
10   It's a charging instruction for me.  It is the elements of my
11   case.
12             THE COURT:  Correct.
13             MR. SWINDOLL:  And I felt that it was necessary to
14   have all of them, including indifference, so when I argue it, I
15   can show where indifference fits.
16             MR. ELLIS:  Well, where does it talk about deliberate
17   indifference in this?  Oh, I see.
18             THE COURT:  Third element.
19             MR. ELLIS:  Third.  Okay.  So where is deliberate
20   indifference?  Let's go back and find deliberate indifference.
21   What's the number?
22             THE COURT:  Seven.
23             MR. ELLIS:  Seven.  Bear with me.
24        Well, see, I've just got in my mind this little six- or
25   seven-minute span of time.  We always think of deliberate

1  indifference -- gosh, I get in trouble when I think out loud.

2  We always think of deliberate indifference as -- in terms of a

3  time continuum, you know, you stayed back in that cell for 30

4  days and didn't get his insulin or something like that.

5          THE COURT:  Right.

6          MR. ELLIS:  But if you're going to not give seven, but

7  give eight, you're going to have to define deliberate

8  indifference.  Aren't you?

9          THE COURT:  Six defines serious medical need and seven

10  defines deliberate indifference.

11          MR. ELLIS:  Well, okay.  Let's go with it then.  I'm

12  okay with it.  This is -- Instruction 9 is an elements -- more

13  of an elements instruction and seven is a definitions

14  instruction, isn't it?

15          THE COURT:  Right, right.  Six and seven are the

16  definitions instructions that really accompany Instruction 9.

17          MR. ELLIS:  I'm okay.

18          THE COURT:  So no suggestions, comments, or edits to

19  Instruction 9 on behalf of the plaintiff?

20          MR. SWINDOLL:  No.

21          THE COURT:  I understand the defendants object and

22  they're not waiving any objections made with regard to directed

23  verdict, but in terms of just the language and the form of this,

24  Instruction 9, you're all right with it, no change?

25          MR. ELLIS:  Yes.

1    THE COURT:  Okay.  Instruction 10.  Now, we're wading

2    into territory where I don't think there are model instructions

3    from the Eighth Circuit.  This is the claim against Saline

4    County.

5    MR. SWINDOLL:  Your Honor, on behalf of the

6    plaintiffs, this is what I was reading was required.

7    MR. ELLIS:  Say that again.

8    MR. SWINDOLL:  This is what I was reading when I came

9    to court that was required, and that's what I've been trying to

10   prove.  If this is a -- the plaintiff has no objection to this.

11   I think this is what the law is.

12   MR. ELLIS:  May I respond, your Honor?

13   THE COURT:  You can.

14   MR. ELLIS:  I think that there is just absolutely not

15   one scintilla -- I just love that word -- of evidence in this

16   record to support the giving of Instruction No. 10.  I mean,

17   what is the policy or custom that they're complaining about?  I

18   can see where, you know, a conditions case where they don't have

19   a registered dietician down there and over a two- or three-month

20   period, somebody gets scurvy or rickets or sodium poisoning.

21   That's one thing.  That's policy.

22   But this, what does county policy have to do with what

23   happened in a seven-minute period?  What policy, what policy

24   were they not following?  I guess -- I guess what I'm arguing

25   is, the county shouldn't even be in this case.  I don't know

1   what the custom or policy that they're complaining about would

2   be.

3              THE COURT:  I will say the proof before the Court, I

4   can see the proof on the issues regarding Instruction 9, which

5   relates to the deliberate indifference and the serious medical

6   needs.  I think there's lots of play in regard to whether there

7   was a policy, custom, or practice, if the people on the ground

8   knew about the policy, custom, or practice.  And I'm not going

9   to make the plaintiff's case any more than that.  But I see

10  that.

11      I question, too, to an extent excessive force in regard to

12  policy, custom, and practice, and also in regard to failure to

13  train, which we'll get to next.  I'm not certain about excessive

14  force in that same light.  I'm not sure about notice.

15             MR. SWINDOLL:  I don't believe I have a case on

16  excessive force for the county.  I just don't think I proved

17  that and I think we don't need to be worried about that.

18             THE COURT:  All right.

19             MR. SWINDOLL:  My case was the medical case against

20  the county, as the Court understands.

21             MR. ELLIS:  I've got to come clean with the Court on

22  something.  I hate doing this.

23      There is a case -- and I looked for it half the night and I

24  know it's there because Judge Deere and I taught a course on

25  1983 litigation for the Federal Practice Institute, a seminar,

 1    that says that there is no constitutional right by a detainee to

 2    in-house medical facilities in a jail.  I wish I could find that

 3    case.  I know it's there.

 4         Now, you're going to have to hold that there is a

 5    constitutional right to in-house medical facilities in a jail.

 6    You've got to hold that to get to the jury on this issue.

 7              THE COURT:  What about the policy, custom, or practice

 8    of admitting someone who is so high, intoxicated, all of those

 9    issues, to begin with?  I mean, there's been -- to begin with,

10    the admission policy of the jail.

11              MR. ELLIS:  Well --

12              THE COURT:  Don't you think there's some evidence of

13    that that's in play?

14              MR. ELLIS:  Maybe on Ms. Shelnutt.  She made the call

15    as he came in.  But what did the county have to do with that?

16              THE COURT:  I've got the sheriff saying that there's a

17    policy that they shouldn't admit people, practice, custom,

18    whatever you want to call it, that they shouldn't admit people

19    who are too intoxicated, inebriated, whatever.  There's some

20    evidence of that from Sheriff Pennington testifying to that.

21    Right?  And then I had witnesses in this courtroom say you can't

22    turn every prisoner away who is too intoxicated, inebriated,

23    whatever, we just can't do that.  And the question was why not.

24    And the answer was, I don't know.

25         What do I do with that?  What is that claim?  I don't know

1   what that claim is.

2           MR. ELLIS:  I'm not quarreling with the Court.  The

3   Court was sitting closer to the witnesses than I am, I was.

4   But --

5           THE COURT:  The record will speak for itself, but

6   that's what I recall.

7           MR. ELLIS:  I know you recall that.  What I remember

8   is that the decisions, that those decisions were judgment calls

9   at the personnel level.  I don't know that the county as an

10  official custom or practice ever got involved in the decision of

11  who is or is not turned away from that jail.  Ever.  I don't

12  think -- and I don't think the sheriff indicated that.  All he

13  said was when they're too drunk, too high to be brought into the

14  jail, then they're taken to the emergency room.  That was his

15  testimony.  And that's the case.  I mean, we've established that

16  with the other witnesses.  Mr. Richards confirmed that.  What

17  does that have to do with county policy?

18          THE COURT:  Mr. Swindoll, I'll let you speak to it.

19  It's your case.

20          MR. SWINDOLL:  Thank you, your Honor.  Sheriff

21  Pennington said that he had been seeking medical care in his

22  jail so that this situation would not arise where his officers

23  were required to use their judgment when they were not trained

24  to do so.  I think every officer who testified said he was not

25  trained to do recognition of intoxicated people at a level that

1   they were dangerous.  The sheriff recognized this and he told us

2   that they are not competent to do so.  He worried about it from

3   ground zero, that he sought the help of the Quorum Court.  But

4   nothing happened.  The same practice continued until 2012 when

5   they placed medical in the jail.  I think that was his

6   testimony, and I think under the circumstances, that is a long-

7   standing practice in Saline County, from 2008 to 2012, that he

8   had a friend come by if they had an emergent medical need, but

9   he relied instead on untrained and unqualified people to make

10  the assessment, which is what happened in this case.

11      I think the jury could conclude from all of that that

12  there's something here to talk about and I think they should be

13  instructed on it.

14          MS. KOSTELNIK:  And there's the testimony of the

15  jailers as to what was the practice and the custom of the county

16  employees at the time and what was the custom and practice in

17  the jail towards intoxicated persons, and that was that they

18  were not evaluating and not trained to evaluate persons in the

19  jail at that time.  That custom, pattern, and practice goes

20  beyond just what are the words on there, in their policy.  It

21  goes to what are the actions.

22          MR. ELLIS:  I've had my say, your Honor.  If they had

23  a resolution from the Quorum Court saying to lock the door and

24  throw away the key down there or something like that, that would

25  be one thing, but they don't have any conduct, any pattern, any

1   practice, established by the county or, for that matter, the

2   sheriff.  The sheriff's testimony was, if they're too drunk, if

3   they're too high, we take them to the hospital.  I mean, that's

4   not a long-standing custom or policy or practice.  So I object

5   to this.

6           THE COURT:  All right.  What I hear plaintiff's

7   counsel saying is that at a minimum, the referenced Instruction

8   No. 8, which is the excessive force instruction, comes out.

9           MR. SWINDOLL:  Yes, your Honor.

10          THE COURT:  Where the second element is, second, the

11  acts of any individual defendant deprived Casey Babovec of his

12  particular constitutional rights under the U. S. Constitution as

13  explained in Instruction No. 9.

14          MR. ELLIS:  Wait, wait.

15          THE COURT:  We're on Instruction No. 10.  There's a

16  reference in the second element.

17          MR. ELLIS:  Eight.  Okay.  Got you.  But he's

18  keeping -- you're keeping Instruction No. 8.  You're just taking

19  it out of the reference.

20          THE COURT:  I'm taking it out of the reference there.

21          MR. ELLIS:  Got you.

22          THE COURT:  Plaintiff's counsel has conceded there's

23  no claim against the county for excessive force.  There's no

24  policy, custom, or practice claim against the county for

25  excessive force.  So I'm going to take out that reference for

1    sure.

2         And I hear the information from you in regard to

3    Instruction 10 and the objections, Mr. Ellis, but at this time

4    I'm going to leave 10 in the packet.  I also will look for the

5    case that you believe -- and what I understand you to say is,

6    the case indicates the county has no obligation to provide

7    medical care to a pretrial detainee?

8              MR. ELLIS:  I'll continue to look for that case.

9              THE COURT:  Did I state correctly what you think it

10   holds?  I really will search for it.  You think the county is

11   not obligated to provide medical care to a pretrial detainee?

12             MR. ELLIS:  No, no.  It's not obligated to have

13   medical facilities in the jail.  They are obligated to provide

14   medical care, and we do that, we take them to the hospital or

15   take them to the doctor right along.  As long as there's some

16   kind of medical care available.

17             THE COURT:  Okay.

18             MR. ELLIS:  I'm just saying that case says you

19   don't --

20             THE COURT:  You don't have to have a clinic, doctor,

21   facility on site at the jail.

22             MR. ELLIS:  Exactly.

23             THE COURT:  I understand.

24             MR. ELLIS:  Let me just address one more thing here.

25   And this is a correct statement of the law, I think.  Official

1    policy means a rule, a regulation, or regulation promulgated,

2    adopted, or ratified by the county, which may include a single

3    decision by properly constituted legislative body.

4         There is absolutely no evidence anywhere in this building,

5    much less that record, that that's the case in this litigation.

6    This is error.

7              THE COURT:  I'm okay with letting it go, and we'll

8    see.  I mean, I hear you, but I think there are lots of facts

9    and circumstances in this -- I've got a jail policy that's been

10   put before the jury that there are allegations that people

11   followed or didn't follow, there's questions about the policy

12   itself in regard to whether somebody's unconscious, do you still

13   use common sense, what do you do in regard to that.  I'm just

14   not sure, and if it's error, it may be, but I don't know how

15   else you get at that claim.  If it's the jail policy, is that

16   enough to say that's the official policy of the county?  It's

17   the Saline County Detention Center.  I don't know.  Right?  I

18   mean, what do I do with that?  Is that not a claim at all?  Is

19   that a different claim?  I don't know.  Mr. Swindoll, I'm happy

20   to hear from you as well.

21             MR. SWINDOLL:  I also believe that the failure to

22   provide upon request on several or numerous occasions by the

23   sheriff is an act of the legislative body that eliminated or

24   placed upon untrained people in the jail for a long period of

25   time this situation, which they were not trained and not capable

1    of handling, according to them.

2            MR. ELLIS:  But, your Honor, he's not the legislative

3    body.

4            MR. SWINDOLL:  The Quorum Court --

5            MR. ELLIS:  Practice or custom means any permanent,

6    widespread, well-settled practice or custom that constitutes a

7    standard operating procedure of the county.  If they're too

8    drunk, we take them to the emergency room.  That is the

9    undisputed proof in this case.  As a matter of fact, we give

10   them a breathalyzer and he wouldn't take one.  But that's

11   neither here nor there.  I just feel pretty strongly -- I don't

12   feel very strongly about many things, but I feel strongly about

13   that.

14           THE COURT:  I understand.

15           MR. ELLIS:  I've made my record.

16           THE COURT:  Anything further on this instruction,

17   Mr. Swindoll?

18           MR. SWINDOLL:  No, your Honor.

19           THE COURT:  Mr. Ellis?

20           MR. ELLIS:  No, ma'am.  I've said what I need to say.

21           THE COURT:  Instruction 11, failure to train by the

22   county.

23           MR. ELLIS:  I'd object to this instruction.

24   Mr. Swindoll may want to talk first.

25           MR. SWINDOLL:  On behalf of the plaintiff on

1   Instruction No. 11, Sheriff Pennington has said that my people
2   are not qualified.  The people have said they had no training.
3   That is a practice that he continued in the jail during the
4   period of time when he knew there was no other way in which an
5   inmate or a detainee might achieve medical care other than
6   through the jail and through the booking process and the
7   monitoring.  Which he himself says was not -- they were not
8   qualified to do.  And he didn't train them once he knew that.
9   That's what training is about.  Once a supervisor, once a person
10  in position knows that his people are not competent to deal with
11  a thing that might be a life-threatening emergency, that's why I
12  thought it was proper in this case.  Now, if the sheriff's
13  practices and customs and policies in that circumstance doesn't
14  meet the test, frankly, I don't know this area of the law.  But
15  that's what I thought and that's why I brought it to the Court
16  like this.

17         THE COURT:  One clarification from Mr. Swindoll first.
18  As I understand it, for this instruction as well, for failure to
19  train, liability for the county, you also agree that excessive
20  force should be out here, too?

21         MR. SWINDOLL:  I'm not sure about training and
22  excessive force, given every officer's declaration that there
23  was nothing wrong with the force used on this man and that they
24  were all trained to do exactly this.  We have expert testimony
25  that the force was excessive and that these officers overstepped

1    their ability during the restraint and thereafter.

2            THE COURT:  So --

3            MR. SWINDOLL:  So I think it's a question of fact and

4    I think the jury has information and I think that they should be

5    instructed on force in that case.

6            THE COURT:  So leave this instruction as it reads now,

7    which is a reference back to 8 and 9.

8            MR. SWINDOLL:  Yes.

9            THE COURT:  In the first element.

10           MR. SWINDOLL:  For training.

11           THE COURT:  I'll hear from the defense on that,

12   Mr. Ellis.  I understand you object to the instruction being

13   given at all.

14           MR. ELLIS:  I do.  It's not only a two-fer.  It's a

15   three-fer.  You're going to give an instruction we'll talk about

16   in a minute, Instruction No. 12, Bruce Pennington's failure to

17   train.  Now, I wouldn't like it and I would object to it, but it

18   would be a better idea rather than a failure to train, the

19   county, to give a failure to train supervisors McKinney and

20   Richards.  The county as an entity isn't in the training

21   business.  If the county had a training facility and barred

22   jailers from learning how to be a good jailer, that would be one

23   thing.  But we're not a training -- the county is a government

24   entity.

25           MR. SWINDOLL:  Your Honor, I think he's right.

1           MR. ELLIS:  Supervisors --

2           THE COURT:  I mean, this is an official capacity

3    claim; right?

4           MR. ELLIS:  Yes.

5           THE COURT:  We're going to get tied up in the

6    semantics.  At the end of the day, it's an official capacity

7    claim.  But you also have Mr. Pennington in an individual

8    capacity claim as a supervisor, too; right?

9           MR. SWINDOLL:  I see.

10          THE COURT:  So I'm not sure how to parse that through

11   with the jury and the interrogatories and to get at that.  You

12   know, it's the fiction of individual in official capacity in

13   1983 law and I'm not sure how best to break that down for the

14   jury.  So that's -- if you all have suggestions, I'm happy to

15   hear them.  I will say these elements and these claims, there

16   were, as I recall, I don't think there were any proffers.

17          MR. SWINDOLL:  No, there weren't.

18          THE COURT:  There were no proffers by either side on

19   these.  In other words, I'm happy to hear your suggestions, it

20   is your case, as to what you think this should look like, the

21   claims that remain.

22          MR. ELLIS:  It shouldn't be given.  My position is it

23   shouldn't be given.  If you're going to give also an instruction

24   with regard to Bruce Pennington, and, I suppose we could give

25   one, I wouldn't like it, but we could give one with regard to

1    the other supervisors in the case.  This is an abstract

2    reference to a governmental entity.  That's my objection to it.

3    I think the jury has a right to ask in deliberations if this

4    instruction is given, does the county run a training farm for

5    jailers that's inadequate?  That's not what counties do.

6            THE COURT:  How do you propose getting at the

7    distinction between holding Bruce Pennington in his official

8    capacity as the Sheriff of Saline County liable versus holding

9    Bruce Pennington in his individual capacity as Bruce Pennington

10   liable?

11           MR. ELLIS:  Well, because an action against a sheriff

12   in his official capacity is, in fact, an action against the

13   county.

14           THE COURT:  But there are two separate claims here.

15   Right?

16           MR. ELLIS:  No.

17           THE COURT:  I need a verdict on two separate claims.

18           MR. ELLIS:  No, I don't think so.  A verdict against

19   Pennington in his official capacity is a verdict against the

20   county.  The law is clear on that.

21           THE COURT:  I understand that, but there's an

22   individual capacity claim against Bruce Pennington.  That claim

23   survives.  It's still here.  How do I instruct on that?  That's

24   the question I have for both of you.  So, I mean --

25           MR. SWINDOLL:  I'm good with 11, your Honor, now that

1    I understand.

2              MR. ELLIS:  Was your question a rhetorical one, your

3    Honor?

4              THE COURT:  I just don't know how to do it.  I really

5    don't know.  There are no models, I don't believe, in the Eighth

6    Circuit.  And I'm not sure -- at you know, this point maybe the

7    claim shouldn't survive against Mr. Pennington in his individual

8    capacity, but it appears that the case law permits it.  So I'm

9    not sure where we stand.  *Parrish v. Ball* is the case in the

10   Eighth Circuit that states a failure to train claim can survive

11   against an individual supervisor in his individual capacity.

12             MR. ELLIS:  That's a correct statement of the law.  I

13   agree with that.

14             THE COURT:  So I'm trying to get at that in an

15   instruction and I'm open to suggestions.

16             MR. ELLIS:  Where were you reading from?  Were you

17   reading a note on use, your Honor?

18             THE COURT:  No.  I was looking at law that we looked

19   at last night in order to understand the claims that should be

20   brought forward against Sheriff Pennington and how best to

21   describe them.  *Parrish v. Ball* is 594 F.3d 993.

22             MR. ELLIS:  I've made my record, your Honor.  I'm

23   ready to move on.

24             THE COURT:  Perhaps the way to get at this issue is to

25   say this in Instruction No. 11.  I understand Mr. Ellis's

1   objection to the instruction being given at all.  If the first

2   paragraph states:  Your verdict must be for the plaintiff and

3   against Defendant Saline County and Defendant Bruce Pennington

4   in his official capacity as Sheriff of Saline County on the

5   plaintiff's failure to train claim if all of the following

6   elements have been proved.

7        Instruction 12 is a failure to train claim against Bruce

8   Pennington in his individual capacity, and perhaps that gets

9   stated in the first paragraph of that instruction:  Your verdict

10  must be for the plaintiff and against Defendant Bruce Pennington

11  in his individual capacity on the plaintiff's failure to train

12  claim.

13            MR. ELLIS:  And wouldn't need 12 at all then that way?

14            THE COURT:  12 is still an individual capacity

15  instruction.

16            MR. ELLIS:  I thought you worked individual capacity

17  into 11, did you not?

18            THE COURT:  No, official capacity.

19            MR. ELLIS:  Okay.

20            THE COURT:  Your point, as I understand your point,

21  the county can't act.  The county acts through Sheriff

22  Pennington in his official capacity as the sheriff in regard to

23  training.  Right?

24            MR. ELLIS:  Right.

25            THE COURT:  So that addresses at least that issue.  I

1    understand and recognize still that you object to the

2    instruction overall, but in an effort to try to get at that

3    issue.

4            MR. SWINDOLL:  Plaintiff is good with that, your

5    Honor.

6            THE COURT:  What I will do with Instruction 11 is add

7    that language.  So the first line in Instruction 11, which is

8    the failure to train against the county, will state:  Your

9    verdict must be for the plaintiff and against Defendant Saline

10   County and Defendant Bruce Pennington in his official capacity

11   as Sheriff of Saline County on the plaintiff's failure to train

12   claim if all of the following elements have been proved.

13       And the rest of the instruction will remain the same.

14       Mr. Swindoll?

15           MR. SWINDOLL:  No objection, your Honor.

16           MR. ELLIS:  I object to the instruction even as you

17   modified it, your Honor, because I don't think it correctly

18   states the law as it applies to these facts.

19           THE COURT:  All right.  Instruction 12 is a failure to

20   train against Bruce Pennington in his individual capacity.

21   Again, my proposal here is that we state:  Your verdict must be

22   for the plaintiff and against Defendant Bruce Pennington in his

23   individual capacity on plaintiff's failure to train claim if all

24   of the following elements have been proved.

25           MR. ELLIS:  Refresh my memory, your Honor.  You

1   dismissed part of the Pennington claim, and I'm trying to

2   remember what part it was.

3            THE COURT:  Excessive force.  So the reference to

4   Instruction No. 8 has to come out here.

5            MR. ELLIS:  I remember now.

6            THE COURT:  That was a typo that we caught last night

7   after we circulated.

8            MR. ELLIS:  Right.

9            MR. SWINDOLL:  Plaintiff is good with 12, your Honor.

10           MR. ELLIS:  I'm going to object to this instruction

11  because I don't think that there's any evidence in the record to

12  support this instruction, particularly fifth.  Mr. Pennington's

13  failure to train is so closely related to the deprivation of

14  Casey Babovec's rights.  It has to be the moving force that

15  caused the ultimate injury.  I just can't see how that was --

16  his involvement or lack of involvement or training or lack of

17  training had anything to do with the moving force in this eight-

18  minute or so period:  So I object to Instruction No. 12 because

19  there's no evidence in the record to support it.

20           THE COURT:  All right.  Your objection is noted.

21      Mr. Swindoll, I'll permit you to speak to it, if you wish.

22           MR. SWINDOLL:  Your Honor, I think there's substantial

23  evidence.  I do not see anything wrong with this instruction

24  after the Court has removed No. 8, the excessive force.

25           THE COURT:  All right.

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

1        MR. SWINDOLL:  And the moving force is going to be a

2   question for the jury.  In this case, there is evidence that he

3   knows these people are not competent and he knows that they're

4   to evaluate, and that puts everyone at risk in this jail.  And

5   his training resulted in this lady not even talking to the

6   arresting officer, required by the procedures.

7        THE COURT:  Mr. Ellis, your objection, I'll give you

8   the final word if you want it.

9        MR. ELLIS:  The evidence is clear, your Honor, moving

10  force, that the way these facts unfolded in this case, there

11  could have -- one of the individuals in Cell 5, Ms. Parker,

12  let's say, could have been a cardiologist and it wouldn't have

13  made any difference.  So training had absolutely nothing to do

14  with the moving force that is involved in this case.

15       I've said what I need to say.  I object to it.

16       THE COURT:  Your objections are noted.  We'll make the

17  objections that we talked about to 12.

18       Instruction 13 -- and, actually, before we leave 12 with

19  Sheriff Pennington, I want to have this discussion.  In the

20  interrogatories for Sheriff Pennington, the way it is currently

21  drafted, it would permit the jury to consider a deliberate

22  indifference claim against Sheriff Pennington and also a failure

23  to train claim against Sheriff Pennington.  I'm not certain that

24  that is appropriate.  And this is Sheriff Pennington in his

25  individual capacity.

1         MR. SWINDOLL:  Which interrogatory?

2         THE COURT:  Interrogatory No. 19.

3         MR. SWINDOLL:  19.  Thank you.

4         THE COURT:  Interrogatories No. 19 and 20.

5         MR. SWINDOLL:  And so the Court's reservation about 19

6    and 20 is that it's confuse -- I really, frankly, don't

7    understand.

8         THE COURT:  I don't know how he could be liable on a

9    deliberate indifference claim.

10        MR. SWINDOLL:  Okay.

11        THE COURT:  I don't see a distinction.  I think it is

12   two bites of the apple for conduct of Sheriff Pennington in his

13   individual capacity to say you're going to submit a deliberate

14   indifference claim, solely Instruction 9, and a failure to train

15   on Instructions 9 and 10, based on the evidence here.

16        MR. ELLIS:  I agree with the Court.

17        THE COURT:  9 and 12.  I'm sorry.  12 was the failure

18   to train.

19        MR. SWINDOLL:  We agree, your Honor.  I'm just

20   ignorant in this area and I think that makes more logical sense

21   to me than anything that I could come up with.

22        MR. ELLIS:  I'm just embarrassed that I didn't see

23   that.

24        THE COURT:  So I think we're going to take out

25   Interrogatory No. 19 for the deliberate indifference.  We'll

1   leave in Interrogatory No. 20.

2            MR. SWINDOLL:  Thank you, your Honor.

3            THE COURT:  And I'm going to add to Interrogatory No.

4   20 Bruce Pennington in his individual capacity.

5            MR. SWINDOLL:  Okay.

6            THE COURT:  We'll get more to the interrogatories, but

7   while we were on Sheriff Pennington, I wanted to talk about that

8   one.

9        Takes us to the issue of Instruction No. 13 on damages.

10            MR. ELLIS:  Your Honor, can we take about a five-

11   minute break?

12            THE COURT:  We sure can.  We'll stand in recess -- why

13   don't we go ahead, we'll come back at 10:15.  Ten minutes.  It's

14   getting a little warm in here for me.  You have water.  If you

15   want to bring in a Coke or anything else, you're welcome to

16   while we do this instructions conference.

17        You can take off your coat.  Go right ahead.

18            MR. ELLIS:  Thank you.

19        (Recess from 10:06 a.m. until 10:25 a.m.; jury not

20   present.)

21            MR. ELLIS:  Your Honor, just to keep the Court

22   apprised of what we're doing, and I want to go forward with

23   this, but Mr. Swindoll and I are in settlement discussions.

24            THE COURT:  Okay.  That's fine.  Let's go ahead and

25   talk -- I'm going to go back one step and talk about the claims,

1    the failure to train claim against the county, Sheriff

2    Pennington in his official capacity, however we want to phrase

3    that, on the excessive force.  And I know I denied a directed

4    verdict on this, but I'm going to say, Mr. Swindoll, that

5    allowing that claim to go forward gives me pause.  The excessive

6    force failure to train.  Because it requires notice.  It either

7    requires the county -- that it be so patently obvious that the

8    county should know or it requires notice.  Something happened

9    before where they should know.

10        I'm not sure that I see that here.  You could convince me

11   that I do, you know, those concepts are very -- like many

12   concepts in 1983, are very hard to put your arms around.

13            MR. SWINDOLL:  Excessive force and training, I think I

14   agree with your Honor.  I just don't know that I have -- your

15   Honor, I hear what you're saying and I have reservations as well

16   about the training on excessive force.  My just novice attitude

17   in this area is, I don't know, and I don't have a lot of

18   evidence that the county did anything about force in this case.

19        My evidence and thrust of the case had to do with the

20   medical training and the use of force as excessive at the time.

21   And so if the Court is asking me if I showed any proof, I'm not

22   certain that I did.  I mean, I went through force every time

23   with every deputy, but they said they did according to the

24   policy.

25            THE COURT:  And there was lots of evidence of that, I

1  will grant you, in my view, enough evidence, right?  And there's

2  evidence of people who didn't receive training.  We have a man

3  using a Taser who didn't receive training.  But the crux of that

4  is, to show liability for the municipality, the plaintiff has to

5  show the municipality had notice.

6          MR. SWINDOLL:  And notice on excessive force they

7  don't have.  That's what I'm trying to agree with.  Now, on the

8  medical, I don't think that's so because we have 30 lawsuits and

9  all of that.

10         THE COURT:  Right.  I think there's information in the

11  record on that, but the issue on excessive force, as I said, it

12  could be that the failure is so obvious that it's so likely to

13  result in a constitutional violation, the need for training is

14  so patently obvious, you'd have to convince me of that one.

15         MR. SWINDOLL:  Your Honor, I agree.  Let's withdraw

16  that one.  Let's just take that out.

17         THE COURT:  That is failure to train against the

18  county and that's Instruction No. 11.  I will take out in the

19  first element the reference to Instruction No. 8.

20         MR. SWINDOLL:  Yes.

21         THE COURT:  Which is the excessive force instruction.

22         MR. ELLIS:  So 11 is out altogether?

23         MR. SWINDOLL:  No, it's out on excessive force.

24         MR. ELLIS:  On excessive force.  Okay.

25         THE COURT:  So what's going to happen, Mr. Ellis,

Jury Instructions Conference                                521

1    Instruction 11 will remain in.  The first element paragraph,

2    where it says:  First, the acts of individual dependents

3    deprived Casey Babovec of his particular constitutional rights.

4                MR. ELLIS:  Got you.  Got you.

5                THE COURT:  I will take out that reference to

6    Instruction No. 8.  All right.

7                MR. ELLIS:  Your Honor, I want to make sure you

8    understand my position with regard to Bruce Pennington in his

9    official capacity and the county.  An action against the county

10   and an action against Bruce Pennington in his official capacity

11   is the same claim, the same cause of action, and I just think

12   there's a redundancy there.

13               THE COURT:  And I see that.  I'm not sure how to

14   separate out the individual capacity claim against Bruce

15   Pennington.  Nor am I sure that it's all that necessary,

16   perhaps.  I think there's an overlap there.  But I also don't

17   know where the pot of money is at the end.  I mean, I've

18   litigated enough cases to know maybe you need that verdict to

19   decide, if there is a verdict, where the pot of money comes

20   from.  I don't know.  And there's a distinction and it's

21   permissible under the law to bring claims against him in his

22   official capacity, which I agree is a claim against Saline

23   County as well, same thing.  We could collapse it together.  But

24   here we also have an individual capacity claim against Bruce

25   Pennington.

1          MR. ELLIS:  I understand.

2          THE COURT:  Okay.  Damages in this case.  We started

3    this discussion a while ago in regard to the *Neer* case.  And

4    I've said my piece on the *Neer* case.  I don't know the weight to

5    be given to it.  I'm not even sure I could say that I read it

6    correctly.  I'm not sure that there's not an argument to be made

7    that a state -- supplemental state law wrongful death claim

8    wouldn't be permissible.  And so I don't know what the damages

9    instruction should necessarily look like in this case.

10         I don't know that it would be inappropriate to give it as

11   proffered.  I think you could give it as proffered.  It may be

12   that it doesn't hold up on appeal, if the Eighth Circuit decides

13   to enact its theory in *Neer* and narrow that and say, no, there's

14   no supplemental state law claim for wrongful death, your damages

15   are more narrow.  I'm not sure what would happen in that

16   situation.  There is a circuit split on that, so --

17         MR. SWINDOLL:  Your Honor, thank you for directing us

18   to the case because after I thought about it and the risk of

19   going forward on the state claim just did not justify us doing

20   that because it certainly is grounds for appeal if I win on that

21   issue.  So I did not put any proof on with respect to anybody's

22   grief except Casey's and the joy of his life that was lost.  I

23   don't have funeral expenses in the record.

24         So I see two elements of damages here, and that obliterates

25   the issues on the state claim in case I get a verdict.  So I

1    propose that the Court instruct only on the value of the

2    decedent's loss of life and his conscious pain and suffering and

3    mental anguish before death, and we drop the rest of it, because

4    I think that makes -- if we win, there's at least a chance to

5    hold onto it.

6              THE COURT:  All right.

7              MR. SWINDOLL:  And, moreover, the record doesn't show

8    any basis for the Court to give those instructions because I

9    didn't have Robin or anybody talk about John, the brother, or

10   any of that, and so I think that that gives us even more reason

11   to worry that the state claim can be a -- not only problematic,

12   maybe lethal.

13             THE COURT:  All right.  With that, Mr. Ellis, do you

14   have anything to add to that?

15             MR. ELLIS:  No, ma'am, I don't.

16             THE COURT:  With that, what I would propose -- I don't

17   know if you have the book in front of you.  If you don't, I will

18   let you borrow the Court's copy of the book.  There is an actual

19   damages instruction 4.70 that's a model that has some additional

20   language in terms of describing the pain and suffering and other

21   elements that you may wish to look through.  I don't know if you

22   have consulted that.  But 4.7 in terms of the model on damages.

23             MR. SWINDOLL:  Okay.  I haven't looked at that model,

24   your Honor, honestly.  Emily will look right now while we're

25   talking.

Jury Instructions Conference                      524

1          THE COURT:  Right.  What I would say is let us -- let

2    the Court maybe rework this damages instruction after having

3    this discussion to make it more in line with what the Eighth

4    Circuit model is, recognizing that it's the loss of life and

5    conscious pain and suffering that you're seeking.

6          MR. SWINDOLL:  Yes.

7          MR. ELLIS:  Just looking at 4.70, your Honor, it looks

8    like elements two and three are specials, medical and wages.

9          THE COURT:  And I don't think there's any --

10         MR. ELLIS:  There's no proof of that, so he's going to

11   be probably number one and that will just have to be reworked.

12         THE COURT:  Right.  All right.  We'll look at that and

13   rework that a little.

14      We'll recirculate that.

15      Instruction 14 is just the model, the election of a

16   foreperson.

17      We can look at the interrogatories.

18         MR. SWINDOLL:  Your Honor, Mr. Ellis and I discussed

19   the interrogatories during the break, and if it's permissible

20   with the Court, we would find from the greater weight of the

21   evidence instead of preponderance, just because that's not -- a

22   preponderance is a term we haven't been talking about with the

23   jury.  We have been talking more likely than not and greater

24   weight.

25         MR. ELLIS:  I prefer greater weight.  I'm fine with

1   either, but I just like greater weight better.  A little more

2   modern.

3           THE COURT:  If you're both in agreement with that, we

4   will change preponderance to greater weight.

5       The first several instructions are to the individual

6   defendants.  I don't know if you've thought any more about the

7   excessive force and the supervisors.

8           MR. SWINDOLL:  I have, and No. 2, I don't have

9   excessive force against Mike Richards.  He's a supervisor.  It

10  says used excessive force and we know he didn't participate.  He

11  just monitored, watched, and supervised.

12          MR. ELLIS:  So it's out?  Two is out?

13          THE COURT:  Do you want a claim against him as the

14  supervisor of excessive force?  I mean, that's -- that goes back

15  to that instruction that we talked about in separating out those

16  two.

17          MR. SWINDOLL:  Yes, yes.  I think that as a

18  supervisor, I have a theory against him, but as his actual use

19  of force, I do not.

20          THE COURT:  Why don't we split -- why don't we do

21  this:  If you'll give us time to work on these interrogatories

22  and that instruction, it will be easier to go through these

23  interrogatories when we revise the instructions.  What I propose

24  we do is separate out the supervisor instruction and the actual

25  conduct instruction on excessive force, noting that McKinney and

1    Richards did not participate in force, they didn't engage in any

2    force, but they were supervisors on the ground in that regard.

3    Is that correct?

4            MR. SWINDOLL:  Yes, your Honor.

5            THE COURT:  A correct view of the plaintiff's theory?

6        Do you have any objection to that, Mr. Ellis?

7            MR. ELLIS:  No.  That's my recollection of the

8    evidence.

9            THE COURT:  All right.  We will rework the instruction

10   and those interrogatories.

11       There's also an issue on the interrogatories that without

12   an underlying constitutional violation, you don't get to

13   liability for the county at all.  So the way we'll structure the

14   interrogatories is, only if you find one of the individual

15   defendants liable or answered yes to one of interrogatories 1

16   through whatever do you answer a county interrogatory.

17           MR. SWINDOLL:  Yes.

18           THE COURT:  So we will rework that as well.

19           MR. ELLIS:  And that's going to -- with regard to

20   Interrogatory No. 25, that's going to booger up -- that's a good

21   old legal word, booger up -- 25 because you've got a percentage

22   down for Saline County.

23           THE COURT:  Right.  Right.

24           MR. ELLIS:  Okay.

25           THE COURT:  We can talk about the allocation.  I mean,

1   the allocation is proposed by Mr. Swindoll, and I'll tell you

2   what we found.  We hit the books to sort of look through that to

3   see what we could find on it.  I don't know what your position

4   on it is, Mr. Ellis.  I'll let Mr. Swindoll speak to it first

5   and then we can talk about Interrogatory No. 25.

6           MR. SWINDOLL:  Your Honor, I have been told but could

7   not find the authority that told me this, that allocation in

8   these cases is problematic, and that's all that I really know.

9   I didn't understand the basis for the discussion.  It was with

10  Mr. Sutter, who knows everything, and he couldn't really explain

11  it to me, but he told me that allocation was to be watched in a

12  case like this, that under a civil rights case, you don't have

13  allocation.  I just don't know exactly what that means.  Maybe

14  the Court can help us here.

15          THE COURT:  Mr. Ellis?

16          MR. ELLIS:  I agree with that.  The problem, if you

17  allocate like this, then you're going to have to give an

18  instruction -- and I know you want it, and it will really mess

19  things -- I mean, we'll be here for days.  You've got to give an

20  instruction on contributory fault on the part of Casey Babovec.

21  Do you list him on here or do you give a separate instruction?

22  Is it a defense?

23          THE COURT:  He's not in here.

24          MR. ELLIS:  Intervening causation, for that matter.

25          THE COURT:  You know, 1983 borrows tort concepts.

Jury Instructions Conference                    528

1              MR. ELLIS:  Sure.

2              THE COURT:  We found a Third Circuit case and treatise

3     that sort of referenced that, but there are no reported cases

4     that allocate.  We didn't find any.  None of those two sources

5     point us to anybody who allocates.

6          I don't disagree with Mr. Ellis in regard to the theory

7     that in a tort case, we would be looking at Casey Babovec's

8     conduct, but I don't have anything that tells me that that's

9     what I'm supposed to do in a civil rights context.  1983 borrows

10    tort concepts, but I don't know if it borrows that one.  There's

11    no real guidance out there on that.

12             MR. ELLIS:  The reason we do it in tort --

13    Mr. Swindoll and I are old car wreck lawyers, so we deal with

14    this a lot.  The only reason we do it in tort litigation is with

15    respect to comparative fault and diminution of damages.

16             THE COURT:  Right.

17             MR. ELLIS:  But it wouldn't operate on this,

18    necessarily, in that regard.  But I agree that the allocation

19    is, what did you say, problematic?

20             MR. SWINDOLL:  Well, problematic because, one, I'm

21    just too ignorant to understand how it might apply without all

22    kinds of problems that you've just mentioned.

23         The only thing I can suggest is that we have a series of

24    interrogatories on what they find the individual damages to be,

25    and --

1          THE COURT:  And assess that to each defendant?  I

2    mean, I don't know how you do that without having an instruction

3    then that cautions against double recoveries; right?

4          MR. SWINDOLL:  Yes, you've got it.  That's right.  If

5    the defendants are found zero percent responsible for this

6    constitutional right violation, then they're out and the

7    allocation goes just to the people the jury finds under the rest

8    of the interrogatories.  It makes logical sense to me.  I only

9    worry about the admonition I had when I came here, and I

10   couldn't find any law either.

11         THE COURT:  I didn't find a reported case.  We spent

12   time looking in all feds, we spent time looking in the Eighth

13   Circuit.  There's references to this.  Clearly there's a maxim

14   that 1983 borrows tort law concepts.  I don't know that it

15   borrows this one.

16         MR. ELLIS:  I don't think it does, your Honor.

17         MR. SWINDOLL:  I don't have a better suggestion than

18   this, your Honor.

19         THE COURT:  I'm not sure how to submit it to the jury

20   then in regard to this, other than to say award an amount of

21   damages and then give what -- part of that award goes to each of

22   these defendants, I guess, in a way that tries to counsel

23   against a double recovery.  I mean, we don't want -- you know,

24   that's your concern with the jury when you have multiple

25   defendants and you leave a blank and a number sign next to each

1    defendant, but --

2            MR. ELLIS:  Let's just play the hand.  What if they

3    bring back interrogatories and you get the following yeses:

4    Reed, Richards, Shelnutt, and Parker.  Four of them.  And how

5    much are your damages?  $10,000.  I like that just because it's

6    good math.  That doesn't necessarily mean that they're all to

7    pay $2,500 apiece.

8            THE COURT:  Correct.  I don't know how to do it other

9    than asking the jury to split that out.

10           MR. SWINDOLL:  In logic, your Honor, 26 should go

11   before 25.  If they don't find any damages, then they don't have

12   any need to assess percentages on those damages.  And so as they

13   go through their logic, they have to find an amount of money and

14   then allocate it based on the proof in the case.  To me, that's

15   logical and it's as close as I can find to sensible.

16           MR. ELLIS:  I don't mind the Court doing it.  If you

17   get a verdict, four yeses, for example, and there's a figure,

18   the Court's heard the evidence.  I don't mind the Court making

19   the allocation.

20           MR. SWINDOLL:  But how would the Court do that?  What

21   would --

22           MR. ELLIS:  She heard the evidence.

23           MR. SWINDOLL:  Yeah, but isn't that just grounds for

24   appeal for everyone, every one of your clients, if we have not

25   the jury decide it, but then we have another body decide it

1    after -- the numbers, doesn't that give every one of your

2    defendants a right to say, well, the Court made that mistake.

3    It should have been the jury who decided.  Isn't it built-in

4    error?  That's what I'm asking.

5            MR. ELLIS:  I don't know.  I know this is error.  I

6    just feel like this is error.

7            MR. SWINDOLL:  Yeah.  Well, give us a better

8    suggestion because I really don't know.

9            MR. ELLIS:  Because you're going to get -- see, you

10   could get -- if you added Casey Babovec onto this percentage as

11   being contributorily at fault, which I think you'd have to do,

12   if you get more than one yes, what are the percentages, you

13   could put 1 percent on Parker and 99 on him.  Or all of them on

14   him.

15       What if the jury thinks that she was at fault -- I'm just

16   using her as an example.  But she didn't cause any of the

17   damages.

18           MR. SWINDOLL:  Your Honor, a person cannot be assessed

19   responsibility in a constitutional law issue like this.  I think

20   that if there's a violation of the rights, it's because the jury

21   has determined the circumstances already and determined that his

22   actions were not -- the actions of the officers against him were

23   not justified under the circumstances.

24       And then to come back after that and add Casey and his

25   actions at the time to -- in a comparative fault circumstance

1    doesn't seem logical and it doesn't seem that -- it gives them a

2    double bite, essentially.  I might not get to conscious

3    indifference or deliberate indifference on the medical if they

4    determine that Casey has done enough, that he was resisting and

5    struggling and wasn't open enough with the jailers about his

6    condition.

7         But if you then decide that they get beyond that hurdle,

8    they come back, and then they go back to decide that Casey

9    should have been assessed a responsibility under that, I think

10   it's a double bite at the apple.  I think it's confusing.  And

11   it feels like error.

12             THE COURT:  Mr. Ellis?

13             MR. ELLIS:  I don't know.

14             THE COURT:  I think we're in uncharted territory.

15   I'll be very honest with you.  I understand -- I'll let

16   Mr. Ellis speak to it, and then I'll say my piece.

17             MR. ELLIS:  Well, since the Court has already used the

18   term, I will, the pot of gold theory, this case could be

19   litigated probably with two or three of these guys, you know.

20   You chose to put ten on there.  That's your call, not mine.  I

21   think there are ten.  I don't know how the Court can give -- can

22   ask the jury to look at Interrogatory No. 25 without also giving

23   them a contributory fault instruction on the part of the

24   plaintiff.  I just can't -- that's illogical.

25        The medical examiner's testimony alone calls for that.

1       So the options are to take this out and do something else

2   or add Casey Babovec.  Either on this instruction or another

3   one.  And it's an affirmative defense, I know.  I've got the

4   burden on it.

5       It would be like AMI 2006, I guess.  That's what I have to

6   say, your Honor.  And I'd again point out, sounding like a

7   broken record, to have a blank on there for Bruce Pennington

8   without setting out whether it's individual or official capacity

9   and then the County of Saline is double dipping on the part of

10  the plaintiff.

11          THE COURT:  We'll make that correction for sure

12  throughout the instructions to say Bruce Pennington in his

13  individual capacity, and where the County of Saline appears, it

14  will be County of Saline and Bruce Pennington in his official

15  capacity as one, so it's clear.  And it's clear in what capacity

16  the county acts, through whom it acts.

17          MR. ELLIS:  Your Honor, I'd be happy to go to AMI and

18  look at the -- I don't know whether it would be the assumption

19  of the risk or comparative fault or something, but try to

20  fashion something with respect to Mr. Babovec, an affirmative

21  defense.

22          THE COURT:  I'm not sure about this point, though,

23  Mr. Ellis, that Mr. Swindoll makes, which is, it's factored into

24  the instruction already.  For example, in use of excessive

25  force, it has to be unreasonable under the circumstances, you

1   know, due to deliberate indifference, that added heightened

2   burden.  Negligence isn't enough here.  Right?

3              MR. ELLIS:  That's true.

4              THE COURT:  Negligence isn't enough.  So that

5   heightened burden all the way throughout these elements, if the

6   plaintiff chins that bar, then the jury is sort of engaged in

7   that analysis.  Right?  If they decide that Casey Babovec

8   resisted, was at his own demise by ingesting the meth, all of

9   those other things, I don't know that you ever get to that point

10  of awarding the damage and allocating.  So --

11             MR. ELLIS:  It would be in the context of fault and

12  not negligence.  I don't think negligence would be -- he's right

13  on -- negligence doesn't play into civil rights litigation.

14  You've instructed on that.  So it would have to be in the

15  context of the word "fault."

16             THE COURT:  But that's the stumbling block that I have

17  with putting Casey Babovec on it at that point, that I think the

18  jury is engaged in some of those assessments to get to the point

19  of awarding anything.  Right?  They have to get past the fact

20  that he was at fault, that he didn't bring this all upon

21  himself, that what happened to him wasn't reasonable in the

22  context based upon his actions, to find a constitutional

23  violation to begin with.  So let me do a little digging on that.

24      I have a plea at 11 that I'm going to take.  That will take

25  about a half an hour.

1    If you all want to stand by while I take this plea, I'll

2    have Mr. McBride begin working on the edits so that when we come

3    back, probably about 11:30, 11:45, there will be a clean packet

4    that we can talk about again and we can pick up our discussion

5    on this damages instruction.

6         You can leave your things, if you'd just sort of move them

7    over.  I think this plea should --

8              MR. SWINDOLL:  I'm just going to take mine back to

9    work on.

10             THE COURT:  Just slide them around.  I'm going to take

11   a recess to grab my file and then I'll be back out here for our

12   plea.

13        Mr. Swindoll and Mr. Ellis, if you're going to stay within

14   the building, if you want to just come back, check back in about

15   11:30, 11:45.

16             MR. ELLIS:  Thank you.

17        (Recess at 10:52 a.m.)

18                  REPORTER'S CERTIFICATE

19        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

20

21                         Date:  November 10, 2015

     /s/ Christa R. Jacimore, RDR, CRR, CCR

22        United States Court Reporter

23

24

25

1          (Proceedings continuing at 12:29 p.m.; jury not present.)

2          THE COURT:  Our jury is not going to be back until

3    1:30.  We're going to get these instructions and the verdict

4    forms edited.  I want to go through them one more time with you

5    all so when we put our jury in the box -- we're going to go

6    through this methodically.  And if it's 1:30 when we put them in

7    the box, great.  If it's closer to 2:30 or three, I'm fine with

8    that.  But I want to get these verdict forms to you all and the

9    instructions to you all to look at it.

10          When we were last out here together, we were talking about

11    apportionment, contribution and those issues regarding this

12    case.  In the break, we've looked at it again.  My law clerks

13    have looked at it again with me.  We've spent several days now

14    looking at it.  And I'm more convinced of what I'm eventually

15    going to do in this case.  But I'll hear argument from you all,

16    and then I'll sort of walk through what I think I will do.  But

17    you may convince me otherwise.

18          Mr. Swindoll, do you have anything you wish to add to what

19    we were talking about with apportionment and contribution?

20          MR. SWINDOLL:  No, Your Honor.  I thought about it.  I

21    think our position is the same.

22          THE COURT:  All right.  Mr. Ellis?

23          MR. ELLIS:  No, ma'am.

24          THE COURT:  All right.  I'm going to cite this into

25    the record.  This is a secondary source that we found at the

1   break, but it confirms what I suspected from other research that

2   we have done.  It is a treatise on Section 1983 litigation

3   claims and defenses by Aspen Publishers.  The compiler is Martin

4   A. Schwartz.  I am looking at Section 16.15, multiple

5   defendants, joint and several liability apportionment,

6   contribution and setoffs in 1983 actions.  And this essentially

7   confirms what our research showed from other cases with some

8   other things added.

9       But basically I think the issue of apportionment is

10  borrowed from tort law.  I think I can make a determination, and

11  there are several cases cited.  And I'll make a copy of this for

12  both of you if you would like to see it.  There are several

13  cases cited here where courts have done a variety of things

14  based upon the nature of the case, the nature of the injury, the

15  nature of the allegations of the defendant's conduct.

16      So to that extent, the determination of whether something

17  is joint and several or whether it should be apportioned

18  essentially is based upon an analysis of both the conduct and

19  the injury.  I could make a good case here that the deliberate

20  indifference maybe should be joint and several, because if you

21  violated it, if you reached that threshold, you've got one

22  injury.  Right?  But I could make a really good case that

23  excessive force gets apportionment, because I have lots of

24  actors who did lots of various things at different times.  The

25  problem with that is, I have one recovery and one claim and one

1   set of damage.

2        So in my analysis, in my mind -- and I'll hear argument

3   from you all.  I think either one would likely work or be

4   acceptable.  But because there's an argument to be made for

5   apportionment, I think for the defense I will have the jury

6   apportion the liability.  And we'll do it so there's a recovery

7   amount and then an amount where that number is apportioned among

8   defendants who are found liable.  And you will see this on the

9   verdict form -- unless you object to that, Mr. Ellis.

10       Would you prefer that it just be joint and several among

11  the defendants?  As I said, I could make an argument either way.

12            MR. ELLIS:  If it were joint and several and you had

13  four "yeses," let's just say, each would owe all.  I don't mean

14  four recoveries, but one recovery.

15            THE COURT:  Right.

16            MR. ELLIS:  If we had theoretically one deep pocket,

17  each would owe all.

18            THE COURT:  Right.

19            MR. ELLIS:  Joint and several.  I don't guess it

20  matters, does it?

21            MR. SWINDOLL:  I think because there's insurance, the

22  joint and several idea makes more sense to me since you are

23  going to pay the verdict if it's four or six or eight of them.

24            MR. ELLIS:  Absolutely.

25            MR. SWINDOLL:  After the appeal is over with.

1              MR. ELLIS:  Yes.

2              MR. SWINDOLL:  So having them apportion it after that

3     doesn't seem to do anything.  It's just going to end up one of

4     them getting a hundred percent, 50 percent.  If they are

5     responsible, you are going to pay that verdict.

6              MR. ELLIS:  That's correct.

7              MR. SWINDOLL:  So what I see as an apportionment is an

8     extra step that may be unnecessary.

9              MR. ELLIS:  I agree.

10             THE COURT:  All right.  So then I will say that

11    there's just a number for the verdict.  If damages are awarded,

12    the damages number is what it is, and we will not apportion.  Is

13    that what I am hearing?

14             MR. SWINDOLL:  Yes.

15             MR. ELLIS:  I believe that's right, Your Honor.

16             THE COURT:  We will take out apportionment.  In regard

17    to contribution, it is an open question.  It is an open

18    question.  This treatise confirms whether -- to the extent a

19    treatise can.  Right?  Everything I've read on this whole area,

20    there's just not a lot of guidance in case law.  Courts have

21    gone a lot of different ways.  And this is an open question of

22    contribution.

23         My comfort level today is not to submit contribution in

24    this context.  I understand borrowing concepts of tort law, that

25    perhaps it may be permissible at some point.  I am not going to

 1  do it.  There's a case, *Northwest Airlines v. Transport Workers*

 2  *Union*.  The cite is 451 U.S. 77.  It's a 1981 Supreme Court

 3  case.  And there the Supreme Court held that there was no right

 4  of contribution in Title VII in equal pay actions.

 5          MR. ELLIS:  Your Honor, you used the term

 6  "contribution" in the context of as between the defendants?

 7          THE COURT:  You know, I think the concept there is

 8  contribution as between defendants.  The way that I read some of

 9  these cases make it more or less sort of a contributory

10  negligence sort of analysis.

11          MR. ELLIS:  Are you talking about the plaintiffs?

12          THE COURT:  Right.  Bringing Casey Babovec back in.

13  So contribution to the extent it is looking at what his fault

14  contributed to the wrong.  Does that make sense, contributory

15  negligence on the part of Casey Babovec?

16          MR. ELLIS:  If we're not going to allocate --

17          THE COURT:  It's a moot point.  Right?

18          MR. ELLIS:  More or less.  I can still argue it.  But

19  it's moot as far as calculation of damages.

20          THE COURT:  That's acceptable.  I mean, the last time

21  we were here, there was a notion of an instruction to be

22  drafted.  Right?

23          MR. ELLIS:  I'm fine with what the Court is doing.

24          THE COURT:  All right.  With that, the only other

25  issue -- again, we have edited the packet.  Mr. McBride is

1   working on finishing that now.  And we will recirculate that

2   with verdict forms.

3        The other issue that we didn't get to were punitive

4   damages.  So punitive damages, we circulated a draft of punitive

5   damages.

6        Does the plaintiff seek punitive damages in this case?

7   And, if so, from whom?

8             MR. SWINDOLL:  Your Honor, we're going to withdraw

9   punitive damages completely.

10            THE COURT:  All right.

11            MR. SWINDOLL:  I withdrew it from the sheriff.  It's

12  not fair to the rest of them.

13            THE COURT:  So we will not instruct on punitives, and

14  we will not allocate.

15       With that, I will go and inform Mr. McBride of these two

16  changes.  We'll finish the packet, and we will bring out a

17  packet that has tracked changes so you can see the changes we've

18  made.  And then we'll go back on the record with that packet

19  after you all have had an opportunity to review it.  So let me

20  talk to him.  You all may stand in recess.  And we'll come hunt

21  you down in the courtroom when we're ready.  Give us about 15

22  minutes, because I want to review both of these before we do it.

23  We're close.

24       (Recess from 12:37 p.m. until 1:27 p.m.; jury not present.)

25            THE COURT:  Folks, I want to go through this

1    instructions packet again to make sure that we've caught

2    everything and make sure that you all have looked at these with

3    the edits we talked about.  I'm going to flip through one by

4    one.

5         Instruction No. 1 was based on the model and had no change.

6         Is it acceptable to counsel for the plaintiff?

7         And I don't intend by having this conference to waive any

8    prior objections that have been made on the record to any of

9    these drafts.  This is really as to form at this point.  I

10   recognize all the prior objections.

11        You may proceed.

12             MR. SWINDOLL:  Your Honor, when we discussed it

13   earlier, we talked about no authority at the bottom of them I

14   thought.

15             THE COURT:  And the final version will not have it.

16   You will get another final version when we print.  It's going to

17   be clean, and you will have it.  You can use it on the ELMO, do

18   whatever.

19             MR. SWINDOLL:  Convicted prisoner/pretrial detainee --

20             THE COURT:  It will say Instruction 1, and it will

21   read what it is.

22             MR. SWINDOLL:  Thank you, Your Honor.  I have no

23   objection.

24             THE COURT:  Counsel for the defense?

25             MR. ELLIS:  Fine.

1            THE COURT:  And you may remain seated as we flip

2    through these.

3        Instruction No. 2, judge's opinion.  Any objection to the

4    form?

5            MR. SWINDOLL:  No objection.

6            MR. ELLIS:  Fine.

7            THE COURT:  Instruction No. 3, credibility of

8    witnesses.

9            MR. SWINDOLL:  No objection.

10           MR. ELLIS:  Good.

11           THE COURT:  Instruction 4, burden of proof.

12           MR. SWINDOLL:  No objection.

13           MR. ELLIS:  No objection.

14           THE COURT:  Instruction 5, color of state law.

15           MR. SWINDOLL:  No objection.

16           MR. ELLIS:  No objection.

17           THE COURT:  Instruction 6, serious medical need.

18           MR. SWINDOLL:  No objection.

19           MR. ELLIS:  No objection.

20           THE COURT:  Instruction 7, deliberate indifference,

21   the standard definition.

22           MR. SWINDOLL:  No objection.

23           MR. ELLIS:  No objection.

24           THE COURT:  Instruction 8, the denial of medical care

25   deliberate indifference.

1          MR. SWINDOLL:  No objection.

2          MR. ELLIS:  No objection.

3          THE COURT:  Instruction 9.  This is the Eighth

4   Amendment excessive force.  We have flip-flopped and

5   flip-flopped in the back.  But we ended up leaving it as the

6   first way to violate it applying the force or the second way to

7   violate it as being a supervisor who either acted or failed to

8   act and taking care of it by driving it through the

9   interrogatory question for the individuals.  We talked about Mr.

10  McKinney and Mr. Richards.  So we left it as one instruction.

11         The other issue I took under advisement but did not rule on

12  was whether or not the bracketed language would remain in the

13  second-to-last paragraph.  Based upon Mr. Swindoll's comments in

14  the record, I left the bracketed language in.  So the

15  second-to-last paragraph, the last sentence states:  "You must

16  decide whether the officer's actions were reasonable in the

17  light of the facts and circumstances confronting the officer

18  without regard to the officer's own state of mind, intention or

19  motivation."

20         MR. SWINDOLL:  No objection, Your Honor.

21         THE COURT:  I recognize the objection to that language

22  and don't contend that you have waived it in any way, Mr. Ellis.

23  I made a ruling on that, though.

24         MR. ELLIS:  No objection as to form.

25         THE COURT:  All right.  Do you have any concerns about

1    leaving those two together, the individuals who actually engaged

2    in the conduct or the supervisors?

3              MR. ELLIS:  No.

4              THE COURT:  That's acceptable.  All right.

5         Failure to train as to Bruce Pennington in his individual

6    capacity, Instruction 10.

7              MR. SWINDOLL:  No objection.

8              MR. ELLIS:  No objection as to form.

9              THE COURT:  All right.  Instruction 11, official

10   policy, practice or custom of Saline County.  And we added Bruce

11   Pennington in his official capacity.

12             MR. SWINDOLL:  No objection.

13             MR. ELLIS:  No objection as to form.

14             THE COURT:  Instruction 12 is the failure to train as

15   against Saline County and Bruce Pennington in his official

16   capacity.

17             MR. SWINDOLL:  No objection.

18             MR. ELLIS:  No objection as to form.

19             THE COURT:  Instruction 13 is the damages instruction.

20   This one we did work on based upon Model 4.70.  Please read it

21   carefully.  Please also weigh in on the last bracketed

22   paragraph.

23             MR. SWINDOLL:  Your Honor, I do object to No. 13.  I

24   believe that the standard was that we should be able to receive

25   the value of the loss of life plus the physical pain he

1    experienced before death.

2              THE COURT:  All right.

3              MR. SWINDOLL:  The loss of the value of his life is

4    what we call that.

5              MR. ELLIS:  I would suggest, Your Honor, that without

6    being too macabre, that the last phrase of the second paragraph

7    is not needed.

8              MR. SWINDOLL:  "Speculation"?

9              MR. ELLIS: No. I'm talking about "whether the injury."

10             MR. SWINDOLL:  Oh, whether it's temporary or

11   permanent.  I think death is clearly permanent.

12             THE COURT:  Understood.  What language do you suggest,

13   Mr. Swindoll, to compensate for the loss of life?

14        And, Mr. Ellis, do you have anything to weigh in on that?

15             MR. SWINDOLL:  The previous set of instructions, the

16   loss of the value of the life --

17             THE COURT:  That's consistent with what's in the first

18   paragraph.  This may just be our own scrivener's confusion here,

19   right, in creating this instruction.  "You must award the

20   plaintiff an amount of money that will fairly compensate her for

21   Casey Babovec's loss of life" --

22             MR. SWINDOLL:  Okay.

23             THE COURT:  -- "and any conscious pain and suffering,

24   mental anguish, of Casey Babovec prior to his death if you find

25   those injuries were a direct result of the conduct of that

1   defendant.  You should consider the following elements of

2   damages:  The physical pain and mental suffering Casey Babovec

3   experienced, the nature and extent of the injury."  I'm happy to

4   entertain any suggestions or edits or comments to that language.

5           MR. ELLIS:  And you are dropping the last phrase

6   there?

7           THE COURT:  I will drop the last phrase there.

8           MR. ELLIS:  Your Honor, I think because of the nature

9   of this litigation, this last bracketed paragraph is really

10  essential to this case.

11          MR. SWINDOLL:  What?

12          THE COURT:  The last bracketed paragraph of that

13  instruction, whether that should stay in or not, Mr. Ellis's

14  position is it should be in.

15          MR. ELLIS:  It should be in.

16          MR. SWINDOLL:  Your Honor, you will have instructed

17  them on this issue.  I believe it would just be double-dipping

18  on it to put that in, because your instructions in the beginning

19  of this trial and throughout the trial -- and you will tell them

20  early on -- this just adds to the burden of the plaintiff.  And

21  I ask that it be removed.

22          THE COURT:  All right.  Mr. McBride, may I see the

23  model rule book to look at that comment?

24      While I look at that authority, do you have any suggestions

25  in regard to the language, Mr. Swindoll, if you have a concern

1    about compensating for the loss of life?  I agree this second

2    paragraph makes it a little confusing.

3              MR. SWINDOLL:  It does, Your Honor.  I was wondering,

4    "You may consider the following elements of damages:  First, the

5    loss of life; second, the physical pain and suffering

6    experienced."  And I think that's all we have.  I do not think

7    the nature and extent of the injury applies in a death case.  I

8    think that that applies to an injury that is permanent or one

9    that is healed.  And the jury is entitled -- both of those are

10   more like injury elements, Your Honor, I think.  And I think

11   that really I'm entitled to the physical pain and suffering by

12   Casey prior to his death and the loss of the value of the life

13   of Casey Babovec.  I think those are my two elements.

14             THE COURT:  Mr. Ellis, what is your position on that?

15             MR. ELLIS:  That was my understanding in our earlier

16   conference, Your Honor.

17             THE COURT:  What I will do then is edit this so that

18   this Instruction 13 at the beginning will read:  "If you find in

19   favor of the plaintiff against any defendant, you must award the

20   plaintiff an amount of money that will fairly compensate her for

21   Casey Babovec's loss of life and any conscious pain and

22   suffering, parentheses, mental anguish, of Casey Babovec prior

23   to his death if you find those injuries were a direct result of

24   the conduct of that defendant.  You should consider the

25   following elements of damages:  The loss of life and the

1    physical pain and mental suffering Casey Babovec experienced."

2          MR. SWINDOLL:  I have no objection at that point

3    except that I still renew my objection regarding the

4    speculation, sympathy, since those are already given, as I've

5    explained.

6          MR. ELLIS:  I think it's appropriate to be there,

7    particularly in view of the fact that it makes a reference to

8    "under this instruction."  You are reinforcing the idea that the

9    jury shouldn't be speculating or guessing.

10          THE COURT:  I will say that there's not much guidance

11    on when that comment is used.  I'm inclined to leave the comment

12    in this instruction.  In looking at that, I'm reminded of

13    another issue that I failed to raise, which is the question of

14    nominal damages.  And I'm reading here in the committee comments

15    that nominal damages must be or should be submitted in all

16    Eighth Amendment cases but must be defined in accord with Model

17    Instruction 4.71.  A nominal damages instruction is not included

18    in this packet, and that committee note concerns me.

19          MR. SWINDOLL:  I would ask that it be included, Your

20    Honor.  Until now I had not realized it wasn't here.

21          MR. ELLIS:  Did I understand in Eighth Amendment

22    cases?  Is that what the Court just read?

23          THE COURT:  Eighth Amendment cases.

24          MR. ELLIS:  This isn't an Eighth Amendment case.

25          THE COURT:  I have a big flag from this morning to ask

1    about this instruction, whether it's appropriate or proper to

2    begin with.

3              MR. ELLIS:  This is a 14th Amendment case.  It's not

4    an Eighth Amendment case.

5              THE COURT:  Right.  I understand that the plaintiff --

6    that's a comment that it should be submitted.  The nominal

7    damages instruction, obviously there are lots of authorities in

8    terms of when it gets submitted and when it doesn't get

9    submitted and what cases it's appropriate or not.  I haven't

10   really heard any argument from either side in regard to that.

11   It's 4.71.  I understand the plaintiff wishes it to be submitted

12   and the defense objects.  I understand it's based on no Eighth

13   Amendment claim being submitted here.  But there are lots of

14   other reasons why nominal damages instructions get submitted in

15   a 1983 claim.  I'm happy to hear argument on both sides.  Then

16   I'll make a decision if you have anything further to add to

17   that.

18             MR. SWINDOLL:  Your Honor, plaintiff has nothing

19   further.

20             MR. ELLIS:  Defense doesn't either.

21             THE COURT:  All right.  I'm going to tell you I'm

22   inclined to submit it and to submit it so that the jury has it

23   to consider if that's what the plaintiff wishes.

24             MR. SWINDOLL:  I do, Your Honor.

25             MR. ELLIS:  Note our objection.

1          THE COURT:  I understand the objection.  We'll add

2    that as Instruction 14 to the packet.  And what is now 14 will

3    become 15.  I made the ruling.  But to make it clear to counsel,

4    the last paragraph, the bracketed paragraph in what is now

5    Instruction 13, will stay in.  We'll add nominal.

6          MR. SWINDOLL:  Your Honor, may I ask my client

7    something, because I may want to withdraw something.

8          THE COURT:  You may.

9          MR. SWINDOLL:  Your Honor, I still ask that it be in

10   there if the Court allows it.

11         THE COURT:  Nominal, to have it in?

12         MR. SWINDOLL:  Yes.

13         THE COURT:  In regard to interrogatories, one change

14   that we'll make, for 1 through 18 -- and these are the

15   individuals, the individual defendants who are named, individual

16   defendants, the questions that relate to them on both deliberate

17   indifference and excessive force.  We will insert the phrase

18   "you must answer this question" as the beginning for 1 through

19   18 so that the jury is clear that they need to answer each of

20   those questions for those individual defendants.

21      We have changed -- you can read Interrogatory No. 1.  It's

22   Defendant Mike Richards, and it relates to 8, which is

23   deliberate indifference.  Interrogatory No. 2 is for Mr.

24   Richards as it relates to his supervisory role in the excessive

25   force claim.  I would encourage you to look at that language to

1    make sure that's acceptable.

2        Is that acceptable to the plaintiff?

3            MR. SWINDOLL:  It is for the plaintiff, Your Honor.

4            MR. ELLIS:  Subject to our earlier objection, Your

5    Honor, this is acceptable as to form.

6            THE COURT:  All right.  I would encourage the

7    plaintiff to double-check and make sure we have all the named

8    defendants as well.  We've done that a couple of times, but that

9    never hurts.

10       Mr. McKinney has the same type of instruction for excessive

11   force in his supervisory capacity for Interrogatory No. 12 as

12   Mr. Richards does.

13           MR. SWINDOLL:  Your Honor, No. 12 is a supervisory

14   instruction.  Right?

15           THE COURT:  Correct.  For Mr. McKinney.

16           MR. SWINDOLL:  I'm sorry?

17           THE COURT:  For Mr. McKinney, yes, yes.

18           MR. SWINDOLL:  I think that's what we agreed to.

19           THE COURT:  It is.  That's what we discussed.  I just

20   want to make sure that that's correct with everyone's

21   recollection.  So that's acceptable for the plaintiff?

22           MR. SWINDOLL:  Fine with the plaintiff, Your Honor.

23   The number of defendants are there.

24           THE COURT:  Mr. Ellis, is that acceptable as to Mr.

25   McKinney as to form, Interrogatory 12?

1          MR. ELLIS:  As to form, yes.

2          THE COURT:  The other change, Interrogatory No. 19,

3    Interrogatory No. 20 and Interrogatory No. 21, those only are

4    answered -- they relate to the failure to train, the policy and

5    practice, custom, and the failure to train.  We've inserted

6    language so that those are only answered if a finding of

7    deliberate indifference as to the serious medical need against

8    one of the individual defendants or, in other words, a related

9    constitutional violation has been found first.

10          MR. ELLIS:  I take it then that if there's a "no"

11   answer on 1 through 18, then 19, 20 and 21 and 22 are moot.  Is

12   that what I understand?

13          THE COURT:  19, 20 and 21 relate solely to deliberate

14   indifference.

15          MR. ELLIS:  22 is damages.

16          THE COURT:  22 is damages.  It would be possible for

17   them not to answer 19, 20, 21 and still have to answer 22.  They

18   could have an excessive force finding.

19          MR. SWINDOLL:  Your Honor, is there a damage

20   interrogatory?

21          THE COURT:  Interrogatory 22.

22          MR. SWINDOLL:  Emily is bringing a good point up to

23   us, Your Honor.  20, 21 and 22, if you have answered "yes" to

24   any of No. 1 through 18, answer these questions.

25          THE COURT:  They only relate to the ones that relate

1   to the deliberate indifference because of failure to train.

2   Policy, practice or custom and failure to train relate only to

3   deliberate indifference.

4           MR. SWINDOLL:  I understand.  Okay.  Fine, Your Honor.

5           THE COURT:  22 on damages relates to either deliberate

6   indifference or excessive force, so all of them come back into

7   play.

8           MR. SWINDOLL:  I've got it.

9           THE COURT:  You might double-check that we have

10  tracked the deliberate indifference questions for each of the

11  individual defendants.

12          MR. SWINDOLL:  I understand.  It's okay with the

13  plaintiff.  We're fine with it, Your Honor.

14          THE COURT:  All right.  If we instruct on nominal

15  damages, my proposal would be that Interrogatory No. 22 be

16  revised to state:  "State the amount of damages which you find

17  from a greater weight of the evidence were sustained by the

18  estate of Casey Babovec, as explained in Instruction No. 13."

19  I'm not sure exactly how to word that with nominal damages being

20  on the table, other than to make a reference "or nominal

21  damages, as explained in Instruction No. 14."

22          MR. SWINDOLL:  So the concern for the Court on the

23  nominal damages is could I have -- I don't understand the

24  concern of the Court.

25          THE COURT:  We need to add some language to

1   Interrogatory No. 22 to include the nominal damages that we're

2   going to add.  Right?

3                MR. SWINDOLL:  Yes.  That's right.  I understand now.

4                THE COURT:  We refer the jury back to Instruction No.

5   13, which is the actual damages instruction.  We are going to

6   insert a nominal instruction, which will become 14.  So my

7   suggestion would be to add in Interrogatory No. 22 a new

8   sentence that states:  "Or nominal damages, as explained in

9   Instruction No. 14."

10                MR. SWINDOLL:  Okay.  I'm good with that.

11                MR. ELLIS:  That's fine.  I don't like it, but that's

12   fine.

13                THE COURT:  I don't know of another way.  If you have

14   another suggestion, I'm happy to hear it.

15                MR. ELLIS:  That's the only way to do it.  I mean, I

16   don't like the idea of nominal damages is what I mean, not -- if

17   you are going to instruct on it, that's as good a way as any to

18   do it, probably the best way.

19                THE COURT:  All right.  Is that form acceptable to the

20   plaintiff's counsel?

21                MR. SWINDOLL:  It is, Your Honor.

22                THE COURT:  And it's acceptable -- the form is

23   acceptable to Mr. Ellis?  And I note your objection to nominal.

24                MR. ELLIS:  Yes.

25                THE COURT:  All right.  Give us a minute.  We're going

 1   to print up a clean packet with those edits that we've talked

 2   about, and we'll be right back out.

 3            MR. ELLIS:  Could I take up a real quick housekeeping

 4   matter, Your Honor?

 5            THE COURT:  You may.

 6            MR. ELLIS:  As is obvious, Mr. Pennington testified in

 7   his deposition regarding, without objection, regarding what the

 8   state police investigation found.  And I'm going to argue that

 9   to the jury.  But now you've got a transcript that's in the

10   record but not in evidence.

11            THE COURT:  Right.

12            MR. ELLIS:  Now, will the Court permit me to lay --

13   this is the page -- on the glass, or should I just merely tell

14   them what it says, remind them what it says?

15            THE COURT:  Mr. Swindoll?

16            MR. SWINDOLL:  Your Honor, we're back at 403 on this

17   issue again.  The Court has consistently ruled against me.  But

18   I raise that again, because it's confusing to the jury.  This is

19   a constitutional case, not a criminal law case.  That conclusion

20   by the state police tends to emphasize it.  It will be confusing

21   to the jury.  That's all I've got.

22            THE COURT:  All right.

23            MR. ELLIS:  You've ruled its admissibility.

24            THE COURT:  It's come into evidence.  It has come into

25   evidence.  The reason a transcript doesn't go back is it would

1   unduly emphasize that testimony over other witnesses's

2   testimony, other witnesses who have testified in this

3   proceeding.  Mr. Pennington's deposition testimony played by

4   video is no different than live testimony.  And we don't permit

5   the jury to ask for portions of the transcript excerpted during

6   the trial.  So in regard to that, and to be consistent with

7   that, what I would prefer -- you may certainly refer to his

8   testimony.  But I would prefer that you not show his

9   testimony --

10          MR. ELLIS:  Okay.

11          THE COURT:  -- on the ELMO in regard to a 403

12  objection.  The way and the nature in which the investigation

13  has been referred to up until this point, I have consistently

14  overruled the 403 in response to specific questions to

15  witnesses.  What I would say is, you know, I'm not going to

16  forecast in advance what Mr. Ellis will say in his closing

17  argument in regard to that.  I'll deny the objection at this

18  point.  In shutting down that line of argument all together, if

19  the line gets crossed, you may certainly rise, and I'll

20  recognize it.  And we'll come to the sidebar and go through and

21  make the objection in that way.  And I understand and appreciate

22  what I'm asking you to do in a closing argument.  But I don't

23  have any other really good way to do it.

24          MR. SWINDOLL:  You won't hear from me during the

25  close.

 1            THE COURT:  There's a line somewhere, and it gets

 2   crossed at some point.  But I've consistently allowed the

 3   inquiry that's been conducted so far.  I don't think it has

 4   crossed that line.  Will it in closing?  Only Mr. Ellis can

 5   tell.

 6            MR. ELLIS:  Not me, Your Honor, surely not me.

 7            MR. SWINDOLL:  Surely not.

 8            MR. ELLIS:  That was the only thing.

 9            THE COURT:  Are there any other matters that we can

10   take up?

11            MR. SWINDOLL:  Not from the plaintiff, Your Honor.

12            THE COURT:  I know that as soon as I instruct and you

13   close our jurors will ask for exhibits.  So if you all have not

14   done so yet, you might make certain that we have the exhibits

15   that you wish and the actual copies of those exhibits that you

16   wish to go back to the jury room.  I will require you both to

17   make a statement on the record that you've reviewed them, that

18   they are acceptable and that they will go back to the jury room

19   during deliberation.  We can take care of that statement after

20   closing.  But you might work on that.

21            MR. SWINDOLL:  Your Honor, I have one question.  There

22   are two DVDs.  Is the jury going to be allowed to review those

23   DVDs?

24            THE COURT:  My suggestion would be that they receive

25   the DVDs and, if they wish to view the DVDs, they make that

1    request of us.  And if they make that request, then we'll take

2    prospective steps to talk to IT to permit equipment back there

3    that would allow them to view it and do nothing else.

4              MR. SWINDOLL:  Okay.  Thank you, Your Honor.

5              THE COURT:  If that's acceptable.  Mr. Ellis, do you

6    have any objection?

7              MR. ELLIS:  That would be the only way to do it.

8              THE COURT:  They will get the DVD.  And if they make

9    the request, we can handle playing it.

10        With that, let's take a ten-minute recess.  We'll come back

11   in at 2:05.  Between now and then, we will hand out instructions

12   and interrogatory forms that are the clean version so you all

13   may flip through those.

14        (Recess from 1:55 p.m. until 2:17 p.m.; jury not present.)

15             THE COURT:  Mr. McBride has handed to you the revised

16   instructions and the revised interrogatories.  I would encourage

17   you to look through all of them.  In particular, Instruction No.

18   14 is the new instruction on nominal damages, and Interrogatory

19   No. 22 is the revised damages interrogatory.

20             MR. SWINDOLL:  Good for the plaintiff, Your Honor.

21             THE COURT:  I recognize the objection to the nominal

22   instruction.  Is this form acceptable to the defendants without

23   waiving that objection?

24             MR. ELLIS:  Yes, ma'am.

25             THE COURT:  All right.  Are we ready to proceed?

1           MR. SWINDOLL:  We are, Your Honor.

2           THE COURT:  Mr. Ellis?

3           MR. ELLIS:  Yes.

4           THE COURT:  All right.  We'll bring the jury into the

5    box, and I'll read the instructions and the interrogatories.

6    Then you all will be permitted to close.

7           (Jury present.)

8           THE COURT:  Ladies and gentlemen of the jury, as I

9    informed you yesterday, we have had the close of proof by the

10   plaintiff and the defense.  It's now time for me to instruct you

11   at the close of the case.  After I instruct you, counsel will be

12   permitted to make closing arguments.  Closing arguments, like

13   opening statements, are not evidence.

14          Members of the jury, the instructions I gave at the

15   beginning of the trial and during the trial are still in effect.

16   Now I am going to give you some additional instructions.

17          You have to follow all of my instructions, the ones I gave

18   you earlier, as well as those I give you now.  Do not single out

19   some instructions and ignore others, because they are all

20   important.  This is true even though I am not going to repeat

21   some of the instructions I gave you at the beginning of and

22   during the trial.

23          You will have copies of the instructions I am about to give

24   you now in the jury room.  Remember, you have to follow all

25   instructions, no matter when I give them, whether or not you

1  have written copies.

2      I have not intended to suggest what I think your verdicts

3  should be by any of my rulings or comments during the trial.

4      In deciding what the facts are, you may have to decide what

5  testimony you believe and what testimony you do not believe.

6  You may believe all of what a witness said or only part of it or

7  none of it.

8      You may consider a witness's intelligence, the opportunity

9  the witness had to see or hear the things testified about, a

10  witness's memory, knowledge, education and experience, any

11  reasons a witness might have for testifying a certain way, how a

12  witness acted while testifying, whether a witness said something

13  different at another time, whether a witness's testimony sounded

14  reasonable and whether or to what extent a witness's testimony

15  is consistent with other evidence you believe.

16      In deciding whether to believe a witness, remember that

17  people sometimes hear or see things differently and sometimes

18  forget things.  You will have to decide whether a contradiction

19  is an innocent misrecollection or a lapse of memory or an

20  intentional falsehood.  That may depend on whether it has to do

21  with an important fact or only a small detail.

22      You will have to decide whether certain facts have been

23  proved by the greater weight of the evidence.  A fact has been

24  proved by the greater weight of the evidence if you find that it

25  is more likely true than not true.  You decide that by

1   considering all of the evidence and deciding what evidence is

2   more believable.

3       You have probably heard the phrase "proof beyond a

4   reasonable doubt."  That is a stricter standard than more likely

5   true than not true.  It applies in criminal cases, but not in

6   this civil case, so put it out of your mind.

7       Acts are done under color of law when a person acts or

8   purports to act in the performance of official duties under any

9   state, county or municipal law, ordinance or regulation.

10      The parties agree that all defendants were acting under

11  color of state law at the time of the events complained of here.

12      A serious medical need is one that has been diagnosed by a

13  physician as requiring treatment or one that is so obvious that

14  even a lay person would easily recognize the necessity for a

15  doctor's attention.

16      Deliberate indifference is established as to a defendant

17  only if there is actual knowledge of a substantial risk that

18  Casey Babovec suffered a serious medical problem or other

19  serious harm that the defendant is expected to prevent and if

20  the defendant disregards that risk by intentionally refusing or

21  intentionally failing to take reasonable measures to deal with

22  the problem.  Negligence or inadvertence does not constitute

23  deliberate indifference.

24      Your verdict must be for the plaintiff and against an

25  individual defendant on the plaintiff's claim of deliberate

1   indifference to Casey Babovec's serious medical need if all of

2   the following elements have been proved:

3        First, Casey Babovec had a serious need for medical care;

4   and

5        Second, the individual defendant was aware of Casey

6   Babovec's serious need for medical care; and

7        Third, the individual defendant, with deliberate

8   indifference, failed to provide the medical care or direct that

9   the medical care be provided or allow Casey Babovec to obtain

10  the medical care needed within a reasonable time; and

11       Fourth, as a direct result, Casey Babovec was injured; and

12       Fifth, the defendant was acting under color of state law,

13  which the parties have agreed was the case.

14       If any of the above elements has not been proved, then your

15  verdict must be for the individual defendant.

16       Your verdict must be for Casey Babovec and against an

17  individual defendant on plaintiff's claim of excessive use of

18  force against that individual defendant if all the following

19  elements have been proved:

20       First, the individual defendant struck, choked, tased or

21  applied physical force to Casey Babovec; or

22       The individual defendant's subordinates struck, choked,

23  tased or applied physical force to Casey Babovec and the

24  individual defendant made a culpable choice between action or

25  inaction in the supervision or control of his or her

1   subordinates, such that the individual defendant knew about the

2   conduct and facilitated it, approved it, condoned it or turned a

3   blind eye to it for fear of what he or she might see; and

4        Second, the force used was not objectively reasonable in

5   light of the situation presented because it was punitive in

6   intent, not rationally related to a legitimate purpose or

7   rationally related but excessive in light of its purpose; and

8        Third, as a direct result, Casey Babovec was injured; and

9        Fourth, the individual defendants were acting under color

10  of state law, which the parties have agreed was the case.

11       In determining whether the force was excessive, you must

12  consider the need for the application of force, the relationship

13  between the need and the amount of force that was used, the

14  extent of the injury inflicted, whether it was used for

15  punishment rather than for a legitimate purpose, such as

16  maintaining order or security within the Saline County Detention

17  Center, and whether a reasonable officer on the scene would have

18  used the same force under similar circumstances.  You must

19  decide whether the officer's actions were reasonable in the

20  light of the facts and circumstances confronting the officer

21  without regard to the officer's own state of mind, intention or

22  motivation.

23       If any of the above elements has not been proved, then your

24  verdict must be for the individual defendant.

25       Your verdict must be for the plaintiff and against

1  defendant Bruce Pennington in his individual capacity on the

2  plaintiff's failure to train claim if all of the following

3  elements have been proved:

4      First, the acts of individual defendants deprived Casey

5  Babovec of his particular constitutional rights under the U.S.

6  Constitution, as explained in Instruction No. 8; and

7      Second, individual defendants acted under color of state

8  law, which the parties have agreed was the case here; and

9      Third, Mr. Pennington's training practices were inadequate;

10 and

11     Fourth, Mr. Pennington was deliberately indifferent to the

12 rights of others in adopting the training practices, such that

13 the failure to train reflects a deliberate or conscious choice

14 by Mr. Pennington, which requires a finding that Mr. Pennington

15 was on notice that his training practices were inadequate and

16 likely to result in a constitutional violation; and

17     Fifth, a deficiency in the training procedures actually

18 caused the violation of Casey Babovec's constitutional rights by

19 individual defendants; that is, Mr. Pennington's failure to

20 train is so closely related to the deprivation of Casey

21 Babovec's rights as to be the moving force that caused the

22 ultimate injury.

23     If any of the above elements has not been proved, then your

24 verdict must be for Mr. Pennington in his individual capacity.

25     Your verdict must be for plaintiff and against defendant

1    County of Saline and Bruce Pennington in his official capacity

2    on the plaintiff's official policy, practice or custom claim if

3    all of the following elements have been proved:

4         First, individual defendants acted under color of state

5    law, which the parties have agreed was the case; and

6         Second, the acts of any individual defendant deprived Casey

7    Babovec of his particular constitutional rights under the U.S.

8    Constitution, as explained in Instruction No. 8; and

9         Third, the individual defendant acted pursuant to an

10   expressly adopted official policy or a long-standing practice or

11   custom of the county.

12        Official policy means a rule or regulation promulgated,

13   adopted, or ratified by the county, which may include a single

14   decision by a properly constituted legislative body.

15        Practice or custom means any permanent, widespread, well

16   settled practice or custom that constitutes a standard operating

17   procedure of the county.

18        If any of the above elements has not been proved, then your

19   verdict must be for Saline County and Mr. Pennington in his

20   official capacity.

21        Your verdict must be for plaintiff and against defendant

22   County of Saline and Bruce Pennington in his official capacity

23   on the plaintiff's failure to train claim if all of the

24   following elements have been proved:

25        First, the acts of the individual defendants deprived Casey

1  Babovec of his particular constitutional rights under the U.S.
2  Constitution, as explained in Instruction No. 8; and
3       Second, individual defendants acted under color of state
4  law, which the parties have agreed was the case here; and
5       Third, the county's training practices were inadequate; and
6       Fourth, the county was deliberately indifferent to the
7  rights of others in adopting the training practices, such that
8  the failure to train reflects a deliberate or conscious choice
9  by the county, which requires a finding that the county was on
10 notice that its training practices were inadequate and likely to
11 result in a constitutional violation; and
12      Fifth, a deficiency in the training practices actually
13 caused the violation of Casey Babovec's constitutional rights by
14 individual defendants; that is, the county's failure to train is
15 so closely related to the deprivation of Casey Babovec's rights
16 as to be the moving force that caused the ultimate injury.
17      If any of the above elements has not been proved, then your
18 verdict must be for Saline County and Mr. Pennington in his
19 official capacity.
20      If you find in favor of the plaintiff against any
21 defendant, you must award the plaintiff an amount of money that
22 will fairly compensate her for Casey Babovec's loss of life and
23 any conscious pain and suffering, mental anguish, of Casey
24 Babovec prior to his death if you find those injuries were a
25 direct result of the conduct of that defendant.

1      You should consider the following elements of damages:  The

2   loss of life and the physical pain and mental suffering Casey

3   Babovec experienced.  Remember, throughout your deliberations

4   you must not engage in speculation, guess or conjecture.  And

5   you must not award any damages under this instruction by way of

6   punishment through sympathy.

7      If you find in favor of the plaintiff under Instruction 8

8   or 9 but you find that the plaintiff's damages have no monetary

9   value, then you must return a verdict for the plaintiff in the

10   nominal amount of $1.

11      There are rules you must follow when you go to the jury

12   room to deliberate and return with your verdict.

13      First, you will select a foreperson.  That foreperson will

14   preside over your discussions and speak for you here in court.

15      Second, it is your duty, as jurors, to discuss this case

16   with one another in the jury room.  You should try to reach

17   agreement if you can do this without going against what you

18   believe to be the truth, because all jurors have to agree on the

19   verdict.  Each one of you must come to your own decision but

20   only after you have considered all of the evidence, discussed

21   the evidence fully with your fellow jurors and listened to the

22   views of your fellow jurors.  Do not be afraid to change your

23   mind if the discussion persuades you that you should.  But do

24   not come to a decision just because other jurors think it is

25   right or just to reach a verdict.  Remember, you are not for or

1  against any party.  You are judges, judges of the facts.  Your

2  only job is to study the evidence and decide what is true.

3      Third, if you need to communicate with me during your

4  deliberations, send me a note signed by one or more of you.

5  Give the note to the court security officer.  And I will answer

6  you as soon as I can either in writing or here in court.  While

7  you are deliberating, do not tell anyone, including me, how many

8  jurors are voting for any side.

9      Fourth, your verdict has to be based only on the evidence

10 and on the law that I have given to you in my instructions.

11 Nothing I have said or done was meant to suggest what I think

12 your verdict should be.  The verdict is entirely up to you.

13     Finally, the verdict form is your written decision in this

14 case.  The form reads:  Interrogatory No. 1.  You must answer

15 this question.  Do you find from a greater weight of the

16 evidence that Mike Richards showed deliberate indifference as to

17 the serious medical need of Casey Babovec, as explained in

18 Instruction No. 8?  There's a space to answer "yes" or "no."

19 There's a space for the foreperson to sign and date.

20     Interrogatory 2.  You must answer this question.  Do you

21 find from a preponderance of the evidence that Mike Richards'

22 subordinates used excessive force against the person of Casey

23 Babovec and that Mike Richards made a culpable choice between

24 action or inaction in the supervision or control of those

25 subordinates, as explained in Instruction No. 9?  There's a

1   space to answer "yes" or "no" and a space for the foreperson to

2   sign and date.

3        Interrogatory No. 3.  You must answer this question.  Do

4   you find from a greater weight of the evidence that Tonya Parker

5   showed deliberate indifference to the serious medical need of

6   Casey Babovec, as explained in Instruction No. 8?  There's a

7   space to answer "yes" or "no" and a space for the foreperson to

8   sign and date.

9        Interrogatory No. 4.  You must answer this question.  Do

10  you find from a greater weight of the evidence that Tonya Parker

11  used excessive force against the person of Casey Babovec, as

12  explained in Instruction No. 9?  There's a space to answer "yes"

13  or "no" and a space for the foreperson to sign and date.

14       You must answer this question.  Interrogatory No. 5.  Do

15  you find from a greater weight of the evidence that Calvin Reed

16  showed deliberate indifference as to the serious medical need of

17  Casey Babovec, as explained in Instruction No. 8?  Answer:

18  "Yes" or "no."  There's a space for the foreperson to sign and

19  date.

20       Interrogatory No. 6.  You must answer this question.  Do

21  you find from a greater weight of the evidence that Calvin Reed

22  used excessive force against the person of Casey Babovec, as

23  explained in Instruction No. 9?  Answer:  "Yes" or "no."

24  There's a space for the foreperson to sign and date.

25       You must answer this question.  Do you find from a greater

1    weight of the evidence that Sam Griffin showed deliberate

2    indifference as to the serious medical need of Casey Babovec, as

3    explained in Instruction No. 8?  There's a space to answer "yes"

4    or "no."  There's a space for the foreperson to sign and date.

5         Interrogatory No. 8.  You must answer this question.  Do

6    you find from a greater weight of the evidence that Sam Griffin

7    used excessive force against the person of Casey Babovec, as

8    explained in Instruction No. 9?  There's a place to answer "yes"

9    or "no" and a place for the foreperson to sign and date.

10        Interrogatory No. 9.  You must answer this question.  Do

11   you find from a greater weight of the evidence that Dion McGuire

12   showed deliberate indifference as to the serious medical need of

13   Casey Babovec, as explained in Instruction No. 8?  There's a

14   space to answer "yes" or "no" and a space for the foreperson to

15   sign and date.

16        Interrogatory No. 10.  You must answer this question.  Do

17   you find from a greater weight of the evidence that Dion McGuire

18   used excessive force against the person of Casey Babovec, as

19   explained in Instruction No. 9?  There's a space to answer "yes"

20   or "no" and a space for the foreperson to sign and date.

21        Interrogatory No. 11.  You must answer this question.  Do

22   you find from a greater weight of the evidence that Ryan

23   McKinney showed deliberate indifference as to the serious

24   medical need of Casey Babovec, as explained in Instruction No.

25   8?  There's a space to answer "yes" or "no" and a space for the

1    foreperson to sign and date.

2         Interrogatory No. 12.  You must answer this question.  Do

3    you find from a greater weight of the evidence that Ryan

4    McKinney's subordinates used excessive force against the person

5    of Casey Babovec and that Ryan McKinney made a culpable choice

6    between action or inaction in the supervision or control of

7    those subordinates, as explained in Instruction No. 9?  There's

8    a space to answer "yes" or "no" and a space for the foreperson

9    to sign and date.

10        Interrogatory No. 13.  You must answer this question.  Do

11   you find from a greater weight of the evidence that David Fenton

12   showed deliberate indifference to the serious medical need of

13   Casey Babovec, as explained in Instruction No. 8?  There's a

14   space to answer "yes" or "no" and a space for the foreperson to

15   sign and date.

16        Interrogatory No. 14.  You must answer this question.  Do

17   you find from a greater weight of the evidence that David Fenton

18   used excessive force against the person of Casey Babovec, as

19   explained in Instruction No. 9?  There's a space to answer "yes"

20   or "no" and a space for the foreperson to sign and date.

21        Interrogatory No. 15.  You must answer this question.  Do

22   you find from a greater weight of the evidence that James Payne

23   showed deliberate indifference as to the serious medical need of

24   Casey Babovec, as explained in Instruction No. 8?  There's a

25   space to answer "yes" or "no" and a space for the foreperson to

1    sign and date.

2        Interrogatory No. 16.  You must answer this question.  Do

3    you find from a greater weight of the evidence that James Payne

4    used excessive force against the person of Casey Babovec, as

5    explained in Instruction No. 9?  There's a space to answer "yes"

6    or "no" and a space for the foreperson to sign and date.

7        Interrogatory No. 17.  You must answer this question.  Do

8    you find from a greater weight of the evidence that Nancy

9    Shelnutt showed deliberate indifference as to the serious

10   medical need of Casey Babovec, as explained in Instruction No.

11   8?  There's a space to answer "yes" or "no" and a space for the

12   foreperson to sign and date.

13       Interrogatory No. 18.  You must answer this question.  Do

14   you find from a greater weight of the evidence that Nancy

15   Shelnutt used excessive force against the person of Casey

16   Babovec, as explained in Instruction No. 9?  Answer:  "Yes" or

17   "no" and the space for the foreperson to sign and date.

18       Interrogatory No. 19.  If you find by the greater weight of

19   the evidence that one or more defendant showed deliberate

20   indifference as to the serious medical need of Casey Babovec by

21   answering "yes" to Interrogatory No. 1, 3, 5, 7, 9, 11, 13, 15

22   or 17, please answer this Interrogatory No. 19.

23       Do you find from a greater weight of the evidence that a

24   failure to train by Bruce Pennington in his individual capacity

25   resulted in the lack of medical care for Casey Babovec, as

explained in Instruction No. 10?  Answer:  "Yes" or "no," a space for the foreperson to sign and date.

Interrogatory No. 20.  If you find by the greater weight of the evidence that one or more defendant showed deliberate indifference as to the serious medical need of Casey Babovec by answering "yes" to Interrogatory No. 1, 3, 5, 7, 9, 11, 13, 15 or 17, please answer this Interrogatory No. 20.

Do you find from a greater weight of the evidence that an official policy, practice or custom of the County of Saline and Bruce Pennington in his official capacity resulted in a lack of medical care for Casey Babovec, as explained in Instruction No. 11?  Answer:  "Yes" or "no."  There's a space for the foreperson to sign and date.

Interrogatory No. 21.  If you find by the greater weight of the evidence that one or more defendant showed deliberate indifference as to the serious medical need of Casey Babovec by answering "yes" to Interrogatory No. 1, 3, 5, 7, 9, 11, 13, 15 or 17, please answer this Interrogatory No. 21.

Do you find from a greater weight of the evidence that a failure to train by the County of Saline and Bruce Pennington in his official capacity resulted in a lack of medical care for Casey Babovec, as explained in Instruction No. 12?  Answer: "Yes" or "no," signed by the foreperson and dated.

Interrogatory No. 22.  Please answer this Interrogatory No. 22 only if you have answered "yes" to any one of Interrogatory

1    Nos. 1 through 18.

2        State the amount of damages that you find from a greater

3    weight of the evidence were sustained by the estate of Casey

4    Babovec, as explained in Instruction No. 13, or nominal damages,

5    as explained in Instruction No. 14.  There's a space to enter an

6    amount.  There's a space for the foreperson to sign and date.

7        You will take this form, these verdict forms.  And when

8    each of you have all agreed on the verdicts, your foreperson

9    will fill in the forms, sign and date and advise the court

10   security officer, marshal or bailiff that you are ready to

11   return to the courtroom.

12       With that, I'll make the statement I know it's warm in the

13   jury room, and we're working on a fan.  You can let the court

14   security officer know if you have other requests.  But, first,

15   it's time for closing arguments.

16       Plaintiff's counsel may proceed when you are ready.

17           MR. SWINDOLL:  Thank you, Your Honor.

18       Ladies and gentlemen, thank you.  You are an essential part

19   of this case.  You are the most important part of this case,

20   because it is a constitutional law case.  It's not a criminal

21   case.  None of these people have been charged with a crime.

22   None of them will go to jail.  But they seem to think that

23   constitutional rights don't apply in Saline County, and that's

24   why we're here.  We are asking you, as citizens, to judge their

25   conduct and determine whether or not Saline County violated the

1    constitutional rights of 6,000 people a year when they came

2    through there, not just Casey Babovec.  There's a system failure

3    in Saline County.  There is a lack of medical care for years

4    before April of 2011.  There is a known knowledge by the sheriff

5    and by the Quorum Court and by the deputies that they don't have

6    the ability to assess these people when they bring them in.  And

7    in this case the system failed, and it caused the death of a

8    citizen, someone who was just a detainee, someone who had not

9    been convicted of anything yet.

10        Their obligation was to protect Casey Babovec and present

11   him to the judge when it was his time to be accounted for what

12   he had done.  And instead, they ignored a serious medical

13   emergency for three and a half hours while Casey Babovec sat in

14   the cell, came to the door and begged for medical help.  In

15   addition, he is sweating.  He took off his shirt.  He urinated

16   on himself, and he lost control of his bowels.  And no one did

17   anything.

18        Now, how do we know that's true?  Do we just take the

19   evidence from the officers, all of whom have a very solid quick

20   little story of there was nothing here, this kid did wrong, and

21   he deserved what he got.  That's their story.  That's their

22   defense.  This kid didn't have constitutional rights.  He didn't

23   have a right to emergency medical care when he asked for it.

24        How do we know he asked?  Certainly none of them are going

25   to say that.  But another citizen, a citizen who knew that she

Closing Argument - By Mr. Swindoll                    577

1   would be attacked and accused when she came to this courtroom, a

2   citizen who lives in Benton, a citizen who was in jail at the

3   time, someone who was there and who could see, said, "I was

4   sitting outside on the bench.  I heard Casey Babovec yelling, 'I

5   need medical assistance.'"  That was Christy Nicholas who sat up

6   there.  Now, she's not a perfect person.  And she told you that.

7   But in cases of constitutional violations, when a citizen is in

8   jail, he doesn't have any help.  He can't call anybody in to

9   observe what's going on.  He can't ask for help from anybody but

10  the jailers.  He is alone and by himself.  And his only -- our

11  constitutional rights that protect people in jail like this, if

12  we don't have that protection, then people in jail will have no

13  protection.  We will be at the hands of the jailers, who always

14  have the same story.  It's always the fault of the inmate.  They

15  don't do anything wrong.  They do everything right.

16      And in this case, even though they know exactly what

17  happened, they wouldn't change a thing.  Every single jailer

18  said that.  Their supervisor said that.  Their jail said that.

19  And you know what their excuse is?  Listen, the state police

20  didn't charge me with a crime and prosecute me.  That's their

21  defense.  This is not a criminal proceeding.  And a law

22  enforcement officer looking at another law enforcement officer

23  and deciding whether a crime happened is not why we're here.

24  We're here to determine if the rights under that flag and in

25  this democracy exist.  If they exist, then our constitutional

Closing Argument - By Mr. Swindoll                578

1    rights to medical care cannot be denied.

2         Now, did Saline County know that there was a practice and a

3    pattern of not providing medical care to the people in their

4    jail?  Yes.  They absolutely knew it.  Sheriff Pennington went

5    to them on numerous occasions and asked for it.  Sheriff

6    Pennington had the guts to tell you that his people are not

7    qualified.  Did you hear that?  His people are not qualified to

8    make the assessment necessary to determine when a person has a

9    serious medical need that is, obviously, guaranteed by the

10   Constitution.

11        These instructions tell you, the ladies and gentlemen, that

12   you can find a violation of his constitutional right for medical

13   care if you find that they were deliberately indifferent.  And

14   if a person is acting in this manner and you are observing him

15   and he asks you for your help, you are deliberately indifferent

16   if you do not provide the medical care necessary in this case to

17   save his life.  Did he die of the methamphetamine?  The answer

18   is absolutely not.  It was one of several factors.

19        Mr. Ellis, in the beginning of this trial, would not

20   acknowledge asphyxiation.  And do you know why?  He would not

21   acknowledge asphyxiation because there is nothing that Casey did

22   that caused the asphyxiation and the cessation of his heart and

23   the overload on his pulmonary system.  He is asking for help.

24   We reviewed the film over and over and over again.  And I did

25   that on purpose, because I wanted you to see Casey on his knees

1    as they opened that door, Casey reaching up.  As he walks out,

2    they jerk him to the left, they jerk him to the right.  And then

3    they throw him on the floor with their arm around his neck, on

4    top of him, such that he bites to try and save his life.  He's

5    not attacking the jailer.  He is losing his life and defending

6    himself in the only way he knows how.

7         "I'm not resisting.  I can't breathe."  That's the

8    testimony of Carolyn Voiles, another citizen, not a jailer, not

9    somebody with an invested interest in this case, that citizen,

10   who knew that she would be attacked when she came here, who knew

11   that no matter what, she had to face all of these jailers who

12   sat outside the interview room when the state police were asking

13   her.  She was intimidated.  She was intimidated.  And she was

14   intimidated, but she was courageous enough to come to a federal

15   courtroom and tell you what she knew.  That's courage.  That's

16   what America is.  That's what the jury system allows.  Citizens

17   can control and judge the actions of officials.  That's what

18   this kind of case is about, do the officials represent the

19   policies in America with regard to our constitutional rights to

20   medical care when we're in custody, and do they have to provide

21   safety and not use excessive force in this situation?

22        And, finally, when they put him on the floor and rendered

23   him unconscious, they did not do anything for six or seven

24   minutes.  And anybody will die in six or seven minutes.  If you

25   are in defib, if you are not -- he was maybe dead when they

1    dragged him out.  They all say he wasn't.  But we heard Dr.

2    Lyman say that in compression asphyxia cases that snoring is the

3    last breath they expel, and they are dead.

4         Now, these people want you to believe he was fine, he was

5    sitting up.  But you saw the film.  He was unresponsive, and he

6    needed emergency medical care in order to survive.  And he

7    didn't get it until it was too late.

8         All of these histrionics, gosh, we did everything we could

9    to protect and save him, that's great.  But he was already dead.

10   That could have all been done while he was still on the floor in

11   the cell in the booking area.  So this idea that, gosh, we did

12   everything we could and we're good people, and, gosh, we go to

13   church, that's not what this case is about.

14        This case is whether or not a young man who died had his

15   constitutional rights violated.  And this whole proceeding is so

16   that people like you can make that decision rather than them,

17   rather than them, who decided on their own not only they didn't

18   do anything wrong, but they would do it exactly the same again.

19   Does that mean another man has to die and another man has to

20   come to a jury?  If not you, who will stop this?  And if not

21   now, when will this stop?

22        The people in Saline County knew that they were in trouble

23   with medical care.  They had 20 to 30 lawsuits filed on care in

24   these kinds of court, in the federal court, where they came to

25   court asking for help on medical care.  All of these people had

1   the same scenario.  Sheriff Pennington said, "I knew it.  I told

2   them.  I told them it was happening, and nothing happened."  No

3   medical care was in this jail until after Casey Babovec died.

4       Now, did it cause this event?  If a medical professional

5   assesses Casey Babovec and he finds he is sweating profusely,

6   he's incoherent, he can't sit still, he's urinated on himself,

7   he's lost control of his bowels, do you not think a medical

8   professional would recognize and appreciate the safety?  But

9   that's not the test.  We don't have medical.  The test is would

10  a reasonable person, not a police officer.  Would a reasonable

11  person, knowing what they can see and hearing what they can

12  hear, recognize that a serious medical care needed attending.  I

13  submit to you that when an inmate, a detainee, a citizen, asks

14  for medical help under these circumstances, there's no excuse if

15  he doesn't get it.

16      Now, how do you determine that besides just what Christy

17  said?  There are some exhibits.  There are 34 stills in Exhibit

18  No. 7 that you can look at.  They are timed.  There's a time

19  line on them.  And you can see -- before 5:08, when they pulled

20  Casey out, you can see him at the door at 4:30, at five o'clock.

21  And you can see one of them coming back to see what's going on.

22  But nobody does anything.  And that's what Christy Nichols said.

23  The deal was, he needed medical, and he didn't get it.

24      So he didn't get the medical that the Constitution and we

25  all deserve when that right to go to the doctor ourselve is

 1   taken over.  The young man makes a mistake.  But should it kill

 2   him?  His accountability is more jail time, not death.  Nobody

 3   is saying Casey didn't deserve to be accountable for drugs.

 4   They are a horrible thing.  Do you know how many people in the

 5   Saline County facility, according to these gentlemen, there are?

 6   What did he say?  Three-quarters?  So if you have 6,000 people,

 7   they have 4,000 times a year to make the assessment.  And they

 8   are not competent to do so.  That's the system failure, because

 9   no matter what you do, if you are not trained and you are busy

10   and you haven't got the understanding to do it, you will make a

11   mistake like this that kills a young man.  If he had been

12   intervened, if he had been allowed medical, he wouldn't be dead,

13   and you wouldn't be here.

14        Excessive force.  Excessive force is force that is more

15   than necessary under the circumstances.  A detainee who is not

16   resisting does not deserve to have six officers pile on top of

17   him and yell and say to you four years later he wouldn't comply,

18   he wouldn't comply.  The complying with the orders they are

19   asking him for is to get his hands behind him.  One of them you

20   know is underneath him.  Dion McGuire told you that.  He

21   couldn't get his arm back there.  So what do they do?  An

22   unlicensed jailer picks up a Taser and walks over and tases him

23   for five seconds.  He doesn't have any permit.  He hasn't had

24   any license.  He hasn't had any training.  He's just going to

25   punish this guy because he can't get his arm out from under him.

Closing Argument - By Mr. Swindoll                           583

1   The kicking that you see before stops.  I suggest to you that a

2   young man who can't breathe and is worried that he might be

3   dying would try to do anything to get up.  And instead, these

4   people are on him.  The compression is not just what I say.

5   It's what the medical examiner of Arkansas says.  The chief

6   medical examiner let you know that compression asphyxia was a

7   component of the death.  And that's because they used excessive

8   force.

9        Casey was not resisting.  Watch him being pulled and then

10  thrown to the floor.  And when he's on the floor, he can't

11  comply.  He keeps saying, "I give him orders to comply," "orders

12  to comply."  If a man cannot comply, he is not disobeying the

13  order.  And, yet, people continued to pile on him.  And,

14  finally, jailer Reed comes over and gratuitously decides to

15  straddle him after he's unconscious and put the weight on him.

16  You know what the excuse was?  Do you remember?  Well, sometime

17  in the past somebody did that.  They woke up and hurt somebody.

18  This is while a man is dying.  They want you to take an

19  antecedent experience that happened in the past and justify the

20  behavior that they had here and to say, well, he died; but, you

21  know, we were worried that we might not have him under control.

22  That's what the testimony is.

23       These jailers are arrogant.  They don't believe that he had

24  any rights whatsoever.  And this idea that they were going to

25  save him, Casey is on his knees at the door asking for help.

1   That's not the act of a man who is resisting their orders.  You

2   looked at the film enough.  You know.  It is your understanding

3   and your decision about excessive force.  And I believe the

4   evidence is crystal clear that excessive force was used in this

5   restraint.  And after they had him under control, excessive

6   force was certainly used, because they were worried about

7   keeping him under control.  He might wake up.

8        And that brings me to this.  A man does not go to sleep in

9   the middle of a struggle.  That's the most incredulous thing

10  I've ever heard.  And I've heard it since I took this case years

11  ago.  That is not -- you don't knock a man into sleep.  You

12  don't render a man into sleep when six people are on top of him.

13  And if he's unresponsive and if he's unconscious, he is

14  certainly entitled to emergency medical care that might save his

15  life.

16       It wasn't provided.  It wasn't provided.  In fact, it was

17  ignored.  Did you see them drag him and drop him facedown?  This

18  is a man that is either dead or dying.  In any event, he's

19  entitled to more care than people standing around in an empty

20  room if he's still alive and letting him die and then launching

21  emergency medical service.  That is not protecting the

22  constitutional rights of anyone.  And it certainly isn't

23  providing any emergency medical care that a person, a citizen,

24  is entitled to.  When you take the right for him to get his own

25  care away from him, you are responsible.

1        Do you remember what I said the first time in this trial?

2    A person, an institution, a jailer who takes someone into their

3    control must provide responsible medical care.  And if they

4    don't, they are responsible for the harm they have created.  And

5    if a jailer uses excessive force and harm results, they are

6    responsible for the harm that occurred.

7        The harm is, obviously, the death of one of our citizens, a

8    30-year-old man, a man who loved his family, a man whose family

9    loved him.  When you look at how one values their life, you look

10   around them, and you look at the people that they loved and the

11   people they interacted with.  And you can tell from looking at

12   the people around him and hearing about how he treated his

13   relatives and his mother and his daughter and his sister that he

14   was a real person.  And he valued his life, or he wouldn't act

15   in such a way when it was taken from him.  Yes, taken from him.

16   And it was taken from him in minutes, while he knew exactly what

17   was happening to him.  He knew they were on top.  He knew that

18   he had trouble breathing.  And he told them, "I can't breathe."

19   And, yet, nothing happened except that he died.  He died.

20       There's nothing more permanent.  All of his life was taken

21   from him because they chose not to provide emergency medical

22   service to him.  They didn't appreciate the evaluation.  Do you

23   remember the evaluation, when the young lady said, "I had only

24   been there a little while, I was too busy to talk to Officer

25   Edens"?  I want you to look at some of the exhibits in this

1    case.  And one of them in particular I want you to look at is

2    their own rules that require -- it's Exhibit 3.  You can look

3    through it.  It has to do with the intake.  The intake says that

4    that intake officer will visit with the arresting officer and

5    get the information from the arresting officer so he will --

6    they will know and can make a proper assessment.  She not only

7    didn't do that, she acknowledges to you that she was busy, that

8    she didn't have time, and she didn't have knowledge, and just

9    placed Casey in the cell.  By itself, that didn't kill him.

10   These bags ruptured at some point, and Casey began to ask for

11   help.  And because he was under their control, he had to rely on

12   them, to his detriment.  And that's what happened.

13        Now, so we know that we have evidence that you have seen

14   with respect to the county.  The county knew it was a practice

15   and a pattern not to provide medical care.  They knew.  Lawsuits

16   were mounting up, and nothing was happening down there, business

17   as usual.  In fact, business as usual still.  They did not do

18   anything wrong.  Those words -- I'll never forget those words as

19   long as I live in this case, because when a man dies, you look

20   at what goes on.  And you try to figure out how it won't happen

21   again.  They haven't done anything wrong, hasn't done anything.

22   Instead, we did everything right.  My people are good people, so

23   we don't have to worry about constitutional rights, because

24   we're police officers.  We're jailers.  We know what's right in

25   the jail.  You don't.  You can't understand.  But it's not what

1    a jailer thinks.  It's not what a police officer thinks.  It's

2    what the Constitution requires.  Do you know who delivers the

3    Constitution in these cases?  You.  You are the people who say

4    the rights were violated.  You are the one who sends the

5    message, you can't do that to citizens.  You are the one who

6    says in your verdict that this is wrong, this needs to be

7    addressed, this needs to be fixed.

8        Now, how do you do that in this case?  There's a set of

9    instructions from medical need, deliberate indifference, medical

10   elements.  But the charging instructions, Casey had a serious

11   medical need, the individual was aware.  That's the discussion.

12   The deliberate indifference, failed to provide medical care.

13       Instructions are a blueprint for you to make analysis on

14   the facts.  You take those elements under medical care and

15   excessive force.  There are five of them.  And you can look

16   through the proof, and you can determine whether or not we made

17   those.  And when you get through discovering the evidence, then

18   you have 23 questions that you have to answer and that you heard

19   the Court read.  And they are for each defendant, and they go

20   on.  Do you find that Mike Richards failed to provide emergency

21   medical care?  Do you find that Mike Richards failed to

22   supervise his people and allowed excessive force during that

23   pileup?  He stood there and watched it.  He stood there and

24   watched Casey Babovec essentially die.  All of them did.  And

25   they are standing around looking like this at him.  This is a

1    man they just rendered unconscious.  This is not reasonable.

2    This is not normal.  And this is not what America is about.

3    Someone has to tell these people that they can't do that,

4    there's another level of care, and that is not just what's

5    comfortable for them, not what they are doing just to protect

6    their inmates or protect themselves.  They have obligations to

7    protect the Constitution and protect the people under their care

8    in a way that we all have agreed for all of our life that the

9    Constitution is the basis for all our freedoms.

10        And if we don't have that, if we don't have that right when

11   we're in custody, then it doesn't matter.  How many people can

12   die?  And nobody can come -- we would have to come to a

13   courtroom.  And we would have to have citizens like you to stand

14   up and speak the truth, a verdict, a verdict that says that

15   medical care is necessary and available with a situation like

16   this, that you cannot use excessive force, that you, Saline

17   County, must provide the means for medical care if you are going

18   to take people into your custody into your jail.  If you are

19   not, send them to some other jail.  But they don't want to do

20   that.  This is about money.

21        So they bring these people in, but they don't take care of

22   them.  Now, if they go to sleep -- gosh, that's the hardest

23   testimony for me yet.  They bring them in, they know they are

24   drunk, they know they are high.  And the assessment, they are

25   not competent to make.  And, yet, they sleep it off.  If they

1    die, it's their fault.  These people are not to be put in jail

2    if they are dangerous like this.  And if they get into the jail

3    and they recognized and know that it is dangerous, ladies and

4    gentlemen, they have to do something.  They can't stand by and

5    say for the security of the jail we didn't do anything.  For the

6    security of the people here, that guy might have woken up, and

7    he might have hurt us.  So we get a right to just do anything we

8    need to do.  And if it happens to cost him his life, that's just

9    the problem for him.  It's not for us.  We're not in jail.

10   We're not under the control of jailers that we don't know.

11   We're not under the control of jailers who ignore my need for

12   medical care.  That's the attitude.  That's the arrogance.  And

13   don't let them point you away by sitting on the stand and acting

14   like this is a football game, just -- I'm just responsible for

15   this, not my men.  That points us away from our duties here in

16   the courtroom.

17        Our duty in the courtroom is to judge each one of these men

18   and whether or not they have violated the rights of a dead man,

19   a man that they participated in when he died.  And for them to

20   stand here without shame, without any worry, and say to you, as

21   citizens, it can happen again, but it's really their fault, that

22   is inhumane.  That is not right.  And it is not American.  It is

23   not constitutional.  This idea that you can hold these people

24   and do anything you want to them is wrong.  It's just wrong from

25   the first second.  It's wrong under the Constitution.

1         These cases are hard cases, because these officers, these

2    policemen, are respected in their community.  But that doesn't

3    mean they won't violate the constitutional rights if they think

4    it's in their best interest.  In this case they think it's in

5    their best interest if they are worried, not that there's an

6    actual danger.  If they are worried about a danger, they don't

7    have to give medical care.  You heard what they said.  Well, he

8    was asleep.  We didn't think he was bothering anyone.  We didn't

9    want to touch him.  And it was all right for Reed to sit on him,

10   because, gosh, he might wake up.  He could hurt us then.

11   Instead, he's unconscious.  He is, obviously, dying.  And for

12   people to stand around and look at him and then drag him like a

13   potato bag and drop him facedown, anybody with any training in

14   medicine or an EMT, or just common sense, knows that if a man is

15   unconscious and been rendered unconscious you don't drag them

16   into a room and drop them facedown, an obvious danger.  They

17   have put the man in even greater danger.  And they haven't

18   provided emergency medical care until it's too late.  That's a

19   constitutional law violation.  That's why we're here, all three

20   of those.  And the county didn't train these people.  They know

21   they weren't trained.

22        So all of those interrogatories that you have to go

23   through, 1 through 23, all deal with the individual

24   responsibility of each of these jailers.  You can't sue them all

25   at once.  Each of them did something different.  Some of them

1   ignored a serious medical need.  Some of them used excessive

2   force.  And that's why we had to bring them all in here.  And

3   that's why I had to ask them all those questions and show them

4   those films and let you see.  It's not what the policemen

5   believe.  It's not what they think is right.  It's what you, as

6   a citizen, think is reasonable under the circumstances.

7        So you can see why juries are put in the mix.  Juries are

8   the ones who determine whether it's reasonable under the

9   circumstances.  These are unanimous decisions.  That's not

10  always easy in a constitutional law case, especially in a

11  situation where you have death.  But when you have the proof,

12  when you have Dr. Michael Lyman here, who teaches graduate-level

13  criminology, who teaches graduate-level criminal law, who has

14  written eight books and hundreds of articles on the subject, who

15  has been an investigative officer on the ground for many years,

16  tell you that excessive force was used -- and he explained and

17  showed you how.  Their denial is just that.  There's no expert

18  saying it.  They are just defending themselves.  They could have

19  brought somebody here.  But, instead, they lean on, we're

20  jailers, we know what we're doing.  The jury will understand.

21  But that's not so.

22       I'm asking you, on behalf of the Babovecs, on behalf of

23  Casey Babovec, on behalf of the community and the citizens at

24  large and the citizens of Arkansas, Saline County has a problem.

25  It's had a problem.  It's had a problem for many years.  It

1    violates the constitutional rights of the people they hold in

2    custody down there.  It doesn't provide the medical.  And now is

3    the time to stop it, not later, not some other case.  Who will

4    do it if not you?

5        Ladies and gentlemen, we ask that you go through this and

6    you answer I think every single question "yes."  And then value

7    the life of Casey Babovec, the life that was wasted in Saline

8    County when this young man's constitutional rights were violated

9    in the ways that you have watched for three days.

10       Thank you for taking part in this.  This is a hard case.

11   There's not a solid black-and-white answer.  It's more likely

12   true than not.  In your mind, that's what you are going to weigh

13   up, is it more likely true than not that Christy Nichols, a

14   citizen, saw and heard him pleading for medical.  Is it more

15   likely true than not that Carolyn Voiles, a witness who took the

16   stand, who came into federal court, despite being in front of

17   all of these people and intimidated -- you can't believe how

18   intimidated these witnesses were.  But they came.  And they gave

19   you, the jury, the information they had.  So I'm asking you to

20   take that information, because in most cases all you have in

21   situations like this is the jailer saying that kid didn't do

22   right, and I had to do something to protect them.  In this case

23   you have clear evidence from people without a dog in the fight

24   what happened.  You can't hear the sound.  But if you add that

25   sound to what you see, there are constitutional rights

Closing Argument - By Mr. Ellis                           593

1    violations that send shivers up my spine.

2        They cannot defend themselves with we didn't get charged

3    with a crime.  This is a constitutional case.  It's not decided

4    by a prosecuting attorney.  It's decided by a jury of your peers

5    of the people who are affected when their constitutional rights

6    are gone.

7        We ask for your verdict.  I think that you should value the

8    loss of Casey Babovec just like a truck ran through a red light.

9    There's plenty of obvious evidence in this case that they ran

10   through red light after red light after red light and caused the

11   death of Casey Babovec.  That young man had some problems.  But

12   he also had a future, and he had hope.  He had a family to help

13   him and protect him.  He had a life that was valuable.  It was

14   wasted, taken from him through excessive force and the failure

15   to provide constitutionally directed medical care in these

16   circumstances.  Thank you.

17           THE COURT:  Mr. Ellis, you may proceed.

18           MR. ELLIS:  Facts are stubborn things.  Facts are

19   stubborn things.  I didn't make that up.  Somebody famous said

20   it.  But I want you to remember it as you hear what I have to

21   say and what Mr. Swindoll has said and in the course of your

22   deliberations.  Facts are stubborn things.

23       Now, a fact can't be manipulated.  A fact is a fact.  It's

24   not like an opinion.  There's an old saying, everybody is

25   entitled to their own opinions, but not their own facts.  A fact

1    can't be shaded.  A fact has to do with truth.  A fact can't be

2    dealt with merely by pounding the table and screaming and

3    screeching and pointing and smearing these good people.  If

4    that's all this case is about from the plaintiff, then I do say,

5    I do say, shame on them.  I do say that.  Shame on them.

6         Now, let's look at the facts.  This is what happened.  I

7    began my opening statement, you will remember, by saying, just

8    offhandedly -- I wasn't thinking about it -- here's what

9    happened.  Well, now we know what happened.  I have a big long

10   list of facts here.  I won't go beyond that.

11        Mr. Babovec entered the jail.  And when he entered it,

12   there's no question but that he was high.  A huge percentage of

13   people enter jails who are high.  Saline County is, I'm sure, no

14   exception.  Pulaski County, the same way.  They are all the

15   same.  You deal with drunks, meth heads, crack heads, pot heads,

16   coke heads.  It's just the nature of a jailer.

17        But the testimony from Ms. Shelnutt was she helped process

18   him in.  He was asked:  "Are you in need of any kind of medical

19   treatment?"  And he said, "no."  He said, "no."  And she made a

20   note of it.  That is a fact in this case.  It is not subject to

21   manipulation by anybody.

22        Later on, after he's in Cell No. 1, he goes to the bathroom

23   in his pants.  I know that's indelicate, but it's a fact.  It's

24   part of this case.  Mr. McGuire goes to get him and showers him.

25   That is a fact in this case.  The other fact associated with

1    that is that Mr. McGuire says that he was happy.  He actually

2    used the word "happy."  Mr. Babovec was happy.  And they were

3    kidding, and they were joking.  Did Mr. McGuire just make that

4    up?  Is he a liar?  Is he a liar?  Is that what he is?  In order

5    for that not to be a fact in this case, you've got to smear Mr.

6    McGuire, stomp and scream and pound the table.

7         Now, there was a fight.  That's a fact in this case.  You

8    will have -- you will probably have two DVDs.  You will have the

9    one that we saw.  It was a good one, because it was produced by

10   someone who knew what they were doing.  There's also the

11   real-time DVD that's Defendants' Exhibit No. 1 that you can take

12   too, and it has the player on it.  So it's got the fight.  I

13   don't think the one we were looking at on the screen has the

14   fight, but it has the actual fight.  That's a fact.

15        And here's what happened.  You will see it on the DVD.

16   He's brought back by Dion, remember, and put back in the cell.

17   And he is not unsteady on his -- I wish -- I, too, wish we had

18   audio, because I believe we would find that his speech wasn't

19   slurred, that his labor wasn't -- that his breathing wasn't

20   labored.  He walked up to this guy and "wham."  There was a

21   fistfight.  Now, fistfights break out in jails every day.  You

22   know that.  But he hit him, and he hit him good.  It's a fact

23   that that was seen on the screen back behind at the booking

24   table.  They went in, and they got him, and they brought him

25   out.

1      Now, Dion McGuire told you that it was his effort to rescue

2   the guy.  He thought Mr. Babovec was really in trouble.  And can

3   you imagine the lawsuit if we hadn't done that?  Can you imagine

4   the lawsuit if we hadn't gotten in -- well, you caused the

5   problem yourself.  We had a duty to protect Mr. Babovec from

6   this guy and a duty to protect the other fellow from Mr.

7   Babovec.  It's just what we do.  So we got him out of the jail,

8   and there was a struggle.  That is a fact.

9      Now, if you want to believe Christy Nichols, "I can't

10  breathe," "I'm having a heart," whatever, there's a problem,

11  because, you see, Christy told us from the witness stand, "I'm

12  not a credible witness."  She actually said that.  That's the

13  first time I've ever heard a witness say that in 40 years of

14  law.  "I am not a credible witness."  The other thing she did

15  was she was sure that Ms. Shelnutt here had a Taser in her hand

16  and threatened Mr. Babovec with it if you don't quit beating on

17  the door, all of that.  Remember that?  Ms. Shelnutt didn't have

18  a Taser because she wasn't qualified to handle it.  Christy made

19  it up.  She made that up for this case.  And during

20  deliberations, I think you should remember that.

21     And you might want to -- Ms. Voiles too.  You might want to

22  wonder what two people in their situation, what their motivation

23  would be to come in to this courtroom and say something about my

24  clients.  I don't want to spoil it for you.  I think you know

25  the answer to that.  You know.  You know what's going on.

1        Okay.  So there was a struggle.  That's a fact.  He gave

2   Ms. Parker a good cussing.  He was angry.  And all of the

3   witnesses testified he was violent, he was aggressive, he was

4   dangerous.  That is a fact.  And that fact is uncontroverted in

5   this case.  And if you don't believe that, then you have to

6   believe that every one of them, some of them of whom are sworn

7   law enforcement officers, are liars.  That's the only way the

8   fact can be made on that point, that they are liars.  That's a

9   smear.  That's what that is from the United States District

10  Court.  That's a smear.

11       Now, he's down finally, difficult cuffing him, really

12  difficult.  They get him cuffed.  And look at the tape, the

13  video, both of them for that matter, because it is a fact that

14  there were -- they can say it a thousand times.  But it just

15  isn't true that six officers were on top of him pushing the

16  breath out of him.  One had one leg, the other had the other

17  leg, Parker and Shelnutt I think.  One had the arm.  The other

18  had the other arm.  Dion McGuire had his head and was being

19  bitten, because he was mad.  He was very mad and angry.  And so

20  they get him cuffed, and they take him to Cell 5.  The

21  undisputed proof is that when he was taken to Cell No. 5 he was

22  still breathing.  That is a fact in this case, folks.

23       Now, we're dealing with a very short time frame.  These

24  have been talked about now for -- don't laugh at me.  It's off.

25  There we go.  Mr. McKinney did this, remember?  He did these

1   numbers.  And you can tell what little time we're dealing with

2   here.  Officer McGuire escorted him to -- Officer McGuire

3   escorted Babovec out of Holding Cell -- no.  That's 5:09.  5:12,

4   he's placed him in 5, just three and a half minutes, just a few

5   minutes he is in Holding Cell 5.  And then it is a fact that

6   Officer Parker noticed that he wasn't breathing.  Ladies and

7   gentlemen, I submit to you that that is the beginning of this

8   medical emergency.  Until then, it was a fistfight and then a

9   fight between officers and Mr. Babovec.  And that's all it was.

10  He was panting.  He was breathing.  He was taken into Cell 5.

11  And then shortly thereafter -- and the time is on there --

12  Officer Parker found that he wasn't breathing.

13      And then what happened?  Well, a fact that they want to

14  ignore.  These people went into action.  That's what they did.

15  They went into action.  They got the defibrillator.  They

16  started CPR.  And I'll say it again.  I'll say it again.  To

17  denigrate and smear Calvin Reed, when he's on his hands and

18  knees giving this man CPR with a face full of vomit, how dare

19  you, plaintiffs, suggest that there's something wrong with that

20  and he's made it up.  How dare you.

21      Now, we've got to deal with this expert that I suggest you

22  deal with swiftly.  I said earlier that everybody -- I don't

23  remember who said it -- somebody famous -- everybody is entitled

24  to their own opinion but not their own facts.  That's what we're

25  dealing with here.  That's why we're here.  It's $10,000 worth

1    of testimony.  You heard that.  I was stunned.  $10,000 to say

2    that something was wrong here.  And the only wrong part was that

3    he was wrong, because he assumed, he assumed that these folks

4    had been on top of Mr. Babovec.  And the video clearly shows

5    that that assumption is mistaken.  And without that, his

6    testimony falls apart.  I'm not suggesting for a moment that

7    it's in bad faith on his part.  He seems like a nice man, might

8    be a good father, good husband.  But the $10,000 just didn't go

9    very far on that one.

10        Now, what is his opinion based on?  We know that it's based

11   on the state police investigation, because he said so.  And we

12   know it's based on that video and I think a couple of other

13   documents.

14        Well, what did Sheriff Pennington say about the state

15   police investigation?  This is the testimony from Sheriff

16   Pennington in the deposition that you heard.  You heard this.

17   The question was:  "In your judgment, in the review that you

18   made, the actions of your officers were not only constitutional"

19   -- Mr. Swindoll wants to say that this all had to do with some

20   kind of criminal investigation.  It was his word,

21   "constitutional."  I'll start again.  "In your judgment, in the

22   review that you made, the actions of your officers were not only

23   constitutional but in connection and in line with jail policies

24   that you had in place?"

25        Here's Sheriff Pennington's answer, formal proof of Sheriff

1   Pennington's answer:  "Correct."  This information was after the

2   state police investigated it and found that there was no

3   wrongdoings.  For $10,000, this expert witness has

4   second-guessed these investigators.  That's what that's about.

5   That's what that's about.

6       Am I suggesting you should disregard his opinion?  That's

7   exactly what I'm suggesting, because I'm trying to figure out

8   how I can say $10,000 as many times as possible, because I want

9   to drive it home.  You get it, though.  But it's based on

10  erroneous facts.  If these guys and girl piled on him, six of

11  them piled on him and suffocated him, that would be one thing.

12  But that just didn't happen.  That just didn't happen, because

13  you saw it.  And he can say that as many times as he wants to.

14  It just didn't happen.  And because that's a fact, a four-point

15  restraint on extremities, not everybody on his back, that's a

16  fact.  That fact blows this expert off that witness stand.  It

17  doesn't mean he's not a nice guy.  It's just an erroneous

18  assumption.

19      Now, so what did Mr. Babovec die of?  That's why we're

20  here.  Did he die because Sheriff Pennington wasn't successful

21  the first time around talking the Quorum Court into providing

22  on-site medical care?  Judge Baker has told you that there has

23  to be a nexus between the two.  There has to -- I'm looking for

24  the word.  I'll see it in a minute -- the moving force.

25  Something has to be the moving force of, in this case, his

1    death.  Was the politics of this, Sheriff Pennington, was that

2    the moving force?  Do you think if we had had the finest

3    cardiologist in America in the back room rushing to the aid of

4    Casey Babovec in this case in that many minutes that he would

5    have survived?  Of course not.  That had absolutely nothing to

6    do with it.  It makes great copy.  It makes great copy for the

7    press back there, Mr. Swindoll.  But it's a fact that he died

8    without regard to what the Saline County Quorum Court did or

9    didn't authorize.

10        What did the medical examiner say?  And take this with you.

11   This is Defendants' Exhibit No. 2.  Read it word for word if you

12   need to.  What does it say?  "Cause of death:  Methamphetamine

13   intoxication.  Contributory factors:  Struggle, restraint and

14   exertion."

15        Whose methamphetamine?  Well, I want to be general about

16   this, because his mother is sitting over here.  The family, they

17   have lost a loved one.  But it was his methamphetamine in those

18   two packets that ruptured so that he could avoid law enforcement

19   on that issue, apparently.  It was his struggle.  He's the one

20   who struggled and fought and fought my clients in an effort not

21   to be cuffed.  And we don't know why, but that happened.  That's

22   a fact in this case.

23        Now, this case doesn't have anything to do with 6,000 --

24   something about 6,000 people in jail.  It doesn't have anything

25   to do with some other litigation somewhere else, and it doesn't

1   have anything to do with how bad Saline County is.  And Mr.

2   Swindoll can get up here all day and talk bad about us.  All it

3   has to do with are these facts.

4       Now, the word that was used in the beginning of this case

5   by the plaintiff's attorney, "accountable," accountable.  And

6   then Ms. Cruz, Ms. Babovec Cruz, took the stand.  And she used

7   that word too.  She wanted accountability, and she wanted

8   medical staff in the jail.  Those were the two things she was

9   interested in.  Well, we got that.  We got medical staff.

10  Sheriff Pennington got that.  She thanked him by suing him.  She

11  thanked him for doing what she wanted done by filing this

12  lawsuit against him.  If I seem a little insensitive about that,

13  it's because I am.  You should be too.

14      Now, let's talk about accountability.  Where do we look

15  with respect to accountability with respect to the death of

16  Casey Babovec?  You can find some scapegoat all day.  But sooner

17  or later, we have to deal with personal responsibility.  And

18  there's no question whether -- well, there may be a question,

19  but probably not -- that if those bags hadn't ruptured he

20  probably would not have died.  But nobody put those packages

21  that the medical examiner found in Casey Babovec's stomach

22  except Casey Babovec, except for Casey Babovec.  That's all.

23  That's all.  Saline County politics has nothing to do with this

24  case.  And I say again, shame on you.

25      Now, here's what I think you should do.  Here's what I want

1   you to do.  The Court has given you 22 interrogatories.  The

2   word "interrogatory" is a fancy pants lawyer word for

3   "question."  That's all it is.  Judge Baker is good enough to

4   actually call it that.  "You must answer this question."  Now, 1

5   through 18 are necessary for you to answer.  They are about

6   these individual defendants.  You don't have to answer anything

7   after 18 under one circumstance, and that is if every one of

8   those interrogatories are answered "no."  If you find by a

9   greater weight of evidence -- I'm not going to read every one of

10  them -- greater weight of evidence that Michael Richards showed

11  deliberate indifference; that Tonya Parker, deliberate

12  indifference; Tonya Parker, excessive force.  "No, no, no," on

13  every one of them through 18.  And that ends this case.  That

14  ends this case.

15       But it does something else, folks.  If the plaintiff's

16  counsel wants to get up and scream and rant and point and avoid

17  the facts of this case, the facts, and talk about the flag, it's

18  his business, because he doesn't have anything else to talk

19  about.  What I want you to do and what I'm urging you to do and

20  what I think you ought to do, not because I'm on this side or

21  just because it's the right thing to do, is clear their name.

22  And you can do that with your verdict.

23       Tonya Parker does her work as part of her ministry.  It's

24  pretty obvious.  You got that from her testimony.

25       Calvin Reed, now, Calvin Reed, Calvin Reed is a little bit

1   cavalier in this case.  He didn't know that Mr. Babovec was in

2   the kind of distressed condition that he was.  He probably

3   wouldn't have handled him quite as cavalierly as he did.  But he

4   went into action, didn't he?  He went into action when it was

5   obvious that this man had a serious medical emergency.  And

6   that's when it began, when Tonya couldn't find a pulse.  I'm

7   proud of Calvin Reed, of all of them.  I'm proud of Calvin Reed.

8   He went into jail work because he wanted to advance in law

9   enforcement.  And he did.  He did.  He got into patrol.

10       And Ryan McKinney.  You can have your Dr. Lyman.  You give

11   me Ryan McKinney, because there's a difference.  He teaches the

12   same courses Lyman does.  Hey, there's a difference.  Ryan

13   McKinney has been a jailer.  And the undisputed proof is Lyman

14   was never ever a jailer or even a jail administrator.  You need

15   to take that into consideration when you consider his opinion.

16       These people have been smeared.  They have been besmirched.

17   They have been yelled at and screamed at like you have.  I ask

18   you to clear their names, clear their names with your verdict.

19   And it should be swift and powerful.  Thank you.

20            MR. SWINDOLL:  Thank you, Your Honor.

21       The defense wants you to look at the facts.  Let's take

22   this fact, the physical evidence of asphyxiation.  He even

23   mentioned that.  How do you think the physical evidence and the

24   autopsy showed asphyxiation?  How if people weren't on top of

25   him?  Michael Lyman had the benefit of the medicine.  He knew

1    that.  And I'm going to ask you, this whole time they were

2    talking, why didn't you just have Michael Lyman interview all

3    these defendants so you could see the intonation, ladies and

4    gentlemen, that's impossible in a lawsuit.  And Mr. Ellis knows

5    it.  Mr. Ellis knows that he would not on a bet allow my expert

6    to interview each of these officers.  He would never allow that.

7    And, yet, he offers that as an idea and suggesting that I called

8    these officers liars.  That's shameful.  I did not.  I said the

9    proof is different than what they say.  You are the one who

10   decides whether they are telling the truth or not.

11        And he didn't mention Carolyn Voiles.  Why not?  Two

12   citizens that he doesn't control, and he can't get their

13   testimony the way he wants it, he attacks and says they are not

14   credible.  You are the judge of credibility.  Christy can say

15   she's not credible.  The fact is, she was there.  People like us

16   don't have the benefit of witnesses in the jail.  All they have

17   is the officers usually.  Today we have two citizens who told

18   you he wasn't resisting.  He was asking for medical help.  That,

19   the testimony of Lyman and the testimony of the medical examiner

20   of the State of Arkansas is all you need to know that excessive

21   force was used in this case and that he was begging for help and

22   that his last words were, "I can't breathe.  I'm not resisting."

23   Can there be any more clear evidence?  She doesn't have a dog in

24   the fight.

25        The only way this circumstance changes is with your

1    verdict.  Otherwise, things are going to be the same in Saline

2    County.  They are.  There's not going to be any rights down

3    there.  And every time someone dies, it's going to be their

4    fault.  Ladies and gentlemen, that is not constitutional.  They

5    knew what the situation was.  And if they didn't know in the

6    beginning, if you look at Exhibit No. 7 and you start at

7    Exhibit 7.1 and go to 7.9, you will see Casey up.  You will see

8    him moving around.  You will see him taking his shirt off.  You

9    will see him at the door screaming for help, and he's not

10   getting it.

11        So why does he start the fight?  I don't think there's any

12   evidence other than he's gotten their attention.  He has to get

13   somebody's attention.  He's lost control of his bowels.  They

14   won't pay attention to him.  He's asked for medical help, and he

15   doesn't get it.  So what does he do?  He walks in and starts a

16   fight in one second.  Look at it if you want.  And he's knocked

17   to his knees, and the other guy walks away.  He is not in any

18   danger of any more fight.  He is at his knees begging for help.

19   And that's pretty much the last thing he says until he says, "I

20   can't breathe.  I'm not resisting."

21        Officers have duties.  Jailers have responsibility.  And

22   we, as American citizens, have the right to rely that they will

23   be sure when they take people into custody and they take away

24   their rights to medical care that they will responsibly provide

25   medical care.  And if they don't, they are responsible for the

1    harm that happens.  And if they use excessive force when they

2    know the circumstance, they are responsible for the harm.

3         These factors killed Casey Babovec.  And the coroner, the

4    medical examiner's facts, are not something that I can twist.

5    But he's going to put up something -- you heard the testimony.

6    And all he wants you to see is methamphetamine intoxication, and

7    we already acknowledged that.  But we also have this man, this

8    scientist, this guy who has been in forensic medicine who has

9    risen to the levels to the chief medical examiner for the State

10   of Arkansas.  And he says you can't say methamphetamine killed

11   this young man.  You can't do that.  No one can.  But I did find

12   evidence of compression asphyxia during the struggle.  And what

13   happened was his system was heated up.  They are struggling with

14   him.  They are getting on top of him.  And when he can't

15   breathe, his system heats up, and his heart stops.  It didn't

16   explode because of meth.  And the idea that someone would say

17   "and his heart exploded" -- I don't want to blame this young

18   woman for saying it in front of her because he was on meth.

19   That didn't happen.  It didn't happen in this case.

20        He died when those police officers, exerting excessive

21   force, and failing to provide medical after they rendered him

22   unconscious and unresponsive.  There's no going back on that.

23   And they can apply for medical care after he's dead.  I don't

24   care if they line up 27 physicians and everybody performs every

25   procedure known to man to try to bring them back from the dead.

1    They are dead.  And you can't use the efforts then to say that

2    they were okay to deny that medical care when it could have

3    happened, when it should have happened, when it should have been

4    administered.

5         Ladies and gentlemen, we ask you to answer those

6    interrogatories "yes."  Answer the 18 "yes."  And then go to the

7    county and assess an amount of money which you know is

8    reasonable for the value of a man's life and for the pain and

9    anguish he knows as he dies with police officers on top of him

10   saying, "I'm not resisting.  I can't breathe."

11        THE COURT:  If you would, Ms. Washington, please swear

12   our court security officer.

13        (Courtroom security officer sworn.)

14        THE COURT:  I'm going to hand the court security

15   officer the jury instructions and the verdict forms.

16        And you have a fan.  I'm informed that you have a fan.

17   Ladies and gentlemen, if you have any questions during the

18   deliberations which pertain to the evidence, the instructions or

19   the verdicts, please write them out and give them to the court

20   security officer.  I mentioned yesterday that when you received

21   the case, which is now, we're on your timetable.  You decide how

22   long you wish to deliberate today.  You may inform the court

23   security officer.  And we'll check in with you periodically.

24   The same is true for any deliberations that are conducted after

25   today.  We're on your timetable at this point.

1          So it is now five till four.  With that, we will stand in

2     recess while the jury deliberates.

3          (Jury out at 3:56 p.m.)

4              THE COURT:  We are on the record with counsel and the

5     parties outside the presence of the jury.

6          Counsel, I will say, if you would, please provide

7     information to Ms. Washington for how we can reach you.  If we

8     have a jury question or a jury note, we will call you.  We will

9     not take up the note until we all convene back here in the

10    courtroom.  If we find out that we have a verdict, we will also

11    contact you.  And we won't come back in the courtroom until

12    everyone is present who wishes to be present.  Counsel, check

13    with your clients as to who wishes to be here.  As we hear

14    information from them, we will let you know.  Close to

15    five o'clock, we'll probably see if they wish to order dinner.

16             MR. ELLIS:  I didn't hear you.

17             THE COURT:  Close to five o'clock, we'll probably see

18    if they wish to order dinner, as an indication of whether they

19    want to continue to deliberate this evening.  I'm a judge who

20    believes if they want to go until ten o'clock, I'll be here

21    until ten o'clock.  That's my preference.  I will say, with

22    that, I've rarely had juries who wish to do that.  You know,

23    usually they want to go and take care of families and other

24    things and come back in the morning.  But I defer to them.  And

25    I'm here as long as they wish to be here.  And we'll reach out

1   to you.  So leave a number where you are going to be.  I would

2   ask that you stay within a reasonable distance.  I tried cases

3   for 16 years, and I think I only had one jury note in 16 years.

4   But every case I tried as a judge, I've had at least one jury

5   note.  So if you will stay close by so we can take up those

6   promptly so they can continue their deliberations, that would be

7   appreciated.

8        Exhibits, they have not gone back yet.  So y'all need to

9   get together on exhibits.  I need a statement from both counsel

10  on the record that you have looked through them and that the

11  stack that you hand to Ms. Washington is the stack that you've

12  agreed upon can go back into the jury room, if you will take

13  care of that.  If there are any questions about that or if I

14  need to come back out to resolve any disputes about that, I'm

15  happy to.  But otherwise, take that up with Ms. Washington.

16  Make sure you both are present.  Make a statement on the record

17  and hand her what you've agreed upon can go back in the jury

18  deliberation room.

19       Is there anything we need to take up, counsel for the

20  plaintiff?

21            MR. SWINDOLL:  Not on the plaintiff's behalf, Your

22  Honor.

23            THE COURT:  Counsel for defense?

24            MR. ELLIS:  Not for the defendant.

25            THE COURT:  All right.  With that, we will stand in

1    recess as well until we have something new to report.

2            MS. KOSTELNIK:  All the plaintiff's exhibits are there

3    to go back to the jury.

4            MR. ELLIS:  Defendants' 1 and Defendants' 2 are our

5    only exhibits, and both of them have been given to the courtroom

6    deputy.

7            MS. KOSTELNIK:  I have reviewed the defendants'

8    exhibits and approved them.

9            MR. ELLIS:  I have too.

10        (Proceedings continuing at 4:47 p.m.; jury not present.)

11            THE COURT:  We are back on the record in the presence

12    of counsel and the parties outside the presence of the jury.

13    "We were handed a note.  And the note, I will read it for

14    counsel.  Then you may come and inspect it if you wish.  We will

15    be leaving today, January 29, at 5 p.m.  We will regroup

16    tomorrow, January 30th, at 9 a.m.  Thank you."  It is signed by

17    ██████████████, who is the foreperson, representative

18    foreperson.  You may see it if you wish.  We're going to put the

19    jury in the box.  I'm going to excuse them for the day.  They

20    are ready to do that now.  I will give them the recess

21    instruction.

22        Are we ready to put them in the box, counsel for the

23    plaintiff?

24            MR. SWINDOLL:  Yes, Your Honor.

25            THE COURT:  Counsel for defense?

1           MR. ELLIS:  Yes.

2       (Jury present.)

3           THE COURT:  Ladies and gentlemen of the jury, I was

4   handed the note by the court security officer.  And I've made

5   counsel and the parties aware of your intent to return tomorrow

6   at nine.  We will stand in recess until nine o'clock tomorrow

7   morning.  We will convene back in here and then take a recess

8   for you all to deliberate.  So if you all would, be here a

9   little bit before nine to be able to convene.  We'll get you

10  back there as soon as we can.

11      During this recess and every other recess, do not discuss

12  this case among yourselves or with anyone else, including your

13  family and friends.  Do not allow anyone to discuss the case

14  with you or within your hearing.  Do not discuss also means do

15  not email, send text messages, blog or engage in any other form

16  of written, oral or electronic communication, as I instructed

17  you before.  Do not read any newspaper or other written account,

18  watch any televised account or listen to any radio program on

19  the subject of this trial.  Do not conduct any Internet research

20  or consult with any other sources about this case, the people

21  involved in the case or its general subject matter.

22      You must keep your mind open and free of outside

23  information.  Only in this way will you be able to decide the

24  case fairly based solely on the evidence and my instructions on

25  the law.  If you decide this case on anything else, you will

1    have done an injustice.  It's very important that you follow

2    these instructions.  I may not repeat these things to you before

3    every recess, but keep them in mind throughout the trial.  I

4    will add the admonition that it's very important that you

5    deliberate as a group and that you deliberate in the jury room.

6    So while you are on this recess, don't talk among one another

7    without the whole group being present in that jury room.  That's

8    the way the process is intended to work.  So with that, have a

9    good evening.  We'll see you tomorrow morning at nine o'clock.

10          (Jury exits courtroom.)

11          THE COURT:  We're on the record with counsel and the

12    parties outside the presence of the jury.  Is there anything we

13    need to take up, counsel for the plaintiff?

14          MR. SWINDOLL:  No, Your Honor.

15          THE COURT:  Counsel for the defense?

16          MR. ELLIS:  No, ma'am.

17          THE COURT:  All right.  With that, we will stand in

18    recess until nine o'clock, when we will be back in here.  We'll

19    put the jury back in the box and recess for them to deliberate.

20    If either party wishes to review the note, I'll hand it to Ms.

21    Washington.  We keep all of these and put them in the file for

22    this case.  Have a good evening.
            (Overnight recess at 4:51 p.m.)
                    REPORTER'S CERTIFICATE
23        I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.
24    /s/Elaine Hinson, RMR, CRR, CCR        Date:  November 16, 2015.
25    United States Court Reporter

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter