IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 17 2016

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

ROBIN BABOVEC, As Special Administratrix
of the Estate of Casey Babovec, Deceased

PLAINTIFF

vs.                    NO. 4:13CV0699KGB

DEPUTY AND OFFICERS MIKE RICHARDS
TONYA PARKER, CALVIN REED, SAM
GRIFFIN, DION MCGUIRE, RYAN MCKINLEY,
DAVID FENTON, JAMES PAYNE, NANCY
SHELLNUT, BRUCE PENNINGTON,
JOHN and JANE DOES I-V, COUNTY OF SALINE            DEFENDANTS

## AFFIDAVIT OF MICHAEL LYMAN

My expert witness report consisting of 32 pages is attached and is

hereby submitted under oath.

**FURTHER THE AFFIANT SAITH NOT.**

MICHAEL LYMAN
Date: 1-6-15

STATE OF ~~ARKANSAS~~ Missouri

COUNTY OF ~~PULASKI~~ Boone

**SUBSCRIBED AND SWORN TO** before me, a Notary Public, on this
the 6th day of January, 2015.

NOTARY PUBLIC

TESSA R. WACKER
Notary Public - Notary Seal
State of Missouri
County of Boone
My Commission Expires December 7, 2015
Commission #11276619

My Commission Expires: 12/7/15

Michael D. Lyman, Ph.D.
2704 Range Arbor D   • Columbia MO , 65203 • (573) 999-1472

# EXPERT REPORT OF MICHAEL D. LYMAN, PH.D.

*Re: Robin Babovec, A Special Administratrix of Estate of Casey Babovec vs. Deputy and Officers Mike Richards, et. al. Case No. 6300-13-680-3 in the Circuit Court of Saline County, Arkansas*

August 29, 2014

## Introduction

The opinions set forth in this report are based on my analysis of documents and testimony provided to me in this case and as informed by my formal training, education, independent research, and experience gained over a collective 40 years as a law enforcement agent, criminal investigator, police trainer and educator.

I have been a college professor teaching and researching in the area of policing for 27 years. I have also authored numerous articles and books dealing with different aspects of police operations for the last 27 years. In the latter capacity, I have become nationally recognized in the areas of police procedure, criminal investigation, drug enforcement and related areas. Prior to becoming an educator, I was a certified generalist police instructor for three years, training police officers and police officer candidates in various police techniques and procedures.

Before entering the field of higher education, I was employed as a criminal investigator working in both Kansas and Oklahoma for a collective period of eleven years. In that capacity, I conducted criminal investigations, made misdemeanor and felony arrests, conducted interviews of suspects, testified in state and federal criminal courts and had considerable experience in the development of police policy and procedure.

## Qualifications

My formal education includes an undergraduate and master's degree from Wichita State University in the Administration of Justice. In 1992, I received a Ph.D. from the University of Missouri-Columbia in Higher and Adult Education. My previous police training includes basic police academies certified through the Council on Law Enforcement Education Training (CLEET) in Oklahoma City, Oklahoma, and the Kansas Law Enforcement Training Academy in Hutchinson, Kansas (KLETA).

During my years as a criminal investigator, I accumulated in excess of 2000 hours of formal, in-service, police training. This training was sponsored by organizations which include the Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), the United States Customs Service, and numerous state and local law-enforcement organizations. Training included firearms qualification, shoot-don't shoot scenarios, practical simulations involving felony arrests, search and seizure, interview and interrogation, vehicles stops, building searches and crisis intervention.

I served for three years as a full-time, certified police instructor employed by the Law Enforcement Training Institute in Columbia, Missouri. I held generalist certification issued by the Missouri Department of Public Safety and in that capacity was awarded Police Instructor of the Year in 1989. As a police instructor I trained literally thousands of law enforcement officers serving in all levels of professional law enforcement. As a police trainer, I have taught by lecturing as well as by utilizing computer-based simulations, videos and professional writings by law enforcement officers in the field. My 27-year publishing record has also contributed greatly to my understanding of police procedures and I have brought much of that research into the police training environment.

I am currently employed as a tenured faculty member of the Columbia College Department of Criminal Justice and Human Services, Missouri, and have been on the faculty since August 1989. My rank is that of Full Professor. I also serve as the departmental Liaison for Graduate Studies for the Master of Science in Criminal Justice degree program and the Director of the Bachelor of Science in Forensic Science Program.

Between August 1989 and November 2000, I served as the department chairman overseeing a faculty of seven in a department representing over 250 criminal justice majors. Between 1985 and

1994 I was a Visiting Professor for the University of Oklahoma teaching on a part-time basis during the summer and winter intercessions. In 1985 and 1986 I taught graduate classes at the University of Central Oklahoma.

Since 1987, I have authored seven books dealing with various areas of policing. These have been published by both nationally and internationally recognized publishing houses which include Prentice Hall (Upper Saddle River, NJ), Anderson Publishing (Cincinnati, OH), CRC Press (Boca Raton, FL), and Charles Thomas Publishing (Springfield, IL). The research required for these books necessitates a close working relationship with law-enforcement officers on local, state, and federal levels as well as a working knowledge of the available literature on policing.

My investigative experience includes an appointment as a criminal investigator assigned to the Special Services Division of the Kansas Bureau of Investigation. This unit functioned as the special investigations unit for the State of Kansas and its members are involved in criminal investigations involving drug trafficking, organized crime and related offenses.

I have also been employed as a Senior Agent in Oklahoma, assigned to the Enforcement Division and the Intelligence Division of the Oklahoma Bureau of Narcotics and Dangerous Drugs Control (OBNDDC). In each of these units my responsibilities were to conduct intelligence, criminal and internal affairs investigations. In this capacity I also served on numerous hiring, shooting and disciplinary boards. While employed with the OBNDDC, I wrote the Standard Operating Procedure Manual for Conducting Wire Taps for the Bureau.

My responsibilities in both Kansas and Oklahoma required me to conduct criminal investigations, internal affairs investigations, assist in the establishment of agency policy and procedures in numerous areas, provide training, work closely with other law enforcement agencies on all levels and work closely with other public safety organizations as they related to my duties.

I currently maintain professional affiliations with The Academy of Criminal Justice Sciences (ACJS); the American Society of Criminology (ASC); the Textbook Author's Association; the Police Executive Research Forum (PERF); the International Association of Chief's of Police (IACP); the American Academy of Forensic Science (AAFS); the International Association for the Study of Organized Crime (IASOC) and the American College of Forensic Examiners International (ACFEI).

The documents and testimony from this case, upon which my opinions are based, include police reports, photographs, statements, court records, videos, professional articles and policy-based research in the area of police procedure.

The information that I have reviewed and considered in this case is the type of information that I, and others in my field, reasonably rely upon in examining, analyzing, and determining causation, as well as rendering opinions on proper police conduct. The body of knowledge that I have reviewed over the years includes texts, research, journals, periodicals and other publications, along with my personal research, experience, training, interaction with colleagues, discussions, interviews and training with law enforcement officers, police supervisors and command staff, as well as my academic studies, teachings and nationally-recognized, peer-reviewed research all form the foundation for my opinions. As a result, my opinions, and basis for my opinions, are provided with a reasonable degree of law enforcement and police certainty.

### Facts & Background

I have been asked by the law firm of Law Office of James F. Swindoll to review the case of *Babovec vs. Richards, et. al.* and render independent professional opinions. The following is my written report regarding the above referenced case as of the date of this report. My opinions are based on the documents provided to me in this case to date as well as my training, education, experience and research in the field of policing. I realize that the discovery process is ongoing in this case and reserve the right to amend or modify my opinions based on additional information that is provided to me, including additional deposition testimony and/or documents.

On April 13, 2011, at approximately 12:23 p.m., Saline County Deputy Heath Edens was located at the east end substation when a white male citizen approached him and informed him that there was a Chevy blazer at the Arch Street Subway being driven by a white male who was "jumping all around and acting crazy."[1] The citizen stated that he was glad his kids were in school if this guy is driving and wanted Edens to check him out. The white male stated that Edens couldn't miss the vehicle because the driver's side of the vehicle was all dented up and had been damaged.

Edens observed the vehicle described by the white male as he was pulling out of the Subway parking lot traveling south on Arch Street. Edens saw the vehicle travel through the intersection of Arch and West Sawmill. The vehicle crossed the yellow centerline and made a wide right turn into the Shell station at Arch and West Sawmill. Edens initiated his overhead blue lights when he saw the vehicle cross the centerline. The vehicle, a white 2001 Chevrolet Blazer, eventually stopped inside a car wash stall.  According to Edens, the whole front driver's side of the vehicle was damaged.[2] It was later determined that the driver of the vehicle was Casey Babovec.

Edens stated that he walked up to the driver's window and saw Babovec. Edens explained the reason for the stop and noted that Babovec did not have his seatbelt on. Babovec was "jumping all around in his seat and could not complete sentences." Edens asked Babovec what he was on and Babovec replied "Nothing, just hungry." Babovec admitted to Edens that he did not have a driver's license. Edens noted that a passenger, Jack Henson, Jr. also accompanied Babovec.

Edens stated that he went back to his patrol car and had central dispatch run Babovec's information through ACIC. Edens was informed that Babovec's driver's license was suspended and that he was wanted on a weapons parole warrant.[3] Central also told Edens that the tags on the vehicle expired. Edens stated that he exited his patrol vehicle and noticed that Babovec was still jumping around within the driver's seat.[4] Edens ordered Babovec out of the vehicle and told him he was under arrest. According to Edens, for his own safety, he had his weapon out of the holster.

Babovec was handcuffed and was still "bouncing around." According to Edens, Babovec was not making any sense. Edens stated that he double locked the handcuffs and placed Babovec in the back of his patrol vehicle. It was at this point that Babovec stated that he had lost control of his bowel.

Edens told Henson that he was free to leave and to get his Subway sandwich only. Henson kept telling Edens that he wanted to take the keys to the vehicle and some other items. Edens told Henson no, only to get his sandwich and leave. Henson reached back into the vehicle and grabbed a pack of cigarettes, cash money, and a cell phone. Henson stated that the cell phone was his along with the money and cigarettes. Edens told Henson to leave.

---

[1] Edens' Case Narrative dated 4-14-2011, p. 4 of 5
[2] Edens' Case Narrative dated 4-14-2011, p. 4 of 5
[3] Edens' Case Narrative dated 4-14-2011, p. 4 of 5
[4] Edens' Case Narrative dated 4-14-2011, p. 4 of 5

Henson was on Arch Street, approximately 50 yards away from the Shell station when Edens heard Babovec yelling in the back of his patrol vehicle. Edens went to the door and Babovec stated that Henson was stealing his phone. Babovec further stated that the phone was his and he wanted Henson arrested. Edens called Henson back and asked him who the cell phone belonged to. Henson said it was Babovec's and that he was going to take it back to his wife. Edens told Henson that he had told him the phone belonged to him and that he was under arrest for theft of property. Note that at some point Deputy Dennis Sisco arrived at the scene to assist. Edens stated that Henson was handcuffed and placed in the back of Sisco's patrol vehicle. Edens then seized the cell phone and returned it to Babovec.

Edens reported that the vehicle was inventoried and towed by Weise Towing. Edens transported Babovec to the Saline County Jail and Sisco transported Henson. Edens stated that as he proceeded to the jail, Babovec was moving around in the back of the patrol vehicle unable to sit still. Babovec's speech was allegedly broken and he was wiping his face all over the back cage glass in Edens' vehicle.[5]

After arriving at the Saline County Jail, Edens again asked Babovec what type of drugs he had been ingesting. Babovec stated, "I told you that I was fucked up" and that "because me and my wife have been having problems."[6] Edens also stated that Babovec said, "I already told you what I have been doing." Edens stated that Babovec could not stand still and his eyes were red and bloodshot.[7] Edens read Babovec his implied consent rights and he said he understood the rights but would not take a blood test or any other test. Babovec also refused to initial or sign the rights form.

Babovec was charged with DWI 2nd, careless/prohibited driving, driving on suspended driver's license, expired tags, refused chemical/blood test and no seatbelt. Henson was charged with theft of property.

Edens transported Babovec to the Saline County Jail and Deputy Dennis Sisco transported Henson. According to Edens, while on the way to jail Babovec could not sit still, his speech was broken and he was wiping his face on the partition inside Edens' patrol car. Once in jail, Edens asked what type of narcotics he was on. Babovec again refused to tell Edens what he had ingested. Babovec arrived at Saline County Jail in Benton at approximately 1:29 p.m., and was placed into holding cell number one at the jail at approximately 2:06 p.m.

According to Deputy Nancy Shelnutt, Babovec had not caused any problems while in holding cell #1 until approximately 4:45 p.m., at about that time, he began to bang on the holding cell door and yell. Detainee Zachary Crockett stated that Babovec was banging on the cell door and wanted to change his pants.[8] Detainee Christy Nichols stated that Babovec "was telling officers that he was having a heart attack but the officers did not do anything to help Babovec.[9] He further stated that a female guard came to the cell on two occasions and told him to quit banging on the door or a Taser was going to be used on him.[10] Detainee Christy Nichols identified Shelnutt as the female guard.[11] It should be noted that Nichols also stated that Babovec told her that he had swallowed 2 grams of methamphetamine before he was arrested and that she informed the officers but no one did anything.[12]

Deputy Nancy Shelnutt and Corporal Tonya Parker went to the holding cell and told Babovec to settle down. Babovec stated that he had a bowel movement in his pants. Deputy Maguire and

---

[5] Edens' Case Narrative dated 4-14-2011, p. 4 of 5
[6] Edens' Case Narrative dated 4-14-2011, p. 5 of 5
[7] Edens' Case Narrative dated 4-14-2011, p. 5 of 5
[8] Statement by Zachary Crockett to Special Agent David Moss dated July 13, 2011
[9] Statement by C. Nichols to Special Agent Dexter Holmes dated April 14, 2011
[10] Statement by Zachary Crockett to Special Agent David Moss dated July 13, 2011
[11] Statement by C. Nichols to Special Agent Dexter Holmes dated April 14, 2011
[12] Statement by C. Nichols to Special Agent Dexter Holmes dated April 14, 2011

Sergeant Ryan McKinney escorted Babovec to the shower room and allowed him to clean up and change into a clean pair of pants.[13] McKinney reported that Babovec was compliant with McGuire's directives. McKinney also stated that while Babovec was changing clothes he made several statements about being high.[14] McKinney reported that Babovec" appeared to be under the influence of some kind of drug."[15] After changing his clothes, Babovec was then either placed on the bench in the holding area or placed back into holding cell #1.[16]

After returning to his cell, detainee Cliff Johnson who was seated on a concrete bench made a comment to Babovec about him urinating on himself. According to detainee Danny Rollans, "[Babovec] started a fight by slapping and then hitting [Johnson] because he thought [Johnson] was making fun of him."[17]

At that time, approximately 5:08 p.m., Babovec walked up to Johnson and began striking him using both hands on both sides of Johnson's head.[18] Johnson stated, "I asked out loud if he had urinated on himself...he then took both of his hands and hit me on both sides of my head."[19] Johnson then stood up off the bench and started to fight with Babovec.[20]

Deputy Dion McGuire was one of the first to respond to the incident. He stated that when he got to the cell door it was open and Babovec was standing just inside the door. McGuire stated that he reached in and grabbed Babovec by his shirt and pulled him from the cell.[21] According to McGuire, Babovec would not comply with his orders to get to the ground. Maguire stated that he then "escorted" Babovec to the ground. Once on the ground, McGuire used his body weight to hold Babovec to the ground.[22] The struggle continued with a number of jailers including Dion McGuire, Deputy Pruett, Corporal Sam Griffin, Deputies Nancy Shelnutt, Calvin Reed, David Fenton, Corporal Tonya Parker and James Payne.[23] During the course of the struggle, jailer Reed and Fenton both deployed Tasers on Babovec in the drive stun mode – both on Babovec's lower back.[24]

At approximately 5:09 p.m., numerous officers responded to the booking area. Included were Sergeant McKinney and Sergeant Michael Richards. Richard stated that the officers quickly had control of Babovec and that he "was on his stomach, handcuffed behind his back and breathing heavily."[25] Richards stated that he observed a large pool of liquid under Babovec and that the area smelled like urine. He further stated that several officers attempted to get Babovec on his feet but when they rolled him over into a seated position he was covered in urine and spitting up blood and saliva from his mouth.[26] Reed stated that he and Griffin placed handcuffs on Babovec.[27]

McKinney stated that when he arrived he noticed that Babovec had urinated on himself and was no longer resisting. McKinney stated that he assisted in moving Babovec from cell #1 to cell #5. McKinney noted that as Babovec was being moved, He "was apparently sleeping and snoring very loudly."[28]

---

[13] Officer report by Sergeant Ryan McKinley Dated April 14, 2011
[14] Officer report by Sergeant Ryan McKinley Dated April 14, 2011
[15] Officer report by Sergeant Ryan McKinley Dated April 14, 2011
[16] Interview of McKinley by Picket dated May 23, 2011
[17] Statement by Danny Rollans to Special Agent David Moss dated April 14, 2011
[18] Memo from Maguire to Pennington dated April 13, 2011; Statement by Danny Rollans to Special Agent David Moss dated April 14, 2011
[19] Statement by Cliff Johnson to Special Agent David Moss dated April 15, 2011
[20] Statement by Cliff Johnson to Special Agent David Moss dated April 15, 2011
[21] Memo from Maguire to Pennington dated April 13, 2011
[22] Memo from Maguire to Pennington dated April 13, 2011
[23] Memo by Griffin to Pennington Dated April 13, 2011
[24] Report by Shelnutt dated April 26, 2011; Interview of David Fenton by David Moss on July 18, 2011
[25] Report by Richards to Pennington dated April 14, 2011
[26] Report by Richards to Pennington dated April 14, 2011
[27] Interview of Reed by Moss dated May 18, 2011
[28] Officer report by Sergeant Ryan McKinley Dated April 14, 2011

At approximately 5:11 p.m., control was gained over Babovec and he was handcuffed behind his back. At approximately 5:12 p.m., Deputy Reed then "pushed" Babovec into holding cell #5, which was empty at the time.[29] After doing so, Babovec was unresponsive.[30] At approximately 5:17 p.m., Sergeant McKinney stated that he went to retrieve some leg shackles and when he returned to sell #5 he observed Corporal Tonya Parker attempting to feel for a pulse on Babovec. Parker informed McKinney that Babovec did not appear to be breathing. McKinney then contacted 911.

Deputy Nancy Shelnutt took the AED from McKinney and at approximately 5:18 p.m., hooked it up to Babovec and activated it. Deputy Pruett was conducting chest compressions and Deputy Reed was also assisting under the direction of the AED system.[31] Corporal Griffin, Corporal Parker and Deputy Shelnutt were also in the room assisting with counting compressions and assisting with the situation.

McKinney reported that at approximately 5:21 p.m., Babovec began vomiting and the officers thought he had been revived so he was placed on his side so the vomit could be removed from his mouth. Once the vomit was removed, the officers realized that Babovec, in fact, was not revived. CPR was then resumed. At approximately 5:25 p.m., paramedics arrived and took over the direction of the scene. At about 5:29 p.m., Babovec was placed on a stretcher and placed in the back of the ambulance.

It should be noted that two female detainees, Carol Voiles and Christie Nichols, who were present at the jail at the time of the incident involving Babovec provided statements regarding what they observed. For example, Carol Voiles stated that she observed Babovec removed from his cell for the purpose of changing his pants and then returned to his cell. She also stated however that she heard Babovec call out from his cell, "I can't breathe." She stated that she also observed numerous jailers remove him from his cell and position themselves on top of Babovec as he called out, "I'm not resisting. I can't breathe." Voiles further stated that she observed jailers repeatedly striking Babovec and then once he became unresponsive, she overheard the jailers laughing at the fact that he defecated on himself.[32]

Another detainee, Christy Nichols, Also stated that she witnessed the incident involving Babovec. She stated that she had walked to the front of the jail to get some cold water out of the fountain when she heard Babovec beating on a cell door stating that he was having a heart attack and that he needed help. She said that the jailers yelled back at him to stop beating on the door but did not assist him. Nichols further stated that after Babovec changed his pants. He was seated next to her and informed her that the jailers were refusing to help him. Nichols also stated that after the altercation began, she observed what took place by looking at the TV monitors in the room. Nichols stated that following the altercation and after Babovec had become unresponsive, she saw Sergeant Richards standing over him laughing at the fact that he urinated on himself. She said when the guards got off of him she had an impression that Babovec was dead.[33]

According to the record, CPR was administered on Babovec after jail staff determined that he was in need of medical assistance. An ambulance was called and Babovec was transported to Saline Memorial Hospital in Benton and was pronounced dead at approximately 5:58 p.m.

According to the state medical examiner's office, the stomach contents of Babovec included two fragments of plastic that were both tied in overhand knots. Amphetamine, diazepam and methamphetamine, were all present in Babovec's blood according to a toxicology report included with the autopsy report. The medical examiner's office concluded that Babovec's cause of death

---

[29] Handwritten statement by T. Parker dated May 16, 2011
[30] Report by Shelnutt dated April 26, 2011
[31] Officer report by Sergeant Ryan McKinley Dated April 14, 2011
[32] Statement by Carol Ann Voiles dated March 26, 2013
[33] Statement by Christy Nichols dated March 26, 2013

was methamphetamine intoxication but contributing factors included "struggle, restraint and exertion."[34]

## Opinions: Basis and Reasoning

All of my opinions are stated within a reasonable degree of certainty within my field. My opinions and the basis for my opinions are based on the totality of my specialized knowledge, skill, education, research, literature, training and information I have reviewed. My opinions and basis for my opinions are based on sufficient facts and data reviewed; are the product of reliable law enforcement principles and methods; and I have applied these law enforcement principles and methods reliably to the facts and circumstances of this case.

There is a body of knowledge and literature about the practice and standards to which modern, professionally administered police agencies should adhere. These standards and accepted practices have evolved over time in the interest of fostering and maintaining police agencies that are professional, effective and whose practices and policies are observant of the law. The standards have evolved, in part, as a response to reported cases of police misconduct and as tools to limit police discretion and ensure that police behavior is within acceptable professional, legal and constitutional limits.

There is a substantial body of literature and knowledge regarding the types of causes of police misconduct. I am well familiar with and have contributed to the literature and body of knowledge regarding the types and causes of police misconduct. Within the broad range of criminal justice, my area of study and practical experience is and has been police misconduct and its relationship with police policy, procedure, training, and supervision and accountability mechanisms. I am currently an active member of the International Association of Chiefs of Police (IACP), Academy of Criminal Justice Sciences (ACJS) the American Society of Criminology (ASC) and the American College of Forensic Examiners International (ACFEI).

## Discussion and Opinions

I have been asked to review this case with regard to the actions of defendant officers and consider the extent their actions and behaviors were proper and consistent with nationally recognized standards of care. Specifically, at issue in this case is the failure on the part of Deputy Edens and jailers to provide medical attention for Babovec as well as what appears to be an excessive use of force against him by Officers at the jail.

It appears as though from the time Babovec was first encountered by Edens and arrested, his actions and behaviors were such that it was obvious that he was under the influence of drugs and was experiencing a negative physiological reaction. This was evidence both on the street and observed by Edens as well as observed by numerous jail employees after Babovec arrived at the jail. At no time, either on the street or after his initial delivery to the Saline County Jail, was emergency medical assistance called to help Mr. Babovec.

It also appears as though a fight occurred between Babovec and Cliff Johnson while they were in Cell #1. When officers responded, they grabbed Babovec and removed him from Cell #1. Once outside the cell an altercation ensued where between 6-7 detention officers collectively forced Babovec to the floor and in one fashion or another placed weight on him while applying handcuffs. Once handcuffed, Babovec was placed in Cell #5 and, at least initially, left alone in a face down, prone position where he was observed as being unresponsive and "snoring." It was then that he was either sat up or rolled over and CPR and other emergency procedures were administered.

---

[34] Arkansas State Crime Laboratory Medical Examiner Division: Conclusions report dated April 14, 2011 by Daniel W. Dye, M.D. Associate Medical Examiner, Pathologist of Record.

The state medical examiner's office, reported that the stomach contents of Mr. Babovec included two fragments of plastic that were both tied in overhand knots. Amphetamine, diazepam and methamphetamine were all present in Babovec's blood according to a toxicology report included with the autopsy report. The medical examiner's office concluded that Babovec's cause of death was methamphetamine intoxication but contributory factors included "struggle, restraint and exertion." The manner of death was identified as "undetermined."[35]

**I. Based on evidence in this case, Saline County Detention Center Deputies Mike Richards, Tonya Parker, Calvin Reed, Sam Griffin, Dion McGuire, Ryan McKinley, David Fenton, James Payne and Nancy Shelnutt ignored their duty to protect Casey Babovec by failing to provide emergency medical attention for him on a timely basis after realizing that he was experiencing a medical emergency.**

It is a concern that detention officers present at the Saline County Jail after Babovec was booked in the jail, were aware that he was under the influence of drugs and was in need of immediate medical attention. Based on statements by detention officers who were present when Babovec was first booked into the jail, he [Babovec] was clearly displaying signs that he was under the influence of drugs and was severely impaired.

The standards of care for dealing with prisoners who exhibit signs of an emergency medical condition has been addressed by the International Association of Chiefs of Police. They state for example,

> "Death while in custody is often a function of injuries and/or illnesses sustained prior to or during arrest coupled with inadequate screening of prisoners and/or failure to seek appropriate medical treatment in a timely fashion."[36]

And,

> "…officers should be aware of physical reactions by keeping close watch over prisoners following arrest…All prisoner complaints of serious injury or physical problems should be taken seriously, and medical aid summoned immediately."[37]

The IACP also states,

> "…in any case where death is not absolutely unmistakable, emergency medical personnel (if not already present) should be summoned to the scene immediately. Any doubt as to life or death can only be resolved by summoning medical assistance…Pending the arrival of emergency medical personnel, first-aid measures should be taken in accordance with departmental policy, the training of the officers present, and the circumstances of the case."[38]

The case record shows that detention officers and supervisors within the Saline County Jail were aware that Babovec was under the influence of drugs, was grossly impaired and was experiencing a medical emergency. Numerous detention officers acknowledged this. For example, based on statements by detention officers not only was Babovec known to be severely impaired on drugs but was also in need of immediate medical attention, which was not provided. Statements by officers and witnesses include,

---

[35] Arkansas State Crime Laboratory Medical Examiner Division: Conclusions report dated April 14, 2011 by Daniel W. Dye, M.D. Associate Medical Examiner, Pathologist of Record.
[36] The International Association of Chiefs of Police Concepts and Issues Paper: Lockups and Holding Facilities, dated October 1996, p. 4
[37] The International Association of Chiefs of Police Concepts and Issues Paper: Transportation of Prisoners (Prisoner Well-being), dated October 1996, p. 13
[38] The International Association of Chiefs of Police Concepts and Issues Paper: Preliminary Death Investigation (Administer First aid and Summon Medical Assistance), dated December 1997, p. 2

Sergeant Ryan McKinney: McKinney was a supervisor in the jail and assisted Deputy McGuire in escorting Babovec to the shower room so he could clean himself off after defecating on himself. McKinney was aware at the time that Babovec had defecated on himself which is evidence of a physical problem. This was combined with McKinney's knowledge that Babovec had been "fidgety and jumpy."[39] Babovec also had made "several statements about being high."[40] McKinney also stated, "Babovec appeared to be under the influence of some kind of drug, apparently an upper, but didn't seem to be dangerously high or violent."[41]

McKinney was clearly aware that Babovec was experiencing a drug-related health crisis. Instead of calling an ambulance or otherwise making arrangements for him to receive emergency medical attention, McKinney stated that he "returned to his desk..."[42]

Corporal Sam Griffin: Griffin stated that at about 1:30 p.m., Edens brought Babovec to the detention center. He stated that Babovec was "jittery" and was unable to stand still while being patted down. Based on Griffin's report, he was aware that Babovec had defecated on himself and was in need of a change of clothes. Based on Griffin's statements, he was clearly aware that Babovec was experiencing some kind of negative reaction from drugs. Nowhere in Griffin's statement does he state that he made any attempt to seek emergency medical attention for Babovec.

Corporal Tonya Parker: Parker was present at the jail at the time of the altercation with Mr. Babovec. She also participated in the struggle with him and restraining him. Parker stated that after Babovec was placed in a holding cell, he began yelling and knocking on the door. She further said that she and deputy Shelnutt went to the holding cell and told Babovec to settle down. At that point, Babovec informed her that he had defecated in his pants. Parker's statement is concerning because even prior to the altercation, she was aware that he had defecated on himself which is an indicator that he was experiencing some sort of physiological problem. Moreover, Parker's statement is consistent with statements made by witnesses Carol Ann Voiles and Christie Nichols who stated that Babovec was banging on the door stating that he was having a heart attack. If it is to be believed that Parker heard Babovec stating that he was having a heart attack but failed to provide him immediate emergency medical attention, her failure to do so in a timely fashion was improper.

Deputy Dion McGuire: Based on McGuire's statement, he was aware that Babovec was "acting very strange, as to be on some type of stimulant"[43] and that he had defecated on himself and was under the influence of drugs or alcohol. McGuire's statements are evidence that he was aware not only that Babovec was under the influence of drugs or alcohol and was experiencing a negative drug reaction by virtue of him defecating on himself. McGuire should have summoned emergency medical assistance for Babovec upon realizing that he was possibly under the influence of a stimulant.

Deputy Nancy Shelnutt: Shelnutt stated that Babovec was "extremely hyper" when he was brought to the detention center.[44] She stated that Babovec was unable to concentrate on the questions he was being asked. Shelnutt was also aware that Babovec"...had a bowel movement in his pants."[45] This statement is consistent with those given by other officers present at the detention center in that it was know that Babovec was not only known to be under the influence of drugs but was known to be experiencing a negative or adverse reaction to them. In spite of this, no emergency medical assistance was called for Babovec before he became unresponsive. A reasonable officer would know that a person in custody who is acting under the

---

[39] McKinley's Officer Report dated 4-14-11
[40] McKinley's Officer Report dated 4-14-11
[41] McKinley's Officer Report dated 4-14-11
[42] McKinley's Officer Report dated 4-14-11
[43] McGuire's statement to Special Agent Joe Pickett dated April 18, 2011
[44] Shelnutt's statement to Special Agent Joe Pickett dated May 16, 2011
[45] Shelnutt's statement to Special Agent Joe Pickett dated May 16, 2011

influence of drugs and who has soiled their pants is most likely experiencing a negative drug reaction that might be life-threatening and that emergency medical assistance should be notified immediately. This did not happen in this case on a timely basis.

Witness Christy Nichols: Nichols stated that she was in the jail on April 13, 2011. Sometime between 5:00 and 5:30 p.m. she saw Casey Babovec. She said that she was in isolation and she went up to the front for her hour out – mainly to get some cold water out of the fountain. She said there was a guy beating on the cell door saying that he was having a heart attack and that he needed help. She said the jailers were yelling back at him to stop beating on the door.

She further said that she could tell something was wrong with Babovec because she knew that he had been "tweaking on dope." She said Officer Maguire was standing right there next to her and Babovec. She said Maguire was playing games with Babovec by telling him that he couldn't stay still for even 30 seconds.

She said he was put back in the cell and she could hear him on the floor speaking under the door saying that he was holding his chest and that he needed help because he was having a heart attack. She said the jailers yelled back, "That's what you get for doing meth."

Nichols said the jailers opened Babovec's cell door and just started tasing him. She stated that she watched what happened through the television monitors and that Babovec lost his bowels again and at that point he became unresponsive. She said the jailers were saying terrible things to him. For example, she said Sergeant Richards was standing over him and saying, "Oh, looks like the little boy peed on himself." She said the guards continued to punch him. She heard Babovec say that he couldn't breathe, that he was having a heart attack and that he needed help. He was also calling out that he was not resisting. She said when the guards got off of him she had the impression that Babovec was dead.[46]

Evidence provided by the video: The video provided to me in this case of Mr. Babovec after he was delivered into Cell #5 (1-12) shows Babovec being dragged into the cell and placed face down while handcuffed. For a period of approximately 2-3 minutes the video shows numerous officers entering the cell and leaning over while looking closely at Babovec and essentially standing in the cell doing nothing to provide him CPR or any life-saving measures. As the video progresses, CPR is eventually started and EMS personnel arrive and are seen assisting Babovec. Based on the video, however, it is clear that upon his initial placement into Cell #5, defendant officers are either unconcerned about Mr. Babovec's well-being or they are at a loss of what to do to help him. This suggests that they are either completely indifferent to Mr. Babovec's safety or not properly trained regarding the administration of CPR.

Not only do these statements make it clear that it was obvious that Mr. Babovec was experiencing a medical emergency by virtue of ingesting drugs but that at least five detention officers were aware of the situation and did nothing. Moreover, and even more concerning, is the evidence that of the officers who were aware of Babovec's condition, two held the position of corporal and one was a sergeant.

Law enforcement officers have a duty to protect the well-being of those who are in their custody. Furthermore, professional law enforcement officers are trained to observe when a subject is under the influence of drugs and who might be in the process of experiencing an overdose. This is especially critical when the subject is impaired to the point of being in harm's way and in need of emergency medical attention. This is supported by the IACP which states,

> "...holding facilities are not intended for or equipped to handle arrestees who require immediate or sustained medical attention. Therefore, no one should be booked into a lockup or holding facility or held for interrogation or related purposes if he (1) exhibits

---

[46] Statement by Christy Nichols dated March 26, 2013

injury or illness that reasonably appears to require medical attention (2) requests medical attention for a serious or potentially serious condition that appears to require immediate medical attention—whether or not that condition can be verified by agency personnel—(3) suffers from apparent extreme alcohol intoxication, drug overdose, or severe mental disorder or (4) has talked about committing suicide or exhibited other signs of being a suicide risk."[47]

In this case, Mr. Babovec should never have been booked into the Saline County Jail. At the very extreme, once detention officers observed evidence of him experiencing a medical emergency (e.g., (1) his obvious impairment, (2) the fact that he defecated on himself, (3) his calling out through the cell door that he was having a heart attack), emergency medical assistance should have been provided to him on an immediate basis.

Even more concerning are statements by Christy Nichols who stated that Sergeant Richards stood over Babovec's body making disparaging remarks to him instead of providing him the medical assistance he needed.

This was the case with Mr. Babovec who was identified by numerous officers as being so grossly impaired that he defecated on himself and was unable to talk or otherwise act in a normal fashion. A reasonable officer would know that a subject who is grossly impaired on drugs and who verbalized to officers that he was having a heart attack and was in need immediate medical attention. Officers Richards, McKinney, Griffin, Reed, Fenton, Payne, Parker, McGuire and Shelnutt ignored their duty to protect Mr. Babovec by ignoring such evidence.

> *It is my opinion, stated with a reasonable degree of professional certainty, that Saline County Detention officers, including Officers Richards, McKinney, Reed, Fenton, Payne, Griffin, Parker, McGuire and Shelnutt, ignored their duty to protect the well-being of Casey Babovec by disregarding clear evidence that he was experiencing a medical emergency that required immediate medical attention. Had immediate medical attention been provided to Mr. Babovec at the time danger signs were first observed, it is likely that Mr. Babovec would be alive today.*

**II. Based on evidence in this case, Saline County Detention Center Officers Deputies Mike Richards, Tonya Parker, Calvin Reed, Sam Griffin, Dion McGuire, Ryan McKinley, David Fenton, James Payne and Nancy Shelnutt collectively used excessive and unreasonable force against Casey Babovec that resulted in his death while he was under arrest and in custody.**

It is concerning that, based on evidence in this case, defendant officers, including Saline County Detention Center Officers Deputies Mike Richards, Tonya Parker, Calvin Reed, Sam Griffin, Dion McGuire, Ryan McKinley, David Fenton, James Payne and Nancy Shelnutt used unnecessary, excessive and unreasonable force against Casey Babovec as they were attempting to place him into handcuffs. Specifically, there is evidence including officer statements, witness statements and the provided video of this incident that detention officers unreasonably placed excessive body weight on Babovec, unreasonably and improperly deployed Taser devices on Babovec and delivered numerous unnecessary hard-handed body strikes to him.

Nationally recognized standards and procedural guidelines are clear regarding the appropriateness of action by police officers with regard to use of force. For example:

***Constitutional standards: Use of force***: The standard of care for law enforcement use of force is identified in U.S. Supreme Court case *Graham v. Connor, 490 U.S. 396 (1989)*. This case established the "objectively reasonable" standard under the Fourth Amendment, which means

---

[47] The International Association of Chiefs of Police Concepts and Issues Paper: Lockups and Holding Facilities, dated October 1996, p. 4

that the reasonableness of an officer's use of force must be reasonable and judged "from the perspective of a reasonable officer at the scene." The professional literature in professional policing explains the term "objectively reasonable." For example,

> "This term means that, in determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of threat or resistance presented by the subject, and the danger to the community."[48]

The "reasonable man," or more accurately, reasonable officer standard identified in the Graham decision is an objective test. That is, it is not based on the intent or motivation of the officer or other subjective factors at the time of the incident. It is based solely on the objective circumstances of the event and the conclusion that would be drawn by any "reasonable officer at the scene."

This expert makes no claim to be an expert in constitutional law, but it should be noted that even the most basic police training includes instruction in case law and certain constitutional principles and how they relate to accepted police procedure. This type of instruction is consistent throughout the nation's police academies.

***Professional policing guidelines (IACP): Use of force***: In addition to the constitutional standards discussed above, professional literature in policing and police training guides address the appropriate use of force under different circumstances. One authoritative source of professional literature is the International Association of Chiefs of Police (IACP).

The IACP is the nation's largest professional policing organization with over 20,000 members in over 100 countries. In 1987, the IACP entered into a cooperative agreement with the U.S. Justice Department's Bureau of Justice Assistance to establish a National Law Enforcement Policy Center. The purpose of the center was to assist law enforcement administrators across the country in the task of developing law enforcement policies that reflect nationally recognized professional practices.

A publication from the IACP's national Law Enforcement Policy Center is the Use of Force Model Policy and Concepts and Issues Paper published in 2006. Included in that publication are the following:

> "Officers may use only that level of force that is objectively reasonable to bring an incident under control. Officers are authorized to use department-approved, non-deadly force techniques and issued equipment to (1) Protect the officer or others from physical harm; (2) restrain or subdue a resistant individual; and/or (3) Bring an unlawful situation safely and effectively under control.[49]

The IACP further states,

> "...police officers must have at their disposal a variety of equipment and techniques that will allow them to respond appropriately to resistant or dangerous individuals. These include, but are not limited to, skills in verbal persuasion, unarmed self-defense tactics, use of come-along holds, use of restraint and physical compliance measures, and use of departmentally approved non-deadly weapons such as pepper spray, the stun gun, PR-24, baton and related devices. Without these and other alternatives at their disposal, there is a greater likelihood that officers may employ tactics that are inappropriate or excessive or that serve to aggravate or escalate a confrontation."

---

[48] International Association of Chiefs of Police National Law Enforcement Policy Center (2006). Use of Force. February
[49] International Association of Chiefs of Police National Law Enforcement Policy Center (2006). Use of Force. February

The IACP further states,

> "Officers recognize that use of force includes a much wider range of non-consensual compliance techniques and devices. These less coercive but more common uses of force may range from command presence to hand control procedures such as a firm grip, escort or pain or pressure compliance holds, or the use of other more aggressive measures involving a stun gun, electronic control weapon (ECW), pepper spray, or other non-deadly force equipment or tactics."[50]

*International Association of Chiefs of Police*: National guidelines identifying appropriate police use of force are found in the International Association of Chiefs of Police (IACP) Use of Force Model Policy and Concepts and Issues Paper published in 1995. The IACP states for example:

> "The variety of coercive options available to police officers in a confrontational setting is generally referred to as the force continuum. Force options on this continuum, ranging from so-called verbal judo and command presence to the use of a deadly weapon, officers are expected to employ only the level of force that is objectively reasonable to gain control and compliance of suspects."[51]

The concept of "force continuum" or "escalation of force continuum" as identified by the IACP refers to a listing of steps in the escalation of force.  The use of force continua list alternatives in steps which are ordered chronologically (i.e. which should be attempted first, and if that does not work, which should be attempted next, and so forth). The levels of force listed below represent widely recognized levels of a use of force continuum.

1. Deadly Force: Firearms / Head strikes (highest)
2. Impact Weapons / Asp/ Batons
3. Hard Hand Control Tactics
4. Pepper Spray / Taser
5. Empty/soft Hand Control
6. Verbal Commands
7. Command Presence (lowest)

It is important to note an officer's escalation of force should comport with the escalation of resistance or threat posed by the subject. Police training and professional literature are consistent in that the continuum is not a ladder to be climbed. That is, an officer may enter a situation, which may escalate, de-escalate, remain unchanged, or fluctuate quickly. Escalation of force only deals with one of these conditions and officers must know when to deescalate as well as escalate their levels of force against a subject at the appropriate times.

The IACP Model Policy on Arrests cautions against positioning a subject during or after handcuffing so as to avoid asphyxiation or what has become known as "positional asphyxia." They state for example,

> "Studies have indicated that when a suspect is face down on his or her stomach, respiration is impaired, and the result may be "positional asphyxia" – in effect, the suspect dies of suffocation.  This potential is exacerbated in situations where the suspect is overweight, has exerted substantial energy in resisting arrest or in other ways prior to being restrained, and when the suspect has ingested alcohol and/or drugs to the event."[52]

---

[50] IACP Use of Force Concepts and Issues Paper, February 2006
[51] IACP Use of Force Concepts and Issues Paper, February 2006
[52] The International Association of Chiefs of Police, National Law Enforcement Policy Center, <u>Arrests: Concepts and Issues Paper</u>. February 2003.

Based on Griffin's statements, he was clearly aware that Babovec was on his stomach and was having pressure applied to him by numerous detention officers prior to his becoming unresponsive. Furthermore, Griffin was aware that after Babovec had been taken to holding cell #5, he was placed on his stomach once again. Griffin knew or should've known that Babovec should not have been placed on his stomach during the struggle and after he was taken to Holding Cell #5 because doing so would impair his ability to properly breathe. A reasonable officer would know this.

Deputy Dion McGuire: McGuire stated that after he removed Babovec from his cell and placed him on the ground, his [McGuire's] left arm was pinned under Babovec. McGuire further stated that after Babovec was on the ground, he [McGuire] "...continued to use my bodyweight to hold Babovec to the ground."[64] McGuire's statements are evidence that he was aware that Babovec was placed on his stomach and the weight of officers was placed on top of him. It was improper for McGuire to place weight on Babovec as he was being restrained realizing that excessive weight would restrict Babovec's ability to breathe. A reasonable officer would know this.

Deputy Michael Prewett: Prewett stated that at about 5:00 p.m. he was in Sergeant Richards' office and was informed that there was a problem in the booking area. He stated that he followed Richards to hold him so #5 and saw a white male laying face down on the floor of the cell.[65] Prewett's statement is concerning because it is further evidence that after being delivered to holding cell #5, Babovec was placed in a face down prone position on his stomach and left there. This is concerning because this occurred in the struggle where Mr. Babovec was restrained and after he became unresponsive. Furthermore, Prewett's statement is evidence that after being placed in holding cell #5, Babovec was not provided emergency medical assistance in a timely fashion and essentially left to his own devices on the floor – at least for a period of time. It is concerning that none of the officers present at the time Mr. Babovec went unresponsive, bothered to summon emergency medical assistance for him.

Deputy Calvin Reed: Deputy Reed was also present at the detention center struggle with Mr. Babovec. Reed stated that he observed at least five other jailers struggling to gain control of Babovec. Reed stated that he assisted them by applying different pressure points on Babovec's legs.

Witness Carol Ann Voiles: Voiles was in the jail at the time of the altercation with Babovec. In her statement she stated that officers pulled Babovec up out of his cell and she could hear Babovec yell, "I can't breathe." She said the jailers started to twist his arm and Babovec stated, "I'm not resisting. I can't breathe." She stated that it just progressed from there to where the jailers ended up all on top of Babovec, hitting him and tasing him on at least two occasions. She stated that at some point Babovec stop moving and the officers then dragged him into another cell. She stated that at that point, she was unable to see what was taking place in the other cell. She did say, however, that she could hear the officers laughing that Babovec have defecated on himself.[66]

These statements are instructive in that she observed numerous jailers on Babovec and that Babovec was unresponsive. This is evidence that the weight of the officers on Babovec was a contributing factor to Babovec's death. This is further supported by the medical examiner's determination that Babovec's cause of death was methamphetamine intoxication but contributing factors included "struggle, restraint and exertion."[67] A person in custody who was known to be under the influence of drugs and who is known to be experiencing a negative drug reaction and who has become unresponsive should've been provided immediate emergency medical assistance. A reasonable officer would know this. Based on Prewett's statement, this did not take place in a timely basis.

---

[64] McGuire's memo to Pennington dated April 13, 2011
[65] Prewett's statement to Special Agent David Moss dated May 16, 2011
[66] Statement by Carol Ann Voiles dated March 26, 2013
[67] Arkansas State Crime Laboratory Medical Examiner Division: Conclusions report dated April 14, 2011 by Daniel W. Dye, M.D. Associate Medical Examiner, Pathologist of Record.

Deputy David Fenton: Fenton was also involved in the altercation with Mr. Babovec. Fenton stated that after Babovec was taken to the floor, he [Fenton] deployed a Taser to Babovec's lower left back.[68] He stated that after Babovec was delivered to cell #5, he was observed not to be coherent.

Deputy Calvin Reed: Reed stated that he located the Taser on the floor and deployed a five second drive stun to Babovec's lower back.[69] He stated that he and Corporal Griffin were able to place handcuffs on Babovec.

Evidence provided by the video: According to the video provided in this case, at the time Mr. Babovec was removed from Cell #1, five (5) officers initially took him to the floor in the booking area. A sixth officer is seen over by the cell door and a seventh officer is seen rushing in from the bottom of the screen. As the struggle continues, it is apparent that most, if not all, 5-6 officers are positioned either on top of Babovec or are placing pressure/weight on parts of him. Approximately two minutes into the incident, two additional males wearing tan pants and maroon-colored shirts approach from the bottom of the screen. It is believed that these two persons were supervisors.

At about the 2:08 minute point in the video, the officers start to get off of Babovec who is seen laying face down in a prone position while handcuffed in the back. As this occurs, one additional detention officer (believed to be Reed) is seen on his hands and knees continuing to apply pressure on Babovec's back. Six detention officers are then seen standing around Babovec along with the two males wearing tan pants and maroon-colored shirts. At about the 3:25 minute point in the video, detention officers and one of the males wearing tan pants appear to be attempting to sit Babovec up. Babovec is then seen being dragged by Reed to another cell (cell #5) while the other officers follow. A janitorial employee is then seen entering the room from the bottom of the screen. He proceeds to mop the floor where Babovec was laying.

➢  *It is my opinion, stated with a reasonable degree of professional certainty, that Saline County Detention Center Officers Deputies Mike Richards, Tonya Parker, Calvin Reed, Sam Griffin, Dion McGuire, Ryan McKinley, David Fenton, James Payne and Nancy Shelnutt used unnecessary, excessive and unreasonable force against Casey Babovec while attempting to handcuff him after he was in their custody. The actions of defendant officers in this case were inconsistent with nationally recognized standards of care and professional practices and procedures and served no objectively reasonable purpose.*

**III. The excessive use of force against Casey Babovec by Saline County Detention Officers represents a gross failure to supervise by detention center supervisors.**

It is also concerning that numerous officers holding "rank" and having some supervisory responsibility not only participated in the altercation with Mr. Babovec but failed to properly intervene as Mr. Babovec was subjected to excessive force.

For example, the record shows that a minimum of 4 officers had rank at the time of the incident involving Mr. Babovec. This is significant because in law enforcement, officers with rank are those who have been identified as having some degree of leadership. In this case there were approximately 2 officers with the rank of corporal – Corporal Samuel Griffin, Corporal Tonya Parker, and at least 2 officers holding the rank of sergeant (a rank above that of corporal) – Sergeant Ryan McKinney and Sergeant Michael Richards.

When a person who is law enforcement custody dies there must be accountability. This is especially so in cases, such as this case, where an arrestee shows clear signs of impairment, defecates on himself and is heard yelling through his cell door that he is having a heart attack. In this case, Defendants Griffin, Parker, McKinley and Richards were aware of at least one, if not all

---

[68] Fenton's statement to Special Agent David Moss dated July 13, 2011
[69] Reed's statement to Special Agent David Moss dated May 16, 2011

of these signs, of a medical emergency. As such, they should have immediately summoned emergency medical personnel or had emergency medical personnel summoned – at the time these signs were first observed. This was not done. Instead, emergency medical personnel were not called until Mr. Babovec was unresponsive. This is a serious supervisory breach that could and should have been avoided through proper care and due diligence. Had either one of these "ranking" officers properly assumed their role as supervisor and called emergency medical personnel to assist Mr. Babovec, it is likely that he would have survived.

In a related concern, given the excessive levels of force used against Mr. Babovec, as described by detention officers, civilian witnesses and as portrayed by the provided photos and videos, there appears to be a serious lack of supervision with regard to the handcuffing of Mr. Babovec and the excessive force used to do so. Proper supervision would have resulted in supervisors ordering officers off of Babovec and thus allowing him to breathe. Instead, "ranking" officers either participated in the use of force against Mr. Babovec or at the very minimum, failed to halt the extensive force used against him. Had any one of the "ranking" officers involved in this incident properly asserted their authority and instructed detention officers to use less physical force against Mr. Babovec, it is likely that he would have survived the altercation.

➢ *It is my opinion, stated with a reasonable degree of professional certainty, that the failure on the part of defendant officers to provided timely medical assistance to Casey Babovec and their excessive and unreasonable use of force against him represents a clear failure to supervise. This is especially so considering at least four (4) of the officers present at the time of the altercation involving Babovec held supervisory rank.*

This concludes my report at this time.

**Fees and Previous Experience**

This report contains the opinions I am prepared to express at trial in this matter. My fees in this case are at the rate of $200 per hour and an initial retainer of $4000. I charge $2350 per day plus expenses for depositions and any work conducted out of town.

I have testified as an expert witness on 163 occasions including hearings, depositions and trials. Those that have occurred during the past four years are listed in Appendix #2.

Respectfully submitted,


Michael D. Lyman, Ph.D.
August 29, 2014

**APPENDIX #1 – MATERIALS REVIEWED**

1. Complaint
2. Arkansas State Police Summary of Investigation by Moss dated July 18, 2011
3. Special Agent's notes by Moss dated June 7, 2011
4. Special Agent's notes by Moss dated April 14, 2011
5. Crime scene search document by Pickett dated April 18, 2011
6. Diagram of Saline County Jail booking area
7. Diagram of holding cell #1
8. Diagram of holding cell #5
9. Rough sketch of jail (3)
10. Log of crime scene photos crime scene photos by Moss Dated April 18, 2011
11. Thumbnails of crime scene photos
12. Video of incident
13. Video of Nichols
14. Video of Voiles
15. Taser download documents
16. Officer report: McKinney
17. Timeline by McKinney
18. Description of subject/index form by McKinney
19. Interview of witness report by Pickett re: Michael McKinney
20. Handwritten report by McKinney
21. Edens' case narrative report
22. State of Arkansas notice of suspension report
23. DWI or refusal to submit to DUI form
24. Photocopies of citations
25. Interview of witness report by David Moss re: Edens
26. Handwritten statement by Edens
27. Report by Pickett re: Michael Richards
28. Handwritten statement by Michael Richards dated April 18, 2011
29. Interview of witness report by David Moss re: James Payne
30. Report by Griffin to Lieut. Pennington dated April 13, 2011
31. Interview a witness report by Joe Pickett re: Samuel Griffin
32. Handwritten statement by Samuel Griffin dated April 18, 2011
33. Report by Maguire to Lieut. Pennington dated April 13, 2011
34. Interview a witness report by Joe Pickett re: Dion McGuire
35. Handwritten statement by Dion Maguire dated April 18, 2011
36. Incident report by Michael Prewett dated April 13, 2011
37. Interview of witness report by David Moss re: Michael Prewett
38. Handwritten statement by Prewett dated May 16, 2011
39. Officer report by Cpl. Parker Dated April 13, 2011
40. Interview of witness report by Picket re: Tonya Parker
41. Handwritten statement by Tonya Parker
42. Interview of Witness by Picket re: Nancy Shelnutt
43. Handwritten statement by Nancy Shelnutt
44. Interview a witness report by Joe Pickett regarding Nancy Shelnutt
45. Handwritten statement by Shelnutt
46. Report by Deputy Anders
47. Interview of witness report by Joe Pickett regarding Karen Anders
48. Handwritten statement by Karen Anders dated May 16, 2011
49. Interview a witness report by David Moss regarding Deputy David Fenton
50. Handwritten statement by Fenton
51. Memo to Lieut. Pennington
52. Interview a witness report by David Moss regarding Deputy Dennis Sisco
53. Hand written report by Sisco
54. Interview a witness report by David Moss regarding Deputy Calvin Reed

55. Handwritten statement by Calvin Reed
56. Interview a witness report by David Moss regarding Deputy Chad Westbrook
57. Hand written statement by Westbrook
58. Interview a witness report by Joe Pickett regarding Jennifer Files
59. Interview a witness report by David Moss regarding Benjamin Barton
60. Handwritten statement by Benjamin Barton
61. Statement by Jack Hanson
62. Interview a witness report by David Moss regarding Jack Henson Junior
63. Handwritten statement by Jack Henson
64. Interview a witness report by David Moss regarding Danny Rollans
65. Handwritten statement by Danny Rollans
66. Interview of witness report by David Moss regarding Ronald Cottrell
67. Handwritten statement by Ronald Cottrell
68. Interview of witness report by David Moss regarding Steven Cottrell
69. Handwritten statement by Steven Cottrell
70. Interview of witness report by David Moss regarding Zaskaray Crockett
71. Handwritten statement by Crockett
72. Interview of witness report by Dexter Holmes regarding Scotty Dodson
73. Handwritten statement by Dodson
74. Interview of witness report by Dexter Holmes regarding Valentino Gomez
75. Interview of witness report by David Moss regarding Cliff Johnson
76. Handwritten statement by Johnson
77. Interview of witness report by David Moss regarding Aldo Lugo
78. Handwritten statement by Lugo
79. Interview of witness report by David Moss regarding Jay Whaley
80. Handwritten statement by Whalley
81. Interview of witness report by Dexter Holmes regarding Christie Nichols
82. Transcript of examination under oath of Christie Nichols dated March 26, 2013
83. Interview a witness report by Dr. Holmes regarding Carol Ann Voiles
84. Transcript of examination under oath of Carol Ann Voiles dated March 26, 2013
85. Crime Lab report
86. Prosecuting Attorney Letter
87. International Association of Chief's of Police (IACP), Use of Force: Model Policy, August, 2006
88. International Association of Chief's of Police (IACP), Use of Force: Concepts and Issues Paper: Originally published: February 1989; Revised: 2006
89. The International Association of Chiefs of Police, National Law Enforcement Policy Center, Arrests: Concepts and Issues Paper. February 2003.
90. IACP National Law Enforcement Policy Center, Arrests, Model Policy, January 2003
91. International Association of Chiefs of Police (IACP), National Law Enforcement Policy Center: Electronic Control Weapons Concepts and Issues Paper, dated January 2005
92. International Association of Chiefs of Police (IACP), National Law Enforcement Policy Center: Electronic Control Weapons Model Policy
93. IACP National Law Enforcement Policy Center. Standards of Conduct. Concepts and Issues Paper, October 1998
94. The International Association of Chiefs of Police Concepts and Issues Paper: Transportation of Prisoners (Prisoner Well-being), dated October 1996
95. The International Association of Chiefs of Police Concepts and Issues Paper: Preliminary Death Investigation (Administer First aid and Summon Medical Assistance), dated December 1997
96. The International Association of Chiefs of Police Concepts and Issues Paper: Lockups and Holding Facilities, dated October 1996
97. Graham v. Connor, 490 U.S. 396 (1989)

## APPENDIX #2 – EXPERT TESTIMONY

Depositions given in last four years:

1.  Joseph Alvarado vs. Oakland County, Oakland County Sheriff's Department and
    Deputy Mickey Simpkinson; Case No. 09-cv-14312; United States District Court Eastern
    District of Michigan Southern Division
        For Plaintiff
        Use of force
        Deposition: 9/10

2.  Daniel Thompson and Cathy A. Thompson vs. Wendell Hall et. al. Case No.: 3:08-cv-
    63/WS/MD in the United States District Court Northern District of Florida,
     Pensacola Division
        For Plaintiff
        Use of force/Internal affairs/Supervision
        Deposition: 1/11

3.  Patricia Hagans vs. Franklin County Sheriff's Office, et. al., Case No. 2:08-CV-850; In the
    United States District for the Southern District of Ohio Eastern Division
        For Plaintiff
        Use of force
        Deposition: 2/11

4.  Ueketta Jimerson v. Village of Skokie and Detective Will Zahn; 08 L 4824, Cook County
    Circuit Court
        For Defense
        Investigative procedures / eyewitness identification
        Deposition: 3/11

5.  Ronald L. Huntley v. City of Owasso, et. al. 10-CV-017 JMP-FHM; In the United States
    District Court for the Northern District of Oklahoma
        For Plaintiff
        Use of force
        Deposition: 4/11

6.  Lindquist v. Sheriff Grayson Robinson, et. al.; Civil Action No. 10-cv-02264-REB-MEH;
    In the United States District Court or the District of Colorado
        For Plaintiff
        Use of force
        Deposition: 7/11

7.  Jesse Dupris and Jeremy Reed v. United States of America, et. al. No. CV08-8132-PCT-
    PGR; CV08-8133-PCT-PGR; In United States District Court, District of Arizona
        For Plaintiff
        Investigative process/arrest
        Deposition: 7/11

8.  James I. Huebner v. Brad D. Ware, et. al., Case No. 09-CV-1295 IN the State of Wisconsin
    Circuit Court Branch 10, Dane County
        For Plaintiff
        Vehicle stops/Use of force
        Deposition: 9/11

9.  Katherine L. Russell vs. Christopher Davis, et al., Case No. 4:10-cv-2179; In The United
    States District Court For The Northern District Of Ohio Eastern Division
        For Plaintiff
        Vehicle stops/Pat down search
        Deposition: 11/11

10. Brandon v. Moore, et. al., Case No. 11-CV-178-CVE-TLW; United States District Court,
    Northern District of Oklahoma
        For Plaintiff
        Vehicle stops/Arrest/Use of Force
        Deposition: 11/11

11. David Lee Nall et. al., v. City of Painesville, et. al., 1:10 cv-02883 in the United States District
    Court for the Northern District of Ohio Eastern Division
        For Plaintiff
        Vehicle stops/Arrest/Use of Force
        Deposition: 11/11

12. Darryl Burton v. City of St. Louis, Missouri, et. al.; No. 4:10-CV-01540-TCM: In the United
    States District Court Eastern Division of Missouri, Eastern Missouri
        For Plaintiff
        Criminal Investigation/lineups/informants
        Deposition: 12/11

13. Laurie Peabody, et. al. vs. Perry Township, Ohio, et. al. Case No 2:10-cv-1078 In the United
    States District Court Southern Division of Ohio Eastern Division
        For Plaintiff
        Patrol stops; Taser; Use of force
        Deposition: 12/11

14. Galbreath v. Maser, et. al.; Case No: 0916-CV34709; In the Circuit Court of Jackson County,
    Missouri at Kansas City
        For Plaintiff
        Use of force
        Deposition: 1/12

15. Michelle Stogner v. Chris Sturdivant, et al. Civil Action No.: 10-Cv-125; In the United State
    District Court Middle District Of Louisiana
        For Plaintiff
        Use of force
        Deposition: 1/12

16. Rehberg V. Pueblo, Et Al, Civil Action No. 10-Cv-0261-LTB; In The United States District
    Court For The District Of Colorado
        For Plaintiff
        Arrest/Use of force
        Deposition: 2/12

17. Joseph M. Ramos Sr. as Administrator v. Jared White, Scott Brooks and the Town of
    Dartmouth; United States District Court for the District of Massachusetts;
    Civil Action No. 1:09 CV 11649 NG
        For Plaintiff
        Investigative stop/Use of deadly force
        Deposition: 3/12

18. Re: Paul O'Grady, et. al., v. City of Ballwin, MO et. al.; Case No. 4:10CV01707 in the United States District Court of Eastern District of Missouri, Eastern Division
    For Plaintiff
    Suicide response/foreseeability/involuntary commitment
    Deposition: 3/12

19. Russell Gregory III, in his capacity as Personal Representative of the Estate of Mary Fisher, and in his Capacity as Guardian of Ashley Keiko Gregory, a Minor, the heir of Mary Fisher, deceased, Russell Gregory, III vs. City of Memphis, Officer Patrick Taylor, No. 07-02445 SHM-sta; In the United States District Court for the Western Division of Tennessee at Memphis;
    For Plaintiff
    Suicide Police supervision; mental illness; traffic stops
    Deposition: 5/12

20. Valerie Walker, Personal Representative for Estate of Andre Walker v. Cumberland County Hospital System, Inc., et. al. In the General Court of Justice Superior Court Division NO 11 CVS 8357 (North Carolina)
    For Plaintiff
    Use of force
    Deposition: 6/12

21. Hale v. City of Martinsburg, et. al.; Civil Action No. 3:11-CV-78; United States District Court for the Northern District of West Virginia
    For Plaintiff
    Use of force
    Deposition: 9/12

22. John Boynton v. Jeff Wishard et. al., Case 2:10-cv-04179-NKL: In the United States District Court for the Western District of Missouri Central Division
    For Plaintiff
    Malicious prosecution
    Deposition: 9/12

23. Edith Lynn Marques, et. al. vs. Pima County Sheriff Clarence W. Dupnik, et. al. No. C2011 8159 in the Superior Court of the State of Arizona in and for the County of Pima
    For Plaintiff
    Pursuit
    Deposition: 12/12

24. Lisa Herrera as Personal Representative of the Estate of Rudolfo R. Lucero, Deceased, v. City of Roswell; Robert Smith; Eric Brackeen and John Meredith a/k/a Jon Meredith; Cause No. CIV-11-00848 CG/KBM; In the United States District Court of New Mexico
    For Plaintiff
    Use of Deadly Force
    Deposition: 1/13

25. Charles F. Foltz v. Jeff Wood et. al.; Case No. 2:11-CV-2252-PKH; in the United States District Court for the Western District of Arkansas Fort Smith Division
    For Plaintiff
    Arrest/Use of Force
    Deposition: 1/13

26. Re: John Harmon and Stephanie Harmon v. Hamilton County, Ohio, et. al. Case No. 1:10-cv-911; in the United States District Court Southern District of Ohio Western Division Cincinnati
 For Plaintiff
 Arrest/Use of Force
 Deposition: 3/13

27. Patrick Williams, etc., v. City of Midfield, Alabama, et. al., Civil Action No. CV-2010-900265; WCOP Matter, No.: 027318-0001
 For Plaintiff
 Police pursuit
 Deposition: 3/13

28. Jason Friday vs. Keli Theison, et. al. Case No. 1016-CV3792, Division 18 In the Circuit Court of Jackson County, Missouri at Kansas City.
 For Plaintiff
 Search and seizure / Deadly force
 Deposition: 3/13

29. Family Serv. Assoc. of Steubenville, Ohio, etc, et. al. v. Wells Township, et. al.; United States District Court, Southern District Case No. 2:12-CV-135
 For Plaintiff
 Investigative detention/Arrest/Safety of Arrestees
 Deposition: 5/13

30. Melissa Standifer v. Jacob Lacon, et. al., Case No. 1:11-Cv-0293 in The United States District Court For The Southern District Of Ohio Western Division
 For plaintiff
 Custody/Safety of Arrestees/nonconsensual committal
 Deposition: 5/13

31. Ladonna L. Sanders versus City of Grandview, Missouri; Case No: 4:12-CV-01069-GAF, in the United States District Court for the Western District of Missouri Western Division
 For plaintiff
 Arrest/Use of force
 Deposition: 7/13

32. Connie Berry, Individually and as Administrator of the Estate of Eric Berry, Plaintiff, v. Brandon Davis as individual et. al., Defendants; Case No. 12-2269 - in the United States District Court for the Western District of Arkansas
 For plaintiff
 Arrest/Use of force
 Deposition: 10/13

33. Ty Evans v. Frank Poston et. al., No. 1:07-CV-0592-DFH-JMS; In the United States District Court for the Southern District of Indiana
 For plaintiff
 Use of force
 Deposition: 11/13

34. Cause No. 2:13cv105; Elizabeth Lawson v. Marion County, Texas, et. al., In the United States District Court for the Eastern District of Texas – Marshall Division
 For plaintiff
 Use of force
 Deposition: 12/13

35. Brandon M. Cook v. Joe Peters, et. al., Case No. 13CV107GKF-FHM; In the United States
District Court for the Northern District of Oklahoma
      For plaintiff
      Use of force
      Deposition: 12/13

36. Estate of Patrick Burns v. Neil Williamson, et. al. Case No.: 3:11-cv-03020-SEM-BGC;
in the United States District Court for the Central District of Illinois Springfield Division
      For plaintiff
      Use of force
      Deposition: 4/14

37. Carolyn Chaudoin, Adm' x of Estate of Thomas E. Ferguson v. Larue Co., et. al., USDC,
Western District of KY at Louisville, Civil Action No. 3:13CV-472-CRS
      For plaintiff
      Use of deadly force
      Deposition: 5/14

Hearings in last four years:

1. State of Alaska vs. Alfred John Minder. Case No. 4FA-13-425 CR: In the District Court for the
State of Alaska Fourth Judicial District
      For defense
      Traffic Stop/Arrest
      Administrative Hearing: 5/13

2. State of Alaska vs. Alfred John Minder. Case No. 4FA-13-425 CR: In the District Court for the
State of Alaska Fourth Judicial District
      For defense
      Traffic Stop/Arrest
      Suppression Hearing: 7/13

3. State of Alaska vs. Alfred John Minder. Case No. 4FA-13-425 CR: In the District Court for the
State of Alaska Fourth Judicial District
      For defense
      Traffic Stop/Arrest
      Suppression Hearing: 10/13

Trial testimony in last four years:

1. Robert Brewer Plaintiff vs. Ed Rodgers, et. al; United States District Court, Eastern District Of
Kentucky Central Division at Lexington; Civil Action No. 5:08-23
      For Plaintiff
      Use of deadly force
      Trial date (3rd trial): 11/10

2. Tracy Watson, Renee Stalker, Pam Stalker, Guardian ad litem for minors v. County of Santa
Clara, et. al. Case No. C06-4029 RMW In the United States District Court Northern District of
California San Jose Division
      For Plaintiff
      Investigative procedures
      Trial: 3/11

3. Ueketta Jimerson v. Village of Skokie and Detective Will Zahn; 08 L 4824, Cook County
   Circuit Court
       For defense
       Investigative procedures/Arrest/Probable cause
       Trial: 2/12

4. Steve C. Thornton and Judith E. Thornton v. Thomas Carpenter, et. al., In the United States
   District Court for Southern District of Mississippi, Cause No. 3:09 cv 323 HTW-LRA
       For Plaintiff
       Arrest / Investigative detention / Use of force
       Trial: 7/12

5. Jacob Rush, individually and as administrator of the estate of Gilbert Rush Jr., et. al. v. City of
   Mansfield, Ohio, et. al. Civil No. 1:07-cv-01068. In the United States District Court Northern
   District of Ohio Eastern Division
       For Plaintiff
       Raid planning / Use of deadly force
       Trial deposition: 10/12

6. Edith Lynn Marques, et. al. vs. Pima County Sheriff Clarence W. Dupnik, et. al. No. C2011
   8159 in the Superior Court of the State of Arizona in and for the County of Pima
       For Plaintiff
       Police pursuit
       Trial: 1/13

7. Salanitro v. Altiere, Wheaton, and Washington County; United States District Court
   Case No. 3:11-CV-1051-S1
       For Plaintiff
       Use of Deadly Force / Arrest
       Trial: 2/13

8. James I. Huebner v. Brad D. Ware, et. al., Case No. 09-CV-1295 IN the State of Wisconsin
   Circuit Court Branch 10, Dane County
       For Plaintiff
       Motor vehicle stops/Use of force
       Trial: 4/13

9. Ty Evans v. Frank Poston et. al., No. 1:07-CV-0592-DFH-JMS; In the United States District
   Court for the Southern District of Indiana
       For plaintiff
       Use of force
       Trial: 11/13

10. Cause No. 2:13cv105; Elizabeth Lawson v. Marion County, Texas, et. al., In the United
    States District Court for the Eastern District of Texas – Marshall Division
        For plaintiff
        Use of force
        Trial: 2/14

## APPENDIX #3 - CURRICULUM VITAE: MICHAEL D. LYMAN, PH.D.

### CURRENT POSITION

Business address:     Columbia College of Missouri
                      1001 Rogers Street
                      Columbia, MO 65203
                      Office (573) 875-7472

Residence:            3703 Hunter Valley Drive
                      Columbia, MO 65203

                      Cellular: 573.268.4224

**Rank:**        Professor of Criminal Justice
                 Service from: August 1989 to Present

**Responsibilities:**

- Graduate Coordinator: Master of Science of Criminal Justice degree program
- Developed the curriculum for the Master of Science in Criminal Justice (MSCJ) program
- Developed curriculum for Bachelor of Science of Forensic Science degree program
- Former department chairman from 1989-2001
- Undergraduate courses taught include Introduction to Criminal Justice; Policing in America; Criminal Investigation; Management of Criminal Justice Agencies. Graduate courses taught include: Development of Standard Operating Procedure; Policy Development and Evaluation; Current Issues and Future Directions in Criminal Justice

### PREVIOUS EMPLOYMENT

#### General Background:

As a law enforcement officer I have participated in over 600 felony arrests and testified in over 250 criminal trials and hearings. I also regularly sat on shooting and disciplinary boards and served as lead investigator in numerous internal affairs investigations.

I have also been the lead investigator in cases involving numerous crimes. These include but are not limited to: murder, extortion, arson, drug trafficking, corruption, rape, burglary, robbery, assault, organized crime investigations. In this capacity I have developed and managed informants, worked with witnesses, victims, newspaper reporters, federal agencies and working undercover in criminal investigations. Duties have included surveillance operations; interviews of witnesses; interrogations of suspects; arrests; searches & seizures, etc.

#### Certified Generalist Instructor - The University of Missouri-Columbia

                          Law Enforcement Training Institute - School of Law
                          321 Hearnes Center
                          Columbia, Missouri 65211
                          From - 7-15-86 to 8-15-89
*Responsibilities*:      Instructed police office recruits in police academy in the
                          areas of criminal investigation, interviews & interrogations,
                          informant management, use of force, felony arrests,
                          professional ethics Police academy program
                          coordinator keynote speaker at academy graduations

## The Oklahoma Bureau of Narcotics and Dangerous Drugs (state police bureau)

4545 North Lincoln Blvd.
Oklahoma City, Oklahoma  73102
Position –Criminal Investigator

Responsibilities:    Originated and managed large-scale criminal investigations throughout the State of Oklahoma; testified in criminal court on both the federal and state level; made arrests; served search warrants; conducted interrogations; served on personnel hiring boards; disciplinary boards; shooting review and promotion boards; conducted background investigations of prospective recruits and conducted numerous internal affairs investigations as Sr. investigator; testified in two congressional hearings.

I also served as training and field training officer (FTO) for new recruits for over four years.

From - 10/1/81 to 7/9/86

## The Kansas Bureau of Investigation (state police investigative bureau)

1620 Tyler
Topeka, Kansas  66612
Position –Criminal Investigator

Responsibilities:    Originated and managed large-scale criminal investigations throughout the State of Kansas; testified in criminal court on both the federal and state level; made arrests; served search warrants; conducted interviews and interrogations; conducted numerous internal affairs and pre-employment background investigations.

From - 6/75 to 10/80

## Agent – City County Investigative Squad (Johnson County, Kansas)

Johnson County Courthouse, Olathe, Kansas (Kansas City Metro Area) Task Force concept utilizing officers on loan from 13 jurisdictions. This unit is no longer in existence as it operated on grant money which was depleted during the early 1980s.
Position –Criminal Investigator (civilian)

Responsibilities:    Initiated full-scale criminal investigations at the direction of the unit Manager; enforced the laws of the State of Kansas; assisted in conducting arrests and serving search warrants; developed and managed informants; testified in criminal hearings and trials; conducted interviews and interrogations.

From - 6/74 to 6/75

**Visiting Professor – University of Oklahoma**

Norman, Oklahoma
From 1986-1989

In this capacity I was brought to Oklahoma three times each year (December, May and August intercessions) for a period of nine years to teach courses in the law Enforcement Administration Program.

## PUBLICATIONS

**Textbooks:**

1. Lyman, M. D. & G. W. Potter (2015). Organized Crime, 6th ed . Prentice Hall: Upper Saddle River, NJ

2. Lyman, M. D. (2014). Criminal Investigation: The Art and the Science, 7th ed. Prentice Hall: Upper Saddle River, NJ.

3. Lyman, M. D. & G. W. Potter (2014). Drugs in Society: Causes, Concepts and Control, 7th ed. Elsevier/Anderson Publishing: Cincinnati, OH. (Released September 2013)

4. Lyman, M. D. (2013). Criminal Investigation (Justice Series). Pearson Education: Columbus, OH.

5. Lyman, M. D. (2010). The Police: An Introduction, 4th ed. Prentice Hall: Upper Saddle River, NJ. Fourth Edition due out in May 2009.

6. Lyman, M. D. (2007). Practical Drug Enforcement, 3rd ed. CRC Press: Boca Raton, FL

7. Lyman, M. D. (1989). Gangland: Drug Trafficking by Organized Criminals. Springfield, IL: Charles Thomas Publisher

8. Lyman, M. D. (1987). Narcotics and Crime Control. Springfield, IL: Charles Thomas Publisher

**Articles / Essays:**

Lyman, M. (2005). "Drug Enforcement in the United States." An essay for The Encyclopedia of Law Enforcement, Sage Publications: Thousand Oaks, CA.

Lyman, M. (2005). "Undercover Operations." An essay for The Encyclopedia of Law Enforcement, Sage Publications: Thousand Oaks, CA.

Lyman, M. (2004). The Decision to Chase: Revisiting Police Pursuits and the appropriateness of Action. The Police Forum Journal.

Lyman, M. (2004). "Transnational Organized Crime." An essay for The Encyclopedia of Murder & Violent Crime; Eric Hickey Editor. Sage Publications: Thousand Oaks, CA.

Lyman, M. (2004). "Domestic Organized Crime." An essay for The Encyclopedia of Murder & Violent Crime. Sage Publications: Thousand Oaks, CA.

## AWARDS

- <u>2004 Community Partner Award</u> presented by the Columbia Missouri Police Foundation, February 2004.
- <u>Police Instructor of the Year Award</u> presented by the Missouri Department of Public Safety, Peace Officer's Standards and Training (POST). Presented April 1989.

- <u>Meritorious Award for Independent Study Course</u> presented by the National University Continuing Education Association. April 1989.

## ACADEMIC BACKGROUND

- <u>Doctor of Philosophy (1992)</u> Higher and Adult Education and Foundations. University of Missouri-Columbia, Columbia, Missouri

- <u>Master of Science in Administration of Justice – Police Agency Management (1979)</u> Wichita State University Graduate School, Wichita, Kansas

- <u>Bachelor of Science in Administration of Justice (1977)</u> Wichita State University, Wichita, Kansas

- Successfully completed 16-hour Taser Instructor course in April 2009

## CONSULTING

- I have been practicing as an expert witness/consultant since 2001 and as such have sat on both sides of the table evaluating cases for both plaintiff and defense. Of the cases I have accepted for review, approximately 85 percent are for the plaintiff and 15 percent for the defense. Thus far, I have reviewed over 275 cases in over thirty states and have provided expert testimony on approximately 163 occasions. I have also testified in at trial numerous 1983 civil federal actions. For the most part, my expertise is in the area of use of force but I have provided testimony in the areas of proper investigative procedures and police supervision. I consider cases for both defense and plaintiff, and favor neither.

- In April 2009 I consulted for a Hollywood production company by reviewed and providing creative feedback on a screenplay for a television pilot. The company, Saint of Circumstance Productions is a Twentieth Century Fox Company.

- I have served as consultant for the Federal Research Division of the U.S. Library of Congress and the Director of Central Intelligence Crime and Narcotics Center in Washington DC (in January 2003.)

- I have conducted police training seminars for the Public Agency Training Council located at 5101 Decatur Blvd. Ste. L., Indianapolis, IN. Topics included: criminal investigation; undercover operations and informant management (in Columbus, OH (1989-1991).

- In 2006 I, along with two police detectives, wrote a model policy and companion paper on digital crime scene photography for the International Association of Chiefs of Police (IACP), which is used as a national guideline for police policy development. This model policy is currently available through the IACP.

## ORGANIZATIONAL AFFILIATIONS

- International Association of Chief's of Police (IACP)
- Academy of Criminal Justice Sciences (ACJS)
- American Society of Criminology (ASC)
- American Academy of Forensic Science (AAFS
- American College of Forensic Examiners International (ACFEI)
- The International Association for the Study of Organized Crime (IASOC)